**FILED**
CLERK, U.S. DISTRICT COURT

**9/26/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CDO___ **DEPUTY**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2024 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR  2:24-cr-00569-MEMF |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 371: Conspiracy to Defraud the United States; 18 U.S.C. § 371: Conspiracy to Commit Wire Fraud and Fraud in Connection with Purchase and Sale of Securities; 18 U.S.C. § 1343: Wire Fraud; 26 U.S.C. § 7206(2): Assisting in the Preparation of False Tax Return; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| PAUL A. BILZERIAN, SCOTT ROHLEDER, and IGNITE INTERNATIONAL BRANDS, LTD., | |
| Defendants. | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

[ALL DEFENDANTS]

A.   INTRODUCTORY ALLEGATIONS

1.   At times relevant to this Indictment:

a.   Defendant PAUL A. BILZERIAN was a resident of St. Kitts and Nevis and previously an American businessman and corporate raider.  In 1989, defendant BILZERIAN was convicted of securities

fraud, among other charges, in the United States District Court for the Southern District of New York and sentenced to four years' imprisonment.

b.    In 1989, the United States Securities and Exchange Commission ("SEC") brought a civil action against defendant BILZERIAN in the United States District Court for the District of Columbia based on the same underlying conduct as the criminal case (the "SEC Case").  In 1993, the SEC obtained civil judgments totaling approximately $62,337,600 against defendant BILZERIAN (the "SEC Judgment"), including more than $33 million in disgorgement and more than $29 million in prejudgment interest.  Since then, defendant BILZERIAN has evaded enforcement of the judgments.

c.    In 2000, the United States District Court for the District of Columbia found defendant BILZERIAN in contempt of the SEC Judgment and appointed a receiver to collect defendant BILZERIAN's assets to effectuate the SEC Judgment.  In 2001, when defendant BILZERIAN continued to evade the SEC Judgment, the same court held defendant BILZERIAN in contempt of the receivership order.  Since then, the SEC has reported that it has only been successful in recovering a net amount of approximately $547,000 toward satisfaction of the SEC Judgment.  With interest, the amount of the SEC Judgment now exceeds $180 million.

d.    D.B. was defendant BILZERIAN's son.  D.B. was a professional poker player and social media influencer who gained notoriety for portraying his conspicuous lifestyle on social media, including photographs and videos depicting him partying with scantily clad women, jet-skiing, drinking, smoking, shooting large guns, spending time on boats and beaches, and flying around the world in

private jets.  D.B.'s primary residence was a mansion located on West Patrick Lane in Las Vegas, Nevada (the "Patrick Lane Mansion").

e.  Defendant SCOTT ROHLEDER was a resident of North Carolina and Florida and a certified public accountant.  Since at least 2018, defendant ROHLEDER worked for defendant BILZERIAN and his various business interests in a number of roles.  Defendant ROHLEDER also regularly assisted in the preparation of D.B.'s tax returns.

f.  Defendant IGNITE INTERNATIONAL BRANDS, LTD. ("IGNITE") was a publicly traded company that marketed itself as a "lifestyle brand," selling vape pens, liquor, clothing, cannabidiol products, and various other products inspired by the persona that D.B. portrayed on his social media accounts.  Beginning in 2019, shares of defendant IGNITE were publicly traded over the counter in United States securities markets under the symbol "BILZF" and constituted "securities" within the meaning of the Securities Exchange Act of 1934.  Soon after going public, defendant IGNITE completed a reverse takeover with Ignite International Ltd. ("Ignite US"), formerly Vulcan Enterprises Ltd., making Ignite US a wholly owned subsidiary of defendant IGNITE.  Defendant IGNITE primarily operated out of its offices in Los Angeles, California, and Vaughan, Canada.  Putatively, D.B. was the Chief Executive Officer ("CEO"), founder, and Chairman of defendant IGNITE.  Defendant ROHLEDER held various roles at defendant IGNITE, including Chief Financial Officer.

