**EXHIBIT 2**

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) Case No. 1:89-cv-1854-RCL |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| PAUL A. BILZERIAN, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**NOTICE OF MOTION AND MOTION FOR RELIEF FROM FINAL JUDGMENT
UNDER RULE 60(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE
WITH INCORPORATED MEMORANDUM OF LAW**

Defendant Paul Bilzerian, by and through his attorney David I. Schoen, hereby files this Motion for Relief From Final Judgment Under Federal Rule of Civil Procedure 60(b). Mr. Bilzerian respectfully requests that this Court vacate the disgorgement judgment entered against him in accordance with *Liu v. Securities and Exchange Commission*, 591 U.S. 71 (2020), related authority, and subsequent legislative action.

Mr. Bilzerian, together with Scott Rohleder and Ignite International Brands, Ltd., has been indicted in *United States v. Bilzerian, et al,*, 24-cr-00569-MEMF (C.D.Cal Sept. 24, 2024). The criminal trial date is **November 3, 2024**. Count one of the indictment is predicated on alleged conspiratorial efforts to impede collection on the disgorgement ordered by this Court – the order that is the subject of this motion for relief.

i

## **LCvR 7(m) Certification**

I certify that I have contacted opposing counsel concerning this motion and I am authorized

to represent to the Court that this motion will be opposed.

Dated: August 20, 2025                                Respectfully submitted,

By: _____

DAVID I. SCHOEN
D.C. Bar No. 391408
SCHOEN LAW FIRM, LLC
2800 Zelda Road Suite 100-6
Montgomery, AL 36106
Tel: (917) 941-7952
Email: schoenlawfirm@gmail.com

ii

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................ 1

II.    PROCEDURAL BACKGROUND.................................................................................. 5

        A.  The SEC Judgment ................................................................................. 5

        B.  The Receivership .................................................................................... 6

        C.  The September 2024 Indictment........................................................... 7

III.   LEGAL STANDARD AND ARGUMENT ...................................................... 7

        A.  Relief is Warranted Under Rule 60(b)(4) ........................................... 7

        B.  Relief is Warranted Under Rule 60(b)(5) ......................................... 10

        C.  Relief is Warranted Under Rule 60(b)(6) ......................................... 11

      1. The *Liu* Holding Materially Altered the Law Governing Disgorgement and Resolved an Unsettled Legal Question ........................................................... 12

      2. Mr. Bilzerian Acted Diligently and Promptly Once the Judgment Regained Legal Consequence ................................................................................................... 13

      3. The Use of the Judgment as a Basis for the Pending Criminal Case Undermines Any Reliance on Its Finality...................................................................... 14

    4. No Comity Concerns Are Implicated by Reopening the Judgment.................. 15

    5. The Judgment Has Been Fundamentally Undermined by Intervening Law and Constitutional Concerns................................................................................. 15

          a.  The Legal Change in *Liu* Invalidates the Basis for the Disgorgement Judgment................................................................. 15

            1. Disgorgement was Improper Because There Were No Victims ............................................................................................ 16

            2. The Disgorgement was Improper Because It was Not Based on Net Profits ................................................................................. 18

b. The Disgorgement Judgment Violates the Double Jeopardy Clause Because it Amounts to a Punishment .......................................... 18

1. Affirmative Disability or Restraint ......................................... 20

2. Historically Regarded as Punishment ..................................... 21

3. Scienter ................................................................................... 21

4. Retribution and Deterrence ..................................................... 22

5. Already a Crime ...................................................................... 24

6. Alternative Purpose ................................................................ 24

7. Excessive in Relation to Alternative Purpose ......................... 25

c. The Disgorgement Judgment Violates the Excessive Fines Clause ...................................................................................................... 27

IV. CONCLUSION ..................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Agostini v. Felton*,
521 U.S. 203 (1997).................................................................................3, 11

*Austin v. Smith*,
312 F.2d 337 (D.C.Cir.1962).............................................................................8

*Austin v. United States*,
509 U.S. 602 (1993)...............................................................................4, 26, 27

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
734 F.3d 1175 (D.C. Cir. 2013)..........................................................................8

*Bellevue Manor Assocs. v. United States*,
165 F.3d 1249 (9th Cir. 1999) .........................................................................10

*In re Brown*,
547 B.R. 846 (Bankr. S.D. Cal. 2016) .............................................................11

*Bryson v. Gere*,
268 F.Supp.2d 46 (D.D.C. 2003) ......................................................................2

*Bynoe v. Baca*,
966 F.3d 972 (9th Cir. 2020) ...........................................................................12

*Crosby v. Bradstreet Co.*,
312 F.2d 483 (2d Cir. 1963).............................................................................9

*Gonzalez v. Crosby*,
545 U.S. 524 (2005)..........................................................................................11

*Gschwind v. Cessna Aircraft Co.*,
232 F.3d 1342 (10th Cir. 2000) ........................................................................9

*Horne v. Flores*,
557 U.S. 433 (2009)....................................................................................10, 11

*Hudson v. United States*,
522 U.S. 93 (1997)..................................................................................... *passim*

*Jordan v. U.S. Dep't of Lab.*,
331 F.R.D. 444 (D.D.C. 2019).........................................................................10

*Kalb v. Feuerstein*,
308 U.S. 433 (1940)............................................................................................8

*Kemp v. United States*,
   596 U.S. 528 (2022)....................................................................................3, 11

*Kokesh v. S.E.C.*,
   581 U.S. 455 (2017)........................................................................... *passim*

*Liljeberg v. Health Servs. Acquisition Corp.*,
   486 U.S. 847 (1988)...................................................................................11, 13

*Liu v. Securities and Exchange Commission*,
   591 U.S. 71 (2020)............................................................................. *passim*

*Martinez v. Shinn*,
   33 F.4th 1254 (9th Cir. 2022) ............................................................................11

*Phelps v. Alameida*,
   569 F.3d 1120 (9th Cir. 2009) .......................................................................13, 14

*Riley v. BMO Harris Bank, N.A.*,
   115 F. Supp. 3d 87 (D.D.C. 2015).....................................................................11

*Rivers v. Roadway Exp., Inc.*,
   511 U.S. 298 (1994)..............................................................................1, 4, 9

*Saad v. Sec. & Exch. Comm'n*,
   873 F.3d 297 (D.C. Cir. 2017) .................................................................17, 22, 23

*Salazar ex rel. Salazar v. D.C.*,
   633 F.3d 1110 (D.C. Cir. 2011).....................................................................3, 13

*Salazar v. District of Columbia*,
   729 F. Supp. 2d 257 (D.D.C. 2010) ...................................................................10

*Sec & Exch. Comm'n v. Bronson*,
   602 F. Supp. 3d 599 (S.D.N.Y. 2022)................................................................11

*Sec & Exch. Comm'n v. Ahmed*,
   72 F.4th 379 (2d Cir. 2023) ..........................................................................3, 8

*Sec & Exch. Comm'n v. Bilzerian*,
   1991 WL 83964 (D.D.C. 1991) .........................................................................6

*Sec & Exch. Comm'n v. Bilzerian*,
   No. 89-cv-1854 (D.D.C. June 29, 1989)..............................................................5

*Sec & Exch. Comm'n . v. Bilzerian*,
   814 F. Supp. 116 (D.D.C. 1993).............................................................. *passim*

vi

*Sec & Exch. Comm'n v. Crystal World Holdings, Inc.,
  2025 U.S. Dist. LEXIS 16001, 2025 WL 326593 (D.D.C., January 26, 2025)..................8, 16

*Sec & Exch. Comm'n v. Govil,
  86 F.4th 89 (2d Cir. 2023) ............................................................................... passim

*Sec & Exch. Comm'n v. Ripple Labs, Inc.
  2024 U.S. Dist. 140766, 2024 WL 3730403 (S.D.N.Y., August 7, 2024) ..............................17

United States v. Bilzerian et al.,
  24-cr-00569-MEMF (C.D. Cal. 2024)............................................................... passim

United States v. Bajakajian,
  524 U.S. 321 (1998).........................................................................................27

United States v. Bank,
  965 F.3d 287 (4th Cir. 2020) ............................................................................ passim

United States v. Bilzerian,
  1993 WL 3013390 (S.D.N.Y Sept. 2, 1992)........................................................................5

United States v. Bilzerian,
  926 F.2d 1285 (2d Cir. 1991)........................................................................22

United States v. Bilzerian,
  88-cr-00962 (S.D.N.Y. Sept. 27, 1989) ................................................................5,6

*United States v. Halper,
  490 U.S. 435 (1989)........................................................................................18

United States v. Milheiser,
  98 F.4th 935 (9th Cir. 2024) ............................................................................17

United States v. Western Elec. Co.,
  46 F.3d 1198 (D.C. Cir. 1995)........................................................................10

United Student Aid Funds, Inc. v. Espinosa,
  559 U.S. 260 (2010)........................................................................................7, 8, 9

V. T. A., Inc. v. Airco, Inc.,
  597 F.2d 220 (10th Cir. 1979) ............................................................................9

Zacharias v. SEC,
  569 F.3d 458 (D.C. Cir. 2009) ............................................................................17

**Statutes**

15 U.S.C. § 78u(d) .............................................................................................. passim

18 U.S.C. § 371 ................................................................................................................7

**Other Authorities**

Federal Rules of Civil Procedure 60(b) ................................................................... passim

12 *Moore's Federal Practice* - Civil § 60.44 (2025) .......................................................8

12 *Moore's Federal Practice - Civil* § 60.47 (2025) .......................................................10

## I. INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendant respectfully moves this Court for relief from a final judgment pursuant to Federal Rules of Civil Procedure 60(b)(4), (5), or (6). This motion is based, *inter alia,* on the Supreme Court's decision in *Liu v. Securities and Exchange Commission,* 591 U.S. 71 (2020), and subsequent legislative action and case law, which has made clear that there is no authority under 15 U.S.C. § 78u(d)(5) to enter a disgorgement order unless the relief ordered (1) does not exceed the wrongdoer's net profits and (2) there are identifiable investors who suffered losses and the disgorgement is awarded for the benefit of the victims. *Id.* at 75.

In ordering disgorgement in 1993, this Court expressly rejected Mr. Bilzerian's argument that disgorgement must be tied to proof of harm, reasoning that "[d]isgorgement serves to force a defendant to relinquish the amount by which he was unjustly enriched rather than to compensate the victims of fraud." Dkt. 128 (*available as S.E.C. v. Bilzerian*, 814 F. Supp. 116, 124 n.18 (D.D.C. 1993)). The Court ordered disgorgement without regard to victim harm or net profits and did not direct the funds to victims, rendering the judgment invalid under the clarifications announced by the Supreme Court in *Liu*. *See Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 312–13 (1994) ("A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."). Legislative action taken after *Liu* further supports this principle concerning disgorgement, as will be discussed in further detail below.

Mr. Bilzerian now faces related criminal proceedings in the Central District of California based on this Court's 1993 disgorgement order.[1] The trial is set for **November 3, 2025.** The indictment in the Central District of California alleges a conspiracy to impede the SEC's

---

[1] *United States v. Bilzerian, et al,*, 24-cr-00569-MEMF (C.D.Cal Sept. 24, 2024).

collection of this Court's disgorgement order. Because of the imminent threat to his liberty as a function of the legally infirm disgorgement order, Mr. Bilzerian must now seek reconsideration of the prior, invalid, disgorgement judgment. Importantly, this is the only forum in which he may challenge the disgorgement order that is now underpinning criminal charges against him and others.[2] Given that *Liu* clarified that, under the facts here, disgorgement was always improper under the operative statute, the disgorgement order should be vacated and the judgment should be vacated under Rule 60(b)(4), (5) or (6).

As this Court has recognized, Rule 60(b) is a powerful tool that grants judges broad authority to accomplish justice in certain limited circumstances. *See Bryson v. Gere*, 268 F.Supp.2d 46, 53 (D.D.C. 2003) (Lamberth, J.)

*First,* the continued enforcement of an unconstitutional judgment through financial collection and new criminal charges, amounts to a violation of Mr. Bilzerian's right to due process, warranting relief under Rule 60(b)(4). The decision in *Liu* and relevant statutory amendments post-*Liu* make it clear that there never was any authority to enter a disgorgement order under the circumstances present here. Subsequent legislative and judicial developments make it clear that the disgorgement order in this case was void *ab initio*, making relief under Rule 60(b)(4) appropriate.

*Second,* Rule 60(b)(5) provides, *inter alia*, that an earlier judgment must be vacated or terminated when applying it prospectively is no longer equitable. Clearly, using this disgorgement order prospectively, knowing that it unquestionably was an invalid order for the

---

[2] Co-defendants in the California case, Scott Rohleder and Ignite International Brands, Ltd., moved to dismiss the indictment count connected to the disgorgement order. *See U.S. v. Bilzerian et al.*, 24-cr-00569-MEMF, Dkt. 76 (Mar. 11, 2025). The government opposed, arguing that any challenge to the disgorgement judgment was not cognizable before that Court and was an improper collateral attack. *Id.* Dkt. 90 (April 1, 2025). The court dismissed the motion. *Id.* Dkt. 118 (June 2, 2025).

2

reasons set out in *Liu*, in the manner the government seeks to use it – to pursue criminal charges and severe punitive penalties for its alleged violation – cannot be considered equitable. The intervening legislative action after *Liu* further makes clear both that the disgorgement order should be deemed void and that it would be inequitable to permit the order to stand.[3]

*Third*, a court must grant a Rule 60(b)(6) motion in the event of "extraordinary circumstances." Although an intervening change in law *alone* rarely amounts to extraordinary circumstances, courts may consider the change together with a wide range of factors including the risk of injustice to the parties, intervening developments of facts, and diligence in pursuing relief. *Agostini v. Felton*, 521 U.S. 203, 239 (1997); *Kemp v. United States*, 596 U.S. 528, 540 (2022) (*quoting Buck v. Davis*, 580 U.S. 100, 123 (2017)); *Salazar ex rel. Salazar v. D.C.*, 633 F.3d 1110, 1119 (D.C. Cir. 2011).

Here, relief is warranted based on extraordinary circumstances. First, *Liu* resolved an unsettled legal question regarding the lawful scope of disgorgement. Second, Mr. Bilzerian acted diligently upon the government's initiation of a related criminal proceeding premised on the now invalid disgorgement judgment. Third, the government's indisputably punitive use of the decades-old judgment in those criminal proceedings demonstrates an unacceptable risk of injustice to Mr. Bilzerian. Fourth, Mr. Bilzerian has no alternative forum in which to raise his constitutional challenge, as he is barred from collaterally attacking the judgment in the California criminal case. Finally, the disgorgement order is completely unmoored from victim harm and

---

[3] Six months after *Liu* was decided, Congress enacted several amendments to 15 U.S.C. § 78u(d). Among the amendments, Congress enacted 15 U.S.C. § 78u(d)(7), which gave the SEC the power to "seek" and federal courts the power to "order" disgorgement. This action by Congress reflects a change in the law intended to codify the limitations on a disgorgement order as set out in *Liu. See SEC v. Ahmed*, 72 F.4th 379, 395 (2d Cir. 2023); *SEC v. Govil*, 86 F.4th 89, 99-100 (2d Cir. 2023).

thus conflicts with the principles clarified in *Liu* and its interpretation of the statute authorizing disgorgement from the time the statute was enacted.

In addition, the unconstitutionality of the disgorgement order itself constitutes an extraordinary circumstance justifying relief under Rule 60(b)(6).

The judgment also raises serious concerns under both the Double Jeopardy Clause and the Eighth Amendment's Excessive Fines Clause, constitutional violations that weigh heavily in favor of vacating the judgment. Although courts have historically rejected double jeopardy arguments in the context of civil disgorgement, the decisions in *Hudson v. United States*, 522 U.S. 93, 104 (1997), *Kokesh v. S.E.C.*, 581 U.S. 455 (2017), and *United States v. Bank*, 965 F.3d 287 (4th Cir. 2020), recognize that ostensibly civil penalties may, in some cases, be so punitive in purpose or effect that they must be treated as criminal in nature. Here, under the factors articulated in *Hudson*, the disgorgement order in Mr. Bilzerian's case functioned as a criminal sanction.[4]

The disgorgement judgment also amounts to an excessive fine in violation of the Eighth Amendment. The Excessive Fines Clause prohibits the government from imposing a financial penalty that is grossly disproportionate to the offense. *Austin v. United States*, 509 U.S. 602, 609–610 (1993). Here, the disgorgement judgment had no relation to any measure of net profits,

---

[4] Although this Court previously rejected Mr. Bilzerian's double jeopardy argument, the preceding case law issued after the 1993 judgment nullifies the Court's prior rationale for denying the claim and confirms that Mr. Bilzerian's arguments were correct. *See Bilzerian*, 814 F. Supp. 116, 123 (D.D.C. 1993) (*citing United States v. Halper*, 490 U.S. 435 (1989) in denying double jeopardy claim); *see also Hudson*, 522 U.S. at 96 (*overruling Halper*, 490 U.S. 435); *Rivers*, 511 U.S. at 313 ("But when this Court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law. . . .Thus, it is not accurate to say that the Court's decision []"changed" the law that previously prevailed . .. Rather, [] the opinion finally decided what [the statute] had always meant and explained why the Courts of Appeals had misinterpreted the will of the enacting Congress.").

was never returned to victims, and lacked any legitimate remedial justification. Indeed, there were no victims ever identified rendering the disgorgement unconstitutionally excessive.

The factors set out above support the conclusion that relief under Rule 60(b)(4), (5) or (6) must be granted. The unconstitutionality of the judgment, when considered alongside the holding in *Liu*, and the attempt to use the legally and factually unsupportable disgorgement order prospectively more than 30 years later for related criminal proceedings, constitute the kind of extraordinary circumstances for which Rule 60(b) relief should be granted.

## II. PROCEDURAL BACKGROUND

### A. The SEC Judgment

Paul Bilzerian was convicted of securities fraud in 1989. *United States v. Bilzerian*, No. 88-cr-962 (S.D.N.Y.) ("S.D.N.Y. Criminal Case"). Importantly, the 1989 trial record contains no evidence of harm to any purported victim. To the contrary, the prosecutor expressly stated that the government was "*not required to prove any actual injury*." *See* Ex. 1, Crim. Trial Tr. at 1695, May 17, 1989 (emphasis added). Following his conviction, Mr. Bilzerian was sentenced to four years in prison (later reduced to 20 months) and paid a $1.5 million criminal fine. *See United States v. Bilzerian*, 1993 WL 3013390 (S.D.N.Y Sept. 2, 1992), attached for the Court's convenience as Ex. 2. At sentencing, the government offered no argument as to victim losses. *See* Ex. 3, Government's Sentencing Memorandum, *United States v. Bilzerian,* No. 88-cr-00962 (S.D.N.Y. Sept. 27, 1989). The judgment of conviction included no restitution order. *See* Ex. 4, *United States v. Bilzerian*, No. 88-cr-00962 (S.D.N.Y Sept. 29, 1989), Dkt. 47.

In the wake of the S.D.N.Y criminal case, the SEC filed a civil action against Bilzerian seeking disgorgement of purportedly wrongful profits. *See* Ex. 5, Complaint at 74, *SEC v. Bilzerian*, No. 89-cv-1854 (D.D.C. June 29, 1989). In 1991, this Court granted the SEC's motion

for partial summary judgment, holding that "since Bilzerian's [criminal] conviction was based on the same facts alleged by the Commission in support of certain of its claims with respect to these securities[,] Bilzerian is therefore collaterally estopped from relitigating the facts underlying his conviction." *SEC v. Bilzerian*, 1991 WL 83964, at *1 (D.D.C. 1991).

Because the AUSA never proved any victim harm in the S.D.N.Y criminal case, and this Court estopped Mr. Bilzerian from disputing the issue of victim harm, the Court failed to identify victims or calculate any harm to victims and proceeded to issue disgorgement untethered to victim harm, in the amount of $33,140.787.07 plus pre-judgment interest.[5] *Bilzerian*, 814 F. Supp. at 120. The Court calculated the disgorgement amount as equivalent to Mr. Bilzerian's alleged gross profit. No effort was made ever to distinguish between alleged gross and net profits. *Id*. at 123–24. The Court also concluded that there was no violation of the Double Jeopardy Clause under then-existing law. *Id*. at 120.

### B. The Receivership

In 2000, the Court appointed a Receiver and established a Receivership Estate "for the purpose of identifying, marshalling, receiving and liquidating [Bilzerian's] assets to satisfy the disgorgement judgments." Dkt. 185. The Court further ordered the Receiver have "exclusive control" of all of Mr. Bilzerian's accounts and Mr. Bilzerian and his agents to "give access to [any] assets, books, records or other property to the Receiver." Dkt. 210 at 3-4. The Receiver investigated the entities identified by the court as recipients of Mr. Bilzerian's funds and liquidated the assets she was able to locate. *See* Dkt. 1200-1. The Receiver's investigation led to

---

[5] The judgment did not require the disgorgement of funds that had already been disgorged or forfeited in the criminal case. *See Bilzerian*, 814 F. Supp. at 120 ("[T]he Court finds that defendant has merely been assessed a criminal penalty; he has not yet had his illicit profits ordered to be disgorged.").

the seizure of all assets and property traceable to Mr. Bilzerian. In 2015, the Receiver moved to terminate the receivership; Mr. Bilzerian objected only to the extent it provided for the continuation of the disgorgement judgments entered against him." *Id*. at 2. In 2016, the Court granted the Receiver's Motion "in its entirety," terminated the receivership, and ordered that "[t]he disgorgement judgments previously entered against Mr. Bilzerian in this case shall remain in full force and effect." Dkt. 1201 at 2.

### C. The September 2024 Indictment

On September 26, 2024, Mr. Bilzerian, Scott Rohleder, and Ignite International Brands, Ltd., were indicted by a grand jury in the Central District of California. *United States v. Bilzerian*, No. 2:24-cr-00569 (C.D. Cal. Sept. 26, 2024) (Indictment). Count 1 of the Indictment alleges that Mr. Bilzerian, Mr. Rohleder, and Ignite knowingly and willfully conspired with one another to defraud the United States by impeding the SEC's ability to collect on the disgorgement judgment, in violation of 18 U.S.C. § 371. Thus, the factual basis for the charge is entirely premised upon a disgorgement judgment which has no lawful basis under *Liu* and other more recent authority, and which must, therefore, be vacated.

## III. LEGAL STANDARD AND ARGUMENT

### A. Relief is Warranted Under Rule 60(b)(4)

Relief from a final judgment under Rule 60(b)(4) is available when the "judgement is void." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 279 (2010).

> A void judgment is a legal nullity. Although the term "void" describes a result, rather than the conditions that render a judgment unenforceable, it suffices to say that a void judgment is one so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final.

*Id*. at 270 (cleaned up).

A motion under Rule 60(b)(4) may be made at any time. *Austin v. Smith,* 312 F.2d 337, 343 (D.C.Cir.1962) (holding that Rule 60(b)(4) motions are not governed by a reasonable time restriction). Rule 60(b)(4) reflects the fundamental principle that a judgment must be void when a court lacks jurisdiction or there has been a violation of due process. *Espinosa*, 559 U.S. at 271. Due process violations justifying relief may arise when procedural deficiencies exist. *Id*. at 270–271. A judgment obtained in violation of the Double Jeopardy Clause is so "fundamentally infirm" that it amounts to a due process violation and the judgment may be considered void. The term "void" generally is limited in this context to a judgment from a court lacking jurisdiction or which conflicts with the defendant's right to due process of law. It is not sufficient for the earlier judgment merely to have been entered on an erroneous application of the law; the question under Rule 60(b)(4) is whether the relief at issue was beyond the court's power to order. *Kalb v. Feuerstein,* 308 U.S. 433, 438 (1940); 12 Moore's Federal Practice - Civil § 60.44 (2025).

Unlike other Rule 60 grounds, relief is mandatory once the movant establishes that the judgment is void. *See Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1179 (D.C. Cir. 2013) (stating that "[u]nlike motions brought under the other subsections of Rule 60(b), courts have no discretion in granting relief under Rule 60(b)(4); if the judgment is void, it must be set aside.").

Mr. Bilzerian urges the Court to find that the underlying statutory section 15 U.S.C. § 78u(d)(5), which speaks of "equitable" relief and not "disgorgement" never gave the Court the power to enter a disgorgement order because the disgorgement order here is not an "equitable" order at all, and therefore was void *ab initio*. *See Govil*, 86 F.4th at 98-108; *Ahmed*, 72 F.4th 379; *SEC v. Crystal World Holdings, Inc.*, 2025 U.S. Dist. LEXIS 16001, *6, n.1, 2025 WL 326593 (D.D.C., January 26, 2025) (noting the discussion about whether Congress intended to remove

8

disgorgement from the rubric of "equitable relief" in this statutory context). Alternatively, the disgorgement order is void *ab initio* under *Liu*, based on the application of the fundamental principle that "a judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Rivers*, 511 U.S. at 312-13.

Moreover, courts recognize significant due process violations as satisfying the test for relief under Rule 60(b)(4). *See, e.g.*, *Espinosa*, 559 U.S. at 270 ("[A] void judgment is one so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final . . . The list of such infirmities is exceedingly short; otherwise, Rule 60(b)(4)'s exception to finality would swallow the rule."). A judgment is void if the rendering court was powerless to enter it. *Gschwind v. Cessna Aircraft Co.*, 232 F.3d 1342, 1346 (10th Cir. 2000), *cert. denied*, 533 U.S. 915 (2001). Violations of other fundamental constitutional rights may give rise to voidness as well. *V. T. A., Inc. v. Airco, Inc.,* 597 F.2d 220, 225 (10th Cir. 1979) (*citing Crosby v. Bradstreet Co.*, 312 F.2d 483, 485 (2d Cir. 1963), *cert. denied*, 373 U.S. 911 (1963) (granting relief under Rule 60(b)(4) because the consent order violated the First Amendment, thus the "court was without power to make such an order [and] the order was void.").

Here, the double jeopardy violation, set forth more fully *infra*, renders the original judgment so "fundamentally infirm" that relief under Rule 60(b)(4) is warranted. A judgment rendered in violation of the Double Jeopardy Clause is more than merely erroneous; it is constitutionally intolerable and the Court was not empowered to make such an order; thus, the order is void. *See Crosby*, 312 F.2d at 485.

//

//

9

## B. Relief is Warranted Under Rule 60(b)(5)

Federal Rule of Civil Procedure 60(b)(5) provides that an earlier judgment can be challenged and vacated when it is used prospectively and doing so is no longer equitable due to a change in the factual circumstances or the law. While the equitable provision of Rule 60(b)(5) "may not be used to challenge the legal conclusions on which a prior judgment or order rests," it may still serve as "a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (*quoting Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384 (1992)). The party who seeks relief under Rule 60(b)(5) "'bears the burden of establishing that changed circumstances warrant relief,' *id.*, and must show that applying the judgment prospectively is no longer equitable by proving a change in factual conditions or the law, *Salazar v. District of Columbia*, 729 F. Supp. 2d 257, 263–64 (D.D.C. 2010)." *Jordan v. U.S. Dep't of Lab.,* 331 F.R.D. 444, 453 (D.D.C. 2019*), aff'd sub nom. Jordan v. United States Dep't of Lab*. 2020 WL 283003 (D.C. Cir. Jan. 16, 2020) (denying relief where the movant failed to assert any change in the facts or the law and simply argued its continued application would not be equitable).