g.  G.G.-P. was a resident of St. Kitts and Nevis and an associate of defendant BILZERIAN.  G.G.-P. was elected to defendant IGNITE's board of directors in July 2020.

h.  International Investments Ltd. ("International Investments") was a business entity based in St. Kitts and Nevis and

3

originally incorporated in February 2007.  Initially, International Investments was nominally owned by V.V. and defendant BILZERIAN's other son, A.B.  Eventually, nominal ownership in International Investments was transferred to Another Dimension Ltd., which was owned by G.G.-P.  In truth, G.G.-P. served as a straw owner for International Investments, which operated at the direction of and for the benefit of defendant BILZERIAN.  Through International Investments and other corporate entities, defendant BILZERIAN funneled millions of dollars into defendant IGNITE.

       i.    Rohleder, Inc., was a Florida corporation operating out of North Carolina.  While defendant ROHLEDER was nominally the president and director of Rohleder, Inc., he operated the company at the direction of and for the benefit of defendant BILZERIAN.

B.   <u>CONSPIRACY TO DEFRAUD THE UNITED STATES</u>

2.   Beginning no later than in or about December 2018, and continuing through at least September 26, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendants BILZERIAN, ROHLEDER, and IGNITE, knowingly and willfully conspired with one another, and with others known and unknown to the Grand Jury, to defraud the United States and agencies thereof, namely, the SEC, by impeding, impairing, obstructing, and defeating the lawful government functions of the SEC with respect to collection of the SEC Judgment by deceitful and dishonest means.

C.   <u>MANNER AND MEANS OF THE CONSPIRACY</u>

3.   The object of the conspiracy was carried out, and was to be carried out, in substance, as follows:

       a.    Defendant BILZERIAN would cause the incorporation of businesses operated at his direction and for his benefit but

nominally under the ownership of other individuals, including but not limited to International Investments, Vulcan Enterprises, Ltd., and Veritas Investments (the "PAUL BILZERIAN Entities").

b. To avoid satisfying his obligation in the SEC case, defendant BILZERIAN would falsely represent that he was indigent and unable to pay the SEC Judgment, including through filing an application to proceed in forma pauperis, claiming in that the only asset he possessed was a purported federal tax refund claim, and providing tax returns and financial disclosures omitting the considerable assets he held in the PAUL BILZERIAN Entities.

c. To continue to deploy his considerable wealth in the United States while evading the SEC Judgment, defendant BILZERIAN would funnel millions of dollars of his assets to capitalize defendant IGNITE while concealing his role in defendant IGNITE's ownership and management through nominees.

i. Defendant BILZERIAN would invest millions of dollars to acquire shares in defendant IGNITE through the PAUL BILZERIAN Entities. With assistance from defendant ROHLEDER, defendant BILZERIAN also would lend millions of dollars more to defendant IGNITE through the PAUL BILZERIAN Entities, including more than a dozen promissory notes totaling more than $20 million for short-term or convertible debt.

ii. Although D.B. was nominally the CEO of defendant IGNITE, in truth, defendant BILZERIAN exercised de facto control at defendant IGNITE. Together with defendant ROHLEDER, defendant BILZERIAN would oversee operations, strategy, marketing, and fundraising at defendant IGNITE, to the point of holding daily management meetings. As a beneficial owner of defendant IGNITE,

defendant BILZERIAN also would exert significant influence in decisions to hire and fire defendant IGNITE's executives and members of the board of directors.

iii. At defendant BILZERIAN's direction, defendant ROHLEDER would assist in deploying defendant BILZERIAN's assets to capitalize defendant IGNITE, including by using entities controlled by defendant ROHLEDER, including Rohleder, Inc., as a vehicle to hold and transfer assets belonging to International Investments.