The standard to be applied should be a flexible one that examines the prospective use at issue and the changes in the law or facts since the judgment was entered and should not be limited to the institutional type of relief at issue. 12 *Moore's Federal Practice - Civil* § 60.47 [2] (2025); *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1256-57 (9th Cir. 1999) (applying flexible standard and affirming grant of relief under Rule 60(b)(5)); *United States v. Western Elec. Co*., 46 F.3d 1198, 1203-1208 (D.C. Cir. 1995) (applying flexible standard of Rule

10

60(b)(5) to affirm district court modification of consent decree and antitrust restrictions based on changes that were unforeseen at the time the judgment was entered).

The prospective use of this disgorgement order as the predicate for a criminal prosecution, when we now know without any question that it is not a lawful order based on the prerequisites in *Liu* and its legislative and judicial progeny, is not equitable, and therefore it must be vacated under Rule 60(b)(5). *See also, Sec & Exch. Comm'n v. Bronson,* 602 F. Supp. 3d 599, 615-19 (S.D.N.Y. 2022), affirmed at 2022 WL 5237474 (2d Cir. Oct. 6, 2022*); Horne v. Flores,* 557 U.S. 433, 447 (2009*)*.

### C.  Relief is Warranted Under Rule 60(b)(6)

Federal Rule of Civil Procedure 60(b)(6) is a catch-all provision, providing that a court may relieve a party from a final judgment for "any other reason that justifies relief" not encompassed by the other reasons enumerated in Rule 60(b). Fed. R. Civ. P 60(b)(6). Rule 60(b)(6) motions "should only be granted in 'extraordinary circumstances'" in order to justify reopening a matter that would not merit reconsideration under Rules 60(b)(1)–(5). *Riley v. BMO Harris Bank, N.A.*, 115 F. Supp. 3d 87, 94 (D.D.C. 2015) (*quoting Ackermann v. U.S.*, 340 U.S. 193, 199 (1950)); *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005); *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988). Extraordinary circumstances occur when there are "other compelling reasons" that prevented the movant from raising the basis of the motion during the pendency of the case, including a subsequent change in law. *Martinez v. Shinn,* 33 F.4th 1254 (9th Cir. 2022). Although intervening changes in the law alone rarely constitute extraordinary circumstances, it may be part of a multi-factor test. *See Agostini*, 521 U.S. at 239; *In re Brown*, 547 B.R. 846 (Bankr. S.D. Cal. 2016); *Cf. Kemp*, 596 U.S. at 540, 142 (Sotomayor, J.,

11

concurring) (detailing "settled precedents" recognizing the availability of Rule 60(b)(6) to reopen a judgment in extraordinary circumstances, including a change in controlling law).

Relevant factors in determining extraordinary circumstances include (1) the nature of the legal change, including whether the change in law resolved an unsettled legal question; (2) whether the movant exercised diligence in pursuing reconsideration of their claim; (3) the parties' reliance interests in the finality of the judgment; (4) the delay between the finality of the judgment and the Rule 60(b)(6) motion; (5) the relationship between the change in law and the challenged judgment; and (6) whether there are concerns of comity that would be disturbed by reopening a case. *Bynoe v. Baca*, 966 F.3d 972 (9th Cir. 2020). In evaluating these factors, courts have emphasized that they should be considered flexibly and under a totality of the circumstances approach.

### 1. The *Liu* Holding Materially Altered the Law Governing Disgorgement and Resolved an Unsettled Legal Question

The first factor in determining whether extraordinary circumstances exist under Rule 60(b)(6) is the nature of the legal change and specifically, if such change resolved a previously unsettled legal question. *See Bynoe v. Baca*, 966 F.3d 972, 983 (9th Cir. 2020). This factor weighs heavily toward granting relief.

Before *Liu*, courts were inconsistent in their application of disgorgement as a remedy in SEC enforcement actions, leading to divergent approaches in lower courts. In *Kokesh v. S.E.C.*, 581 U.S. 455 (2017), the Supreme Court held that disgorgement should be treated as a penalty for the purposes of the five-year civil statute of limitations but left open the question of whether the SEC has authority to seek disgorgement as an equitable remedy. *Id*. at 466 n.3.

This question was answered in *Liu,* where the Court limited disgorgement under 15 U.S.C. § 78u(d)(5) to an equitable remedy for victims. *Liu,* 591 U.S. at 75. The Court

emphasized that "the SEC's equitable, profit-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains." *Id*. at 89. "To hold otherwise would render meaningless the later part of § 78u(d)(5)." *Id*.; *see also* 15 U.S.C. § 78u(d)(5) ("In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be *appropriate or necessary for the benefit of investors*.") (emphasis added).

Because *Liu* resolved an unsettled legal question of SEC disgorgement authority, this factor weighs in favor of granting relief.

### 2. Mr. Bilzerian Acted Diligently and Promptly Once the Judgment Regained Legal Consequence

The second and fourth factors of the Rule 60(b)(6) extraordinary circumstances analysis consider, respectively, whether the movant exercised diligence and if there was an unreasonable delay in seeking relief. While the passage of time between the original judgment and the motion is relevant, courts asses it in context, including whether the judgment has remained active, or if it continued to affect the movant. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 869 (1988) (granting relief under Rule 60(b)(6) despite a ten-month delay after discovering basis for motion). The D.C. Circuit "has not identified a standard for assessing 'reasonable time' under Rule 60(b). It has, however, considered prejudice to the non-moving party." *Salazar ex rel Salazar,* 633 F.3d at 1118. What matters is whether the movant acted reasonably once meaningful consequences reemerged. *See Phelps v. Alameida*, 569 F.3d 1120, 1137 (9th Cir. 2009) (finding petitioner acted diligently where he promptly sought legal advice and pursued relief within a reasonable time after a change in the law clarified his legal position).

Mr. Bilzerian has acted with consistent diligence and there is no prejudice to the SEC in his filing of the motion now. To the extent the Court believes there was delay, the delay was not unreasonable. Mr. Bilzerian appealed the disgorgement judgment and has continued to challenge its legitimacy for the past three decades. Mr. Bilzerian's personal liberty was only recently threatened by the continued existence of the SEC Judgment and Mr. Bilzerian sought the advice of counsel, promptly reassessed the case in light of *Liu*, and filed this motion thereafter. That is well within a reasonable time, particularly given the complexity of the underlying matter, this Court's opposition to litigation from Mr. Bilzerian, and the time required for new counsel to review the case.

In short, Mr. Bilzerian's long-standing objection to the judgment and his prompt action once new circumstances arose was not unreasonable delay and poses no prejudice to the SEC. This factor also weighs in favor of granting relief under Rule 60(b)(6).

### 3. The Use of the Judgment as a Basis for the Pending Criminal Case Undermines Any Reliance on Its Finality

This factor considers whether either party has a legitimate reliance interest in the finality of the judgment. In assessing this, courts consider how the judgment has been treated over time and whether reopening it would disturb settled expectations. *See Phelps,* 569 F.3d at 1135 (explaining that while finality is important, courts must weigh whether reopening the judgment would disturb legitimate reliance interests).

Here, the government has not consistently treated the disgorgement judgment as final. After allowing the receivership to lapse in 2016, effectively ending efforts to collect, it later revived the judgment to initiate criminal charges. That new use confirms the judgment still carries serious legal and practical consequences, contradicting any assertion that it has been treated as settled or final.

14

The government cannot selectively invoke finality to shield the judgment from review while simultaneously using it to impose new burdens and penalties, both economic and those involving liberties, onto Mr. Bilzerian, therefore this factor favors relief.

### 4. No Comity Concerns Are Implicated by Reopening the Judgment

The comity factor considers whether granting relief would disrupt principles of international judicial respect. That concern is not present here. Although Mr. Bilzerian resides in St. Kitts, no foreign government is pursuing parallel or conflicting proceedings. Thus, reopening the SEC judgment would not interfere with the interests or authority of any other sovereign nation.

### 5. The Judgment Has Been Fundamentally Undermined by Intervening Law and Constitutional Concerns

The most relevant factors examine the relationship between the change in law and the challenged judgment. Here, multiple changes in the law have fundamentally undermined both the basis for the disgorgement order, as well as the Court's rejection of Mr. Bilzerian's claim that the excessively punitive order violated the Double Jeopardy Clause, such that relief from the judgment is necessary. Specifically, the Supreme Court's clarification of disgorgement principles in *Liu*, the understanding under *Hudson* and *Kokesh* that, as applied, this disgorgement is so punitive that it amounts to a criminal punishment in violation of the Double Jeopardy Clause, and the excessive amount of the fine in violation of the Eighth Amendment, all collectively undermine the judgment and strongly support relief.

### a. The Legal Change in *Liu* Invalidates the Basis for the Disgorgement Judgment

Although the precise guidelines of permissible disgorgement remain unsettled, *Liu* and subsequent rulings make clear that awards exceeding a defendant's net profits and failing to return funds to victims violate the fundamental equitable principles underlying federal securities

law. *Liu,* 591 U.S. at 75; *see also SEC v. Govil*, 86 F.4th 89, 102 (2d Cir. 2023) (vacating a disgorgement judgment because it directly conflicted with *Liu*'s requirements that disgorgement not exceed the wrongdoer's net profits and that the funds be returned to identifiable victims). The disgorgement judgment against Mr. Bilzerian clearly violates these bounds, rendering it excessive and unjust.

### 1. Disgorgement was Improper Because There Were No Victims

*Liu* places significant limitations on courts' equitable powers to order disgorgement when victims cannot be identified and compensated. Though *Liu* stops short of holding that SEC disgorgement awards *must* compensate victims to be valid, lower courts addressing the issue after *Liu* have concluded that the SEC's inability to identify and compensate victims warrants a reassessment of the disgorgement order. *See Govil*, 86 F.4th at 105.

In *Govil,* the Second Circuit vacated a disgorgement judgement because the SEC failed to show that investors had suffered harm. *Id.* at 94. The court held that it was an abuse of discretion to award disgorgement without first determining whether investors suffered pecuniary harm. *Id.* at 98. *Govil* also emphasized that investors cannot be considered "victims" absent financial loss, and that there can be no return of funds where there was no deprivation in the first place. *Id.* at 103.

Like in *Govil*, here there is a complete absence of proof as to victim harm. Indeed, the transactions were a success and profitable to investors; there was no proven harm to victims at all. Instead, the government's final theory of harm focused on the "white knights" as victims, those being the entities related to Cluett and Hammermill. *Bilzerian*, 814 F. Supp. at 122. However, there is no evidence that they were harmed at all, much less by the purported misconduct upon which the flawed judgment is based, and this Court should follow the Second

16

Circuit's reasoning in *Govil.* 86 F.4th at 89; *SEC v. Ripple Labs, Inc.*, 2024 U.S. Dist. LEXIS 140766, \*15-\*21, 2024 WL 3730403 (S.D.N.Y., August 7, 2024) (Same); *Cf. SEC v. Crystal World Holdings*, 2025 WL 326593, 2025 U.S. Dist. LEXIS 16001 (D.D.C. January 1, 2025) (finding that despite agreement with the reasoning in *Govil*, the district court was bound by the D.C. Circuit's opinion in *Zacharias v. SEC*, 569 F.3d 458 (D.C. Cir. 2009)); *but see Saad v. Sec. & Exch. Comm'n*, 873 F.3d 297, 304-305 (D.C. Cir. 2017) ("Notably, the Supreme Court's decision in *Kokesh* overturned a line of cases from this Court that had concluded that disgorgement was remedial and not punitive. *See, e.g., Zacharias v. SEC*, 569 F.3d 458, 471-72 (D.C. Cir. 2009)") (J. Kavanaugh, concurring).

The white knight buyers that ultimately purchased Cluett (WPP) and Hammermill (International Paper) did not pay more to acquire the companies than the value the buyers assigned to those companies; they were not coerced into buying the companies in any way or tricked into paying a higher price than they believed the companies to be worth. *Cf. United States v. Milheiser*, 98 F.4th 935, 945 & n.7 (9th Cir. 2024) (holding that "[s]tatements that do not go to the nature of the bargain [defined as price, quality, or other essential aspects of the transaction] are not material, even if they cause another person to enter into a transaction that they would otherwise avoid"). At worst, Mr. Bilzerian's acquisition of shares and subsequent tender offers for each company simply identified to the market at large that each company was undervalued.

Most importantly, this discussion amounts to no more than speculation as there was no evidence of pecuniary harm presented to this Court. The government could not and did not prove any harm to any victim at any time, and the award thus exceeds the SEC's disgorgement authority and is invalid. The disgorgement order is directly at odds with *Liu* and *Govil*,

17

demonstrating the clear discrepancy between the change in law and the judgment entered against Mr. Bilzerian.

### 2. The Disgorgement was Improper Because It was Not Based on Net Profits

*Liu* affirms that the disgorgement order was unlawful not in any way limited to Mr. Bilzerian's net profits. Indeed, there is no effort reflected in the order to even attempt to distinguish between gross and net profits. *See e.g., Bilzerian*, 814 F. Supp. at 119–20. *Liu* is clear that disgorgement beyond net profits is impermissible: "By incorporating these longstanding principles into §78u(d)(5), Congress prohibited the SEC from seeking an equitable remedy in excess of a defendants' net profits from wrongdoing." *See Liu*, 591 U.S. at 85.

Accordingly, under *Liu*, the disgorgement order exceeded the Court's authority and was invalid as a matter of law.

### b. The Disgorgement Judgment Violates the Double Jeopardy Clause Because it Amounts to a Punishment

This Court previously rejected Mr. Bilzerian's claim that the disgorgement order violated the Double Jeopardy Clause. *Bilzerian*, 814 F. Supp. at 120 (*citing United States v. Halper*, 490 U.S. 435 (1989). Subsequently, the Supreme Court overruled *Halper*, the primary justification for this Court's reasoning in denying Mr. Bilzerian's double jeopardy argument. *Id; see Hudson v. United States,* 522 U.S. 93 (1997). Because of the change in the law, this Court's prior reasoning no longer supports the constitutionality of the judgment, and an analysis under *Hudson* makes clear that the disgorgement order amounts to a second punishment in violation of the Double Jeopardy Clause, requiring relief under Rule 60(b)(6).

Although courts have generally reasoned that civil disgorgement is a remedial rather than punitive sanction, that reasoning is not applicable here because while the judgment is *labeled*

18

civil, its applied impact renders the judgment effectively a punishment. *Hudson* provides a two-part test for determining if civil sanctions are punitive.

The first step is statutory construction, wherein the Court first asks, "whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Hudson*, 522 U.S. at 99. If the legislature has expressed an intention to create a civil penalty, the second step of *Hudson* requires the court to "inquire further whether the statutory scheme was so punitive either in purpose *or effect*, as to transform what was clearly intended as a civil remedy into a criminal penalty." *Id.* (internal citations omitted) (emphasis added). Only the "clearest proof" can "transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 100.

The Fourth Circuit's decision in *United States v. Bank*, 965 F.3d 287 (4th Cir. 2020), offers a helpful framework for applying the *Hudson* factors to SEC disgorgement following the Supreme Court's decision in *Kokesh*.[6] 581 U.S. 455. Although the *Bank* court ruled against the defendant, that court's analysis of factors, many of which are present here but were not present in *Bank*, weighs in favor of treating this disgorgement order as punitive under the Double Jeopardy Clause.

With respect to the first *Hudson* step, we do not dispute that Congress intended SEC disgorgement to serve as a civil penalty rather than as a criminal penalty. *See Bank*, 965 F.3d at 297–98. However, the second part of *Hudson* presents seven "useful guideposts" for determining whether a civil penalty is so punitive in purpose or effect that it renders itself criminal. Factors relevant to this analysis include whether the penalty (1) imposes an affirmative disability, (2) has been historically viewed as punishment, (3) requires a finding of scienter, (4) serves punitive

---

[6] In *Kokesh*, the Supreme Court held that disgorgement should be treated as a penalty for the purposes of the five-year civil statute of limitations.

19

aims such as retribution or deterrence, (5) targets conduct that is already criminal, (6) serves a non-punitive purpose, and (7) is excessive relative to that purpose. *Id* at 294-95. A careful evaluation of these guideposts leads to the inescapable conclusion that in this matter, under these specific circumstances, the disgorgement order is effectively a criminal penalty.

### 1. Affirmative Disability or Restraint

The first factor courts consider when distinguishing civil from criminal penalties is whether the sanction imposes an affirmative disability or restraint. In *Hudson*, the Supreme Court analogized such disabilities or restraints to the "infamous punishment of imprisonment." 522 U.S. at 104. In *Bank*, the Fourth Circuit concluded that this factor weighed against classifying SEC disgorgement as a criminal penalty. However, that conclusion rested largely on two facts: the defendant in *Bank* was not imprisoned, and the disgorgement order did not require payment beyond the amount of unlawfully obtained gains. *Bank*, 965 F.3d at 298.

Here, by contrast, Mr. Bilzerian's circumstances demonstrate a markedly punitive effect. Unlike in *Bank*, Mr. Bilzerian was not only imprisoned for the conduct underlying the disgorgement judgment, but he was also ordered to disgorge a sum far exceeding any net profits, after already serving his criminal sentence. Additionally, despite acknowledging that Mr. Bilzerian had returned half of his allegedly improper gross profits to investors, the order nevertheless required him to disgorge the full amount of the alleged gross profits. *Compare, e.g.*, *Bilzerian*, 814 F. Supp. at 119 ("In December of 1985, defendant repaid investors the full amounts of their loans plus a sum total of one-half the profits earned on the Cluett trades"); with *id.* at 123 ("Thus the Court requires defendant to disgorge $4,821,124, *the total profits* gained

from Cluett stock while in violation of the law.") (emphasis added).[7] These facts starkly distinguish this case from *Bank* and support the conclusion that the disgorgement imposed here functioned not as a remedial measure, but as a punitive one.

Moreover, while the SEC claimed that Mr. Bilzerian's actions deprived the investing public of critical information regarding his intent and ability to acquire Cluett and Hammermill, no actual harm to the public resulted from the alleged misconduct. Unlike most securities fraud cases where investor harm is readily identifiable, here the clear lack of demonstrable harm further supports the argument that even disgorgement of the profits Mr. Bilzerian personally retained constitutes an affirmative disability or restraint under *Hudson*'s framework. This factor therefore supports the conclusion that the judgment is a criminal penalty.

### 2. Historically Regarded as Punishment

While disgorgement has not historically been classified as punishment, it is a fact intensive analysis. *See Bank*, 965 F.3d at 299. Under *Liu*'s framework, the judgment's purpose and effect were clearly punitive because it was not limited to net profits or tied to compensating victims. *See Liu*, 591 U.S. at 75. Thus, even if disgorgement is often not regarded as punishment in the abstract, as applied here it most assuredly operates as one. Therefore, this factor also weighs in favor of finding the order was a criminal penalty.

### 3. Scienter

In *Hudson*, the sanctions challenged on double jeopardy grounds could be imposed on any individual who violated specific banking statutes, without regard to state of mind, which supported a finding that the sanctions were civil in nature. *See Hudson,* 522 U.S. at 104. By

---

[7] The 1993 disgorgement judgment seemingly requires Mr. Bilzerian to disgorge half of the purportedly improper gross profits from the Hammermill transaction but is silent as to the reason for the disparate treatment. *See SEC v. Bilzerian*, 814 F.Supp. at 123–24.

21

contrast, here the underlying conduct involved violations that required proof of scienter, including willful intent and knowledge of wrongdoing. *Bilzerian*, 814 F. Supp. at 117. While an element of scienter does not alone support a finding of a punishment, as many securities violations require scienter, here, the underlying offenses and the resulting punishment both turned on intentional, knowing misconduct. *Cf., Bank*, 965 F.3d at 299.

*Hudson* emphasized that inquiry must focus not only on the formal labels of civil or criminal, but on whether the sanction is so punitive "in purpose or effect" that it constitutes a second punishment. 522 U.S. at 99. Here, Mr. Bilzerian was convicted of crimes requiring scienter, and the SEC relied on that same conduct and intent to justify a significant disgorgement award. This close relationship between criminal intent and the civil sanction supports the conclusion that the sanction was punitive in nature.

Further support of the centrality of the scienter element is evident in the opinion of the Second Circuit. *United States v. Bilzerian*, 926 F.2d 1285, 1293 (2d Cir. 1991). Accordingly, the element of scienter weighs in favor of the disgorgement order constituting a criminal punishment.

### 4. Retribution and Deterrence

The *Bank* court explicitly acknowledged that *Kokesh* "tilts this factor in [the defendant's] favor," recognizing that *Kokesh* expressly held that SEC disgorgement is imposed "for punitive purposes" because its "primary purpose … is to *deter* violations of the securities laws by *depriving* violators of their ill-gotten gains." *Bank*, 965 F.3d at 300 (quoting *Kokesh,* 581 U.S. at 464) (emphasis added). The *Bank* court also endorsed *Kokesh's* conclusion that disgorgement "go[es] beyond compensation, [is] intended to punish, and label defendants wrongdoers as a

22

consequence of violating public laws," further supporting the view that such remedies are punitive. *Id.*

Even before *Bank*, the D.C. Circuit, in a concurrence by then-Judge Kavanaugh, emphasized that *Kokesh* explicitly held disgorgement was punitive: "The disgorgement money often does not go to victims, and moreover, is not limited to the amount of harm to victims— both of which would be required if the sanction were truly remedial rather than punitive." *Saad*, 873 F.3d at 304-305 (J. Kavanaugh, concurring in remand for district court to consider whether *Kokesh* altered determination that lifetime disbarment from FINRA could be considered remedial).

This analysis applies with even greater force here. The disgorgement order repeatedly and explicitly cites deterrence as a motivating justification for the disgorgement award. *Bilzerian*, 814 F. Supp. at 120. This confirms that the sanction was designed to punish Mr. Bilzerian and to send a broader message to other potential defendants. Additionally, even assuming some portion of the award could be viewed as compensatory in theory, the SEC neither intended to distribute nor in fact did distribute the proceeds to identifiable victims because there were none. *See Liu*, 591 U.S. at 89. Thus, any compensatory justification is not a legitimate consideration.

Although this Court stated that the sanction imposed was "remedial and not solely for deterrence or retribution," the facts belie this conclusion. *Bilzerian*, 814 F.Supp. at 120; *Cf. Saad*, 873 F.3d at 305 (J. Kavanaugh concurring). The disproportionate nature of the award, the absence of identifiable victims, and the SEC's express reliance on deterrence all underscore that the sanction functioned punitively. This factor strongly supports a finding that the disgorgement order was criminal in effect under the *Hudson* framework.

23

### 5. Already a Crime

In both *Bank* and here, the conduct underlying the disgorgement order was also the subject of criminal liability, an important factor that *Bank* recognized as favoring classification of the sanction as criminal. *See Bank*, 965 F.3d at 300. However, the case for punitive treatment is even stronger here than it was in *Bank*. Unlike in *Bank*, where the disgorgement preceded any criminal prosecution, Mr. Bilzerian had already been criminally convicted for the same conduct years before the disgorgement judgment was entered. Thus, while this factor weighed in favor of finding the sanction punitive in *Bank*, it does so even more clearly here. The sequencing of criminal conviction followed by civil disgorgement amplifies the punitive effect and reinforces the conclusion that the disgorgement functioned as a second punishment for the same offense.

### 6. Alternative Purpose

*Hudson's* "alternative purpose" guidepost is perhaps the most conceptually complex of the seven factors. This factor asks whether the sanction at issue can be justified by purposes other than punishment. *See Hudson*, 522 U.S. at 99; *Bank*, 965 F.3d at 300. In *Bank*, the court interpreted *Kokesh* to acknowledge that while punishment may be a primary aim of disgorgement, it is not the sole purpose. *Id*. The *Bank* court pointed to several non-punitive goals of disgorgement such as preventing wrongdoers from retaining ill-gotten gains, encouraging investor confidence, improving market efficiency, and promoting the stability of the securities industry. *Bank*, 965 F.3d at 300. According to *Bank*, these goals reflect "the equitable nature of the remedy," despite *Kokesh's* express recognition of disgorgement's punitive function. *Id*.

But here, any non-punitive goals of disgorgement are inapposite given that there was no harm to individual investors or disruption of market efficiency. Rather, any of the so-called "alternative purposes," such as encouraging investor confidence and promoting market stability,

24

are just variations of deterrence or incapacitation, rebranded in civil terms. Similarly, "ensuring that defendants do not profit from their illegal acts" squarely aligns with punitive rationale. Here, there is no valid "alternative purpose" for the excessive disgorgement order, so this factor also supports a finding that the order was punitive.

### 7. Excessive in Relation to Alternative Purpose

The final *Hudson* factor asks whether the sanction is "excessive in relation to the alternative purpose" identified. *Hudson*, 522 U.S. at 100; *Bank*, 965 F.3d at 300–01. In *Bank*, the Fourth Circuit offered analysis of this factor, asserting in two sentences that "[d]isgorgement is meant to be limited to the amount of illegal profits gained by a defendant, and as such, it is less likely that disgorgement 'will be excessive in relation to Congress's nonpunitive goals.'" *Id.* (quoting *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998)). This conclusory reasoning, and reliance on pre-*Kokesh* authority, fails to engage with the substance of the proportionality inquiry that *Hudson* requires.

Here, the record provides ample support for the conclusion that the $33 million disgorgement award against Mr. Bilzerian was grossly excessive relative to any legitimate non-punitive purpose:

- **Lack of net profits**: Even crediting the government's theory that the Cluett and Hammermill investments generated ill-gotten gains, at least $7 million of the SEC Judgment exceeds Mr. Bilzerian's net profits and is therefore categorically impermissible under *Liu*. That overage alone renders the sanction disproportionate.

- **No victim compensation**: The government never identified any actual victims nor demonstrated an intent to return any portion of the funds to injured parties—

25

both of which *Liu* emphasized as essential features of a properly circumscribed disgorgement remedy. *Id.* at 88–89. The absence of compensatory function supports the conclusion that the remedy served no purpose other than punishment.

- **Punitive layering**: The $33 million disgorgement award came after Mr. Bilzerian had already served his prison term and paid a significant monetary fine. Whatever non-punitive purposes might be advanced for disgorgement, such as encouraging investor confidence or promoting financial market stability, are difficult to reconcile with the magnitude and timing of the sanction. In fact, it is arguable that such an outsized judgment undermines public confidence in fair and proportionate regulation, rather than enhancing it.

- **Questionable premise of "ill-gotten gains"**: Unlike typical securities fraud cases, the government's theory in this case was novel and attenuated. The alleged misconduct consisted primarily of late filings and incomplete disclosures regarding control of certain securities, conduct that commentators have described as, at worst, technical violations.