iv. Despite defendant BILZERIAN's prominent leadership role at defendant IGNITE, defendants BILZERIAN, ROHLEDER, and IGNITE would conceal his role, including by omitting his name in publicly filed disclosures. Additionally, while defendant IGNITE would publicly disclose the numerous promissory notes it entered into with International Investments, it would conceal that International Investments and its assets were controlled by and belonged to defendant BILZERIAN and that defendant BILZERIAN was a major shareholder in defendant IGNITE through shares held by the PAUL BILZERIAN Entities.

d. After learning federal authorities had become aware of defendant BILZERIAN's involvement in defendant IGNITE, defendant IGNITE would seek to misleadingly downplay that involvement by issuing a press release mischaracterizing defendants BILZERIAN and ROHLEDER as "unpaid consultants" to defendant IGNITE. In truth, as defendant IGNITE then knew, defendant BILZERIAN was the de facto head and beneficial owner of defendant IGNITE, and defendant ROHLEDER was a de facto executive of defendant IGNITE.

D.    OVERT ACTS

     4.    On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants BILZERIAN, ROHLEDER, and IGNITE, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Central District of California and elsewhere:

     Overt Act No. 1:    On April 16, 2018, defendant BILZERIAN filed a motion to proceed in forma pauperis in the SEC case in which he listed $740 in gross monthly wages, $260 held in checking and savings accounts, and a purported joint tax refund claim for $8,243,125.

     Overt Act No. 2:    On July 3, 2018, defendant BILZERIAN sent an email to the SEC offering to resolve the SEC Judgment by giving the SEC 90 percent of a purported federal tax refund, which defendant BILZERIAN stated "is essentially the only asset I have to work with."

     Overt Act No. 3:    On July 10, 2018, defendant BILZERIAN submitted to the SEC an IRS Form 433-A in which he listed a gross monthly income of $2,738, cash holdings of $10, no personal bank accounts, no investments, no real property, no personal assets, and no credit.

     Overt Act No. 4:    On May 16, 2019, defendant BILZERIAN caused International Investments to make a $3 million loan to Ignite Distribution, LLC, a subsidiary of defendant IGNITE.

     Overt Act No. 5:    On July 15, 2019, defendant BILZERIAN sent an email to the SEC asking the agency to stop garnishing his Social Security payments, stating "As you know, I have filed bankruptcy twice and a receiver confiscated and liquidated all my assets, including my wages . . . ."

<u>Overt Act No. 6:</u>   On June 8, 2020, defendant BILZERIAN caused International Investments to make a $5 million (Canadian or "CAD") loan to defendant IGNITE.

<u>Overt Act No. 7:</u>   On June 11, 2020, defendant BILZERIAN caused International Investments to make a $3.35 million loan to defendant IGNITE.

<u>Overt Act No. 8:</u>   On November 16, 2020, defendant BILZERIAN caused International Investments to make a $6.5 million CAD loan to defendant IGNITE.

<u>Overt Act No. 9:</u>   On January 27, 2021, defendant BILZERIAN caused International Investments to make a $3.2 million CAD loan to defendant IGNITE.

<u>Overt Act No. 10:</u>   On February 6, 2021, in an email to defendant IGNITE's CFO, President, and defendant ROHLEDER, defendant BILZERIAN directed defendant IGNITE's CFO to account for the $4.63 million accounts receivable owed by International Investments for defendant IGNITE's vape product inventory by offsetting a $5 million note obligation that defendant IGNITE owed to International Investments.

<u>Overt Act No. 11:</u>   On March 7, 2021, in an email to defendant IGNITE's CFO, President, and defendant ROHLEDER, defendant BILZERIAN directed defendant IGNITE's CFO that "All invoices and payments will need to go to Rohleder, Inc. (Scott) which will collect the funds on behalf of [International Investments]."

<u>Overt Act No. 12:</u>   On May 24, 2021, defendant BILZERIAN caused International Investments to make a $1.5 million loan to defendant IGNITE.