In sum, the size, timing, and factual foundation of the disgorgement order strongly suggest that the award was excessive relative to any legitimate civil purpose. Instead, the sanction appears retributive, imposed years after the conduct, following criminal conviction and incarceration, with no compensatory function. Therefore, this final *Hudson* factor provides perhaps the most compelling argument that the disgorgement judgment was punitive in both purpose and effect. As *Hudson* emphasized, these factors must be evaluated in totality. Here, the disproportionality of the sanction relative to its stated goals, coupled with the absence of identifiable victims or concrete civil benefit, weighs heavily in favor of criminal classification.

26

The Double Jeopardy Clause bars such an outcome and therefore extraordinary circumstances exist which warrant the relief requested.

//

### c. The Disgorgement Judgment Violates the Excessive Fines Clause

The Eighth Amendment's Excessive Fines Clause prohibits the government from imposing financial penalties that are punitive in nature and grossly disproportionate to the conduct at issue. *See Austin v. United States*, 509 U.S. 602, 622 (1993). As the Supreme Court recognized in *Austin*, the Clause applies not only to criminal fines but also to civil penalties that serve punitive purposes, including deterrence and retribution. *Id.* Here, the $33 million judgment against Mr. Bilzerian cannot be justified as remedial and instead reflects precisely the kind of punishment the Eighth Amendment guards against.

As set forth above, disgorgement in SEC enforcement actions is permissible only when it serves a *remedial* function i.e., when it is limited to a defendant's net profits and directed toward victim compensation. *Liu*, 591 U.S. at 75. The judgment imposed here not only fails *Liu's* requirements, but the government's own conduct confirms that the judgment had a solely punitive effect, imposed after a criminal sentence had already been served and never used for restitution.

Furthermore, in *United States v. Bajakajian*, 524 U.S. 321, 334 (1998), the Court emphasized that a monetary penalty violates the Excessive Fines Clause when it is "grossly disproportional to the gravity of the defendant's offense." That is the case here. The government has never alleged that Mr. Bilzerian caused victim or public harm, nor that his conduct resulted in investor losses. *Bilzerian*, 814 F. Supp. at 119-120. To the contrary, the conduct at issue, a technical violation of securities reporting requirements, is a magnitude less serious than the

27

punishment imposed. The judgment's scale, regarding both the alleged offense and Mr. Bilzerian's actual gains, is grossly disproportionate by any measure.

Taken together, *Austin*, *Liu*, and *Bajakajian* require courts to reject financial penalties that serve retributive purposes without remedial justification, or that are vastly out of proportion to the conduct. The judgment here violates both principles. It is punitive in nature and excessive in scope. Therefore, continued enforcement of that judgment today directly violates the Eighth Amendment. Such a violation warrants relief under 60(b)(6).

## IV. CONCLUSION

For the reasons set forth above, Mr. Bilzerian has demonstrated that relief is appropriate under Rule 60(b)(4), (5) or (6). The Supreme Court's decision in *Liu* materially altered the law governing disgorgement, and the judgment at issue only recently became relevant again due to new criminal proceedings. Considering these developments and based on the totality of the circumstances, this Court should grant this motion and vacate the disgorgement judgment against Mr. Bilzerian.

Dated: August 20, 2025                Respectfully submitted,

                                   /s/ David I. Schoen
                                  DAVID I. SCHOEN
                                  D.C. Bar No. 391408
                                  SCHOEN LAW FIRM, LLC
                                  2800 Zelda Road Suite 100-6
                                  Montgomery, AL 36106
                                  Tel: (917) 941-7952
                                  Email: schoenlawfirm@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of August, 2025, I caused a true and correct copy of

the foregoing to be served on all counsel of record by filing the same through this Court's ECF

system.

<u>/s/ David I. Schoen</u>

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------x

UNITED STATES OF AMERICA

v.                                          88 Cr. 762

PAUL BILZERIAN,

                Defendant.

-----------------------------x

                                        May 17, 1989
                                        10:00 a.m.

Before:

        HON. ROBERT J. WARD,

                                        District Judge

(Trial resumed)

(Open court)

THE COURT: I understand that counsel have some matters that they wish to take up before we bring in the jury.

Mr. Sachs.

MR. SACHS: Your Honor, the next witness, according to Mr. Brodsky, is Dwight Norris, to whom reference has been made, and the court may recall was an accountant who prepared some personal and partnership returns, in at least one case, for Paul Bilzerian.

I asked Mr. Brodsky whether he intended to elicit

SOUTHERN DISTRICT REPORTERS 212-791-1020

(At the side bar)

THE COURT: I will ask two questions. One is for an offer of proof, and then as to the perceived relevance of the proffered evidence.

MR. AUCHINCLOSS: Your Honor, if questioned this witness would testify that to his knowledge there was no 13D filed with respect to Hammermill Paper at the time that he sold on the 7th.

In addition, there was no indication in the financial news that anybody was interested in making a tender offer or otherwise acquiring Cluett, Peabody -- Hammermill, I beg your pardon, and he would finally testify that had he known about a 13D position filed by anybody at all he would not have sold those shares.

MR. MATHEWS: I don't have a 1986 calendar before me but, first of all, the indictment charges that Mr. Bilzerian should have filed by July 7. The SEC stays open until 5:30 in the afternoon to accept filings, and, indeed, they can be delivered after hours. The market closes at 4:00 or 4:30.

Any sale even on July 7 would not be relevant to the charges in the indictment. There would have to be a trade date of July 8 or later for any seller's testimony to be relevant with respect to whether or not they would have acted differently had Mr. Bilzerian filed on time.

SOUTHERN DISTRICT REPORTERS 212-791-1020

Therefore, I would move that your Honor not allow this witness to testify .

MR. BRODSKY: Your Honor, if I may, the fallacy in Mr. Mathews' argument is that we are not required to prove any actual injury, what a civil plaintiff's burden would be.

The purpose of this witness is to show what significance an average investor would place in a 13D, and this witness will testify that as a holder of Hammermill stock it would have been very important to him to know that there was a 13D position there and whether or not he sold on the 7th, the 8th or 9th is irrelevant to that point.

We are not putting him on for the purpose of proving our actual damages in this case because that is not a burden that the government has in this case.

MR. MATHEWS: The prejudicial value once they have already elicited that he was the seller at or about the time and the price for which he sold for would far outweigh any probative value and do nothing but lead to jury confusion.

The jury would think that this person is being presented as an investor with respect to that investment they just elicited testimony on and therefore was a supposed victim, and I would respectfully suggest that the prejudicial value would far outweigh any probative value.

SOUTHERN DISTRICT REPORTERS 212-791-1020

They have already had expert testimony from Mr. Coffee generally, and to now, with a witness like that that would have so much prejudice after they get that he sold, I respectfully would argue that the prejudicial value outweighs the probative value.

MR. BRODSKY: Also, if I could add, the fact of the matter is -- it would be one thing if Mr. Bilzerian did file his 13D at 5 minutes to 5:00 just before the SEC closed on July 7. He obviously did not, at the time he was accumulating his stock.

He didn't file his 13D until --

THE COURT: The indictment at paragraph 56 gives the date as on or about July 25.

MR. BRODSKY: Yes.

THE COURT: Which would mean that this witness sold his Hammermill stock before the actual filing, and what is your position as to when the document should have been filed?

MR. MATHEWS: The indictment charges July 7 it should have been filed, specifically charges in the indictment.

MR. BRODSKY: That is correct.

MR. AUCHINCLOSS: That is correct, your Honor.

THE COURT: I am going to overrule the objection. First, I believe in the context of the

SOUTHERN DISTRICT REPORTERS 212-791-1020

**EXHIBIT 2**

U.S. v. Bilzerian, Not Reported in F.Supp. (1992)

Fed. Sec. L. Rep. P 97,014

1992 WL 301390
United States District Court, S.D. New York.

UNITED STATES of America

v.

BILZERIAN.

No. 88 CR. 962 (RJW).
|
Sept. 2, 1992.

Opinion

ROBERT J. WARD, District Judge.

**\*1** Defendant, Paul A. Bilzerian, moves for an order pursuant to former Rule 35(b), Fed.R.Crim.P., (applicable to offenses committed before November 1, 1987) to reduce the four year sentence imposed by this Court on September 27, 1989. The motion, which was filed on February 3, 1992, within 120 days after the denial of defendant's petition for *certiorari* by the United States Supreme Court, was timely.

This Court deferred rendering a decision on the motion pending a determination of defendant's application for parole. The Court was recently advised that the National Commissioners have ordered Bilzerian continued to expiration.

After a jury trial, defendant was convicted of nine counts of violating 15 U.S.C. § 78j(b) and 18 U.S.C. §§ 1001

and 371. In addition to the four year custodial sentence, defendant was sentenced to two years probation during which time he was ordered to perform 250 hours of community service and was fined $1,500,000. A $350 special assessment was also imposed. The fine and the special assessment have been paid.

Defendant's conviction was affirmed by the United States Court of Appeals for the Second Circuit on January 3, 1991, *United States v. Bilzarian,* 926 F.2d 1285, and *certiorari* was denied by the Supreme Court on October 7, 1991, 112 S.Ct. 63.

Bilzarian voluntarily surrendered on December 2, 1991 and has served nine months. Assuming good institutional behavior, the Court anticipated that this 41 year old defendant, who had no prior criminal history, and a good work record, would be paroled after serving one-third of his four year sentence.

After considering defendant's moving papers, the Government's opposition, and the order of the National Commissioners continuing defendant to expiration, this Court has determined to carry out its original sentencing purpose by granting the motio to the extent of reducing the custodial portion of defendant's sentence to 20 months.

Amended judgment signed.

**All Citations**

Not Reported in F.Supp., 1992 WL 301390, Fed. Sec. L. Rep. P 97,014

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,          :

         - v. -          :          88 Cr.^(RJW)

PAUL A. BILZERIAN,          :

         DEFENDANT.          :

- - - - - - - - - - - - - - - - - -x

GOVERNMENT'S SENTENCING MEMORANDUM

BENITO ROMANO,
United States Attorney for the
Southern District of New York,
Attorney for the United States
    of America.

DAVID E. BRODSKY,
JOHN W. AUCHINCLOSS II,
Assistant United States Attorneys,

    Of Counsel.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA    :

      -v.-           :        88 Cr. 962 (RJW)

PAUL A. BILZERIAN,      :

       Defendant.    :

- - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

### Introduction

The Government respectfully submits this memorandum in response to the sentencing memorandum filed by defendant Paul A. Bilzerian on September 22, 1989. Our purpose is briefly to review several factors that the Government believes should be taken into account by the Court in fashioning an appropriate sentence for the defendant.

### The Seriousness of Bilzerian's Criminal Conduct

Bilzerian stands convicted of engaging in a pattern of fraudulent conduct in connection with four multi-million dollar securities transactions. Bilzerian's numerous offenses exhibited unabashed mendacity. Over the course of an 18-month period, Bilzerian concocted elaborate, unlawful schemes to conceal from the investing public the true sources of his takeover financing. He also engaged in rigged, illegal securities transactions with Jefferies & Company in order to evade federal reporting requirements and cheat on his taxes. In furtherance of those fraudulent undertakings, Bilzerian submitted false documents to the Securities and Exchange Commission ("SEC"), filed false tax

returns with the Internal Revenue Service ("IRS"), exchanged phony invoices with Jefferies & Company, and committed perjury during a civil deposition.[1]

Bilzerian's unlawful conduct defrauded thousands of innocent shareholders, undermined investor confidence in the securities markets, and impeded important functions of government. Every investor who sold his or her stock in Cluett Peabody or Hammermill Paper at a time when Bilzerian should have had a Schedule 13D on file was cheated out of a substantial increase in the value of that stock. By the same token, investors who traded in Cluett Peabody or Hammermill Paper after Bilzerian had filed a false Schedule 13D were cheated out of accurate information upon which to base their investment decisions.[2]

---

[1] Bilzerian seeks leniency from this Court because, he claims, no one "had reason to believe at the time that the conduct at issue in this case would be considered criminal." Bilzerian Sentencing Memorandum at 6. Bilzerian thus would have this Court believe that he did not know that it was a crime to submit false documents to the SEC, file false tax returns with the IRS, or give false testimony under oath. Bilzerian's claim is as ludicrous as his assertion at trial that he did not know that he was required to file income tax returns every year.

[2] Bilzerian argues that the absence of a list of victims means that no one was injured by his dishonest conduct. This is sheer sophistry. Tens of thousands of shares of Cluett Peabody and Hammermill Paper stock were publicly traded every day during the course of Bilzerian's fraudulent schemes. While the names of individual victims may not be known, Bilzerian can hardly deny that Cluett Peabody shareholders and Hammermill Paper shareholders constitute at least two readily identifiable classes of investors that were harmed by his unlawful conduct.

Bilzerian's fraudulent schemes also threatened the integrity of the securities markets, which depend upon the free flow of accurate information in order function properly. When an unscrupulous market participant deliberately disseminates false information about a stock, the entire system breaks down. Not only are investors unable to evaluate that particular stock, but they also may become cynical and suspicious of other stocks.

The deleterious effects of Bilzerian's fraud extended beyond the marketplace, to the agencies of government. Bilzerian perverted the function of the SEC, using its offices to disseminate the false information contained in his Schedule 13D filings. In addition, Bilzerian sought to defraud the IRS, both by claiming tax deductions to which he was not legally entitled, and by submitting false tax returns in an attempt to cover up his crimes.

Bilzerian derived millions of dollars from his many acts of wrongdoing. By his own admission, he earned approximately $2 million from the Cluett Peabody deal, and approximately $10 million from the Hammermill Paper deal. (Tr. 2880). Bilzerian also made several hundred thousand dollars from the H.H. Robertson and Armco Steel transactions.[3]

---

[3]Congress has specially provided for financially successful malefactors such as Bilzerian. Section 3571 of Title 18, United States Code, provides:

> If any person derives pecuniary gain from the offense, or if the offense results in the pecuniary loss to a person other than the defendant, the defendant may be fined not more than twice the gross gain or twice the gross loss, unless imposition of a

## Bilzerian's Arrogant Defiance of the Legal System

Throughout these proceedings, Bilzerian has displayed contempt for the legal system. He has shown absolutely no contrition or remorse. Even in the face of the jury's unqualified condemnation of his conduct, Bilzerian stubbornly maintains that he did nothing wrong. In addition, he has challenged the good faith of the United States Attorney's Office, charging that this prosecution was brought for "political reasons."

Bilzerian's most outrageous display of arrogance and disrespect for the law occurred when he took the witness stand. Over the course of five days of testimony, Bilzerian repeatedly perjured himself before the jury and this Court. Bilzerian told one false story after another, trying desperately to escape responsibility for the crimes that he had committed. This Court may, and most certainly should, take Bilzerian's perjured trial testimony into account when fashioning an appropriate sentence.

---

fine under this subsection would unduly complicate or prolong the sentencing process.

The Government urges that Bilzerian be fined in accordance with Section 3571. Bilzerian was convicted of securities fraud, conspiracy, and making false statements in connection with both the Cluett Peabody and the Hammermill Paper transactions. His own testimony established the amount of his "pecuniary gain" from those offenses. Thus, even setting aside the relatively smaller gains that Bilzerian derived from the H.H. Robertson and Armco Steel transactions, Bilzerian may be fined as much as $24 million in this case. A substantial fine is entirely appropriate so that Bilzerian does not profit from his wrongdoing.

This Court should also consider that Bilzerian has committed perjury on several prior occasions. As the Government proved at trial -- and as the defendant virtually admitted on the witness stand -- Bilzerian committed perjury in 1986 during a civil deposition in connection with the Allied Stores takeover. In 1987, Bilzerian perjured himself again when he appeared before the SEC in connection with the investigation that gave rise to this prosecution. Bilzerian appeared before the SEC in 1988 for a second round of testimony, and yet again gave false answers under oath.

In short, Bilzerian engaged in a pattern of serious criminal activity. His fraudulent schemes victimized thousands of innocent shareholders, threatened the integrity of the markets, and obstructed the functions of government, while making Bilzerian a very wealthy man. When confronted by the Government, Bilzerian resorted to perjury in order to escape responsibility for his crimes. As Judge Lasker said on the occasion of the sentencing of Boyd Jefferies, in reference to those privileged individuals, such as Bilzerian, who occupy the highest echelons of our financial community: "It is absurd and obscene for any person so engaged to undertake acts which will simply bring him possibly greater riches." Bilzerian should be severely punished for his conduct.[4]

---

[4]In his sentencing memorandum, Bilzerian has the temerity to liken his situation to that of Boyd Jefferies, implying that he, like Jefferies, should be given a suspended sentence. However, Jefferies' sentence was based on a number of factors that obviously do not apply to Bilzerian. First, Jefferies has

## The Urgent Need for General Deterrence

Bilzerian's sentence must also serve to deter other potential wrongdoers in the financial community. Wall Street will be watching this sentencing very closely. A substantial sentence will send a much needed message to that community: white collar defendants who derive millions of dollars by repeatedly engaging in criminal conduct, and then seek to avoid responsibility for that conduct by committing perjury before the SEC and a federal judge and jury, should expect long periods of incarceration and large fines. A lenient sentence, on the other hand, will not only encourage future misconduct, it will also indicate that those in positions of wealth and power are treated more favorably by our criminal justice system than defendants who

---

cooperated extensively with the Government; Bilzerian has not. To the contrary, Bilzerian has done nothing but belittle the Government's law enforcement efforts. Second, Jefferies took full responsibility for his crimes at a very early stage of the investigation, enabling the Government to turn its attention to other wrongdoers. Bilzerian, by contrast, not only has refused to accept responsibility, but has affirmatively sought to thwart the Government's investigation by committing perjury, both before the SEC and during the trial. Third, as a result of his crimes, Jefferies earned the goodwill of his customers. Bilzerian, on the other hand, derived tens of millions of dollars from the dishonest practices that marked his securities transactions. As Judge Lasker stated, Jefferies "earned" a suspended sentence "through agony and effort." The only sentence that Bilzerian has "earned" is a substantial prison term and a large fine.

are poor and less fortunate.[5]

## Conclusion

Defendant Paul A. Bilzerian should be sentenced to a substantial period of incarceration that punishes him for the seriousness of his crimes and the arrogant disregard he has shown for the law, and also deters other potential wrongdoers from similar misconduct. According to the Probation Department, the Sentencing Guidelines prescribe a prison term of 46-57 months. Although this is not a Guidelines case, the Government respectfully submits that the Guidelines provide a useful benchmark for fashioning an appropriate prison sentence.[6] Bilzerian should also receive a substantial fine so that, upon release from prison, he will not enjoy the fruits of his fraudulent schemes.

Respectfully submitted,

BENITO ROMANO,
United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.

David E. Brodsky,
John W. Auchincloss II,
Assistant United States Attorneys,
          Of Counsel.

---

[5] In support of his plea for a lenient sentence, Bilzerian purports to undertake a statistical analysis of past sentences. Each case must be decided on its own merits, however. The numerous aggravating circumstances in this case, discussed above, make clear that a lenient sentence would be wholly inappropriate for Bilzerian.

[6] In selecting an appropriate prison term, the Court should be aware that, given Bilzerian's parole release guidelines, the defendant will most likely serve only one-third of his sentence.

DAVID E. BRODSKY deposes and says that he is employed in the office of the United States Attorney for the Southern District of New York.

That on September 26, 1989 he served a copy of the annexed Government's Sentencing Memorandum via telecopy to:

Arthur Mathews
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, D.C. 20037-1420
Telecopy number: (202) 293-0074.

That on the same date he also served a copy of the annexed Government's Sentencing Memorandum by placing the same in a properly postpaid franked envelope addressed as indicated above, and by placing said envelope in the mailbox for mailing at the United States Courthouse Annex, One St. Andrew's Plaza, New York, New York 10007.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. 1746

David E. Brodsky

Executed on September 26, 1989

**EXHIBIT 4**

```
                                                    *** GRID F16 ***
ACTIVE CRIMINAL DOCKETS      NY-S(NEW YORK CITY) 04/13/92
CR-88-00962-01                                              PAGE 1
                                                   CR-88-00962-01
              US-V-BILZERIAN
                  as of 03/14/92 at 12:30 PM

------------------------------------------------------------------

Judge: JUDGE WARD                     Case Filed: 12/21/88

Defendant:

D1    BILZERIAN, PAUL A


      Dft ID: -25491

      Pending counts:
        FALSE STATEMENTS, 18.1001 (3)
        SECURITIES FRAUD, 15.78JB78FF (7)
        CONSP. TO COMMIT SECURITIES FRAUD, 18.371 (10-11)

      Offense Level (opening): FEL

      Terminated counts:           Disposition
        FALSE STATEMENTS, 18.1001 (12)  (Count 12) Dismissed.
                                           04/11/89
        SECURITIES FRAUD, 15.78JB78FF  (Counts 1-2,4-6,8-9) FLD
          (1), FALSE STATEMENTS, 18.     JUDGMENT & COMMITMENT
          1001 (2,4), FALSE              ORDER(DEFT & ATTY ARTHUR F.
          STATEMENTS, 18.1001 (8-9)      MATHEWS, ESQ. PRESENT).
          CONSP. TO COMMIT SECURITIES    AUSA BRODSKY.  THE DEFT IS
          FRAUD, 18.371 (5-6)            HEREBY COMMITTED TO THE
                                         CUSTODY OF THE ATTORNEY
                                         GENERAL OR HIS AUTHORIZED
                                         REPRESENTATIVE FOR
                                         IMPRISONMENT FOR A PERIOD
                                         OF FOUR(4) YEARS ON EACH OF
                                         COUNTS 1,2,5,6,8&9, TO RUN
                                         CONCURRENTLY WITH EACH
                                         OTHER. IMPOSITION OF
                                         SENTENCE IS SUSPENDED ON
                                         COUNT 4, & DEFT PLACED ON
                                         PROBATION FOR A PERIOD OF
                                         TWO(2) YEARS, SUBJECT TO
                                         THE STANDING PROBATION
                                         ORDER OF THIS COURT.
                                         PROBATION SHALL COMMENCE
                                         UPON DEFT'S RELEASE FROM
                                         IMPRISONMENT.  SPECIAL
                                         CONDITION OF PROBATION
                                         BEING THAT DEFT DEVOTE 250
                                         HOURS OF COMMUNITY SERVICE
                                         DURING THE PERIOD OF HIS
```

ACTIVE CRIMINAL DOCKETS     NY-S(NEW YORK CITY) 04/13/92     *** GRID G16 ***

CR-88-00962-01                                        CR-88-00962-01     PAGE 2

        US-V-BILZERIAN
              as of 03/14/92 at 12:30 PM

----------------------------------------------------------------

                            PROBATION AS DIRECTED BY
                            THE PROBATION DEPARTMENT.
                            PROBATION SUPERVISION MAY
                            BE TRANSFERRED TO THE
                            APPROPRIATE U.S. PROBATION
                            DEPARTMENT IN TAMPA,
                            FLORIDA.  DEFT SHALL PAY
                            FINES TO THE U.S. IN THE
                            SUM OF $250,000 ON EACH OF
                            COUNTS 1,2,5,6,8&9 (TOTAL
                            FINE:$1,500,000) BY OCTOBER
                            27, 1989.  SAID FINES WILL
                            NOT BE STAYED BY THE COURT.
                            IN ADDITION, A $50
                            ASSESSMENT IS IMPOSED BY
                            THE COURT UPON THE DEFT ON
                            EACH OF COUNTS 1,2,4,5,6,8&
                            9(TOTAL ASSESSMENT:$350) AS
                            PROVIDED BY LAW PURSUANT TO
                            TITLE 18, USC SECTION
                            3013(A)(2)(A).  DEFT'S
                            ADDRESS: 816 TARAY
                            BOULEVARD, TAMPA, FLORIDA.
                            DEFT IS REQUIRED TO NOTIFY
                            THE U.S. ATTY OF ANY CHANGE
                            OF HIS NAME & ADDRESS
                            WITHIN THIRTY(30) DAYS. THE
                            COURT DOES NOT IMPOSE A
                            SENTENCE ON COUNT 3 & COUNT
                            7.  DEFT CONTINUED ON BAIL
                            PENDING APPEAL. (09/29/89)

    Offense Level (disposition): FEL

    Total Jail: 48 Mo  Total Probation: 24 Mo  Total Fine: $1,500,000.00

    Defense Counsel:
        MATHEWS, ARTHUR F
        641 LEXINGTON AVE
        NY, NY
        832-3611