1      Overt Act No. 13:   On October 14, 2021, defendant BILZERIAN

2 caused International Investments to make a $1.886 million loan to

3 defendant IGNITE.

4      Overt Act No. 14:   On December 21, 2021, defendant IGNITE

5 issued a press release misleadingly characterizing defendants

6 BILZERIAN and ROHLEDER as having served as "unpaid consultants" for

7 defendant IGNITE.

8      Overt Act No. 15:   On a date before September 19, 2024,

9 defendant BILZERIAN wrote in an email to a journalist that he had

10 never owned shares in, or controlled, International Investments.

1      COUNT TWO

2      [18 U.S.C. § 371]

3      [ALL DEFENDANTS]

4      5.   The Grand Jury realleges paragraph 1 of this Indictment

5 here.

6 A.   INTRODUCTORY ALLEGATIONS

7      6.   At times relevant to this Indictment:

8           a.   Beginning in or around October 2020, defendant IGNITE

9 contracted with Company 1, a company located in Phoenix, Arizona, to

10 serve as both a distributor and a third-party logistics company

11 ("3PL") for defendant IGNITE's products, including vaping products,

12 which largely were imported into the United States from foreign

13 nations, including the People's Republic of China.  In its role as

14 3PL, Company 1 would store defendant IGNITE's products in a

15 designated 3PL section of Company 1's warehouse.  When defendant

16 IGNITE notified Company 1 of a purchase order placed by a customer,

17 Company 1 would package and ship defendant IGNITE's products to the

18 customer.  By contrast, when Company 1 purchased defendant IGNITE

19 products in its role as a distributor, Company 1 would submit a

20 purchase order to defendant IGNITE and would move the purchased

21 products from defendant IGNITE's 3PL section of the warehouse over to

22 Company 1's designated section.

23           b.   In or around November 2020, defendant IGNITE began

24 ordering large shipments of vape products from China and storing them

25 in its designated 3PL section of Company 1's warehouse.  On or about

26 December 15, 2020, Company 1 clarified to defendant IGNITE that

27 Company 1 was storing the inventory in defendant IGNITE's 3PL

28 section, not purchasing it.  Defendant IGNITE's then-President

1  confirmed his understanding that Company 1 had not purchased this

2  inventory.

3         c.    On or about January 16, 2021, in response to an email

4  from defendant BILZERIAN on behalf of defendant IGNITE, Company 1's

5  principal reiterated to defendants BILZERIAN and IGNITE that Company

6  1 had not purchased the large quantity of vape product inventory

7  being stored at Company 1's warehouse and that the inventory still

8  belonged to defendant IGNITE.

9  B.    OBJECTS OF THE CONSPIRACY

10        7.    Beginning no later than in or about October 2020, and

11 continuing through September 26, 2024, in Los Angeles County, within

12 the Central District of California, and elsewhere, defendants

13 BILZERIAN, ROHLEDER, and IGNITE conspired with one another and with

14 others known and unknown to the Grand Jury to commit the following

15 offenses:

16        a.    Wire Fraud, in violation of Title 18, United States

17 Code, Section 1343; and

18        b.    Fraud in Connection with the Purchase and Sale of

19 Securities, in violation of Title 15, United States Code,

20 Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations,

21 Section 240.10b-5.

22 C.    MANNER AND MEANS OF THE CONSPIRACY

23        8.    The objects of the conspiracy were carried out, and were to

24 be carried out, in substance, as follows:

25        a.    To create the false impression among investors that

26 its sales were both sizeable and growing, thereby increasing the

27 value of its shares, defendant IGNITE would issue press releases that

28

inflated sales figures in 2020 by including unsold inventory stored by Company 1 in its capacity as defendant IGNITE's 3PL.

b.    When Company 1 refused to certify to defendant IGNITE's auditor that it had purchased the unsold inventory, defendant BILZERIAN, through foreign wire communications, would cause defendant IGNITE to sell approximately $4.63 million in vape product inventory to International Investments in exchange for extinguishing an equal amount of defendant IGNITE's debt that International Investments held in various convertible notes.