    U S Attorneys:
        BRODSKY, DAVID E

--------------------------------------------------------------------

```
ACTIVE CRIMINAL DOCKETS        NY-S(NEW YORK CITY) 04/13/92  *** GRID #16 ***
CR-88-00962-01                                   CR-88-00962-01    PAGE 3
              US-V-BILZERIAN
                  as of 03/14/92 at 12:30 PM
--------------------------------------------------------------------------
```

```
                                            *** GRID I16 ***
ACTIVE CRIMINAL DOCKETS      NY-S(NEW YORK CITY) 04/13/92
                                                              PAGE 4
CR-88-00962-01                              CR-88-00962-01
              US-V-BILZERIAN
                             PROCEEDINGS

12/21/88   1    Filed indictment (MAGISTRATE BERNIKOW) (Dkt'd 01/11/89).
                US Attorney BRODSKY, DAVID E added to case (MAGISTRATE
                BERNIKOW) (Dkt'd 01/11/89).

12/29/88        Mark the beginning of a potential excludable period of type
                .X-T starting on 12/29/88 and not to extend beyond 01/05/89
                (MAGISTRATE LEE) (Dkt'd 01/11/89).
                Excludable delay based on finding the ends of justice
                served by continuance began on 12/29/88 and ended on
                01/05/89 (ADJ. TO 1-5-89.) (MAGISTRATE LEE) (Dkt'd
                01/11/89).

01/05/89        Defendant's first appearance (DEFT PRES W/ATTY. ARTHUR F.
                MATTHEWS, BAIL SET AT $50,000 PRB, PTS, SURR P.P.  DEFT
                PERMITTED TRAVEL ON PERMISSION OF AUSA OR PTS, BAIL LIMITS
                TO INTERCONTINENTAL U.S. DEFT PLEADS NOT GUILTY, F/P
                ORDERED CASE ASSIGNED TO JUDGE WARD FOR ALL PURPOSES.)
                (MAGISTRATE DOLINGER) (Dkt'd 01/11/89).
                Arraignment held (Counts 1-12) (DEFT PLEADS NOT GUILTY)
                (MAGISTRATE DOLINGER) (Dkt'd 01/11/89).
                Defendant enters plea of not guilty (Counts 1-12)
                (MAGISTRATE DOLINGER) (Dkt'd 01/11/89).
                Case assigned to JUDGE WARD (MAGISTRATE DOLINGER) (Dkt'd
                01/11/89).
           2    Filed personal appearance bond in the amount of $500,000.00
                (Dkt'd 01/11/89).
           3    Filed appearance of MATHEWS, ARTHUR F as attorney for
                defendant (Dkt'd 01/12/89).
                Attorney MATHEWS, ARTHUR F added to case (Dkt'd 01/12/89).
                Status hearing held (SCHEDULING CONF. HELD.  DISCOVERY
                SCHEDULE SET. THE COURT SCHEDULES THE FOLLOWING MOTION
                CALENDER(1)DEFT TO SERVE & FILE MOTIONS BY 2-16-89 (2)GOVT
                TO SERVE & FILE ITS OPPOSITION BY 3-16-89 (3)DEFT TO SERVE &
                FILE HIS REPLY BY 3-23-89 (4)ORAL ARGUMENT SCHEDULED FOR 3-
                31-89@10:00. THE COURT SCHEDULES TRIAL FOR MAY 1, 1989 AT
                10:00A.M. IN THE INTEREST OF JUSTICE, THE COURT GRANTS A
                CONTINUANCE PURS TO T 18.3161(H)(B) FROM 1-5-89 TO 2-16-89.
                DEFT CONT. ON BAIL.) (JUDGE WARD) (Dkt'd 01/12/89).
                Trial date set for 05/01/89 @ 10:00 AM (Counts 1,2-4,5-6,7,
                8-9,10-11,12) (JUDGE WARD) (Dkt'd 01/12/89).
                Mark the beginning of a potential excludable period of type
                X-T starting on 01/05/89 and not to extend beyond 02/16/89
                (Dkt'd 01/12/89).
                Excludable delay based on finding the ends of justice
                served by continuance began on 01/05/89 and ended on
                02/16/89 (Dkt'd 01/12/89).

02/16/89   4    Motion filed (MOT#1) (FOR AN ORDER(A) PURS TO RULE 12(B)
                OF THE FRCP, DISMISSING THE INDICTMENT(B)ALTERNATIVELY,
```

```
                                                      *** GRID J16 ***
ACTIVE CRIMINAL DOCKETS      NY-S(NEW YORK CITY) 04/13/92
                                                               PAGE 5
CR-88-00962-01                              CR-88-00962-01
            US-V-BILZERIAN
                              PROCEEDINGS
              PURS TO RULE 12(B) OF THE FRCP, REQUIRING CONSOLIDATION OF
              COUNTS 2&3&9, & COUNTS 5,6,10&11 ON GROUNDS OF MULTIPLICITY.
              RET 3-31-89() (Dkt'd 02/17/89).
              Mark the beginning of a potential excludable period of type
              X-E starting on 02/16/89 (Dkt'd 02/17/89).
         5    - FLD MEMORANDUM OF LAW IN SUPPORT OF DEFT'S MOTION TO
              DISMISS THE INDICTMENT OR FOR ALTERNATIVE RELIEF. (Dkt'd
              02/17/89).

03/16/89 6    Filed transcript of proceedings for 01/05/89 (Dkt'd
              03/21/89).

03/24/89      Pre-trial conference held (Counts 1,2-4,5-6,7,8-9,10-11,12)
              (DEFT NOT PRESENT.) (JUDGE WARD) (Dkt'd 03/27/89).

03/27/89 7    - FLD SUBMISSION OF THE SECURITIES & EXCHANGE COMMISSION
              REGARDING SUBPOENA DUCES TECUM ISSUED TO THE COMMISSION BY
              DEFT. (Dkt'd 03/27/89).

03/28/89 8    Motion to quash filed  (MOT#2) (FOR AN ORDER QUASHING &
              VACATING THE SUBPOENA DUCES TECUM, RET 4-7-89.) (Dkt'd
              03/28/89).
         8    Mark the beginning of a potential excludable period of type
              X-E starting on 03/28/89 ((In re MOT#QS on 3-28-89)) (Dkt'd
              03/28/89).
         9    Memorandum in support of motion to quash  (MOT#2) (Dkt'd
              03/28/89).
         10   - FLD MEMORANDUM OF LAW IN OPPOSITION TO DEFT'S MOTION TO
              DISMISS THE INDICTMENT OR FOR ALTERNATIVE RELIEF. (Dkt'd
              03/28/89).

03/31/89 11   Motion to quash filed  (MOT#3) (FOR AN ORDER PURS TO RULE
              17(C) OF THE FRCP, QUASHING IN ITS ENTIRETY THE FEBRUARY 23,
              1989 SUBPOENA DUCES TECUM ISSUED UPON THE APPLICATION OF
              DEFT TO JEFFERIES & CO., INC. ETC. RET 4-7-89.) (Dkt'd
              03/31/89).
              Mark the beginning of a potential excludable period of type
              X-E starting on 03/31/89 (Dkt'd 03/31/89).
         12   Memorandum in support of motion to quash  (MOT#3) (Dkt'd
              03/31/89).
         13   Affidavit (AFFIDAVIT OF LLOYD H. FELLER, IN SUPPORT OF THE
              ACCOMPANYING MOTION TO QUASH THE 2-23-89 SUBPOENAS DUCES
              TECUM ISSUED TO JEFFERIES & CO. & MORGAN LEWIS, UPON THE
              APPLICATION OF DEFT PAUL A. BILZERIAN.) (Dkt'd 03/31/89).
         14   Affidavit (AFFIDAVIT OF JOHN F.X. PELOSO, IN SUPPORT OF THE
              ACCOMPANYING MOTION TO QUASH THE 2-23-89 SUBPOENAS DUCES
              TECUM ISSUED TO JEFFERIES & CO. & MORGAN LEWIS UPON THE
              APPLICATION OF DEFT.) (Dkt'd 03/31/89).
         15   Affidavit (AFFIDAVIT OF JOHN F. HARTIGAN, IN SUPPORT OF THE
```

```
                                                *** GRID K16 ***
ACTIVE CRIMINAL DOCKETS        NY-S(NEW YORK CITY) 04/13/92
                                                                  PAGE 6
CR-88-00962-01                              CR-88-00962-01
              US-V-BILZERIAN
                              PROCEEDINGS
```

ACCOMPANYING MOTION TO QUASH THE 2-23-89 SUBPOENAS DUCES TECUM ISSUED TO JEFFERIES & CO. & MORGAN LEWIS UPON THE APPLICATION OF DEFT.) (Dkt'd 03/31/89).

04/03/89  16   - FLD REPLY MEMORANDUM IN SUPPORT OF DEFT'S MOTION TO DISMISS THE INDICTMENT OR FOR ALTERNATIVE RELIEF. (Dkt'd 04/04/89).

04/07/89      Status hearing held (ORAL ARGUMENT HELD, TO CONTINUE ON APRIL 11, 1989a11:00A.M.) (JUDGE WARD) (Dkt'd 04/13/89).

04/11/89      Status hearing held (ORAL ARGUMENT CONTINUED & CONCLUDED. (1)DEFT'S MOTION TO DISMISS THE INDICTMENT IS DENIED ON ALL COUNTS WITH THE EXCEPTION OF COUNT 12. THE COURT DISMISSES COUNT 12.(2)DEFT'S MOTION TO CONSOLIDATE COUNTS 2&3,8&9 & COUNTS 5,6,10&11 IS DENIED. (3)DEFT'S MOTION TO TRANSFER ACTION TO THE U.S.D.C. FOR THE MIDDLE DISTRICT OF FLORIDA IS DENIED.(4)DEFT'S MOTION TO STRIKE PREJUDICIAL & IRRELEVANT MATERIAL FROM THE INDICTMENT IS DENIED.(5)DEFT'S MOTION TO PERMIT CERTAIN THIRD/PARTY SUBPOENAS DUCES TECUM TO BE MADE RETURNABLE BEFORE TRIAL IS DENIED.) (JUDGE WARD) (Dkt'd 04/13/89).
Dismissed (Count 12) (JUDGE WARD) (Dkt'd 04/13/89).
Motion denied (MOT#1) (JUDGE WARD) (Dkt'd 04/13/89).
Motion to quash denied (MOT#2) (JUDGE WARD) (Dkt'd 04/13/89).
Motion to quash denied (MOT#3) (JUDGE WARD) (Dkt'd 04/13/89).
Excludable delay due to hearings on Pretrial Motions began on 02/16/89 and ended on 04/11/89 (Dkt'd 04/13/89).
Excludable delay due to hearings on Pretrial Motions began on 03/28/89 and ended on 04/11/89 (Dkt'd 04/13/89).
Excludable delay due to hearings on Pretrial Motions began on 03/31/89 and ended on 04/11/89 (Dkt'd 04/13/89).

04/12/89      Order filed (FLD MEMO-ENDORSED ON MOTION FOR AND ORDER QUASHING & VACATING THE SUBPOENA DUCES TECUM, DATED 2-23-89. ..MOTION DISPOSED OF IN ACCORDANCE WITH ORAL DECISION RENDERED THIS DATE. CM) (JUDGE WARD) (Dkt'd 04/13/89).
Order filed (FLD MEMO-ENDORSED ON MOTION OF DEFT TO DISMISS INDICTMENT OR FOR ALTERNATIVE RELIEF...MOTION DISPOSED OF IN ACCORDANCE WITH ORAL DECISION RENDERED ON APRIL 7 & APRIL 11, 1989. CM) (JUDGE WARD) (Dkt'd 04/13/89).
Order filed (FLD MEMO-ENDORSED ON MOTION FOR AN ORDER QUASHING IN ITS ENTIRETY THE 2-23-89 SUBPOENA DUCES TECUM ISSUED UPON THE APPLICATION OF DEFT... MOTION DISPOSED OF IN ACCORDANCE WITH ORAL DECISION RENDERED THIS DATE. CM) (JUDGE WARD) (Dkt'd 04/13/89).

```
                                                      *** GRID L16 ***
ACTIVE CRIMINAL DOCKETS        NY-S(NEW YORK CITY) 04/13/92
                                                                      PAGE 7
CR-88-00962-01                                      CR-88-00962-01
                       US-V-BILZERIAN
                                    PROCEEDINGS

04/24/89  17     - FLD GOVERNMENT'S PROPOSED EXAMINATION OF PROSPECTIVE
                   JURORS & DSPROPOSED PRE-TRIAL CHARGE TO THE JURY ON
                   SECURITIES TERMS & ISSUES. (Dkt'd 04/25/89).

04/25/89  18     Motion to quash filed  (MOT#4) (FOR AN ORDER, QUASHING IN
                  ITS ENTIRETY THE APRIL 11, 1989 SUBPOENA DUCES TECUM ISSUED
                  UPON THE APPLICATION OF PAUL A. BILZERIAN, RET 5-1-89.)
                  (Dkt'd 04/26/89).
          18     Mark the beginning of a potential excludable period of type
                  X-E starting on 04/25/89 ((In re MOTFQS on 4-25-89)) (Dkt'd
                  04/26/89).
          19     Memorandum in support of motion to quash  (MOT#4) (Dkt'd
                  04/26/89).

04/26/89  20     - FLD DEF T'S PROPOSED VOIR DIRE QUESTIONS. (Dkt'd
                   04/26/89).
          21     - FLD DEFT'S OPPOSITION TO PATTERSON, BELKNAP, WEBB &
                   TYLER'S MOTION TO QUASH SUBPOENA DUCES TECUM. (Dkt'd
                   04/26/89).
          22     - FLD JURY QUESTIONNAIRE. (Dkt'd 04/26/89).

05/01/89         Voir dire begins-jury (Counts 1,2-4,5-6,7,8-9,10-11) (JUDGE
                  WARD) (Dkt'd 05/02/89).
                 Trial begins-jury (Counts 1,2-4,5-6,7,8-9,10-11) (Dkt'd
                  05/02/89).

05/02/89         Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (JURY
                  SELECTION CONT JURY SELECTED & SWORN PRELIMINARY
                  INSTRUCTIONS BY THE COURT TO THE JURY OPENING STATEMENTS.)
                  (JUDGE WARD) (Dkt'd 05/03/89).

05/03/89         Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (GOVT'S
                  EVIDENCE.) (JUDGE WARD) (Dkt'd 05/08/89).

05/04/89         Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT. OF
                  GOVT'S EVIDENCE.) (JUDGE WARD) (Dkt'd 05/08/89).

05/05/89  24     Order filed (FLD ONE(1) ENVELOPE ORDERED SEALED & IMPOUNDED
                  PER ORDER OF JUDGE WARD DATED 5-5-89. CONTENTS:PRE-TRIAL
                  FINDINGS.) (JUDGE WARD) (Dkt'd 05/15/89).

05/08/89  23     - FLD DEFT'S OPPOSITION TO GOVERNMENT'S ORAL MOTION IN
                   LIMINE CONCERNING EVIDENCE OF SIMILAR TRANSACTIONS. (Dkt'd
                   05/08/89).
                 Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT. OF
                  GOVT'S EVIDENCE) (JUDGE WARD) (Dkt'd 05/09/89).

05/09/89   .     Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT. OF
                  GOVT'S EVIDENCE.  DEFT MOVES THE COURT FOR A MISTRIAL.
```

```
                                                      *** GRID M16 ***
ACTIVE CRIMINAL DOCKETS        NY-S(NEW YORK CITY) 04/13/92
                                                                    PAGE 8
CR-88-00962-01                                    CR-88-00962-01
                 US-V-BILZERIAN
                                  PROCEEDINGS

                   MOTION DENIED.) (JUDGE WARD) (Dkt'd 05/11/89).

05/10/89          - TRIAL CONTINUED:APPLICATION OF BELNAP, WEBB & TYLER TO
                    R17, FRCP, TO QUASH THE SUBPOENA ISSUED BY DEFT IS GRANTED.
                    WARS,J CONT. OF GOVT'S EVIDENCE. (JUDGE WARD) (Dkt'd
                    05/15/89).

05/11/89          Order filed (FLD MEMO-ENDORSED ON MOTION, FOR AN ORDER
                  QUASHING IN ITS ENTIRETY THE APRIL 11, 1989 SUBPOENA DUCES
                  TECUM ISSUED UPON THE APPLICATION OF DEFT PAUL A. BILZERIAN.
                  ..MOTION GRANTED IN ACCORDANCE WITH ORAL DECISION RENDERED
                  THIS DATE. CMC) (JUDGE WARD) (Dkt'd 05/12/89).
                  Motion to quash granted  (MOT#4) (JUDGE WARD) (Dkt'd
                  05/12/89).
                  Excludable delay due to hearings on Pretrial Motions began
                  on 04/25/89 and ended on 05/11/89 (Dkt'd 05/12/89).
                  Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT OF
                  GOVT'S EVIDENCE.) (JUDGE WARD) (Dkt'd 05/15/89).

05/15/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT. OF
                  GOVT'S EVIDENCE) (JUDGE WARD) (Dkt'd 05/22/89).

05/16/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT. OF
                  GOVT'S EVIDENCE.) (JUDGE WARD) (Dkt'd 05/22/89).

05/17/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT. OF
                  GOVT'S EVIDENCE GOVT. RESTS.) (JUDGE WARD) (Dkt'd 05/22/89).

05/18/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (DEFT MOVES
                  THE COURT FOR JUDGMENT OF ACQUITTAL ON COUNTS 1&7..MOTION
                  DENIED..WARD,J COUNTS 5,6,10&11.  MOTION DENIED..WARD,J
                  COUNTS 2,3,8&9..MOTION DENIED..WARD,J. COUNT 4. MOTION
                  DENIED..WARD,J DEFT MOVES THE COURT TO STRIKE PORTIONS OF
                  THE INDICTMENT AS FOLLOWS:COUNT 6, PARAGRAPH 35..."AND THE
                  INTERNATL REVENUE SERVICE"  PARAGRAPH 36(A).. & THE
                  INTERNAL REVENUE SERVICE,"PARAGRAPH 38, IN ITS ENTIRETY
                  PARAGRAPH 45.." WHO DEDUCTED THE PAYMENT ON A 1985 INCOME
                  TAX RETURN AS A "CONSULTING FEE". COUNT11, PARAGRAPH 75.
                  AND THE INTERNAL REVENUE SERVICE, PARAGRAPH 76(A)&(B)' AND
                  THE DINTERNAL REVENUE SERVICE, PARAGRAPH 78, IN ITS
                  ENTIRETY..MOTION DENIED. DEFT MOVES THE COURT TO STRIKE THE
                  CHANGE OF MARGIN VIOLATIONS ON COUNTS 5,10&11 MOTION DENIED.
                  ..WARD,J DEFT MOVES THE COURT TO CONSOLIDATE THE CONSPIRACY
                  COUNTS, TO WIT, COUNTS 5,6,10&11.  DECISION RESERVED..WARD
                  J. DEFT MOVES THE COURT TO CONSOLIDATE COUNTS 2&3 & COUNTS
                  8&9..MOTION DENIED.) (JUDGE WARD) (Dkt'd 05/22/89).
                  Filed transcript of proceedings for 03/24/89 (Dkt'd
                  05/23/89).
```

```
                                              *** GRID N16 ***
ACTIVE CRIMINAL DOCKETS        NY-S(NEW YORK CITY) 04/13/92
                                                                    PAGE 9
CR-88-00962-01                               CR-88-00962-01
                     US-V-BILZERIAN
                                     PROCEEDINGS

05/22/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (TRIAL
                    CONTINUED:DEFT'S EVIDENCE.) (JUDGE WARD) (Dkt'd 05/23/89).

05/23/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT. OF
                    DEFT'S EVIDENCE.) (JUDGE WARD) (Dkt'd 05/24/89).

05/24/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT. OF
                    DEFTS EVIDENCE) (JUDGE WARD) (Dkt'd 05/25/89).

05/30/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT. OF
                    DEFTS EVIDENCE.) (JUDGE WARD) (Dkt'd 05/31/89).
            26    - FLD DEFT'S PROPOSED JURY INSTRUCTIONS. (Dkt'd 05/31/89).
            27    Motion filed (MOT#5) (MOTION IN LIMINE TO INSULATE THE
                    JURY FROM QUESTIONS, COMMENTS & ARGUMENTS THAT CALL
                    ATTENTION TO DEFT'S INVOCATION OF THE ATTY-CLIENT PRIVILEGE.
                    ) (Dkt'd 05/31/89).
                  Mark the beginning of a potential excludable period of type
                    X-E starting on 05/30/89 (Dkt'd 05/31/89).

05/31/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT OF
                    DEFT'S EVIDENCE.) (JUDGE WARD) (Dkt'd 06/02/89).

06/01/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (DEFT MOVES
                    THE COURT FOR A MISTRIAL. MOTION DENIED.) (JUDGE WARD)
                    (Dkt'd 06/02/89).

06/02/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT. OF
                    GOVT'S EVIDENCE.) (JUDGE WARD) (Dkt'd 06/12/89).

06/05/89          Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (CONT. OF
                    DEFT'S EVIDENCE' DEFT RESTS GOVT'S REBUTTAL EVIDENCE GOVT.
                    RESTS.) (JUDGE WARD) (Dkt'd 06/12/89).
                  Order filed (FLD MEMO-ENDORSED ON MOTION IN LIMINE TO
                    INSULATE THE JURY FROM QUESTIONS...MOTION DENIED IN
                    ACCORDANCE WITH ORAL DECISION RENDERED THIS DATE. CMC)
                    (JUDGE WARD) (Dkt'd 06/12/89).
                  Excludable delay due to hearings on Pretrial Motions began
                    on 05/30/89 and ended on 06/05/89 (Dkt'd 06/12/89).
                  Motion denied (MOT#5) (JUDGE WARD) (Dkt'd 06/12/89).
            28    Motion filed (MOT#6) (MOTION TO STRIKE PORTION OF
                    INDICTMENT CHARGING CONSPIRACY TO DEFRAUD THE INTERNAL
                    REVENUE SERVICE OR, ALTERNATIVELY MOTION FOR JUDGMENT OF
                    ACQUITTAL ON SUCH PORTIONS.) (Dkt'd 06/12/89).
                  Mark the beginning of a potential excludable period of type
                    X-E starting on 06/05/89 (Dkt'd 06/12/89).
            29    Motion filed (MOT#7) (MOTION TO STRIKE ALLEGATIONS
                    RELATING TO VIOLATION OF MARGIN REGULATIONS.) (Dkt'd
                    06/12/89).
                  Mark the beginning of a potential excludable period of type
```

```
                                                  *** GRID 016 ***
ACTIVE CRIMINAL DOCKETS      NY-S(NEW YORK CITY) 04/13/92
                                                                  PAGE 10
68-88-00962-01                                  CR-88-00962-01
              US-V-BILZERIAN
                              PROCEEDINGS

              X-E starting on 06/05/89 (Dkt'd 06/12/89).

06/06/89      Status hearing held (DEFT RENEWS HIS MOTION FOR JUDGMENT OF
              ACQUITTAL ON ALL COUNTS.. MOTION DENIED. JWARD,J.  DEFT
              MOVES THE COURT FOR CONSOLIDATION OF THE TITLE 18, USC
              .SECTION 1001 COUNTS TO WIT, COUNTS 2,3,4,8&9...MOTION
              DENIED..WARD,J. THE GOVT. VOLUNTARILY CONSOLIDATES THE
              CONSPIRACY COUNTS TO, WIT, COUNTS 5,6,10&11 AS FOLLOWS:
              COUNTS 5 & 10 ARE CONSOLIDATED INTO ONE COUNT & COUNTS 6&11
              ARE CONSOLIDATED INTO ONE COUNT...GRANTED, WARD,J.  DEFT
              MOVES THE COURT TO STRIKE THE CHARGE OF MARGIN VIOLATIONS
              ON COUNTS 5,10&11...MOTION DENIED..WARD,J DEFT MOVES THE
              COURT TO STRIKE CERTAIN PORTIONS OF THE INDICTMENT...MOTION
              GRANTED TO THE EXTENT INDICATED BY THE COURT..WARD,J CHARGE
              CONFERENCE HELD.) (JUDGE WARD) (Dkt'd 06/12/89).

06/07/89      Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (SUMMATIONS)
              (JUDGE WARD) (Dkt'd 06/12/89).
        30    - FLD DEFT'S PROPOSED SUPPLEMENTARY REQUESTS TO CHARGE.
              (Dkt'd 06/12/89).
        31    - FLD GOVERNMENT'S PROPOSED SUPPLEMENTARY REQUESTS TO
              CHARGE. (Dkt'd 06/12/89).

06/08/89      Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (COURT'S
              CHARGE MARSHAL SWORN ALTERNATE JURORS DISCHARGED JURY
              DELIBERATIONS.) (JUDGE WARD) (Dkt'd 06/12/89).

06/09/89      Trial held-jury (Counts 1,2-4,5-6,7,8-9,10-11) (TRIAL
              CONTINUED:CONT. OF JURY DELIBERATIONS, JURY VERDICT: GUILTY
              ON COUNT 1 GUILTY ON COUNT 2 GUILTY ON COUNT 3 GUILTY ON
              COUNT 4 GUILTY ON COUNT 5(CONSOLIDATED WITH COUNT10 ON JUNE
              6, 1989) GUILTY ON COUNT 6(CONSOLIDATED WITH COUNT 11 ON
              JUNE 6, 1989) GUILTY ON COUNT 7 GUILTY ON COUNT 8 GUILTY ON
              COUNT 9 JURORS DISCHARGED THE COURT SETS THE FOLLOWING POST
              VERDICT MOTION SCHEDULE DEFT TO SERVE & FILE HIS MOTION
              PAPERS BY AUGUST 2, 1989 GOVT. TO SERVE & FILE ITS
              OPPOSITION PAPERS BY AUGUST 11, 1989.  DEFT TO SERVE & FILE
              HIS REPLY PAPERS BY AUGUST 15, 1989a12:00P.M. P.S.I.
              ORDERED SENTENCE SCHEDULED FOR AUGUST 16, 1989a9:30A.M.
              DEFT CONT. ON BAIL PENDING SENTENCE TRIAL CONCLUDED.)
              (JUDGE WARD) (Dkt'd 06/14/89).
              Jury verdict of guilty (Counts 1,2-4,5-6,7,8-9,10-11)
              (JUDGE WARD) (Dkt'd 06/14/89).
              Order cause referred to the probation department for a pre-
              sentence investigation (Counts 1,2-4,5-6,7,8-9,10-11)
              (JUDGE WARD) (Dkt'd 06/15/89).
              Sentencing set for 08/16/89 a 9:30 AM (Counts 1,2-4,5-6,7,8-
              9,10-11) (Dkt'd 06/15/89).
```

```
                                                    *** GRID A17 ***
ACTIVE CRIMINAL DOCKETS        NY-S(NEW YORK CITY) 04/13/92
                                                                    PAGE 11
CR-88-00962-01                                       CR-88-00962-01
                    US-V-BILZERIAN
                                   PROCEEDINGS

06/12/89            Order filed (FLD MEMO-ENDORSED ON MOTION TO STRIKE PORTION
                    OF INDICTMENT CHARGING CONSPIRACY TO DEFRAUD THE INTERNATL
                    REVENUE SERVICE OR, ALTERNATIVELY, MOTION FOR JUDGMENT OF
                    ACQUITTAL ON SUCH PORTIONS...MOTION DENIED IN ACCORDANCE
                    WITH ORAL DECISION RENDERED THIS DATE. CMC) (JUDGE WARD)
                    (Dkt'd 06/15/89).
                    Motion denied (MOT#6) (JUDGE WARD) (Dkt'd 06/15/89).
                    Excludable delay due to hearings on Pretrial Motions began
                    on 06/05/89 and ended on 06/12/89 (Dkt'd 06/15/89).
                    Order filed (FLD MEMO-ENDORSED ON MOTION TO STRIKE
                    ALLEGATIONS RELATING TO VIOLATION OF MARGIN REGULATIONS..
                    MOTION DENIED IN ACCORDANCE WITH ORAL DECISION RENDERED
                    THIS DATE. CMC) (JUDGE WARD) (Dkt'd 06/15/89).
                    Motion denied (MOT#7) (JUDGE WARD) (Dkt'd 06/15/89).
                    Excludable delay due to hearings on Pretrial Motions began
                    on 06/05/89 and ended on 06/12/89 (Dkt'd 06/15/89).

06/16/89  32        Motion for new trial filed (MOT#8) (Counts 1-11) (Dkt'd
                    06/19/89).

06/21/89  33        Filed transcript of proceedings for 04/11/89 (Dkt'd
                    06/21/89).
          34        Filed transcript of proceedings for 04/07/89 (Dkt'd
                    06/21/89).

08/16/89  35        Filed transcript of proceedings for 05/16/17 (Dkt'd
                    08/17/89).
          36        Filed transcript of proceedings for 05/01/02 (Dkt'd
                    08/17/89).
          37        Filed transcript of proceedings for 05/24/30 (Dkt'd
                    08/17/89).
                    Filed transcript of proceedings for 05/08/09 (Dkt'd
                    08/17/69).
          38        Filed transcript of proceedings for 06/02/05 (Dkt'd
                    08/17/89).
                    - SENTENCE ADJOURNED TO 9-15-89@10:00A.MM. (JUDGE WARD)
                    (Dkt'd 09/05/89).

08/21/89  39        - FLD MEMORANDUM OF DEFT PAUL A. BILZERIAN IN SUPPORT OF
                    MOTION FOR A NEW TRIAL. (Dkt'd 08/21/89).

08/23/89  40        Motion filed (MOT#9) (FOR AN ORDER GRANTING LEAVE TO
                    COUNSEL FOR DEFT TO COMMUNICATE WITH JUROR PAUL J. O'NEILL,
                    RET 8-30-89.) (Dkt'd 08/24/89).
                    Mark the beginning of a potential excludable period of type
                    X-E starting on 08/23/89 (Dkt'd 08/24/89).
          41        - FLD MEMORANDUM OF LAW IN SUPPORT OF DEFT'S MOTION FOR
                    LEAVE TO COMMUNICATE WITH JUROR PAUL J. O'NEILL. (Dkt'd
                    08/24/89).
```

```
                                                          *** GRID B17 ***
ACTIVE CRIMINAL DOCKETS        NY-S(NEW YORK CITY) 04/13/92
                                                                       PAGE 12
CR-88-00962-01                                        CR-88-00962-01
                 US-V-BILZERIAN
                                   PROCEEDINGS

08/30/89           - DEFT'S MOTION FOR LEAVE TO COMMUNICATE WITH JUROR
                     DISPOSED OF BY INQUIRY MADE BY THE COURT OF JUROR IN THE
                     PRESENCE OF COUNSEL FOR THE PARTIES. (JUDGE WARD) (Dkt'd
                     09/05/89).

09/01/89           Order filed (FLD MEMO-ENDORSED ON DEFT'S MOTION FOR LEAVE
                     TO COMMUNICATE WITH JUROR...MOTION DISPOSED OF BY INQUIRY
                     MADE BY THE COURT OF PAUL J.O'NFILL IN THE PRESENCE OF
                     COUNSEL FOR THE PARTIES. CM) (JUDGE WARD) (Dkt'd 09/05/89).

                   Motion  denied  (MOT#9) (JUDGE WARD) (Dkt'd 09/05/89).

09/06/89    42     - FLD GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFT'S
                     MOTION FOR NEW TRIAL. (Dkt'd 09/07/89).

09/08/89    43     - FLD REPLY OF DEFT PAUL A. BILZERIAN IN SUPPORT OF MOTION
                     FOR NEW TRIAL. (Dkt'd 09/11/89).

09/26/89           Order filed (FLD MEMO-ENDORSED ON DEFTS MOTION FOR NEW
                     TRIAL... MOTION DENIED IN ACCORDANCE WITH MEMORANDUM
                     DECISION FILED HEREWITH.  CMC) (JUDGE WARD) (Dkt'd
                     09/27/89).
            44     Order filed (FLD MEMORANDUM, ACCORDINGLY, BILZERIAN'S NEW
                     TRIAL MOTION IS IN ALL RESPECTS DENIED. CMC) (JUDGE WARD)
                     (Dkt'd 09/27/89).
                   Motion for new trial denied  (MOT#8) (JUDGE WARD) (Dkt'd
                     09/27/89).
                   Excludable delay due to hearings on Pretrial Motions began
                     on 08/23/89 and ended on 09/01/89 (Dkt'd 09/27/89).

09/27/89    45     - FLD GOVERNMENT'S SENTENCING MEMORANDUM. (Dkt'd 09/27/89).

            46     - FLD SENTENCING MEMORANDUM ON BEHALF OF PAUL A. BILZERIAN.
                     (Dkt'd 09/28/89).

09/29/89    47     Sentencing of defendant (Counts 1-2,4-6,8-9) (FLD JUDGMENT &
                     COMMITMENT ORDER(DEFT & ATTY ARTHUR F. MATHEWS, ESQ.
                     PRESENT).  AUSA BRODSKY.  THE DEFT IS HEREBY COMMITTED TO
                     THE CUSTODY OF THE ATTORNEY GENERAL OR HIS AUTHORIZED
                     REPRESENTATIVE FOR IMPRISONMENT FOR A PERIOD OF FOUR(4)
                     YEARS ON EACH OF COUNTS 1,2,5,6,8&9, TO RUN CONCURRENTLY
                     WITH EACH OTHER. IMPOSITION OF SENTENCE IS SUSPENDED ON
                     COUNT 4, & DEFT PLACED ON PROBATION FOR A PERIOD OF TWO(2)
                     YEARS, SUBJECT TO THE STANDING PROBATION ORDER OF THIS
                     COURT.  PROBATION SHALL COMMENCE UPON DEFT'S RELEASE FROM
                     IMPRISONMENT.  SPECIAL CONDITION OF PROBATION BEING THAT
                     DEFT DEVOTE 250 HOURS OF COMMUNITY SERVICE DURING THE
                     PERIOD OF HIS PROBATION AS DIRECTED BY THE PROBATION
                     DEPARTMENT.  PROBATION SUPERVISION MAY BE TRANSFERRED TO
```

```
                                                      *** GRID C17 ***
ACTIVE CRIMINAL DOCKETS        NY-S(NEW YORK CITY) 04/13/92
                                                             PAGE 13
CR-88-00962-01                                 CR-88-00962-01
                  US-V-BILZERIAN
                              PROCEEDINGS

            THE APPROPRIATE U.S. PROBATION DEPARTMENT IN TAMPA, FLORIDA.
             DEFT SHALL PAY FINES TO THE U.S. IN THE SUM OF $250,000
            ON EACH OF COUNTS 1,2,5,6,8&9 (TOTAL FINE:$1,500,000) BY
            OCTOBER 27, 1989.  SAID FINES WILL NOT BE STAYED BY THE
            COURT.  IN ADDITION, A $50 ASSESSMENT IS IMPOSED BY THE
            COURT UPON THE DEFT ON EACH OF COUNTS 1,2,4,5,6,8&9(TOTAL
            ASSESSMENT:$350) AS PROVIDED BY LAW PURSUANT TO TITLE 18,
            USC SECTION 3013(A)(2)(A).  DEFT'S ADDRESS: 816 TARAY
            BOULEVARD, TAMPA, FLORIDA.  DEFT IS REQUIRED TO NOTIFY THE
            U.S. ATTY OF ANY CHANGE OF HIS NAME & ADDRESS WITHIN
            THIRTY(30) DAYS.  THE COURT DOES NOT IMPOSE A SENTENCE ON
            COUNT 3 & COUNT 7.  DEFT CONTINUED ON BAIL PENDING APPEAL.)
            (JUDGE WARD) (Dkt'd 10/02/89).
            Issued judgment and commitment to U.S. Marshal (Counts 1-2,
            4-6,8-9) (JUDGE WARD) (Dkt'd 10/02/89).
        47  - DOCKETED AS A JUDGMENT #89,2397 ON 9-29-89 (JUDGE WARD)
            (Dkt'd 10/04/89).

10/05/89 48  Filed notice of appeal (Counts 1-2,4-6,8-9) (APPL#1) (FLD
            DEFT PAUL A. BILZERIAN'S NOTICE OF APPEAL TO THE USCA FOR
            THE SECOND CIR. FROM THE JUDGMENT ENTERED IN THIS ACTION ON
            9-27-89. COPY SENT TO CHAMBERS, COPY TO U.S. ATTY'S OFFICE.
            ORIG APPEAL WITH COPY OF JUDGMENT & TWO COPIES OF DKT
            ENTRIES SENT TO COURT OF APPEALS.) (Dkt'd 10/06/89).

10/19/89 49  Filed transcript of proceedings for 08/31/89 (Dkt'd
            10/19/89).

10/30/89 51  - FLD NOTICE THAT THE ORIGINAL RECORD ON APPEAL HAS BEEN
            TRANSMITTED TO THE USCA FOR THE SECOND CIR. ON 10-30-89.
            (Dkt'd 10/31/89).

10/31/89 50  - FLD LETTER TO THE COURT FROM AUSA DAVID E. BRODSKY DTD 10-
            30-89, IN RE: THAT PURS TO SECTION 11 OF THE LOCAL RULES OF
            THE USCA FOR THE SECOND CIR., THE DEFT & THE GOVERNMENT
            HAVE DESIGNATED THE ENCLOSED GOVERNMENT EXHIBITS AS
            NECESSARY FOR THE DETERMINATION OF THE APPEAL. (RETURNED TO
            O&A). (Dkt'd 10/31/89).

11/06/89 52  Stipulation Filed (JOINT REQUEST TO SUPPLEMENT THE RECORD
            ON APPEAL.) (JUDGE WARD) (Dkt'd 11/08/89).

11/09/89 53  - FLD NOTICE THAT THE 1ST SUPPLEMENTAL RECORD ON APPEAL HAS
            BEEN TRANSMITTED TO THE USCA FOR THE SECOND CIR. ON 11-9-89.
            (Dkt'd 11/13/89).

11/15/89 54  Filed transcript of proceedings for 09/27/89 (Dkt'd
            11/16/89).
```

```
                                            *** GRID D17 ***
ACTIVE CRIMINAL DOCKETS      NY-S(NEW YORK CITY) 04/13/92
                                                              PAGE 14
CR-88-00962-01                                  CR-88-00962-01
               US-V-BILZERIAN
                               PROCEEDINGS

11/21/89  55   - FLD SATISFACTION OF JUDGMENT #89,2397 (Dkt'd 11/22/89).

11/24/89       Payment on fine received, $350.00 (PAID TO DATE:$350.)
               (Dkt'd 11/27/89).

06/06/91  56   Filed certified copy of order from U.S. Court of Appeals
               affirming judgment of U.S. District Court  (APPL#1) (FLD
               TRUE COPY OF ORDER & MANDATE WITH ATTACHED OPINION, THAT
               THE JUDGMENT OF DISTRICT COURT IS AFFIRMED IN ACCORDANCE
               WITH THE OPINION OF THIS COURT. E.O.D. 6/11/91 & COPY SENT
               TO CHAMBERS.) (Dkt'd 06/11/91).

07/02/91  57   Order filed (FLD TRUE COPY OF ORDER FROM THE USCA FOR THE
               SECOND CIR. THAT THE NOTICE OF MOTION FOR RECALL OF THE
               MANDATE ISSUED WHILE STAY OF MANDATE WAS IN EFFECT, IT IS
               HEREBY ORDERED THAT THE MOTION IS GRANTED. COPY SENT TO
               CHAMBERS.) (Dkt'd 07/10/91).

10/26/91  58   Order filed (FLD TRUE COPY OF ORDER & MANDATE WITH ATTACHED
               OPINION FROM THE USCA FOR THE SECOND CIR. THAT THE JUDGMENT
               OF DISTRICT COURT IS AFFIRMED. E.O.D. 10/30/91 & COPY SENT
               TO CHAMBERS) (Dkt'd 10/30/91).

10/30/91  59   Order filed (THA THE EXECUTION OF THE SENTENCE OF
               INCARCERATION IMPOSED BY THIS COURT IN THIS CASE COMMENCE
               NO LATER THAN 2:00P.M. ON MONDAY, 12/2/91 ETC. & THAT THE
               CLERK OF THIS COURT DELIVER A CERTIFIED COPY OF THIS ORDER
               TO THE U.S. MARSHAL FOR THIS DISTRICT. CM) (JUDGE WARD)
               (Dkt'd 10/30/91).

12/11/91  60   Judgment and commitment returned executed, executed on
               12/02/91 (Counts 1-2,4,6,8-9) (DEFT VOLUNTARY SURRENDER
               12/2/91 TO FPC, EGRION AFB, FL.) (Dkt'd 12/11/91).

02/03/92  61   Motion to reduce sentence filed  (MOT#10) (Counts 1-2,4-6,8-
               9) (RET 2/21/92@9:30) (Dkt'd 02/03/92).
          62   Memorandum in support of motion to reduce sentence
               (MOT#10) (Dkt'd 02/03/92).

02/18/92  63   - GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFT'S MOTION
               FOR REDUCTION OF SENTENCE. (Dkt'd 02/18/92).

02/27/92  64   - REPLY MEMORANDUM IN SUPPORT OF MOTION FOR REDUCTION OF
               SENTENCE. (Dkt'd 02/27/92).
...............................................................

               End of docket
```