c.    Notwithstanding the sale of the vape product inventory to International Investments, at defendant BILZERIAN's direction, defendant IGNITE would continue to track the inventory and produce invoices for subsequent sales of the vape products -- behavior inconsistent with a bona fide sale to International Investments -- with all invoices and payments going through defendant ROHLEDER and Rohleder, Inc.

d.    Knowing that neither Company 1 nor International Investments had purchased the vape product inventory in December 2020, defendant ROHLEDER would falsely inform defendant IGNITE's auditor that the sale occurred in December 2020 and that International Investments stepped into the shoes of Company 1 as purchaser.

e.    Defendants BILZERIAN, ROHLEDER, and IGNITE would mislead investors into believing the sale to International Investments was a profitable, arms-length transaction, by:

i.    continuing to falsely backdate the sale of vape products to 2020 in public statements;

1      ii.   concealing the fact that International
2  Investments was a shell company controlled by defendant BILZERIAN,
3  and that defendant BILZERIAN also controlled defendant IGNITE; and
4      iii. failing to disclose that International
5  Investments was not a distributor or vendor or vape products and
6  therefore could only sell the inventory in competition with defendant
7  IGNITE, thereby undermining the latter's future sales.
8      9.   On January 19, 2021, after issuing its false and misleading
9  press release, defendant IGNITE's share price increased from
10  approximately $0.42 to $1.20 per share, representing a gain of
11  approximately $84 million in market capitalization.
12  D.   OVERT ACTS
13      10.  On or about the following dates, in furtherance of the
14  conspiracy and to accomplish its objects, defendants BILZERIAN,
15  ROHLEDER, and IGNITE, and others known and unknown to the Grand Jury,
16  committed the following overt acts, among others, in the Central
17  District of California and elsewhere:
18  Overt Act No. 1:    On January 19, 2021, defendant IGNITE issued
19  a press release stating, "Revenue grew steadily throughout the fourth
20  quarter beginning with a $1.2 million in October and increasing to
21  $3.7 million in November, followed by revenue of $5.2 million in
22  December."
23  Overt Act No. 2:    On January 28, 2021, defendant BILZERIAN
24  stated on a phone call with Company 1 personnel and others that, if
25  Company 1 refused to take financial responsibility for defendant
26  IGNITE's vape product inventory, then defendant BILZERIAN would pay
27  for the vape product inventory out of his own pocket.
28

1     <u>Overt Act No. 3:</u>    On February 6, 2021, in an email to
2  defendant IGNITE's CFO, President, and defendant ROHLEDER, defendant
3  BILZERIAN directed defendant IGNITE's CFO to account for the $4.63
4  million accounts receivable owed by International Investments for
5  defendant IGNITE's vape product inventory by offsetting a $5 million
6  note obligation that defendant IGNITE owed to International
7  Investments.

8     <u>Overt Act No. 4:</u>    On March 7, 2021, in an email to defendant
9  IGNITE's CFO, President, and defendant ROHLEDER, defendant BILZERIAN
10 instructed defendant IGNITE's CFO that "[a]ll invoices and payments
11 will need to go to Rohleder, Inc. (Scott) which will collect the
12 funds on behalf of [International Investments]."

13    <u>Overt Act No. 5:</u>    On April 6, 2021, in an email to members of
14 defendant IGNITE's auditor, defendant ROHLEDER claimed, as CFO for
15 International Investments, that latter had "stepped into the shoes of
16 [Company 1]" with respect to the purchase of vape products from
17 defendant IGNITE.

18    <u>Overt Act No. 6:</u>    On April 30, 2021, defendant IGNITE publicly
19 released consolidated financial statements for 2019 and 2020, listing
20 total sales of approximately $16,944,159 in 2020 and claiming that
21 International Investments "made purchases of product from Ignite of
22 $5,878,244 in 2020."