**EXHIBIT 5**

CaseCase4CaseX905eB9-18504R5-1-RODDocomentmt17d281-5FileFile06249789/2BageP72ce245475Page
ID #:1019

UNITED STATES DISTRICT COURT
for the
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>450 Fifth Street, N.W.<br>Washington, D.C. 20549<br>(202) 272-2945, | : | Civil Action<br>No. _____<br>**89- 1854** |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | COMPLAINT FOR<br>INJUNCTIVE AND<br>OTHER EQUITABLE<br>RELIEF |
|  | : |  |
| PAUL A. BILZERIAN,<br>DAVID A. TALLANT,<br>BILZERIAN AND MACK ASSOCIATES,<br>HPC ACQUISITION CORPORATION,<br>EDWARD J. DEBARTOLO, SR.,<br>WILLIAM D. MOSES, and<br>RICHARD S. SOKOLOV, | : | **FILED**<br><br>JUN 2 9 1989 |
|  | : |  |
| Defendants. | : | CLERK, U. S. DISTRICT COURT<br>DISTRICT OF COLUMBIA |

OBERDORFER, J. LFO

E

Plaintiff SECURITIES AND EXCHANGE COMMISSION (the "Commission") for its COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF (the "Complaint") alleges, upon information and belief, that:

1. Defendants Paul A. Bilzerian, David A. Tallant, Bilzerian and Mack Associates and HPC Acquisition Corporation, directly or



2

indirectly, personally or through direction of their agents, have engaged, are engaged or are about to engage in acts, transactions, practices and courses of business which constitute violations of the securities laws and regulations of the United States, as described more fully below.

2. Defendants Edward J. Debartolo, Sr., William D. Moses and Richard S. Sokolov, directly or indirectly, personally or through direction of their agents, have engaged, and, unless restrained and enjoined, are likely to engage in acts, transactions, practices and courses of business which constitute violations of the securities laws and regulations of the United States, as described more fully below.

### JURISDICTION AND VENUE

3. The Commission brings this action pursuant to the authority conferred upon it by Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d) and § 78u(e)] to permanently restrain and enjoin the defendants, and for other equitable relief.

4. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

5. Each of the defendants, directly or indirectly, has made use of means and instrumentalities of interstate commerce, of the mails or of the facilities of a national securities exchange, in connection with the acts, transactions, practices and courses of business alleged herein, certain of which have occurred within the District of Columbia.

Case 2:84-cr-00569-MRL RCD Document 1472-5 Filed 06/28/22 Page 74 of 154 Page ID #:1021

3

6. Venue lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7. Each defendant, unless permanently restrained and enjoined by this Court, will continue to engage in the acts, transactions, practices and courses of business alleged herein, and in acts, practices and courses of business of similar purport and object.

DEFENDANTS

8. Defendant Paul A. Bilzerian ("Bilzerian") is a resident of Tampa, Florida. Bilzerian is a private investor who has made several attempts to acquire public companies. On June 9, 1989, Bilzerian was convicted by a jury in the United States District Court for the Southern District of New York of nine felony counts relating to his illegal conduct concerning the common stock of Cluett Peabody & Co., Inc., Hammermill Paper Co., Armco, Inc. and H.H. Robertson Co., certain of which conduct is covered by the allegations set forth below. Bilzerian is scheduled for sentencing on August 16, 1989.

9. Defendant David A. Tallant ("Tallant") is a resident of Carmichael, California. Tallant is an attorney and member of the California bar. He is a sole practitioner.

10. Defendant Bilzerian and Mack Associates ("Associates") was a Delaware partnership, whose general partners were Bilzerian, Bilzerian Investors, L.P. and Mack Asset Co., L.P. Associates acquired in excess of five (5) percent of the outstanding common stock of Hammermill Paper Company ("Hammermill") and was one of the

4

bidders in a July 25, 1986 tender offer for Hammermill common stock.

11.   Defendant HPC Acquisition Company, Inc. ("HPC") was a Delaware corporation and an indirect wholly-owned subsidiary of Associates.  HPC was incorporated on July 22, 1986 and was another of the bidders in a July 25, 1986 tender offer for Hammermill common stock.

12.   Defendant Edward J. DeBartolo, Sr. ("DeBartolo, Sr.") is a resident of Boardman, Ohio.  DeBartolo, Sr. is the Chairman of the Board of Directors of The Edward J. DeBartolo Corporation ("EJDC"), a private company that is among the world's largest developers and managers of regional shopping malls.

13.   Defendant William D. Moses ("Moses") is a resident of Youngstown, Ohio.  Moses is the Senior Vice President of Operations at EJDC.

14.   Defendant Richard S. Sokolov ("Sokolov") is a resident of Boardman, Ohio.  Sokolov is Senior Vice President-Development and General Counsel at EJDC.

<u>OTHER RELEVANT PERSONS AND ENTITIES</u>

15.   Boyd L. Jefferies ("Jefferies") was at all relevant times the Chairman of the Board of Directors and Chief Executive Officer of Jefferies & Company, Inc. ("Jefferies & Company"), a broker-dealer registered with the Commission.  On March 17, 1987, the Commission instituted a civil injunctive action and an administrative proceeding against Jefferies and Jefferies & Company, alleging violations of the antifraud, books and records,

5

beneficial ownership reporting requirements and other provisions of the federal securities laws. Without admitting or denying the allegations of the Commission, Jefferies and Jefferies & Company each consented to the entry of injunctions and the issuance of Commission orders sanctioning both the firm and Jefferies.

I.

CLUETT PEABODY & COMPANY, INC.

FIRST CLAIM - CLUETT

Bilzerian Violated Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rules 13d-1 and 13d-2 Thereunder, 17 C.F.R. §§ 240.13d-1 and 240.13d-2 -- Failure to Disclose Beneficial Ownership and False Statements on Schedule 13D.

16. Paragraphs 1 through 15 are realleged and incorporated by reference herein.

17. Cluett Peabody & Company, Inc. ("Cluett") is incorporated in New York. Cluett's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was traded on the New York and regional exchanges at all relevant times, until November 1985 when Cluett was acquired by a subsidiary of West Point-Pepperell, Inc. ("WPP").

18. On June 4, 1985, Bilzerian filed with the Commission, on behalf of himself, his general partner, William B. Brodovsky ("Brodovsky"), and the general partnership that he formed with Brodovsky, the Bilzerian and Brodovsky Partnership ("the Partnership"), a statement on Schedule 13D ("Schedule 13D") with respect to Cluett. As described in detail below, the Schedule 13D reported that Bilzerian, Brodovsky and the Partnership were the

CaseCase8:24-cv-1569-MSS-UAM51-RO4Document14715-EFiledFile06/28/29/2PagePage377of745475Page ID #:1024

6

beneficial owners of 9.9% of the outstanding common stock of Cluett. From July 12, 1985 through November 14, 1985, Bilzerian filed or caused the filing with the Commission of five amendments to the Schedule 13D.

19. From on or about June 4, 1985 and thereafter, Bilzerian made, and caused the Partnership to make, in the Schedule 13D and amendments thereto filed with respect to Cluett, untrue statements of material fact, omitted to state material facts necessary to make the statements that were made, not misleading, and omitted facts required to be stated by Section 13(d) of the Exchange Act, Rules 13d-1 and 13d-2 thereunder and Schedule 13D.

20. As more fully described below, the untrue statements, misstatements and omissions that Bilzerian made, and caused the Partnership to make or to fail to make and the failure to disclose accurately required information in the Schedule 13D and amendments thereto concerned, among other things, the following:

(a) the fact that Bilzerian had borrowed a substantial portion of the funds that had been used to purchase the Cluett securities reported in the Schedule 13D and amendments thereto from certain individual investors and the terms and conditions of those borrowings;

(b) the fact that Bilzerian was the beneficial owner of certain Cluett securities secretly purchased and held for him by Jefferies & Company;

7

(c)   the fact that Bilzerian's purpose in acquiring
      Cluett securities was not to acquire the company
      but to coerce the company's management to pay him
      "greenmail" or to enter into an agreement with a
      white knight; and

(d)   the fact that, on or about October 2, 1985, at the
      latest, Bilzerian entered into a group arrangement
      for the purpose of acquiring, holding, voting
      and/or disposing of Cluett securities, which group
      arrangement included DeBartolo, Sr., Moses and
      Sokolov.

### Bilzerian's Secret Arrangements for Financing the Purchase of Cluett Common Stock

21.   From on or about April 12, 1985, through on or about May 28, 1985, Bilzerian raised approximately $8.75 million from a number of individual investors ("the Cluett Investors"). Bilzerian obtained these funds for the purpose of acquiring Cluett securities or in order to pay for Cluett securities he already had acquired.

22.   Bilzerian entered into contracts, arrangements and understandings with the Cluett Investors pursuant to which: (a) Bilzerian agreed to share evenly with the Cluett Investors the profits, if any, earned on the securities purchased with their funds; and (b) Bilzerian personally guaranteed that the Cluett Investors would not lose money and that their funds would be returned by a date certain.

CaseCase2:84-cr-80569-MSDAR54-DocDocument4-17281-5FiledFiled06/28/39/23PagePage79of945475Page ID #:1026

8

23. In an apparent attempt to conceal the identity and existence of the Cluett Investors and the terms of their loans with Bilzerian, Bilzerian funneled the approximately $8.75 million that he raised through a series of trusts that he created or caused to be created. These trusts purported to provide Bilzerian with a fund of investment capital.

24. Defendant DeBartolo, Sr. was one of the Cluett Investors. DeBartolo, Sr. provided $2 million of the approximately $8.75 million Bilzerian used to purchase Cluett common stock.

25. DeBartolo, Sr. made his $2 million investment on the same terms as the other Cluett Investors. In addition to these terms, which are set forth in paragraph 22 above, DeBartolo, Sr. understood that his relationship to Bilzerian's acquisition of Cluett securities would not be disclosed publicly in any document or report filed with the Commission.

26. Bilzerian concealed from and misrepresented in his filings with the Commission, and thus in his representations to the investing public, Cluett and Cluett's shareholders, the facts concerning the financial arrangements that he had entered into with the Cluett Investors. Bilzerian filed, and caused the Partnership to file, an initial Schedule 13D on June 4, 1985. This Schedule 13D reported that Bilzerian, Brodovsky and the Partnership had purchased 581,000 shares of Cluett common stock and had acquired an option to purchase 210,000 Cluett shares (for $35 per share) for a total cost of approximately $17,821,016. The

9

Schedule 13D disclosed that approximately $8.8 million of the total amount consisted of funds extended to the Partnership's margin account at Morgan Stanley & Co. The Schedule 13D, however, did not report the source of the remaining funds.

27. Bilzerian filed, and caused the Partnership to file, the first amendment to the Schedule 13D on July 12, 1985. This amendment reported that Bilzerian's "personal funds" represented approximately $9,021,016 of the total acquisition cost and that the remaining funds had been obtained through ordinary margin accounts. In fact, at least approximately $8.75 million of the $9,021,016 that Bilzerian reported as "personal funds" had been obtained by him from the Cluett Investors in the manner and under the terms discussed in paragraphs 21 through 25 above, and were not Bilzerian's personal funds.

28. Neither the initial Schedule 13D filed by Bilzerian, Brodovsky and the Partnership nor any of the subsequent five amendments thereto disclosed the true source of funds or the contracts, arrangements and understandings between Bilzerian and the Cluett Investors that are set forth in paragraphs 21 through 25 above.

Bilzerian's Undisclosed Purpose For the Stock Acquisition

29. The Schedule 13D filed on June 4, 1985, reported that Bilzerian, Brodovsky and the Partnership had acquired Cluett common stock in order "to exercise influence on the management of [Cluett] . . . principally with a view to proposing and effecting a

Case 2:24-cr-00569-ODW Document 47-5 Filed 06/26/25 Page 81 of 154 Page ID #:1028

10

leveraged buyout, with the participation of [Cluett] management, of the entire equity interest of [Cluett]."

30. In fact, Bilzerian's purpose in acquiring beneficial ownership of in excess of five percent of Cluett common stock was to allow him to appear to be a credible takeover threat and thereby induce Cluett's management to pay him and the Partnership greenmail or to enter into an acquisition arrangement with a friendly buyer (a so-called "white knight").

Bilzerian's Secret Accumulation Arrangement
With Jefferies & Company

31. On or about May 21, 1985, Bilzerian entered into an agreement with Michael Landy ("Landy"), a Senior Vice President of Institutional Sales at Jefferies & Company, pursuant to which Jefferies & Company would accumulate the common stock of Cluett for Bilzerian's benefit. Under this agreement, Jefferies & Company would acquire the Cluett shares and, at a later date, Bilzerian would "buy" the shares from Jefferies & Company and pay the firm its cost to acquire the stock, plus its cost to carry the stock and commissions.

32. In accordance with this arrangement, from May 21 through May 27, 1985, Jefferies & Company acquired 302,000 shares of Cluett in a firm account for Bilzerian.

33. As a result of the agreement described in paragraph 31 above, Bilzerian became the beneficial owner of in excess of five percent of the outstanding common stock of Cluett on May 21, 1985.

11

34.   Bilzerian, as the beneficial owner of more than five percent of the common stock of Cluett, had an obligation to file with the Commission a Statement on Schedule 13D with respect to his holdings no later than ten days after his beneficial ownership exceeded five percent, or by May 31, 1985.

35.   Bilzerian, individually and on behalf of the Partnership, failed to file a Schedule 13D until June 4, 1985.

36.   On or about May 28, 1985, Bilzerian, on behalf of the Partnership, purchased from Jefferies & Company the 302,000 shares that had been accumulated in the manner described in paragraphs 31 and 32 above, for an average price of $29.97 per share.  This average price per share represented Jefferies & Company's cost to acquire and carry the shares and a six cent per share commission.

37.   The Schedule 13D and the amendments thereto also failed to report the above-described arrangement with Jefferies & Company and falsely reported a purchase of 302,000 shares of Cluett common stock as having occurred on May 28, 1985.

### The Group Arrangement

38.   From May through August 1985, defendants DeBartolo, Sr., Moses and Sokolov acquired and/or controlled 280,900 shares of Cluett common stock, as noted in paragraphs 93 through 95 below. The majority of these shares were acquired by DeBartolo, Sr.

39.   On or about August 26, 1985, Bilzerian requested that DeBartolo, Sr. provide approximately $20 million in additional financing for a tender offer for Cluett.  DeBartolo, Sr. declined at that time to provide the financing.

12

40.  On or about October 2, 1985 at the latest, Bilzerian entered into an arrangement, agreement or understanding with DeBartolo, Sr., Moses and Sokolov pursuant to which the shares of Cluett common stock held by DeBartolo, Sr., Moses and Sokolov ("the Shares") were available to be used by Bilzerian to further his effort to launch a takeover of Cluett.

41.  At the time when DeBartolo, Sr., Moses and Sokolov agreed to make available their Cluett shares to Bilzerian, they owned, respectively, 216,900 shares, 49,000 shares and 5,000 shares of Cluett common stock.

42.  Bilzerian did not amend, or cause the Partnership to amend, the Schedule 13D on file with the Commission to reflect the arrangement described in paragraph 40 above.