23

24

25

26

27

28

COUNTS THREE THROUGH SIX

[18 U.S.C. § 1343]

[ALL DEFENDANTS]

11.  The Grand Jury realleges paragraphs 1, 6, 8, 9 and 10 of this Indictment here.

A.  THE SCHEME TO DEFRAUD

12.  Beginning no later than in or about October 2020, and continuing through September 26, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendants BILZERIAN, ROHLEDER, and IGNITE, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud victim-investors as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises.

13.  The scheme to defraud operated, in substance, as described in paragraphs 6, 8, 9, and 10 of this Indictment.

B.  USE OF INTERSTATE AND FOREIGN WIRES

14.  On or about the dates set forth below, within the Central District of California, and elsewhere, for the purpose of executing the scheme to defraud described above, defendants BILZERIAN, ROHLEDER, and IGNITE transmitted and caused the transmission of the following items by means of wire communication in interstate and foreign commerce:

| COUNT | DEFENDANTS | DATE | INTERSTATE OR FOREIGN WIRE TRANSMISSION |
|-------|------------|------|----------------------------------------|
| THREE | BILZERIAN, IGNITE | 01/19/2021 | Press Release published on Canada's System for Electronic Document Analysis and Retrieval ("SEDAR") from defendant IGNITE falsely representing that "Revenue grew steadily throughout the fourth quarter beginning with a $1.2 million in October and increasing to $3.7 million in November, followed by revenue of $5.2 million in December." |
| FOUR | BILZERIAN, ROHLEDER, IGNITE | 02/06/2021 | Email from defendant BILZERIAN to defendant IGNITE's CFO, President, and defendant ROHLEDER, with subject line "Company 1 Reconciliation," directing CFO to account for International Investments' purchase of vape inventory by offsetting debt that defendant IGNITE owed to International Investments. |
| FIVE | BILZERIAN, ROHLEDER, IGNITE | 03/07/2021 | Email from defendant BILZERIAN to defendant IGNITE's CFO, President, and defendant ROHLEDER, with subject line "Aspire/II Sales," directing that "All invoices and payments will need to go to Rohleder, Inc. (Scott) which will collect the funds on behalf of II." |
| SIX | BILZERIAN, ROHLEDER, IGNITE | 04/30/2021 | Press Release published on SEDAR from defendant IGNITE falsely representing that "International Investments had principal and interest due to it of $10,719,785 as of December 31, 2020 and made purchases of product from Ignite of $5,878,244 in 2020." |

COUNTS SEVEN THROUGH NINE

[26 U.S.C. § 7206(2)]

[DEFENDANT ROHLEDER]

15.  The Grand Jury realleges paragraph 1 of this Indictment here.

16.  In or around May 2018, D.B. decided to purchase the Patrick Lane Mansion.  Ignite US paid approximately $8.5 million in cash for the property and, during escrow, assigned the property to a single-member LLC owned by D.B. ("LLC 1").

17.  In or around November 2018, with the initial public offering of defendant IGNITE looming, defendant ROHLEDER drafted two agreements, both backdated to June 2018, concerning the Patrick Lane Mansion.  One was a promissory note stating that Ignite US loaned LLC 1 approximately $8.5 million with an interest rate of 5 percent.  The second was a lease agreement to give the appearance that LLC 1 leased the Patrick Lane Mansion to Ignite US for a monthly rent of approximately $35,000.  As defendant ROHLEDER intended, these two agreements effectively cancelled each other out, as 5 percent interest on a $8.5 million loan amounts to roughly $35,000 per month.  By making it appear that D.B. was renting the Patrick Lane Mansion back to Ignite US, defendant ROHLEDER obviated the need for D.B. to make monthly payments to repay Ignite US.