43.  On or about October 9, 1985, Bilzerian proposed to Moses that the Shares be reported to be sold to him at $38 per share with a forty-five day delayed settlement.  Bilzerian further proposed that, notwithstanding the reported sale price, the transfer of the Shares would be subject to two further conditions: (a) that if Bilzerian announced a tender offer for Cluett at a price higher than $38 per share the individual owners of the Shares automatically would receive the higher price; and (b) that if Bilzerian's tender offer bid was "topped" by a higher bid the transaction would be canceled so that the Shares could be sold to the higher bidder at the higher price.  Bilzerian then falsely represented himself to the Commission and to the investing public to be the owner of the Shares at no cost to himself.

13

44.  On or about October 9, 1985, Bilzerian understood that 347,567 shares of Cluett common stock were subject to the arrangement described in paragraphs 40 through 43 above.

45.  On or about October 10, 1985, Moses told Bilzerian that the number of shares subject to the arrangement described in paragraphs 40 through 43 above had been overcounted by 66,667 shares.  Notwithstanding this material discrepancy, Bilzerian told Moses to place an order to sell 347,567 shares of Cluett common stock at a price of $38 per share with a broker to be selected by Bilzerian.

46.  As previously agreed, on or about October 14, 1985 Moses placed an order to sell 347,567 shares of Cluett common stock at a price of $38 per share with a broker selected by Bilzerian, and Bilzerian placed an order to buy the same number of shares of Cluett at the same price with the same broker.  Both orders were subject to a forty-five day settlement period.  Bilzerian publicly reported a purchase of 347,567 shares of Cluett common stock at $38 per share.

47.  As discussed in detail below, on October 15, 1985 Bilzerian, Brodovsky and the Partnership filed with the Commission a tender offer statement on Schedule 14D-1 announcing a tender offer for all of the outstanding shares of Cluett common stock at $40 per share.  This filing purported to amend the Schedule 13D referred to in paragraph 26 above that Bilzerian previously had caused to be filed.  This amendment concealed the arrangement

14

described in paragraphs 40 through 43 above and materially misrepresented the nature of the transaction involving the Shares.

48. Between October 16, 1985 and November 3, 1985, Bilzerian entered into another arrangement or understanding with another of the Cluett Investors to acquire sufficient shares of Cluett common stock to make up for the shortfall of 66,667 Shares, referred to in paragraph 45 above.

49. Pursuant to this arrangement, on or about November 4, 1985, 162,900 shares of Cluett common stock were transferred into a brokerage account in the name of the Partnership. On or about November 12, 1985, Bilzerian sold 96,233 of these shares into the market.

50. The Schedule 13D filed by Bilzerian, Brodovsky and the Partnership never was amended to reflect the acquisition of the 162,900 shares or to reflect the disposition of the 96,233 shares referred to in paragraph 49 above.

51. The Schedule 13D and amendments thereto filed by Bilzerian, Brodovsky and the Partnership contained untrue statements of material fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 13(d), Rules 13d-1 and 13d-2 thereunder, and Schedule 13D, including, among others, the following:

(a) the Schedule 13D failed to disclose that Bilzerian borrowed approximately $8.75 million of the approximately $17 million purchase price (which

15

included a reported $8.8 million in margin loans) of the Cluett securities listed in the initial Schedule 13D and failed to describe the terms of the loan transactions and the names of the parties thereto (Schedule 13D, Item 3);

(b)     Amendment 1 to the Schedule 13D falsely identified the source of funds used to acquire Cluett securities as Bilzerian's personal funds;

(c)     the Schedule 13D failed to disclose the contracts, arrangements, understandings and relationships that Bilzerian had entered into with the Cluett Investors pursuant to which the Cluett Investors were entitled to one-half of the profits earned on the Cluett securities purchased with the funds that they had provided and pursuant to which such investors received personal guarantees from Bilzerian that they would not lose money on their investments (Schedule 13D, Items 3, 5 and 6);

(d)     the Schedule 13D falsely reported that the purpose of acquiring Cluett stock was to attempt a leveraged buyout when, in fact, the purpose was to pose a credible takeover threat in order to force Cluett management to pay greenmail or to seek out a white knight (Schedule 13D, Item 4);

(e)     the Schedule 13D was filed with the Commission more then ten days after Bilzerian and the Partnership

Case 2:24-cv-00569-JLS-RAO Document 17-5 Filed 06/28/25 Page 87 of 154 Page ID #:1034

16

became the beneficial owners of in excess of five percent of the securities of Cluett;

(f)   the Schedule 13D failed to disclose the existence of a group formed on or about October 2, 1985, at the latest for the purpose of acquiring, voting, holding or disposing of Cluett securities, the identities of DeBartolo, Sr., Moses and Sokolov as members of the group, and the number of Cluett shares beneficially owned by each of the undisclosed group members (Schedule 13D, Items 2, 5 and 6);

(g)   the Schedule 13D falsely stated that there were no contracts, arrangements, understandings or relationships between the filing persons and any other person with respect to Cluett common stock, when the contracts, arrangements, understandings and relationships described in paragraphs 21 through 50 above were in existence;

(h)   the Schedule 13D was not amended to report the acquisition on or about November 4, 1985 of 162,900 shares of Cluett common stock as described in paragraph 49; and

(i)   the Schedule 13D was not amended to report the disposition on or about November 12, 1985 of 96,233 shares of Cluett common stock as described in paragraph 49.

17

52.   By reason of the foregoing, Bilzerian violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 thereunder [17 C.F.R. §§ 240.13d-1 and 240.13d-2].

### SECOND CLAIM - CLUETT

Bilzerian Violated Section 14(d) of the Exchange Act, 15 U.S.C. § 78n(d), and Rules 14d-3 and 14d-6 Thereunder, 17 C.F.R. §§ 240.14d-3 and 240.14d-6 --False and Misleading Tender Offer Statement

### Bilzerian's Other Undisclosed Tender Offer Arrangements

53.   Paragraphs 1 through 52 are realleged and incorporated by reference herein.

54.   On or about October 7, 1985, DeBartolo, Sr. agreed to loan Bilzerian $2 million to be used by Bilzerian solely to pay expenses related to the planned tender offer for Cluett.

55.   From on or about October 7 through on or about October 28, 1985, Bilzerian used the $2 million loaned by DeBartolo, Sr. to pay commitment fees and other expenses related to the October 15, 1985 tender offer for Cluett.

56.   Bilzerian did not disclose, or cause to be disclosed, the $2 million loan discussed in paragraphs 54 and 55 above, in any filing made with the Commission.

### Bilzerian's False and Misleading Tender Offer Statement

57.   On October 15, 1985, CPC Acquisition Company ("CPC"), an entity controlled by Bilzerian, filed a tender offer statement on Schedule 14D-1 with the Commission.  The Schedule 14D-1 stated that the purpose of the tender offer to acquire all of the outstanding common stock of Cluett at $40 per share cash was "to acquire the entire equity interest" in Cluett.

18

58.  The Schedule 14D-1 reported that CPC beneficially owned 1,952,867 shares of Cluett common stock, including 347,567 shares that reportedly had been acquired on October 14, 1985 "in an open market transaction for an aggregate purchase price of $13,224,924."  The Schedule 14D-1 reported that this purchase price, which represented a per share price of $38, had been paid "utilizing capital contributions from the partners."

59.  On or about November 4, 1985, Cluett entered into an agreement with West Point-Pepperell, Inc. ("WPP"), whereby WPP agreed to purchase Cluett for a price of $41 per share to be paid in a combination of cash and securities.  WPP also agreed to pay $40 cash for 1,138,567 of the shares of Cluett common stock that Bilzerian had publicly reported that he and the Partnership owned in exchange for Bilzerian and the Partnership agreeing to cease their tender offer.

60.  In fact, 280,900 of the shares of Cluett common stock that Bilzerian represented to WPP that he owned were the shares subject to the arrangement described in paragraphs 40 through 43 above.  By entering into the agreement with WPP, Bilzerian had committed himself to deliver the shares held by DeBartolo, Sr., Moses and Sokolov.  Pursuant to the terms of the arrangement described in paragraphs 40 through 43 above, Bilzerian also was obligated to pay DeBartolo, Sr., Moses and Sokolov $40 per share for their shares, rather than the $38 per share referred to in paragraph 43 above, and reported in the Schedule 14D-1 referred to in paragraph 47 above.

Case 2:24-cr-00599-MWF-RAO Document 47285-5 Filed 06/29/25 Page 190 of 154 75 Page ID #:1037

19

61.    On or about November 4, 1985, Bilzerian communicated to Moses and Sokolov his plan to conceal further the existence of the arrangement described in paragraphs 40 through 43 above. Specifically, Bilzerian said that he would draft and mail to DeBartolo, Sr. a letter and promissory note that purported to pay DeBartolo, Sr. $38 per share (the price that had been reported publicly in the Schedule 14D-1 filed by Bilzerian) for 280,900 shares of Cluett.  Bilzerian told Moses and Sokolov that the $40 per share price that actually would be paid for the Shares would not be mentioned in the letter or the promissory note, and the $2 per share difference between the actual price of $40 per share paid for the Shares and the publicly reported sales price of $38 per share would be paid to DeBartolo, Sr., Moses and Sokolov separately.  The letter and promissory note were sent by Bilzerian on or about November 4, 1985.

62.    On or about December 5, 1985, Bilzerian paid DeBartolo, Sr., Moses and Sokolov $40 per share for the 280,900 shares of Cluett common stock discussed above.

63.    The documents described in paragraph 61 above were created and sent by Bilzerian to appear to track the public disclosure in the Schedule 14D-1 that Bilzerian had acquired a substantial block of Cluett in October for $38 per share.

64.    In or about December 1985, Bilzerian repaid DeBartolo, Sr. and the other Cluett Investors the full amount of their initial loans plus an amount equal to one-half of the profits that

20

had been earned on the shares of Cluett common stock that had been purchased by Bilzerian with the borrowed funds.

65. The Schedule 14D-1 that Bilzerian caused CPC to file with the Commission contained untrue statements of material fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 14(d) of the Exchange Act, Rules 14d-3 and 14d-6 thereunder and Schedule 14D-1, including, among others, the following:

      (a)    the Schedule 14D-1 falsely represented that the purpose of the tender offer was to acquire an equity interest in Cluett when, in fact, the purpose of the tender offer was to induce Cluett to pay greenmail or to negotiate to be acquired by a white knight;

      (b)    the Schedule 14D-1 omitted to report that $2 million had been borrowed from DeBartolo, Sr. for the purpose of obtaining funding for the tender offer;

      (c)    the Schedule 14D-1 falsely reported that 347,567 shares of Cluett had been purchased on October 14, 1985, when in fact:

            (1)    the transaction was not a sale because Bilzerian did not intend to purchase the Shares unless certain contingencies occurred;

21

    (2)   the price per share, if a sale were to occur, was $40 not the $38 per share reported in the Schedule 14D-1;

    (3)   the transaction involved 280,900 shares of Cluett common stock not the 347,567 shares reported in the Schedule 14D-1;

    (4)   the transaction was a privately negotiated transaction and not an open market acquisition as reported in the Schedule 14D-1; and

    (5)   no capital contribution had been made by Bilzerian or his partners to pay for the 347,567 shares of Cluett as reported in the Schedule 14D-1.

66. By reason of the foregoing, Bilzerian violated Section 14(d) of the Exchange Act [15 U.S.C. § 78n(d)] and Rules 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.14d-3 and 240.14d-6].

<u>THIRD CLAIM - CLUETT</u>

Bilzerian Violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 Thereunder, 17 C.F.R. § 240.10b-5--Securities Fraud

67. Paragraphs 1 through 66 are realleged and incorporated by reference herein.

68. Bilzerian, directly or indirectly, in connection with the purchase and sale of the securities of Cluett, by the use of means and instrumentalities of interstate commerce, the mails, or facilities of a national securities exchange, employed devices,

22

schemes or artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

69. As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 13D and amendments thereto that he filed and caused the Partnership to file with respect to the securities of Cluett contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading.

70. As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 14D-1 with respect to the securities of Cluett that he caused CPC to file contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading.

71. In addition to the foregoing, Bilzerian lied to the staff of the Commission while he was under oath and sworn to tell the truth in investigative testimony concerning the existence and nature of these contracts, arrangements and understandings concerning Cluett.

23

72. By reason of the foregoing, Bilzerian violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM - CLUETT

Bilzerian Violated Section 14(e) of the
Exchange Act, 15 U.S.C. § 78n(e)--Tender Offer Fraud

73. Paragraphs 1 through 72 are realleged and incorporated by reference herein.

74. As detailed above, Bilzerian, directly or indirectly, in connection with a tender offer or request or invitation for tenders of Cluett securities, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in fraudulent, deceptive and manipulative acts and practices.

75. As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 14D-1 with respect to the securities of Cluett that he caused CPC to file, contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

76. By reason of the foregoing, Bilzerian violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)].

24

## FIFTH CLAIM - CLUETT

Bilzerian Aided and Abetted Jefferies & Company's
Violations of Section 17(a)(1) of the Exchange Act,
15 U.S.C. § 78q(a)(1), and Rule 17a-3 Thereunder,
17 C.F.R. § 240.17a-3 -- False Books and Records

77. Paragraphs 1 through 76 are realleged and incorporated by reference herein.

78. Jefferies & Company, as a registered broker-dealer, must make and keep such records as the Commission by rule proscribes as necessary and appropriate in the public interest or for the protection of investors, including accurately identifying, among other things, the account for which each transaction is made and the true beneficial owner of each security.

79. Jefferies & Company, as a result of the secret accumulation agreement with Bilzerian described in paragraphs 31 through 37 above, failed to reflect accurately on its books and records, among other things, Bilzerian's beneficial ownership of the 302,000 Cluett shares accumulated and held by the firm, in violation of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

80. Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or would involve violations of Section 17(a)(1) of the Exchange Act and Rule 17a-3 thereunder, and substantially assisted in the commission of those violations.

81. By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 17(a)(1) of the

25

Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

### SIXTH CLAIM - CLUETT

Bilzerian Violated Section 7(f) of the Exchange Act, 15 U.S.C. § 78g(f), and Regulation X Thereunder, 12 C.F.R. § 224.1 et seq.--Margin Violations

82. Paragraphs 1 through 81 are realleged and incorporated by reference herein.

83. Pursuant to the arrangement described in paragraphs 31 through 37 above, Bilzerian caused credit to be extended and obtained, and received and enjoyed the beneficial use of a loan and extension of credit for the purpose of purchasing or carrying Cluett securities in contravention of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

84. By reason of the foregoing, Bilzerian violated Section 7(f) of the Exchange Act [15 U.S.C. § 78g(f)] and Regulation X thereunder [12 C.F.R. § 224.1 et seq.].

### SEVENTH CLAIM - CLUETT

Bilzerian Aided and Abetted Jefferies & Company's Violations of Section 7(c) of the Exchange Act, 15 U.S.C. § 78g(c), and Regulation T Thereunder, 12 C.F.R. § 220.1 et seq.--Margin Violations

85. Paragraphs 1 through 84 are realleged and incorporated by reference herein.

86. Pursuant to the arrangement described in Paragraphs 31 through 37 above, Jefferies & Company, directly or indirectly, extended and maintained credit, and arranged for the extension and maintenance of credit, to Bilzerian for the purchase of Cluett

26

securities in violation of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

87. By virtue of its unlawful extension of credit to Bilzerian, Jefferies & Company violated Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

88. Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or involved violations of Section 7(c) of the Exchange Act and Regulation T, and substantially assisted in the commission of those violations.

89. By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

### EIGHTH CLAIM - CLUETT

DeBartolo, Sr., Moses and Sokolov Violated Sections 10(b) and 13(d) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78m(d), and Rules 10b-5 and 13d-1 thereunder, 17 C.F.R. §§ 240.10b-5 and 240.13d-1, and Aided and Abetted Bilzerian's Violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(d), 78n(d) and 78n(e), and Rules 10b-5, 13d-1, 13d-2, 14d-3 and 14d-6 Thereunder, 17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.13d-2, 240.14d-3 and 240.14d-6 -- Reporting/Antifraud Violations

90. Paragraphs 1 through 76 are realleged and incorporated by reference herein.

91. As detailed above, the filing of the initial Schedule 13D and the amendments thereto filed by Bilzerian with respect to Cluett violated Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 in that, among other things, neither the Schedule 13D

27

nor the amendments disclosed the true source of funds used to acquire the Cluett securities, the interest of the Cluett Investors in Bilzerian's disclosed holdings of Cluett securities and the arrangements, agreements and understandings that Bilzerian had entered into with the Cluett Investors.

92. DeBartolo, Sr. and Moses knew or were reckless in not knowing of these violations by Bilzerian of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder, and, by arranging for and providing funds to Bilzerian as described above, substantially assisted in the commission of those violations.

93. Following the filing of Bilzerian's Schedule 13D, and with knowledge of, or in circumstances where he should have known of, the materially false and misleading statements contained therein, DeBartolo, Sr. purchased 186,900 shares of Cluett common stock from June 28, 1985 through August 1, 1985. DeBartolo, Sr. realized a profit of $613,075 on the sale of these shares.

94. DeBartolo, Sr. also suggested to Sokolov that Sokolov purchase additional shares of Cluett stock. From August 1 through August 5, 1985, Sokolov purchased 5,500 shares of Cluett common stock. DeBartolo, Sr. provided the funds to Sokolov to make these purchases. Sokolov realized a profit of $11,625 upon the sale of these shares.

95. Following the filing of Bilzerian's Schedule 13D, and with knowledge of, or in circumstances where he should have known of, the materially false and misleading statements contained therein, Moses purchased 30,000 shares of Cluett common stock from

28

July 31 through August 2, 1985. Moses realized a profit of $76,475 upon the sale of these shares.

96. As set forth above in paragraphs 38 through 46 above, on or about October 2, 1985, at the latest, DeBartolo, Sr., Moses and Sokolov formed a group with Bilzerian for the purpose of acquiring, holding, voting or disposing of Cluett securities.

97. DeBartolo, Sr., Moses and Sokolov did not file a Schedule 13D disclosing their group arrangement with Bilzerian with respect to Cluett securities or the number of shares of Cluett common stock beneficially owned by the group members.

98. As described in paragraph 43 above, DeBartolo, Sr., Moses and Sokolov entered into an arrangement whereby the 280,900 shares of Cluett common stock acquired and/or controlled by them would be made available to Bilzerian at a reported price of $38 per share.

99. DeBartolo, Sr., Moses and Sokolov knew or were reckless in not knowing that Bilzerian's false and misleading description in the Schedule 14D-1 of the arrangement described in paragraphs 40 through 43 above violated Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act and Rules 10b-5, 13d-2 and 14d-3 thereunder, and that they substantially assisted in the commission of those violations, and thereby aided and abetted Bilzerian's violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act and Rules 10b-5, 13d-2, 14d-3 and 14d-6 thereunder.

100. DeBartolo, Sr.'s, Moses' and Sokolov's knowing or reckless failure to file a Schedule 13D with respect to their

29

beneficial ownership of more than five percent of the outstanding common stock of Cluett, as described in paragraphs 96 and 97, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

101. By reason of the foregoing, DeBartolo, Sr., Moses and Sokolov violated Sections 10(b) and 13(d) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(d)] and Rules 10b-5 and 13d-1 thereunder [17 C.F.R §§ 240.10b-5 and 240.13d-1], and aided and abetted Bilzerian's violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78n(d) and 78n(e)], and Rules 10b-5, 13d-2, 14d-3 and 14d-6 thereunder, [17 C.F.R. §§ 240.10b-5, 240.13d-2, 240.14d-3 and 240.14d-6], and DeBartolo, Sr. and Moses aided and abetted Bilzerian's violations of Rule 13d-1 under the Exchange Act [17 C.F.R. § 240.13d-1].

II.

HAMMERMILL PAPER COMPANY

FIRST CLAIM - HAMMERMILL

Bilzerian, Bilzerian & Mack Associates and HPC Acquisition Company Violated Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rule 13d-1 Thereunder, 17 C.F.R. § 240.13d-1--Failure to Timely Disclose Beneficial Ownership and False Statements on a Schedule 13D

102. Paragraphs 1 through 15 are realleged and incorporated by reference herein.

103. Hammermill is incorporated in Pennsylvania. Hammermill's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was traded on the New York and regional stock exchanges at all relevant times,

30

until August 1986 when Hammermill was acquired by International Paper Company.

104.  On or about July 25, 1986, Bilzerian filed with the Commission, on behalf of Bilzerian and Mack Associates ("Associates"), a partnership of which he was the managing general partner, and HPC Acquisition Company ("HPC"), an indirect wholly-owned subsidiary of Associates, a combined Schedule 13D and 14D-1 with respect to Hammermill ("Schedule 13D/14D-1").  The Schedule 13D/14D-1 announced that HPC and Associates were making a tender offer for all of the outstanding shares of Hammermill common stock at $52 per share in cash.  As described in detail below, the Schedule 13D/14D-1 reported that HPC and Associates were the beneficial owners of 19.6% of the outstanding common stock of Hammermill.

105. From on or about July 25, 1986 and thereafter, Bilzerian made, and caused HPC and Associates to make, in the Schedule 13D/14D-1, untrue statements of material fact, omitted to state material facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 13(d) of the Exchange Act, Rule 13d-1 thereunder and Schedule 13D.

106.  As described more fully below, the false statements and omissions that Bilzerian made and caused Associates and HPC to make or to fail to make and the failure to disclose accurately required information in the Schedule 13D/14D-1 concerned, among other things, the following:

Case 2:24-cr-00569-MSR-RCP Document 42-5 Filed 06/28/39/2 Page 102 of 154 Page ID #:1049

31

(a)  the fact that Bilzerian borrowed a substantial portion of the funds that had been used to purchase the Hammermill securities reported in the Schedule 13D/14D-1 from certain individual investors and the terms and conditions of those borrowings; and

(b)  the fact that Bilzerian was the beneficial owner of certain Hammermill securities secretly purchased and held for him by Jefferies & Company.

Bilzerian's Undisclosed Arrangements for
Financing the Purchase of Hammermill Common Stock

107.  From on or about February 25, 1986 through on or about July 11, 1986, Bilzerian raised approximately $15 million from a number of individual investors ("the Hammermill Investors"). Bilzerian obtained these funds for the purpose of acquiring Hammermill securities or in order to pay for Hammermill securities he already had acquired.

108.  Bilzerian entered into contracts, arrangements and understandings with the Hammermill Investors pursuant to which: (a) Bilzerian agreed to share evenly with the Hammermill Investors the profits, if any, earned on the securities purchased with their funds; (b) Bilzerian agreed to provide to the Hammermill Investors the dividends earned, if any, on the securities purchased with their funds; and (c) Bilzerian personally guaranteed that the Hammermill Investors would not lose money and that their funds would be returned by a date certain.

32

109.  In an apparent attempt to conceal the identities of the Hammermill Investors and the terms of their loans with Bilzerian, Bilzerian funneled the approximately $15 million that he raised from the Hammermill Investors through trusts entered into between defendant Tallant and the Hammermill Investors (the "Tallant Trusts").  These trusts purported to provide Tallant with unrestricted investment authority.  In fact, Tallant arranged with Bilzerian to transfer immediately to Bilzerian all contributions made by the Hammermill Investors to the Tallant Trusts.

110.  DeBartolo, Sr. was one of the Hammermill Investors. DeBartolo, Sr. provided $8 million of the approximately $15 million that Bilzerian raised through the Tallant Trusts.

111.  In addition to the contracts, arrangements and under- standings set forth in paragraph 108 above, DeBartolo, Sr. understood that his relationship to Bilzerian's acquisition of Hammermill securities would not be disclosed publicly in any document or report filed with the Commission.

112.  On or about September 1986, Bilzerian repaid the Hammermill Investors the full amount of their investments plus an amount equal to approximately one-half of the profits that had been earned on the shares of Hammermill common stock that had been purchased by Bilzerian and Associates with the Hammermill Investors' funds.

113.  Bilzerian concealed from and misrepresented in his filings with the Commission, and thus in his representations to the investing public, Hammermill and Hammermill's shareholders,

Case 2:24-cr-00589-MCS-R54 Document 71-85 Filed 06/29/21 Page 304 of 4 547 5 Page ID #:1051

the facts concerning the financial arrangements that he had entered into with the Hammermill Investors. Bilzerian caused Associates and HPC to file a combined Schedule 13D/14D-1 on July 25, 1986. This Schedule reported that HPC and Associates had acquired 3,281,250 shares of Hammermill common stock for a total cost of approximately $153,738,180 (settlement on 1,674,700 of these shares, at a total cost of approximately $87,084,400.00, was delayed until seven days after the termination of the tender offer). The Schedule 13D/14D-1 represented that at least $10 million of the approximately $66,653,780 that actually had been expended for the purchase of the Hammermill shares had been obtained from Bilzerian's "personal funds." In fact, these funds had been obtained in the manner and under the terms discussed in paragraphs 107 through 111 above, and were not Bilzerian's personal funds.

114. Neither the Schedule 13D/14D-1 filed by HPC and Associates nor any of the amendments thereto disclosed the contracts, arrangements and understandings between Bilzerian and the Hammermill Investors that are set forth above in paragraphs 107 through 113.

### Bilzerian's Secret Accumulation Arrangement with Jefferies & Company

115. On or about June 26, 1986, Bilzerian entered into an agreement with Jefferies, the then Chairman of Jefferies & Company, pursuant to which Jefferies & Company would accumulate Hammermill common stock for Bilzerian's benefit. Under this agreement, Jefferies & Company would accumulate Hammermill and, at

34

a later date, Bilzerian would "buy" the shares from Jefferies & Company and pay the firm its cost to acquire the stock, plus its cost to carry the stock and commissions.

116. In accordance with this arrangement, from June 26 through July 16, 1986, Jefferies & Company acquired 551,000 shares of Hammermill common stock in a firm account for Bilzerian.

117. As a result of the above-described arrangement, on June 27, 1986, Bilzerian became the beneficial owner of in excess of five percent of the outstanding common stock of Hammermill.

118. Bilzerian, as the beneficial owner of more than five percent of the common stock of Hammermill, had an obligation to file with the Commission a Statement on Schedule 13D with respect to his holdings no later than ten days after his beneficial ownership exceeded five percent, or by July 7, 1986.

119. Bilzerian, individually and on behalf of Associates and HPC, failed to file a Schedule 13D with respect to Hammermill until July 25, 1986.

120. On or about July 21, 1986, Bilzerian, on behalf of himself and Associates, purchased from Jefferies & Company the 551,000 shares that Jefferies & Company had accumulated in the manner described above for an average price of $42.78 per share. This price per share included Jefferies & Company's cost to acquire the shares, its cost to carry them and a commission. The $42.78 was below the market price for the day: on July 21, 1986 Hammermill common stock traded at a high of $45.875 per share, a low of $44.875 per share and closed at $45 per share. Jefferies &

35

Company, at Bilzerian's request, reported the trade as having occurred after 4:30 Eastern Standard Time (after the stock exchanges closed) so that it would not be reported on the consolidated tape, in an apparent attempt to conceal this transaction.