18.  Defendant ROHLEDER assisted D.B. in the preparation of his personal tax returns for tax years 2018, 2019, and 2020.  Despite knowing that the Patrick Lane Mansion was D.B.'s primary residence during this period, defendant ROHLEDER knowingly provided D.B.'s tax preparer with financial statements for LLC 1 for tax years 2018, 2019, and 2020, that reported rental income and interest expenses in

17

connection with the Patrick Lane Mansion.  As a result, the Schedules E attached to D.B.'s Forms 1040 reported rental income, interest expenses, and/or depreciation for the Patrick Lane Mansion, resulting in improper deductions in D.B.'s tax returns.  For D.B.'s home address, defendant ROHLEDER provided D.B.'s tax preparer with an address that corresponded to a hangar at Harry Reid International Airport in Las Vegas, Nevada.

19.  To repay the promissory note between LLC 1 and Ignite US, defendant ROHLEDER drafted a Share Purchase Agreement dated November 20, 2018 between D.B. and Ignite US, whereby D.B. sold 2.5 million of his Ignite US shares back to Ignite US at the price of $4.00 per share for a total of $10 million.  Under the agreement, approximately $8.7 million of the sale proceeds were used to pay off the promissory note to LLC 1 and its interest.  Because D.B. first acquired the Ignite US shares no earlier than December 28, 2017, the stock sale constituted a short-term capital gain that was supposed to be taxed as ordinary income.  Upon realizing this, and despite knowing that the stock sale occurred in November 2018, defendant ROHLEDER knowingly and falsely informed D.B.'s tax preparer that the stock sale occurred on December 30, 2018 so that it would appear to qualify as a "long-term" capital gain -- that is, capital held for more than one year -- which, for D.B., was taxable at a lower rate than ordinary income.

20.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant ROHLEDER willfully aided and assisted in, and procured, counseled, and advised, the preparation and presentation to the Internal Revenue Service, under, and in connection with a matter

arising under, the internal revenue laws, of the tax returns for taxpayer D.B. and other documents set forth below, which were fraudulent and false as to material matters, and thereby resulting in losses over the three years to the Internal Revenue Service of approximately $1,536,949:

| COUNT | CALENDAR YEAR | FILING DATE | TAX RETURNS CONTAINING MATERIALLY FALSE ITEMS |
|---|---|---|---|
| SEVEN | 2018 | 08/08/2019 | A 2018 United States Individual Income Tax Return, Form 1040, including (1) a fraudulent Schedule E form wherein the Patrick Lane Mansion is falsely alleged to be "rental real estate" and have been subject to 214 "fair rental days"; and (2) a fraudulent Form 8949 listing a false sale date of December 30, 2018, for shares of Vulcan Enterprises Ltd. |
| EIGHT | 2019 | 07/15/2020 | A 2019 United States Individual Income Tax Return, Form 1040, including a fraudulent Schedule E form wherein the Patrick Lane Mansion is falsely alleged to be "rental real estate" and have been subject to 365 "fair rental days" |
| NINE | 2020 | 10/15/2021 | A 2020 United States Individual Income Tax Return, Form 1040, including a fraudulent Schedule E form wherein the Patrick Lane Mansion is falsely alleged to be "rental real estate" and have been subject to 366 "fair rental days" |

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

21.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of any of the offenses set forth in Counts One through Six of this Indictment.

22.  Any defendant, if so convicted, shall forfeit to the United States of America the following:

a.   All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offense; and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

23.  Pursuant to Title 18, United States Code, Section 981(a)(1)(c), as incorporated by Title 28, United States Code, Section 2461(c), any defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has

been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/ _____
Foreperson

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

BRETT A. SAGEL
Assistant United States Attorney
Chief, Corporate and Securities
   Fraud Strike Force

ALEXANDER B. SCHWAB
Assistant United States Attorney
Deputy Chief, Corporate and
   Securities Fraud Strike Force

DAVID H. CHAO
Assistant United States Attorney
Deputy Chief, General Crimes Section