121. The Schedule 13D/14D-1 filed by Associates and HPC failed to report the above-described arrangement with Jefferies & Company and falsely reported a purchase of 551,000 shares of Hammermill common stock as having occurred on July 21, 1986.

122. From July 8, 1986 (the day after a Schedule 13D should have been filed) until July 25, 1986 (when the Schedule 13D actually was filed), Bilzerian caused HPC and Associates to acquire an additional 2,148,100 shares of Hammermill common stock at an average price of approximately $50.00 per share. HPC and Associates received $64.50 per share for each of these shares on or about September 10, 1986, when the shares were tendered to International Paper Company. This amounted to an illicit profit of approximately $31,016,918.

Bilzerian's False and Misleading Tender Offer Statement

123. The Schedule 13D/14D-1 that Bilzerian filed on behalf of HPC and Associates contained untrue statements of material fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be included therein by Section 13(d), Rule 13d-1 thereunder and Schedule 13D, including, among others, the following:

CaseCase3:4e4se05689-M504R54-PxDDondarntent47285-FileFiled06/20/89/2Page307e0745475Page ID #:1054

36

(a)  the Schedule 13D/14D-1 failed to include disclosure that approximately $15 million of the total purchase price of the Hammermill securities listed in the Schedule 13D/14D-1 had been borrowed by Bilzerian, and it failed to describe the terms of the loan transactions and the names of the parties thereto (Schedule 13D, Item 3);

(b)  the Schedule 13D/14D-1 falsely identified the source of at least $10 million of funds used to acquire Hammermill securities as Bilzerian's personal funds;

(c)  the Schedule 13D/14D-1 failed to disclose the contracts, arrangements, understandings and relationships that Bilzerian had entered into with the Hammermill Investors pursuant to which the Hammermill Investors were entitled to one-half of the profits earned on the Hammermill securities purchased with the funds that they provided and to receive any dividends declared on the securities purchased with the funds that they provided and were personally guaranteed by Bilzerian against any loss on their investments (Schedule 13D, Items 3, 5 and 6);

(d)  the Schedule 13D/14D-1 was filed with the Commission more then ten days after Bilzerian, HPC and Associates became the beneficial owners of in

37

excess of five percent of the securities of Hammermill;

(e)   the Schedule 13D/14D-1 falsely stated that there were no contracts, arrangements, understandings or relationships with respect to the Hammermill securities when, in fact, the contracts, arrangements, understandings and relationships described in paragraphs 103 through 123 were in existence.

124.   As a result of the foregoing, Bilzerian, HPC and Associates violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. §§ 240.13d-1].

SECOND CLAIM - HAMMERMILL

Bilzerian, HPC and Associates Violated Section 14(d) of the Exchange Act, 15 U.S.C. § 78n(d), and Rules 14d-3 and 14d-6 Thereunder, 17 C.F.R. §§ 240.14d-3 and 240.14d-6--False and Misleading Tender Offer Statement

125.   Paragraphs 1 through 15 and 102 through 124 are realleged and incorporated by reference herein.

126.   As enumerated in Paragraph 123 above, the Schedule 13D/14D-1 that Bilzerian caused HPC and Associates to file contained untrue statements of material fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 14(d) of the Exchange Act [15 U.S.C. § 78m(d)], Rules 14d-3 and 14d-6 thereunder and Schedule 14D-1 [17 C.F.R. §§ 240.14d-3, 240.14d-6 and 240.14d-100].

38

127.  By reason of the foregoing, Bilzerian, HPC and Associates violated Section 14(d) of the Exchange Act [15 U.S.C. § 78n(d)] and Rules 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.14d-3 and 240.14d-6].

### THIRD CLAIM - HAMMERMILL

Bilzerian, HPC and Associates Violated Section 10(b)
of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5
Thereunder, 17 C.F.R. § 240.10b-5--Securities Fraud and
Market Manipulation.

128.  Paragraphs 1 through 15 and 102 through 127 are realleged and incorporated by reference herein.

129.  Bilzerian, directly or indirectly, in connection with the purchase and sale of the securities of Hammermill, by use of the means and instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, employed devices', schemes or artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

130.  As set forth in paragraphs 103 through 127 above, Bilzerian knew or was reckless in not knowing that the Schedule 13D/14D-1 that he caused HPC and Associates to file with respect to the securities of Hammermill contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under

39

which they were made, not misleading and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchases and sellers of such securities.

131. In addition to the foregoing, Bilzerian lied to the staff of the Commission while he was under oath and sworn to tell the truth in investigative testimony concerning the existence and nature of these contracts, arrangements and understandings concerning Hammermill.

<u>Bilzerian's Market Manipulation</u>

132. On or about May 7, 1986, Bilzerian began negotiating with a certain institutional money manager ("the Manager") that controlled a substantial block of Hammermill common stock for the purchase of all or part of the Manager's block. Among the proposals that Bilzerian made was to acquire a portion of the block in the near future at the prevailing market price and to obtain an option to purchase the remaining portion of the block at a higher price.

133. On Thursday, May 8, 1986, Bilzerian sold 60,000 shares of Hammermill common stock under his control into the market. These sales constituted approximately 11% of the total activity in Hammermill for that day. Hammermill common stock traded at a high of $42 and a low of $39.25 on May 8, 1986.

134. On Friday, May 9, 1986, Bilzerian sold 177,700 shares of Hammermill common stock under his control into the market. These sales constituted approximately 26% of the total activity in

Case 2:24-cv-00589-MSG-RSH Document 17-285 Filed 06/28/89/2 Page 40 of 145 475 Page ID #:1058

40

Hammermill for that day.  Hammermill common stock traded at a high of $44.875 and a low of $42.125 on May 9, 1986.

135.  On Monday, May 12, 1986, Bilzerian sold 125,000 shares of Hammermill common stock under his control into the market. These sales constituted approximately 44% of the total activity in Hammermill for that day.  Hammermill common stock traded at a high of $43.875 and a low of $42.50 on May 12, 1986.

136.  On Monday, May 12, 1985, Hammermill common stock closed at $42.75, which was one point lower than the close on Friday, May 9, 1985.

137.  The sales of Hammermill common stock on May 8, 9 and 12 were undertaken at Bilzerian's direction for the purpose of depressing the price of Hammermill common stock in order to induce the Manager to sell all or part of the block of Hammermill under the Manager's control to Bilzerian at the then prevailing market price.

138.  Bilzerian's manipulation of the price of Hammermill common stock was knowing or reckless and was a device, scheme or artifice to defraud, involved the making of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or was an act, practice or course of business which operated as a fraud or deceit in connection with the purchase or sale of Hammermill common stock.

139.  The series of transactions in Hammermill common stock on May 12, 1986 were undertaken at Bilzerian's direction for the

CaseCase8:09-cr-00854-RCL-RCB Document 17-2 85 Filed 06/29/89/2 Page 41 of 124 5475 Page ID #:1059

41

purpose of, and with the effect of, creating actual or apparent active trading in Hammermill common stock and depressing the price of Hammermill common stock for the purpose of inducing the Manager to sell all or part of the Hammermill block under its control to Bilzerian.

140.  By reason of the foregoing, Bilzerian, HPC and Associates violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

<u>FOURTH CLAIM - HAMMERMILL</u>

Bilzerian, HPC and Associates Violated Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e)--Tender Offer Fraud

141.  Paragraphs 1 through 15 and 102 through 140 are realleged and incorporated by reference herein.

142.  As detailed above, Bilzerian, directly or indirectly, in connection with a tender offer or request or invitation for tenders of Hammermill securities, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in fraudulent, deceptive and manipulative acts and practices.

143.  As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 13D/14D-1 with respect to the securities of Hammermill that he caused HPC and Associates to file contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated

CaseCase4:09-cv-1854-RBD Document 4285-FiledFiled06/29/09/29/Page 42 ID #:1060

42

and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

144. By reason of the foregoing, Bilzerian, HPC and Associates violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)].

<u>FIFTH CLAIM - HAMMERMILL</u>

Bilzerian Violated Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2)--Market Manipulation

145. Paragraphs 1 through 15 and 102 through 144 are realleged and incorporated by reference herein.

146. The series of transactions in Hammermill common stock on May 12, 1986, which are described in paragraphs 133 through 140 above, were undertaken at Bilzerian's direction for the purpose of, and with the effect of, creating actual or apparent active trading in Hammermill common stock for the purpose of inducing the Manager to sell all or part of the Hammermill block under its control.

147. Bilzerian, directly or indirectly, by the use of the mails or means or instrumentalities of interstate commerce, or a facility of any national securities exchange, effected, alone or with one or more persons, a series of transactions in Hammermill securities creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

148. By reason of the foregoing, Bilzerian violated Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

43

SIXTH CLAIM - HAMMERMILL

Bilzerian Aided and Abetted Jefferies & Company's
Violations of Section 17(a)(1) of the Exchange Act, 15
U.S.C. § 78q(a)(1), and Rule 17a-3 Thereunder, 17
C.F.R. § 240.17a-3--False Books and Records

149. Paragraphs 1 through 15 and 102 through 148 are reavailable reached reasonably reached... reavailable reached

149. Paragraphs 1 through 15 and 102 through 148 are realleged and incorporated by reference herein.

150. Jefferies & Company, as a registered broker-dealer, must make and keep such records as the Commission by rule proscribes as necessary and appropriate in the public interest or for the protection of investors, including accurately identifying, among other things, the account for which each transaction is made and the true beneficial owner of each security.

151. Jefferies & Company, as a result of the secret accumulation agreement with Bilzerian, failed to reflect accurately on its books and records, among other things, Bilzerian's beneficial ownership of the 551,000 Hammermill shares accumulated and held by the firm, in violation of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3, thereunder [17 C.F.R. § 240.17a-3].

152. Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or involved violations of Section 17(a)(1) of the Exchange Act and Rule 17a-3, and substantially assisted in the commission of those violations.

153. By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

44

## SEVENTH CLAIM - HAMMERMILL

Bilzerian Violated Section 7(f) of the Exchange Act, 15
U.S.C. § 78g(f), and Regulation X Thereunder, 12 C.F.R.
§ 224.1 et seq.--Margin Violations

154.  Paragraphs 1 through 15 and 102 through 153 are reagged and incorporated by reference herein.

155.  Pursuant to the arrangement described in paragraphs 115 through 122 above, Bilzerian caused credit to be extended and obtained, and received and enjoyed the beneficial use of a loan and extension of credit for the purpose of purchasing or carrying Hammermill securities in contravention of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

156.  By reason of the foregoing, Bilzerian violated Section 7(f) of the Exchange Act [15 U.S.C. § 78g(f)] and Regulation X thereunder [12 C.F.R. § 224.1 et seq].

## EIGHTH CLAIM - HAMMERMILL

Bilzerian Aided and Abetted Jefferies & Company's
Violations of Section 7(c) of the Exchange Act, 15
U.S.C. § 78g(c), and Regulation T Thereunder, 12 C.F.R.
§ 220.1 et seq.--Margin Violations

157.  Paragraphs 1 through 15 and 102 through 156 are reagged and incorporated by reference herein.

158.  Pursuant to the arrangement described in paragraphs 115 through 122 above, Jefferies & Company, directly or indirectly, extended and maintained credit and arranged for the extension and maintenance of credit to Bilzerian for the purchase of Hammermill securities, in violation of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

45

159. By virtue of its unlawful extension of credit to Bilzerian, Jefferies & Company violated Section 7(c) of the Securities Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

160. Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or involved violations of Section 7(c) of the Exchange Act and Regulation T, and substantially assisted in the commission of those violations.

161. By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

<u>NINTH CLAIM - HAMMERMILL</u>

Tallant Aided and Abetted Bilzerian's Violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(d), 78n(d) and 78n(e), and Rules 10b-5, 13d-1, 14d-3 and 14d-6 Thereunder, 17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.13d-2, 240.14d-3 and 240.14d-6--Aiding and Abetting Securities Fraud

162. Paragraphs 1 through 15 and 102 through 161 are realleged and incorporated herein by reference.

163. Tallant facilitated Bilzerian's fraudulent scheme by serving as the trustee of the Tallant Trusts, which were instruments used to funnel funds to Bilzerian for the purpose of acquiring Hammermill securities while, at the same time, concealing the identities of the Hammermill Investors and the true terms of their investments.

164. Tallant further facilitated Bilzerian's fraudulent scheme by, on at least one occasion, providing oral assurances to

46

one Hammermill Investor that--contrary to the language of the trust agreement between the Hammermill Investor and Tallant--the Hammermill Investor's trust contribution would be used by Bilzerian to buy a specific security, that the Hammermill Investor's trust contribution was guaranteed by Bilzerian to be returned, and that the Hammermill Investor would share evenly with Bilzerian the profits, if any, earned on the securities purchased with the investor's trust contribution.

165. Tallant knew or was reckless in not knowing of Bilzerian's violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78n(d), and 78n(e)] and Rules 10b-5, 13d-1, 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.14d-3 and 240.14d-6], and, by secretly funneling money from the Hammermill Investors to Bilzerian through the Tallant Trust, substantially assisted in the commission of those violations.

166. By reason of the foregoing, Tallant aided and abetted Bilzerian's violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78n(d) and 78n(e)] and Rules 10b-5, 13d-1, 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.14d-3 and 240.14d-6].

CaseCase6:89-18541R54-RCDDocument4285-FileFiled6/29/89/2PagePage478of4545475Page ID #:1065

47

## TENTH CLAIM – HAMMERMILL

DeBartolo, Sr. Aided and Abetted Bilzerian's
Violations of Sections 13(d), 14(d) and 14(e) of
the Exchange Act, 15 U.S.C. §§ 78m(d), 78n(d) and 78n(e),
and Rules 13d-1, 14d-3 and 14d-6 Thereunder, 17 C.F.R.
§§ 240.13d-1, 240.14d-3 and 240.14d-6.

167. Paragraphs 1 through 15, 102 through 114, 123 through 127, and 141 through 144 are realleged and incorporated by reference herein.

168. As set forth above, the Schedule 13D/14D-1 and the amendments thereto that Bilzerian caused to be filed with respect to Hammermill violated Sections 13(d), 14(d) and 14(e) of the Exchange Act and Rules 13d-1, 14d-3 and 14d-6 thereunder in that, among other things, they did not disclose the true source of funds used to acquire the Hammermill securities, the interest of the Hammermill Investors in Hammermill securities and the arrangements, agreements and understandings that Bilzerian had entered into with the Hammermill Investors.

169. DeBartolo, Sr. knew or was reckless in not knowing that the conduct engaged in by Bilzerian was unlawful and/or would involve violations of Sections 13(d), 14(d) and 14(e) of the Exchange Act and Rules 13d-1, 14d-3 and 14d-6 thereunder, and substantially assisted in the commission of those violations.

170. DeBartolo, Sr.'s investment in the Tallant Trust entitled him to receive the profits earned on 197,550 shares of Hammermill common stock, the amount that was purchased with his $8 million investment in the Tallant Trust. On July 25, 1986, the day

Case 2:24-cr-00589-MSR-RCB Document 171-2 Filed 06/29/29/21 Page 480 of 945/475 Page ID #:1066

48

that Bilzerian caused the Schedule 13D/14D-1 to be filed, trading in Hammermill common stock closed at $53.75 per share.

171.  On or about September 11, 1986, DeBartolo, Sr. received $11,760,000.00, which represented an illegal profit of $2,123,662 from the time Bilzerian filed the false and misleading Schedule 13D/14D-1.

172.  By reason of the foregoing, DeBartolo, Sr., aided and abetted Bilzerian's violations of Sections 13(d), 14(d) and 14(e) of the Exchange Act [15 U.S.C. §§ 78m(d), 78n(d) and 78n(e)] and Rules 13d-1, 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.13d-1, 240.14d-3, and 240.14d-6].

<u>ELEVENTH CLAIM - HAMMERMILL</u>

Moses Violated Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), and Rule 14e-3 Thereunder, 17 C.F.R. § 240.14e-3--Trading While in Possession of Material Nonpublic Information

173.  Paragraphs 1 through 15 and 102 through 144 above are realleged and incorporated by reference herein.

174.  Defendant Moses purchased 5,000 shares of Hammermill common stock of June 19, 1986 and another 5,000 shares of Hammermill common stock on June 20, 1986.

175.  Moses purchased the Hammermill common stock discussed in paragraph 174 above on June 19 and 20, 1986 at a time when Bilzerian had taken a substantial step or substantial steps to commence a tender offer for Hammermill, while Moses was in possession of material information, to wit (a) that Bilzerian had formulated a plan to make a tender offer for all of the outstanding shares of Hammermill common stock; (b) that Bilzerian was

49

negotiating with investment bankers to obtain the financing for a tender offer for Hammermill, and (c) that Bilzerian was negotiating, as part of his tender offer plan, for the purchase of a substantial block of Hammermill common stock held by the Manager, relating to such tender offer which information Moses knew or had reason to know was nonpublic and which Moses knew or had reason to know had been acquired directly or indirectly from Bilzerian.

176. On or about July 25, 1986, Moses sold the 10,000 shares of Hammermill common stock for a profit of approximately $129,375.

177. By reason of the foregoing, Moses violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

III.

H.H. ROBERTSON COMPANY

FIRST CLAIM - ROBERTSON

Bilzerian Aided and Abetted Jefferies & Company's
Violations of Section 17(a)(1) of the Exchange Act, 15
U.S.C. § 78q(a)(1), and Rule 17a-3 Thereunder, 17 C.F.R.
§ 240.17a-3--False Books and Records

178. Paragraphs 1 through 15 are realleged and incorporated by reference herein.

179. H.H. Robertson Company ("Robertson") is incorporated in Pennsylvania. Robertson's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is traded on the New York and regional stock exchanges.

180. In or about July 1985, Bilzerian asked Landy whether Jefferies & Company would purchase shares of Robertson common stock held by Bilzerian and hold them for thirty (30) days with

CaseCase8085-89-18504R54-PCDDoDdocumenthe285-FiledFil06/28/89/2Page30of5145475Page
ID #:1068

50

the understanding that Bilzerian would buy the stock back and would repay Jefferies & Company the cost of the stock, plus the firm's cost to carry the stock and commissions. Landy, with Jefferies' approval, agreed to enter into this agreement.

181. Pursuant to this understanding, on July 22, 1985 Bilzerian "sold" 58,000 shares of Robertson common stock to Jefferies & Company at a price of $30.50 per share.

182. During the first thirty days that Jefferies & Company held the Robertson stock for Bilzerian, the market price for Robertson common stock declined from approximately $30.50 per share on July 23, 1985 to approximately $27.00 per share on August 23, 1985.

183. From on or about August 22, 1985, until on or about October 15, 1985, Bilzerian assured various Jefferies & Company employees that the firm would be protected against loss as a result of carrying the Robertson stock for him. Bilzerian, however, did not repurchase the 58,000 shares as he had promised to do.

184. On October 15, 1985, Jefferies & Company sold the 58,000 Robertson shares that were held for Bilzerian. Jefferies & Company realized a loss of approximately $250,000 on this sale.

185. From on or about October 15, 1985 to on or about December 24, 1985, another customer of Jefferies & Company, who had introduced Bilzerian to Landy (hereinafter referred to as "the Customer"), generated approximately $125,000 in securities commissions at Jefferies & Company that were intended to

Case 2:34-cr-80569-18514R54-RCD Document 47285-Filed 06/28/89/2 Page 122 of 154 75 Page ID #:1069

51

compensate Jefferies & Company for a portion of the loss the firm sustained in selling Bilzerian's Robertson position. Jefferies & Company used this commission income to offset a portion of the losses that it had sustained as a result of selling Bilzerian's Robertson stock.

186. On or about December 24, 1985, at Jefferies & Company's urging, Bilzerian paid Jefferies & Company $125,000 to compensate the firm for the remainder of the loss that it had sustained in connection with Bilzerian's Robertson position. This payment was made with the understanding that the $125,000 would be refunded to Bilzerian if he and/or the Customer provided business to Jefferies & Company sufficient to generate commission charges to repay the remaining loss.

187. On or about December 24, 1985, in an attempt to conceal the purpose of the $125,000 payment discussed in paragraph 186 above, Bilzerian and Jefferies & Company agreed that Jefferies & Company would send Bilzerian an invoice for supposed "financial services" provided by it in connection with Bilzerian's threatened takeover of Cluett. In fact, Jefferies & Company did not provide any such services, and the invoice that Jefferies & Company sent was false and fictitious.

188. On or about February 14, 1986, Jefferies & Company repaid Bilzerian $75,000 of the money that he had paid the firm to cover the Robertson loss. In an attempt to conceal the purpose of this payment, Bilzerian prepared and sent to Jefferies & Company an invoice in the amount of $75,000 for supposed "consulting services"

52

provided by Bilzerian.  In fact, Bilzerian did not provide any such services, and the invoice that he prepared and sent to Jefferies & Company was false and fictitious.

189.  On or about March 10, 1986, in an attempt to obtain repayment of the remaining funds that he had paid to Jefferies & Company to cover the Robertson loss, Bilzerian prepared and sent to Jefferies & Company another false and fictitious invoice in the amount of $75,000.  This invoice fraudulently charged Jefferies & Company for consulting services rendered by Bilzerian, when in fact Bilzerian never rendered any consulting services to Jefferies & Company.  Bilzerian used the false and fictitious invoice as a vehicle to conceal the terms of his illegal agreement.

190.  Jefferies & Company, as a registered broker-dealer, must make and keep such records as the Commission by rule proscribes as necessary and appropriate in the public interest or for the protection of investors, including accurately identifying, among other things, the account for which each transaction is made and the true beneficial owner of each security.

191.  Jefferies & Company, as a result of the secret parking agreement with Bilzerian, failed to reflect accurately on its books and records, among other things, Bilzerian's beneficial ownership of the 58,000 Robertson shares held by the firm, in violation of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

192.  Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or would involve

53

violations of Section 17(a)(1) of the Exchange Act and Rule 17a-3 thereunder, and substantially assisted in the commission of those violations.

193.  By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

### SECOND CLAIM - ROBERTSON

Bilzerian Violated Section 7(f) of the Exchange Act, 15 U.S.C. § 78g(f), and Regulation X Thereunder, 12 C.F.R. § 224.1 et seq.--Margin Violations

194.  Paragraphs 1 through 15 and 178 through 193 are realleged and incorporated by reference herein.

195.  Pursuant to the arrangement described in paragraphs 179 through 193 above, Bilzerian caused credit to be extended and obtained, and received and enjoyed the beneficial use of a loan and extension of credit for the purpose of purchasing or carrying Robertson securities in contravention of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

196.  By reason of the foregoing, Bilzerian violated Section 7(f) of the Exchange Act [15 U.S.C. § 78g(f)] and Regulation X thereunder [12 C.F.R. § 224.1 et seq.].

### THIRD CLAIM - ROBERTSON

Bilzerian Aided and Abetted Jefferies & Company's Violations of Section 7(c) of the Exchange Act, 15 U.S.C. § 78g(c), and Regulation T Thereunder, 12 C.F.R. § 220.1 et seq.--Margin Violations

197.  Paragraphs 1 through 15 and 178 through 196 are realleged and incorporated by reference herein.

Case 2:34-cr-80589-18544R54-RCD Document 4285-5 Filed 06/29/89/2Page 325 of 545475Page ID #:1072

54

198.  Pursuant to the arrangement described in paragraphs 179 through 193 above, Jefferies & Company, directly or indirectly, extended and maintained credit, and arranged for the extension and maintenance of credit to Bilzerian for the purchase of Robertson securities in violation of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

199.  By virtue of its unlawful extension of credit to Bilzerian, Jefferies & Company violated Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

200.  Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or would involve violations of Section 7(c) of the Exchange Act and Regulation T, and substantially assisted in the commission of those violations.

201.  By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

IV.

ARMCO INCORPORATED

FIRST CLAIM - ARMCO

Bilzerian Aided and Abetted Jefferies & Company's
Violations of Section 17(a)(1) of the
Exchange Act, 15 U.S.C. § 78q(a)(1), and
Rule 17a-3 Thereunder, 17 C.F.R.
§§ 240.17a-3--False Books and Records

202.  Paragraphs 1 through 15 are realleged and incorporated by reference herein.

55

203. Armco Incorporated ("Armco") is incorporated in Ohio. Armco's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is traded on the New York and regional stock exchanges.

204. On or about September 1, 1986, Bilzerian asked Landy if Jefferies & Company would buy 306,600 shares of Armco common stock and hold them thirty (30) days with the understanding that Bilzerian would buy them back and pay Jefferies & Company the cost of the stock, plus the firm's cost to carry the stock and commissions. Landy, with Jefferies approval, agreed to enter into this arrangement.

205. Pursuant to this arrangement, on September 2, 1986 Bilzerian "sold" 306,600 shares of Armco common stock to Jefferies & Company at a price of $7.125 per share.

206. On or about September 15, 1986, Bilzerian entered into a second arrangement with Landy pursuant to which Jefferies & Company would acquire additional shares of Armco common stock for Bilzerian's benefit. Under this arrangement, Jefferies & Company would acquire Armco shares for Bilzerian, and at a later date Bilzerian would "buy" the shares from Jefferies & Company and pay the firm its cost to acquire the stock, plus its cost to carry the stock and commissions.

207. Pursuant to this second arrangement, from September 15 through October 1, 1986, Jefferies & Company acquired 512,300 shares of Armco common stock for Bilzerian in a firm account.

56

208.  On October 2, 1986, pursuant to the arrangements described above, Jefferies & Company sold 818,900 shares of Armco common stock to Bilzerian.  At Bilzerian's request, the sale price was reported to have occurred at $8.00 per share, when in fact Bilzerian had agreed with Jefferies & Company that Bilzerian would pay $7.25 per share for the 818,900 shares.  The $7.25 price was intended to compensate Jefferies & Company for its cost to acquire the stock, its costs to carry the stock and its commissions.

209.  On or about November 1, 1986, Bilzerian sent Jefferies & Company a false and fictitious invoice purporting to seek payment of $583,625 for "consulting services" supposedly provided by Bilzerian.  Bilzerian had not performed any such services for Jefferies & Company.  The invoice was in fact a vehicle for concealing the transfer to Bilzerian of the $.75 per share profit that he was owed by Jefferies & Company pursuant to the illegal arrangements discussed in paragraphs 202 through 208 above.

210.  Jefferies & Company, as a registered broker-dealer, must make and keep such records as the Commission by rule proscribes as necessary and appropriate in the public interest or for the protection of investors, including accurately identifying, among other things, the account for which each transaction is made and the true beneficial owner of each security.

211.  Jefferies & Company, as a result of the secret arrangements with Bilzerian discussed in paragraphs 202 through 208 above, failed to reflect accurately on its books and records, among other things, Bilzerian's beneficial ownership of 818,900 Armco

57

shares held by the firm, in violation of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)(1)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

212. Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or would involve violations of Section 17(a)(1) and Rule 17a-3, and substantially assisted in the commission of those violations.

213. By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 17(a)(1) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-3 thereunder [17 C.F.R. § 240.17a-3].

## SECOND CLAIM - ARMCO

Bilzerian Violated Section 7(f) of the Exchange Act, 15 U.S.C. § 78g(f), and Regulation X Thereunder, 12 C.F.R. § 224.1 et seq.--Margin Violations

214. Paragraphs 1 through 15 and 202 through 213 are realleged and incorporated by reference herein.

215. Pursuant to the arrangements described in paragraphs 203 through 213 above, Bilzerian caused credit to be extended and obtained, and received and enjoyed the beneficial use of a loan and extension of credit for the purpose of purchasing or carrying Armco securities in contravention of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

216. By reason of the foregoing, Bilzerian violated Section 7(f) of the Exchange Act [15 U.S.C. § 78g(f)] and Regulation X thereunder [12 C.F.R. § 224.1 et seq.].

58

## THIRD CLAIM - ARMCO

Bilzerian Aided and Abetted Jefferies & Company's
Violations of Section 7(c) of the Exchange Act, 15
U.S.C. § 78g(c), and Regulation T Thereunder, 12 C.F.R.
§ 220.1 et seq.--Margin Violations

217.   Paragraphs 1 through 15 and 202 through 216 are realleged and incorporated by reference herein.

218.   Pursuant to the arrangement described in paragraphs 203 through 213 above, Jefferies & Company, directly or indirectly, extended and maintained credit and arranged for the extension and maintenance of credit to Bilzerian for the purchase of Armco securities in violation of the rules and regulations proscribed by the Board of Governors of the Federal Reserve System.

219.   By virtue of its unlawful extension of credit to Bilzerian, Jefferies & Company violated Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

220.   Bilzerian knew or was reckless in not knowing that Jefferies & Company's conduct was unlawful and/or would involve violations of Section 7(c) of the Exchange Act and Regulation T, and substantially assisted in the commission of those violations.

221.   By reason of the foregoing, Bilzerian aided and abetted Jefferies & Company's violations of Section 7(c) of the Exchange Act [15 U.S.C. § 78g(c)] and Regulation T thereunder [12 C.F.R. § 220.1 et seq.].

59

## PAY 'N PAK STORES, INC.

## FIRST CLAIM - PAY 'N PAK

Bilzerian Violated Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rule 13d-1 Thereunder, 17 C.F.R. § 240.13d-1--False Statements on Schedule 13D

222. Paragraphs 1 through 15 above are realleged and incorporated by reference herein.

223. Pay 'N Pak Stores, Inc. ("PNP") is incorporated in the State of Washington. PNP's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was traded on the New York and regional stock exchanges at all relevant times, until March 1988 when the company's shareholders approved a management-led buyout.

224. On March 26, 1987, Bilzerian and BiCoastal Financial Corporation ("BiCoastal"), a Florida corporation wholly-owned by Bilzerian, filed a Schedule 13D with the Commission with respect to PNP. Bilzerian and BiCoastal filed amendments to the Schedule 13D on March 30, 1987 and thereafter.

225. The March 26, 1987 Schedule 13D reported that Bilzerian and BiCoastal were the beneficial owners of 722,000 shares of PNP common stock. The Schedule 13D further represented that Bilzerian personally had acquired 583,300 of these shares at a cost of approximately $6,596,800. The Schedule 13D reported that approximately one-half of this purchase price was paid through ordinary margin loans and that the remainder of funds were obtained from Bilzerian's "personal funds."

60

226.  On or about November 24, 1986, Bilzerian obtained $3.75 million from a partnership controlled by an individual investor ("the PNP Investor").  Bilzerian obtained these funds for the purpose of acquiring PNP securities or in order to pay for PNP securities he already had acquired.

227.  Bilzerian entered into contracts, arrangements and understandings with the PNP Investor pursuant to which: (a) Bilzerian agreed to share evenly with the PNP Investor the profits, if any, earned on the securities purchased with the funds that the PNP Investor provided; and (b) Bilzerian personally guaranteed that the PNP Investor would not lose money and that the funds the PNP Investor had provided would be returned.

228.  In an apparent attempt to conceal the identity and existence of the PNP Investor and the terms of the loan with Bilzerian, Bilzerian funneled the $3.75 million through a trust entered into between defendant Tallant and the PNP Investor.  The trust purported to provide Tallant with unrestricted investment authority.  In fact, Tallant arranged with Bilzerian to transfer immediately to Bilzerian all contributions made to the trusts with the individual investor.

229.  Neither the March 26, 1987 Schedule 13D nor any amendments thereto disclosed the contracts, arrangements and understandings between Bilzerian and the PNP Investor that are set forth in paragraphs 223 through 228 above.

230.  The Schedule 13D and the amendments thereto filed by Bilzerian and BiCoastal contained untrue statements of material

61

fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 13(d), Rules 13d-1 and 13d-2 thereunder and Schedule 13D, including, among others, the following:

    (a)    the Schedule 13D failed to disclose that Bilzerian borrowed approximately $3.75 million of the total purchase price of the PNP common stock listed in the March 26, 1987 Schedule 13D and failed to describe the terms of the loan transactions and the names of the parties thereto (Schedule 13D, Item 3);

    (b)    the Schedule 13D falsely identified the source of all of the funds used by Bilzerian to acquire PNP securities as Bilzerian's personal funds;

    (c)    the Schedule 13D and the amendments thereto failed to disclose the contracts, arrangements, under-standings and relationships that Bilzerian had entered into with the PNP Investor pursuant to which the PNP Investor was entitled to one-half of the profits earned on the PNP securities purchased with the funds that the PNP Investor provided and pursuant to which the PNP Investor was personally guaranteed by Bilzerian not to lose money on the investment (Schedule 13D, Items 3, 5 and 6); and

    (d)    the Schedule 13D falsely stated that there were no contracts, arrangements, understandings or

62

relationships with respect to the PNP securities when the contracts, arrangements, understandings and relationships described in paragraphs 223 through 229 were in existence.

231. By reason of the foregoing, Bilzerian violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 thereunder [17 C.F.R. §§ 240.13d-1 and 240.13d-2].

SECOND CLAIM - PAY 'N PAK

Bilzerian Violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 Thereunder, 17 C.F.R. § 240.10b-5--Securities Fraud

232. Paragraphs 1 through 15 and 222 through 231 are realleged and incorporated by reference herein.

233. Bilzerian, directly or indirectly, in connection with the purchase and sale of the securities of PNP, by use of the means or instrumentalities of interstate commerce, the mails, or facilities of a national securities exchange, employed devices, schemes or artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

234. As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 13D and amendments thereto with respect to the securities of PNP that he filed and caused BiCoastal to file

63

contained untrue statements of material fact and omissions of material facts necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading.

235.  By reason of the foregoing, Bilzerian violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

THE SINGER COMPANY

FIRST CLAIM - SINGER

Bilzerian Violated Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rule 13d-1 Thereunder, 17 C.F.R. § 240.13d-1--False Statements on Schedule 13D

236.  Paragraphs 1 through 15 are realleged and incorporated by reference herein.

237.  The Singer Company ("Singer") is incorporated in New Jersey.  Singer's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was traded on the New York and regional stock exchanges at all relevant times.

238.  On October 29, 1987, Bilzerian caused a Schedule 13D to be filed with the Commission with respect to Singer on behalf of Bilzerian Partners Limited Partnership 1 ("Partners"), a partnership whose sole general partners were Bilzerian and Bilzerian's wholly-owned entity, BiCoastal Acquisition Corporation.

239.  The Schedule 13D reported that Partners were the beneficial owners of 2.1 million shares of Singer common stock. The Schedule 13D reported that approximately one-half of the

CaseCase5:05689-1854R54-RCDDocument4285-FiledF1061087890/2Page035654547Page ID #:1082

64

approximately $91 million cost of acquiring these shares was obtained from ordinary margin loans and that the other half was "obtained from the working capital of the Partnership which was derived from the capital contributions of the partners, which in turn were derived from their working capital or personal funds."

240. On November 2, 1987, Bilzerian caused the Singer Acquisition Company, a subsidiary of Partners, to file a Schedule 14D-1 with the Commission announcing a tender offer for all of the outstanding shares of Singer at $50 per share. Neither the Schedule 14D-1 nor any amendments thereto disclosed the contacts, arrangements or understandings set forth below.

241. On or about March 11, 1987, Bilzerian obtained $3.5 million from an individual investor ("the first Singer Investor"). Bilzerian obtained these funds for the purpose of acquiring Singer securities or paying for Singer securities he already had acquired.

242. In an apparent attempt to conceal the identity and existence of the first Singer Investor and the terms of the loan with Bilzerian, Bilzerian funneled the $3.5 million through a trust entered into between defendant Tallant and the first Singer Investor. The trust purported to provide Tallant with unrestricted investment authority. In fact, Tallant arranged with Bilzerian to transfer immediately to Bilzerian the contribution made to the trust by the first Singer Investor.

243. On or about October 21, 1987, Bilzerian obtained $4.5 million from a partnership controlled by an individual investor

65

("the second Singer Investor"). Bilzerian obtained these funds for the purpose of acquiring Singer securities or paying for Singer securities he already had acquired.

244. Bilzerian entered into contracts, arrangements and understandings with both of the Singer Investors pursuant to which: (a) Bilzerian agreed to share evenly with the Singer Investors the profits, if any, earned on the securities purchased with the funds the Singer Investors provided; and (b) Bilzerian personally guaranteed that the Singer Investors would not lose money and that the funds they had provided would be returned.

245. The Schedule 13D filed by Bilzerian and Partners did not disclose the contracts, arrangements and understandings between Bilzerian and the two Singer Investors that are set forth in paragraphs 237 through 244 above.

246. The Schedule 13D filed by the Partnership contained untrue statements of material fact, omitted to state facts necessary to make the statements that were made not misleading, and omitted facts required to be stated by Section 13(d), Rule 13d-1 thereunder and Schedule 13D, including, among others, the following:

> (a) the Schedule 13D failed to disclose that Bilzerian borrowed $8 million of the total purchase price of the Singer securities listed in the Schedule 13D and failed to describe the terms of the loan transactions and the names of the parties thereto (Schedule 13D, Item 3);

CaseCase4Case69591855411R54-RODmdementurth4285-FileF0664289789/2Bage6637674574P5Page
ID #:1084

66

(b)    the Schedule 13D falsely identified the source of
all of the funds used by Bilzerian to acquire
Singer securities as personal funds or working
capital;

(c)    the Schedule 13D failed to disclose the contracts,
arrangements, understandings and relationships
that Bilzerian had entered into with the Singer
Investors pursuant to which the Singer Investors
were entitled to one-half of the profits earned on
the Singer securities purchased with the funds that
they provided and were personally guaranteed by
Bilzerian not to lose money on their investments
(Schedule 13D, Items 3, 5 and 6); and

(d)    the Schedule 13D falsely stated that there were
no contracts, arrangements, understandings or
relationships with respect to the Singer
securities when the contracts, arrangements,
understandings and relationships described in
paragraphs 237 through 244 were in existence.

247.   By reason of the foregoing, Bilzerian violated Section
13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1
thereunder [17 C.F.R. § 240.13d-1].

Case 2:24-cr-00589-MCS-RAO Document 1-8 Filed 06/28/24 Page 68 of 154 Page ID #:1085

68

the arrangement, agreement or understanding between Bilzerian and the first Singer Investor set forth above.

253. By reason of the foregoing, Bilzerian violated Section 14(d) of the Exchange Act [15 U.S.C. § 78n(d)] and Rules 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.14d-3 and 240.14d-6].

<u>FORTUNE FINANCIAL GROUP, INC.</u>

<u>FIRST CLAIM - FORTUNE</u>

Bilzerian Violated Section 13(d) of the Exchange Act,
15 U.S.C. § 78m(d), and Rule 13d-1 Thereunder,
17 C.F.R. § 240.13d-1--Failure To Disclose Timely
Beneficial Ownership on Schedule 13D

254. Paragraphs 1 through 15 are realleged and incorporated by reference herein.

255. Fortune Financial Group Incorporated ("Fortune") is incorporated in Florida. Fortune's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is traded through the National Association of Securities Dealers, Inc. Automated Quotation System ("NASDAQ") as a National Market System stock.

256. On or about February 26, 1988, at the latest, Bilzerian became, directly or indirectly, the beneficial owner of in excess of five percent of the outstanding common stock of Fortune.

257. Section 13(d) of the Exchange Act and Rule 13d-1 thereunder require any person to file with the Commission a Statement on Schedule 13D describing the nature and extent of their securities holdings no later than ten days after they become the beneficial owners of in excess of five percent of a class of registered securities.

Case 2:34-cr-80658-MSR-PJ-CD Document 47285 Filed 06/28/89/2 Page 68 of 57-475 Page ID #:1086

69

258.   On May 3, 1988, Bilzerian filed with the Commission for the first time a Schedule 13D with respect to Fortune.  The Schedule 13D reported that Bilzerian and Bilzerian Partners Limited Partnership Series B ("Partners") were the beneficial owners of 282,00 shares of Fortune common stock, which represented approximately 6.25% of the total outstanding common stock of Fortune.

259.   Bilzerian filed the Schedule 13D with the Commission more than ten days after Bilzerian and Partners became the beneficial owners of in excess of five percent of the outstanding common stock of Fortune, which was on March 8, 1988 at the latest.

260.   On or about April 21, 1988, Bilzerian purchased 50,000 shares of Fortune common stock at a cost of $18.25 per share.  On or about April 27, 1988, Bilzerian purchased another 5,000 shares of Fortune common stock at a cost of $19.25 per share.  When Bilzerian made these purchases he secretly had been, directly or indirectly, the beneficial owner of in excess of five percent of the outstanding common stock of Fortune for more than ten days. On May 3, 1988, the day that Bilzerian belatedly filed his initial Schedule 13D, Fortune common stock closed at $24 per share, up $4.75 points from the close of $19.25 on May 2, 1988.  Thus, Bilzerian realized an illegal savings of at least $318,125 by virtue of his failure to file timely a Schedule 13D.

261.   By reason of the foregoing, Bilzerian violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

Case 2:24-cr-00589-MCR-BCD Document 142-85 Filed 06/28/89/2 Page 690 of 745 Page ID #:1087

70

## SECOND CLAIM - FORTUNE

Bilzerian Violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 Thereunder, 17 C.F.R. § 240.10b-5--Securities Fraud

262. Paragraphs 1 through 15 and 254 through 261 are realleged and incorporated by reference herein.

263. Bilzerian, directly or indirectly, in connection with the purchase and sale of the securities of Fortune, by use of the means or instrumentalities of interstate commerce, the mails, or facilities of a national securities exchange, employed devices, schemes or artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, including purchasers and sellers of such securities.

264. On or about January 18, 1988, Bilzerian spoke with an officer of Fortune. During this conversation, Bilzerian was informed that the number of shares of Fortune common stock that he represented that he owned constituted in excess of five percent of the total number of shares of Fortune common stock then outstanding.

265. As stated above, Bilzerian knew or was reckless in not knowing that the Schedule 13D with respect to the securities of Fortune that he caused the Partnership to file contained untrue statements of material fact and omissions of material facts

71

necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading.

266.   By reason of the foregoing, Bilzerian violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court:

I.

Grant permanent injunctions restraining and enjoining defendants Bilzerian and Tallant, and their officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

II.

Grant permanent injunctions restraining and enjoining defendants Bilzerian and Tallant, and their officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78m(d); 17 C.F.R. §§ 240.13d-1 and 240.13d-2].

72

### III.

Grant permanent injunctions restraining and enjoining defendants Bilzerian and Tallant, and their officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 14(d) of the Exchange Act and Rules 14d-3 and 14d-6 promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78n(d); 17 C.F.R. §§ 240.14d-3 and 240.14d-6].

### IV.

Grant permanent injunctions restraining and enjoining defendants Bilzerian and Tallant, and their officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 14(e) of the Exchange Act, and from aiding and abetting such violations [15 U.S.C. § 78n(e)].

### V.

Grant a permanent injunction restraining and enjoining defendant Bilzerian, and his officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 7(c) of the Exchange Act and Regulation T promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78g(c); 12 C.F.R. §§ 220.1 et seq.].

73

## VI.

Grant a permanent injunction restraining and enjoining defendant Bilzerian, and his officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 7(f) of the Exchange Act and Regulation X promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78g(f); 12 C.F.R. § 224.1 <u>et</u> <u>seq</u>].

## VII.

Grant a permanent injunction restraining and enjoining defendant Bilzerian, and his officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 17(a) of the Exchange Act and Rule 17a-3 promulgated thereunder, and from aiding and abetting such violations [15 U.S.C. § 78q(a); 17 C.F.R. § 240.17a-3].

## VIII.

Grant a permanent injunction restraining and enjoining defendant Bilzerian, and his officers, agents, servants, employees, attorneys, and those persons in active concert with them from violating, directly or indirectly, Section 9(a)(2) of the Exchange Act, and from aiding and abetting such violations [15 U.S.C. § 78i(a)(2)].

74

IX.

Grant permanent injunctions restraining and enjoining defendants DeBartolo, Sr., Moses and Sokolov, and their officers, agents, servants, employees, attorneys-in-fact, and those persons associated with them from violating, directly or indirectly, Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78n(d) and 78n(e)] and Rules 10b-5, 13d-1, 13d-2, 14d-3 and 14d-6 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.13d-2, 240.14d-3 and 240.14d-6], and as to defendant Moses only, Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3] and from aiding and abetting such violations.

X.

Enter an Order requiring the defendants, and each of them, to account for and disgorge all profits and monies received and losses avoided as a result of their illegal conduct as alleged by the Commission herein.

XI.

Enter an Order requiring defendant Moses to pay civil penalties under the Insider Trading Sanctions Act of 1984, 15 U.S.C. § 78u(d)(2)(a), in the amount of $129,325.00 from his trading in Hammermill common stock, as described herein.

75

## XII.

Grant all further relief, legal or equitable, that the Court believes is warranted under the circumstances.

Respectfully Submitted,

_____
Gary Lynch

_____
William R. McLucas

_____
Thomas C. Newkirk

_____
Bruce A. Hiler

_____
Barry R. Goldsmith

_____
Jay A. Dubow

_____
Herbert F. Janick III

_____
Catherine M. Shea

Attorneys for Plaintiff
Securities and Exchange
  Commission
450 Fifth Street, N.W.
Mail Stop 4-5
Washington, D.C. 20549
(202) 272-2945

Dated:  June 29, 1989

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) | Case No. 1:89-cv-1854-RCL |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | |
| v. | ) ) ) ) ) ) | |
| | ) | |
| PAUL A. BILZERIAN, | ) ) | |
| | ) | |
| Defendant. | ) ) ) | |

**[PROPOSED] ORDER GRANTING RELIEF FROM FINAL JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)**

The Court has reviewed Defendant Paul Bilzerian's Motion for Relief From Final Judgment Under Federal Rule of Civil Procedure 60(b) and finds relief is appropriate. The disgorgement judgement against Defendant Paul Bilzerian is hereby vacated.

_____
Date

_____
Hon. Royce C. Lamberth
United States District Judge

| SECURITIES AND EXCHANGE COMMISSION | represented by | John G. Silbermann<br>U.S. SECURITIES & EXCHANGE COMMISSION<br>100 F Street, NE<br>Washington, DC 20549<br>(202) 551-4907<br>Email: silbermannj@sec.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>Kathleen A. Ford<br>SECURITIES & EXCHANGE COMMISSION<br>44 Montgomery Street<br>26th Floor<br>San Francisco, CA 94104-4603<br>(415) 705-2500<br>Fax: (415) 705-2501<br>Email: fordka@sec.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>Michael James Roessner<br>SECURITIES AND EXCHANGE COMMISSION<br>Division of Enforcement<br>100 F. Street, NE<br>Mail Stop 5631<br>Washington, DC 20549<br>202-551-4347<br>Fax: 703-813-9366<br>Email: roessnerm@sec.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>Sara Z. Moghadam<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| PAUL A. BILZERIAN | represented by | PAUL A. BILZERIAN<br>P.O. Box 2086<br>Basseterre 33613<br>St. Kitts<br>Email: pabilzeria@aol.com<br>PRO SE |
|---|---|---|
| ERNEST B. HAIRE | represented by | ERNEST B. HAIRE<br>9545 N. Florida Avenue<br>Tampa, FL 33612<br>(813) 933-7632<br>PRO SE |
| DAVID E. HAMMER | represented by | David Eric Hammer<br>DAVID E. HAMMER, P.A.<br>212 Crystal Grove Boulevard<br>Lutz, FL 33548-6460<br>(813) 274-4999<br>Fax: (800) 967-7340<br>Email:<br>mail@davidhammeresq.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| ROBERT W. BLEAKLEY | represented by | ROBERT W. BLEAKLEY<br>15170 North Florida Avenue<br>Tampa, FL 33613<br>(813) 221-3198<br>PRO SE |
| DOUGLAS N. MENCHISE<br>*Chapter 7 Bankruptcy Trustee*<br>*for the Estate of Terri L.* | represented by | DOUGLAS N. MENCHISE<br>300 Turner Street<br>Clearwater, FL 33756 |

2

| | | |
|---|---|---|
| *Steffen, in the U.S. Bankruptcy Court for the Middle District of Florida.* | | (727) 442-2186<br>PRO SE |
| **MAXIMILIAN DANISHEVSKI** | represented by | **MAXIMILIAN DANISHEVSKI**<br>319 Lange Leemstr<br>2018 Antwerp<br>Belgium<br>+372 5993 7398<br>PRO SE |
| **PAUL DECAILLY** | represented by | **PAUL DECAILLY**<br>3111 W. Dr. MLK Jr. Blvd, Ste 100<br>Tampa, FL 33607<br>(813) 286-2909<br>PRO SE |
| **SHAW PITTMAN** | represented by | **David J. Cynamon**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| **TERRI L. STEFFEN** | represented by | **TERRI L. STEFFEN**<br>16634 Sedona de Avila<br>Tampa, FL 33613<br>(813) 264-1818<br>PRO SE<br><br>**Edward B. Davis**<br>AKERMAN, SENTERFITT & EDISON, P.A.<br>Las Olas Centre II<br>350 East Las Olas Boulevard<br>Suite 1600<br>Fort Lauderdale, FL 33301-4200<br>*LEAD ATTORNEY* |

| | | *ATTORNEY TO BE NOTICED* <br><br> **Joseph W. Hatchett** <br> AKERMAN, SENTERFITT & EDISON, P.A. <br> Las Olas Centre II <br> 350 East Las Olas Boulevard <br> Suite 1600 <br> Fort Lauderdale, FL 33301-4200 <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |
|---|---|---|
| **OVERSEAS HOLDING LIMITED PARTNERSHIP** | represented by | **Edward B. Davis** <br> (See above for address) <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* <br><br> **Joseph W. Hatchett** <br> (See above for address) <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |
| **GEOFFREY TODD HODGES** | represented by | **GEOFFREY TODD HODGES** <br> G.T. HODGED, P.A. <br> 905 Shaded Water Way <br> Lutz, FL 33549 <br> 262-2365 <br> Fax: AREA (813) <br> PRO SE |
| **PUMA FOUNDATION, LTD.** | represented by | **David Eric Hammer** <br> (See above for address) <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

4

| | | Don Mason Stichter |
| | | STICHTER, RIEDEL, BLAIN & PROSSER, P.A. |
| | | 110 East Madison Street |
| | | Tampa, FL 33602 |
| | | (813) 229-0144 |
| | | Fax: (813) 229-1811 |
| | | Email: dstichter@srbp.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Gerald Michael Nelson** |
| | | NELSON BISCONTI & THOMPSON, LLC |
| | | 718 West Martin Luther King Boulevard |
| | | Suite 200 |
| | | Tampa, FL 33603 |
| | | (813) 221-0999 |
| | | Fax: 813-314-9626 |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| **MARK YAFFE** | represented by | **John Thorpe Richards , Jr** |
| | | BOGORAD & RICHARDS PLLC |
| | | 1800 Diagonal Road |
| | | Suite 600 |
| | | Alexandria, VA 22314 |
| | | 703-457-7823 |
| | | Fax: 703-457-7824 |
| | | Email: jtr@bogoradrichards.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| **ALLEN YAFFE** | represented by | **John Thorpe Richards , Jr** |
| | | (See above for address) |

| | | |
|---|---|---|
| | | *LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| **NATIONAL GOLD EXCHANGE, INC.** | represented by | **John Thorpe Richards , Jr**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| **DAN BILZERIAN** | represented by | **Marc J. Randazza**<br>RANDAZZA LEGAL GROUP, PLLC<br>8991 W. Flamingo Rd<br>Suite B<br>Las Vegas, NV 89147<br>702-420-2001<br>Email: ecf@randazza.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Thomas C. Goldstein**<br>GOLDSTEIN & RUSSELL P.C.<br>Partner/Owner<br>7475 Wisconsin Avenue<br>Suite 850<br>Bethesda, MD 20814<br>(202) 362-0636<br>Email: tgoldstein@goldsteinrussell.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Jay Marshall Wolman**<br>RANDAZZA LEGAL GROUP, PLLC<br>100 Pearl Street<br>14th Floor<br>Hartford, CT 06103 |

| | | |
|---|---|---|
| | | (702) 420-2001<br>Fax: (305) 437-7662<br>Email: jmw@randazza.com<br>*ATTORNEY TO BE NOTICED* |
| **KEVIN A. HORSTWOOD** | represented by | **KEVIN A. HORSTWOOD**<br>Haven House<br>Grand Mai, St George<br>Grenada, WI<br>PRO SE |
| **LOVING SPIRIT FOUNDATION INC** | represented by | **Edward B. Davis**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Gerald Michael Nelson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Joseph W. Hatchett**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Samuel Robert Sutton**<br>15320 Falconbridge Terrace<br>North Potomac, MD 20878<br>301-244-8744<br>Fax: 301-298-1310<br>Email:<br>robert@srobertsuttonlaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| **ADAM BILZERIAN** | represented by | **David Chesnoff**<br>CHESNOFF & SCHONFELD<br>520 South Fourth Street |

|  |  | 520 South Fourth Street<br>Las Vegas, NV 89101<br>702-384-5563<br>Email:<br>dzchesnoff@cslawoffice.net<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Richard A. Schonfeld**<br>CHESNOFF & SCHONFELD<br>520 South Fourth Street<br>520 South Fourth Street<br>Las Vegas, NV 89101<br>702-384-5563<br>Fax: 702-598-1435<br>Email:<br>rschonfeld@cslawoffice.net<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**George Allen Dale**<br>LAW OFFICES OF G.<br>ALLEN DALE, PLLC<br>555 13th Street, NW<br>Suite 500 West<br>Washington, DC 20004<br>202-638-2900<br>Fax: 202-628-4177<br>Email: gallendale@aol.com<br>*ATTORNEY TO BE NOTICED* |