# EXHIBIT H

# Ignite International Brands, Ltd.
# LISTING STATEMENT FORM 2A
# May 30, 2019

This Listing Statement describes the distribution of securities of an entity that is expected to indirectly derive a portion of its revenues from the cannabis industry in certain states of the United States, which industry is illegal under United States federal law. Ignite International Brands, Ltd. (the "Company"), a corporation incorporated under the laws of the Province of British Columbia, Canada, may be considered to have indirect (through its intended business combination with Ignite International, Ltd.) and ancillary involvement (through investments in Tahoe Hydroponics Company, LLC) in the cannabis industry in the States of California and Nevada where local state laws permit such activities. Currently, the Company is not directly engaged in the manufacture, importation, possession, use, sale or distribution of cannabis in the recreational cannabis marketplace in either Canada or the United States, nor is the Company directly engaged in the manufacture, importation, possession, use, sale or distribution of cannabis in the medical cannabis marketplace in Canada or the United States.

Almost half of the states in the United States have enacted legislation to regulate the sale and use of medical cannabis without limits on tetrahydrocannabinol ("THC"), while other states have regulated the sale and use of medical cannabis with strict limits on the levels of THC. Notwithstanding the permissive regulatory environment of adult-use recreational and medical cannabis at the state level, cannabis continues to be categorized as a controlled substance under the Controlled Substances Act (the "CSA") in the United States and as such, cannabis-related practices or activities, including without limitation, the manufacture, importation, possession, use or distribution of cannabis are illegal under United States federal law. Strict compliance with state laws with respect to cannabis will neither absolve the Company of liability under United States federal law, nor provide a defense to any federal proceeding which may be brought against the Company. Any such proceedings brought against the Company may adversely affect the Company's financial performance.

As a result of the conflicting views between state legislatures and the federal government of the United States regarding cannabis, investments in cannabis businesses in the United States are subject to inconsistent legislation and regulation. Unless and until the United States Congress amends the CSA with respect to cannabis (and there can be no assurance as to the timing or scope of any such potential amendments), there is a risk that federal authorities may enforce current federal law, which may adversely affect the current and future business and investments of the Company in the United States. As such, there are a number of risks associated with the Company's existing and future business and investments in the United States.

For the reasons set forth above, the Company's interests in the United States cannabis market may become the subject of heightened scrutiny by regulators, stock exchanges, clearing agencies and other authorities in Canada. There are a number of risks associated with the business of the Company. See Section 17 – *Risk Factors*.

**TABLE OF CONTENTS**

Page

1. GLOSSARY OF TERMS ..................................................................................................... 4

2. CORPORATE STRUCTURE ............................................................................................ 14

3. GENERAL DEVELOPMENT OF THE BUSINESS ........................................................... 16

4. NARRATIVE DESCRIPTION OF THE BUSINESS .......................................................... 48

5. SELECTED CONSOLIDATED FINANCIAL INFORMATION .......................................... 54

6. MANAGEMENT'S DISCUSSION AND ANALYSIS ........................................................ 57

7. MARKET FOR SECURITIES .......................................................................................... 58

8. CONSOLIDATED CAPITALIZATION ............................................................................ 58

9. OPTIONS TO PURCHASE SECURITIES ........................................................................ 58

10. DESCRIPTION OF THE SECURITIES .......................................................................... 60

11. ESCROWED SECURITIES ........................................................................................... 64

12. PRINCIPAL SHAREHOLDERS .................................................................................... 65

13. DIRECTORS AND OFFICERS ...................................................................................... 66

14. CAPITALIZATION ...................................................................................................... 70

15. EXECUTIVE COMPENSATION ................................................................................... 73

16. INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS ................................. 76

17. RISK FACTORS .......................................................................................................... 76

18. PROMOTERS ............................................................................................................. 98

19. LEGAL PROCEEDINGS .............................................................................................. 98

20. INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS ........ 99

21. AUDITORS, TRANSFER AGENTS AND REGISTRARS ................................................ 99

22. MATERIAL CONTRACTS ........................................................................................... 99

23. INTEREST OF EXPERTS ........................................................................................... 100

24. OTHER MATERIAL FACTS ....................................................................................... 101

25. FINANCIAL STATEMENTS ....................................................................................... 108

SCHEDULE A – FINANCIAL STATEMENTS OF IGNITE INTERNATIONAL BRANDS, LTD.

SCHEDULE B – MD&A OF IGNITE INTERNATIONAL BRANDS, LTD.

SCHEDULE C – FINANCIAL STATEMENTS OF IGNITE INTERNATIONAL, LTD.

SCHEDULE D – MD&A OF IGNITE INTERNATIONAL, LTD.

SCHEDULE E – PRO-FORMA CONSOLIDATED FINANCIAL STATEMENTS OF IGNITE INTERNATIONAL BRANDS, LTD.

- 1 -

**Introduction**

This Listing Statement (the "**Listing Statement**") is furnished in connection with the proposed business combination of Ignite International, Ltd. ("**Ignite US**"),  Ignite International Brands, Ltd. ("**Ignite Canada**" or the "**Company**"), 1203238 B.C. Ltd. ("**FinCo**"), 1203243 B.C. Ltd.("**Merger Sub**"), a wholly-owned subsidiary of the Company (the "**Business Combination**", which after its completion, results in the Company being the "**Resulting Issuer**") and the application to requalify for listing the subordinate voting shares of the Resulting Issuer (the "**Subordinate Voting Shares**") on the Canadian Securities Exchange (the "**CSE**"), after which the Resulting Issuer will change its business focus from being an investment company to being a vertically integrated company operating in the cannabis industry. No Person (as defined herein) has been authorized to give any information or make any representation in connection with the Resulting Issuer or the Business Combination other than as contained in this Listing Statement, and if given or made, any such information or representation must not be relied upon as having been authorized by the Company, Ignite US, FinCo, Merger Sub or the Resulting Issuer.

Information contained in this Listing Statement is given as of May 30, 2019, unless otherwise specifically stated. Neither the delivery of this Listing Statement nor any distribution of the securities referred to in this Listing Statement will, under any circumstance, create an implication that there has been no change in the information set forth herein since the date of such information given in this Listing Statement.

This Listing Statement does not constitute an offer to sell or a solicitation of an offer to purchase any securities or the solicitation of a proxy by any Person in any jurisdiction in which such an offer or solicitation is not authorized or in which the Person making such offer or solicitation is not qualified to do so or to any Person to whom it is unlawful to make such an offer or solicitation of an offer or a proxy solicitation.

**Currency and Consolidation**

In this Listing Statement, all dollar amounts are expressed in Canadian dollars, except as otherwise indicated. References to "$", "CDN$" or "dollars" are to Canadian dollars and references to "US$" are to U.S. dollars. Unless otherwise indicated, all Ignite Canada and Resulting Issuer share data herein is presented on a post-Consolidation (as defined herein) basis.

**Cautionary Note Regarding Forward-Looking Statements**

The information provided in this Listing Statement, including information incorporated by reference, may contain "forward-looking statements" about the Business Combination and the Resulting Issuer. In addition, the parties herein may make or approve certain statements in future filings with Canadian securities regulatory authorities, in press releases, or in oral or written presentations by representatives of the parties herein that are not statements of historical fact and may also constitute forward-looking statements. All statements, other than statements of historical fact, made by the Company that address activities, events or developments that the Company expects or anticipates will or may occur in the future are forward-looking statements, including, but not limited to, statements preceded by, followed by or that include words such as "may", "will", "would", "could", "should", "believes", "estimates", "projects", "potential", "expects", "plans", "intends", "anticipates", "targeted", "continues", "forecasts", "designed", "goal", or the negative of those words or other similar or comparable words.

- 2 -

Forward-looking statements may relate to the anticipated completion of the Business Combination, future financial conditions, results of operations, plans, objectives, performance or business developments, statements with respect to planned acquisitions, strategic partnerships or other transactions not yet concluded, plans to market, sell and distribute products, market competition, plans to retain and recruit personnel, the ability to secure funding and the ability to obtain regulatory and other approvals. These statements speak only as at the date they are made and are based on information currently available and on the then current expectations of the party making the statement and assumptions concerning future events, which are subject to a number of known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements to be materially different from that which was expressed or implied by such forward-looking statements, including, but not limited to, risks and uncertainties related to:

- the receipt of required approvals in respect of the proposed Business Combination, including without limitation, the CSE Approval (as defined herein), within the anticipated time or at all;

- the Resulting Issuer's business strategy of being a vertically integrated company operating in the cannabis industry;

- risks of new and changing governmental and environmental regulation;

- statements regarding changes in laws and enforcements in the United States;

- any commentary related to the legalization of cannabis and the timing related thereto;

- risks associated with economic conditions, dependence on management and conflicts of interest;

- the availability of capital to fund planned growth and expenditures;

- the business strategies and milestones of the Resulting Issuer;

- the Resulting Issuer's investments in the United States, the characterization, and consequences of those investments under federal law;

- the framework for the enforcement of medical cannabis and cannabis related offenses in the United States and Canada;

- prevailing regulatory and tax laws and regulations;

- protection of intellectual property;

- the speculative and competitive nature of the cannabis industry;

- the ability to secure necessary personnel, equipment and services;

- the positive impact on and the growth of the Resulting Issuer's branded products expected from Dan Bilzerian's positive celebrity status; and

- other risks described in this Listing Statement and described from time to time in documents filed by the Resulting Issuer with Canadian securities regulatory authorities.

The forward-looking statements contained herein are based on certain key expectations and assumptions, including, without limitation: (i) expectations and assumptions concerning timing of receipt of required regulatory approvals, including with respect to the receipt of required licenses and third party consents, if any; (ii) expectations and assumptions concerning the success of the operations of the Resulting Issuer; (iii) expectations regarding the continued trend towards legalization of marijuana in various jurisdictions; (iv) expectations regarding the continued growth of the adult-use marijuana industry; (v) expectations that the Financing (as defined herein) will be

- 3 -

completed; and (v) expectations that the parties herein will successfully complete the Business Combination.

With respect to the forward-looking statements contained herein, although the Company and Ignite US believe that the expectations and assumptions on which the forward-looking statements are based are reasonable, undue reliance should not be placed on the forward-looking statements because no assurance can be given that such expectations will prove to be correct. Since forward-looking statements address future events and conditions, by their very nature they involve inherent risks and uncertainties. Actual results could differ materially from those currently anticipated due to many factors and risks. The Company and Ignite US cannot guarantee future results, levels of activity, performance or achievements. Consequently, there is no representation by the Company and Ignite US that actual results achieved will be the same in whole or in part as those set out in the forward-looking statements and information. There are risks and other factors, some of which are beyond the control of the Company and Ignite US, which could cause results to differ materially from those expressed in the forward-looking statements and information contained in this Listing Statement. These include, but are not limited to: the availability of sources of income to generate cash flow and revenue; risks relating to the receipt of the required licenses; risks relating to federal and provincial regulations applicable to the production and sale of marijuana; risks relating to additional funding requirements; due diligence risks; exchange rate risks; risks relating to non-controlling interests; changes in laws, regulations and/or guidelines; unfavourable publicity or consumer perception; the Company's and Ignite US's limited operating history; competition; banking issues related to the cannabis industry; additional financing requirements; currency fluctuations; research and market development; liability and enforcement complaints; product liability; reliance on key inputs; resale of shares; price volatility of publicly traded securities; dependence and reliance upon existing management, research and development personnel, as well as growing and extraction personnel; management of growth; dividends; intellectual property; insurance coverage; costs of maintaining a public listing; litigation; operational risks; difficulty implementing business strategy; actual and potential conflicts of interest; available talent pool; and potential transaction and legal risks, as more particularly described under the heading "*Risk Factors*" in this Listing Statement.

Consequently, all forward-looking statements made in this Listing Statement and other documents of the parties herein are qualified by such cautionary statements and there can be no assurance that the anticipated results or developments will actually be realized or, even if realized, that they will have the expected consequences to or effects on the Resulting Issuer. The cautionary statements contained or referred to in this section should be considered in connection with any subsequent written or oral forward-looking statements that we and/or Persons acting on our behalf may issue. The parties herein undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, other than as required under securities legislation. An investment in the Resulting Issuer's securities should be considered highly speculative. There is no guarantee that an investment in the Resulting Issuer will earn any positive return in the short or long term. An investment in the Resulting Issuer is appropriate only for investors who have the capacity to absorb a loss of some or all of their investment. There are certain risk factors associated with an investment in the Resulting Issuer's securities. See Section 17 – *Risk Factors* in this Listing Statement.

- 4 -

**Market and Industry Data**

This Listing Statement includes market and industry data that has been obtained from third party sources, including industry publications. The Company believes that the industry data is accurate and that its estimates and assumptions are reasonable, but there is no assurance as to the accuracy or completeness of this data. Third party sources generally state that the information contained therein has been obtained from sources believed to be reliable, but there is no assurance as to the accuracy or completeness of included information. Although the data is believed to be reliable, the Company has not independently verified any of the data from third party sources referred to in this Listing Statement or ascertained the underlying economic assumptions relied upon by such sources.

**1. GLOSSARY OF TERMS**

The following is a glossary of certain general terms used in this Listing Statement including the summary hereof. Terms and abbreviations used in the financial statements included in or appended to this Listing Statement are defined separately and the terms and abbreviations defined below are not used therein, except where otherwise indicated. Words importing the singular, where the context requires, include the plural and vice versa and words importing any gender include all genders.

"**2018 Farm Bill**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – United States Federal Overview – 2018 Farm Bill.*

"**50% Interest in Cariboo Rose**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's Prior Mineral Exploration Business – Koster Dam Project*.

"**ACMPR**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – Canada – Cannabis Act and Regulations*.

"**Additional Interest in Cariboo Rose**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's Prior Mineral Exploration Business – Koster Dam Project*.

"**AmalCo**" means the continuing corporation to be constituted upon the completion of the amalgamation of FinCo and Merger Sub.

"**Affiliate**" means a corporation that is affiliated with another corporation as described below.

A corporation is an "**Affiliate**" of another corporation if:

a)      one of them is the subsidiary of the other; or

b)      each of them is controlled by the same Person.

A corporation is "**controlled**" by a Person if:

a)      voting securities of the corporation are held, other than by way of security only, by or for the benefit of that Person; and

A-4

- 5 -

b)      the voting securities, if voted, entitle the Person to elect a majority of the directors of the corporation.

A Person beneficially owns securities that are beneficially owned by:

a)      a corporation controlled by that Person; or

b)      an Affiliate of that Person or an Affiliate of any corporation controlled by that Person.

"**Associate**" when used to indicate a relationship with a Person, means:

a)      an issuer of which the Person beneficially owns or controls, directly or indirectly, voting securities entitling him to more than 10% of the voting rights attached to outstanding securities of the issuer;

b)      any partner of the Person;

c)      any trust or estate in which the Person has a substantial beneficial interest or in respect of which a Person serves as trustee or in a similar capacity; or

d)      in the case of a Person who is an individual:

         (i)      that Person's spouse or child, or

         (ii)      any relative of the Person or of the Person's spouse who has the same residence as that Person.

"**AUMA**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – Compliance with Applicable State Laws in the United States – California State Laws*.

"**BCBCA**" means the *Business Corporations Act* (British Columbia), and the regulations thereunder, as now in effect and as amended from time to time.

"**Bo**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Recent Developments of Ignite US*.

"**Board**" means the board of directors of Ignite Canada or the Resulting Issuer, as the context requires.

"**Bravado**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Recent Developments of Ignite US*.

"**BSA/AML**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – United States Federal Overview*.

"**Business Combination**" has the meaning ascribed thereto in the introduction to this Listing Statement.

- 6 -

"**Business Combination Agreement**" means the business combination agreement dated April 9, 2019, as amended May 6, 2019, by and among the Company, Ignite US, FinCo, Merger Sub and the Ignite US Shareholders (other than the Company).

"**Business Combination Letter Agreement**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Fundamental Change – Business Combination Agreement*.

"**Canadian IP License**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd. – Canadian IP License Agreement*.

"**Canadian IP License Agreement**" means the trademark & copyright license agreement to be entered on Closing between Canadian IP Sub and Ignite US permitting Canadian IP Sub to enter into manufacturing agreements and develop, market, promote, sell and distribute certain approved IGNITE-branded products in Canada.

"**Canadian IP Sub**" means Ignite International Brands (Canada) Ltd., a wholly-owned subsidiary of Ignite Canada incorporated under the laws of the Province of British Columbia.

"**Cannabis Act**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – Canada – Cannabis Act and Regulations*.

"**Cannabis Regulations**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – Canada – Cannabis Act and Regulations*.

"**Cariboo Rose**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's Prior Mineral Exploration Business – Koster Dam Project*.

"**Cariboo Rose Definitive Agreement**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's Prior Mineral Exploration Business – Koster Dam Project*.

"**Cariboo Rose Option Period**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's Prior Mineral Exploration Business – Koster Dam Project*.

"**Cariboo Rose Property**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's Prior Mineral Exploration Business – Koster Dam Project*.

"**CBD**" means cannabidiol, the main non-psychoactive constituent of the cannabis plant.

"**CDS**" has the meaning ascribed thereto in Section 17 – *Risk Factors – Risks Related to the Marijuana Industry – The fact that Marijuana is Illegal in Most Jurisdictions May Affect the Trading of Resulting Issuer Shares.*

"**CEO**" means chief executive officer.

"**CFO**" means chief financial officer.

- 7 -

"**Change of Business**" means Ignite Canada's change of business focus from being an investment company to a vertically-integrated company operating in the cannabis industry, as announced on March 1, 2019.

"**Closing**" means the closing of the Business Combination.

"**Code**" means the Internal Revenue Code, as amended*.*

"**Cole Memorandum**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – United States Federal Overview*.

"**Consolidation**" means, collectively, the First Consolidation and the Second Consolidation.

"**Conversion Ratio**" has the meaning ascribed thereto in Section 10.1 – *Description of the Securities – Resulting Issuer Shares – Proportionate Voting Shares*.

"**Convertible Note**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd*.

"**Criminal Code**" means the *Criminal Code* (Canada).

"**CSA**" means the *Controlled Substances Act*.

"**CSE**" has the meaning ascribed thereto in the introduction to this Listing Statement.

"**CSE Approval**" means the final approval of the CSE in respect of the listing of the Subordinate Voting Shares on the CSE following completion of the Business Combination, as evidenced by the issuance of the final approval bulletin of the CSE in respect thereof.

"**CSE Policies**" means the rules and policies of the CSE in effect as of the date hereof.

"**Cura**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Recent Developments of Ignite US*.

"**DOJ**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – United States Federal Overview*.

"**DOT**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – Compliance with Applicable State Laws in the United States – Nevada State Laws*.

"**FATCA**" means the United States *Foreign Account Tax Compliance Act*.

"**Financing**" means the private placement of 17,200,000 Subscription Receipts issued at a price of $1.50 per Subscription Receipt for aggregate gross proceeds of $25,800,000, which was completed on on May 24, 2019.

"**FinCEN**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – United States Federal Overview*.

"**FinCo**" has the meaning ascribed thereto in the introduction to this Listing Statement.

- 8 -

"**FinCo Shares**" means common shares in the capital of FinCo.

"**FINRA**" means the Financial Industry Regulatory Authority, Inc.

"**FIRPTA**" has the meaning ascribed thereto in Section 24 – *Other Material Facts – Certain United States Federal Income Tax Considerations – Tax Considerations for Non-U.S. Holders – Sale or Other Taxable Disposition*.

"**First Consolidation**" means the consolidation of Ignite Canada Shares on a two (old) for one (new) basis which was effected on October 30, 2018.

"**First Share Exchange Agreement**" means the agreement entered into by Ignite Canada, Ignite US, Veritas and Vulcan SKN whereby Ignite Canada agreed to acquire 5,000,000 Ignite US Shares in consideration for the issuance of the Payment Shares.

"**First Share Exchange Transaction**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd. – Share Exchange Transaction*.

"**First Share Exchange Closing Date**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd. – Share Exchange Transaction*.

"**Foreign Private Issuer**" has the meaning ascribed thereto in Section 17 – *Risk Factors – Securities Law and Taxation Risks – Risks Related to Potential Changes to Determining Foreign Private Issuer Status in the United States.*

"**Fundamental Change**" means, collectively, the Business Combination and the Change of Business.

"**Harvest**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Recent Developments of Ignite US*.

"**Health Canada**" means the federal institution established to help Canadians maintain and improve their health.

"**Ignite Canada**" or the "**Company**" has the meaning ascribed thereto in the introduction to this Listing Statement.

"**Ignite Canada Option Plan**" has the meaning ascribed thereto in Section 9 – *Options to Purchase Securities*.

"**Ignite Canada Options**" means options to acquire Ignite Canada Shares pursuant to the Ignite Canada Option Plan.

"**Ignite Canada Shareholders**" means the holders of Ignite Canada Shares.

"**Ignite Canada Shares**" means the issued and outstanding common shares in the capital of Ignite Canada.

- 9 -

"**Ignite Canada Warrants**" means the outstanding common share purchase warrants of Ignite Canada.

"**Ignite US**" has the meaning ascribed thereto in the introduction to this Listing Statement.

"**Ignite US Shareholders**" means the holders of Ignite US Shares.

"**Ignite US Shares**" means the issued and outstanding common shares in the capital of Ignite US.

"**IHR**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – Canada – Cannabis Act and Regulations*.

"**International IP License**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd. – International IP License Agreement*.

"**International IP License Agreement**" means the trademark & copyright license agreement to be entered on Closing between International IP Sub and Ignite US permitting International IP Sub to enter into manufacturing agreements and develop, market, promote, sell and distribute certain approved IGNITE-branded products everywhere in the world except for Canada and the United States.

"**International IP Sub**" means Ignite International Brands (U.K.) Ltd., a wholly-owned subsidiary of Ignite Canada incorporated under the laws of England and Wales.

"**Investees**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – Issuers with U.S. Cannabis-Related Activities*.

"**ITA**" means the *Income Tax Act*, R.S.C. 1985, c.1 (5th Supp.) and the regulations thereto, as now in effect and as it may be amended from time to time.

"**IRS**" means the United States Internal Revenue Service.

"**LCC**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's Prior Mineral Exploration Business – Lustdust Property*.

"**License**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd. – License Agreement*.

"**License Agreement**" means the Trademark & Copyright License Agreement dated September 29, 2018 between Ignite US, as licensor, and Ignite Canada, as licensee.

"**Licensed Bilzerian IP**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd*.

"**Listing Statement**" has the meaning ascribed thereto in the introduction to this Listing Statement.

"**Loudpack**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Recent Developments of Ignite US*.

- 10 -

"**Lustdust Property**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's Prior Mineral Exploration Business – Lustdust Property*.

"**MAUCRSA**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – Compliance with Applicable State Laws in the United States – California State Laws*.

"**MCRSA**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – Compliance with Applicable State Laws in the United States – California State Laws*.

"**MD&A**" means management's discussion & analysis.

"**Meeting**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Fundamental Change – Ignite Canada Shareholder Meeting*.

"**Merger Sub**" has the meaning ascribed thereto in the introduction to this Listing Statement.

"**Minister**" means the Minister of Health (Canada).

"**MOU**" has the meaning ascribed thereto in Section 17 – *Risk Factors – Risks Related to the Marijuana Industry – The fact that Marijuana is Illegal in Most Jurisdictions May Affect the Trading of Resulting Issuer Shares.*

"**MRCC**" means Mackie Research Capital Corporation.

"**NEOs**" has the meaning ascribed thereto in Section 15 – *Executive Compensation*.

"**New License Agreements**" means the Canadian IP License Agreement and the International IP License Agreement.

"**NI 52-110**" means National Instrument 52-110 – *Audit Committees.*

"**Non-U.S. Holder**" has the meaning ascribed thereto in Section 24 – *Other Material Facts – Certain United States Federal Income Tax Considerations*.

"**OE**" has the meaning ascribed thereto in Section 13.6-13.9 – *Corporate Cease Trade Orders or Bankruptcies; Penalties or Sanctions; Personal Bankruptcies*.

"**Payment Shares**" means the 10,140,178 Ignite Canada Shares issued by Ignite Canada to Veritas and Vulcan SKN pursuant to the First Share Exchange Transaction.

"**Person**" means any individual, corporation, company, partnership, unincorporated association, trust, joint venture, governmental body or any other legal entity whatsoever.

"**Prior Bilzerian License Agreement**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd*.

"**Prior Bilzerian LOI**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations– Ignite International, Ltd*.

- 11 -

"**Prior Trademarks and Copyrights**" means the "IGNITE" word mark, including trademark application no. 1,882,311 and "IGNITE" design mark, including trademark application no. 1,882,335 and related intellectual property in which Ignite US has the right to license as further described in the License Agreement.

"**Proportionate Voting Shares**" means the proportionate voting shares in the capital of the Resulting Issuer.

"**Resulting Issuer**" has the meaning ascribed thereto in the introduction to this Listing Statement.

"**Resulting Issuer Option Plan**" means the Ignite Canada Option Plan, after giving effect to the Business Combination.

"**Resulting Issuer Options**" means options to acquire Subordinate Voting Shares.

"**Resulting Issuer Shares**" means, collectively, the Proportionate Voting Shares and the Subordinate Voting Shares.

"**Resulting Issuer Warrants**" means warrants to purchase Subordinate Voting Shares.

"**Salvation**" mean Salvation Botanicals Ltd., a corporation incorporated under the laws of the Province of British Columbia.

"**SAR**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – United States Federal Overview*.

"**SEC**" means the United States Securities and Exchange Commission.

"**Second Consolidation**" means the consolidation of Ignite Canada Shares on a five (old) for one (new) basis which was effected on January 18, 2019.

"**Second Share Exchange Transaction**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Recent Developments of Ignite Canada*.

"**SEDAR**" means System for Electronic Document Analysis and Retrieval.

"**Sessions Memorandum**" has the meaning ascribed thereto in Section 3.3 – *Trends, Commitments, Events or Uncertainties – United States Federal Overview*.

"**Share Exchange Financings**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Recent Developments of Ignite Canada*.

"**Share Exchange Letter Agreement**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Recent Developments of Ignite Canada*.

"**Staff Notice 51-352**" means Staff Notice 51-352 – *Issuers with U.S. Marijuana-Related Activities* of the Canadian Securities Administrators.

"**Subordinate Voting Shares**" has the meaning ascribed thereto in the introduction to this Listing Statement.

- 12 -

"**Subscription Receipts**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Fundamental Change – Subscription Receipt Financing*.

"**Tahoe**" mean Tahoe Hydroponics Company, LLC, a corporation incorporated under the laws of the Nevada.

"**Tahoe Agreement**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Tahoe Hydroponics Company LLC*.

"**Tahoe Note**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Tahoe Hydroponics Company LLC*.

"**Taylor Mammon**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Taylor Mammon & Nathan Limited*.

"**THC**" means tetrahydrocannabinol, the main psychoactive constituent of the cannabis plant.

"**Trademarks and Copyrights**" means the "IGNITE" word mark, including trademark application no. 1,882,311, the "IGNITE" design marks, and related intellectual property in which Ignite US has the right to license as further described in the New License Agreements.

"**U.K. Agreements**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Taylor Mammon & Nathan Limited*.

"**U.S.**" and "**United States**" means the United States of America, its territories and possessions, any state of the United States, and the District of Columbia.

"**U.S**. **Exchange Act**" means the United States *Securities Exchange Act of 1934*, as amended.

"**U.S. Holder**" has the meaning ascribed thereto in Section 24 – *Other Material Facts – Certain United States Federal Income Tax Considerations*.

"**U.S. Resident**" means a resident of the United States as determined in accordance with Rule 3b-4 under the U.S. Exchange Act.

"**U.S. Securities Act**" means the United States *Securities Act of 1933*, as amended.

"**USRPHC**" has the meaning ascribed thereto in Section 24 – *Other Material Facts – Certain United States Federal Income Tax Considerations – Tax Considerations for Non-U.S. Holders – Sale or Other Taxable Disposition*.

"**USRPI**" has the meaning ascribed thereto in Section 24 – *Other Material Facts – Certain United States Federal Income Tax Considerations – Tax Considerations for Non-U.S. Holders – Sale or Other Taxable Disposition*.

"**Vapergy**" has the meaning ascribed thereto in Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd*.

A-12

- 13 -

"**Veritas**" means Veritas Investments, Ltd., a corporation incorporated under the laws of St. Kitts and Nevis.

"**Vulcan SKN**" means Vulcan Enterprises SKN, Ltd., a corporation incorporated under the laws of St. Kitts and Nevis.

- 14 -

## 2. CORPORATE STRUCTURE

### 2.1 <u>Corporate Name and Head and Registered Office</u>

The full corporate name of Ignite Canada is "Ignite International Brands, Ltd." Ignite Canada's head office is located at 11 Cidermill Avenue, Vaughan, Ontario L4K 4B6. Ignite Canada's registered and records office is located at Royal Centre, Suite 1500, 1055 West Georgia Street, Vancouver, British Columbia V6E 4N7.

The full corporate name of Ignite US is "Ignite International, Ltd." Ignite US' head office is located at 6005 Las Vegas Boulevard South, Suite 7, Las Vegas, Nevada 89119. Ignite US' registered office is located at 1920 Thomes Avenue, Suite 610, Cheyenne, Wyoming 82001.

Upon completion of the Business Combination, the Resulting Issuer's head office will be located at 11 Cidermill Avenue, Vaughan, Ontario L4K 4B6. The Resulting Issuer's registered and records office will be located at Royal Centre, Suite 1500, 1055 West Georgia Street, Vancouver, British Columbia V6E 4N7.

### 2.2 <u>Jurisdiction of Incorporation</u>

Ignite Canada was incorporated on February 25, 1985 under the BCBCA as "Info-Stop Communications Inc." On September 25, 1990, Ignite Canada changed its name from "Info-Stop Communications Inc." to "Alpha Gold Corp." On August 19, 2013, Ignite Canada changed its name from "Alpha Gold Corp." to "ALQ Gold Corp." On October 30, 2018, Ignite Canada changed its name from "ALQ Gold Corp." to "Green Axis Capital Corp." and effected the First Consolidation on the basis of one post-First Consolidation Ignite Canada Share for every two pre-First Consolidation Ignite Canada Shares. On January 10, 2019, Ignite Canada changed its name from "Green Axis Capital Corp." to "Ignite International Brands, Ltd." On January 18, 2019, Ignite Canada effected the Second Consolidation on the basis of one post-Second Consolidation Ignite Canada Share for every five pre-Second Consolidation Ignite Canada Shares.

Ignite Canada currently has three wholly-owned subsidiaries:

a) ALQ Investments LLC, which was organized pursuant to the laws of Nevada on September 8, 2017;

b) Merger Sub, which was incorporated pursuant to the laws of British Columbia on March 29, 2019;

c) Canadian IP Sub, which was incorporated pursuant to the laws of British Columbia on April 16, 2019; and

d) International IP Sub, which was incorporated pursuant to the laws of England and Wales on May 2, 2019.

Ignite US was incorporated on December 28, 2017 under the laws of Wyoming as "Vulcan Enterprises US, Ltd." On July 23, 2018, Ignite US filed articles of amendment to amend its authorized share capital from 1,000,000 to 200,000,000 Ignite US Shares. On October 30, 2018, Ignite US changed its name from "Vulcan Enterprises US, Ltd." to "Ignite International, Ltd." Pursuant to the terms of the

- 15 -

Business Combination, Ignite US will become a wholly-owned subsidiary of the Resulting Issuer on Closing.

The Resulting Issuer will be a reporting issuer in British Columbia, Alberta and Ontario.

**2.3      Inter-corporate Relationships**

The following diagram represents the organizational chart of Ignite Canada, as of the date of this Listing Statement:



Ignite US does not have any subsidiaries prior to Closing.

**2.4      Fundamental Change**

The Business Combination will constitute a Fundamental Change as defined in the CSE Policies. Following Closing, ALQ Investments LLC will become a wholly-owned subsidiary of Ignite US and Ignite US will become a wholly-owned subsidiary of the Resulting Issuer. The Resulting Issuer will subsequently change its business focus from being an investment company to being a vertically-integrated company operating in the cannabis industry. *See Item 3.1 – General Development of the Business – Fundamental Change – Business Combination Agreement.*

The following diagram represents the organizational chart of the Resulting Issuer, following Closing of the Business Combination, the subsequent liquidation, wind-up and dissolution of AmalCo and ALQ Investments LLC becoming a wholly-owned subsidiary of Ignite US:

- 16 -



## 2.5    Non-Corporate Issuers and Issuers Incorporated Outside of Canada

The Resulting Issuer will not be a non-corporate issuer or an issuer incorporated outside of Canada.

## 3. GENERAL DEVELOPMENT OF THE BUSINESS

### 3.1    General Development of the Business

Ignite Canada is a reporting issuer currently listed on the CSE under the symbol "BILZ". The Ignite Canada Shares had previously traded on the TSX Venture Exchange under the trading symbol "ALQ" up until September 19, 2016. On September 20, 2016, Ignite Canada voluntarily delisted from the TSX Venture Exchange and listed the Ignite Canada Shares on the CSE, under the same trading symbol. Ignite Canada is headquartered in Vaughan, Ontario and is a reporting issuer in British Columbia, Alberta and Ontario.

Prior to Closing, Ignite Canada had been an investment company seeking opportunities in the global cannabis sector. On March 1, 2019, trading in the Ignite Canada Shares was halted as Ignite Canada announced the Business Combination and the Change of Business.

Upon Closing, the Resulting Issuer will change its business focus from being an investment company to being a vertically-integrated company operating in the cannabis industry. The Resulting Issuer's operations in Canada with respect to the IGNITE brand will be conducted through Canadian IP Sub, the Resulting Issuer's operations in the United States will be conducted through Ignite US, and the Resulting Issuer's operations in jurisdictions other than Canada and the United States will be conducted through International IP Sub.

Below is a description of the general developments of Ignite Canada's business over its three most recently completed financial years and any subsequent periods.

- 17 -

***Ignite Canada's Prior Mineral Exploration Business***

Lustdust Property

Ignite Canada held a 100% interest in the Lustdust property comprised of 20 cell claims located in the Omineca Mining Division, British Columbia (the "**Lustdust Property**"). On June 16, 2016, Ignite Canada announced that it entered into a definitive agreement with Lorraine Copper Corp. ("**LCC**") pursuant to which, and subject to shareholder and regulatory approval, LCC would purchase the Lustdust Property by: (i) issuing to Ignite Canada 5.5 million common shares in the capital of LCC on closing, (ii) paying Ignite Canada $50,000 in cash on closing, and (iii) incurring $100,000 in exploration expenditures on the Lustdust Property on or before 12 months from closing.

Ignite Canada held an annual and special meeting on August 10, 2016, to consider, among other things, the approval for the disposition of the Lustdust Property to LCC. For additional information on the proposed disposition of the Lustdust Property, see Ignite Canada's management information circular dated July 11, 2016, a copy of which is filed under Ignite Canada's SEDAR profile at www.sedar.com and is incorporated by reference in this Listing Statement.

On August 10, 2016, Ignite Canada Shareholders voted in favour of a resolution approving the sale of the Lustdust Property to LCC and this transaction was completed on September 26, 2016. After September 26, 2016, Ignite Canada did not have any producing mineral properties and was without a known body of commercial ore. Exploration was then focused on the Koster Dam Project.

On October 13, 2016, Ignite Canada announced that it acquired 5.5 million common shares in the capital of LCC in connection with the completion of the sale of the Lustdust Property to LCC on September 26, 2016. As a result, Ignite Canada held approximately 16.9% of the issued and outstanding common shares in the capital of LCC, on an undiluted basis, at that time. At a special meeting of Ignite Canada Shareholders held on April 5, 2017, Ignite Canada Shareholders passed a special resolution approving the distribution of the 5.5 million common shares in the capital of LCC held by Ignite Canada to Ignite Canada Shareholders as a return of capital. Such distribution of the LCC shares was completed on April 17, 2017.

Koster Dam Project

On June 28, 2016, Ignite Canada entered into a definitive option and joint venture agreement (the "**Cariboo Rose Definitive Agreement**") with Cariboo Rose Resources Ltd. ("**Cariboo Rose**"), pursuant to which Ignite Canada was granted an initial option to acquire a 50% legal and beneficial interest to 6 mineral claims encompassing approximately 3,286 hectares (the "**Cariboo Rose Property**"). The Cariboo Rose Property is located within the Clinton Mining Division of British Columbia on Crown land and is known as the Koster Dam Project. Pursuant to the terms of the Cariboo Rose Definitive Agreement, Ignite Canada had an option to earn a 50% legal and beneficial interest in the Cariboo Rose Property (the "**50% Interest in Cariboo Rose**") by incurring at least $110,495 of expenditures on the Cariboo Rose Property on or before June 28, 2017 (the "**Cariboo Rose Option Period**"). If Ignite Canada earned the 50% Interest in Cariboo Rose, then Ignite Canada also had the option to acquire a further 50% legal and beneficial interest in the Cariboo Rose Property (for a total legal and beneficial interest of 100%) (the "**Additional Interest in Cariboo Rose**") by paying Cariboo Rose a cash payment of $400,000 on or before the end of the Cariboo Rose Option Period. If Ignite Canada exercised the 50% Interest in Cariboo Rose but did not exercise the Additional Interest in Cariboo Rose, the parties would enter into a joint venture agreement with

- 18 -

respect to the Cariboo Rose Property. If either of the parties to the joint venture dilute to an interest equal to 10% or less, then such party's interest would automatically convert to a 1% net smelter return royalty.

On June 13, 2017, Ignite Canada announced that it would not be pursuing its option to acquire an interest in the Koster Dam Project as it was not in position to incur the expenditures required to earn the interest in the project. As a result, Ignite Canada relinquished all of its interest in the Koster Dam Project.

### Ignite Canada's New Global Cannabis Operations

<u>Tahoe Hydroponics Company, LLC</u>

On August 28, 2017, Ignite Canada announced its intention to become an investment company focusing on opportunities in the US and global cannabis sector and that it entered into a binding agreement (the "**Tahoe Agreement**") with Tahoe.

Tahoe is a private company based in Carson City, Nevada, United States and is involved in the cultivation and packaging of cannabis products. Tahoe owns 25,000-square-foot recreationally licensed cultivation, pre-roll, production and packaging facility located in Carson City, Nevada, United States.

Tahoe has received a provisionally approved distribution license for the State of Nevada. Completing the final licensing criteria will make Tahoe one of the only non-liquor distributors for the distribution of recreational cannabis in the State of Nevada.

Pursuant to the Tahoe Agreement, Ignite Canada:

     a)     agreed to initially loan an aggregate of US$3,000,000 to Tahoe prior to October 15, 2017;

     b)     would have the option to convert that loan to equity in Tahoe, representing 30% of the outstanding shares of Tahoe; and

     c)     would then have the further option to acquire the remaining 70% of the outstanding shares of Tahoe on a share exchange basis, based on the fair market value of Ignite Canada Shares and Tahoe (based on a five times multiple of its 12 month trailing revenues), provided that in any event the former shareholders of Tahoe will hold 65% of the outstanding shares of Ignite Canada on closing.

Subsequent to the entering into of the Tahoe Agreement, Ignite Canada and Tahoe determined that due to the stage of Tahoe's development and the respective growth objectives of both companies, Ignite Canada's optimal investment in Tahoe would more appropriately be structured as a simple unsecured debt obligation. Accordingly, Tahoe and Ignite Canada terminated the Tahoe Agreement on May 15, 2018 and replaced it with a promissory note evidencing the advance of US$1.35 million from Ignite Canada to Tahoe with a 6% annual interest rate (the "**Tahoe Note**"). Ignite Canada plans to seek repayment of the Tahoe Note by receiving monthly payments of principal and interest, which can be accelerated by a liquidity event (including the outright sale of Tahoe). Ignite Canada expects

- 19 -

full repayment of any outstanding balance on the note, including accrued interest receivable, on December 31, 2019.

In connection with the Tahoe Note and pursuant to a finder's fee agreement dated June 1, 2018, Ignite Canada agreed to pay a finder's fee to Firetronic Entertainment Inc. of 50,000 Ignite Canada Shares in consideration of the introduction to Tahoe and the facilitation of negotiations in respect of the Tahoe Agreement and Tahoe Note.

Salvation Botanicals Ltd.

Salvation is a private company based in Nanaimo, British Columbia, Canada, which is involved in the production of high-quality standardized cannabinoid products for licensed producers and operates one of the first analytics laboratories in Canada, accredited by Health Canada to test cannabis and cannabis derivatives for licensed producers of medical cannabis, ACMPR growers, approved cannabis patients, license holders under Section 56 of the *Marihuana for Medical Purposes Regulations* (Canada), industrial hemp producers and any other party legally entitled to possess cannabis.

Salvation was granted a dealer license under the *Narcotic Control Regulations* (Canada), allowing contract extract production, with authority to extract and produce oil, capsules and tinctures within Health Canada guidelines. In 2016, Health Canada granted Salvation a hemp processing license permitting production and sale of seed and grain derivatives. Using the name "Purely Hemp", Salvation has developed a line of value-added foods including hemp protein powder, hulled hemp seeds, protein bars, hemp butter, capsules (oil, protein powder) and cold-pressed hemp oil, while building exports of value-added bulk hemp products. Under the transitional provisions of the Cannabis Act, a dealer license issued under the *Narcotic Control Regulations* (Canada) and every license issued under the *Industrial Hemp Regulations* (Canada) prior to the Cannabis Act coming into force are deemed to be licenses issued under the Cannabis Act.

Ignite Canada subscribed for 3,000,000 units of Salvation at a price of CDN$0.50 per unit for a total cost of CDN$1,500,000 pursuant to three subscription agreements between Ignite Canada and Salvation. Each unit is comprised of one common share of Salvation and one-half of one common share purchase warrant exercisable into one-half additional common share of Salvation at a price of CDN$0.75 for a term of eighteen months.

Ignite International, Ltd.

Ignite US is a corporation incorporated under the laws of the State of Wyoming, United States.

On December 21, 2017, Ignite Canada entered into a binding letter of intent (the "**Prior Bilzerian LOI**") with Ignite US to acquire certain intellectual property rights for use of the "Burn by Bilzerian" brand and the name, approved photographs, approved images, voice, and approved likenesses of Dan Bilzerian exclusively within the global cannabis industry (collectively, "**Licensed Bilzerian IP**").

Ignite US is the exclusive owner of the Licensed Bilzerian IP, which includes the brand logos or related marks, including "Burn by Bilzerian" and "IGNITE". In the Prior Bilzerian LOI, Ignite Canada and Ignite US had agreed to the following:

> (i)     Ignite Canada would initially receive a limited license to utilize the Licensed Bilzerian IP for its use in the Canadian and international cannabis industry (excluding the

- 20 -

United States), in exchange for Ignite Canada issuing 5,000,000 Ignite Canada Shares (on a pre-Consolidation basis) to Ignite US;

(ii)     Ignite US would assist with Ignite Canada's utilization of the Licensed Bilzerian IP through personal appearances by Dan Bilzerian and utilization of Dan Bilzerian's social media accounts; and

(iii)    Ignite Canada would retain the exclusive option to acquire additional global exclusive rights to Ignite US's Licensed Bilzerian IP for additional consideration.

On January 28, 2018, Ignite Canada and Ignite US entered into a license agreement (the "**Prior Bilzerian License Agreement**") which gave effect to the terms of the Prior Bilzerian LOI. Subsequently, Ignite US and Ignite Canada agreed to terminate both the Prior Bilzerian LOI and the Prior Bilzerian License Agreement.

On April 26, 2018, Ignite Canada loaned CDN$5,000,000 to Ignite US and Ignite US issued a convertible promissory note in favour of Ignite Canada (the "**Convertible Note**"). The Convertible Note bears interest at a rate of 8% per annum and matures 24 months following the date of issuance upon demand of Ignite Canada. The Convertible Note is convertible into 3,300,000 Ignite US Shares. It is expected that the Convertible Note will be repaid in full on Closing using the proceeds of the Financing.

In connection with the issuance of the Convertible Note and pursuant to a finder's fee agreement dated April 23, 2018, Ignite Canada agreed to pay a finder's fee to Vapergy International, LLC ("**Vapergy**") equal to 2% of the gross proceeds of Ignite Canada's private placement (closing of which was announced on April 20, 2018) in consideration for Vapergy's assistance in introducing Ignite Canada to members of the Ignite US team, and facilitation of negotiations in respect of the License Agreement.

*Share Exchange Transaction*

On September 29, 2018, Ignite Canada entered into the First Share Exchange Agreement with Ignite US, Veritas and Vulcan SKN, whereby Ignite Canada agreed to acquire 5,000,000 Ignite US Shares from Veritas and Vulcan SKN in consideration for the issuance of the Payment Shares (the "**First Share Exchange Transaction**"). Upon receipt of: (i) all regulatory approvals, including the approval of CSE, and (ii) approval from the Ignite Canada Shareholders, the closing of the First Share Exchange Transaction occurred on November 23, 2018 (the "**First Share Exchange Closing Date**"). In connection with the First Share Exchange Agreement, Ignite Canada completed the First Consolidation of Ignite Canada Shares on a two (old) for one (new) basis. On November 23, 2018, Ignite Canada announced the Second Consolidation on a five (old) for one (new) basis which was effected on January 18, 2019.

*License Agreement*

Ignite US has the right to license the use of the Prior Trademarks and Copyrights with respect to the "IGNITE" brand. Ignite Canada also entered into the License Agreement which is effective as of the First Share Exchange Closing Date, whereby Ignite US, as licensor, granted the following to Ignite Canada, as licensee:

- 21 -

- a non-exclusive royalty bearing license to use the Prior Trademarks and Copyrights in all countries of the world, excluding the United States of America, in connection with products that contain CBD and where the percentage content of THC is less than 10%;

- an exclusive royalty bearing license to use the Prior Trademarks and Copyrights in all Provinces and Territories of Canada, excluding British Columbia, in connection with the products containing THC but not CBD; and

- an exclusive royalty bearing license to use the Prior Trademarks and Copyrights in all Provinces and Territories of Canada, excluding British Columbia, in connection with the products containing a combination of THC and CBD, provided that the THC content is 10% or more

(collectively, the "**License**").

The License specifically excludes products consisting of vaporizer pens with interchangeable cartridges and any non-cannabis products such as garments, accessories, etc. Under the License Agreement, Ignite Canada is not permitted to sublicense any of its rights under the agreement without Ignite US's prior written consent. If Ignite US determines in its discretion that Ignite Canada is unable to meet the demand for products in the applicable territory, Ignite Canada has agreed to increase its production of products in the applicable territory which may include engaging third parties to assist in the manufacture and production of products. Ignite Canada has agreed to pay for all manufacturing, shipping, and packaging to be used in respect of the products and has further agreed to pay for all advertising, marketing and promotional materials displaying any of the Prior Trademarks and Copyrights.

Ignite Canada has agreed to pay Ignite US on a monthly basis 10% of the aggregate total gross revenue received by Ignite Canada, directly or indirectly, from the sale of products under the License, commencing with the first commercial sale of any product. In the case of a branded dispensary, using the Ignite name and/or marks, the 10% royalty will extend to all gross sales of all products in the dispensary, whether IGNITE branded or otherwise. Ignite Canada also agreed to the following yearly minimum payments to Ignite US, applicable against royalties (in US$):

- Months 1-12: $2,000,000
- Months 13-24: $3,000,000
- Months 25-36: $4,000,000
- Months 37-48: $5,000,000
- Months 49-60: $5,500,000
- Months 61-72: $6,000,000
- Months 73-84: $6,500,000
- Months 85-96: $7,000,000
- Months 97-108: $7,500,000
- Months 109-120: $8,000,000

- 22 -

Ignite Canada also agreed to apply, on a monthly basis, at least 2% of the gross revenue received for all products in the previous month on marketing, which may be (with Ignite US's approval) Ignite Canada–managed, or remitted to Ignite US to offset Ignite US's marketing and advertising expenditures.

The License Agreement and the License granted thereunder commenced on the First Share Exchange Closing Date, and continue for an initial term of 10 years. Upon the expiration of the initial term, Ignite US and Ignite Canada will have the opportunity to renegotiate in good faith. Should the parties fail to reach a mutually satisfactory agreement within 40 days of the end of such 10 year period or such other period as may be mutually agreed by the parties in writing, then the License Agreement will extend for a further 5 year fixed term commencing from the end of such 10 year period. During this 5 year term, the terms and conditions of the License Agreement will continue, with the exception of the foregoing yearly minimum payments whereby Ignite Canada agreed, for each of the 5 years, to make the yearly minimum royalty payments, applicable against royalties, set for the amount payable in the final year of the initial term.

In connection with the Business Combination, it is expected that, on Closing, the License Agreement will be terminated and the Canadian IP License Agreement and the International IP License Agreement will be entered into.

*Canadian IP License Agreement*

Ignite US has the right to license the use of the Trademarks and Copyrights with respect to the "IGNITE" brand. Canadian IP Sub intends to enter into the Canadian IP License Agreement on Closing, which will grant Canadian IP Sub an exclusive and royalty bearing license to use the Trademarks and Copyrights in all provinces and territories in Canada, in connection with the (a) products that contain one or more of CBD, THC, and nicotine; and (b) non-cannabis items (the "**Canadian IP License**").

The Canadian IP License Agreement and the Canadian IP License granted thereunder will commence on the Closing, and continue for an initial term of 5 years. Upon the expiration of the initial term, Ignite US and Canadian IP Sub will have the opportunity to renegotiate in good faith. Should the parties fail to reach a mutually satisfactory agreement before 40 days from the end of such 5 year period, then the Canadian IP License Agreement will extend for a further 5 year fixed term commencing from the end of such initial 5 year period.

Under the Canadian IP License Agreement, Canadian IP Sub is not permitted to sublicense any of its rights under the agreement without Ignite US's prior written consent (which may not be unreasonably withheld), except that Canadian IP Sub may sublicense to wholly-owned subsidiaries and may engage third parties to assist in the manufacture, promotion and distribution of products. Canadian IP Sub has agreed to pay for all manufacturing, shipping, and packaging to be used in respect of the products and has further agreed to pay for all advertising, marketing and promotional materials displaying any of the Trademarks and Copyrights.

Canadian IP Sub has agreed to pay Ignite US on a monthly basis the following percentages of the aggregate gross revenue received by the Canadian IP Sub, from the sale of the products commencing with the first commercial sale of any product within Canada (provided that no royalties shall be owing during the first year of the initial term):

- 23 -

- 5% of the aggregate gross revenue from the first anniversary of the effective date until the end of the third year of the term;

- 4% of the aggregate gross revenue from the third anniversary of the effective date until the end of the fourth year of the term;

- 3% of the aggregate gross revenue from the fourth anniversary of the effective date until the end of initial term; and

- 2% of the aggregate gross revenue for any renewal term.

*International IP License Agreement*

International IP Sub intends to enter into the International IP License Agreement on Closing, which will grant International IP Sub an exclusive and royalty bearing license to use the Trademarks and Copyrights worldwide except in the United States and Canada, in connection with the (a) products that contain one or more of CBD, THC, and nicotine; and (b) non-cannabis items (the "**International IP License**").

The International IP License Agreement and the International IP License granted thereunder will commence on the Closing, and continue for an initial term of 5 years. Upon the expiration of the initial term, Ignite US and International IP Sub will have the opportunity to renegotiate in good faith. Should the parties fail to reach a mutually satisfactory agreement before 40 days from the end of such 5 year period, then the International IP License Agreement will extend for a further 5 year fixed term commencing from the end of such initial 5 year period.

Under the International IP License Agreement, International IP Sub is not permitted to sublicense any of its rights under the agreement without Ignite US's prior written consent (which may not be unreasonably withheld), except that International IP Sub may sublicense to wholly-owned subsidiaries and may engage third parties to assist in the manufacture, promotion, and distribution of products. International IP Sub has agreed to pay for all manufacturing, shipping, and packaging to be used in respect of the products and has further agreed to pay for all advertising, marketing and promotional materials displaying any of the Trademarks and Copyrights.

International IP Sub has agreed to pay Ignite US on a monthly basis the following percentages of the aggregate gross revenue received by the International IP Sub, from the sale of the products commencing with the first commercial sale of any product within Canada (provided that no royalties shall be owing during the first year of the initial term):

- 5% of the aggregate gross revenue from the first anniversary of the effective date until the end of the third year of the term;

- 4% of the aggregate gross revenue from the third anniversary of the effective date until the end of the fourth year of the term;

- 3% of the aggregate gross revenue from the fourth anniversary of the effective date until the end of initial term; and

- 2% of the aggregate gross revenue for any renewal term.

- 24 -

<u>GenX BioSciences Corp.</u>

On January 21, 2019, Ignite Canada announced that it had entered into a binding letter of intent which would allow Ignite Canada to acquire all of the issued and outstanding common shares in Gen X BioSciences Corp., a leading cannabis extraction company. On February 22, 2019, Ignite Canada announced that, as a result of its due diligence, it had terminated this binding letter of intent.

<u>Taylor Mammon & Nathan Limited</u>

On May 7, 2019, Ignite Canada announced that it had entered into definitive agreements (the "**U.K. Agreements**") with Taylor Mammon & Nathan Limited ("**Taylor Mammon**"), a leading CBD manufacturer and distributor of white label CBD solutions in the United Kingdom. Under the U.K. Agreements, Taylor Mammon will, under exclusive Ignite license in the United Kingdom, manufacture, package and distribute a wide array of premium Ignite branded CBD products to select wholesale and retail channels, subject to and in accordance with applicable laws and regulations of the jurisdiction. Ignite Canada and Taylor Mammon are jointly developing a comprehensive marketing program that will support the launch of IGNITE branded products. The U.K. Agreements also include the option for Ignite Canada to expand into other strategic European markets.

It is expected that, concurrently with the termination of the License Agreement and the execution of the International IP License Agreement, the U.K. Agreements will be assigned to International IP Sub.

***Recent Developments of Ignite Canada***

On August 3, 2017, Ignite Canada completed a non-brokered private placement of 4,915,634 Ignite Canada Shares for gross proceeds of $1,843,363 at a price of $0.375 per Ignite Canada Share. Subscribers under this offering who were not insiders of Ignite Canada agreed to a contractual hold period on their Ignite Canada Shares for a six month hold from the date of close, which hold period ended on February 3, 2018.

On August 9, 2017, Ignite Canada announced the resignation of Mr. Stephen Leahy from the Board, and the appointment of Mr. Morgan Good as a director of Ignite Canada.

On August 28, 2017, trading in Ignite Canada Shares was halted as Ignite Canada made an application to the CSE of its intention to change its business from being a mineral resource exploration company to an investment company seeking investment opportunities in the global cannabis sector.

On September 28, 2017, Ignite Canada closed the first tranche of a non-brokered private placement of 794,800 Ignite Canada Shares for gross proceeds of $1,390,900 at a price of $1.75 per Ignite Canada Share.

On October 23, 2017, Ignite Canada announced the resignation of its former auditors, Smythe LLP, Chartered Professional Accountants, and the appointment of Davidson & Company LLP, Chartered Professional Accountants as Ignite Canada's successor auditors.

On October 31, 2017, Ignite Canada closed the second tranche of its non-brokered private placement of 672,653 Ignite Canada Shares for gross proceeds of $1,177,143.45 at a price of $1.75 per Ignite Canada Share.

- 25 -

On November 24, 2017, Ignite Canada completed the third tranche of its non-brokered private placement of 524,357 Ignite Canada Shares for gross proceeds of $917,625.10 at a price of $1.75 per Ignite Canada Share.

On January 24, 2018, Ignite Canada completed the fourth tranche of its non-brokered private placement of 601,871 Ignite Canada Shares for gross proceeds of $1,053,275.00 at a price of $1.75 per Ignite Canada Share.

On April 20, 2018, Ignite Canada announced the completion of a non-brokered private placement of 2,401,580 units of Ignite Canada at a price of $5.00 per unit for gross proceeds of $12,007,900. Each unit was comprised one Ignite Canada Share and one-half of one share purchase warrant, each whole warrant entitling the holder to acquire one additional Ignite Canada Share at $12.50 for a period of 12 months.

On September 29, 2018, Ignite Canada entered into the First Share Exchange Agreement with Ignite US, Veritas and Vulcan SKN. See Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd. – Share Exchange Transaction*.

Concurrent with the Closing of the Share Exchange Transaction on November 23, 2018, Ignite Canada entered into a letter agreement (the "**Share Exchange Letter Agreement**") with Ignite US and certain Ignite US Shareholders holding approximately 40.1% of the outstanding Ignite US Shares, whereby the Ignite US Shareholders agreed to sell their Ignite US Shares to Ignite Canada in consideration for the issuance of 30 million Ignite Canada Shares (the "**Second Share Exchange Transaction**"). Pursuant to the Share Exchange Letter Agreement, Ignite Canada also agreed to enter into: (i) a share purchase agreement with Dan Bilzerian whereby Ignite Canada agreed to acquire from Dan Bilzerian 3,800,000 Ignite US Shares held by Dan Bilzerian in consideration for USD$16 million in cash on closing of the Second Share Exchange Transaction; and (ii) an agreement with Dan Bilzerian whereby, subject to closing of the Second Share Exchange Transaction, Dan Bilzerian will grant an option to Ignite Canada to acquire all the Ignite US Shares then held by Dan Bilzerian on the basis of one post-Consolidation Ignite Canada Share for every 1.25 Ignite US Shares, in consideration for CAD$10,000 per year, which option will only be exercisable immediately prior to the closing of a transaction whereby a third party acquires all of the then issued and outstanding Ignite Canada Shares. Also pursuant to the Share Exchange Letter Agreement, the parties agreed to pursue a brokered financing for gross proceeds of a minimum of CAD$50 million and a maximum of CAD$150 million, as well as a non-brokered concurrent private placement of Ignite Canada Shares of up to CAD$100 million, both at an issue price of CAD$6.50 (collectively, the "**Share Exchange Financings**"). The Share Exchange Letter Agreement further contemplates that, on closing of the Second Share Exchange Transaction, Ignite Canada would issue options to acquire 2 million post-Consolidation Ignite Canada Shares with an exercise price of not less than the issue price of the Ignite Canada Shares issued in the Share Exchange Financings to such Persons as designated by Ignite US.

On January 8, 2019, Ignite Canada announced that Ignite Canada and Ignite US have mutually agreed to terminate the Share Exchange Letter Agreement but proceed with the name change of Ignite Canada to "Ignite International Brands, Ltd." and the Second Consolidation, and further announced the resignation of Mr. Morgan Good from the Board and the appointment of Mr. Luciano (Lu) Galasso as a director of Ignite Canada. The Share Exchange Letter Agreement was terminated as of January 2, 2019. The name change was completed on January 10, 2019 and the Second Consolidation was completed on January 18, 2019.

- 26 -

On January 21, 2019, the Ignite Canada Shares resumed trading on the CSE under the symbol "BILZ" and Ignite Canada announced that it had entered into a binding letter of intent which would allow Ignite Canada to acquire all of the issued and outstanding common shares in Gen X BioSciences Corp. On February 22, 2019, Ignite Canada announced that, as a result of its due diligence, it had terminated this binding letter of intent.

On February 4, 2019, Ignite Canada granted an aggregate of 1,710,000 Ignite Canada Options to certain directors, officers, and employees of the Company, pursuant to the Ignite Canada Option Plan. The Ignite Canada Options are exercisable at a price of $3.50 per share, will vest equally over a three-year period and expire on February 2, 2024.

On February 22, 2019, Ignite Canada announced the resignation of Mr. Brandon Boddy from the Board and the appointment of Mr. Scott Rohleder as a director of Ignite Canada.

On May 7, 2019, Ignite Canada announced that it had entered into definitive agreement with Taylor Mammon, a United Kingdom based white label manufacturer of CBD products. See Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – European White Label Manufacturer*.

### *Recent Developments of Ignite US*

On April 1, 2018, Ignite US entered into a Trademark Licensing Agreement with Cura Partners, Inc. ("**Cura**"). Under this agreement, Ignite US granted Cura the right to use its "IGNITE", "Bilzerian" and "Dan Bilzerian" trademarks in connection with the manufacturing, development, marketing, promotion, sales and distribution of certain CBD and THC vaporizer products. In respect of THC vaporizer products, Ignite US granted Cura an exclusive license to use its trademarks in Oregon and California (subject to Cura's ability to meet demand). In respect of CBD vaporizer products, Ignite US granted Cura an exclusive license to use its trademarks across the United States (subject to Cura's ability to meet demand). In addition to this license, Ignite US has agreed to use reasonable commercial efforts to cause Dan Bilzerian to advertise its trademarks and products developed by Cura under its trademarks through social media and other channels. In exchange for these rights, Cura has agreed to pay Ignite US a 10% royalty on gross revenue in respect of licensed product sales.

On May 7, 2018, Ignite US entered into a Trademark Licensing Agreement with LP-KP IP Holdings, LLC ("**Loudpack**"). Under this agreement, Ignite US granted Loudpack the right to use its "IGNITE", "Bilzerian" and "Dan Bilzerian" trademarks in connection with the manufacturing, development, marketing, promotion, sales and distribution of a variety of THC products. This license is exclusive in the state of California (subject to Loudpack's ability to meet demand). In addition to this license, Ignite US has agreed to use reasonable commercial efforts to cause Dan Bilzerian to advertise its trademarks and products developed by Loudpack under its trademarks through social media and other channels. In exchange for these rights, Loudpack has agreed to pay Ignite US a 10% royalty on gross revenue in respect of licensed product sales.

On August 30, 2018, Ignite US entered into a Trademark Licensing Agreement with ECVD MMS Wholesale, LLC ("**Bo**"). Under this agreement, Ignite US granted Bo the right to use its "IGNITE" trademark in connection with the manufacturing, development, marketing, promotion, sales and distribution of batteries and cartridges compatible with CBD, THC and nicotine vaporizers. This license is exclusive across the United States (subject to Bo's ability to meet demand). In exchange for

- 27 -

these rights, Bo has agreed to pay Ignite US a 10% royalty on gross revenue in respect of licensed product sales subject to yearly minimum amount.

On September 25, 2018, Ignite US entered into a Limited Liability Company Operating Agreement with Harvest DCP of Nevada, LLC ("**Harvest**"), governing the operation of a joint venture through which Ignite US and Harvest will develop and operate a flagship Ignite dispensary in Las Vegas, Nevada. Ignite US has granted the joint venture a license to use its trademarks in connection with the operation of dispensaries and the production of cannabis products. Additionally, Ignite US has agreed to supply the joint venture with cannabis products through white label suppliers in accordance with purchase orders. The joint venture will make monthly cash distributions to Harvest and Ignite US in accordance with their pro-rata membership interests. Under this agreement, there is a mechanism through which the joint venture can develop additional flagship dispensaries in other strategic markets.

On October 4, 2018, Ignite US entered into a merchandising agreement with Bravado International Group Merchandising Service, Inc. ("**Bravado**"). Under this agreement, Ignite US granted Bravado the exclusive right to use its name, symbols, emblems, logos, designs, likenesses, visual representations service marks, and trademarks in connection with a variety of consumer products, including posters, calendars, lighters, buttons, trading cards, headphones, games, and apparel. In exchange for this right, Bravado has agreed to pay Ignite US royalties on its net receipts from the sale of such products subject to a yearly minimum amount.

### *Fundamental Change*

Business Combination Agreement

On February 28, 2019, Ignite Canada entered into a letter agreement (the "**Business Combination Letter Agreement**") with Ignite US pursuant to which Ignite Canada and Ignite US agreed to combine their businesses. On March 1, 2019, the Ignite Canada Shares were halted from trading on the CSE until adequate filings have been made in connection with the Fundamental Change.

On April 9, 2019, Ignite Canada entered into the Business Combination Agreement with Ignite US, FinCo, Merger Sub, and the Ignite US Shareholders. On May 6, 2019, the parties executed an amendment to the Business Combination Agreement to provide for coattail rights for the Subordinate Voting Shares to ensure the Subordinate Voting Shares participate equally with the Proportionate Voting Shares in the event of a takeover bid.

Pursuant to the Business Combination Agreement, all Ignite US Shareholders agreed to sell their Ignite US Shares to Ignite Canada in exchange for an aggregate of 218,932,400 Subordinate Voting Shares and Proportionate Voting Shares (on an as-converted to Subordinate Voting Share basis). Ignite US Shareholders who are not U.S. Residents will receive 2.65 Subordinate Voting Shares for each Ignite US Share held. Ignite US Shareholders who are U.S. Residents will receive 0.01325 Proportionate Voting Shares for each Ignite US Share held. On Closing, the existing Ignite US shareholders will hold approximately 95.6% of the Resulting Issuer Shares, with Dan Bilzerian, the Chairman and CEO of the Company, holding not less than 62.5% of the issued and outstanding Resulting Issuer Shares, excluding any Subordinate Voting Shares issued pursuant to the Financing.

Following Closing, Ignite US will become a wholly-owned subsidiary of Ignite Canada which will allow the Resulting Issuer to operate in a more effective manner. See Section 4.1 – *Narrative Description of*

- 28 -

*the Business*.   Further, following Closing, the Subordinate Voting Shares are expected to resume trading on the CSE under the ticker "BILZ".

The Resulting Issuer Shares issued in connection with the Business Combination may be subject to escrow conditions and/or resale restrictions as required by applicable securities laws and the policies of the CSE.

Closing of the Business Combination is subject to certain conditions, which may be waived, including:

- the entering into of the New License Agreements; and

- the Company obtaining all requisite shareholder approvals and requisite regulatory approvals from the CSE and any applicable Canadian securities regulatory authorities by May 29, 2019.

Subscription Receipt Financing

Pursuant to the terms of the Business Combination Agreement, FinCo completed a private placement (the "**Financing**") on May 24, 2019 which raised aggregate gross proceeds of CAD$25,800,000.

Pursuant to the Financing, FinCo issued 17,200,000 subscription receipts (the "**Subscription Receipts**") at a price of $1.50 per Subscription Receipt. On Closing, each Subscription Receipt will automatically convert, for no additional consideration and with no additional action by the holder thereof, for one (1) FinCo Share.

As further detailed below, on Closing, each FinCo Share will be exchanged for no additional consideration for one (1) Subordinate Voting Share and FinCo will amalgamate with Merger Sub to form AmalCo, a wholly-owned subsidiary of the Ignite Canada.  Subsequent to the Closing, AmalCo will be liquidated and its assets will be wound-up into the Resulting Issuer and then AmalCo will be dissolved.

Business Combination Steps

The Business Combination will be effected by way of a plan of arrangement pursuant to Section 288 of the BCBCA. The principal steps of the Business Combination are as follows:

(a)     the Notice of Articles and Articles of Ignite Canada is amended to set out the rights and restrictions of the existing class of Ignite Canada Shares and re-designate such class as the Subordinate Voting Shares, and to create a class of Proportionate Voting Shares;

(b)     the Subscription Receipts are exchanged for no additional consideration into FinCo Shares;

(c)     FinCo and Merger Sub amalgamate under Section 269 of the BCBCA to form AmalCo and the FinCo Shares are exchanged for Subordinate Voting Shares on a one-to-one basis;

- 29 -

(d)      all Ignite US Shareholders that are not U.S. Residents transfer their Ignite US Shares to Ignite Canada in consideration for Subordinate Voting Shares on a 1:2.65 basis; and

(e)      all Ignite US Shareholders that are U.S. Residents transfer their Ignite US Shares to Ignite Canada in consideration for Proportionate Voting Shares on a 1:0.01325 basis.

Canadian IP Sub and the International IP Sub will continue to remain wholly-owned subsidiaries of the Resulting Issuer and be parties to the Canadian IP License Agreement and the International IP License Agreement, respectively.

The Convertible Note is expected to be fully repaid upon the completion of the Business Combination using the proceeds from the Financing.

Subsequent to the Closing, AmalCo will be liquidated and its assets will be wound-up into the Resulting Issuer and then AmalCo will be dissolved.

Subsequent to the Closing of the Business Combination, the common shares of ALQ Investments LLC held by Ignite Canada are expected to be transferred to Ignite US, thereby making ALQ Investments LLC a wholly-owned subsidiary of Ignite US.

The Subordinate Voting Shares are not expected to resume trading until following the Closing of the Business Combination.

Ignite Canada Shareholder Meeting

In order to obtain the requisite shareholder approvals in connection with the Business Combination, Ignite Canada held an annual general and special meeting of shareholders on May 29, 2019 (the "**Meeting**"). At the Meeting, Ignite Canada Shareholders approved a resolution approving the Business Combination by: (i) at least two-thirds of the votes cast on such resolution by Ignite Canada Shareholders present in person or by proxy at the Meeting; (ii) at least a simple majority of the votes cast on such resolution by Ignite Canada Shareholders present in person or by proxy at the Ignite Meeting, excluding the Ignite Canada Shares held directly or indirectly by "affiliates" and "control persons" of Ignite Canada under National Instrument 41-101 – *General Prospectus Requirements* and Ontario Securities Commission Rule 56-501 – *Restricted Shares*; and (iii) at least a simple majority of the votes cast on such resolution by Ignite Canada Shareholders present in person or by proxy at the Meeting, excluding the Ignite Canada Shares required to be excluded under Multilateral Instrument 61-101 – *Protection of Minority Security Holders in Special Transactions*.

In connection with the Meeting, Ignite Canada obtained proxies from Veritas and Vulcan SKN, and each director and officer of Ignite Canada who holds Ignite Canada Shares, in which they agreed to vote their Ignite Canada Shares in favour of all actions necessary to consummate the Business Combination, including but not limited to approval of the plan of arrangement giving effect to the Business Combination.

**3.2      Significant Acquisitions and Dispositions**

Other than as set forth in *Item 3.1 – General Development of the Business*, there has been no significant acquisition or disposition completed by Ignite Canada nor any significant probable

acquisition proposed by Ignite Canada since the beginning of its fiscal year ended December 31, 2018 other than as set out elsewhere in this Listing Statement.

Other than as set forth in *Item 3.1 – General Development of the Business*, there has been no significant acquisition or disposition completed by Ignite US nor any significant probable acquisition proposed by Ignite US since the beginning of its fiscal year ended December 31, 2018 other than as set out elsewhere in this Listing Statement.

### 3.3     Trends, Commitments, Events or Uncertainties

Except as disclosed below and elsewhere in this Listing Statement, the Resulting Issuer is not aware of any trend, commitment, event or uncertainty presently known to management and reasonably expected to have a material effect on the Resulting Issuer's business, financial condition or results of operations upon completion of the proposed Business Combination.

*Issuers with U.S. Cannabis-Related Activities*

On February 8, 2018, the Canadian Securities Administrators published Staff Notice 51-352, which provides specific disclosure expectations for issuers that currently have, or are in the process of developing, cannabis-related activities in the United States as permitted within a particular state's regulatory framework. All issuers with United States cannabis-related activities are expected to clearly and prominently disclose certain prescribed information in prospectus filings and other required disclosure documents.

As a result of the Resulting Issuer's investments in the United States, the Resulting Issuer will be subject to Staff Notice 51- 352.

Upon completion of the Business Combination, the Resulting Issuer will be considered to have material ancillary involvement in U.S. cannabis-related activities under Staff Notice 51-352 through the operations of Ignite US and expects to have indirect involvement in U.S. cannabis-related activities in connection with Ignite US' joint venture dispensary with Harvest. Until the Tahoe Note is repaid, the Resulting Issuer can also be considered to have material ancillary involvement in Tahoe (together with the Ignite US, the "**Investees**"), which is a cultivator and/or seller of marijuana in the United States.

***The following table is intended to assist readers in identifying those parts of this Listing Statement that address the disclosure expectations outlined in Staff Notice 51-352.***

| Industry Involvement | Specific Disclosure Necessary to Fairly Present all Material Facts, Risks and Uncertainties | Listing Statement Cross Reference |
|---|---|---|
| All Issuers with U.S. Marijuana-Related Activities | Describe the nature of the issuer's involvement in the U.S. marijuana industry and include the disclosures indicated for at least one of the direct, indirect and ancillary industry involvement types noted in this table. | Section 3.3 - *Trends, Commitments, Events or Uncertainties – Issuers with U.S. Cannabis-Related Activities – Nature of Investments with U.S. Cannabis-Related* |

- 31 -

| Industry Involvement | Specific Disclosure Necessary to Fairly Present all Material Facts, Risks and Uncertainties | Listing Statement Cross Reference |
|---|---|---|
| | | *Activities* |
| | Prominently state that marijuana is illegal under U.S. federal law and that enforcement of relevant laws is a significant risk. | Cover Page (disclosure in bold typeface) |
| | Discuss any statements and other available guidance made by federal authorities or prosecutors regarding the risk of enforcement action in any jurisdiction where the issuer conducts U.S. marijuana-related activities. | Section 3.3 - *Trends, Commitments, Events or Uncertainties – United States Federal Overview* |
| | Outline related risks including, among others, the risk that third party service providers could suspend or withdraw services and the risk that regulatory bodies could impose certain restrictions on the issuer's ability to operate in the U.S. | Section 17 – *Risk Factors – Risks Related to the Marijuana Industry – Service Providers*. Section 3.3 - *Trends, Commitments, Events or Uncertainties– United States Federal Overview* |
| | Given the illegality of marijuana under U.S. federal law, discuss the issuer's ability to access both public and private capital and indicate what financing options are / are not available in order to support continuing operations. | Section 3.3 - *Trends, Commitments, Events or Uncertainties – Ability to Access Public and Private Capital.* |
| | Quantify the issuer's balance sheet and operating statement exposure to U.S. marijuana related activities. | Section 5 – *Selected Consolidated Financial Information*. Schedules A, C and E to the Listing Statement. |
| | Disclose if legal advice has not been obtained, either in the form of a legal opinion or otherwise, regarding (a) compliance with applicable state regulatory frameworks and (b) potential exposure and implications arising from U.S. federal law. | Section 3.3 - *Trends, Commitments, Events or Uncertainties – Compliance with Applicable State Laws in the United States* |
| **U.S. Marijuana Issuers with indirect involvement in the** | Outline the regulations for U.S. states in which the issuer's investee(s) operate. | Section 3.3 - *Trends, Commitments, Events or Uncertainties –* |

- 32 -

| Industry Involvement | Specific Disclosure Necessary to Fairly Present all Material Facts, Risks and Uncertainties | Listing Statement Cross Reference |
|---|---|---|
| cultivation or distribution | | *Compliance with Applicable State Laws in the United States – Nevada State Laws* |
| | Provide reasonable assurance, through either positive or negative statements, that the investee's business is in compliance with applicable licensing requirements and the regulatory framework enacted by the applicable U.S. state. Promptly disclose any noncompliance, citations or notices of violation, of which the issuer is aware, that may have an impact on the investee's licence, business activities or operations. | Section 3.3 - *Trends, Commitments, Events or Uncertainties – Compliance with Applicable State Laws in the United States – Nevada State Laws* |
| **U.S. Marijuana Issuers with material ancillary involvement** | Provide reasonable assurance, through either positive or negative statements that the applicable customer's or investee's business is in compliance with applicable licensing requirements and the regulatory framework enacted by the applicable U.S. state. | Section 3.3 - *Trends, Commitments, Events or Uncertainties – Compliance with Applicable State Laws in the United States* |

Nature of Investments with U.S. Cannabis-Related Activities

*Tahoe Hydroponics Company LLC*

See Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations - Tahoe Hydroponics Company LLC*.

*Ignite International, Ltd.*

See Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd.*

*Harvest DCP*

See Section 3.1 – *General Development of the Business – Recent Developments of Ignite US.*

***Regulatory Overview***

In accordance with Staff Notice 51-352, below is a discussion of the federal and state-level U.S. regulatory regimes in those jurisdictions where the Resulting Issuer is expected to be indirectly involved in marijuana-related activities through Ignite US. Ignite US, through its joint venture with Harvest, expects to be indirectly engaged in the cultivation, processing, possession, use, sale or

- 33 -

distribution of cannabis in the medicinal and/or adult-use cannabis marketplace in the State of Nevada. The Resulting Issuer may also have ancillary involvement in the U.S. cannabis industry in the States of California and Nevada. In accordance with Staff Notice 51-352, the Resulting Issuer will evaluate, monitor and reassess this disclosure, and any related risks, on an ongoing basis and the same will be supplemented and amended to investors in public filings, including in the event of government policy changes or the introduction of new or amended guidance, laws or regulations regarding marijuana regulation. Any non-compliance, citations or notices of violation which may impact the Resulting Issuer's license, business activities or operations will be promptly disclosed by the Resulting Issuer.

### *United States Federal Overview*

In the United States, thirty-three (33) states and Washington D.C. have legalized medical marijuana, while ten (10) states and Washington, D.C. have legalized recreational marijuana. Cannabis currently remains a Schedule I drug under the CSA and is, therefore, illegal under federal law. Even in those states in which the use of cannabis has been legalized pursuant to state law, its use, possession or cultivation remains a violation of federal law. A Schedule I controlled substance is defined as one that has no currently accepted medical use in the United States, a lack of safety for use under medical supervision and a high potential for abuse. The U.S. Department of Justice (the "**DOJ**") defines Schedule I controlled substances as the most dangerous drugs of all the drug schedules with potentially severe psychological or physical dependence. If the United States federal government decides to enforce the CSA, persons that are charged with distributing, possessing with intent to distribute or growing cannabis could be subject to large fines and/or terms of imprisonment. This is the case even if a business is operating legally under state law.

The DOJ under the former Obama administration previously issued a series of memoranda, including, among others, "Policy Statement Regarding Marijuana Issues in Indian Country," issued by then-Director of the Executive Office for U.S. Attorneys Monty Wilkinson and a memoranda issued by then-Deputy Attorney General James Cole, on August 29, 2013, commonly referred to as the "**Cole Memorandum**", which generally directed the U.S. Attorneys' offices (U.S. federal prosecutors) that individuals and businesses that rigorously comply with state regulatory provisions in states that have strictly-regulated legalized medical or recreational cannabis programs should not be a prosecutorial priority for violations of federal law.

However, on January 4, 2018, Attorney General Jeff Sessions issued a new memorandum "Marijuana Enforcement" and then rescinded the previous guidance memoranda, including the Cole Memorandum.  Under the new guidance, Attorney General Sessions directs all U.S. Attorneys to enforce the laws enacted by U.S. Congress and to follow well-established principles when pursuing prosecutions related to marijuana activities. The DOJ asserts this return to the rule of law is also a return of trust and local control to federal prosecutors who know where and how to deploy DOJ resources most effectively to reduce violent crime, stem the tide of the drug crisis, and dismantle criminal gangs. Therefore, the prosecution of individuals and businesses under the CSA that are engaging in cannabis-related activities in compliance with state law is now at the discretion of local U.S. Attorneys (the "**Sessions Memorandum**").

Despite this, the Sessions Memorandum, being only a statement of DOJ enforcement policy, did not affect the Rohrabacher-Blumenauer amendment which prohibits the DOJ from using federal funds to interfere with state-legal medical marijuana programs. While that amendment is still in effect, it is

A-33

- 34 -

subject to periodic extensions by U.S. Congress, the most recent being a February 15, 2019 extension through to September 30, 2019. The amendment does not cover activities under state recreational marijuana laws.

Under U.S. federal law, it is highly likely a violation of federal money laundering statutes for financial institutions to take any proceeds from marijuana sales or any other Schedule I substance. Canadian banks are also hesitant to deal with cannabis companies, due to the uncertain legal and regulatory framework of the industry. Banks and other financial institutions could be prosecuted and possibly convicted of money laundering and other violations of organized crime statutes for providing services to cannabis businesses. Under U.S. federal law, banks or other financial institutions that provide a cannabis business with a checking account, debit or credit card, small business loan, or any other service could be found guilty of money laundering, conspiracy and other federal crimes.

In 2014, the Financial Crimes Enforcement Network ("**FinCEN**"), in coordination with the DOJ, issued guidelines for financial institutions serving marijuana businesses. The FinCEN guidance is singularly focused on ways to meet Bank Secrecy Act/anti-money-laundering ("**BSA/AML**") obligations while serving the state-legal marijuana sector. It does not authorize financial institutions to serve that sector; rather, it provides a roadmap for BSA/AML compliance for institutions that choose to do so or that otherwise encounter transactions involving marijuana. The FinCEN guidance requires that banks engaged in banking marijuana businesses file special-purpose Special Activity Reports (a "**SAR**") that distinguish among: (a) marijuana businesses lawfully operating in a state (requiring the filing of a "marijuana limited" SAR); (b) marijuana businesses that arguably may not be operating in a manner compliant with state laws (requiring the filing of a "marijuana priority" SAR); and (c) marijuana businesses for which the bank has concluded that a cannabis business was operating in violation of one or more red-flags identified in the Cole Memorandum (requiring the filing of a "marijuana termination" SAR). Despite the recent memorandum by Attorney General Jeff Sessions, FinCEN has subsequently re-affirmed its guidance. In the U.S., on several occasions, bills have been introduced in U.S. Congress to grant banks and other financial institutions immunity from federal criminal prosecution for servicing marijuana-related businesses if the underlying marijuana business follows state law. These bills have not been passed and there can be no assurance that any will be passed. In both Canada and the United States, transactions involving banks and other financial institutions are both difficult and unpredictable under the current legal and regulatory landscape. Legislative changes to help reduce these challenges would benefit companies in the cannabis space, and would improve the efficiency of both significant and minor financial transactions.

Despite the legal, regulatory, and political obstacles the marijuana industry currently faces, the industry has continued to grow.

The following is an analysis of market and regulatory conditions for the marijuana industry in U.S. states in which the Resulting Issuer has investments.

| State | Type of Regulated Cannabis Program | Population (2018) | Number of Patients (May 2018) | Number of Total Cannabis Licenses (as of) |
|---|---|---|---|---|
| California | medical and future adult-use | 39,557,045 | 915,845 | no data |
| Nevada | medical and adult-use | 3,034,392 | 21,579 | no data |

- 35 -

Sources: US Census Bureau and http://www.statista.com

<u>2018 Farm Bill</u>

On December 28, 2018, the Agricultural Improvement Act of 2018 (commonly known as the "**2018 Farm Bill**") was signed into law. The 2018 Farm Bill, among other things, removed industrial hemp and its cannabidiols, including CBD derived from industrial hemp, from the CSA and will amend the Agricultural Marketing Act of 1946 to allow for industrial hemp production and sale in the United States. Under the 2018 Farm Bill, industrial hemp is defined as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." The U.S. Department of Agriculture will promulgate regulations for the industrial hemp industry, the timing of which cannot be assured. Additionally, the 2018 Farm Bill does not legalize CBD derived from "marihuana" (as such term is defined in the Controlled Substances Act of 1970), which is and will remain a Schedule I controlled substance under the Controlled Substances Act of 1970. It is not yet known what role the USFDA will have in regulating industrial hemp and CBD derived from industrial hemp.

<u>Enforcement of U.S. Federal Laws</u>

For the reasons set forth above, the Resulting Issuer's existing investments in the Investees with operations or investments in the United States, and any future investments, may become the subject of heightened scrutiny by regulators, stock exchanges and other authorities in Canada. As a result, the Resulting Issuer may be subject to significant direct and indirect interaction with public officials. There can be no assurance that this heightened scrutiny will not in turn lead to the imposition of certain restrictions on the Resulting Issuer's ability to invest in the United States or any other jurisdiction.

Government policy changes or public opinion may also result in a significant influence over the regulation of the cannabis industry in Canada, the United States or elsewhere. A negative shift in the public's perception of cannabis in the United States or any other applicable jurisdiction could affect future legislation or regulation. Among other things, such a shift could cause state jurisdictions to abandon initiatives or proposals to legalize cannabis.

Further, violations of any federal laws and regulations could result in significant fines, penalties, administrative sanctions, convictions or settlements arising from civil proceedings conducted by either the federal government or private citizens, or criminal charges, including, but not limited to, disgorgement of profits, cessation of business activities or divestiture. This could have a material adverse effect on the Investees and therefore the Resulting Issuer.

***Compliance with Applicable State Laws in the United States***

Ignite Canada has not obtained legal advice regarding compliance with applicable state regulatory frameworks and exposure and implication arising from U.S. federal laws as they relate to the cannabis industry. For each of Ignite Canada's subsidiaries, investee companies and partners involved in the U.S. cannabis industry, to the best of Ignite Canada's knowledge, Ignite Canada is not aware of any non-compliance with applicable licensing requirements and the regulatory framework enacted by the applicable U.S. state for any of its indirect operations, holdings and ventures. Ignite Canada is not aware of: (i) any non-compliance by Ignite Canada, its subsidiaries, investee companies or

- 36 -

partners with respect to marijuana-related activities or (ii) any notices of violation with respect to any marijuana-related activities of Ignite Canada, its subsidiaries, investee companies or partners by its respective regulatory authorities.

California State Laws

In 1996, California was the first state to legalize medical marijuana through Proposition 215, the Compassionate Use Act of 1996. This legalized the use, possession and cultivation of medical marijuana by patients with a physician recommendation for treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.

In 2003, Senate Bill 420 was signed into law establishing an optional identification card system for medical marijuana patients. In September 2015, the California legislature passed three bills collectively known as the Medical Cannabis Regulation and Safety Act (the "**MCRSA**"). The MCRSA established a licensing and regulatory framework for medical marijuana businesses in California. The system created multiple license types for dispensaries, infused products manufacturers, cultivation facilities, testing laboratories, transportation companies, and distributors. Edible infused product manufacturers would require either volatile solvent or non-volatile solvent manufacturing licenses depending on their specific extraction methodology. Multiple agencies would oversee different aspects of the program and businesses would require a state license and local approval to operate. However in November 2016, voters in California overwhelmingly passed Proposition 64, the Adult Use of Marijuana Act (the "**AUMA**") creating an adult-use marijuana program for adults 21 years of age or older. AUMA had some conflicting provisions with MCRSA, so in June 2017, the California State Legislature passed Senate Bill No. 94, known as Medicinal and Adult-Use Cannabis Regulation and Safety Act (the "**MAUCRSA**"), which amalgamates MCRSA and AUMA to provide a set of regulations to govern a medical and adult-use licensing regime for cannabis businesses in the State of California. The four agencies that regulate marijuana at the state level are the Bureau of Cannabis Control, California Department of Food and Agriculture, California Department of Public Health, and California Department of Tax and Fee Administration. MAUCRSA went into effect on January 1, 2018.

To legally operate a medical or adult-use cannabis business in California, the operator must have both a local and state license. This requires license holders to operate in cities with marijuana licensing programs. Therefore, cities in California are allowed to determine the number of licenses they will issue to marijuana operators, or can choose to outright ban marijuana.

A medicinal retailer license permits the sale of medicinal cannabis and cannabis products to a medicinal cannabis patient in California who possesses a physician's recommendation. Only certified physicians may provide medicinal marijuana recommendations. An adult-use retailer license permits the sale of cannabis and cannabis products to any individual 21 years of age or older who does not possess a physician's recommendation.

An adult-use or medicinal cultivation license permits cannabis cultivation activity which means any activity involving the planting, growing, harvesting, drying, curing, grading or trimming of cannabis. Such licenses further permit the production of a limited number of non-manufactured cannabis products and the sales of cannabis to certain licensed entities within the state of California for resale or manufacturing purposes.

An adult-use or medical manufacturing license permits the manufacturing of cannabis products. Manufacturing includes the compounding, blending, extracting, infusion, packaging or repackaging, labeling or relabeling, or other preparation of a cannabis product.

In the state of California, only cannabis that is grown in the state can be sold in the state. Although California is not a vertically-integrated system, the state allows licensees to make wholesale purchase of cannabis from, or a distribution of cannabis and cannabis product to, another licensed entity within the state.

Holders of marijuana licenses in California are subject to a detailed regulatory scheme encompassing: security, staffing, sales, manufacturing standards, inspections, inventory, advertising and marketing, product packaging and labeling, records and reporting, and more. As with all jurisdictions, the full regulations, as promulgated by each applicable state agency, should be consulted for further information about any particular operational area.

Nevada State Laws

In the State of Nevada, medical marijuana use was legalized by a ballot initiative in 2000. State-certified medical marijuana establishments were first operational in 2015. On November 8, 2016, voters in Nevada passed the Regulation and Taxation of Marijuana Act (Ballot Question 2) to allow for the sale, possession and consumption of recreational marijuana in the state for adults 21 and older. The first dispensaries providing adult-use cannabis began sales in July 2017. The Nevada Department of Taxation (the "**DOT**") is the regulatory agency overseeing the medical and adult use cannabis programs. Cities and counties in Nevada are allowed to determine the number of local cannabis licenses they will issue.

*Nevada Licenses and Regulations*

In the State of Nevada, only cannabis that is grown/produced in the state by a licensed establishment may be sold in the state. The state also allows a licensed entity to make wholesale sales of cannabis to another licensed entity within the state. There are five types of retail marijuana establishment

- 38 -

licenses: cultivation facility, distributor, product manufacturing facility, testing facility, and retail store.

*Nevada Reporting Requirements*

The State of Nevada uses METRC as the state's computerized T&T system used to track commercial cannabis activity and seed-to-sale. Individual licensees, whether directly or through third-party integration systems, are required to push data to the state to meet all reporting requirements. The chosen seed-to-sale system must capture the required data points for cultivation and manufacturing as required in Nevada Revised Statutes Section 453A.

### Ability to Access Public and Private Capital

Ignite Canada has historically had access to equity and debt financing from prospectus exempt (private placement) markets in Canada and the United States. Ignite Canada expects that the Resulting Issuer will continue to have access to financing from these exempt markets. The Resulting Issuer's executive team and Board have extensive relationships with sources of private capital (such as funds and high net worth individuals) that could be invested at a higher cost of capital.

While the Resulting Issuer is not able to obtain bank financing in the U.S. or financing from other U.S. federally regulated entities, the Company currently has access to equity financing through the private markets in Canada and the public and private markets in the United States. Since the use of marijuana is illegal under U.S. federal law, and in light of concerns in the banking industry regarding money laundering and other federal financial crimes related to marijuana, U.S. banks have been reluctant to accept deposit funds from businesses involved with the marijuana industry. Consequently, businesses involved in the marijuana industry often have difficulty finding a bank willing to accept their business. Likewise, marijuana businesses have limited, if any, access to credit card processing services. As a result, marijuana businesses in the U.S. are largely cash-based. This complicates the implementation of financial controls and increases security issues.

Commercial banks, private equity firms and venture capital firms have approached the cannabis industry cautiously to date. However, there are increasing numbers of high net worth individuals and family offices that have made meaningful investments in companies and projects similar to Ignite Canada and Ignite US, and the Resulting Issuer's expected projects and investments. Although there has been an increase in the amount of private financing available over the last several years, there is neither a broad nor deep pool of institutional capital that is available to issuers with cannabis-related activities. There can be no assurance that additional financing, if raised privately, will be available to the Resulting Issuer when needed or on terms which are acceptable. The Resulting Issuer's inability to raise financing to fund capital expenditures or acquisitions could limit its growth and may have a material adverse effect upon future profitability. See Section 17 – *Risk Factors – Other Business and Operating Risks – Additional Financing*.

### Canada

Cannabis Act and Regulations

On December 13, 2016, the Task Force on Cannabis Legalization and Regulation, which was established by the Canadian federal government to seek input on the design of a new system to legalize, regulate and restrict access to cannabis, published its report outlining its recommendations.

- 39 -

On April 13, 2017, the Canadian federal government released Bill C-45, *An Act respecting Cannabis and to amend the Controlled Drugs and Substances Act, the Criminal Code and other Acts* (the "**Cannabis Act**"), which proposed the enactment of the Cannabis Act (Canada) to regulate the production, distribution and sale of cannabis for unqualified adult use. On November 27, 2017, the House of Commons passed Bill C-45. On June 19, 2018 the Senate approved Bill C-45 and the Act received Royal Assent on June 21, 2018. The Cannabis Act came into force on October 17, 2018. Given that these regulations are very new, the impact of such regulatory changes on the Resulting Issuer's business is unknown.

The Cannabis Act provides a licensing and permitting scheme for the production, importation, exportation, testing, packaging, labelling, sending, delivery, transportation, sale, possession and disposal of cannabis for nonmedicinal use (i.e., adult use), to be implemented by regulations made under the Cannabis Act. The Cannabis Act maintains separate access to cannabis for medical purposes, including providing that import and export licenses and permits will only be issued in respect of cannabis for medical or scientific purposes or in respect of industrial hemp.

On July 11, 2018, the Canadian federal government published regulations in the Canada Gazette, Part II, to support the coming into force of the Cannabis Act, including the *Cannabis Regulations* ("**Cannabis Regulations**"), and proposed amendments to the *Industrial Hemp Regulations* ("**IHR**"), the *Narcotic Control Regulations* (Canada) and certain regulations under the *Food and Drugs Act* (Canada). The Cannabis Regulations and IHR, among other things, outline the rules for the legal cultivation, processing, research, testing, distribution, sale, importation and exportation of cannabis and hemp in Canada, including the various classes of licenses that can be granted, and set standards for cannabis and hemp products that became available for legal sale on October 17, 2018.

As of October 17, 2018, the Cannabis Act and the Cannabis Regulations replaced the *Access to Cannabis for Medical Purposes Regulation* ("**ACMPR**") as the governing regulations in respect of the production, sale and distribution of medical cannabis and related oil extracts. Transitional provisions of the Cannabis Act provide that every license issued under Section 35 of the ACMPR that was in force immediately before the day on which the Cannabis Act came into force (being October 17, 2018) was deemed to be a license issued under the Cannabis Act, and that such license will continue in force until it is revoked or expires.

Licenses, Permits and Authorizations

The Cannabis Regulations establish six classes of licenses:

1. Cultivation licenses;
2. Processing licenses;
3. Analytical testing licenses;
4. Sales for medical purposes licenses;
5. Research licenses; and
6. Cannabis drug licenses.

The Cannabis Regulations also create subclasses for cultivation licenses (standard cultivation, micro-cultivation and nursery) and processing licenses (standard processing and micro-processing). Different licenses and each sub-class therein, carry differing rules and requirements that are intended to be proportional to the public health and safety risks posed by each license category and

- 40 -

each sub-class. Producers holding production and sales licenses under the ACMPR will be transferred to similar licenses under the Cannabis Act.

The Cannabis Regulations permit cultivation license holders to conduct both outdoor and indoor cultivation of cannabis, however no licensed activities (except for destruction, antimicrobial treatment and distribution) can take place in a "dwelling-house". The implications of the proposal to allow outdoor cultivation are not yet known, but such a development could be significant as it may reduce start-up capital required for new entrants in the cannabis industry. It may also ultimately lower prices as capital expenditure requirements related to growing outside are typically much lower than those associated with indoor growing.

The amendments to the IHR came into force on October 17, 2018. The regulatory scheme for industrial hemp largely remains the same, however the IHR now permits the sale of hemp plants to licensed cannabis producers, and licensing requirements were softened in accordance with the low risk posed by industrial hemp.

Security Clearances

Certain people associated with cannabis licensees, including individuals occupying a "key position" directors, officers, large shareholders and individuals identified by the Minister, must hold a valid security clearance issued by the Minister. Under the Cannabis Regulations, the Minister may refuse to grant security clearances to individuals with associations to organized crime or with past convictions for, or an association with, drug trafficking, corruption or violent offences. This was largely the approach in place under the ACMPR and other related regulations governing the licensed production of cannabis for medical purposes. Individuals who have histories of nonviolent, lower-risk criminal activity (for example, simple possession of cannabis, or small-scale cultivation of cannabis plants) are not precluded from participating in the legal cannabis industry, and the grant of security clearance to such individuals is at the discretion of the Minister and such applications will be reviewed on a case-by-case basis.

Cannabis Tracking System

Under the Cannabis Act, the Minister is authorized to establish and maintain a national cannabis tracking system. The purpose of this system is to track cannabis throughout the supply chain to help prevent diversion of cannabis into, and out of, the legal market. The Cannabis Regulations provide the Minister with the authority to make a ministerial order that would require certain persons named in such order to report specific information about their authorized activities with cannabis in the form and manner specified by the Minister.

Cannabis Products

The Cannabis Regulations set out the requirements for the sale of cannabis products at the retail level and permit the sale of dried cannabis, cannabis oil, fresh cannabis, cannabis plants, and cannabis seeds, including in such forms as "pre-rolled" and in capsules. The THC content and serving size of cannabis products is limited by the Cannabis Regulations. The sale of edibles containing cannabis and cannabis concentrates will not initially be permitted, however the Canadian federal government began consultations in late 2018 to develop regulations to support the sale and distribution of edibles and concentrates, and intends such regulations to come into force by October

- 41 -

17, 2019. Health Canada plans to consult broadly on these regulations with the provinces and territories, industry, the public health community and other interested stakeholders.

The IHR defines industrial hemp as cannabis plants whose leaves and flowering heads do not contain more than 0.3% THC.

Packaging and Labeling

The Cannabis Regulations set out requirements pertaining to the packaging and labelling of cannabis products. Such requirements are intended to promote informed consumer choice and allow for the safe handling and transportation of cannabis. The Cannabis Regulations require all cannabis products to be packaged in a manner that is tamper-proof and child-resistant.

While minor allowances for branding would be permitted, Health Canada is proposing strict limits on the use of colours, graphics, and other special characteristics of packaging. Cannabis package labels must include specific information, such as:

i.     product source information, including the class of cannabis and the name, phone number and email of the cultivator;

ii.    a mandatory health warning, rotating between Health Canada's list of standard health warnings;

iii.   the Health Canada standardized cannabis symbol on cannabis products that contains THC in a concentration greater than 10 μg/g; and

iv.    information specifying THC and CBD content.

A cannabis product's brand name may only be displayed once on the principal display panel or, if there are separate principal display panels for English and French, only once on each principal display panel. It can be in any font style and any size, so long as it is equal to or smaller than the health warning message. The font must not be in metallic or fluorescent colour. In addition to the brand name, only one other brand element can be displayed.

Cannabis for Medical Purposes

Part 14 of the Cannabis Regulations sets out the regime for medical cannabis following legalization, which is to remain substantively the same as that which existed under the ACMPR, with adjustments to create consistency with rules for non-medical use, improve patient access, and reduce the risk of abuse within the medical access system. Patients who have the authorization of their healthcare provider will continue to have access to cannabis, either purchased directly from a federally licensed producer, or by registering to produce a limited amount of cannabis for their own medical purposes, or designating someone to produce cannabis for them.

Health Products and Cosmetics Containing Cannabis

Health Canada has taken a scientific, evidenced-based approach for the oversight of health products with cannabis that are approved with health claims, including prescription and non-prescription drugs, natural health products, veterinary drugs and veterinary health products, and medical devices.

- 42 -

Under the Cannabis Regulations, the use of cannabis-derived ingredients (other than certain hemp seed derivatives containing no more than 10 parts per million THC) in cosmetics is permitted and will be subject to provisions of the Cannabis Act.

Import / Export Permits for Medical or Scientific Purposes

Part 10 of the Cannabis Regulations sets out the process by which a license holder may apply for an import or export permit for medical or scientific purposes, as set out in the Cannabis Regulations. A permit must be obtained for each shipment of cannabis. An application for an import or export permit must contain specific information including the name and address of the holder, license number and specifics of the particular shipment including intended use of the cannabis and specific shipment details. The Cannabis Regulations contain reporting requirements in respect of the import / export of cannabis in reliance of a permit issued under the Cannabis Regulations.

Provincial and Territorial Regulatory Framework

While the Cannabis Act provides for the regulation of the commercial production of cannabis for recreational purposes and related matters by the Canadian federal government, the Cannabis Act proposes that the provinces and territories of Canada will have authority to regulate other aspects of recreational cannabis (similar to what is currently the case for liquor and tobacco products), such as sale and distribution, minimum age requirements, places where cannabis can be consumed, and a range of other matters.

All Canadian provinces and territories have announced regulatory regimes for the distribution and sale of cannabis for recreational purposes within those jurisdictions. There are essentially three general frameworks that the provinces and territories have proposed: (i) private cannabis retailers licensed by the province; (ii) government run retail stores; or (iii) a combination of both frameworks (e.g., privately licensed brick and mortar retail stores, while online retail stores are operated by the applicable provincial government). Regardless of the framework, the recreational cannabis market is ultimately supplied by federally licensed cultivators and processors. In many cases, the provinces that have or propose to have privately licensed retailers have or will have a government run wholesaler. Such privately licensed retail stores are or will be required to obtain their cannabis products from the wholesalers, while the wholesalers, in turn, acquire the cannabis products from the federally licensed cultivators and processors. In addition, each of these Canadian jurisdictions has established a minimum age of 19 years old, except for Québec and Alberta, where the minimum age is 18.

*Ontario*: In Ontario, the distribution and retail sale of recreational cannabis is conducted through the Ontario Cannabis Retail Corporation, a subsidiary of the Liquor Control Board of Ontario, while recreational cannabis is also sold online through the Ontario Cannabis Store platform. The Ontario government issued 25 licenses through a lottery for the sale of recreational cannabis by private retailers in authorized retail stores which came into effect on April 1, 2019. Municipalities and First Nations reserve band councils were permitted to opt out of the retail cannabis market if they passed a resolution by January 22, 2019.

*British Columbia*: In British Columbia, recreational cannabis is sold through both public and privately operated stores, with the provincial Liquor Distribution Branch handling wholesale distribution. The province has not capped the number of stores that may be opened, but no one private entity may have an interest in more than eight stores.

- 43 -

*Alberta*: In Alberta, cannabis products are sold by private retailers that receive their products from a government-regulated distributor, similar to the distribution system currently in place for alcohol in the province. Only licensed retail outlets are permitted to sell cannabis with online sales run by the Alberta Gaming and Liquor Commission.

*Saskatchewan*: In Saskatchewan, recreational cannabis is sold by private retailers. The Saskatchewan Liquor and Gaming Authority issued 51 retail permits to private operators in as many as 40 Saskatchewan municipalities and First Nation communities, with municipalities and First Nation communities having the option of opting out of having a retail cannabis store if they choose. The Saskatchewan government has indicated it will consider whether to issue more permits approximately 18 months following legalization. Saskatchewan will also allow wholesale distribution of cannabis by private companies who obtain a wholesale permit.

*Manitoba*: In Manitoba, a "hybrid model" for cannabis distribution applies where the supply of cannabis is secured and tracked by the Manitoba Liquor and Lotteries Corp.; however, licensed private retail stores are permitted to sell recreational cannabis.

*Québec*: In Québec, all recreational marijuana must be managed and sold through outlets of the Société Québécoise du cannabis, a subsidiary of the Société des alcools du Québec, and its online site.

*New Brunswick*: In New Brunswick, recreational cannabis is sold through a network of tightly-controlled, stand-alone stores through Cannabis NB, a subsidiary of the New Brunswick Liquor Corporation.

*Nova Scotia*: In Nova Scotia, the Nova Scotia Liquor Corporation is responsible for the regulation of cannabis in the province, and recreational cannabis is only to be sold publicly through government-operated storefronts and online.

*Prince Edward Island*: In Prince Edward Island, similar to Nova Scotia, cannabis must be sold publicly, through government stores and online.

*Newfoundland and Labrador*: Newfoundland and Labrador has adopted a mixed private and public model for the distribution and sale of recreational cannabis, with public stores opening only where no private stores have expressed interest. The province's crown-owned liquor corporation, the Newfoundland and Labrador Liquor Corp., oversees the distribution to private sellers who may sell to consumers. The Newfoundland and Labrador Liquor Corp. controls the possession, sale and delivery of cannabis, and sets prices. It is also the initial online retailer, although licenses may later be issued to private interests.

*Yukon*: The Yukon limits the initial distribution and sale of recreational cannabis to government outlets and government-run online stores, and allows for the later licensing of private retailers.

*Northwest Territories*: The Northwest Territories relies on the N.W.T. Liquor Commission to control the importation and distribution of cannabis, whether through retail outlets or by mail order service run by the liquor commission. Communities in the Northwest Territories are able to hold a plebiscite to prohibit cannabis, similar to options currently available to restrict alcohol in the Northwest Territories.

- 44 -

*Nunavut*: The Nunavut Cannabis Act establishes the licensing system for the retail sale of recreational cannabis. The Nunavut legislation contemplates the sale of cannabis through both public and licensed private retail stores and online. Sales initially will only be through the Liquor and Cannabis Commission and its agent. Under the Nunavut Cannabis Act, a Person can submit an application for a license to operate a cannabis store, remote sales store, or cannabis lounge. This application process will likely not be in place until later in 2019.

The following illustration outlines the most recent distribution models by province.



**Source:  https://lift.co**

- 45 -

*Market Demand*

Medical Marijuana Demand

It is estimated that there will be 630,000 (1.7% of the population) registered medical marijuana patients in Canada by 2024, resulting in annual demand of approximately 230,000 kilograms of medical marijuana. In 2018, it was estimated the demand by ACMPR patients will be roughly 95,000 kilograms. Based on these forecasts, it is estimated that by 2024, the value of the Canadian medical marijuana market could be $1.9 billion to $2.6 billion. (source: MRCC, September 20, 2017).

While legal access to medical cannabis has been available since 1999, the majority of the medical community has remained cautious about its ability to treat certain diseases and conditions. This skepticism has largely been attributable to the lack of definitive clinical data about the efficacy of medical cannabis and to social stigma regarding marijuana. However, industry proponents have been working hard to educate the medical community about the benefits of marijuana and recent third-party studies are adding to its credibility as a legitimate treatment option for patients with chronic pain and other medical conditions. As a result, the medical marijuana industry is still in its infancy and as set out below the 330% increase in sales of medical cannabis from March 2016 to June 2017 indicates that strong growth is likely to continue for the foreseeable future. (Source: MRCC, September 20, 2017)

Quarterly Sales of Dried Marijuana and Cannabis Oils in Canada, 2016–2017



Source: Office of Parliamentary Budget Officer "Legalized Cannabis: Fiscal Considerations", November 1, 2016.

Non-Medical Marijuana Demand

Market studies indicate that 18% to 22% of the Canadian population aged 18 and over currently consumes recreational marijuana, so there is already a large and established user base. This translates into annual cannabis demand of approximately 700,000 to 1 million kilograms of cannabis

- 46 -

per year, all of which is being supplied through illegal channels. Based on these forecasts, it is estimated that the value of the Canadian recreational marijuana market in 2018 will be approximately $5.2 billion to $7.9 billion (based only on dried flower sales). (Source: MRCC, September 20, 2017).

The Canadian government estimates that approximately 70% of cannabis demand will come from the adult market (ages 18 – 44).



| | 15-17 Years | 18-24 Years | 25-44 Years | 45-64 Years | 65 Years and Over | All |
|---|---|---|---|---|---|---|
| 2018 | 299<br>187  462 | 1,390<br>1,043  1,781 | 2,033<br>1,535  2,530 | 863<br>646  1,146 | 50<br>31  87 | 4,635<br>3,442  6,005 |
| 2021 | 346<br>207  557 | 1,488<br>1,065  1,993 | 2,335<br>1,676  3,036 | 962<br>690  1,326 | 62<br>37  112 | 5,193<br>3,674  7,024 |

(Source: Office of Parliamentary Budget Officer "Legalized Cannabis" Fiscal Considerations, November 1, 2016)

### *Emerging Consumption Patterns (Concentrates, Edibles and Extracts)*

Smoking cannabis is the most traditional form of ingestion and consists of smoking the dried flowers or leaves of the cannabis plant. Hash and kief are also ingested this way. Cannabis can be smoked through a pipe, rolled into a joint (or cigarette), or smoked using a water pipe (bong). Vaporizing involves using a vaporizer, which is a device that is able to extract the therapeutic ingredients in the cannabis plant material, called cannabinoids, at a much lower temperature than required for burning. This allows user to inhale the active ingredients as a vapor instead of smoke, and spares them the irritating and harmful effects of smoking. Many medical marijuana patients find that vaporizing offers an improved medical effectiveness, compared to smoking.

Topical cannabis encompasses herbal medicines that are applied directly to the skin or muscles. They include lotions, salves, balms, sprays, oils, and creams. Some patients report they are effective for skin conditions like psoriasis, joint diseases like rheumatoid arthritis, migraines, restless leg syndrome, some spasms, and everyday muscle stress and soreness. However, unlike smoking, vaporizing or eating the medical cannabis, topical products are generally non-psychoactive.

The push towards regulating both medical and recreational cannabis markets has sparked demand from raw cannabis to extracted cannabis concentrates.

Current data suggests that if trends continue in their current direction, cannabis concentrates are destined to become the dominant figure in the market. In fact, over the past year, concentrate sales rose more than 50%. Conversely, flower sales declined in most markets. (Source: Arcview Market Research Executive Summary – "The State of the Legal Marijuana Markets, 6th Edition").

- 47 -

The chart below shows category share by quarter in Colorado, United States – one of the first U.S. states to legalize recreational use of cannabis and cannabis related products.



*Emerging Trend (Demand for CBD)*

Increased demand for cannabis extracts has grown alongside higher demand for the compound CBD. CBD is a non-psychoactive ingredient in cannabis that has shown great potential for medical treatment of a variety of health conditions, including epilepsy. Due to the fact that CBD is non-psychoactive, CBD extracts attract a large market of patients who are averse to using medical marijuana because of its psychoactive properties, but want to take advantage of its therapeutic properties.

As research continues to provide insights into the medical efficacy of CBD, the popularity of CBD extracts continues to grow. Concentrated CBD extractions allow patients to consume a medically adequate dose of CBD, with less unwanted side effects. This will significantly aid in the objective of improving medical research and utility for patients who require the use of CBD to treat various health issues.

See chart below for US market projections for CBD (hemp-derived, marijuana-derived, and pharmaceutical).

- 48 -



Source: https://newfrontierdata.com

### *Uncertainties*

There are significant risks associated with the business of the Resulting Issuer as described above and in Section 17 – *Risk Factors*. Readers are strongly encouraged to carefully read all of the risk factors contained in that section.

### 4. NARRATIVE DESCRIPTION OF THE BUSINESS

### 4.1    Business of the Resulting Issuer

**General**

Up until the summer of 2017, Ignite Canada was primarily engaged in the acquisition, exploration and development of mineral properties located in Canada. On August 28, 2017, Ignite Canada announced its intention to change its business focus from being a mineral resource exploration company to an investment company. On January 18, 2019, the change of business was completed and Ignite Canada began operating as an investment company. On March 1, 2019, the Company announced that it had entered into a letter agreement with Ignite US to complete the Business Combination and intends to change its business focus from being an investment company to being a vertically-integrated company operating in the cannabis industry. Subsequently, on April 9, 2019, the Company entered into the Business Combination Agreement pursuant to which it will acquire all Ignite US Shares not already held by the Company. Upon Closing, the businesses of Ignite Canada and Ignite US will become the business of the Resulting Issuer.

For details of Ignite Canada's business prior to Closing, see Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations* and Section 3.1 – *General Development of the Business – Recent Developments of Ignite Canada*.

- 49 -

For details of Ignite US's business prior to Closing, see Section 3.1 – *General Development of the Business – Recent Developments of Ignite US*.

On Closing, the Resulting Issuer intends to expand the current business of Ignite US across additional legal jurisdictions in the United States and into international jurisdictions across multiple product applications.  The Resulting Issuer intends to effect this expansion through brand leverage, product development, targeted marketing and strategic partnerships as further set out below.

**Business Objectives**

The Resulting Issuer intends to pursue the following business objectives during the twelve month period following the Closing:

- leverage Dan Bilzerian's global reach and influence to build the IGNITE brand across multiple product lines;

- maintain an "asset light" approach focusing on brand development, product innovation, and in-market execution;

- continue to develop the United States market concurrently with CBD, THC and, at a later stage, nicotine products within traditional and dispensary sales channels in accordance with regulatory conditions;

- initiate and scale international (non-North American) operations including branded Ignite sales of legal CBD products and, within regulatory parameters, THC and nicotine products; and

- utilize global strategic partnerships to scale brand development, drive tailored product innovation initiatives, and build value-added, jurisdiction specific marketing and distribution infrastructure.

**Significant Events or Milestones**

The Resulting Issuer intends to achieve the above business objectives by pursuing the following significant events or milestones during the next twelve month period.

*Brand Development*

The Resulting Issuer intends to leverage one of the most recognized lifestyle brands on social media (Dan Bilzerian & Ignite) to accelerate the IGNITE brand as a leading consumer products company, including CBD and THC cannabis product lines, targeting young adult consumers. The Resulting Issuer intends to market its products and brand through Dan Bilzerian's and Ignite's established social media platform of over 43 million followers through content marketing as well as traditional marketing media in compliance with jurisdiction specific regulatory conditions.  The Resulting Issuer anticipates launching its marketing campaign, including utilization of Dan Bilzerian's and Ignite's social media platform as well as traditional marketing media within two months of Closing at an estimated cost of $3,900,000.

- 50 -

*Product Development*

The Resulting Issuer intends to offer consumers with a full range of products, including a rechargeable vape pen offering CBD, THC and nicotine pods in a single use system. The vape pen is currently distributed in convenience stores, independent vape shops and available for purchase through its e-commerce site.

Currently, the Resulting Issuer's products are in approximately 200 dispensaries in California and approximately 15 dispensaries in Nevada. In the next twelve months, the Resulting Issuer intends to expand its product offering into legalized jurisdictions including Arizona, Florida, Oregon, Colorado, Michigan, Maryland, New Jersey, Massachusetts, Pennsylvania, Illinois, and Ohio. In addition, the Resulting Issuer is exploring options to launch its products in other lucrative markets such as Canada and the United Kingdom. It expects to have its products in both markets within the next 12 months.

The Resulting Issuer anticipates spending an estimated $3,100,000 on product development and retail expansion in the next twelve months to drive its consumer products operation.

*Sales and Marketing*

The Resulting Issuer intends to increase marketing expenditures on a variety of platforms to drive growth and increase brand awareness on a national and international scale. The Resulting Issuer intends to emphasize a combination of traditional and social media advertising, website development, retaining additional influencers and brand ambassadors to drive online brand awareness, and grow its trained field sales and marketing team to drive Ignite customer and products at dispensaries. The Resulting Issuer anticipates spending approximately $8,900,000 on sales and marketing efforts in the next twelve months. The projected spend can be summarized as follows:

Advertising including media, agency and production:      $2,200,000

Marketing initiatives:                                  $5,100,000

Staffing:                                               $1,600,000

*Strategic Partnerships*

The Resulting Issuer  intends to utilize strategic partnerships which focus on fulfillment, distribution, e-commerce and retail. The Resulting Issuer will focus its efforts on product design and brand development and will utilize industry experts in manufacturing and fulfillment to bring its products to market. In addition, distribution partners and relationships will continue to be emphasized as the Resulting Issuer expands distribution of its products in international markets. Collectively, the Resulting Issuer anticipates incurring approximately $921,000 within twelve months on strategic partnerships to drive growth.

*International Operations*

The Resulting Issuer anticipates launching CBD products in the United Kingdom in the second quarter of 2019 for anticipated costs of $3,350,000.

**Total Funds Available**

At the most recent month end prior to the filing of this Listing Statement, Ignite Canada had $5,171,000 in estimated working capital available. The combined working capital plus net proceeds

- 51 -

of $25,800,000 from the Financing result in additional funds in the sum of approximately $30,971,000.

The Resulting Issuer intends to allocate available funds on a consolidated basis, as follows:

| Description | Amount |
|---|---|
| Brand Development | $3,900,000 |
| Product Development | $3,100,000 |
| Sales and Marketing | $8,900,000 |
| Strategic Partnerships | $921,000 |
| International Operations | $3,350,000 |
| General and Administrative Expenses[1] | $8,100,000 |
| General working capital | $2,700,000 |
| **Total:** | **$30,971,000** |

Note:
(1)    Consists of $2,700,000 with respect to headcount, $2,600,000 with respect to professional fees and $2,800,000 with respect to administrative overhead.

Notwithstanding the foregoing, there may be circumstances where, for sound business reasons, a reallocation of funds may be necessary for the Resulting Issuer to achieve its objectives. The Resulting Issuer may require additional funds in order to fulfill all of its expenditure requirements to meet its business objectives and may either issue additional securities or incur debt. There can be no assurance that if any additional funding is required by the Resulting Issuer, it will be able, if required, to obtain such funding on a timely basis or at all. However, it is anticipated that the available funds will be sufficient to satisfy the Resulting Issuer's objectives over the next 12 months.

### Assets

Following Closing of the Business Combination, the Resulting Issuer will have the following intangible assets:

- *Intellectual Property:* Pursuant to the New License Agreements, the Resulting Issuer plans to commercialize the License within the cannabis industry in Canada and internationally.

- *Celebrity Brand and Trademark:* Dan Bilzerian and the Ignite trademark are known worldwide and their social media reach is substantial at over 43 million followers with weekly impressions exceeding 150 million. Many of his followers are males between the ages of 18-40 years old which aligns with the target market for the IGNITE branded products currently provided to the target market.

- *Licensing:* The Resulting Issuer will use its exclusive rights and brands to white label products in the cannabis sector, including: flower and pre-rolls, oils and concentrates, capsules and sprays, edibles and topicals, clothing and merchandising. Celebrity-branded marijuana strains are already commanding a premium in recreational markets by capitalizing on name recognition and sophisticated branding. As the marketplace becomes saturated with numerous products with varying potency and quality, the Resulting Issuer anticipates its branded products will benefit from the differentiation and credibility associated with the brand's ambassadors and trademark; namely Dan Bilzerian and Ignite.

- 52 -

- *Brands:*  The Resulting Issuer plans to continue the licensing of the "IGNITE" brand in the United States, specifically focused on states that have passed legalized recreational Cannabis sales and production, which at this time include Washington, Colorado, Oregon, Alaska, California, Maine, Massachusetts, Nevada, Michigan, Vermont  and the District of Columbia. Celebrity-branded  marijuana strains are already commanding a premium in recreational markets by capitalizing on name recognition and sophisticated branding. The trend toward relevant celebrity-branded cannabis is growing and could become a much bigger part of the recreational market in the future. As the marketplace becomes saturated with numerous products with varying potency and quality, the Resulting Issuer anticipates its branded products will benefit from the differentiation and credibility associated with the brand's ambassadors.

- *Strategic Partners:* The Resulting Issuer has established or is in the process of formalizing commercial relationships with select sales and distribution partners with which it intends to work to  exploit the expanding market by licensing additional value-chain participants the rights to develop regulatory approved product offerings such as branded strains of cannabis, tinctures, combustibles including vaporizers, infused and edible cannabis consumables, as well as ancillary hard goods and accessories.

### Employees

As of December 31, 2018, Ignite Canada had 6 employees and Ignite US had 35 employees.

### Competitive Conditions and Position

United States

U.S.    legal cannabis industry is expected to reach $75 billion in sales by 2030, according to the Financial   Post   (Source:   http://business.financialpost.com/cannabis/cannabis-sales-look-set-to-surpass-pop-by-2030 - April 4, 2018). Thirty three states and the District of Columbia currently have laws broadly legalizing marijuana in some form or another, ten of which (Alaska, California, Colorado, Maine, Massachusetts, Michigan, Nevada, Oregon, Vermont and Washington) and the District of Columbia, have adopted expansive laws legalizing marijuana for recreational use. Most recently, the legal recreational use of marijuana in Michigan kicked off on December 2018 (however, regulations governing recreational-use sales will not come into effect until later in 2019). Many States allow for limited use of medical marijuana under certain circumstances. Medical marijuana laws are often broader than others, regarding types of medical conditions that allow for treatment varying from state to state.

Canada

In 2017, the Canadian Government introduced the Cannabis Act and an amendment to the Criminal Code, to legalize and regulate the use of cannabis for recreational purposes. The Cannabis Act came into force on October 17, 2018. The Cannabis Act provides a licensing and permitting scheme for the production, importation, exportation, testing, packaging, labelling, sending, delivery, transportation, sale, possession and disposal of cannabis for nonmedicinal use (i.e., adult use), to be implemented by regulations made under the Cannabis Act. The Cannabis Act maintains separate access to cannabis for medical purposes, including providing that import and export licenses and permits will only be issued in respect of cannabis for medical or scientific purposes or in respect of industrial hemp. See

- 53 -

Section *3.3 - Trends, Commitments, Events or Uncertainties – Canada – Cannabis Act and Regulations* above.

International

The International legal cannabis market is expanding also with Uruguay, Germany and Israel leading the way, and many countries in Europe and Central and South America are not far behind. Ignite Canada believes that the worldwide following of Dan Bilzerian will expose the Resulting Issuer to a number of international opportunities to expand the business in other countries as they relax their views on cannabis.

Market Segmentation and Targeting

The legal market is split into two segments: medical and recreational consumers. Ignite Canada believes that recreational adult-use holds the greatest growth opportunity for its investment strategy. According to Statistics Canada, the majority of cannabis users are male, and the highest percentage of users are in the 18-44 age bracket (Source: http://www.statcan.gc.ca/pub/82-003-x/2018002/article/54908/tbl/tbl01-eng.htm and 2015 Canadian Tobacco, Alcohol, and Drugs Survey). This aligns well with the Resulting Issuer's investment in Ignite US, as Dan Bilzerian has over ten million male followers under the age of 45.

Competitive Conditions

There are numerous other celebrity brands to compete with in the cannabis space, notably:

Musicians

- Willie Nelson: Willie's Reserve
- Snoop Dogg: Leafs by Snoop
- Ghostface Killah: Wu Goo
- Bob Marley: Marley Natural
- The Game: Trees by Game
- Wiz Khalifa's Khalifa Kush
- Die Antwoord: Zef Zol
- Julian Marley: Juju Royal

Celebrities

- Trailer Park Boys
- Whoopi Goldberg: Whoopi & Maya
- Tommy Chong: Chong's Choice
- Montel Williams: LenitivLabs

A-53

- 54 -

**Bankruptcy and Receivership**

Neither Ignite Canada, Ignite Canada's subsidiaries, nor Ignite US has been the subject of any bankruptcy or any receivership or similar proceedings against it or any voluntary bankruptcy, receivership or similar proceedings within the three most recently completed financial years or the current financial year.

**Material Restructuring**

Neither Ignite Canada, Ignite Canada's subsidiaries nor Ignite US has been subject to any material restructuring transaction within the three most recently completed financial years other than with respect to the disposition by Ignite Canada of its mineral projects. See Section 3.1 – *General Development of the Business – Ignite Canada's Prior Mineral Exploration Business*. Neither Ignite Canada, Ignite Canada's subsidiaries nor Ignite US has been subject to a material restructuring transaction during the current financial year. Except in connection with the Business Combination, no material restructuring transactions have been proposed in respect of Resulting Issuer or its subsidiaries for the current financial year.

**4.2     Asset Backed Securities**

The Resulting Issuer will not have any asset backed securities.

**4.3     Companies with Mineral Projects**

The Resulting Issuer will not have any mineral projects. See Section 3.1 - *General Development of the Business – Ignite Canada's Prior Mineral Exploration Business*.

**4.4     Companies with Oil and Gas Operations**

The Resulting Issuer will not have any oil and gas operations.

**5. SELECTED CONSOLIDATED FINANCIAL INFORMATION**

**5.1     Consolidated Financial Information – Annual Information**

*Ignite Canada*

The following selected financial information of Ignite Canada is subject to the detailed information contained in the financial statements of Ignite Canada and related notes thereto appearing elsewhere in this Listing Statement. The selected financial information is derived from the audited financial statements of Ignite Canada for the ten months ended December 31, 2018 and for the years ended February 28, 2018 and February 28 2017, copies of which are attached hereto as Schedule A. This information should only be read in conjunction with the audited financial statements, and accompanying notes, included elsewhere in this Listing Statement, or on Ignite Canada's SEDAR profile at www.sedar.com.

- 55 -

| | Ten Months Ended December 31, 2018 (audited) | Year Ended February 28 (audited) | |
| --- | --- | --- | --- |
| | | 2018 | 2017 |
| | | CDN$ | CDN$ |
| Operating Data: | | | |
| Total Revenue | Nil | Nil | Nil |
| Total Expenses | 3,605,367 | 668,003 | 208,031 |
| Income (Loss) from Continuing Operations | (3,605,367) | (668,003) | (208,031) |
| Income (Loss) per Share from Continuing Operations – Basic and Fully Diluted | (0.38) | (0.23) | 0.037 |
| Net Income (Loss) | (3,231,502) | (542,156) | 225,970 |
| Income (Loss) per Share – Basic and Fully Diluted | (0.34) | (0.19) | 0.041 |
| Dividends | Nil | Nil | Nil |
| | | | |
| Balance Sheet Data: | | | |
| Total Current Assets | 7,678,119 | 15,724,507 | 446,450 |
| Total Assets | 16,221,216 | 19,006,987 | 449,553 |
| Total Current Liabilities | 397,164 | 3,743,310 | 310,561 |
| Total Long-Term Financial Liabilities | 0 | 0 | 0 |
| Shareholders' Equity (deficit) | 15,824,052 | 15,263,677 | 138,992 |

***Ignite US***

The following selected financial information of Ignite US is subject to the detailed information contained in the financial statements of Ignite US and related notes thereto appearing elsewhere in this Listing Statement. The selected financial information is derived from the audited financial

- 56 -

statements of Ignite US for the year ended December 31, 2018, copies of which are attached hereto as Schedule C.

| | Year Ended December 31 (audited) | Period from Inception (December 28, 2017) to December 31 (audited) |
|---|---|---|
| | 2018 | 2017 |
| | US$ | US$ |
| Operating Data: | | |
| Total Revenue | 1,890,013 | Nil |
| Total Expenses | 13,188,444 | Nil |
| Income (Loss) from Continuing Operations | (12,643,128) | Nil |
| Income (Loss) per Share from Continuing Operations – Basic and Fully Diluted | (0.14) | Nil |
| Net Income (Loss) | (12,566,986) | Nil |
| Income (Loss) per Share – Basic and Fully Diluted | (0.14) | Nil |
| Dividends | Nil | Nil |
| | | |
| Balance Sheet Data: | | |
| Total Current Assets | 11,001,697 | Nil |
| Total Assets | 16,514,078 | Nil |
| Total Current Liabilities | 3,052,066 | Nil |
| Total Long-Term Financial Liabilities | 3,881,000 | Nil |
| Shareholders' Equity (deficit) | 9,581,012 | Nil |

**Resulting Issuer**

A copy of the pro-forma consolidated financial statements of Resulting Issuer for the year ended on December 31, 2018 is attached as Schedule E to this Listing Statement.

- 57 -

### 5.2    Consolidated Financial Information – Quarterly Information

*Ignite Canada*

The results for each of the eight most recently completed quarters ending at the end of the most recently completed fiscal year of Ignite Canada, December 31, 2018, are summarized below:

| Quarter Ending | Revenue | Income (Loss) | Income (Loss) per Share |
|---|---|---|---|
| Dec 31, 2018[1] | Nil | (1,058,480) | (0.05) |
| Aug 31, 2018 | Nil | (959,097) | (0.10) |
| May 31, 2018 | Nil | (1,213,925) | (0.13) |
| Feb 28, 2018 | Nil | (374,285) | (0.13) |
| Nov 30, 2017 | Nil | 37,842 | 0.01 |
| Aug 31, 2017 | Nil | (83,323) | (0.03) |
| May 31, 2017 | Nil | (122,390) | (0.04) |
| Feb 28, 2017 | Nil | (5,898) | (0.00) |

Note:
(1)    Four month period ended December 31, 2018.

### 5.3    Dividends

The Resulting Issuer will not have a dividend policy and has no current plans to pay dividends to its shareholders.

### 5.4    Foreign GAAP

This item does not apply to Ignite Canada, Ignite US or the Resulting Issuer.

### 6. MANAGEMENT'S DISCUSSION AND ANALYSIS

*Ignite Canada*

Ignite Canada's MD&As for the ten months ended December 31, 2018 and for the years ended February 28, 2018 and February 28, 2017 are attached to this Listing Statement as Schedule B. Ignite Canada's MD&A should be read in conjunction with the audited financial statements of Ignite Canada for the ten months ended December 31, 2018 and the fiscal years ended February 28, 2018 and February 28, 2017 (and the notes thereto), which are included in this Listing Statement in Schedule A.

*Ignite US*

Ignite US' MD&A for the year ended December 31, 2018 is attached to this Listing Statement as Schedule D . Ignite US' MD&A should be read in conjunction with the audited financial statements of Ignite US for the year ended December 31, 2018 (and the notes thereto), which are included in this Listing Statement as Schedule C.

- 58 -

**7. MARKET FOR SECURITIES**

The Ignite Canada Shares are currently listed on the CSE under the symbol "BILZ", however, trading has been halted in contemplation of the Business Combination since March 1, 2019. Prior to listing on the CSE, the Ignite Canada Shares were listed and posted for trading on the TSX Venture Exchange under the symbol "ALQ".

Upon completion of the Business Combination, and subject to CSE Approval, it is expected that the Subordinate Voting Shares will be listed for trading on the CSE under the symbol "BILZ".

**8. CONSOLIDATED CAPITALIZATION**

As of the date hereof, the outstanding capital of Ignite Canada consists of:

      a)      20,717,091 Ignite Canada Shares;

      b)      122,569 Ignite Canada Warrants; and

      c)      1,610,000 Ignite Canada Options.

Following Closing, the outstanding capital of the Resulting Issuer is expected to consist of the following:

      a)      756,257 Proportionate Voting Shares;

      b)      105,598,091 Subordinate Voting Shares;

      c)      122,569 Resulting Issuer Warrants; and

      d)      1,610,000 Resulting Issuer Options.

**9. OPTIONS TO PURCHASE SECURITIES**

Ignite Canada currently has in place a 10% rolling stock option plan (the "**Ignite Canada Option Plan**"). The Ignite Canada Option Plan was previously approved by Ignite Canada Shareholders at an annual general and special meeting on September 14, 2017. Under the Ignite Canada Option Plan, the Board may, from time to time, grant stock options to purchase Ignite Canada Shares to certain directors, officers, employees and consultants of Ignite Canada and of its subsidiaries and Affiliates. The material terms of the Ignite Canada Option Plan are as follows:

- The aggregate maximum number of underlying Ignite Canada Shares reserved for issuance upon the exercise of any Ignite Canada Options which may be granted under the Ignite Canada Option Plan at any one time is 10% of the number of Ignite Canada Shares outstanding at the time of grant.

- The term of any Ignite Canada Options granted under the Ignite Canada Option Plan will be fixed by the Board at the time such options are granted, provided that the term will not be permitted to exceed a term of ten years.

- The exercise price of any Ignite Canada Options granted under the Ignite Canada Option Plan will be determined by the Board in its sole discretion, but shall not be less than the closing price of Ignite Canada Shares on the day preceding the day on which the directors grant such options.

- Vesting restrictions may be imposed on the Ignite Canada Options, at the discretion of the Board, at the time of grant.

- All Ignite Canada Options will be non-assignable and non-transferable.

- Optionholders may be entitled to exercise their Ignite Canada Options for a fixed period of time after they cease to be a director, employee, consultant or management company employee of Ignite Canada (typically being 90 days, depending on the circumstances).

- Disinterested shareholder approval must be obtained for (i) any reduction in the exercise price of an outstanding Ignite Canada Option if the optionholder is an insider; (ii) any grant of Ignite Canada Options to insiders, within a 12 month period, if such grant would exceed 10% of the then outstanding Ignite Canada Shares; and (iii) any grant of Ignite Canada Options to any one individual, within a 12 month period, if such grant would exceed 5% of the then outstanding Ignite Canada Shares.

- Ignite Canada Options will be subject to an equitable adjustment in the event of any consolidation, subdivision, conversion or exchange of Ignite Canada Shares, with such adjustment being at the sole discretion of the Board.

The Resulting Issuer is not considering making any changes to the Ignite Canada Option Plan other than, immediately after Closing, the Resulting Issuer intends to amend the Ignite Canada Option Plan to reflect the re-designation of Ignite Canada Shares to Subordinate Voting Shares.

The above is a summary of the principal terms of the Ignite Canada Option Plan, which summary is qualified by and is subject to the full terms and conditions of the Ignite Canada Option Plan.

As at the date of this Listing Statement, Ignite Canada has 20,717,091 Ignite Canada Shares issued and outstanding. As a result, 2,071,709 Ignite Canada Shares are currently available for issuance pursuant to Ignite Canada Options granted under the Ignite Canada Option Plan. Currently, there are 1,610,000 Ignite Canada Options outstanding under the Ignite Canada Option Plan as summarized in the below table, leaving 461,709 Ignite Canada Shares available for grant of further Ignite Canada Options.

On Closing, it is expected that there will be an aggregate of 105,598,091 Subordinate Voting Shares issued and outstanding, resulting in 10,559,809 Subordinate Voting Shares being available for issuance pursuant to the Resulting Issuer Option Plan. On Closing, it is expected that 1,610,000 Resulting Issuer Options will be outstanding under the Resulting Issuer Option Plan and 8,949,809 Resulting Issuer Options will remain available for grant.

The following table summarizes the Ignite Canada Options outstanding as at the date of this Listing Statement.

- 60 -

| Category | Number of Ignite Canada Option holders | Number of Ignite Canada Options | Grant Date | Expiry Date | Exercise Price Per Ignite Canada Share CDN$ | Market Value of the Ignite Canada Share on the Grant Date CDN$ | Market Value of the Ignite Canada Shares as at the date of this Listing Statement |
|---|---|---|---|---|---|---|---|
| Executive officers and past executive officers | 2 | 900,000[1] | February 2, 2019 | February 2, 2024 | $3.50 | $2.78 | $1.72 |
| | 1 | 60,000 | April 30, 2018 | April 30, 2023 | $5.00 | $1.08 | $1.72 |
| Directors and past directors who are not also executive officers | 1 | 50,000[1] | February 2, 2019 | February 2, 2024 | $3.50 | $2.78 | $1.72 |
| | 1 | 40,000 | April 30, 2018 | April 30, 2023 | $5.00 | $1.08 | $1.72 |
| Other employees and past employees | 3 | 460,000[1] | February 2, 2019 | February 2, 2024 | $3.50 | $2.78 | $1.72 |
| Consultants | 2 | 100,000 | April 30, 2018 | April 30, 2023 | $5.00 | $1.08 | $1.72 |

Note:
(1)   These Ignite CAN Options will vest over three years with 1/3 vesting on each of the first, second and third anniversaries of the date of issue.

## 10. DESCRIPTION OF THE SECURITIES

### 10.1    Description of the Securities

***Resulting Issuer Shares***

Subordinate Voting Shares (formerly common shares of Ignite Canada)

Right to Notice and Vote    Holders of Subordinate Voting Shares will be entitled to notice of and to attend at any meeting of the shareholders of the Resulting Issuer, except a meeting of which only holders of another particular class or series of shares of the Resulting Issuer will have the right to vote. At each such meeting, holders of Subordinate Voting Shares will be entitled to one vote in respect of each Subordinate Voting Share held.

Class Rights    As long as any Subordinate Voting Shares remain outstanding, the Resulting Issuer will not, without the consent of the holders of the Subordinate Voting Shares by separate special resolution, prejudice or interfere with any right attached to the Subordinate Voting Shares. Holders of Subordinate Voting Shares will not be entitled to a right of first refusal to subscribe for, purchase or receive any part of any issue of Subordinate Voting Shares, or bonds, debentures or other securities of the Resulting Issuer.

Dividends    Holders of Subordinate Voting Shares will be entitled to receive as and when declared by the directors of the Resulting Issuer, dividends in cash or property of the Resulting Issuer.

- 61 -

| | |
|---|---|
| Participation | In the event of the liquidation, dissolution or winding-up of the Resulting Issuer, whether voluntary or involuntary, or in the event of any other distribution of assets of the Resulting Issuer among its shareholders for the purpose of winding up its affairs, the holders of Subordinate Voting Shares will, subject to the prior rights of the holders of any shares of the Resulting Issuer ranking in priority to the Subordinate Voting Shares, be entitled to participate ratably along with all other holders of Subordinate Voting Shares and Proportionate Voting Shares (on an as-converted to Subordinate Voting Share basis). |
| Coattail Rights | The provisions provide in effect that in the event that an offer is made to purchase Proportionate Voting Shares, and the offer is one (assuming the holder is a resident of Ontario regardless of its actual residency) which is required, pursuant to applicable securities legislation and regulations or the rules of a stock exchange, if any, on which the Proportionate Voting Shares are then listed, to be made to all or substantially all the holders of Proportionate Voting Shares in a province or territory of Canada to which the requirement applies (without taking into consideration any statutory or regulatory exemption from such obligation), each Subordinate Voting Share shall become convertible at the option of the holder into Proportionate Voting Shares at the inverse of the Conversion Ratio (as defined in the special rights and restrictions for Proportionate Voting Shares) then in effect, at any time while the offer is in effect until one day after the time prescribed by applicable securities legislation (or otherwise provided by the offeror) for the offeror to take up and pay for such shares as are to be acquired pursuant to the offer. The conversion right may only be exercised in respect of Subordinate Voting Shares for the purpose of depositing the resulting Proportionate Voting Shares under the offer, and for no other reason. |

Proportionate Voting Shares

| | |
|---|---|
| Right to Notice and Vote | Holders of Proportionate Voting Shares will be entitled to notice of and to attend at any meeting of the shareholders of the Resulting Issuer, except a meeting of which only holders of another particular class or series of shares of the Resulting Issuer will have the right to vote. At each such meeting, holders of Proportionate Voting Shares will be entitled to one vote in respect of each Subordinate Voting Share into which such Proportionate Voting Share could then be converted (currently 200 votes per Proportionate Voting Share). |
| Class Rights | As long as any Proportionate Voting Shares remain outstanding, the Resulting Issuer will not, without the consent of the holders of the Proportionate Voting Shares by separate special resolution, prejudice or interfere with any right attached to the Proportionate Voting Shares. Holders of Proportionate Voting Shares will not be entitled to a right of first refusal to subscribe for, purchase or receive any part of any issue of Proportionate Voting Shares, or bonds, debentures or other securities of the Resulting Issuer. |
| Dividends | Holders of Proportionate Voting Shares will be entitled to receive as and when |

- 62 -

declared by the directors of the Resulting Issuer, dividends in cash or property of the Resulting Issuer. If a dividend is declared for the Subordinate Voting Shares, holders of the Proportionate Voting Shares shall be entitled to receive the same dividend with respect to each Subordinate Voting Share into which such Proportionate Voting Share could then be converted.

Participation    In the event of the liquidation, dissolution or winding-up of the Resulting Issuer, whether voluntary or involuntary, or in the event of any other distribution of assets of the Resulting Issuer among its shareholders for the purpose of winding up its affairs, the holders of Proportionate Voting Shares will, subject to the prior rights of the holders of any shares of the Resulting Issuer ranking in priority to the Proportionate Voting Shares, be entitled to participate ratably along with all other holders of Proportionate Voting Shares (on an as-converted to Subordinate Voting Share basis) and Subordinate Voting Shares.

Conversion    The Proportionate Voting Shares each have a restricted right to convert into 200 Subordinate Voting Shares (the "**Conversion Ratio**"), subject to adjustments for certain customary corporate changes. The ability to convert the Proportionate Voting Shares is subject to a restriction that the aggregate number of Subordinate Voting Shares and Proportionate Voting Shares held of record, directly or indirectly, by residents of the United States (as determined in accordance with Rules 3b-4 under the U.S. Exchange Act, may not exceed forty percent (40%) of the aggregate number of Subordinate Voting Shares and Proportionate Voting Shares issued and outstanding after giving effect to such conversions and to a restriction on beneficial ownership of Subordinate Voting Shares exceeding certain levels. In addition, the Proportionate Voting Shares will be automatically converted into Subordinate Voting Shares in certain circumstances, including upon the registration of the Subordinate Voting Shares issuable upon conversion of all the Proportionate Voting Shares for resale under the U.S. Securities Act.

General

Except as noted above, the Resulting Issuer Shares are not subject to any pre-emptive rights, conversion or exchange rights, or provisions providing for redemption, retraction, purchase for cancellation or surrender. There are no sinking or purchase fund provisions, no provisions permitting or restricting the issuance of additional securities or any other material restrictions, and there are no provisions which are capable of requiring a security holder to contribute additional capital.

***Resulting Issuer Options***

See Section 9 – *Options To Purchase Securities*.

***Resulting Issuer Warrants***

As of the date hereof, the Resulting Issuer has a total of 122,569 share purchase warrants outstanding as follows:

- 63 -

| Date of Issuance | Number of Warrants | Expiry Date | Exercise Price | Description |
|---|---|---|---|---|
| September 28, 2017 | 54,236 | September 28, 2019 | $2.15 | Finder's warrants |
| October 31, 2017 | 38,226 | October 31, 2019 | $2.15 | Finder's warrants |
| November 24, 2017 | 30,107 | November 24, 2019 | $2.15 | Finder's warrants |
| **Total:** | 122,569 | | | |

**10.2     - 10.6 <u>Miscellaneous Securities Provisions</u>**

None of the matters set out in Sections 10.2 to 10.6 of CSE Form 2A are applicable to the share structure of the Resulting Issuer.

**10.7     <u>Prior Sales</u>**

Ignite Canada Shares were listed on the CSE under the ticker symbol "BILZ". The following tables set forth the issuances of Ignite Canada Shares within the last twelve (12) months before the date of this Listing Statement.

| Date Issued | Number of Ignite Canada Shares | Issue Price per Ignite Canada Share | Aggregate Issue Price | Nature of Consideration |
|---|---|---|---|---|
| November 23, 2018 | 10,140,178 | $1.70[1] | $17,238,303[1] | Ignite US Shares |

Note:
(1)     Issued pursuant to the First Share Exchange Transaction with a deemed price of $1.70 per Ignite Canada Share.

In the last twelve (12) months before the date of the Listing Statement, Ignite US has issued the following securities of Ignite US.

| Date Issued | Number of Ignite US Shares | Issue Price per Ignite US Shares | Aggregate Issue Price | Nature of Consideration |
|---|---|---|---|---|
| May 2018 | 13,500,000 | US$2.222 | US$30,000,000 | Cash |
| June 2018 | 400,000 | US$2.50 | US$1,000,000 | Cash |
| October 2018 | 116,000 | US$3.00 | US$348,000 | Cash |

- 64 -

### 10.8 Stock Exchange Price

The following table sets out the price ranges and volume traded or quoted on the CSE for the Ignite Canada Shares on a monthly basis for each month of the current quarter and the immediately preceding quarter and on a quarterly basis for the next preceding seven quarters.

| Period | High ($) | Low ($) | Volume |
|---|---|---|---|
| March 2019[1] | Trading Halted | | |
| February 2019 | $2.95 | $1.26 | 1,874,848 |
| January 2019 | $4.04 | $1.95 | 3,289,093 |
| Quarter ended December 31, 2018 | Trading Halted | | |
| Quarter ended September 30, 2018 | Trading Halted | | |
| Quarter ended June 30, 2018 | Trading Halted | | |
| Quarter ended March 31, 2018 | Trading Halted | | |
| Quarter ended December 31, 2017 | Trading Halted | | |
| Quarter ended September, 30 2017[2] | $2.15 | $0.35 | 43,865 |
| Quarter ended June 30, 2017 | $0.05 | $0.055 | 37,000 |

Note:
(1)   The Ignite Canada Shares were halted on March 1, 2019 on the announcement of the proposed Business Combination.
(2)   The Ignite Canada Shares were halted on August 28, 2017 on the announcement of the change of business of Ignite Canada to an investment company.

### 11. ESCROWED SECURITIES

The Resulting Issuer is an "exempt issuer" within the meaning of Part 3.2(b) of NP 46-201 and the CSE has confirmed that the Resulting Issuer will not be subject to the CSE's escrow requirements.

To the knowledge of the Company, the table below includes the details of Ignite Canada Shares held in escrow as of the date hereof:

| Designation of class held in escrow | Number of securities held in escrow[1] | Percentage of class |
|---|---|---|
| Ignite Canada Shares | | |
| 1.  Brandon Boddy | 100,000 | 0.48% |
| 2.  Morgan Good | 111,600 | 0.54% |
| Ignite Canada Options | | |
| 1.  Brandon Boddy | 40,000 | 2.48% |
| 2.  Morgan Good | 60,000 | 3.73% |
| 3.  Ming Jang | 20,000 | 1.24% |

Notes:
(1) 10% of these securities were released on January 21, 2019 and 15% of the remaining securities will be released every six months thereafter, subject to the rules of the CSE.

- 65 -

## 12. PRINCIPAL SHAREHOLDERS

**12.1      - 12.2 Principal Shareholders**

To the knowledge of the directors and officers of Ignite Canada, as of the date of this Listing Statement and on Closing of the Business Combination, no Person beneficially owns, directly or indirectly, or exercise control or direction over voting securities carrying more than 10% of the voting rights attached to the voting securities of the Resulting Issuer other than disclosed herein.

As of the date of this Listing Statement:

- Veritas owns, both of record and beneficially, 3,042,053 Ignite Canada Shares representing approximately 14.7% of the non-diluted issued and outstanding Ignite Canada Shares and approximately 13.6% of the fully-diluted issued and outstanding Ignite Canada Shares.

- Vulcan SKN owns, both of record and beneficially, 7,098,125 Ignite Canada Shares representing approximately 34.3% of the non-diluted issued and outstanding Ignite Canada Shares and approximately 31.6% of the fully-diluted issued and outstanding Ignite Canada Shares.

On Closing:

- Dan Bilzerian will own, both of record and beneficially, 748,625 Proportionate Voting Shares representing approximately 99.0% of the non-diluted issued and outstanding Proportionate Voting Shares and approximately 99.0% of the fully-diluted issued and outstanding Proportionate Voting Shares.

- Veritas will own, both of record and beneficially, 8,448,053 Subordinate Voting Shares representing approximately 8.0% of the non-diluted issued and outstanding Subordinate Voting Shares and approximately 3.3% of the fully-diluted issued and outstanding Subordinate Voting Shares.

- Vulcan SKN will own, both of record and beneficially, 32,538,125 Subordinate Voting Shares representing approximately 30.8% of the non-diluted issued and outstanding Subordinate Voting Shares and approximately 12.6% of the fully-diluted issued and outstanding Subordinate Voting Shares.

The same individual exercises control over the shares of Veritas and Vulcan SKN.

**12.3      Voting Trusts**

To the knowledge of the Resulting Issuer, no voting trust exists within the Resulting Issuer such that more than 10% of any class of voting securities of the Resulting Issuer are held, or are to be held, subject to any voting trust or other similar agreement.

**12.4      Associates and Affiliates**

Vulcan SKN and Veritas are considered Affiliates because each of them is controlled by the same individual, Gregory Gilpin-Payne, a resident of St. Kitts and Nevis.

- 66 -

**13. DIRECTORS AND OFFICERS**

**13.1    - 13.5 Directors and Officers**

The Articles of the Resulting Issuer provide that the number of directors should not be fewer than three (3) directors. Each director will hold office until the close of the next annual general meeting of the Resulting Issuer, or until his or her successor is duly elected or appointed, unless his or her office is earlier vacated. The Board of the Resulting Issuer will consist of three (3) directors, of whom two (2) are independent (as defined in NI 52-110).

The following table lists the names, municipalities of residence of the proposed directors and officers of the Resulting Issuer, their positions and offices held with the Resulting Issuer, their principal occupations during the past five (5) years, and the number of securities of the Resulting Issuer that are beneficially owned, directly or indirectly, or over which control or direction will be exercised by each.

| Name, Province/State, Country of Residence and Position(s) Held with Ignite Canada | Principal Occupation for Past Five Years | Director of the Resulting Issuer Since | Number and Percentage of Resulting Issuer Shares Beneficially Owned or Controlled[3] |
|---|---|---|---|
| Dan Bilzerian[1][2] <br><br> Nevada, United States <br><br> *Chief Executive Officer and Director* | Chairman and Founder of the Ignite Group of Companies | January 9, 2019 | 748,625 Proportionate Voting Shares (convertible into 149,725,000 Subordinate Voting Shares (58.3%))[4][5] |
| Edoardo (Eddie) Mattei <br><br> Ontario, Canada <br><br> *Chief Financial Officer and Corporate Secretary* | Chartered Professional Accountant and Chartered Accountant, Chief Financial Officer of a private company named Mircom Technologies Ltd., and Vice President of Global Taxation at Royal Group Technologies Ltd. | N/A | Nil[6] |
| Luciano (Lu) Galasso[1][2] <br><br> Ontario, Canada <br><br> *Director* | Chartered Professional Accountant, Chairman and Director of Titanium Transportation Group Inc. (since 2015); and Partner of Zzen Group | January 8, 2019 | 1,080,000 Subordinate Voting Shares[7] (0.4%) |

- 67 -

| | | | |
|---|---|---|---|
| | of Companies (since 2005) | | |
| Scott Rohleder[(1)(2)]<br>Florida, United States<br><br>*Director* | Chief Operating Officer of a membership organization comprised of business owners, VP Operations of a national trucking company | February 22, 2019 | 159,000 Subordinate Voting Shares (<0.1%) |
| Jim McCormick<br>Texas, United States<br><br>*President* | Chief Financial Officer and Chief Operating Officer of KushCo Holdings Inc. (since 2017), and various executive management roles with British American Tobacco around the world | N/A | Nil |

Notes:
(1)    Members of the Audit Committee.
(2)    Members of the Compensation Committee.
(3)    Amounts assume the conversion of all Proportionate Voting Shares to Subordinate Voting Shares using the Conversion Ratio resulting in a total of 256,849,491 Subordinate Voting Shares issued and outstanding.
(4)    Dan Bilzerian will hold nil Subordinate Voting Shares and 748,625 Proportionate Voting Shares convertible into 149,725,000 Subordinate Voting Shares using the Conversion Ratio.
(5)    Does not include 500,000 Ignite Canada Options granted on February 2, 2019 exercisable at a price of $3.50 until expiry on February 2, 2024.
(6)    Does not include 400,000 Ignite Canada Options granted on February 2, 2019 exercisable at a price of $3.50 until expiry on February 2, 2024.
(7)    1,060,000 of these Subordinate Voting Shares will be held by 1260356 Ontario Limited. Luciano (Lu) Galasso holds 10% of the shares of 1260356 Ontario Limited. Luciano (Lu) Galasso will hold 20,000 Subordinate Voting Shares directly.

Upon Closing, the directors and executive officers of the Resulting Issuer will beneficially own, directly or indirectly, as a group 749,420 Proportionate Voting Shares representing approximately 99% of the issued and outstanding Proportionate Voting Shares on a non-diluted basis (based on 756,257 Proportionate Voting Shares issued and outstanding).

Additionally, upon Closing, the directors and executive officers of the Resulting Issuer will beneficially own, directly or indirectly, as a group 1,080,000 Subordinate Voting Shares representing approximately 1.0% of the issued and outstanding Subordinate Voting Shares on a non-diluted basis (based on 105,598,091 Subordinate Voting Shares issued and outstanding).

The Resulting Issuer's audit committee will be composed of Dan Bilzerian, Luciano (Lu) Galasso and Scott Rohleder, each of whom is a director of Ignite Canada and financially literate in accordance with NI 52-110. Luciano (Lu) Galasso and Scott Rohleder are independent, as defined under NI 52-110, and Dan Bilzerian is not independent as he will be an officer of the Reporting Issuer.  The Reporting Issuer relies on the exemption found in Section 6.1 of NI 52-110 in respect of a majority of independent audit committee.

- 68 -

The Reporting Issuer's compensation committee will be composed of Dan Bilzerian, Luciano (Lu) Galasso and Scott Rohleder.

The Board may from time to time establish additional committees.

**13.6    -13.9 Corporate Cease Trade Orders or Bankruptcies; Penalties or Sanctions; Personal Bankruptcies**

Other than as disclosed below, no proposed director, officer or shareholder holding a sufficient number of securities of the Resulting Issuer:

a)    is, at the date of this Listing Statement, or has been, within 10 years before the date of this Listing Statement, a director, CEO or CFO of any company, including any personal holding company of such director, CEO or CFO that:

(i)    while that Person was acting in that capacity, was the subject of a cease trade or similar order, or an order that denied the other relevant company access to any exemption under securities legislation, for a period of more than 30 consecutive days; or

(ii)    was the subject of a cease trade or similar order or an order that denied the relevant company access to any exemption under securities legislation for a period of more than 30 consecutive days issued after the that Person issued after the director, CEO or CFO ceased to be a director or executive officer and which resulted from an event that occurred while the Person was acting in such capacity;

b)    is, at the date of this Listing Statement, or has been, within 10 years before the date of this Listing Statement, a director or executive officer of any company that, while that Person was acting in that capacity, or within a year of that Person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold its assets; or

c)    nor any personal holding company has, within 10 years before the date of this Listing Statement, become bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or become subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of such Person or their personal holding company.

No proposed director or executive officer of the Resulting Issuer has been subject to: (i) any penalties or sanctions imposed by a court relating to securities legislation or by a securities regulatory authority or has entered into a settlement agreement with a securities regulatory authority; or (ii) any other penalties or sanctions imposed by a court or regulatory body that would likely be considered important to a reasonable security holder in making an investment decision.

A-68

- 69 -

Mr. Mattei was the Chief Financial Officer of OE Quality Friction Inc. ("**OE**") which underwent receivership in December of 2014. OE's creditor, BMO, appointed PricewaterhouseCoopers as the receiver at that time. To the best of Mr. Mattei's knowledge, OE has been inactive since December 2014 and Mr. Mattei is otherwise unaware of the status of the receivership as of today's date. Mr. Mattei formally resigned from his role as Chief Financial Officer at the time the receiver was appointed.

**13.10    Conflicts of Interest**

Conflicts of interest may arise as a result of the directors and officers of the Resulting Issuer also holding positions as directors or officers of other companies. Some of the individuals who will be directors and officers of the Resulting Issuer have been and will continue to be engaged in the identification and evaluation of assets, businesses and companies on their own behalf and on behalf of other companies, and situations may arise where the directors and officers of the Resulting Issuer will be in direct competition with the Resulting Issuer. Conflicts, if any, will be subject to the procedures and remedies provided under BCBCA.

**13.11    Management**

Brief descriptions of the biographies for all of the proposed officers and directors of the Resulting Issuer are set out below:

**Dan Bilzerian** (38) – Director and Chief Executive Officer – After serving four years and being honourably discharged from the United States Navy, Mr. Bilzerian attended the University of Florida where he majored in Business and Criminology. Soon after completing his college studies, Mr. Bilzerian became one of the world's most successful professional poker players, earning upwards of $50 million per year. As Chairman and Founder of the Ignite Group of Companies, Mr. Bilzerian has launched a trusted and premium global cannabis brand.

**Edoardo (Eddie) Mattei** (48) – Chief Financial Officer and Corporate Secretary – Mr. Mattei is a Chartered Professional Accountant and Chartered Accountant.  He has served in various executive finance and corporate taxation roles across several diverse industries including vertically integrated manufacturing and entertainment media entities.  Mr. Mattei's focus throughout his career has been on driving cross functional efficiencies with an entrepreneurial mindset applied to all deliverables.  Mr. Mattei's most recent appointment was as Chief Financial Officer of the Mircom Technologies Ltd., a privately held, vertically integrated Canadian entity operating in the highly regulated, global fire and life safety marketplace.  Mr. Mattei has also served as the Vice President of Global Taxation at Royal Group Technologies Ltd., a $2 billion publicly traded Canadian company. Mr. Mattei is a graduate of the University of Toronto (Economics) and holds a Masters' in Business Administration from Wilfrid Laurier University.

**Luciano (Lu) Galasso** (63) – Director – Mr. Galasso is a Chartered Professional Accountant with over 35 years of experience primarily in acquisitions and financings. He is a partner with Zzen Group of Companies which owns and operates companies in land development and manufacturing sectors. He is the Chairman of the board of directors of Titanium Transportation Group Inc., a company listed on the TSX Venture Exchange. He has served on the board of Meta Foundation, a charitable organization dedicated to people with special needs. Mr. Galasso previously worked at KPMG LLP and Arthur Andersen LLP in their respective income tax specialty groups. He was previously the vice president and director of taxation of Royal Group Technologies Limited and was a member of the acquisition

- 70 -

committee. As of the date hereof, Mr. Galasso has not entered into any non-competition or non-disclosure agreements with Ignite Canada or the Resulting Issuer.

**Scott Rohleder** (55) – Director –Mr. Rohleder has accumulated over 30 years of business experience. Most recently, Mr. Rohleder served as the Chief Operating Officer of a membership organization comprised of business owners, Vice President of Operations of a national trucking company, and as the Acting Chief Financial Officer for a diversified publicly traded company headquartered in Australia. Prior to these roles, he was a Director in a full-service accounting firm. Early in his career, Mr. Rohleder worked as the Controller of CRC Products, Inc., a national leader in the distribution of institutional restaurant equipment and supplies, and later served as its Chief Financial Officer, Chief Operating Officer and President.  During his tenure, Mr. Rohleder led the company into new markets including a strategic acquisition. Mr. Rohleder holds a Bachelor's degree in Finance and Accounting from the University of Kentucky.

**Jim McCormick** (52) – President – Mr. McCormick is highly experienced global consumer goods executive with a deep understanding of brand and trade marketing, operations & supply chain, finance and scaling a business internationally.  Mr. McCormick has operated extensively in regulated markets and has led business units with up to 2,500 employees and $3.0 billion in revenues. Recently, Mr. McCormick was the COO and CFO for KushCo Holdings Inc., the leading provider of ancillary products and services to the US and Canadian cannabis sector. Mr. McCormick spent the majority of his professional career with British American Tobacco (BAT) where he spent a total of 17 years, 14 of which included living and working overseas.  This included CEO and CFO postings in the UK, Argentina, Singapore, Trinidad, Turkey, Indian Ocean Islands and North Africa. Mr. McCormick holds an MBA from Southern Illinois University and a Bachelor's degree in Finance and Accounting from Eastern Illinois University.

## 14. CAPITALIZATION

### 14.1    Capitalization

The following chart is with respect to the Subordinate Voting Shares to be listed upon completion of the Business Combination:

| | Number of Securities (non-diluted) | Number of Securities (fully diluted)[1] | Percentage of Issued (non-diluted) | Percentage of Issued (fully diluted) |
|---|---|---|---|---|
| Public Float | | | | |
| Total Outstanding (A) | 105,598,091 | 258,582,060 | 100% | 100% |
| Held by Related Persons or employees of the Issuer or Related Person of the Issuer, or by persons or companies who beneficially own or control, directly or indirectly, more than a 5% voting position in the Issuer (or who would beneficially own or control, directly | 94,507,845 | 245,491,845 | 89.5% | 94.9% |

- 71 -

| | Number of Securities (non-diluted) | Number of Securities (fully diluted)[1] | Percentage of Issued (non-diluted) | Percentage of Issued (fully diluted) |
|---|---|---|---|---|
| or indirectly, more than a 5% voting position in the Resulting Issuer upon exercise or conversion of other securities held) (B) | | | | |
| Total Public Float (A-B) | 11,090,246 | 13,090,215 | 10.5% | 5.1% |
| Freely-Tradeable Float | | | | |
| Number of outstanding securities subject to resale restrictions, including restrictions imposed by pooling or other arrangements or in a shareholder agreement and securities held by control block holders (C) | 211,600 | 331,600 | 0.2% | 0.1% |
| Total Tradeable Float (A-C) | 105,386,491 | 258,250,460 | 99.8% | 99.9% |

Note:
(1)    Reflects the conversion of all 756,257 Proportionate Voting Shares to 151,251,400 Subordinate Voting Shares using the Conversion Ratio, and the exercise of all Resulting Issuer Warrants and Resulting Issuer Options.

**Public Securityholders (Registered) of the Resulting Issuer**

The following table sets out the number of public securityholders (registered) of the Resulting Issuer:

| Size of Holding | Number of Holders | Total Number of Securities |
|---|---|---|
| 1 – 99 securities | 12 | 462 |
| 100 -499 securities | 6 | 1,535 |
| 500 – 999 securities | 12 | 7,200 |
| 1,000 – 1,999 securities | 16 | 21,275 |
| 2,000 – 2,999 securities | 15 | 36,174 |
| 3,000 – 3,999 securities | 3 | 10,283 |
| 4,000 – 4,999 securities | 2 | 8,000 |
| 5,000 or more securities | 147 | 63,812,294 |
| **TOTAL** | 213 | 63,897,223 |
| **TOTAL BOARD LOTS** | 195 | |

**Public Securityholders (Beneficial) of the Resulting Issuer**

The following table sets out the number of public securityholders (beneficial)[1] of the Resulting Issuer:

- 72 -

| Size of Holding | Number of Holders | Total Number of Securities |
|---|---|---|
| 1 – 99 securities | 229 | 8,948 |
| 100 -499 securities | 211 | 43,282 |
| 500 – 999 securities | 92 | 57,693 |
| 1,000 – 1,999 securities | 116 | 145,270 |
| 2,000 – 2,999 securities | 95 | 203,408 |
| 3,000 – 3,999 securities | 37 | 116,359 |
| 4,000 – 4,999 securities | 40 | 166,136 |
| 5,000 or more securities | 342 | 9,652,632 |
| TOTAL | 1,162 | 10,393,428 |

**Note:**

(1) The amounts included in this table are based on share range reports dated April 12, 2019. The Resulting Issuer may have other beneficial holders of its securities that it is not aware of. Certain of the shareholders in this table may be insiders of the Resulting Issuer, however such information is not distinguished in a range report and accordingly is outside the knowledge of the Resulting Issuer.

**Non-Public Securityholders (Registered) of the Resulting Issuer**

The following table sets out the number of non-public securityholders (registered) of the Resulting Issuer:

| Size of Holding | Number of Holders | Total Number of Securities |
|---|---|---|
| 1 – 99 securities | - | - |
| 100 -499 securities | - | - |
| 500 – 999 securities | - | - |
| 1,000 – 1,999 securities | - | - |
| 2,000 – 2,999 securities | - | - |
| 3,000 – 3,999 securities | - | - |
| 4,000 – 4,999 securities | - | - |
| 5,000 or more securities | 6 | 94,507,845 |
| TOTAL | 6 | 94,507,845 |

### 14.2    Convertible/Exchange Securities

| Description of Security (include conversion/exercise terms, including conversion/exercise price) | Number of convertible/exchangeable securities | Number of listed securities issuable upon conversion/exchange |
|---|---|---|
| Resulting Issuer Options[1] | 1,610,000[4] | 1,610,000 |
| Resulting Issuer Warrants[2] | 122,569 | 122,569 |

- 73 -

| Proportionate Voting Shares[3] | 756,257 | 151,251,400 |
|---|---|---|

Notes:
(1)    200,000 of which are exercisable at a price of $5.00 until April 30, 2023 and 1,410,000 of which are exercisable at a price of $3.50 until February 2, 2024.
(2)    For details of the Resulting Issuer Warrants, see Section 10.1 – *Description of the Securities – Resulting Issuer Warrants*.
(3)    For details on the conversion of Proportionate Voting Shares, see Section 10.1 – *Description of the Securities – Proportionate Voting Shares*.
(4)    Ignite Canada is challenging the validity of 200,000 of these Ignite Canada Options.

## 14.3    Other Listed Securities

The Resulting Issuer does not have any other listed securities reserved for issuance that are not included in Section 14.1 or 14.2.

## 15. EXECUTIVE COMPENSATION

The statement of executive compensation contained in this section relates only to the proposed executive compensation of the Resulting Issuer assuming completion of the Business Combination. Details related to the executive compensation paid by Ignite Canada, prepared in accordance with Form 51-102F6V of National Instrument 51-102 – *Continuous Disclosure Obligations*, can be found in the management information circular filed on May 2, 2019 and available under the Company's profile on SEDAR at www.sedar.com.

The objectives, criteria and analysis of the compensation of the executive officers of the Resulting Issuer will be determined by the Board.

In this section "Named Executive Officers" mean (a) the CEO (or an individual who acted in a similar capacity), (b) the CFO (or an individual who acted in a similar capacity), (c) The Resulting Issuer's other most highly compensated executive officer, whose total compensation exceeded $150,000, and (d) each individual who would be a named executive officer under paragraph (c) but for the fact that the individual was not an executive officer of the Resulting Issuer, and was not acting in a similar capacity, at the end of that financial year. The Resulting Issuer will have three Named Executive Officers ("**NEOs**"), namely Dan Bilzerian, CEO, Edoardo (Eddie) Mattei, CFO and Corporate Secretary and Jim McCormick, President.

The compensation structure, policies and programs of the Resulting Issuer regarding its NEOs will be determined by the Board, based on its evaluation of the performance of the NEOs, the Resulting Issuer's cash position and general public market conditions. The Board recognizes the need to provide a total compensation package that will attract and retain qualified and experienced executives, as well as align the compensation level of each executive to that executive's level of responsibility; bearing in mind the very limited cash reserves of the Resulting Issuer. In general, a NEO's compensation is comprised of (i) base salary; (ii) option based awards; and (iii) bonuses.

Compensation Discussion and Analysis

The Resulting Issuer's compensation philosophy for executive officers will follow three underlying principles:

a)    to provide compensation packages that encourage and motivate performance;

- 74 -

b)      to be competitive with other companies of similar size and scope of operations so as to attract and retain talented executives; and

c)      to align the interests of its executive officers with the long-term interests of the Resulting Issuer and its shareholders through stock related programs.

When determining compensation policies and individual compensation levels for the Resulting Issuer's executive officers, the Resulting Issuer will take into consideration a variety of factors, including the overall financial and operating performance of the Resulting Issuer, and the Board's overall assessment of:

a)      each executive officer's individual performance and contribution towards meeting corporate objectives;

b)      each executive officer's level of responsibility;

c)      each executive officer's length of service; and

d)      industry comparables.

In keeping with the Resulting Issuer's philosophy to link senior executive compensation to corporate performance and to motivate senior executives to achieve exceptional levels of performance, the Resulting Issuer intends to adopt a model that includes both base salary or consulting fees and "at-risk" compensation, comprised of participation in the Resulting Issuer Option Plan as described herein. In addition, the Resulting Issuer may award discretionary performance bonuses based on executives meeting short-term performance milestones.

Base Salary - Fees

Base salary and consulting fee levels reflect the fixed component of pay that compensates executives for fulfilling their roles and responsibilities and assists in the attraction and retention of highly qualified executives. Base salaries will be reviewed annually to ensure they reflect each respective executive's performance and experience in fulfilling his or her role and to ensure executive retention. Salary and consulting fee levels will be reviewed and revised as the Resulting Issuer grows.

Stock Options

Performance-based incentives will be granted by way of Resulting Issuer Options. The awards are intended to align executive interests with those of shareholders by tying compensation to share performance and to assist in retention through vesting provisions. Grants of Resulting Issuer Options will be based on:

a)      the executive's performance;

b)      the executive's level of responsibility within the Resulting Issuer;

c)      the number and exercise price of options previously issued to the executive;

d)      the difference between the executive's salary and that paid by comparable companies; and

- 75 -

e)      the overall aggregate total compensation package provided to the executive.

Resulting Issuer Options will typically be granted on an annual basis in connection with the review of executives' compensation packages. Resulting Issuer Options may also be granted to executives upon hire or promotion and as special recognition for extraordinary performance.

Chief Executive Officer Compensation

The components of CEO's compensation will be the same as those which apply to the other senior executive officers of the Resulting Issuer, namely base salary or consulting fees, stock option incentives and discretionary performance bonuses (which are subject to targets being achieved). In setting the recommended salary or consulting fees of the CEO, the Resulting Issuer will take into consideration the salaries or fees paid to other CEOs in similar industries and in the public company sector, as described above under the heading "*Compensation Discussion and Analysis*". In setting the salary or fees, performance bonus and long-term incentives for the CEO, the Resulting Issuer will evaluate the performance of the CEO in light of his impact on the achievement of the Resulting Issuer's goals and objectives.

**Director and NEO Compensation, Excluding Compensation Securities**

The following table sets forth the anticipated compensation to be paid or awarded to the NEOs and directors of the Resulting Issuer:

| Table of Compensation Excluding Compensation Securities | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name & position | Year | Salary, Consulting Fee, Retainer or Commission ($)[1] | Bonus ($)[1] | Committee or meeting fees ($)[1] | Value of Perquisites ($)[1] | Value of all other compensation ($)[1] | Total compensation ($)[1] |
| Dan Bilzerian, CEO and Director | 2019 | $275,000 | TBD | TBD | TBD | TBD | $275,000 |
| Edoardo (Eddie) Mattei, CFO and Corporate Secretary | 2019 | $225,000 | TBD | TBD | TBD | TBD | $225,000 |
| Luciano (Lu) Galasso, Director | 2019 | Nil | TBD | TBD | TBD | TBD | Nil |
| Scott Rohdeler, Director | 2019 | Nil | TBD | TBD | TBD | TBD | Nil |
| Jim McCormick, President | 2019 | $405,405[2] | TBD | TBD | TBD | TBD | $405,405[2] |

Note:
(1)   All compensation, other than annual salaries for the NEOs, to be paid to the NEOs and directors of the Resulting Issuer during the 12-month period following Closing will be determined by the Board and the Compensation Committee.
(2)   Figure presented is based on a $US:$CDN exchange rate of 0.74 on May 1, 2019. Jim McCormick's salary is anticipated to be US$300,000.

**Stock Options and Other Compensation Securities**

After completion of the Business Combination, the Resulting Issuer does not expect to make any changes to the Ignite Canada Option Plan other than, immediately after Closing, the Resulting Issuer intends to amend the Ignite Canada Option Plan to reflect the re-designation of Ignite Canada Shares to Subordinate Voting Shares. See Section 9 – *Options to Purchase Securities*.

**Employment, Consulting and Management Agreements**

The Resulting Issuer does not intend to enter into any agreements or arrangements under which compensation would be provided during the next financial year or would be payable in respect of services provided to the Resulting Issuer that are:

    a)    performed by a director or a NEO, or

    b)    performed by any other party but are services typically provided by a director or a NEO,

other than the grant of options under the Resulting Issuer Option Plan, and the reimbursement of expenses any director or NEO may have incurred on behalf of Ignite Canada or the Resulting Issuer.

In particular, after the completion of the Business Combination, the Resulting Issuer does not intend to enter into any agreements or arrangement containing provisions with respect to change of control, severance, termination or constructive dismissal.

***Pension Disclosure***

The Resulting Issuer does not intend to provide any form of pension or retirement plan to any of its directors or NEOs.

***Directors' and Officers' Liability Insurance***

The Resulting Issuer intends to maintain directors' and officers' liability insurance of Ignite Canada following Closing.

**16. INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS**

Upon Closing, no director or officer of the Resulting Issuer nor any Associate of any such director or officer will be indebted to the Resulting Issuer nor will any such person's indebtedness to another entity been the subject of a guarantee, support agreement, letter of credit or other similar arrangement or understanding provided by the Resulting Issuer or a subsidiary thereof.

**17. RISK FACTORS**

There are a number of risk factors that could cause future results to differ materially from those described herein. The risks and uncertainties described in this Listing Statement are not the only ones the Resulting Issuer may face. Additional risks and uncertainties that the Resulting Issuer is unaware of, or that the Resulting Issuer currently deems not to be material, may also become important factors that affect the Resulting Issuer. If any such risks actually occur, the Resulting

- 77 -

Issuer's business, financial condition or results of operations could be materially adversely affected. If such circumstances arise, investors could lose all or part of their investment.

An investment in the Resulting Issuer Shares should be considered highly speculative, not only due to the nature of Ignite Canada's and Ignite US' existing business and operations, but also due to the uncertainty related to the completion of the proposed Business Combination. In evaluating the Business Combination, Ignite Canada Shareholders and investors generally should carefully consider not only the following risk factors relating to the Resulting Issuer Shares, but the risk factors associated with the business of the Resulting Issuer set out below. The following list of risk factors is not a definitive list of all risk factors associated with the Resulting Issuer or the Business Combination. Additional risks and uncertainties, including those currently known or considered immaterial by Ignite Canada and Ignite US, may also adversely affect the Resulting Issuer Shares and/or the business of the Resulting Issuer.

**Risks Related to the Fundamental Change**

***CSE may not approve the Proposed Fundamental Change***

The proposed Business Combination constitutes a "Fundamental Change" pursuant to the policies of the CSE. Although Ignite Canada and Ignite US have received conditional approval from the CSE, there can be no assurance the Resulting Issuer will be able to satisfy the requirements of the CSE such that the CSE will provide final approval of the proposed Business Combination and issue the CSE Approval. If the parties to the Business Combination are unable to successfully complete the Business Combination, the Subordinate Voting Shares may not be listed on the CSE, in which case there may be no market through which the Subordinate Voting Shares may be traded.

***No Assurance that the Business Combination will be Completed***

Closing remains subject to a number of conditions, including, but not limited to, receipt of the requisite approvals from Ignite Canada Shareholders and satisfaction of standard closing conditions for transactions of this nature and the CSE Approval. There can be no assurance that the Business Combination will be completed as proposed or at all. Failure to complete the Business Combination as proposed may also impact the price of Ignite Canada Shares.

***Costs to Complete the Business Combination***

There are certain costs related to the Business Combination, such as legal and accounting fees and certain additional fees incurred, that must be paid even if the Business Combination is not completed. There are also opportunity costs associated with the diversion of management attention away from the conduct of the Ignite Canada and Ignite US's business in the ordinary course.

**Risks Related to the Resulting Issuer's Operations**

***No Operating History as a Vertically-Integrated Cannabis Company***

The Resulting Issuer and its management have no history of operations as a vertically-integrated company in the cannabis industry. As such, upon completion of the proposed Business Combination, the Resulting Issuer will be subject to all of the business risks and uncertainties associated with any new business enterprise, including the lack of experience in managing and operating the business

- 78 -

and the risk that the Resulting Issuer will not achieve its financial objectives as estimated by management or at all.

### Lack of Availability of Growth Opportunities

The Resulting Issuer's business plan includes growth through the Resulting Issuer's identification of suitable investment or acquisition opportunities, pursuing such opportunities, consummating investments or acquisitions, and effectively generating returns on such investments or acquisitions. If the Resulting Issuer is unable to manage its growth effectively, its business, operating results, and financial condition could be adversely affected.

### Foreign Taxes and Double Taxation

The Resulting Issuer may invest in cannabis companies based in foreign jurisdictions and may be subject to double taxation on its foreign investments, which will reduce the return on investments and the profitability, if any, of the Resulting Issuer.

### Conflicts of Interest

The Resulting Issuer may, in the future, raise further funds through the sale of securities to other companies which may be associated with the directors of officers of the Resulting Issuer, and, as such, the directors and officers of the Resulting Issuer may increase their ownership and/or control positions in the Resulting Issuer without an equal opportunity to participate in such financings being granted to other shareholders. Under certain circumstances, shareholder approval of such action may be required. As certain directors and officers are involved with other companies, there may be potential conflicts of interest limiting the amount of time managing the affairs of the Resulting Issuer.

### Lack of Capital

Until revenues exceed expenses, the Resulting Issuer will raise the necessary capital through private placements and other financing tools. There can be no assurance that management will be successful in raising the necessary capital required to fund ongoing activities.

### Strategic Investments or Acquisitions and Joint Ventures may Result in Additional Risks and Uncertainties in the Resulting Issuer's Business

The Resulting Issuer may grow its business through strategic investments, acquisitions or joint ventures. When it makes strategic investments or acquisitions or enters into joint ventures, the Resulting Issuer expects to face numerous risks and uncertainties in combining or integrating the relevant businesses and systems. In addition, future acquisitions or joint ventures may involve the issuance of additional Resulting Issuer Shares, which may dilute shareholders' interests in the Resulting Issuer.

Although the Resulting Issuer will perform diligence on any businesses it purchases or makes an investment in, in light of the circumstances of each transaction, an unavoidable level of risk remains regarding the actual condition of these businesses. The Resulting Issuer may not be able to ascertain the value or understand the potential liabilities of the acquired businesses and their operations until it assumes operating control of the assets and operations of these businesses or an investment is made.

In addition, expansion, acquisitions or joint ventures may require significant managerial attention, which may be diverted from the Resulting Issuer's other operations. If the Resulting Issuer is unsuccessful in overcoming these risks, its business, financial condition or results of operations could be materially and adversely affected.

### Environmental Regulations and Risks

Through its investments and operations, the Resulting Issuer may be subject to environmental regulation. These regulations mandate, among other things, the maintenance of air and water quality standards and land reclamation. They also set forth limitations on the generation, transportation, storage and disposal of solid and hazardous waste. Environmental legislation is evolving in a manner that will require stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental assessments of proposed projects and a heightened degree of responsibility for companies and their officers, directors and employees. There is no assurance that future changes in environmental regulation, if any, will not adversely affect the Resulting Issuer's operations.

Government approvals and permits are currently, and may in the future, be required in connection with the Resulting Issuer's operations. To the extent such approvals are required and not obtained, the Resulting Issuer may be curtailed or prohibited from proceeding with the development of its operations as currently proposed.

Failure to comply with applicable laws, regulations and permit requirements may result in enforcement actions thereunder, including orders issued by regulator or judicial authorities causing operations to cease or to be curtailed and may include corrective measures requiring capital expenditures, installations of additional equipment, or remedial actions. The Resulting Issuer may be required to compensate those suffering loss or damage by reason of its operations and may have civil or criminal fines or penalties imposed for violations of applicable laws and regulations.

### Product Liability

Through its investments and operations, the Resulting Issuer may manufacture, process and/or distribute products designed to be ingested by humans, and therefore face an inherent risk of exposure to product liability claims, regulatory action and litigation if products are alleged to have caused significant loss or injury. In addition, the manufacture and sale of cannabis products involve the risk of injury to consumers due to tampering by unauthorized third parties or product contamination. Previously unknown adverse reactions resulting from human consumption of cannabis products alone or in combination with other medications or substances could occur. The Resulting Issuer may be subject to various product liability claims, including, among others, that the products produced by them caused injury or illness, include inadequate instructions for use or include inadequate warnings concerning possible side effects or interactions with other substances. A product liability claim or regulatory action could result in increased costs, could adversely affect the reputation of the Resulting Issuer and could have a material adverse effect on the business, results of operations and financial condition of the Resulting Issuer. There can be no assurances that product liability insurance will be obtained or maintained on acceptable terms or with adequate coverage against potential liabilities.

### Product Recalls

- 80 -

Through its investments and operations, the Resulting Issuer may cultivate, manufacture and distribute cannabis products. Cultivators, manufacturers and distributors of products are sometimes subject to the recall or return of their products for a variety of reasons, including product defects, such as contamination, unintended harmful side effects or interactions with other substances, packaging safety and inadequate or inaccurate labeling disclosure. If any product produced by the Resulting Issuer is recalled due to an alleged product defect or for any other reason, the Resulting Issuer could be required to incur the unexpected expense of the recall and any legal proceedings that might arise in connection with the recall and may lose a significant amount of sales and may not be able to replace those sales at an acceptable margin or at all. Additionally, if any of the products produced by the Resulting Issuer were subject to recall, the image of that product and the Resulting Issuer could be harmed. A recall for any of the foregoing reasons could lead to decreased demand for products produced by the Resulting Issuer and could have a material adverse effect on its results of operations and financial condition.

### Risks Inherent in an Agricultural Business

Cannabis is an agricultural product. There are risks inherent in the cultivation business, such as insects, plant diseases and similar agricultural risks. Although the products are usually grown indoors or green houses under climate-controlled conditions, with conditions monitored, there can be no assurance that natural elements will not have a material adverse effect on the production of the Resulting Issuer's subsidiaries' or investees' products and, consequentially, on the business, financial condition and operating results of the Resulting Issuer.

### Reliance on Key Inputs

The cultivation, extraction and processing of cannabis and derivative products is dependent on a number of key inputs and their related costs including raw materials, electricity, water and other local utilities. Any significant interruption or negative change in the availability or economics of the supply chain for key inputs could materially impact the business, financial condition and operating results of the Resulting Issuer. Some of these inputs may only be available from a single supplier or a limited group of suppliers. If a sole source supplier was to go out of business, the Resulting Issuer may be unable to find a replacement for such source in a timely manner, or at all. Any inability to secure required supplies and services or to do so on appropriate terms could have a materially adverse impact on the business, financial condition and operating results of the Resulting Issuer.

In addition, cannabis growing operations consume considerable energy, making the Resulting Issuer vulnerable to rising energy costs. Rising or volatile energy costs may adversely impact the business of the Resulting Issuer and its ability to operate profitably.

### Service Providers in the United States

As a result of any adverse change to the approach in enforcement of United States cannabis laws, adverse regulatory or political change, additional scrutiny by regulatory authorities, adverse change in public perception in respect of the consumption of marijuana or otherwise, third party service providers to the Resulting Issuer could suspend or withdraw their services, which may have a material adverse effect on the Resulting Issuer's business, revenues, operating results, financial condition or prospects.

- 81 -

**Risks Related to the Marijuana Industry**

***The fact that Marijuana is Illegal in Most Jurisdictions May Affect the Trading of Resulting Issuer Shares***

The Resulting Issuer's business may involve the distribution of securities of an entity that is expected to indirectly derive a portion of its revenues from the cannabis industry in certain U.S. states, which industry is illegal under U.S. federal law. Ignite US, through its joint venture with Harvest, will be indirectly engaged in the cultivation, processing, possession, use, sale or distribution of cannabis in the medicinal and/or adult-use cannabis marketplace in the United States where local state law permits such activities. In Canada, the Cannabis Act regulates the production, distribution and sale of cannabis for unqualified adult use and came into force on October 17, 2018. The ACMPR will continue to operate in tandem with the recreational regime, and will be re-evaluated within five years of the Cannabis Act coming into force. Currently, Ignite Canada and Ignite US are not directly engaged in the manufacturing, importation, possession, use, sale or distribution of cannabis in the recreational cannabis marketplace in either Canada or the United States, nor are Ignite Canada and Ignite US directly engaged in the manufacturing, importation, possession, use, sale or distribution of cannabis in the medical cannabis marketplace in the United States or Canada.

Almost half of the U.S. states have enacted legislation to regulate the sale and use of medical cannabis without limits on THC, while other states have regulated the sale and use of medical cannabis with strict limits on the levels of THC. Notwithstanding the permissive regulatory environment of cannabis at the state level, cannabis continues to be categorized as a controlled substance under the CSA in the United States and as such, may be in violation of federal law in the United States.

As a result of the conflicting views between state legislatures and the United States federal government regarding cannabis, involvement in cannabis businesses in the United States is subject to inconsistent legislation and regulation. Unless and until U.S. Congress amends the CSA with respect to cannabis (and as to the timing or scope of any such potential amendments there can be no assurance), there is a risk that federal authorities may enforce current federal law, which may adversely affect the current and future business of the Resulting Issuer in the United States. As such, there are a number of risks associated with Resulting Issuer's existing and future business in the United States.

For the reasons set forth above, Ignite Canada and Ignite US's existing business in the United States cannabis market, and the Resulting Issuer's future business, may become the subject of heightened scrutiny by regulators, stock exchanges, clearing agencies and other authorities in Canada. It has been reported by certain publications in Canada that the Canadian Depository for Securities Limited is considering a policy shift that would see its subsidiary, CDS Clearing and Depository Services Inc. ("**CDS**"), refuse to settle trades for cannabis issuers that have investments in the United States. CDS is Canada's central securities depository, clearing and settlement hub settling trades in the Canadian equity, fixed income and money markets. On February 8, 2018, following discussions with the Canadian Security Administrators and recognized Canadian securities exchanges, the TMX Group, who is the owner of the Canadian Depository for Securities Limited, announced the signing of a Memorandum of Understanding ("**MOU**") with Aequitas NEO Exchange Inc., the CSE and the Toronto Stock Exchange confirming that it relies on such exchanges to review the conduct of listed issuers. The MOU notes that securities regulation requires that the rules of each of the exchanges must not

- 82 -

be contrary to the public interest and that the rules of each of the exchanges have been approved by the securities regulators. Pursuant to the MOU, CDS will not ban accepting deposits of or transactions for clearing and settlement of securities of issuers with cannabis-related activities in the U.S.

Even though the MOU indicated that there are no plans of banning the settlement of securities through CDS, there can be no guarantee that the settlement of securities will continue in the future. If such a ban were to be implemented, it would have a material adverse effect on the ability of holders of Subordinate Voting Shares to make and settle trades. In particular, the Subordinate Voting Shares would become highly illiquid until an alternative was implemented, and investors would have no ability to effect a trade of the Subordinate Voting Shares through the facilities of a stock exchange.

### Risk Factors Related to the United States

Unlike in Canada, which has federal legislation and a framework regarding the cultivation, distribution, sale and possession of medical cannabis under the Cannabis Act, cannabis remains a Schedule I substance under the CSA in the U.S. While numerous states and the District of Columbia have passed laws permitting possession and use of marijuana for medical or recreational purposes, it remains illegal on the federal level and individuals and businesses engaged in the marijuana industry have ongoing risk of prosecution for felony crimes under federal laws.

While in August 2013, as a result of the conflicting views between state and federal government regarding cannabis, then Deputy Attorney General, James Cole, authored the Cole Memorandum addressed to all U.S. district attorneys, outlining certain priorities for the Department of Justice ("**DOJ**") relating to the prosecution of cannabis offenses, on January 4, 2018, a memorandum from then U.S. Attorney General Jeff Sessions was issued to U.S. district attorneys, effectively rescinding previous guidance from the DOJ specific to cannabis enforcement in the U.S., including the Cole Memorandum. U.S. federal prosecutors no longer have guidance relating to the exercise of their discretion on prosecuting cannabis related violations of U.S. federal law. Following this decision, the Canadian Securities Administrators issued Staff Notice 51-352 on February 8, 2018, explaining that Canadian public companies with U.S. Marijuana Related Activities are required to provide additional disclosures. These disclosures and additional expectations apply to all issuers with U.S. marijuana-related activities, including those with direct and indirect involvement in the cultivation and distribution of marijuana, as well as issuers that provide goods and services to third parties involved in the U.S. marijuana industry. Issuers are expected to provide these disclosures in prospectus filings and other required documents, such as their Annual Information Form and MD&A.

It is possible that further developments could significantly adversely affect the business, financial condition and results of businesses involved in U.S. marijuana-related activities and in the cannabis industry generally. Such potential proceedings could involve significant restrictions being imposed upon the Resulting Issuer or its subsidiaries or investees, while diverting the attention of key executives. Such proceedings could have a material adverse effect on the Resulting Issuer's business, revenues, operating results and financial condition as well as the Resulting Issuer's reputation, even if such proceedings were concluded successfully in favor of Resulting Issuer.

U.S. Congress passed appropriations bills for the last 4 years which have not appropriated funds to the DOJ for prosecution of cannabis offenses for individuals who are in compliance with state level

medical cannabis laws. Most recently, U.S. Congress extended the prohibition to September 2019. This prohibition is, however, subject to ongoing extension/approval by U.S. Congress and could be rescinded. Courts have interpreted these appropriations bills to effectively prevent the federal government from prosecuting individuals when those individuals comply with state law. This conduct continues to violate federal law, and U.S. courts have observed that should U.S. Congress at any time choose to appropriate funds to fully prosecute under the CSA, any individual or business, (despite fully complying with state laws) could be prosecuted for violations of federal law. If U.S. Congress ever restores funding, the federal government will have the authority to prosecute individuals for any violations of the law which occurred before it lacked funding and that are within the CSA's five-year statute of limitations. Further, the prohibition on the use of funds relates solely to medical marijuana state laws and does not prevent the DOJ from spending funds to prosecute individuals and businesses operating under state recreational marijuana laws.

There are currently 33 States and the District of Columbia which have laws broadly legalizing marijuana in some form or another, 10 of which (Alaska, California, Colorado, Maine, Massachusetts, Michigan, Nevada, Oregon, Vermont, and Washington) and the District of Columbia have adopted expansive laws legalizing marijuana for recreational use. Notwithstanding the permissive regulatory environment of medical cannabis at the state level, cannabis continues to be categorized as a controlled substance under the CSA and as such, violates federal law in the U.S.

Violations of any federal regulations and laws could result in administrative sanctions, penalties, fines, criminal charges and convictions which may result in diminished profit, cessation of business activities or divestiture losses. These violations can also have a material adverse effect on the Resulting Issuer, including its brand, reputation and ability to conduct business, financial position, ability to raise additional capital, operating results, profitability or liquidity. It is difficult for the Resulting Issuer to estimate the resources and time needed for the investigation of any such matters or its final resolution.

Further, because marijuana is illegal under U.S. federal law, investing in cannabis business could be found to violate the CSA. As a result, individuals involved with cannabis business, including but not limited to investors and lenders, may be indicted under U.S. federal law. Your investment in the Resulting Issuer, and the investment in or operation of companies in the cannabis business by the Resulting Issuer, may: (a) expose you personally to criminal liability under U.S. federal law, resulting in monetary fines and jail time; and (b) expose any real and personal property used in connection with the Resulting Issuer's business to seizure and forfeiture to the U.S. federal governments. The risk of strict enforcement of the CSA remains uncertain.

The Resulting Issuer's business in the U.S. will currently be limited to the licensing of its brands and the personality of Dan Bilzerian for products in the cannabis industry. In order to become a licensee or sub-licensee, the licensee entity must provide the Resulting Issuer with the licenses it has been granted by the state regulatory authorities which permit it to carry on the sale of cannabis products. On a go-forward basis, the licensee entity is also required to maintain the licenses in good standing or the Resulting Issuer shall have the right to cancel the licensing arrangement. On this basis, management is of the view that the Resulting Issuer's business interests in the United States will adhere to the principles of the Cole Memorandum.

- 84 -

### Risks Related to Other Laws and Regulations

The industry in which the Resulting Issuer will operate may subject the Resulting Issuer to compliance with a myriad of other federal, state, provincial and local laws and regulations, which could include, among others, laws and regulations relating to cannabis, personally identifiable information, wage and hour restrictions, health and safety matters, consumer protection and environmental matters. The Resulting Issuer's business objectives are contingent upon, in part, compliance with regulatory requirements enacted by these governmental authorities and obtaining all regulatory approvals, where necessary, for the sale of its products. The Resulting Issuer cannot predict the time required to secure all appropriate regulatory approvals for its products. Compliance with such laws and regulations may be costly and a failure to comply with such laws and regulations could result in fines, penalties, litigation and other liability that could materially adversely affect the Resulting Issuer.

The Resulting Issuer's business and products are and will continue to be regulated as applicable laws continue to change and develop. Regulatory compliance and the process of obtaining regulatory approvals can be costly and time-consuming. Further, the Resulting Issuer cannot predict what kind of regulatory requirements its business will be subject to in the future. Any delays in obtaining, or failure to obtain regulatory approvals would significantly delay the development of markets and products and could have a material adverse effect on the business, results of operations and financial condition of the Resulting Issuer.

Furthermore, although the operations of Ignite Canada are currently carried out in accordance with all applicable rules and regulations (except as disclosed in this Listing Statement with respect to investments in entities with cannabis activities in the United States), no assurance can be given that new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner which could limit or curtail the Resulting Issuer's ability to conduct its business. Amendments to current laws and regulations governing the importation, distribution, transportation and/or production of medical marijuana, or more stringent implementation thereof could have a substantial adverse impact on the Resulting Issuer. Local, state, provincial and federal laws and enforcement policies concerning marijuana-related conduct are changing rapidly and will continue to do so for the foreseeable future. Changes in applicable law are unpredictable and could have a material adverse effect on the Resulting Issuer. Changes in applicable laws or regulations could significantly diminish the Resulting Issuer's prospects. The Resulting Issuer has little or no control over potential changes to laws or regulations that may affect its business.

Additionally, governmental regulations affect taxes and levies, healthcare costs, energy usage and labor issues, all of which may have a direct or indirect effect on the Resulting Issuer's business and its customers or suppliers. Changes in these laws or regulations, or the introduction of new laws or regulations, could increase the costs of doing business for the Resulting Issuer, or its customers or suppliers, or restrict the Resulting Issuer's actions, causing the Resulting Issuer to be materially adversely affected.

### Nevada Regulatory Risks

In Nevada, all marijuana establishments must register with the Nevada Department of Taxation ("**DOT**") and be issued a medical marijuana establishment registration certificate. In a local governmental jurisdiction that issues business licenses, the issuance by the DOT of a medical marijuana establishment registration certificate is considered provisional until the local government

A-84

- 85 -

has issued a business license for operation and the establishment is in compliance with all applicable local governmental ordinances. Final registration certificates are valid for a period of one year and are subject to annual renewals after required fees are paid and the business remains in good standing. Renewal requests are typically communicated through email from the DOT and include a renewal form. The renewal periods serve as an update for the DOT on the licensee's status toward active licensure. It is important to note provisional licenses do not permit the operation of any commercial or medical cannabis activity. Only after a provisional licensee has gone through necessary state and local inspections, if applicable, and has received a final registration certificate from the DOT may an entity engage in cannabis business operation. There is no assurance that Tahoe and/or Harvest will be issued final registration certificates in respect of their provisional licenses.

### Anti-Money Laundering Laws and Regulations

The Resulting Issuer will be subject to a variety of laws and regulations domestically and in the United States that involve money laundering, financial recordkeeping and proceeds of crime, including the *Bank Secrecy Act*, as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Sections 1956 and 1957 of U.S.C. Title 18 (the Money Laundering Control Act), the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada), as amended and the rules and regulations thereunder, the *Criminal Code* (Canada) and any related or similar rules, regulations or guidelines, issued, administered or enforced by governmental authorities in the United States and Canada.

Banks often refuse to provide banking services to businesses involved in the marijuana industry due to the present state of the laws and regulations governing financial institutions in the United States. The lack of banking and financial services presents unique and significant challenges to businesses in the marijuana industry. The potential lack of a secure place in which to deposit and store cash, the inability to pay creditors through the issuance of checks and the inability to secure traditional forms of operational financing, such as lines of credit, are some of the many challenges presented by the unavailability of traditional banking and financial services.

The FinCEN guidance provides instructions to banks seeking to provide services to cannabis-related businesses. The FinCEN guidance states that in some circumstances, it is permissible for banks to provide services to cannabis-related businesses without risking prosecution for violation of federal money laundering laws. It refers to supplementary guidance relating to the prosecution of money laundering offenses predicated on cannabis- related violations of the CSA. While the FinCEN guidance has not been rescinded by the DOJ at this time, it remains unclear whether the current administration will follow its guidelines. Overall, the DOJ continues to have the right and power to prosecute crimes committed by banks and financial institutions, such as money laundering and violations of the Bank Secrecy Act, that occur in any state, including in states that have legalized the applicable conduct and the DOJ's current enforcement priorities could change for any number of reasons, including a change in the opinions of the President of the United States or the United States Attorney General. A change in the DOJ's enforcement priorities could result in the DOJ prosecuting banks and financial institutions for crimes that previously were not prosecuted.

In the event that any of the Resulting Issuer's operations, or any proceeds thereof, any dividends or distributions therefrom, or any profits or revenues accruing from such operations in the United States were found to be in violation of money laundering legislation or otherwise, such transactions

A-85

- 86 -

may be viewed as proceeds of crime under one or more of the statutes noted above or any other applicable legislation. This could restrict or otherwise jeopardize the ability of the Resulting Issuer to declare or pay dividends, effect other distributions or subsequently repatriate such funds back to Canada. Furthermore, in the event that a determination was made that the Resulting Issuer's proceeds from operations (or any future operations or investments in the United States) could reasonably be shown to constitute proceeds of crime, the Resulting Issuer may decide or be required to suspend declaring or paying dividends without advance notice and for an indefinite period of time.

### *Change in Laws, Regulations and Guidelines*

The Resulting Issuer's operations will be subject to various laws, regulations and guidelines relating to the manufacture, management, transportation, storage and disposal of medical marijuana, as well as being subject to laws and regulations relating to health and safety, the conduct of operations and the protection of the environment.

On June 21, 2018, the Cannabis Act received Royal Assent and came into force on October 17, 2018. The ACMPR will continue to operate in tandem with the recreational regime, and will be re-evaluated within five years of the Cannabis Act coming into force. The governments of every Canadian province and territory have implemented different regulatory regimes for the distribution, sale and use of recreational cannabis within those jurisdictions. For example, Quebec, Manitoba, New Brunswick, Nova Scotia, Prince Edward Island and the Northwest Territories have chosen the government regulated model for distribution, whereas Saskatchewan and Newfoundland & Labrador have opted for a private sector approach. Alberta, British Columbia and Ontario are pursuing a hybrid approach of public and private sale and distribution. See Section 3.3 – *Trends, Commitments, Events or Uncertainties – Canada – Provincial and Territorial Regulatory Framework*.

As the federal and provincial governments adjust to the new legal recreational-use cannabis environment, they may implement changes to their regulatory schemes and guidelines. For instance, while Ontario had previously committed to a government-regulated model for distribution, it subsequently enacted the *Cannabis License Act*, 2018, which creates a licensing scheme for private cannabis retail stores, licenses for which were awarded via a lottery. There can be no assurance as to what changes to regulatory schemes and guidelines that the federal or provincial governments may enact, or the effect of any such changes on the Resulting Issuer's business and results of operations.

### *Risks Related to the Licensing Process*

The recreational and medical marijuana rules are constantly changing throughout the global cannabis industry. As a result, consumers and producer rights are in limbo. The future business partnerships and licensee agreements that the Resulting Issuer may make may be subject to receiving regulatory certification or accreditation through Health Canada, U.S. laws, or any other applicable regulatory authority. Any failure of the Resulting Issuer or any of its subsidiaries or investees to maintain a license or any failure to comply with the requirements of a license would have a material adverse impact on the business, financial condition and operating results of the Resulting Issuer and could lead to a significant decline in the value of its securities.

### *Unfavourable Publicity or Consumer Perception*

Management of Ignite Canada and Ignite US believe that the recreational and medical marijuana industry is highly dependent upon consumer perception regarding the safety, efficacy and quality of

- 87 -

the marijuana produced. Consumer perception of the Resulting Issuer's proposed products may be significantly influenced by scientific research or findings, regulatory investigations, litigation, media attention and other publicity regarding the consumption of marijuana products.

There can be no assurance that future scientific research, findings, regulatory proceedings, litigation, media attention or other research findings or publicity will be favourable to the recreational and medical marijuana markets or any particular product, or consistent with earlier publicity. The Resulting Issuer's dependence upon consumer perceptions means that future research reports, findings, regulatory proceedings, litigation, media attention or other publicity that are perceived as less favourable than, or that question, earlier research reports, findings or publicity could have a material adverse effect on the demand for the Resulting Issuer's proposed products and the business, results of operations, financial condition and cash flows of the Resulting Issuer. Further, adverse publicity reports or other media attention regarding the safety, efficacy and quality of marijuana in general, or the Resulting Issuer's proposed products specifically, or associating the consumption of marijuana with illness or other negative effects or events, could have such a material adverse effect. Such adverse publicity reports or other media attention could arise even if the adverse effects associated with such products resulted from consumers' failure to consume such products appropriately or as directed.

### *Liability, Enforcement Complaints, etc.*

The Resulting Issuer's participation (and Ignite Canada's and Ignite US's prior participation) in the marijuana industry may lead to litigation, formal or informal complaints, enforcement actions, and inquiries by various federal, provincial, state, or local governmental authorities. Litigation, complaints, and enforcement actions could consume considerable amounts of financial and other corporate resources, which could have an adverse effect on the Resulting Issuer's future cash flows, earnings, results of operations and financial condition.

### *The Resulting Issuer's Contracts May be Unenforceable*

As the CSA currently prohibits the production, processing and use of marijuana, contracts with third parties (customers, suppliers, vendors, landlords, etc.) pertaining to the production, processing, or selling of marijuana-related products, including any leases for real property, may be unenforceable. In addition, if the U.S. federal government begins strict enforcement of the CSA, any property (personal or real) used in connection with a marijuana-related business may be seized by and forfeited to the federal government. In this case, the Resulting Issuer's inability to enforce contracts, including its sub-licensing contracts, or any loss of business property (whether the Resulting Issuer's or its vendors') will have a material adverse effect on the Resulting Issuer.

### *The Resulting Issuer May not be Able to Obtain or Maintain a Bank Account*

Because producing, manufacturing, processing, possessing, distributing, selling, and using marijuana is a crime under the CSA, most banks and other financial institutions are unwilling to provide banking services to marijuana businesses due to concerns about criminal liability under the CSA as well as concerns related to federal money laundering rules in the United States. Though guidelines issued in past years allow financial institutions to provide bank accounts to certain cannabis businesses, few banks have taken advantage of those guidelines and many cannabis businesses still operate on an all-cash basis. Operating on an all-cash or predominantly-cash basis would make it difficult for the Resulting Issuer to manage its business, pay its employees and pay its taxes, and may create serious

- 88 -

safety issues for the Resulting Issuer, its employees and its service providers. Although Ignite Canada currently has several bank accounts, the Resulting Issuer's inability to maintain these bank accounts, or obtain and maintain other bank accounts after the Business Combination, could have a material adverse effect on the Resulting Issuer.

### The Marijuana Industry Faces Significant Opposition

It is believed by many that large well-funded businesses may have strong economic opposition to the marijuana industry. The pharmaceutical industry is well funded with a strong and experienced lobby that eclipses the funding of the marijuana industry. Any inroads the pharmaceutical industry could make in halting or impeding the marijuana industry could have a material adverse effect on the Resulting Issuer.

### The Protections of Bankruptcy Law may be Unavailable in the U.S.

As discussed above, the use of marijuana is illegal under U.S. federal law. Therefore, it may be argued that the U.S. federal bankruptcy courts cannot provide relief for parties who engage in marijuana or marijuana-related businesses. Recent U.S. bankruptcy court rulings have denied bankruptcies for dispensaries upon the justification that businesses cannot violate U.S. federal law and then claim the benefits of U.S. federal bankruptcy for the same activity. The Resulting Issuer may not be able to seek the protection of the bankruptcy courts in the U.S. for the equal protection of creditors or debtor-in-possession financing or obtain credit from U.S. federal-chartered financial institutions.

### Risks Related to Intellectual Property Protection

The Resulting Issuer will not be able to register any U.S. federal trademarks for its cannabis products. Because producing, manufacturing, processing, possessing, distributing, selling, and using cannabis is illegal under the CSA, the United States Patent and Trademark Office will not permit the registration of any trademark that identifies cannabis products. As a result, the Resulting Issuer may be unable to protect its cannabis product trademarks beyond the geographic areas in which it conducts business. The use of the Resulting Issuer's trademarks by one or more other persons could have a material adverse effect on the value of such trademarks.

### Heightened Scrutiny by Canadian Authorities

For the reasons set forth above, the business, operations and investments of the Resulting Issuer may become the subject of heightened scrutiny by regulators, stock exchanges and other authorities in Canada. As a result, the Resulting Issuer may be subject to significant direct and indirect interaction with public officials. There can be no assurance that this heightened scrutiny will not in turn lead to the imposition of certain restrictions on the Resulting Issuer's ability to invest or hold interests in other entities in the U.S. or any other jurisdiction, in addition to those described herein.

On February 8, 2018, the Canadian Securities Administrators published Staff Notice 51-352 describing the Canadian Securities Administrators' disclosure expectations for specific risks facing issuers with cannabis-related activities in the U.S. Staff Notice 51-352 confirms that a disclosure-based approach remains appropriate for issuers with U.S. cannabis-related activities. Staff Notice 51-352 includes additional disclosure expectations that apply to all issuers with U.S. cannabis-related activities, including those with direct and indirect involvement in the cultivation and distribution of cannabis, as well as issuers that provide goods and services to third parties involved in the U.S. cannabis industry.

- 89 -

*Constraints on Marketing Products*

The development of the Resulting Issuer's business and operating results may be hindered by applicable restrictions on sales and marketing activities imposed by government regulatory bodies. The regulatory environment in the United States limits the Resulting Issuer's ability to compete for market share in a manner similar to other industries. If the Resulting Issuer is unable to effectively market its products and compete for market share, or if the costs of compliance with government legislation and regulation cannot be absorbed through increased selling prices for its products, the Resulting Issuer's sales and operating results could be adversely affected.

**Securities Law and Taxation Risks**

*Risks Related to Potential Changes to Determining Foreign Private Issuer Status in the United States*

The transactions contemplated by the Business Combination were structured so that the Resulting Issuer would be a Foreign Private Issuer as defined in Rule 405 under the U.S. Securities Act and Rule 3b-4 under the U.S. Exchange Act, following completion of the Business Combination. The term "**Foreign Private Issuer**" is defined as any non-U.S. corporation, other than a foreign government, except any issuer meeting the following conditions:

> (a) more than 50 percent of the outstanding voting securities of such issuer are, directly or indirectly, held on record by residents of the United States; and
> (b) any one of the following:
>> (i) the majority of the executive officers or directors are United States citizens or residents, or
>> (ii) more than 50 percent of the assets of the issuer are located in the United States, or
>> (ii) the business of the issuer is administered principally in the United States.

The term 'held of record' is defined by Rule 12g5-1 under the U.S. Exchange Act. Generally speaking, the holder identified on the record of security holders is considered as the record holder.

In December 2016, the SEC issued a Compliance and Disclosure Interpretation to clarify that issuers with multiple classes of voting stock carrying different voting rights may, for the purposes of calculating compliance with this threshold, examine either (i) the combined voting power of its share classes or (ii) the number of voting securities, in each case held of record by U.S. residents. Based on this interpretation, each issued and outstanding Subordinate Voting Share and each issued and outstanding Proportionate Voting Share is counted as one voting security for the purposes of determining the 50 percent U.S. resident threshold and the Resulting Issuer is expected to be a Foreign Private Issuer upon completion of the Business Combination.

Should the SEC's guidance and interpretation change, it is likely the Resulting Issuer will lose its Foreign Private Issuer status.

*Risks Related to the Company's Loss of Foreign Private Issuer Status in the United States*

The Resulting Issuer is expected to be a Foreign Private Issuer. If, as of the last business day of the Resulting Issuer's second fiscal quarter for any year, more than 50% of the Resulting Issuer's

A-89

outstanding voting securities (as determined under Rule 405) are directly or indirectly held of record by residents of the United States, and (i) the majority of the Resulting Issuer's executive officers or directors are United States citizens or residents, or (ii) more than 50 percent of the assets of the Resulting Issuer are located in the United States, or (iii) the business of the Resulting Issuer is administered principally in the United States, then the Resulting Issuer will no longer meet the definition of a Foreign Private Issuer, which may have adverse consequences on the Resulting Issuer's ability to raise capital in private placements or Canadian prospectus offerings. In addition, the loss of the Resulting Issuer's Foreign Private Issuer status may likely result in increased reporting requirements and increased audit, legal and administration costs. These increased costs may significantly affect the Resulting Issuer's business, financial condition and results of operations.

### *U.S. Domestic Corporation for U.S. Federal Income Tax Purposes*

As a result of the Business Combination, the Resulting Issuer will be treated as a U.S. domestic corporation for U.S. federal income tax purposes under Section 7874(b) of the Code. As a result, the Resulting Issuer will be subject to U.S. income tax on its worldwide income and that any dividends paid by the Resulting Issuer to Non-U.S. Holders will be subject to U.S. federal income tax withholding at a 30% rate or such lower rate as provided in an applicable treaty. The Resulting Issuer will continue to be treated as a U.S. domestic corporation for U.S. federal tax purposes.

Dividends received by U.S. Holders will not be subject to U.S. withholding tax but will be subject to Canadian withholding tax. Dividends paid by the Resulting Issuer will be characterized as U.S. source income for purposes of the foreign tax credit rules under the Code. Accordingly, U.S. Holders generally will not be able to claim a credit for any Canadian tax withheld unless, depending on the circumstances, they have an excess foreign tax credit limitation due to other foreign source income that is subject to a low or zero rate of foreign tax.

In addition, Section 382 of the Code contains rules that limit for U.S. federal income tax purposes the ability of a corporation that undergoes an "ownership change" to utilize its net operating losses (and certain other tax attributes) existing as of the date of such ownership change. Under these rules, a corporation is treated as having had an "ownership change" if there is more than a 50% increase in stock ownership by one or more "five percent shareholders," within the meaning of Section 382 of the Code, during a rolling three-year period.

Furthermore, the Resulting Issuer will be subject to Canadian income tax on its worldwide income. Consequently, it is anticipated that the Resulting Issuer will be liable for both U.S. and Canadian income tax, which could have a material adverse effect on its financial condition and results of operations.

Because the Resulting Issuer Shares are treated as shares of a U.S. domestic corporation, the U.S. gift, estate and generation-skipping transfer tax rules generally apply to a Non-U.S. Holder of the Resulting Issuer Shares.

### **Other Business and Operating Risks**

### *Limited Operating History*

Ignite Canada and Ignite US have yet to generate any significant revenue. The Resulting Issuer is therefore subject to many of the risks common to early-stage enterprises operating in a competitive

- 91 -

industry, including under-capitalization, cash shortages, limitations with respect to personnel, financial, and other resources and lack of revenues. There is no assurance that the Resulting Issuer will be successful in achieving its anticipated investment objectives or operate profitably. The Resulting Issuer's business must be considered in light of the risks, expenses, and problems frequently encountered by companies in their early stages of development. Specifically, such risks may include, among others:

• the Resulting Issuer's inability to fund operations from unpredictable cash flows;

• the Resulting Issuer's failure to anticipate and adapt to developing markets;

• the Resulting Issuer's inability to attract, retain and motivate qualified personnel; and

• the Resulting Issuer's failure to operate profitably in a competitive industry.

There can be no assurance that the Resulting Issuer will be successful in addressing these risks. To the extent it is unsuccessful in addressing these risks, the Resulting Issuer may be materially and adversely affected. There can be no assurance that the Resulting Issuer will ever achieve or sustain profitability.

### History of Losses

Ignite Canada and Ignite US have incurred losses in recent periods. The Resulting Issuer may not be able to achieve or maintain profitability and may continue to incur significant losses in the future. In addition, the Resulting Issuer expects to continue to increase operating expenses as it implements initiatives to continue to grow its new business. If the Resulting Issuer's revenues do not increase to offset these expected increases in costs and operating expenses, it will not be profitable.

### Reliance on Management and Key Personnel

The Resulting Issuer's success substantially depends on the skills, talents, abilities and services of its executive management team. The contributions of the existing management team to the immediate and near term operations of the Resulting Issuer are likely to be of central importance. Should one or more of these individuals become incapacitated, leave the employment of the Resulting Issuer or in some other way cease to participate sufficiently in the management and operation of the Resulting Issuer, its business could be materially adversely affected. The Resulting Issuer's inability to attract and retain qualified management personnel, could affect its ability to manage its business and could materially adversely affect its business, financial condition, cash flows, and results of operations. The Resulting Issuer's financial position, liquidity and results of operations depend on the executive management team's ability to execute its business strategy. Management's inability or failure to execute any element of the Resulting Issuer's business strategy could materially adversely affect the Resulting Issuer's financial position and results of operation.

The Resulting Issuer also relies heavily on key personnel and this future success depends on having the key people on board. In the unlikely event of a dramatic change in condition to Dan Bilzerian and his personal brand (popularity, health, illness, incarceration, death, dismemberment) this would have a material adverse effect on the Resulting Issuer's ability to execute its business strategy and its results of operations and financial condition may be materially adversely affected. The Resulting Issuer does not have key personnel insurance, nor does it expect to obtain such insurance in the near future. The loss of the services of such key personnel may have a material adverse effect on the Resulting Issuer business, financial condition, results of operations and prospects. In addition, there

can be no assurance that the Resulting Issuer will be able to continue to attract and retain all personnel necessary for the development and operation of its business.

### Officers and Directors Exercise Significant Control

Immediately after Closing, the officers and directors of the Resulting Issuer will own approximately 150,964,000 of the issued and outstanding Subordinate Voting Shares (assuming the conversion of the Proportionate Voting Shares to Subordinate Voting Shares at the Conversion Ratio), and are expected to control approximately 59% of the votes of the Resulting Issuer pursuant to their ownership. The Resulting Issuer's shareholders nominate and elect the Board, which generally has the ability to control the acquisition or disposition of the Resulting Issuer's assets, and the future issuance of its securities. Accordingly, for any matters with respect to which a majority vote of the Resulting Issuer Shares may be required by law, the Resulting Issuer's directors and officers may have the ability to control such matters. Because the directors and officers will exercise a significant amount of voting power in the Resulting Issuer, investors may find it difficult or impossible to replace the Resulting Issuer's directors if they disagree with the way the Resulting Issuer's business is being operated.

### Operating Risks and Insurance Coverage

The Resulting Issuer will be affected by a number of operational risks and it may not be adequately insured for certain risks, including: labour disputes; catastrophic accidents; fires; blockades or other acts of social activism; changes in the regulatory environment; impact of non-compliance with laws and regulations; and natural phenomena, such as inclement weather conditions, floods, earthquakes and ground movements. There is no assurance that the foregoing risks and hazards will not result in damage to, or destruction of, the Resulting Issuer's assets, personal injury or death, environmental damage, adverse impacts on the Resulting Issuer's operations, costs, monetary losses, potential legal liability and adverse governmental action, any of which could have an adverse impact on the Resulting Issuer's future cash flows, earnings and financial condition. Also, the Resulting Issuer may be subject to or affected by liability or sustain loss for certain risks and hazards against which the Resulting Issuer cannot insure or which it may elect not to insure because of the cost. This lack of insurance coverage could have an adverse impact on the Resulting Issuer's future cash flows, earnings, results of operations and financial condition.

Insurance that is otherwise readily available, such as workers compensation, general liability, and directors and officers insurance, is more difficult for the Resulting Issuer to find, and more expensive, because it is in the cannabis industry. There are no guarantees that the Resulting Issuer will be able to find such insurance in the future, or that the cost will be affordable. If the Resulting Issuer is forced to go without such insurance, it may prevent the Resulting Issuer from entering into certain business sectors, may inhibit its growth, may expose the Resulting Issuer to additional risk and financial liabilities and could have a material adverse effect.

### Risks Related to the New License Agreements

The Resulting Issuer's success is expected to be dependent substantially on its ability to realize the benefits from the New License Agreements. Failure to comply with the terms of the New License Agreements, or an early termination or cancellation of the New License Agreements for any reason, would have a material adverse effect on the Resulting Issuer's ability to execute its business strategy and its results of operations and financial condition may be materially adversely affected.

- 93 -

***The Resulting Issuer's Websites are Accessible in Jurisdictions where Medical or Recreational Use of Marijuana is not Permitted and, as a Result the Resulting Issuer may be Found to be Violating the Laws of those Jurisdictions***

The Resulting Issuer's websites, which advertise its products for use in connection with marijuana, are visible in jurisdictions where the medical and recreational use of marijuana is unlawful. As a result, the Resulting Issuer may face legal action brought against it by such jurisdictions for engaging in an activity illegal in that jurisdiction. Such an action could have a material adverse effect on the Resulting Issuer.

***Currency Fluctuations***

Due to the Resulting Issuer's operations in the United States, and its intention to continue future operations outside Canada, the Resulting Issuer may be exposed to significant currency fluctuations. All or substantially all of the Resulting Issuer's financings will be raised in Canadian dollars, but a substantial portion of the Resulting Issuer's operating expenses are incurred in US dollars. There is no expectation that the Resulting Issuer will put any currency hedging arrangements in place. Fluctuations in the exchange rate between the US dollar and the Canadian dollar may have a material adverse effect on the Resulting Issuer's business, financial condition and operating results. The Resulting Issuer may, in the future, establish a program to hedge a portion of its foreign currency exposure with the objective of minimizing the impact of adverse foreign currency exchange movements. However, even if the Resulting Issuer develops a hedging program, there can be no assurance that it will effectively mitigate currency risks.

***European Anti-Money Laundering Laws and Regulation***

European laws, regulations and their enforcement, particularly those pertaining to anti-money laundering, relating to making and/or holding investments in cannabis-related practices or activities are in flux and vary dramatically from jurisdiction to jurisdiction across Europe (including without limitation, the United Kingdom). The enforcement of these laws and regulations and their effect on the Resulting Issuer's shareholders are uncertain and involve considerable risk. In the event that any of the Resulting Issuer's operations, or any proceeds thereof, any dividends or distributions therefrom, or any profits or revenues accruing from such operations are found to be in violation of such laws or regulations, such transactions (including holding of Resulting Issuer Shares) could expose any shareholder(s) in that jurisdiction to potential prosecution and/or criminal and civil sanction.

***Risks Associated with Acquisitions***

As part of its overall business strategy, the Resulting Issuer may pursue select strategic acquisitions, which would provide additional product offerings, vertical integrations, additional industry expertise and a stronger industry presence in both existing and new jurisdictions. Future acquisitions may expose it to potential risks, including risks associated with: (a) the integration of new operations, services and personnel; (b) unforeseen or hidden liabilities; (c) the diversion of resources from the existing business and technology; (d) potential inability to generate sufficient revenue to offset new costs; (e) the expenses of acquisitions; or (f) the potential loss of or harm to relationships with both employees and existing users resulting from its integration of new businesses. In addition, any proposed acquisitions may be subject to regulatory approval.

- 94 -

### *The Resulting Issuer Will Be an Entrant Engaging in a New Industry*

The marijuana industry is fairly new. There can be no assurance that an active and liquid market for shares of the Resulting Issuer will develop and shareholders may find it difficult to resell their shares. Accordingly, no assurance can be given that the Resulting Issuer will be successful in the long term.

### *Dependence on Suppliers and Skilled Labour*

The ability of the Resulting Issuer to compete and grow will be dependent on it having access, at a reasonable cost and in a timely manner, to skilled labour, equipment, parts and components. No assurances can be given that the Resulting Issuer will be successful in maintaining its required supply of skilled labour, equipment, parts and components. This could have an adverse effect on the financial results of the Resulting Issuer.

### *Difficulty to Forecast*

The Resulting Issuer must rely largely on its own market research to forecast sales as detailed forecasts are not generally obtainable from other sources at this early stage of the recreational cannabis industry in Canada and the U.S. A failure in the demand for its products to materialize as a result of competition, technological change or other factors could have a material adverse effect on the business, results of operations and financial condition of the Resulting Issuer.

### *Failure to Manage Growth Effectively*

The rapid execution necessary for the Resulting Issuer to successfully implement its business strategy requires an effective planning and management process. The Resulting Issuer anticipates significant growth and will be required to continually improve its financial and management controls, reporting systems and procedures on a timely basis, and to expand, train and manage its personnel. There can be no assurance that the Resulting Issuer's procedures or controls will be adequate to support operations. If the Resulting Issuer is unable to manage growth effectively, it could suffer a material adverse effect.

### *Internal Controls*

Effective internal controls are necessary for the Resulting Issuer to provide reliable financial reports and to help prevent fraud. Although the Resulting Issuer will undertake a number of procedures and will implement a number of safeguards, in each case, in order to help ensure the reliability of its financial reports, including those imposed on the Resulting Issuer under Canadian securities law, the Resulting Issuer cannot be certain that such measures will ensure that the Resulting Issuer will maintain adequate control over financial processes and reporting. Failure to implement required new or improved controls, or difficulties encountered in their implementation, could harm the Resulting Issuer's results of operations or cause it to fail to meet its reporting obligations. If the Resulting Issuer or its auditors discover a material weakness, the disclosure of that fact, even if quickly remedied, could reduce the market's confidence in the Resulting Issuer's consolidated financial statements and materially adversely affect the trading price of the Subordinate Voting Shares.

*Liquidity*

The Resulting Issuer cannot predict at what prices the Subordinate Voting Shares will trade upon completion of the Business Combination. Following the Business Combination, the price of the Subordinate Voting Shares may fluctuate significantly due to the market's reaction to the Business Combination and general market and economic conditions. An active trading market for the Subordinate Voting Shares following the Business Combination may never develop or, if developed, it may not be sustained. CSE Approval has not yet been obtained and cannot be guaranteed. There is a significant liquidity risk associated with an investment in the Resulting Issuer. There can be no assurance that an active and liquid market for the Subordinate Voting Shares will be maintained and an investor may find it difficult to resell any securities of the Resulting Issuer.

*Additional Financing*

The Resulting Issuer's ability to implement its business plan may depend on its ability to obtain additional financing. The Resulting Issuer cannot provide assurance that it will be able to secure additional financing on terms favorable to the Resulting Issuer or at all. If adequate funds are not available on acceptable terms, the Resulting Issuer's ability to continue and grow its businesses would be dependent on the cash flow, if any, from its operations, which may not be sufficient. If additional funds are raised through the issuance of shares, the percentage ownership of then-current shareholders may be reduced, such holders may experience additional dilution and such new securities may have rights, preferences or privileges senior to those of the Resulting Issuer's previously issued shares.

*Litigation*

The Resulting Issuer may become party to litigation from time to time in the ordinary course of business which could adversely affect its business. Should any litigation in which the Resulting Issuer becomes involved be determined against the Resulting Issuer, such a decision could adversely affect the Resulting Issuer's ability to continue operating and the market price for Subordinate Voting Shares and could use significant resources. Even if the Resulting Issuer is involved in litigation and wins, litigation can redirect significant resources.

*Asset Location and Legal Proceedings*

Many of the Resulting Issuer's assets and investments will be located outside of Canada and many of its officers and directors will be resident outside of Canada and their assets are outside of Canada. Serving process on the directors and officers may prove to be difficult or excessively time consuming. Additionally, it may be difficult to enforce a judgment obtained in Canada against the Resulting Issuer, its subsidiaries and any directors and officers residing outside of Canada.

*Legislative or Regulatory Reform*

The Resulting Issuer's operations will be subject to a variety of laws, regulations, guidelines and policies relating to the manufacture, import, export, management, packaging/labeling, advertising, sale, transportation, storage and disposal of medical marijuana but also including laws and regulations relating to drugs, controlled substances, health and safety, the conduct of operations and the protection of the environment. Due to matters beyond the control of the Resulting Issuer, these laws, regulations, guidelines and policies may cause adverse effects to its operations.

- 96 -

The commercial marijuana industry is a new industry and the Resulting Issuer anticipates that such regulations will be subject to change as the governments monitor licensed producers in action.

*Competition*

The Resulting Issuer has numerous competitors throughout Canada and the United States utilizing a substantially similar business model. Excessive competition may impact sales and may cause the Resulting Issuer to reduce prices of its products. Any material reduction in prices could have a material adverse effect on the Resulting Issuer. The Resulting Issuer will be operating in a highly competitive industry where it may compete with numerous other companies in the cannabis industry, some of which may have far greater resources, more experience, and more qualified personnel than it does. There can be no assurance that the Resulting Issuer will be able to successfully compete against these other entities. To remain competitive, the Resulting Issuer will require a continued high level of investment in research and development, marketing, sales and client support. The Resulting Issuer may not have sufficient resources to maintain research and development, marketing, sales and client support efforts on a competitive basis which could materially and adversely affect the Resulting Issuer's business, financial condition and results of operations.

The legal cannabis industry is relatively new and it is highly competitive and regulated and is evolving at a fast pace. New risks may emerge to the new industry and the Resulting Issuer may not be able to predict all risks or be able to predict the outcome of certain events will affect the actual results of statements contained in any forward-looking statements. The Resulting Issuer may incur reoccurring costs and obligations related to regulatory compliance in jurisdictions which it operates. Failure to comply with these regulations may result in penalties, restrictions of operations and potentially additional costs for corrective measures. Further, changes in regulations, more vigorous enforcement of regulations or other unanticipated events could require increased compliance costs, or extensive changes to operations, which may give rise to material liabilities, and could have a material adverse effect on the Resulting Issuer and its business.

Because of the early stage of the industry in which the Resulting Issuer will operate, the Resulting Issuer expects to face additional competition from new entrants. If the number of users of cannabis in Canada and the United States increases, the demand for products will increase and the Resulting Issuer expects that competition will become more intense, as current and future competitors begin to offer an increasing number of diversified products. To remain competitive, the Resulting Issuer will require a continued high level of investment in research and development, marketing, sales and client support. The Resulting Issuer may not have sufficient resources to maintain research and development, marketing, sales and client support efforts on a competitive basis which could materially and adversely affect its business, financial condition and results of operations.

*External Factors*

The Resulting Issuer's business strategy includes operating in the cannabis industry. The success of this strategy is subject to numerous external factors, such as the Resulting Issuer's ability to attract, train and retain qualified personnel, the ability to access capital, the ability to obtain required permits and licenses, the prevailing laws and regulatory environment of each jurisdiction in which the Resulting Issuer may operate, which are subject to change at any time, the degree of competition within the industries and markets in which the Resulting Issuer operates and its effect on the

A-96

Resulting Issuer's ability to retain existing and attract new customers. Some of these factors are beyond the Resulting Issuer's control.

### Changes in Industry Standards

The industry in which the Resulting Issuer operates could be subject to rapid changes, including, among others, changes in consumer requirements and preferences. There can be no assurance that the demand for any products or services offered by the Resulting Issuer will continue, or that the mix of the Resulting Issuer's future product and service offerings will satisfy evolving consumer preferences. The success of the Resulting Issuer will be dependent upon its ability to develop, introduce and market products and services that respond to such changes in a timely fashion. Consumer preferences change from time to time and can be affected by a number of different and unexpected trends. The Resulting Issuer's failure to anticipate, identify or react quickly to these changes and trends, and to introduce new and improved products on a timely basis, could result in reduced demand for the Resulting Issuer's products, which would in turn cause the Resulting Issuer's revenues and profitability to suffer.

### Dependence on Technology

The Resulting Issuer relies on information technology systems. All of these systems are dependent upon computer and telecommunications equipment, software systems and Internet access. The temporary or permanent loss of any component of these systems through hardware failures, software errors, the vulnerability of the Internet, operating malfunctions or otherwise could interrupt the Resulting Issuer's business operations and materially adversely affect the Resulting Issuer.

### U.S. Shareholders

Major securities clearing firms in the United States have ceased participating in transactions related to securities of Canadian public companies involved in the cannabis industry. This appears to be due to the fact that marijuana continues to be listed as a controlled substance under U.S. federal law, with the result that marijuana-related practices or activities, including the cultivation, possession or distribution of marijuana, are illegal under U.S. federal law. Accordingly, U.S. residents who acquire Resulting Issuer Shares as "restricted securities" may find it difficult – if not impossible – to resell such securities over the facilities of any Canadian stock exchange on which the Resulting Issuer Shares may then be listed. It remains unclear what impact, if any, this and any future actions among market participants in the United States will have on the ability of U.S. residents to resell any Resulting Issuer Shares that they may acquire in open market transactions. Our understanding is that all U.S. brokers must use a clearing service to facilitate resale transactions over Canadian securities exchanges. Some U.S. brokers have self-clearing capabilities; those that do not must use third party clearing firms. Furthermore, U.S. holders of the Resulting Issuer Shares may have difficulty or be unable to open a brokerage account with a U.S. broker, which may restrict such holder's ability to trade its Resulting Issuer Shares in a timely manner.

### Risk Related to Capital Markets

If the Resulting Issuer raises capital by issuing debt securities, such debt securities would rank senior to the Resulting Issuer Shares upon its bankruptcy or liquidation. In addition, the Resulting Issuer may raise capital by issuing equity securities that may be senior to the Resulting Issuer Shares for the

- 98 -

purposes of dividend and liquidating distributions, which may adversely affect the market price of the Resulting Issuer Shares. Finally, upon bankruptcy or liquidation, holders of its debt securities and preferred shares and lenders with respect to other borrowings will receive a distribution of the Resulting Issuer's available assets prior to the holders of the Resulting Issuer Shares. Additional equity offerings may dilute the holdings of existing shareholders or reduce the market price of the Subordinate Voting Shares, or both.

The market price of the Subordinate Voting Shares has been and is likely in the future to be volatile. The Subordinate Voting Shares may fluctuate in response to factors such as: halting of trading by the CSE, SEC or FINRA, announcements by us regarding liquidity, legal proceedings, significant acquisitions, equity investments and divestitures, strategic relationships, addition or loss of significant customers and contracts, capital expenditure commitments, loan, note payable and agreement defaults, loss of our subsidiaries and impairment of assets, issuance of convertible or equity securities for general or merger and acquisition purposes, issuance or repayment of debt, accounts payable or convertible debt for general or merger and acquisition purposes, sale of a significant number of shares of our by shareholders, general market and economic conditions, quarterly variations in our operating results, investor relation activities, announcements of technological innovations, new product introductions by us or our competitors, competitive activities, and additions or departures of key personnel.

These broad market and industry factors may have a material adverse effect on the market price of Subordinate Voting Shares, regardless of our actual operating performance. These factors could have a material adverse effect on its business, financial condition, and/or results of operations.

## 18. PROMOTERS

### 18.1    – 18.3 – Promoter Consideration

Ignite Canada and Ignite US are not aware of any Person who could be characterized as a promoter of Ignite Canada or the Resulting Issuer or any of their subsidiaries within the two years immediately preceding the date of this Listing Statement.

## 19. LEGAL PROCEEDINGS

### 19.1    Legal Proceedings

The Resulting Issuer and its subsidiaries were not previously a party to, or the subject of, any legal proceeding nor are currently party to any material legal proceeding or contemplating any legal proceedings which are material to their business. From time to time, however, the Resulting Issuer or its subsidiaries may be subject to various claims and legal actions arising in the ordinary course of business. Management of Ignite Canada and Ignite US are not currently aware of any legal proceedings contemplated against the Resulting Issuer or any of its subsidiaries.

### 19.2    Regulatory Actions

The Resulting Issuer and its subsidiaries are not subject to any penalties or sanctions imposed by any court or regulatory authority relating to securities legislation or by a securities regulatory authority nor has any party entered into a settlement agreement with a securities regulatory authority or been subject to any other penalties or sanctions imposed by a court or regulatory body or self-regulatory

authority that are necessary to provide full, true and plain disclosure of all material facts relating to the Resulting Issuer's securities or would be likely to be considered important to a reasonable investor making an investment decision.

## 20. INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS

Other than as otherwise disclosed herein, no proposed director or executive officer of the Resulting Issuer nor any Person or company that is the direct or indirect beneficial owners of, or who exercises control or direction over, more than 10% of any class of the Resulting Issuer's outstanding voting securities, or an Associate or Affiliate of any Persons or companies referred to in this paragraph, has any material interest, direct or indirect, in any transaction within the three years before the date of this Listing Statement, or in any transaction, that has materially affected or will materially affect the Resulting Issuer or a subsidiary of the Resulting Issuer.

## 21. AUDITORS, TRANSFER AGENTS AND REGISTRARS

### 21.1    Auditors

The auditors of the Resulting Issuer will be Davidson & Company LLP, Chartered Professional Accountants at its office located at 1200 – 609 Granville Street, P.O. Box 10372, Pacific Centre, Vancouver, British Columbia, V7Y 1G6.

### 21.2    Transfer Agent and Registrar

The transfer agent and registrar of the Resulting Issuer will be Odyssey Trust Company at its office located at United Kingdom Building, 323 – 409 Granville Street, Vancouver, British Columbia, V6C 1T2.

## 22. MATERIAL CONTRACTS

### 22.1    Material Contracts

The following are a summary of the material contracts, other than contracts entered into in the ordinary course of business, entered into by Ignite Canada and Ignite US during the course of the two years prior to the date of the Listing Statement, as well as those that the Resulting Issuer and its subsidiaries intend to enter in connection with the Business Combination:

a)      Tahoe Note (see Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Tahoe Hydroponics Company, LLC*);

b)      Subscription Agreements with Salvation (see Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Salvation Botanicals Ltd.*);

c)      the Convertible Note (see Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd.*);

- 100 -

d)      the First Share Exchange Agreement (see Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd. – Share Exchange Transaction*);

e)      the Prior Bilzerian License Agreement (see Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd.*);

f)      the License Agreement (see Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd. – License Agreement*);

g)      the Business Combination Agreement (see Section 3.1 – *General Development of the Business – Fundamental Change – Business Combination Agreement)*;

h)      the Trademark and License Agreement with Cura (see Section 3.1 – *General Development of the Business – Recent Developments of Ignite US*);

i)      the Trademark and License Agreement with Loudpack (see Section 3.1 – *General Development of the Business – Recent Developments of Ignite US*);

j)      the Trademark and License Agreement with Bo (see Section 3.1 – *General Development of the Business – Recent Developments of Ignite US*);

k)      the Harvest Joint Venture Agreement (see Section 3.1 – *General Development of the Business – Recent Developments of Ignite US*);

l)      the Merchandising Agreement with Bravado (see Section 3.1 – *General Development of the Business – Recent Developments of Ignite US*);

m)      the Canadian IP License Agreement (see Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd. – Canadian IP License Agreement*); and

n)      the International IP License Agreement (see Section 3.1 – *General Development of the Business – Ignite Canada's New Global Cannabis Operations – Ignite International, Ltd. – International IP License Agreement*).

## 22.2    **Special Agreements**

This section is not applicable to the Resulting Issuer.

## 23. INTEREST OF EXPERTS

No Person or corporation whose profession or business gives authority to a statement made by the Person or corporation and who is named as having prepared or certified a part of this Listing Statement or as having prepared or certified a report or valuation described or included in this Listing Statement holds any beneficial interest, direct or indirect, in any securities or property of Ignite Canada, Ignite US, the Resulting Issuer or of an Associate or Affiliate of Ignite Canada, Ignite US or the

- 101 -

Resulting Issuer and no such Person is expected to be elected, appointed or employed as a director, senior officer or employee of Ignite Canada, Ignite US, the Resulting Issuer or of an Associate or Affiliate of Ignite Canada, Ignite US or the Resulting Issuer and no such Person is a promoter of Ignite Canada, Ignite US, the Resulting Issuer or an Associate or Affiliate of Ignite Canada, Ignite US or the Resulting Issuer.

Davidson & Company LLP, Chartered Professional Accountants, is independent of Ignite Canada, Ignite US and the Resulting Issuer in accordance with the rules of professional conduct of the Institute of Chartered Professional Accountants of British Columbia.

## 24. OTHER MATERIAL FACTS

**Certain United States Federal Income Tax Considerations**

The following discussion is a summary of certain material U.S. federal income tax considerations for U.S. Holders and Non-U.S. Holders (each as defined below) relating to the ownership and disposition of Subordinate Voting Shares. This summary is general in nature and does not discuss all aspects of U.S. federal income taxation that may be relevant to a holder of Subordinate Voting Shares in light of its particular circumstances. In addition, this summary does not address the U.S. federal alternative minimum tax, the Medicare tax on net investment income, U.S. federal estate and gift taxes, U.S. state and local taxes or foreign taxes. This summary deals only with Subordinate Voting Shares held as capital assets within the meaning of Section 1221 of the Code (generally, property held for investment), and does not address tax considerations applicable to any holder of Subordinate Voting Shares that may be subject to special treatment under the United States federal income tax laws, including:

- a bank or other financial institution;
- a tax-exempt or governmental organization;
- a retirement plan or other tax-deferred account (other than with respect to US Holders in the 401(k) Plan),;
- a partnership, an S corporation or other entity treated as a partnership or pass-through (or an investor therein);
- an insurance company;
- a mutual fund, regulated investment company or real estate investment trust;
- a Person that purchases or sells Subordinate Voting Shares as part of a wash sale for tax purposes;
- a dealer or broker in stocks and securities, or currencies;
- a trader in securities that elects mark-to-market treatment;
- a holder of Subordinate Voting Shares subject to the alternative minimum tax provisions of the Code;
- a holder of Subordinate Voting Shares that received Subordinate Voting Shares through the exercise of an employee stock option, through a tax qualified retirement plan or otherwise as compensation;
- a Person that owns (or is deemed to own) 10% or more of the total votes or total value of the outstanding Resulting Issuer stock;
- a Person who is required to accelerate the recognition of any item of gross income with respect to Resulting Issuer stock as a result of such income being recognized on an applicable financial statement;

- 102 -

- a U.S. Holder whose functional currency is not the U.S. dollar;
- a Person that holds Subordinate Voting Shares as part of a hedge, straddle, constructive sale, conversion or other integrated transaction;
- "controlled foreign corporations";
- "passive foreign investment companies"; or
- a U.S. expatriate.

This summary is based on the Code, treasury regulations promulgated under the Code, and rulings and judicial decisions, all as in effect as of the date hereof, and all of which are subject to change or differing interpretations at any time, possibly with retroactive effect. We have not sought, and do not intend to seek, any ruling from the IRS with respect to the statements made and the conclusions reached in the following summary, and no assurance can be given that the IRS will agree with the views expressed herein, or that a court will not sustain any challenge by the IRS in the event of litigation. If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds Subordinate Voting Shares, the tax treatment of a partner in the partnership generally will depend upon the status of the partner and the activities of the partnership. A partner in a partnership should consult its own tax advisors regarding the tax consequences of acquiring, holding and disposing of Subordinate Voting Shares.

**THIS DISCUSSION IS INTENDED ONLY AS A GENERAL SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES TO A HOLDER OF SUBORDINATE VOTING SHARES. WE URGE BENEFICIAL OWNERS OF SUBORDINATE VOTING SHARES TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE SPECIFIC TAX CONSEQUENCES OF ACQUIRING, HOLDING AND DISPOSING OF SUBORDINATE VOTING SHARES.**

**U.S. Holders**

A "**U.S. Holder**" of Subordinate Voting Shares means a holder that is for U.S. federal income tax purposes:

- an individual citizen or resident of the U.S.;

- a corporation (or other entity taxable as a corporation) created or organized in or under the laws of the U.S. or any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if it: (1) is subject to the primary supervision of a court within the U.S. and one or more U.S. persons have the authority to control all substantial decisions of the trust; or (2) has a valid election in effect under applicable treasury regulations to be treated as a U.S. Person.

With respect to the first bullet point above, an individual is generally treated as a resident of the U.S. in any calendar year for U.S. federal income tax purposes if the individual either (i) is the holder of a green card, generally during any point of such year, or (ii) is present in the U.S. for at least 31 days in that calendar year, and for an aggregate of at least 183 days during the three-year period ending on the last day of the current calendar year. For purposes of the 183-day calculation (often referred to as the Substantial Presence Test), all of the days present in the U.S. during the current year, one-third of the days present in the U.S. during the immediately preceding year, and one-sixth of the days

A-102

- 103 -

present in the second preceding year are counted. Residents of the U.S. are generally treated for U.S. federal income tax purposes as if they were U.S. citizens.

**Non-U.S. Holders**

A "**Non-U.S. Holder**" is a beneficial owner of Subordinate Voting Shares (other than an entity or arrangement classified as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder.

### *Tax Classification as a U.S. Domestic Corporation*

As a result of the Business Combination, pursuant to Section 7874(b) of the Code and the treasury regulations promulgated thereunder, notwithstanding that the Resulting Issuer is organized under the provisions of the BCBCA, solely for U.S. federal income tax purposes, it is anticipated that the Resulting Issuer will be treated as a U.S. domestic corporation.

The Resulting Issuer anticipates that it will experience a number of significant and complicated U.S. federal income tax consequences as a result of being treated as a U.S. domestic corporation for U.S. federal income tax purposes, and this summary does not attempt to describe all such U.S. federal income tax consequences. Section 7874 of the Code and the treasury regulations promulgated thereunder do not address all the possible tax consequences that arise from the Resulting Issuer being treated as a U.S. domestic corporation for U.S. federal income tax purposes. Accordingly, there may be additional or unforeseen U.S. federal income tax consequences to the Resulting Issuer that are not discussed in this summary.

Generally, the Resulting Issuer will be subject to U.S. federal income tax on its worldwide taxable income (regardless of whether such income is "U.S. source" or "foreign source") and will be required to file a U.S. federal income tax return annually with the IRS. The Resulting Issuer anticipates that it will also be subject to tax in Canada. It is unclear whether the Resulting Issuer will be entitled to foreign tax credits under the Code and how the foreign tax credit rules will operate in certain circumstances, as a result of the Resulting Issuer being treated as a U.S. domestic corporation for U.S. federal income tax purposes and the taxation of the Resulting Issuer also in Canada. Accordingly, it is possible that the Resulting Issuer will be subject to double taxation with respect to all or part of its taxable income. It is anticipated that such U.S. and Canadian tax treatment will continue indefinitely and that the Subordinate Voting Shares will be treated indefinitely as shares in a U.S. domestic corporation for U.S. federal income tax purposes, notwithstanding future transfers. The remainder of this summary assumes that the Resulting Issuer will be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

### *Tax Considerations for U.S. Holders*

Distributions

Distributions of cash or property with respect to Subordinate Voting Shares will constitute dividends for U.S. federal income tax purposes to the extent paid from the Resulting Issuer's current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Dividends will generally be taxable to a non-corporate U.S. Holder at the preferential rates applicable to long-term capital gains, provided that such holder meets certain holding period and other requirements. Distributions in excess thereof will generally be treated first, as a return of capital and be applied against, and reduce, a U.S. Holder's adjusted tax basis in its Subordinate Voting Shares, but not below zero, and thereafter be treated as capital gain and treated as described under Section 24 – *Other Material Facts – Certain United States Federal Income Tax Considerations – Tax Considerations for U.S. Holders – Sale or Other Taxable Disposition* below.

A-103

- 104 -

Dividends received by corporate U.S. Holders may be eligible for a dividends received deduction, subject to certain restrictions relating to, among others, the corporate U.S. Holder's taxable income, holding period and debt financing.

Sale or Other Taxable Disposition

Upon the sale or other taxable disposition of Subordinate Voting Shares, a U.S. Holder will generally recognize capital gain or loss equal to the difference between (i) the amount realized by such U.S. Holder in connection with such sale or other taxable disposition, and (ii) such U.S. Holder's adjusted tax basis in such stock. Such capital gain or loss will generally be long-term capital gain or loss if the U.S. Holder's holding period respecting such stock is more than twelve months. U.S. Holders who are individuals are eligible for preferential rates of taxation respecting their long term capital gains. Deductions for capital losses are subject to limitations.

Foreign Tax Credit Limitations

Because it is anticipated that the Resulting Issuer will be subject to tax both as a U.S. domestic corporation and as a Canadian corporation, a U.S. Holder may pay, through withholding, Canadian tax, as well as U.S. federal income tax, with respect to dividends paid on Subordinate Voting Shares. For U.S. federal income tax purposes, a U.S. Holder generally may elect for any taxable year to receive either a credit or a deduction for foreign income taxes paid by the holder during the year. Complex limitations apply to the foreign tax credit, including a general limitation that the credit cannot exceed the proportionate share of a taxpayer's U.S. federal income tax that the taxpayer's foreign source taxable income bears to the taxpayer's worldwide taxable income. In applying this limitation, items of income and deduction must be classified, under complex rules, as either foreign source or U.S. source. The status of the Resulting Issuer as a U.S. domestic corporation for U.S. federal income tax purposes will cause dividends paid by the Resulting Issuer to be treated as U.S. source rather than foreign source for this purpose. As a result, a foreign tax credit may be unavailable to U.S. Holders for any Canadian tax paid on dividends received from the Resulting Issuer. Similarly, to the extent a sale or disposition of the Subordinate Voting Shares by a U.S. Holder results in Canadian tax payable by the U.S. Holder (for example, in the event the Subordinate Voting Shares constitute taxable Canadian property within the meaning of the ITA), a U.S. foreign tax credit may be unavailable to the U.S. Holder for such Canadian tax. In each case, however, the U.S. Holder should be able to take a deduction for the U.S. Holder's Canadian tax paid, provided that the U.S. Holder has not elected to credit other foreign taxes during the same taxable year. The foreign tax credit rules are complex, and each U.S. Holder should consult its own tax advisors regarding these rules.

Foreign Currency

The amount of any distribution paid to a U.S. Holder in foreign currency, or the amount of proceeds paid in foreign currency on the sale, exchange or other taxable disposition of Subordinate Voting Shares, generally will be equal to the U.S. dollar value of such foreign currency based on the exchange rate applicable on the date of receipt (regardless of whether such foreign currency is converted into U.S. dollars at that time). A U.S. Holder will have a basis in the foreign currency equal to its U.S. dollar value on the date of receipt. Any U.S. Holder who converts or otherwise disposes of the foreign currency after the date of receipt may have a foreign currency exchange gain or loss that would be treated as ordinary income or loss, and generally will be U.S. source income or loss for foreign tax credit purposes. Different rules apply to U.S. Holders who use the accrual method of tax accounting. Each U.S. Holder should consult its own U.S. tax advisors regarding the U.S. federal income tax consequences of receiving, owning, and disposing of foreign currency.

- 105 -

Information Reporting and Backup Withholding

U.S. backup withholding (currently 24%) is imposed upon certain payments to Persons that fail (or are unable) to furnish the information required pursuant to U.S. information reporting requirements. Distributions to U.S. Holders will generally be exempt from backup withholding, provided the U.S. Holder meets applicable certification requirements, including providing a U.S. taxpayer identification number on a properly completed IRS Form W-9, or otherwise establishes an exemption. The Resulting Issuer must report annually to the IRS and to each U.S. Holder the amount of distributions and dividends paid to that U.S. Holder and the proceeds from the sale or other disposition of Subordinate Voting Shares, unless such U.S. Holder is an exempt recipient.

Backup withholding does not represent an additional tax. Any amounts withheld from a payment to a U.S. Holder under the backup withholding rules will generally be allowed as a credit against such U.S. Holder's U.S. federal income tax liability, and may entitle such U.S. Holder to a refund, provided the required information and returns are timely furnished by such U.S. Holder to the IRS.

### Tax Considerations for Non-U.S. Holders

Distributions

Distributions of cash or property on Subordinate Voting Shares will constitute U.S. source dividends for U.S. federal income tax purposes to the extent paid from the Resulting Issuer's current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess thereof will first constitute a return of capital and be applied against and reduce a Non-U.S. Holder's adjusted tax basis in its Subordinate Voting Shares, but not below zero, and thereafter be treated as capital gain and will be treated as described under Section 24 – *Other Material Facts – Certain United States Federal Income Tax Considerations – Tax Considerations for Non-US Holders – Sale or Other Taxable Disposition* below.

Subject to the discussions under Section 24 – *Other Material Facts – Certain United States Federal Income Tax Considerations – Tax Considerations for Non-U.S. Holders – Information Reporting and Backup Withholding* and under Section 24 – *Other Material Facts – Certain United States Federal Income Tax Considerations – Tax Considerations for Non-U.S. Holders – FATCA* below, any dividend paid to a Non-U.S. Holder of Subordinate Voting Shares generally will be subject to U.S. federal withholding tax at a rate of 30%, or such lower rate as may be specified under an applicable income tax treaty, unless the dividend is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the U.S.. In order to receive a reduced treaty rate, a Non-U.S. Holder must provide its financial intermediary with an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or an appropriate successor form), properly certifying such holder's eligibility for the reduced rate. If a Non-U.S. Holder holds Subordinate Voting Shares through a financial institution or other agent acting on the Non-U.S. Holder's behalf, the Non-U.S. Holder will be required to provide appropriate documentation to such agent, and the Non-U.S. Holder's agent will then be required to provide such (or a similar) certification to us, either directly or through other intermediaries. A Non-U.S. Holder that does not timely furnish the required certification, but that qualifies for a reduced treaty rate, generally may apply for and obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their own tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

Dividends paid to a Non-U.S. Holder that are effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S. (or, if required by an applicable income tax treaty, are attributable to a U.S. permanent establishment, or fixed base, of the Non-U.S. Holder) generally will be exempt from the withholding tax described above and instead will be subject to U.S. federal

- 106 -

income tax on a net income basis at regular graduated U.S. federal income tax rates applicable to U.S. Holders. In such case, the Resulting Issuer will not have to withhold U.S. federal tax so long as the Non-U.S. Holder timely complies with the applicable certification and disclosure requirements. In order to obtain this exemption from withholding tax, a Non-U.S. Holder must provide its financial intermediary with an IRS Form W-8ECI properly certifying its eligibility for such exemption. Any such effectively connected dividends received by a corporate Non-U.S. Holder may be subject to an additional "branch profits tax" at a rate of 30% (or such lower rate as may be specified by an applicable income tax treaty), as adjusted for certain items. Non-U.S. Holders should consult their own tax advisors regarding any applicable tax treaties that may provide for different rules.

Sale or Other Taxable Disposition

Subject to the discussions under Section 24 – *Other Material Facts – Certain United States Federal Income Tax Considerations – Tax Considerations for Non-U.S. Holders – Information Reporting and Backup Withholding* and under Section 24 – *Other Material Facts – Certain United States Federal Income Tax Considerations – Tax Considerations for Non-U.S. Holders – FATCA* below, any gain realized on the sale or other disposition of Subordinate Voting Shares by a Non-U.S. Holder generally will not be subject to U.S. federal income tax unless:

- the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S. (or, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment, or fixed base, of the Non-U.S. Holder);

- the Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition, and certain other conditions are met; or

- the rules of the Foreign Investment in Real Property Tax Act of 1980 ("**FIRPTA**") apply to treat the gain as effectively connected with a U.S. trade or business.

A Non-U.S. Holder who has gain that is described in the first bullet point immediately above generally will be subject to U.S. federal income tax on the gain derived from the sale or other disposition pursuant to regular graduated U.S. federal income tax rates in the same manner as if it were a U.S. Holder. In addition, a corporate Non-U.S. Holder described in the first bullet point immediately above may be subject to the branch profits tax equal to 30% of its effectively connected earnings and profits (or at such lower rate as may be specified by an applicable income tax treaty), as adjusted for certain items.

A Non-U.S. Holder who meets the requirements described in the second bullet point immediately above will be subject to a flat 30% tax (or a lower tax rate specified by an applicable tax treaty) on the gain derived from the sale or other disposition, which gain may be offset by certain U.S. source capital losses (even though the individual is not considered a resident of the U.S.), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

With respect to the third bullet point above, pursuant to FIRPTA, in general, a Non-U.S. Holder is subject to U.S. federal income tax in the same manner as a U.S. Holder on any gain realized on the sale or other disposition of a "U.S. real property interest" ("**USRPI**"). For purposes of these rules, a USRPI generally includes stock in a U.S. corporation if such corporation's interests in U.S. real property constitute 50% or more, by value, of the sum of the U.S. corporation's (i) assets used in a trade or business, (ii) U.S. real property interests, and (iii) interests in real property outside of the U.S. A U.S. corporation whose interests in U.S. real property constitute 50% or more, by value, of the sum of such assets is commonly referred to as a U.S. real property holding corporation ("**USRPHC**").

A-106

- 107 -

The Resulting Issuer believes that it is not, has not been, and as a result of the Business Combination, does not anticipate becoming a USRPHC.

Information Reporting and Backup Withholding

With respect to distributions and dividends on Subordinate Voting Shares, the Resulting Issuer must report annually to the IRS and to each Non-U.S. Holder the amount of distributions and dividends paid to such Non-U.S. Holder and any tax withheld with respect to such distributions and dividends, regardless of whether withholding was required with respect thereto. Copies of the information returns reporting such dividends and distributions and withholding also may be made available to the tax authorities in the country in which the Non-U.S. Holder resides or is established under the provisions of an applicable income tax treaty, tax information exchange agreement or other arrangement. A Non-U.S. Holder will be subject to backup withholding for dividends and distributions paid to such Non-U.S. Holder unless either (i) such Non-U.S. Holder certifies under penalty of perjury that it is not a U.S. Person (as defined in the Code), which certification is generally satisfied by providing a properly executed IRS Form W-8BEN, IRS Form W-8BEN-E, or IRS Form W-8ECI (or appropriate successor form), and the payor does not have actual knowledge or reason to know that such holder is a U.S. Person, or (ii) such Non-U.S. Holder otherwise establishes an exemption.

With respect to sales or other dispositions of Subordinate Voting Shares, information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other disposition of Subordinate Voting Shares within the U.S. or conducted through certain U.S.-related financial intermediaries, unless either (i) such Non-U.S. Holder certifies under penalty of perjury that it is not a U.S. Person (as defined in the Code), which certification is generally satisfied by providing a properly executed IRS Form W-8BEN, IRS Form W-8BEN-E, or IRS Form W8ECI (or appropriate successor form), and the payor does not have actual knowledge or reason to know that such holder is a U.S. Person, or (ii) such Non-U.S. Holder otherwise establishes an exemption.

Whether with respect to distributions and dividends, or the sale or other disposition of Subordinate Voting Shares, backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Non-U.S. Holder's U.S. federal income tax liability, if any, provided the required information is timely furnished to the IRS.

FATCA

Withholding taxes may be imposed pursuant to FATCA (Sections 1471 through 1474 of the Code) on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities. Specifically, except as discussed below, a 30% withholding tax may be imposed on dividends on, Subordinate Voting Shares paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Code).

Such 30% FATCA withholding will not apply to a foreign financial institution if such institution undertakes certain diligence and reporting obligations, or otherwise qualifies for an exemption from these rules. The diligence and reporting obligations include, among others, entering into an agreement with the U.S. Department of Treasury pursuant to which the foreign financial institution must (i) undertake to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the Code), (ii) annually report certain information about such accounts, and (iii) withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the U.S. governing FATCA may be subject to different rules.

- 108 -

The 30% FATCA withholding will not apply to a non-financial foreign entity which either certifies that it does not have any "substantial United States owners" (as defined in the Code), furnishes identifying information regarding each substantial United States owner, or otherwise qualifies for an exemption from these rules.

Under the applicable treasury regulations and administrative guidance, withholding under FATCA generally applies currently to payments of dividends on Subordinate Voting Shares.

**THE FOREGOING SUMMARY IS NOT INTENDED TO CONSTITUTE A COMPLETE DESCRIPTION OF ALL TAX CONSEQUENCES THAT MAY BE RELEVANT TO PARTICULAR HOLDERS OF SUBORDINATE VOTING SHARES AND IS NOT TAX OR LEGAL ADVICE. HOLDERS OF SUBORDINATE VOTING SHARES SHOULD CONSULT THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM (INCLUDING THE APPLICATION AND EFFECT OF ANY STATE, LOCAL, NON-U.S. INCOME AND OTHER TAX LAWS) OF ACQUIRING, HOLDING AND DISPOSING OF SUBORDINATE VOTING SHARES.**

**25. FINANCIAL STATEMENTS**

Schedule A contains the audited financial statements of Ignite Canada, including the auditor's report thereon, for the ten months ended December 31, 2018 and for the years ended February 28, 2018 and February 28 2017.

Schedule C contains the audited financial statements of Ignite US, including the auditor's report thereon, for the year ended December 31, 2018**.**

Schedule E contains the pro-forma financial statements of the Resulting Issuer.

- 109 -

**CERTIFICATE OF THE ISSUER**

Pursuant to a resolution duly passed by its Board of Directors, Ignite International Brands, Ltd. hereby applies for the listing of the above mentioned securities on the Canadian Securities Exchange. The foregoing contains full, true and plain disclosure of all material information relating to Ignite International Brands, Ltd. It contains no untrue statement of a material fact and does not omit to state a material fact that is required to be stated or that is necessary to prevent a statement that is made from being false or misleading in light of the circumstances in which it was made.

Dated at Vancouver, British Columbia this 30th day of May, 2019.


*/s/ Dan Bilzerian*                              */s/ Edoardo (Eddie) Mattei*
Dan Bilzerian                                    Edoardo (Eddie) Mattei
Chief Executive Officer and Director             Chief Financial Officer and
                                                 Corporate Secretary

**ON BEHALF OF THE BOARD OF DIRECTORS**

*/s/* Scott Rohleder
Scott Rohleder
Director

- 110 -

**CERTIFICATE OF THE TARGET**

The foregoing contains full, true and plain disclosure of all material information relating to Ignite International, Ltd. It contains no untrue statement of a material fact and does not omit to state a material fact that is required to be stated or that is necessary to prevent a statement that is made from being false or misleading in light of the circumstances in which it was made.

Dated at Vancouver, British Columbia this 30th day of May, 2019.


*/s/ Dan Bilzerian*                                         */s/ Eddie Mattei*
Dan Bilzerian                                                   Eddie Mattei
Chief Executive Officer                                  Chief Financial Officer


**ON BEHALF OF THE BOARD OF DIRECTORS**

*/s/ Dan Bilzerian*
Dan Bilzerian
Sole Director

**Schedule A – Financial Statements of Ignite International Brands, Ltd.**

# IGNITE INTERNATIONAL BRANDS, LTD.
### (formerly Green Axis Capital Corp.)

## CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE TEN MONTHS ENDED DECEMBER 31, 2018
### (Expressed in Canadian Dollars)

# DAVIDSON & COMPANY LLP —————— Chartered Professional Accountants ——————

## INDEPENDENT AUDITORS' REPORT

To the Shareholders of
Ignite International Brands, Ltd. (formerly Green Axis Capital Corp.)

### *Opinion*

We have audited the accompanying consolidated financial statements of Ignite International Brands, Ltd. (formerly Green Axis Capital Corp.) (the "Company"), which comprise the consolidated statements of financial position as at December 31, 2018 and February 28, 2018 and the consolidated statements of loss and comprehensive loss, cash flows and changes in shareholders' equity for the ten months ended December 31, 2018 and the year ended February 28, 2018, and notes to the consolidated financial statements, including a summary of significant accounting policies.

In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of Ignite International Brands, Ltd. (formerly Green Axis Capital Corp.) as at December 31, 2018 and February 28, 2018, and its financial performance and its cash flows for the ten months ended December 31, 2018 and the year ended February 28, 2018 in accordance with International Financial Reporting Standards ("IFRS").

### *Basis for Opinion*

We conducted our audits in accordance with Canadian generally accepted auditing standards. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Consolidated Financial Statements section of our report. We are independent of the Company in accordance with the ethical requirements that are relevant to our audit of the consolidated financial statements in Canada, and we have fulfilled our other ethical responsibilities in accordance with these requirements. We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our opinion.

### *Other Information*

Management is responsible for the other information. The other information obtained at the date of this auditor's report includes Management's Discussion and Analysis.

Our opinion on the consolidated financial statements does not cover the other information and we do not express any form of assurance conclusion thereon.

In connection with our audit of the consolidated financial statements, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the consolidated financial statements or our knowledge obtained in the audit, or otherwise appears to be materially misstated.

We obtained Management's Discussion and Analysis prior to the date of this auditors' report. If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report in this regard.

### *Responsibilities of Management and Those Charged with Governance for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with IFRSs, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.



A member of
Nexia
International

1200 - 609 Granville Street, P.O. Box 10372, Pacific Centre, Vancouver, B.C., Canada V7Y 1G6
Telephone (604) 687-0947 Davidson-co.com

In preparing the consolidated financial statements, management is responsible for assessing the Company's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless management either intends to liquidate the Company or to cease operations, or has no realistic alternative but to do so.

Those charged with governance are responsible for overseeing the Company's financial reporting process.

*Auditor's Responsibilities for the Audit of the Consolidated Financial Statements*

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with Canadian generally accepted auditing standards will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

As part of an audit in accordance with Canadian generally accepted auditing standards, we exercise professional judgment and maintain professional skepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control.
- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by management.
- Conclude on the appropriateness of management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Company's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the consolidated financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Company to cease to continue as a going concern.
- Evaluate the overall presentation, structure and content of the consolidated financial statements, including the disclosures, and whether the consolidated financial statements represent the underlying transactions and events in a manner that achieves fair presentation.
- Obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Company to express an opinion on the consolidated financial statements. We are responsible for the direction, supervision and performance of the group audit. We remain solely responsible for our audit opinion.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, related safeguards.

The engagement partner on the audit resulting in this independent auditor's report is Erez Bahar.

**"DAVIDSON & COMPANY LLP"**

Vancouver, Canada                                          Chartered Professional Accountants

February 28, 2019

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
CONSOLIDATED STATEMENTS OF FINANCIAL POSITION
(Expressed in Canadian Dollars)
AS AT

| | December 31, 2018 | February 28, 2018 |
|---|---|---|
| **ASSETS** | | |
| **Current** | | |
| Cash and cash equivalents | $ 5,414,949 | $ 15,220,447 |
| Receivables | 222,708 | 92,573 |
| Advances | 12,321 | 210,661 |
| Prepaid expenses | 118,062 | 200,826 |
| Current portion of promissory notes (Note 7) | 1,910,079 | - |
| **Total current assets** | 7,678,119 | 15,724,507 |
| **Non-current** | | |
| Equipment (Note 5) | 45,974 | - |
| Investments (Note 6) | 3,224,246 | 1,500,000 |
| Promissory notes (Note 7) | 5,272,877 | 1,782,480 |
| **Total assets** | $ 16,221,216 | $ 19,006,987 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current** | | |
| Trade payables and accrued liabilities | $ 343,960 | $ 1,204,356 |
| Obligation to issue shares (Note 8) | - | 921,681 |
| Subscriptions received in advance (Note 8) | 53,204 | 1,617,273 |
| **Total liabilities** | 397,164 | 3,743,310 |
| **Shareholders' equity** | | |
| Share capital (Note 8) | 35,644,654 | 32,988,727 |
| Subscriptions receivable (Note 8) | - | (315,950) |
| Reserves (Note 8) | 1,717,799 | 897,799 |
| Deficit | (21,538,401) | (18,306,899) |
| **Total shareholders' equity** | 15,824,052 | 15,263,677 |
| **Total liabilities and shareholders' equity** | $ 16,221,216 | $ 19,006,987 |

Nature of operations and going concern (Note 1)
Commitments and contingencies (Note 12)
Subsequent events (Note 15)

_____  Director  _____  Director
      *"Dan Bilzerian"*                            *"Luciano Galasso"*

*The accompanying notes are an integral part of these consolidated financial statements.*

-2-

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
CONSOLIDATED STATEMENTS OF LOSS AND COMPREHENSIVE LOSS
(Expressed in Canadian Dollars)

| | Ten Months Ended December 31, 2018 | | Twelve Months Ended February 28, 2018 | |
|---|---|---|---|---|
| **EXPENSES** | | | | |
| Advertising and promotion | $ | 387,871 | $ | 108,376 |
| Depreciation (Note 5) | | 2,554 | | 582 |
| Insurance | | 8,608 | | 5,807 |
| Management and consulting fees | | 1,199,336 | | 189,436 |
| Office costs | | 42,451 | | 16,911 |
| Professional fees | | 868,687 | | 248,652 |
| Regulatory and transfer agent fees | | 43,272 | | 43,868 |
| Rent | | 63,149 | | 1,500 |
| Share-based payments | | 820,000 | | - |
| Travel | | 169,439 | | 52,871 |
| | | | | |
| **Total operating expenses** | | (3,605,367) | | (668,003) |
| | | | | |
| Interest income | | 336,350 | | 43,839 |
| General exploration | | - | | (1,000) |
| Interest expense | | - | | (442) |
| Foreign exchange | | 37,515 | | 30,971 |
| Loss on disposal of assets | | - | | (2,521) |
| Gain on fair value of marketable securities | | - | | 55,000 |
| | | | | |
| | | 373,865 | | 125,847 |
| | | | | |
| **Loss and comprehensive loss for the period** | $ | (3,231,502) | $ | (542,156) |
| | | | | |
| **Loss per common share, basic and diluted** | $ | (0.34) | $ | (0.19) |
| | | | | |
| **Weighted average number of common shares outstanding Basic and diluted** | | 9,384,119 | | 2,862,922 |

*The accompanying notes are an integral part of these consolidated financial statements.*

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Expressed in Canadian Dollars)

| | Ten Months Ended December 31, 2018 | Twelve Months Ended February 28, 2018 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Loss for the period | $ (3,231,502) | $ (542,156) |
| | | |
| Items not involving cash: | | |
| Shares issued for services | 250,000 | - |
| Depreciation | 2,554 | 582 |
| Accrued interest on promissory notes | (288,021) | (53,265) |
| Accrued interest receivable | (41,092) | - |
| Loss on disposal of assets | - | 2,521 |
| Unrealized gain on fair value of marketable securities | - | (55,000) |
| Foreign exchange on promissory notes | (112,454) | - |
| Share-based compensation | 820,000 | - |
| | (2,600,515) | (647,318) |
| | | |
| **Changes in non-cash working capital items:** | | |
| Receivables | (89,043) | (79,773) |
| Prepaid expenses | 82,764 | (198,728) |
| Advances | 198,340 | (210,661) |
| Trade payables and accrued liabilities | (860,396) | 393,795 |
| | | |
| **Net cash used in operating activities** | (3,268,850 ) | (742,685) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Promissory notes | (5,000,001) | (1,729,215) |
| Equipment | (48,528) | - |
| Reclamation bond | - | 30,000 |
| Investments | - | (1,000,000) |
| | | |
| **Net cash used in investing activities** | (5,048,529) | (2,699,215) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from share issuance, net of costs | (240,000) | 16,106,841 |
| Obligation to issue shares | - | 921,681 |
| Subscriptions received (refunded) in advance | (1,248,119) | 1,617,273 |
| | | |
| **Net cash received from (used in) financing activities** | (1,488,119) | 18,645,795 |
| | | |
| **Change in cash for the period** | (9,805,498) | 15,203,895 |
| | | |
| **Cash and cash equivalents, beginning of the period** | 15,220,447 | 16,552 |
| | | |
| **Cash and cash equivalents, end of the period** | $ 5,414,949 | $ 15,220,447 |
| **Cash paid during the period for interest** | $ - | $ - |
| **Cash paid during the period for income taxes** | $ - | $ - |

Supplemental Cash flow Information (Note 14)

*The accompanying notes are an integral part of these consolidated financial statements.*

-4-

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY
(Expressed in Canadian Dollars)

| | Share Capital | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Number of Common Shares | Amount | Reserves | Subscriptions Receivable | Deficit | Total |
| **Balance, February 28, 2017** | 551,867 | $ 17,204,394 | $ 699,341 | $ - | $ (17,764,743) | $ 138,992 |
| Private placement | 7,453,079 | 17,468,525 | - | (315,950) | - | 17,152,575 |
| Share issuance costs | 41,300 | (1,244,192) | 198,458 | - | - | (1,045,734) |
| Return of capital | - | (440,000) | - | - | - | (440,000) |
| Loss for the year | - | - | - | - | (542,156) | (542,156) |
| **Balance, December 31, 2016** | 8,046,246 | $ 32,988,727 | $ 897,799 | $ (315,950) | $ (18,306,899) | $ 15,263,677 |
| Subscriptions received | - | - | - | 315,950 | - | 315,950 |
| Shares issued for services | 50,000 | 250,000 | - | - | - | 250,000 |
| Share-based compensation | - | - | 820,000 | - | - | 820,000 |
| Share issuance costs | - | (240,000) | - | - | - | (240,000) |
| Shares issued to settle obligation | 2,457,818 | 921,681 | - | - | - | 921,681 |
| Shares issued for investment | 10,140,178 | 1,724,246 | - | - | - | 1,724,246 |
| Loss for the year | - | - | - | - | (3,231,502) | (3,231,502) |
| **Balance, December 31, 2017** | 20,694,242 | $ 35,644,654 | $ 1,717,799 | $ - | $ (21,538,401) | $ 15,824,052 |

The accompanying notes are an integral part of these consolidated financial statements.

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

---

1.    **NATURE OF OPERATIONS AND GOING CONCERN**

Ignite International Brands, Ltd. ("Ignite Canada" or the "Company") (formerly Green Axis Capital Corp.) is a publicly traded company currently listed on the Canadian Securities Exchange ("CSE"), trading under the symbol "BILZ".  The Company's head office is located at 11 Cidermill Avenue, Vaughan, Ontario and is a reporting issuer in British Columbia, Alberta and Ontario.

The Company's shares had previously traded on the TSX Venture Exchange ("TSX-V") under the trading symbol "ALQ" up until September 19, 2016.  On September 20, 2016, the Company voluntarily delisted from TSX-V and listed its common shares on the CSE, under the same trading symbol.  Prior to a change of business, the Company had been primarily engaged in the acquisition an exploration of mineral properties located in Canada.

On August 28, 2017, trading in the Company's shares was halted as the Company made an application to the CSE of its intention to change its business focus from being a mineral resource exploration company to an investment company.  As an investment company, Ignite Canada will be seeking investment opportunities in the global cannabis sector. It is not Ignite Canada's intention to be directly involved in the growing or distribution of cannabis related products, but rather to make strategic investments in companies that are actively engaged in such businesses.

Subsequent to the period ended December 31, 2018, shares of the Company commenced trading under its new symbol "BILZ" on the CSE.

On October 30, 2018, the Company completed a consolidation of its common shares on a 2 old for 1 new basis in conjunction with its name change from ALQ Gold Corp. to Green Axis Capital Corp.  Subsequent to the period ended December 31, 2018 and in conjunction with its investment in Ignite International, Ltd. and the Company's name change to Ignite International Brands, Ltd., the Company further consolidated its shares on a 5 old for 1 new basis.  The resulting consolidations has affected an overall 10 old for 1 new consolidation of its shares; all shares and per share amounts are shown on a post-consolidated basis retroactively throughout these financial statements.

The Company has provided notice to the Canada Revenue Agency of its intention to change the Company's fiscal year end from February 28 to December 31 to be effective December 31, 2018.  The change in year end is being requested as a result of an internal corporate reorganization.

These consolidated financial statements have been prepared with the assumption that the Company will be able to realize its assets and discharge its liabilities in the normal course of business rather than through a process of forced liquidation.  The Company's ability to continue in the normal course of operations is dependent on its ability to raise equity financing or through the sale of its investments at amounts favorable to the Company.  Management estimates there is sufficient working capital as at December 31, 2018 to continue current operations for the next twelve months. These audited consolidated financial statements do not include adjustments to amounts and classifications of assets and liabilities that might be necessary should the Company be unable to continue operations.

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

## 2.    BASIS OF PRESENTATION

### a)    Statement of compliance and basis of measurement

These financial statements, including comparatives have been prepared using accounting policies consistent with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and interpretations issued by the International Financial Reporting Interpretations Committee ("IFRIC"). These financial statements have been prepared on a historical cost basis, except for financial instruments classified as financial instruments at fair value through profit or loss, which are stated at their fair value.  In addition, these financial statements have been prepared using the accrual basis of accounting except for cash flow information.

The consolidated financial statements of the Company for the ten month period ended December 31, 2018 were reviewed by the Audit Committee and approved and authorized for issue by the Board of Directors on February 28, 2019.

### b) Functional currency and presentation currency

These consolidated financial statements are presented in Canadian dollars, unless otherwise noted, which is the functional currency of the Company and its subsidiaries.

### c) Basis of consolidation

These consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries, from the date control was acquired.   Control exists when the Company possesses power over an investee, has exposure to variable returns from the investee and has the ability to use its power over the investee to affect its returns.   All inter-company balances and transactions, and any unrealized income and expenses arising from inter-company transactions, are eliminated on consolidation.

| Name of Subsidiary | Place of Incorporation | Proportion of Ownership Interest | Principal Activity |
|---|---|---|---|
| ALQ Investments LLP | State of Nevada | 100% | Dormant |
| 1190784 BC Ltd.[1] | Province of British Columbia | 100% | Dormant |

[1]  This subsidiary was dissolved subsequent to the period ended December 31, 2018.

## 3.    SIGNIFICANT ACCOUNTING POLICIES

The accounting policies set out below have been applied consistently to all years presented in these financial statements, unless otherwise indicated.

### a)  Cash and cash equivalents

Cash and cash equivalents include cash on hand and deposits held with financial institutions.

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

3.      **SIGNIFICANT ACCOUNTING POLICIES (continued):**

   b)  **Financial instruments**

   The Company has adopted new accounting standard IFRS 9 – Financial Instruments, effective March 1, 2018. The new standard sets out requirements for classifying, recognizing and measuring financial assets and financial liabilities. This standard replaces IAS 39 – Financial Instruments: Recognition and Measurement.

   IFRS 9 is effective for annual periods beginning on or after January 1, 2018.  IFRS 9 allows for an exemption from restating prior periods in respect of the standard's classification and measurement requirements.  The Company has chosen to apply this exemption upon initial adoption, although it was determined that the adoption of IFRS 9 had no impact on the comparative period's financial statements.

   IFRS 9 establishes three primary measurement categories for financial assets: fair value through profit and loss ("FVTPL"), fair value through other comprehensive income ("FVOCI") and amortized cost. The basis for classification depends on the entity's business model and the contractual cash flow characteristics of the instrument. For financial liabilities, the new standard retains most of the requirements of IAS 39, except that fair value changes due to changes in an entity's own credit risk are recorded in other comprehensive Income rather than in net earnings.

   Upon adoption of IFRS 9, the Company has changed its accounting policy for financial instruments as follows:

   **Classification**
   The Company determines the classification of its financial instruments at initial recognition. Upon initial recognition, a financial asset is classified as measured at: amortized cost, fair value through profit and loss ("FVTPL"), or fair value through other comprehensive income (loss) ("FVOCI"). The classification of financial assets is generally based on the business model in which a financial asset is managed and its contractual cash flow characteristics. The adoption of IFRS 9 has not had a significant effect on the Company's accounting policies related to financial liabilities and derivative financial instruments. A financial liability is classified as measured at amortized cost or FVTPL.

   A financial asset is measured at amortized cost if it meets both of the following conditions and is not designated as FVTPL:

   - it is held within a business model whose objective is to hold assets to collect contractual cash flows; and
   - its contractual terms give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

   A debt investment is measured at FVOCI if it meets both of the following conditions and is not designated as FVTPL:

   - it is held within a business model whose objective is achieved by both collecting contractual cash flows and selling financial assets; and
   - its contractual terms give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

   An equity investment that is held for trading is measured at FVTPL. For other equity investments that are not held for trading, the Company may irrevocably elect to designate them as FVOCI. This election is made on an investment-by-investment basis.

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

---

3.    **SIGNIFICANT ACCOUNTING POLICIES (continued):**

   b)  **Financial instruments (continued):**

All financial assets not classified as measured at amortized cost or FVOCI as described above are measured at FVTPL. This includes all derivative financial assets. On initial recognition, the Company may irrevocably designate a financial asset that otherwise meets the requirements to be measured at amortized cost or at FVOCI as at FVTPL if doing so eliminates or significantly reduces an accounting mismatch that would otherwise arise.

Financial liabilities are measured at amortized cost, unless they are required to be measured at FVTPL (such as instruments held for trading or derivatives) or the Company has elected to measure them at FVTPL.

The Company completed an assessment of its financial assets and liabilities as at December 31, 2018. The adoption of IFRS 9 has no quantitative impact on the Company's financial instruments as at December 31, 2018.

However, it has an impact on the classification of the Company's financial instruments compared to the old standard IAS 39 as follows:

| Asset or Liability | Original classification IAS 39 | New classification IFRS 9 |
|---|---|---|
| Cash and cash equivalents | FVTPL | FVTPL |
| Receivables | Loans and receivables | Amortized cost |
| Investments | FVTPL | FVTPL |
| Promissory notes | Loans and receivables | Amortized cost |
| Trade payables and accrued liabilities | Other liabilities | Amortized cost |

**Measurement**

Initial measurement

On initial recognition, all financial assets and financial liabilities are measured at fair value adjusted for directly attributable transaction costs except for financial assets and liabilities classified as FVTPL, in which case the transaction costs are expensed as incurred.

Subsequent measurement

The following accounting policies apply to the subsequent measurement of financial instruments:

   **Financial assets at FVTPL**
   These assets are subsequently measured at fair value. Net gains and losses, including any interest or dividend income, are recognized in profit or loss.

   **Financial assets at amortized cost**
   These assets are subsequently measured at amortized cost using the effective interest method. The amortized cost is reduced by impairment losses. Interest income, foreign exchange gains and losses and impairment are recognized in profit or loss. Any gain or loss on derecognition is recognized in profit or loss.

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

---

3.    **SIGNIFICANT ACCOUNTING POLICIES (continued):**

b)  **Financial instruments (continued):**

**Measurement (continued):**

**Equity investments at FVOCI**
These assets are subsequently measured at fair value. Dividends are recognized as income in profit or loss unless the dividend clearly represents a recovery of part of the cost of the investment. Other net gains and losses are recognized in OCI and are never reclassified to profit or loss.

**Debt investments at FVOCI**
These assets are subsequently measured at fair value. Interest income is calculated using the effective interest rate method, foreign exchange gains and losses and impairment are recognized in profit or loss. Other net gains and losses are recognized in OCI. On derecognition, gains and losses accumulated in OCI are reclassified to profit or loss.

Impairment of financial instruments

The Company assesses at each reporting date whether there is objective evidence that a financial asset or a group of financial assets is impaired.

For financial assets measured at amortized cost, and debt investments at FVOCI, the Company applies the expected credit loss impairment model. On adoption of the expected credit loss model there was no material adjustment.

c)  **Income taxes**

Income tax expense comprises current and deferred tax.  Current tax and deferred tax are recognized in profit or loss except to the extent that it relates to a business combination or items recognized directly in equity or in other comprehensive loss/income.

Current income taxes are recognized for the estimated income taxes payable or receivable on taxable income or loss for the current year and any adjustment to income taxes payable in respect of previous years.  Current income taxes are determined using tax rates and tax laws that have been enacted or substantively enacted by the year-end date.

Deferred tax is recorded using the liability method, providing for temporary differences, between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. Temporary differences are not provided for relating to goodwill not deductible for tax purposes, the initial recognition of assets or liabilities that affect both accounting or taxable loss, and differences relating to investments in subsidiaries to the extent that they will probably not reverse in the foreseeable future. The amount of deferred tax provided is based on the expected manner of realization or settlement of the carrying amount of assets and liabilities, using tax rates enacted or substantively enacted at the date of the statement of financial position.

Recognition of deferred tax assets for unused tax losses, tax credits and deductible temporary differences is restricted to those instances where it is probable that future taxable profit will be available against which the deferred tax asset can be utilized.  At the end of each reporting year the Company reassesses unrecognized deferred tax assets. The Company recognizes a previously unrecognized deferred tax asset to the extent that it has become probable that future taxable profit will allow the deferred tax asset to be recovered.

---

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

3.    **SIGNIFICANT ACCOUNTING POLICIES (continued):**

d)    **Equipment**

Equipment is measured at cost less accumulated depreciation and impairment losses. Cost comprises expenditures that are directly attributable to the acquisition of the asset. Gains and losses on disposal of an item of equipment are determined by comparing the proceeds from disposal with the carrying amount of the equipment and recognized in profit or loss.

Depreciation is calculated over the estimated useful life of the assets using the following declining-balance rates:

| | |
|---|---|
| Computer equipment | 55% |
| Furniture and fixtures | 20% |
| Leasehold improvements | 30% |

e)    **Share capital**

Equity instruments are contracts that give a residual interest in the net assets of the Company. Financial instruments issued by the Company are classified as equity only to the extent that they do not meet the definition of a financial liability or financial asset. The Company's common shares, common share warrants, and stock options are classified as equity instruments. Incremental costs directly attributable to the issue of new common shares, common share warrants, or stock options are shown in equity as a deduction, net of tax, from the proceeds.

The Company has adopted a residual value method with respect to the measurement of shares and warrants issued as private placement units. The residual value method first allocates value to the more easily measurable component based on fair value and then the residual value, if any, to the less easily measurable component. The fair value of the common shares issued in the private placements was determined to be the more easily measurable component, as determined by the closing quoted bid price on the announcement date. The balance, if any, is allocated to the attached warrants. Any fair value attributed to the warrants is recorded as reserves.

f)    **Loss per common share**

Basic loss per share has been calculated using the weighted average number of common shares outstanding during the year.

Diluted loss per share has been calculated using the weighted average number of common shares that would have been outstanding during the respective period had all of the stock options and warrants outstanding at year-end having a dilutive effect been converted into shares at the beginning of the year and the proceeds used to repurchase the Company's common shares at the average market price for the year. If these computations prove to be anti-dilutive, diluted loss per share is the same as basic loss per share.

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

3.    **SIGNIFICANT ACCOUNTING POLICIES (continued):**

g)    **Share-based compensation**

The stock option plan allows Company employees, directors, and consultants to acquire common shares of the Company.   The fair value of options granted is recognized as a share-based compensation expense with a corresponding increase in equity. An individual is classified as an employee when the individual is an employee for legal or tax purposes (direct employee) or provides services similar to those performed by a direct employee. Consideration paid on the exercise of stock options is credited to share capital and the fair value of the options is reclassified from reserves to share capital.

The fair value is measured at grant date and each tranche is recognized over the period during which the options vest.  The fair value of the options granted is measured using the Black-Scholes option pricing model taking into account the terms and conditions upon which the options were granted.  At each financial position reporting date, the amount recognized as an expense is adjusted to reflect the number of stock options that are expected to vest.

Share-based payments to non-employees are measured at the fair value of the goods or services received or if such fair value is not reliably measurable, at the fair value of the equity instruments issued.

h)    **Impairment of long-lived assets**

At the end of each reporting period, the Company's assets are reviewed to determine whether there is any indication that those assets may be impaired. If such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment, if any. The recoverable amount is the higher of fair value less costs to sell and value in use. Fair value is determined as the amount that would be obtained from the sale of the asset in an arm's length transaction between knowledgeable and willing parties. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset. If the recoverable amount of an asset is estimated to be less than its carrying amount, the carrying amount of the asset is reduced to its recoverable amount and the impairment loss is recognized in the profit or loss for the period. For an asset that does not generate largely independent cash inflows, the recoverable amount is determined for the asset (or cash generating unit) to which the asset belongs.

Where an impairment loss subsequently reverses, the carrying amount of the asset (or cash-generating unit) is increased to the revised estimate of its recoverable amount, but to an amount that does not exceed the carrying amount that would have been determined had no impairment loss been recognized for the asset (or cash-generating unit) in prior years. A reversal of an impairment loss is recognized immediately in profit or loss.

**New standards adopted during the period**

- IFRS 9 – Financial Instruments – Effective January 1, 2018, the Company adopted IFRS 9. See Note 3 (b) for the impact of the transition to IFRS 9 on the Company's financial statements.

- IFRS 15 – Revenue from Contracts with Customers – Effective January 1, 2018, the Company adopted IFRS 15. IFRS 15 had no impact on the Company's financial statements as the Company did not recognize any revenue during the year.

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

3.    **SIGNIFICANT ACCOUNTING POLICIES (continued):**

**New standards and interpretations not yet adopted**

Certain new standards, interpretations, amendments and improvements to existing standards were issued by the IASB or IFRIC that are mandatory for accounting periods beginning on or after January 1, 2019. Updates which are not applicable or are not consequential to the Company have been excluded thereof. The following have not yet been adopted by the Company.

- IFRS 16 – Leases: New standard to establish principles for recognition, measurement, presentation and disclosure of leases with an impact on lessee accounting, effective for annual periods beginning on or after January 1, 2019. The Company does not expect a significant impact on the adoption of IFRS 16 as the annual lease payments are not material.

- IFRIC 23 – Uncertainty over Income Tax Treatment: New standard to clarify the accounting for uncertainties in income taxes.  The interpretation provides guidance and clarifies the application of the recognition and measurement criteria in IAS 12 "Income Taxes" when there is uncertainty over income tax treatments.  The interpretation is effective for annual periods beginning on January 1, 2019. The Company is currently assessing the impact of IFRIC 23 on its financial statements.

4.    **CRITICAL ACCOUNTING ESTIMATES AND JUDGMENTS**

The Company makes estimates and judgments about the future that affect the reported amounts of assets and liabilities. Estimates and judgments are continually evaluated based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances. In the future, actual experience may differ from these estimates and assumptions.

The effect of a change in an accounting estimate is recognized prospectively by including it in comprehensive income in the year of the change, if the change affects that year only, or in the year of the change and future years, if the change affects both.

Information about critical estimates and judgments in applying accounting policies that have the most significant risk of causing material adjustment to the financial statements are discussed below.

*Critical judgments*

The preparation of these consolidated financial statements requires management to make judgments regarding the going concern of the Company as discussed in Note 1.

-13-

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

4.    **CRITICAL ACCOUNTING ESTIMATES AND JUDGMENTS (continued):**

*Key sources of estimation uncertainty*

The following are key assumptions concerning the future and other key sources of estimation uncertainty that have a significant risk of resulting in a material adjustment to the carrying amount of assets and liabilities within the current and future years:

i.    Judgment is required in determining whether deferred tax assets are recognized in the statement of financial position. Deferred tax assets, including those arising from unutilized tax losses, require management to assess the likelihood that the Company will generate taxable earnings in future periods, in order to utilize recognized deferred tax assets. Estimates of future taxable income are based on forecast cash flows from operations and the application of existing tax laws in each jurisdiction. To the extent that future cash flows and taxable income differ significantly from estimates, the ability of the Company to realize the net deferred tax assets recorded at the date of the statement of financial position could be impacted.

Additionally, future changes in tax laws in the jurisdictions in which the Company operates could limit the ability of the Company to obtain tax deductions in future periods.

The Company has not recorded any deferred tax assets.

ii.   Management uses the Black-Scholes Option Pricing model for valuation of share-based compensation and brokers' warrants, which requires the input of subjective assumptions including expected price volatility, risk-free interest rates and forfeiture rates. Changes in the input assumption can materially affect the fair value estimate and the Company's results of operations and equity reserves.

iii.  The Company recognizes its investments at fair value. Fair value is determined on the basis of market prices from independent sources, if available. If there is no market price, then the fair value is determined using level 3 inputs which involve considerable estimates as the inputs used to value these financial instruments are based on unobservable market data. There is inherent uncertainty and imprecision in estimating the factors that can affect fair value, and in estimating fair values generally, when observable market data is not available. Changes in assumptions and inputs used in valuing financial instruments could affect reported fair values.

iv.   The Company has issued two unsecured promissory notes to private US companies (Note 7). The recoverability and collectability of these promissory notes is based on management estimates based on a review of available financial information and communication with the borrower. No provision has been made on the collectability of these promissory notes for the period ended December 31, 2018.

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

## 5.  EQUIPMENT

|  | Computer equipment | Furniture and fixtures | Leasehold improvements | Totals |
|---|---|---|---|---|
| **Cost** |  |  |  |  |
| Balance, February 28, 2018 | $ - | $ - | $ - | $ - |
| Additions | 12,841 | 30,657 | 5,030 | 48,528 |
| Balance, December 31, 2018 | $ 12,841 | $ 30,657 | $ 5,030 | $ 48,528 |
| **Depreciation** |  |  |  |  |
| Balance, February 28, 2018 | $ - | $ - | $ - | $ - |
| Depreciation for the period | 1,280 | 1,022 | 252 | 2,554 |
| Balance, December 31, 2018 | $ 1,280 | $ 1,022 | $ 252 | $ 2,554 |
| **Carrying Amounts** |  |  |  |  |
| At February 28, 2018 | $ - | $ - | $ - | $ - |
| At December 31, 2018 | $ 11,561 | $ 29,635 | $ 4,778 | $ 45,974 |

## 6.  INVESTMENTS

**Salvation Botanicals Ltd.**

During the year ended February 28, 2018, the Company entered into an agreement to acquire 3,000,000 units of Salvation Botanicals Ltd. ("Salvation") at a price of $0.50 per unit for a total cost of $1,500,000 pursuant to a subscription agreement between the Company and Salvation (the "Subscription Agreement"). Each unit is comprised of one common share of Salvation and one-half of one common share purchase warrant exercisable into one-half additional share of Salvation at a price of CDN$0.75 for a term of eighteen months.

Salvation is a private company based in Nanaimo, British Columbia, which is involved in the production of high-quality standardized cannabinoid products and operates one of the first analytics laboratories in Canada, accredited by Health Canada to test cannabis and cannabis derivatives for licensed producers of medical cannabis, Access to Cannabis for Medical Purposes Regulations ("ACMPR") growers, approved cannabis patients, industrial hemp producers and any other party legally entitled to possess cannabis.

**Ignite International Ltd. ("Ignite US")**

On September 29, 2018, the Company entered into the Share Exchange Agreement with Ignite US, Veritas Investments, Ltd. ("Veritas") and Vulcan Enterprises SKN, Ltd. ("Vulcan SKN"), whereby the Company acquired 5,000,000 Ignite US Shares from Veritas and Vulcan SKN in consideration for the issuance of 10,140,178 common shares of the Company (Note 8).

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

---

### 7.    PROMISSORY NOTES

#### *Tahoe Hydroponics Company LLC*

On August 23, 2017, the Company entered into a Letter of Agreement (the "Letter") with Tahoe Hydroponics Company LLC ("Tahoe") a US based cannabis cultivation company based in Carson City, Nevada.  The terms of the Letter with Tahoe, initially required that:

|      |      |
|------|------|
| (i)  | the Company will loan an aggregate of US$3,000,000 to Tahoe prior to October 15, 2017; |
| (ii) | the Company will have the option to convert that loan to equity in Tahoe, representing 30% of the outstanding shares of Tahoe; and |
| (iii)| the Company will then have the further option to acquire the remaining 70% of the shares of Tahoe on a share exchange basis, based on the fair market value of the Company' shares and Tahoe (based on a five times multiple of its 12 month trailing revenues), provided that in any event the former Tahoe shareholders will hold 65% of the outstanding shares of the Company on closing. |

In connection with the Letter, the Company had advanced a total of USD$1,350,000 to Tahoe.

On April 24, 2018, the Company and Tahoe mutually terminated the Letter and replaced it with a promissory note evidencing the advance of US$1.35 million from the Company to Tahoe with a 6% annual interest rate. Terms of the promissory note require Tahoe to make monthly installment payments of USD$78,623.

As at December 31, 2018, the promissory note balance is $1,910,079, which includes $68,409 in interest receivable.

#### *Ignite US*

On April 26, 2018, the Company provided a $5,000,000 loan to Ignite US and received an unsecured convertible promissory note ("Convertible Note"). The Convertible Note matures 24 months following the date of issuance and bears interest at 8% per annum. The Company may exercise the Convertible Note for up to 3.3% of the common shares of Ignite US.

As at December 31, 2018, the convertible promissory note balance is $5,272,877, which includes $272,877 in interest receivable.

### 8.    SHARE CAPITAL AND RESERVES

Authorized capital stock: unlimited number of common shares without par value.

On October 30, 2018, the Company completed a consolidation of its common shares on a 2 old for 1 new basis.  Subsequent to the period ended December 31, 2018, the Company further consolidated its shares on a 5 old for 1 new basis.  The resulting consolidations has effected an overall 10 old for 1 new consolidation of its shares; all shares and per share amounts are shown on a post-consolidated basis retroactively throughout these financial statements.

On November 23, 2018, the Company issued 10,140,178 common shares of the Company with a fair value of $1,724,246 as consideration for its investment in Ignite US (Note 6).

On November 23, 2018, the Company issued 2,457,818 common shares with a value of $921,681 to settle its obligation to issue shares related to subscriptions received during the year ended February 28, 2018.

---

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

---

8.    **SHARE CAPITAL AND RESERVES (continued):**

On June 22, 2018, the Company issued 50,000 common shares to Firetonic Entertainment Inc. for their assistance in initiating and facilitating the early discussions between the Company and Tahoe in connection with a debt financing transaction (Note 7).

During the year ended February 28, 2018, the Company issued common shares as follows:

a)   2,457,817 common shares were issued at $0.375 per post-consolidated common share, by way of a non-brokered private placement, for gross proceeds of $921,681.

b)   2,593,682 common shares were issued at $1.75 per post-consolidated common share, by way of a non-brokered private placement, for gross proceeds of $4,538,944.

c)   2,401,580 Units were issued at $5.00 per Unit, by way of a non-brokered private placement, for gross proceeds of $12,007,900. Each Unit comprised of one common share and one-half share purchase warrant with each whole warrant exercisable into one common share for $12.50 for a period of twelve months.

The Company incurred cash costs of $1,045,734, issued 41,300 common shares to finders valued at $43,989, and issued 261,582 finder warrants valued at $198,458.  The finder's warrants were calculated using a Black-Scholes option pricing model with the following weighted average assumptions: expected life of 1.51 years, dividend yield of 0%, expected volatility of 111.52% and a risk free interest rate of 1.33%.

During the year ended February 28, 2018, the Company also received $1,617,273 in cash for private placements which were oversubscribed. The Company refunded $1,564,069 to subscribers for the amounts collected for which shares will not be issued during the period ended December 31, 2018.

On April 17, 2017, the Company completed a return of capital to shareholders of record on January 25, 2017 for the 5,500,000 shares of Lorraine Copper Corp. originally received as consideration for the Lustdust Property.

**Stock Option Plan**

The Company has established a fixed share purchase option plan whereby the Board of Directors may, from time to time, grant options to directors, officers, consultants or service providers to the Company. Under the plan the Company is authorized to grant stock options of up to ten percent (10%) of the number of common shares issued and outstanding. Options granted under the plan may have a maximum term of ten years.

The option exercise price shall not be less than the greater of the closing market price of the Company's shares on the Exchange on (i) the trading day prior to the date of grant of the options, or (ii) the date of grant of the options, provided that (i) if the Company has just been recalled for trading following a suspension or halt, the Company must wait until a satisfactory market has been established before setting the exercise price for and granting of the options (generally five days from the date of resumption of trading); and (ii) if options are granted within 90 days of a distribution of securities by way of a prospectus, the minimum exercise price of those options will be the greater of the Discounted Market Price and the prospectus offering price (the 90 day period to be calculated from the date a final receipt is issued for the prospectus).

---

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

8.    **SHARE CAPITAL AND RESERVES (continued):**

**Stock Options**

On April 30, 2018, the Company granted an aggregate of 200,000 stock options to the directors of the Company and a consultant.  The options, having an exercise price of $5, are fully vested and expire April 30, 2023.  The Company recorded share-based compensation of $820,000 in relation to the options granted based on a Black-Scholes valuation model with the following assumptions:

| | |
|---|---|
| Volatility | 117% |
| Risk-free rate | 2.12% |
| Dividend yield | 0.0% |
| Share price | $5 |
| Exercise price | $5 |
| Expected life of option | 5 years |
| Fair value per option granted | $0.41 |

The number and weighted average exercise prices of the stock options are as follows:

| | Number | Weighted Average Exercise Price |
|---|---|---|
| **Balance, February 28, 2017** | 62,500 | $ 0.60 |
| Canceled | (42,500) | $ 0.60 |
| **Balance, February 28, 2018** | 20,000 | $ 0.60 |
| Granted | 200,000 | $ 5.00 |
| **Balance, December 31, 2018** | 220,000 | $ 4.60 |

Stock options outstanding and exercisable as at December 31, 2018 are as follows:

| Date of Expiry | Number of Options Outstanding | Number of Options Exercisable | Exercise Price | Weighted Average Remaining Life (years) |
|---|---|---|---|---|
| February 14, 2019 | 20,000 | 20,000 | $ 0.60 | 0.12 |
| April 30, 2023 | 200,000 | 200,000 | $ 5.00 | 4.33 |

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

8.    **SHARE CAPITAL AND RESERVES (continued):**

**Warrants**

Common share purchase warrant transactions and the number of common shares purchase warrants outstanding are summarized below:

|  | Number | Weighted Average Exercise Price |
|---|---|---|
| **Balance, February 28, 2017** | - | $    - |
| Issued | 1,462,372 | $ 11.63 |
| **Balance, February 28, 2018 and December 31, 2018** | 1,462,372 | $ 11.63 |

As of December 31, 2018, the Company had outstanding warrants as follows:

| Date of Expiry | Number | Exercise Price | Weighted Average Remaining Life (years) |
|---|---|---|---|
| September 28, 2019 | 54,236 | $  2.15 | 0.74 |
| October 31, 2019 | 38,226 | $  2.15 | 0.83 |
| November 24, 2019 | 30,107 | $  2.15 | 0.90 |
| February 8, 2019 | 526,710[1] | $ 12.50 | 0.11 |
| February 14, 2019 | 126,140[1] | $ 12.50 | 0.12 |
| February 16, 2019 | 686,953[1] | $ 12.50 | 0.13 |
|  | 1,462,372 |  | 0.18 |

[1]Warrants expired unexercised subsequent to December 31, 2018

9.    **FINANCIAL RISK FACTORS**

The fair value of the Company's receivables, advance, and trade payables and accrued liabilities, approximate their carrying value, which is the amount recorded on the statement of financial position, due to their short terms to maturity.  The fair value of the Company's promissory notes approximate fair value due to the market rate of interest. The Company's cash and cash equivalents are measured at fair value, under the fair value hierarchy based on level one quoted prices in active markets for identical assets or liabilities. Investments are measured at fair value using Level 3 inputs.

The three levels of the fair value hierarchy are:

Level 1 – Unadjusted quoted prices in active markets for identical assets or liabilities;

Level 2 – Inputs other than quoted prices that are observable for the asset or liability either directly or indirectly; and

Level 3 – Inputs that are not based on observable market data.

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

---

9.    **FINANCIAL RISK FACTORS (continued):**

Level 3 inputs in determining the fair value of investments includes subjective estimates in assessing for indicators of impairment.

At December 31, 2018 there were no financial assets or liabilities measured and recognized in the statement of financial position at fair value that would be categorized as Level 2 in the fair value hierarchy above.

The key assumptions used by the Company in the valuation of Level 3 investments include and are not limited to, to the value of recently completed financings by the investee, entity-specific information, and publicly available information of comparable entities.

The Company's risk exposures and the impact on the Company's financial instruments are summarized below:

*Credit risk*

Credit risk is the risk of loss associated with a counterparty's inability to fulfill its payment obligations.  The Company's receivables primarily consist of input tax credits receivable from the Government of Canada.  The Company is exposed to credit risk on its promissory notes due from Tahoe and Ignite US.

*Liquidity risk*

The Company's approach to managing liquidity risk is to ensure that it will have sufficient liquidity to meet liabilities when due. As at December 31, 2018, the Company had cash and cash equivalents of $5,414,949 to settle current liabilities of $397,164.  The Company does not believe it is exposed to any significant liquidity risk as at December 31, 2018.

*Market risk*

Market risk is the risk of loss that may arise from changes in market factors such as interest rates and, commodity and equity prices.

a)    Interest rate risk

The Company has cash and cash equivalent balances which are not at a significant risk to fluctuating interest rates.  The Company's current policy is to invest excess cash in investment-grade short-term deposit certificates issued by its banking institutions.  The Company periodically monitors the investments it makes and is satisfied with the credit ratings of its banks.  As at December 31, 2018, the Company did not have any financial instruments which were subject to variable rates of interest.

b)    Price risk

The Company is exposed to price risk with respect to equity prices.  Equity price risk is defined as the potential adverse impact on the Company's earnings due to movements in individual equity prices or general movements in the level of the stock market.

c)    Foreign currency risk

The Company is exposed to foreign currency risk on its promissory note from Tahoe (Note 6) which is denominated in US dollars. A 10% fluctuation in the foreign exchange rate would have a $184,052 impact on profit and loss.

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

## 10.    CAPITAL MANAGEMENT

The Company manages its capital structure and makes adjustments to it, based on the funds available to the Company, in order to support the acquisition, and development of its investments. The Board of Directors does not establish quantitative return on capital criteria for management, but rather relies on the expertise of the Company's management to sustain future development of the business.

The Company is largely dependent upon external financings to fund activities.  In order to search for new business opportunities and pay for administrative costs, the Company will spend its existing working capital and raise additional funds as needed.  The Company will continue to assess new business opportunities and seek to acquire new business assets if it determines there are sufficient business opportunities or economic potential and if it has adequate financial resources to do so.  Management reviews its capital management approach on an ongoing basis and believes that this approach, given the relative size of the Company, is reasonable.

There were no changes in the Company's approach to capital management during the ten month period ended December 31, 2018.  The Company is not subject to externally imposed capital requirements.

## 11.    RELATED PARTY TRANSACTIONS

Related parties and related party transactions impacting the accompanying financial statements are summarized below and include transactions with the following individuals or entities:

Key management personnel:

Key management personnel include those persons having authority and responsibility for planning, directing and controlling the activities of the Company as a whole. The Company has determined that key management personnel consist of executive and non-executive members of the Company's Board of Directors and corporate officers.

Remuneration attributed to key management personnel can be summarized as follows:

|  | Ten Months Ended December 31, 2018 | Twelve Months Ended February 28, 2018 |
|---|---|---|
| Short-term benefits * | $       201,000 | $       141,501 |
| Share-based compensation | 574,000 | - |
| Director fees | - | 2,000 |
| Totals | $       775,000 | $       143,501 |

*includes fees pursuant to contractual employment, or consultancy arrangements. These have been recorded in management and consulting fees, and professional fees.

As at December 31, 2018, $nil (February 28, 2018 - $1,500) was included in accounts payable and accrued liabilities for fees owed to related parties.

-21-

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

---

## 12.    COMMITMENTS AND CONTINGENCIES

### Premise lease

On October 16, 2018, the Company entered into a three year lease agreement for office space expiring November 30, 2021.  The annual base rent, plus the operating costs for each year of the lease, is estimated to be as follows:

| | |
|---|---|
| 1st year | $36,500 |
| 2nd year` | $37,500 |
| 3rd year | $38,000 |

### Ignite US License Agreement

On November 23, 2018, the Company entered into a trademark & copyright license agreement ("License Agreement") whereby Ignite US, as licensor, granted the following to the Company:

- a non-exclusive royalty bearing license to use the "IGNITE" Trademarks and Copyrights in all countries of the world, excluding the United States of America, in connection with products that contain CBD and where the percentage content of THC is less than 10%;

- an exclusive royalty bearing license to use the Trademarks and Copyrights in all Provinces and Territories of Canada, excluding British Columbia, in connection with the products containing THC but not CBD; and

- an exclusive royalty bearing license to use the Trademarks and Copyrights in all Provinces and Territories of Canada, excluding British Columbia, in connection with the products containing a combination of THC and CBD, provided that the THC content is 10% or more

### (collectively, the "License")

The License specifically excludes products consisting of vaporizer pens with interchangeable cartridges and any non-cannabis products such as garments, accessories, etc. Under the License Agreement, the Company is not permitted to sublicense any of its rights under the agreement without Ignite US's prior written consent. If Ignite US determines in its discretion that the Company is unable to meet the demand for products in the applicable territory, the Company has agreed to increase its production of products in the applicable territory which may include engaging third parties to assist in the manufacture and production of products. The Company has agreed to pay for all manufacturing, shipping, and packaging to be used in respect of the products and has further agreed to pay for all advertising, marketing and promotional materials displaying any of the Trademarks and Copyrights.

The Company has agreed to pay Ignite US on a monthly basis 10% of the aggregate total gross revenue received by the Company, directly or indirectly, from the sale of products under the License, commencing with the first commercial sale of any product.  In the case of a branded dispensary, using the Ignite name and/or marks, the 10% royalty will extend to all gross sales of all products in the dispensary, whether Ignite branded or otherwise. The Company has also agreed to the following yearly minimum payments to Ignite US, applicable against royalties (in USD$):

- Months 1-12: $2,000,000
- Months 13-24: $3,000,000
- Months 25-36: $4,000,000
- Months 37-48: $5,000,000
- Months 49-60: $5,500,000
- Months 61-72: $6,000,000

---

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

---

**12.    COMMITMENTS AND CONTINGENCIES (continued):**

**Ignite US License Agreement (continued):**
- Months 73-84: $6,500,000
- Months 85-96: $7,000,000
- Months 97-108: $7,500,000
- Months 109-120: $8,000,000

The Company has also agreed to apply, on a monthly basis, at least 2% of the gross revenue received for all products in the previous month on marketing, which may be (with Ignite US's approval) managed by the Company, or remitted to Ignite US to offset Ignite US's marketing and advertising expenditures.

The License Agreement and the License granted thereunder commenced on the First Closing Date, and continue for an initial term of 10 years.  Upon the expiration of the initial term, Ignite US and the Company will have the opportunity to renegotiate in good faith. Should the parties fail to reach a mutually satisfactory agreement within 40 days of the end of such 10 year period or such other period as may be mutually agreed by the parties in writing, then the License Agreement will extend for a further 5 year fixed term commencing from the end of such 10 year period. During this 5 year term, the terms and conditions of the License Agreement will continue, with the exception of the foregoing yearly minimum payments whereby the Company agreed, for each of the 5 years, to make the yearly minimum royalty payments, applicable against royalties, set for amount payable in the final year of the initial term.

**Notice of Claim**

The Company was served with a Notice of Claim dated November 28, 2018 which has been filed in the Supreme Court of British Columbia naming the Company as one of three defendants.  The Notice of Claim alleges a finder's fee of $120,000 is due to the claimant for work in a previous completed private placement.

The Company believes the lawsuit is without merit and has filed a response accordingly.  No provision has been made by the Company with regards to the Notice of Claim.

**13.    INCOME TAXES**

A reconciliation of income taxes at statutory rates with the reported taxes is as follows:

|  | December 31, 2018 | February 28, 2018 |
|---|---|---|
| Loss for the period ended | $ (3,033,162) | $ (542,156) |
| Expected income tax (recovery) | $ (819,000) | $ (142,000) |
| Change in statutory, exchange rates, and other | (53,000) | (87,000) |
| Permanent differences | 230,000 | (5,000) |
| Share issue costs | (65,000) | (285,000) |
| Adjustment to prior years provision versus statutory returns and expiry of non-capital losses | (85,000) | - |
| Change in unrecognized deductible temporary differences | $ 792,000 | $ 519,000 |
| Total income tax expense (recovery) | $          - | $          - |
| Current income tax | $          - | $          - |
| Deferred tax recovery | $          - | $          - |

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

---

**13.    INCOME TAXES (continued):**

In September 2017, the British Columbia (BC) Government proposed changes to the general corporate income tax rate to increase the rate from 11% to 12% effective January 1, 2018 and onwards.  This change in tax rate was substantively enacted on October 26, 2017.  The relevant deferred tax balances have been re-measured to reflect the increase in the Company's combined Federal and Provincial (BC) general corporate income tax rate from 26% to 27%.

The significant components of the Company's temporary differences, unused tax credits and unused tax losses that have not been included on the consolidated statement of financial position are as follows::

| | December 31, 2018 | Expiry date range | February 28, 2018 |
|---|---|---|---|
| **Temporary Differences** | | | |
| Non-capital losses | $   6,848,000 | 2026-2037 | $   3,936,000 |
| Exploration and evaluation assets | 4,023,000 | No expiry | 4,023,000 |
| Property and equipment | 376,000 | No expiry | 373,000 |
| Share issue costs | 890,000 | 2038-2041 | 872,000 |
| | $  12,137,000 | | $  9,204,000 |

Tax attributes are subject to review, and potential adjustment, by tax authorities.

**14.    SUPPLEMENTAL CASHFLOW INFORMATION**

As at December 31, 2018, the Company had $414,941 (February 28, 2018 – $15,220,447) in cash and $5,000,000 (February 28, 2018 – $nil) in cash equivalents.

During the period ended December 31, 2018, the Company had the following non-cash transactions:
- Common shares issued to settle obligation to issue shares              $    921,681
- Common shares issued for investment in Ignite US              $ 1,724,246

During the year ended February 28, 2018, the Company had the following non-cash transactions:
- Distribution of marketable securities as a return of capital to shareholders      $    440,000
- Investment in Tahoe included in trade payables and accrued liabilities      $    500,000
- Fair value of finders warrants issued      $    198,458

**15.    SUBSEQUENT EVENTS**

Subsequent to the period ended December 31, 2018:

- the Company entered into a Binding Letter of Intent ("Binding LOI") to acquire all of the issued and outstanding shares of Gen X Biosciences Corp. ("Gen X") in exchange for 8,500,000 common shares of the Company.  Gen X is a cannabis-focused bioscience firm with operations in Long beach, California and headquartered in Toronto, ON. The acquisition is subject to further due diligence by the Company and receiving the necessary regulatory approvals.

  On February 21, 2019, the Company terminated the Binding LOI to acquire all the issued and outstanding shares of Gen X.

**IGNITE INTERNATIONAL BRANDS, LTD.**
(formerly Green Axis Capital Corp.)
NOTES TO THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
DECEMBER 31, 2018

15.    **SUBSEQUENT EVENTS (continued):**

- the Company entered into a Binding Letter Agreement with a European white-label manufacturer. It is proposed that the European manufacturer will manufacture, package and distribute Ignite-branded products to select wholesale and retail channels in strategic European territories under a non-exclusive license to be granted by the Company.

- 2,850 warrants with an expiry date of November 24, 2019 were exercised and converted into common shares for total proceeds of $6,128.

- 20,000 stock options with an exercise price of $0.60 per share and an expiry date of February 14, 2019 were exercised for gross proceeds of $12,000.

- 1,710,000 incentive stock options were granted to certain directors, officers, and consultants. The options are exercisable into common shares of the Company at a price of $3.50 for a term of 5 years.



**CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED FEBRUARY 28, 2018**
**(Expressed in Canadian Dollars)**

DAVIDSON & COMPANY LLP ——————— Chartered Professional Accountants ——————

# INDEPENDENT AUDITORS' REPORT

To the Shareholders of
ALQ Gold Corp.

We have audited the accompanying consolidated financial statement of ALQ Gold Corp., which comprise the consolidated statement of financial position as at February 28, 2018 and the consolidated statements of income (loss) and comprehensive income (loss), cash flows, and changes in shareholders' (deficiency) equity for the year then ended, and a summary of significant accounting policies and other explanatory information.

***Management's Responsibility for the Consolidated Financial Statements***

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with International Financial Reporting Standards, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

***Auditors' Responsibility***

Our responsibility is to express an opinion on these consolidated financial statements based on our audit.  We conducted our audit in accordance with Canadian generally accepted auditing standards.  Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements.  The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error.  In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control.  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion.

***Opinion***

In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of ALQ Gold Corp. as at February 28, 2018 and its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards.



A member of
Nexia
International

1200 - 609 Granville Street, P.O. Box 10372, Pacific Centre, Vancouver, B.C., Canada V7Y 1G6
Telephone (604) 687-0947  Davidson-co.com

*Other Matters*

The financial statements of ALQ Gold Corp. for the year ended February 28, 2017 were audited by another auditor who expressed an unmodified opinion on those statements on June 19, 2017.


**"DAVIDSON & COMPANY LLP"**

Vancouver, Canada                                                    Chartered Professional Accountants

July 6, 2018

**ALQ GOLD CORPORATION**
CONSOLIDATED STATEMENTS OF FINANCIAL POSITION
(Expressed in Canadian Dollars)
AS AT

| | February 28, 2018 | February 28, 2017 |
|---|---|---|
| **ASSETS** | | |
| **Current** | | |
| Cash | $ 15,220,447 | $ 16,552 |
| Receivables | 92,573 | 12,800 |
| Reclamation bond | - | 30,000 |
| Marketable securities (Note 5) | - | 385,000 |
| Advance | 210,661 | - |
| Prepaid expenses | 200,826 | 2,098 |
| **Total current assets** | 15,724,507 | 446,450 |
| **Non-current** | | |
| Investment (Note 6) | 1,500,000 | - |
| Promissory note (Note 7) | 1,782,480 | - |
| Equipment (Note 8) | - | 3,103 |
| **Total assets** | $ 19,006,987 | $ 449,553 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current** | | |
| Trade payables and accrued liabilities | $ 1,204,356 | $ 310,561 |
| Obligation to issue shares (Note 10) | 921,681 | - |
| Subscriptions received in advance (Note 10) | 1,617,273 | - |
| **Total liabilities** | 3,743,310 | 310,561 |
| **Shareholders' equity** | | |
| Share capital (Note 10) | 33,047,273 | 17,204,394 |
| Subscriptions receivable (Note 10) | (315,950) | - |
| Reserves (Note 10) | 839,253 | 699,341 |
| Deficit | (18,306,899) | (17,764,743) |
| **Total shareholders' equity** | 15,263,677 | 138,992 |
| **Total liabilities and shareholders' equity** | $ 19,006,987 | $ 449,553 |

Nature of operations and going concern (Note 1)
Basis of presentation (Note 2)
Subsequent event (Note 16)


_____"Morgan Good"_____ Director _____"Ming Jang"_____ Director


The accompanying notes are an integral part of these consolidated financial statements.

**ALQ GOLD CORPORATION**
CONSOLIDATED STATEMENTS OF INCOME (LOSS) AND COMPREHENSIVE INCOME (LOSS)
(Expressed in Canadian Dollars)
FOR THE YEARS ENDED FEBRUARY 28

|  | 2018 | 2017 |
|---|---|---|
| **EXPENSES** | | |
| Advertising and promotion | $    108,376 | $             - |
| Depreciation (Note 8) | 582 | 2,326 |
| Insurance | 5,807 | 6,277 |
| Management and consulting fees | 189,436 | 52,504 |
| Office costs | 16,911 | 36,691 |
| Professional fees | 248,652 | 66,496 |
| Regulatory and transfer agent fees | 43,868 | 37,737 |
| Rent | 1,500 | 6,000 |
| Travel | 52,871 | - |
| **Total operating expenses** | (668,003) | (208,031) |
| | | |
| Gain on sale of Lustdust property (Note 9) | - | 490,000 |
| Interest income | 43,839 | 378 |
| General exploration | (1,000) | (1,000) |
| Interest expense | (442) | (377) |
| Foreign exchange | 30,971 | - |
| Loss on disposal of assets | (2,521) | - |
| Gain (loss) on fair value of marketable securities (Note 5) | 55,000 | (55,000) |
| | 125,847 | 434,001 |
| **Income (loss) and comprehensive income (loss) for the year** | $    (542,156) | $    225,970 |
| | | |
| **Income (loss) per common share, basic and diluted** | $    (0.02) | $    0.04 |
| | | |
| **Weighted average number of common shares outstanding** | | |
| **Basic** | 28,629,215 | 5,518,670 |
| **Diluted** | 28,629,215 | 5,571,829 |

The accompanying notes are an integral part of these consolidated financial statements.

**ALQ GOLD CORPORATION**
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Expressed in Canadian Dollars)
FOR THE YEARS ENDED FEBRUARY 28

|  | 2018 | 2017 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Income (loss) for the year | $ (542,156) | $ 225,970 |
| Items not involving cash: | | |
| Gain on sale of Lustdust property | - | (490,000) |
| Depreciation | 582 | 2,328 |
| Loss on disposal of assets | 2,521 | - |
| Accrued interest receivable | (53,265) | - |
| Unrealized (gain) loss on fair value of marketable securities | (55,000) | 55,000 |
| | (647,318) | (206,704) |
| **Changes in non-cash working capital items:** | | |
| Receivables | (79,773) | (4,945) |
| Prepaid expenses | (198,728) | (2,098) |
| Advance | (210,661) | - |
| Trade payables and accrued liabilities | 393,795 | 112,321 |
| **Net cash used in operating activities** | (742,685) | (101,426) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Promissory Note | (1,729,215) | - |
| Proceeds on sale of Lustdust property | - | 50,000 |
| Reclamation bond | 30,000 | - |
| Investment | (1,000,000) | - |
| Net cash provided by (used in) investing activities | (2,699,215) | 50,000 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from share issuance, net of share issuance costs | 16,106,841 | - |
| Subscriptions received in advance | 1,617,273 | - |
| Obligation to issue shares | 921,681 | - |
| Net cash provided by financing activities | 18,645,795 | - |
| **Change in cash for the year** | 15,203,895 | (51,426) |
| **Cash, beginning of year** | 16,552 | 67,978 |
| **Cash, end of year** | $ 15,220,447 | $ 16,552 |
| Cash paid during the year for interest | $ - | $ - |
| Cash paid during the year for income taxes | $ - | $ - |

Supplemental cash flow information (Note 11)

The accompanying notes are an integral part of these consolidated financial statements.

**ALQ GOLD CORPORATION**
CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' (DEFICIENCY) EQUITY
(Expressed in Canadian Dollars)
FOR THE YEARS ENDED FEBRUARY 28, 2018 AND 2017

| | Number of shares | Share capital | Subscriptions receivable | Reserves | Deficit | Total |
|---|---|---|---|---|---|---|
| Balance at February 28, 2016 | 5,518,670 | $ 17,204,394 | $ - | $ 699,341 | $ (17,990,713) | $ (86,978) |
| Income for the year | - | - | - | - | 225,970 | 225,970 |
| Balance at February 28, 2017 | 5,518,670 | 17,204,394 | - | 699,341 | (17,764,743) | 138,992 |
| Issued for cash | 74,530,788 | 17,468,525 | (315,950) | - | - | 17,152,575 |
| Share issuance costs | 413,000 | (1,208,780) | - | 163,046 | - | (1,045,734) |
| Return of capital | - | (440,000) | - | - | - | (440,000) |
| Loss for the year | - | - | - | - | (542,156) | (542,156) |
| Balance at February 28, 2018 | 80,462,458 | $ 33,024,139 | $ (315,950) | $ 862,387 | $ (18,306,899) | $ 15,263,677 |

The accompanying notes are an integral part of these consolidated financial statements.

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

_____

1. **NATURE OF OPERATIONS AND GOING CONCERN**

   ALQ Gold Corporation ("ALQ" or the "Company") is a publicly traded company currently listed on the Canadian Securities Exchange ("CSE"), trading under the symbol "ALQ".  The Company's shares had previously traded on the TSX Venture Exchange ("TSX-V") under the trading symbol "ALQ" up until September 19, 2016.  On September 20, 2016, the Company voluntarily delisted from TSX-V and listed its common shares on the CSE, under the same trading symbol.   The Company's head office is located at 202 – 5626 Larch Street, Vancouver, BC. and is a reporting issuer in British Columbia, Alberta and Ontario.

   Prior to a change of business, the Company had been primarily engaged in the acquisition an exploration of mineral properties located in Canada.  On August 28, 2017, trading in the Company's shares was halted as the Company made an application to the CSE of its intention to change its business focus from being a mineral resource exploration company to an investment company.  As an investment company, the Company will be seeking investment opportunities in the global cannabis sector.  It is not the Company's intention to be directly involved in the growing or distribution of cannabis related products, but rather to make strategic investments in several companies that would be actively engaged in such businesses.

   These consolidated financial statements have been prepared with the assumption that the Company will be able to realize its assets and discharge its liabilities in the normal course of business rather than through a process of forced liquidation.  The Company's ability to continue in the normal course of operations is dependent on its ability to raise equity financing or through the sale of its investments at amounts favorable to the Company.  Management estimates there is sufficient working capital as at February 28, 2018 to continue current operations for the next twelve months. These consolidated financial statements do not include adjustments to amounts and classifications of assets and liabilities that might be necessary should the Company be unable to continue operations.

2. **BASIS OF PRESENTATION**

   a) **Statement of compliance and basis of measurement**

      These financial statements, including comparatives have been prepared using accounting policies consistent with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and interpretations issued by the International Financial Reporting Interpretations Committee ("IFRIC"). These financial statements have been prepared on a historical cost basis, except for financial instruments classified as financial instruments at fair value through profit or loss, which are stated at their fair value.  In addition, these financial statements have been prepared using the accrual basis of accounting except for cash flow information.

      The financial statements of the Company for the year ended February 28, 2018 were reviewed by the Audit Committee and approved and authorized for issue by the Board of Directors on June 28, 2018.

   b) **Functional currency and presentation currency**

      These consolidated financial statements are presented in Canadian dollars, unless otherwise noted, which is the functional currency of the Company and its subsidiary.

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

2.    **BASIS OF PRESENTATION (continued):**

c)    **Basis of consolidation**

These consolidated financial statements include the accounts of the Company and its wholly owned subsidiary, from the date control was acquired.   Control exists when the Company possesses power over an investee, has exposure to variable returns from the investee and has the ability to use its power over the investee to affect its returns.   All inter-company balances and transactions, and any unrealized income and expenses arising from inter-company transactions, are eliminated on consolidation.

| Name of Subsidiary | Place of Incorporation | Proportion of Ownership Interest | Principal Activity |
|---|---|---|---|
| ALQ Investments LLP | State of Nevada | 100% | Dormant |

3.    **SIGNIFICANT ACCOUNTING POLICIES**

The accounting policies set out below have been applied consistently to all years presented in these financial statements, unless otherwise indicated.

a)  **Cash**

Cash includes cash on hand and deposits held with financial institutions.

b)   **Financial instruments**

All financial instruments are initially recognized at fair value on the statement of financial position. The Company has classified each financial instrument into one of the following categories: (1) financial assets or liabilities at fair value through profit or loss ("FVTPL"), (2) loans and receivables, (3) financial assets available-for-sale, (4) financial assets held-to maturity, and (5) other financial liabilities. Subsequent measurement of financial instruments is based on their classification.

Financial assets and liabilities at FVTPL are subsequently measured at fair value with changes in those fair values recognized in net earnings. Financial assets "available-for-sale" are subsequently measured at fair value with changes in fair value recognized in other comprehensive income (loss), net of tax.

Financial assets "held-to-maturity", "loans and receivables", and "other financial liabilities" are subsequently measured at amortized cost using the effective interest method. The Company's financial assets and liabilities are recorded and measured as follows:

| Asset or Liability | Category | Measurement |
|---|---|---|
| Cash | FVTPL | Fair value |
| Receivables | Loans and receivables | Amortized cost |
| Marketable securities | FVTPL | Fair value |
| Investment | FVTPL | Fair value |
| Promissory note | Loans and receivables | Amortized cost |
| Trade payables and accrued liabilities | Other liabilities | Amortized cost |

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

---

3.    **SIGNIFICANT ACCOUNTING POLICIES (continued):**

b)   **Financial instruments (continued):**

The Company determines the fair value of financial instruments according to the following hierarchy based on the amount of observable inputs used to value the instrument.

Level 1 – Quoted prices are available in active markets for identical assets or liabilities as of the reporting date. Active markets are those in which transactions occur in sufficient frequency and volume to provide pricing information on an ongoing basis.

Level 2 – Pricing inputs are other than quoted prices in active markets included in Level 1. Prices in Level 2 are either directly or indirectly observable as of the reporting date.  Level 2 valuations are based on inputs, including quoted forward prices for commodities, time value and volatility factors, which can be substantially observed or corroborated in the marketplace.

Level 3 – Valuations in this level are those with inputs for the asset or liability that are not based on observable market data.

Cash has been measured at fair value using Level 1 inputs. The Company's investment is measure at fair value using Level 3 inputs.

c)   **Income taxes**

Income tax expense comprises current and deferred tax.  Current tax and deferred tax are recognized in profit or loss except to the extent that it relates to a business combination or items recognized directly in equity or in other comprehensive loss/income.

Current income taxes are recognized for the estimated income taxes payable or receivable on taxable income or loss for the current year and any adjustment to income taxes payable in respect of previous years.  Current income taxes are determined using tax rates and tax laws that have been enacted or substantively enacted by the year-end date.

Deferred tax is recorded using the liability method, providing for temporary differences, between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. Temporary differences are not provided for relating to goodwill not deductible for tax purposes, the initial recognition of assets or liabilities that affect both accounting or taxable loss, and differences relating to investments in subsidiaries to the extent that they will probably not reverse in the foreseeable future. The amount of deferred tax provided is based on the expected manner of realization or settlement of the carrying amount of assets and liabilities, using tax rates enacted or substantively enacted at the date of the statement of financial position.

Recognition of deferred tax assets for unused tax losses, tax credits and deductible temporary differences is restricted to those instances where it is probable that future taxable profit will be available against which the deferred tax asset can be utilized.  At the end of each reporting year the Company reassesses unrecognized deferred tax assets. The Company recognizes a previously unrecognized deferred tax asset to the extent that it has become probable that future taxable profit will allow the deferred tax asset to be recovered.

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

---

3.      **SIGNIFICANT ACCOUNTING POLICIES (continued):**

**d)   Share capital**

Equity instruments are contracts that give a residual interest in the net assets of the Company. Financial instruments issued by the Company are classified as equity only to the extent that they do not meet the definition of a financial liability or financial asset. The Company's common shares, common share, options and warrants, and flow-through shares are classified as equity instruments.

Incremental costs directly attributable to the issue of new common shares, common share warrants, or stock options are shown in equity as a deduction, net of tax, from the proceeds.

**e)   Investments**

All investments at fair value are classified upon initial recognition at fair value through profit or loss, with changes in fair value reported in profit or loss. The Company has met the requirements of IAS 39, Financial Instruments: Recognition and Measurement ("IAS 39") to designate investments at fair value through profit and loss as the investments at fair value constitute a group of financial assets which is managed and its performance is evaluated on a fair value basis. Subsequent to initial recognition, all investments are measured at fair value. Gains and losses arising from changes in the fair value of the investments at fair value through profit or loss are presented in profit or loss in the period in which they arise.

The determination of fair value requires judgment based on market information, where available and appropriate. At the end of each financial reporting period, the Company's management estimates the fair value of investments based on the criteria below. Such valuation changes are reflected in the financial statements. A fair value hierarchy is summarized in Note 9 that distinguishes the significance of the inputs used in determining the fair value measurements of various financial instruments.

All investments in private companies, which includes shares, are initially recorded at cost, being the fair value at the time of acquisition. Thereafter, at each reporting date, the fair value of an investment may, depending upon the circumstances, be adjusted using one or more of the valuation inputs included in Level 3 as discussed in below.

The determinations of fair value of the Company's investments in private companies at other than initial cost are subject to certain limitations. Financial information for private companies in which the Company has investments may not be available or, if available, that information may be limited and/or unreliable.

For private company securities not traded in an active market, all investments are initially recorded at the transaction price, being the fair value at the time of acquisition. Thereafter, at each reporting date, an assessment for indicators of impairment are performed, and the fair value is determined using appropriate valuation techniques. Such techniques may include:

•    Using recent arm's length market transactions
•    A discounted cash flow analysis or other valuation models

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

3.    **SIGNIFICANT ACCOUNTING POLICIES (continued):**

f)  **Earnings (loss) per common share**

Basic earnings (loss) per share has been calculated using the weighted average number of common shares outstanding during the year.

Diluted earnings (loss) per share has been calculated using the weighted average number of common shares that would have been outstanding during the respective period had all of the stock options and warrants outstanding at year-end having a dilutive effect been converted into shares at the beginning of the year and the proceeds used to repurchase the Company's common shares at the average market price for the year. If these computations prove to be anti-dilutive, diluted earnings (loss) per share is the same as basic earnings (loss) per share.

g)  **Share-based compensation**

The stock option plan allows Company employees and consultants to acquire shares of the Company.  The fair value of options granted is recognized as a share-based compensation expense with a corresponding increase in equity. An individual is classified as an employee when the individual is an employee for legal or tax purposes (direct employee) or provides services similar to those performed by a direct employee. Consideration paid on the exercise of stock options is credited to share capital and the fair value of the options is reclassified from reserves to share capital.

The fair value is measured at grant date and each tranche is recognized over the period during which the options vest.  The fair value of the options granted is measured using the Black-Scholes option pricing model taking into account the terms and conditions upon which the options were granted.  At each financial position reporting date, the amount recognized as an expense is adjusted to reflect the number of stock options that are expected to vest.

Share-based payments to non-employees are measured at the fair value of the goods or services received or if such fair value is not reliably measurable, at the fair value of the equity instruments issued.

h)  **Impairment of long-lives assets**

At the end of each reporting period, the Company's assets are reviewed to determine whether there is any indication that those assets may be impaired. If such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment, if any. The recoverable amount is the higher of fair value less costs to sell and value in use. Fair value is determined as the amount that would be obtained from the sale of the asset in an arm's length transaction between knowledgeable and willing parties. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset. If the recoverable amount of an asset is estimated to be less than its carrying amount, the carrying amount of the asset is reduced to its recoverable amount and the impairment loss is recognized in the profit or loss for the period. For an asset that does not generate largely independent cash inflows, the recoverable amount is determined for the cash generating unit to which the asset belongs.

Where an impairment loss subsequently reverses, the carrying amount of the asset (or cash-generating unit) is increased to the revised estimate of its recoverable amount, but to an amount that does not exceed the carrying amount that would have been determined had no impairment loss been recognized for the asset (or cash-generating unit) in prior years. A reversal of an impairment loss is recognized immediately in profit or loss.

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

3.    **SIGNIFICANT ACCOUNTING POLICIES (continued):**

i)  **New standards, interpretations and amendments**

No new standards or interpretations were adopted during the year.

**New standards and interpretations not yet adopted**

Certain new standards, interpretations, amendments and improvements to existing standards were issued by the IASB or IFRIC that are mandatory for accounting periods beginning on or after January 1, 2018. Updates which are not applicable or are not consequential to the Company have been excluded thereof. The following have not yet been adopted by the Company.

• IFRS 9 – New standard that replaced IAS 39 for classification and measurement, effective for annual periods beginning on or after January 1, 2018.

• IFRS 16 – Leases: New standard to establish principles for recognition, measurement, presentation and disclosure of leases with an impact on lessee accounting, effective for annual periods beginning on or after January 1, 2019.

The Company does not expect a significant impact from adoption of the above standards.

4.    **CRITICAL ACCOUNTING ESTIMATES AND JUDGMENTS**

The Company makes estimates and judgments about the future that affect the reported amounts of assets and liabilities. Estimates and judgments are continually evaluated based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances.  In the future, actual experience may differ from these estimates and assumptions.

The effect of a change in an accounting estimate is recognized prospectively by including it in comprehensive income in the year of the change, if the change affects that year only, or in the year of the change and future years, if the change affects both.

Information about critical estimates and judgments in applying accounting policies that have the most significant risk of causing material adjustment to the financial statements are discussed below.

*Critical judgments*

The preparation of these consolidated financial statements requires management to make judgments regarding the going concern of the Company as discussed in Note 1.

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

4.     **CRITICAL ACCOUNTING ESTIMATES AND JUDGMENTS (continued):**

*Key sources of estimation uncertainty*

The following are key assumptions concerning the future and other key sources of estimation uncertainty that have a significant risk of resulting in a material adjustment to the carrying amount of assets and liabilities within the current and future years:

i.     Judgment is required in determining whether deferred tax assets are recognized in the statement of financial position. Deferred tax assets, including those arising from unutilized tax losses, require management to assess the likelihood that the Company will generate taxable earnings in future periods, in order to utilize recognized deferred tax assets. Estimates of future taxable income are based on forecast cash flows from operations and the application of existing tax laws in each jurisdiction. To the extent that future cash flows and taxable income differ significantly from estimates, the ability of the Company to realize the net deferred tax assets recorded at the date of the statement of financial position could be impacted.

Additionally, future changes in tax laws in the jurisdictions in which the Company operates could limit the ability of the Company to obtain tax deductions in future periods.

The Company has not recorded any deferred tax assets.

ii.    Management uses the Black-Scholes Option Pricing model for valuation of share-based compensation and brokers' warrants, which requires the input of subjective assumptions including expected price volatility, risk-free interest rates and forfeiture rates. Changes in the input assumption can materially affect the fair value estimate and the Company's results of operations and equity reserves.

iii.   The Company recognizes its investment at fair value. Fair value is determined on the basis of market prices from independent sources, if available. If there is no market price, then the fair value is determined using level 3 inputs which involve considerable estimates as the inputs used to value these financial instruments are based on unobservable market data. There is inherent uncertainty and imprecision in estimating the factors that can affect fair value, and in estimating fair values generally, when observable market data is not available. Changes in assumptions and inputs used in valuing financial instruments could affect reported fair values.

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

## 5.    MARKETABLE SECURITIES

During the year ended February 28, 2017, the Company received 5,500,000 common shares of Lorraine Copper Corp. ("LLC") as partial proceeds on sale of the Lustdust Property (Note 9).

On April 17, 2017, the Company distributed 5,500,000 shares of LLC as a return of capital to the shareholders of the Company.

|  | # | $ |
|---|---|---|
| Balance as at February 28, 2016 | - | - |
|  |  |  |
| Acquisition of LLC shares | 5,500,000 | 440,000 |
| Fair value adjustment | - | (55,000) |
| Balance as at February 28, 2017 | 5,500,000 | 385,000 |
|  |  |  |
| Fair value adjustment – April 17, 2017 | - | 55,000 |
| Return of capital, April 17, 2017 | (5,500,000) | (440,000) |
|  |  |  |
| Balance as at February 28, 2018 | - | - |

## 6.    INVESTMENT

During the year ended February 28, 2018, the Company entered into an agreement to acquire 3,000,000 units of Salvation Botanical Ltd. ("Salvation") at a price of $0.50 per unit for a total cost of $1,500,000 pursuant to a subscription agreement between ALQ and Salvation (the "Subscription Agreement"). Each unit is comprised of one common share of Salvation and one-half of one common share purchase warrant exercisable into one-half additional share of Salvation at a price of CDN$0.75 for a term of eighteen months. As at February 28, 2018, $500,000 is owed to Salvation as consideration for 1,000,000 units received included in trade payables and accrued liabilities.

Salvation is a private company based in Nanaimo, BC.  The company is involved in the production of high-quality standardized cannabinoid products for licensed producers and operates one of the first analytics laboratories in Canada, accredited by Health Canada to test cannabis and derivatives for licensed producers of medical cannabis, ACMPR growers, approved cannabis patients, Section 56 license holders, industrial hemp producers and any other party legally entitled to possess cannabis.

## 7.    PROMISSORY NOTE

On August 23, 2017, the Company entered into a Letter of Agreement (the "Letter") with Tahoe Hydroponics Company LLC ("Tahoe") a US based cannabis cultivation company based in Carson City, Nevada.  The terms of the Letter with Tahoe, initially required that:

(i)    the Company will loan an aggregate of US$3,000,000 to Tahoe prior to October 15, 2017;

(ii)    the Company will have the option to convert that loan to equity in Tahoe, representing 30% of the outstanding shares of Tahoe; and

(iii)    the Company will then have the further option to acquire the remaining 70% of the shares of Tahoe on a share exchange basis, based on the fair market value of ALQ's shares and Tahoe (based on a five times multiple of its 12 month trailing revenues), provided that in any event the former Tahoe shareholders will hold 65% of the outstanding shares of ALQ on closing.

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

7.    **PROMISSORY NOTE (continued):**

As at February 28, 2018, the Company had advanced a total of US$1,350,000 to Tahoe. Subsequent to the year ended February 28, Tahoe and the Company terminated the Letter and replaced it with a promissory note evidencing the advance of US$1.35 million from the Company to Tahoe with a 6% annual interest rate (the "Tahoe Note").  As at February 28, 2018, the promissory note included $53,265 in interest receivable. In connection with signing of the promissory note subsequent to February 28, 2018, the Company granted a total of 500,000 common shares to a facilitating agent.

8.    **EQUIPMENT**

| | Computer Equipment | | Furniture and fixtures | | Machinery and Equipment | | Vehicles | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cost** | | | | | | | | | | |
| Balance, February 29, 2016 | $ | 8,878 | $ | 17,282 | $ | 23,742 | $ | 54,939 | $ | 104,841 |
| Additions / Disposals | | - | | - | | - | | - | | - |
| Balance, February 28, 2017 | | 8,878 | | 17,282 | | 23,742 | | 54,939 | | 104,841 |
| Additions / Disposals | | (8,878) | | (17,282) | | (23,742) | | (54,939) | | (104,841) |
| Balance, February 28, 2018 | $ | - | $ | - | $ | - | $ | - | $ | - |
| **Depreciation** | | | | | | | | | | |
| Balance, February 29, 2016 | $ | 8,565 | $ | 17,125 | $ | 21,475 | $ | 52,247 | $ | 99,412 |
| Depreciation for the year | | 135 | | 68 | | 972 | | 1,151 | | 2,326 |
| Balance, February 28, 2017 | | 8,700 | | 17,193 | | 22,447 | | 53,398 | | 101,738 |
| Depreciation for the period | | 34 | | 17 | | 242 | | 289 | | 582 |
| Write-off of equipment | | (8,734) | | (17,210) | | (22,689) | | (53,687) | | (102,320) |
| Balance, February 28, 2018 | $ | - | $ | - | $ | - | $ | - | $ | - |
| **Carrying Amounts** | | | | | | | | | | |
| At February 28, 2017 | $ | 178 | $ | 89 | $ | 1,295 | $ | 1,541 | $ | 3,103 |
| At February 28, 2018 | $ | - | $ | - | $ | - | $ | - | $ | - |

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

9.      **MINERAL PROPERTIES**

|  | 2018 | 2017 |
|---|---|---|
| Lustdust Claims | | |
| Acquisition costs | $          - | $          1 |
| Disposal | | (1) |
| Fair value adjustment | $          - | $          - |

During the year ended February 28, 2017, the Company sold the Lustdust Property to Lorraine Copper Corp ("LLC") whereby LLC acquired a 100% interest in the Lustdust Property by:
- Issuing 5,500,000 common shares of LLC (received);
- Paying of $50,000 (received);
- Incurring $100,000 in exploration expenditure on the Lustdust Property (incurred);

As a result of the sale, the Company recorded a $490,000 gain during the year ended February 28, 2017.

10.     **SHARE CAPITAL AND RESERVES**

Authorized capital stock: unlimited number of common shares without par value.

During the year end February 28, 2018, the Company issued common shares as follows:

a)  24,578,170 common shares were issued at $0.0375 per common share, by way of a non-brokered private placement, for gross proceeds of $921,681.

b)  25,936,818 common shares were issued at $0.175 per common share, by way of a non-brokered private placement, for gross proceeds of $4,538,944.

c)  24,015,800 Units were issued at $0.50 per Unit, by way of a non-brokered private placement, for gross proceeds of $12,007,900. Each Unit comprises one common share and one share purchase warrant with each whole warrant exercisable into a common share for $1.25 for a period of twelve months.

The Company incurred cash costs of $1,045,734, issued 413,000 common shares to finders valued at $43,989, and issued 2,279,956 finder warrants valued at $139,912.  The finder's warrants were calculated using a Black-Scholes option pricing model with the following weighted average assumptions: expected life of 1.37 years, dividend yield of 0%, expected volatility of 105.63% and a risk free interest rate of 1.31%.

As at February 28, 2018, a total of $315,950 in subscriptions was receivable for shares issued. Subsequent to February 28, 2018, the full $315,950 was collected.

During the year end February 28, 2018, the Company received subscriptions for an additional 24,578,170 common shares at $0.0375 for which the shares were not issued. As at February 28, 2018, $921,681 is included in obligation to issue shares related to these subscriptions.

During the year ended February 28, 2018, the Company also received $1,617,273 in cash for private placements which were oversubscribed. The Company will return the funds received to subscribers for the amounts collected for which shares will not be issued.

On April 17, 2017, the Company completed a return of capital to shareholders of record on January 25, 2017 for the 5,500,000 shares or Lorraine Copper Corp. originally received as consideration for the Lustdust Property (Note 9).

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

---

### 10.    SHARE CAPITAL AND RESERVES (continued):

**Stock Option Plan**

The Company has established a fixed share purchase option plan whereby the Board of Directors may, from time to time, grant options to directors, officers, consultants or service providers to the Company. Under the plan the Company is authorized to grant stock options of up to ten percent (10%) of the number of common shares issued and outstanding. Options granted under the plan may have a maximum term of ten years. The exercise price of an option may not be less than the closing price on the TSX Venture Exchange on the last trading day preceding the grant.

**Stock Options**

There were no stock options were granted during the years ended February 28, 2018 and 2017.

Stock option transactions and the number of stock options outstanding are summarized below:

|  | Number | Weighted Average Exercise Price |
|---|---|---|
| **Balance, February 28, 2016 and 2017** | 625,000 | $ 0.06 |
| Cancelled | (425,000) | $ 0.06 |
| **Balance, February 28, 2018** | 200,000 | $ 0.06 |

Stock options outstanding at February 28, 2018 are as follows:

| Date of Expiry | Number of Options Outstanding | Number of Options Exercisable | Exercise Price | Weighted Average Remaining Life (years) |
|---|---|---|---|---|
| February 24, 2019 | 200,000 | 200,000 | $ 0.06 | 1.0 |

**Warrants**

Common share purchase warrant transactions and the number of common shares purchase warrants outstanding are summarized below:

|  | Number | Weighted Average Exercise Price |
|---|---|---|
| **Balance, February 28, 2016 and 2017** | - | $    - |
| Granted | 14,287,856 | $ 1.20 |
| **Balance, February 28, 2018** | 14,287,856 | $ 1.20 |

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

---

## 10.    CAPITAL STOCK (continued):

As of February 28, 2018, the Company had outstanding warrants as follows:

| Date of Expiry | Number | Exercise Price | Weighted Average Remaining Life (years) |
|---|---|---|---|
| October 31, 2019 | 382,256 | $ 0.215 | 1.67 |
| November 24, 2019 | 301,070 | $ 0.215 | 1.74 |
| February 8, 2019 | 5,267,100 | $ 1.250 | 0.95 |
| February 14, 2019 | 1,261,400 | $ 1.250 | 0.96 |
| February 16, 2019 | 7,076,030 | $ 1.250 | 0.97 |
| | 2,279,956 | $ 0.94 | 1.19 |

## 11.    SUPPLEMENTAL CASH FLOW IMPORATION

During the year ended February 28, 2018, the Company had the following non-cash transactions:
- Distribution of marketable securities as a return of capital to shareholders    $ 440,000
- Investment in Tahoe included in trade payables and accrued liabilities    $ 500,000
- Fair value of finders warrants issued    $ 139,912

During the year ended February 28, 2017, the Company had the following non-cash transactions:
- Fair value of marketable securities received for sale of Lustdust Property    $ 440,000

## 12.    FINANCIAL RISK FACTORS

The fair value of the Company's receivables, advance, trade payables and accrued liabilities, approximate their carrying value, which is the amount recorded on the statement of financial position, due to their short terms to maturity. The Company's cash is measured at fair value, under the fair value hierarchy based on level one quoted prices in active markets for identical assets or liabilities.

The Company's risk exposures and the impact on the Company's financial instruments are summarized below:

*Credit risk*

Credit risk is the risk of loss associated with a counterparty's inability to fulfill its payment obligations.  The Company's receivables primarily consist of input tax credits receivable from the Government of Canada. The Company is exposed to credit risk on its promissory note due from Tahoe.

*Liquidity risk*

The Company's approach to managing liquidity risk is to ensure that it will have sufficient liquidity to meet liabilities when due. As at February 28, 2018, the Company had a cash balance of $15,220,447 to settle current liabilities of $3,743,310.  The Company does not believe it is exposed to any significant liquidity risk as at February 28, 2018.

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

---

12.     **FINANCIAL RISK FACTORS (continued):**

*Market risk*

Market risk is the risk of loss that may arise from changes in market factors such as interest rates and, commodity and equity prices.

a)      Interest rate risk

The Company has cash balances which are not at a significant risk to fluctuating interest rates. The Company's current policy is to invest excess cash in investment-grade short-term deposit certificates issued by its banking institutions.  The Company periodically monitors the investments it makes and is satisfied with the credit ratings of its banks.  As of February 28, 2018, the Company did not have any investments in investment-grade short-term deposit certificates.

b)      Price risk

The Company is exposed to price risk with respect to equity prices.  Equity price risk is defined as the potential adverse impact on the Company's earnings due to movements in individual equity prices or general movements in the level of the stock market.

c)      Foreign currency risk

The Company is exposed to foreign currency risk on its promissory note from Tahoe (Note 7) which is denominated in US dollars. A 10% fluctuation in the foreign exchange rate would have a $190,000 impact on profit and loss.

13.     **CAPITAL MANAGEMENT**

The Company manages its capital structure and makes adjustments to it, based on the funds available to the Company, in order to support the acquisition, and development of its investments. The Board of Directors does not establish quantitative return on capital criteria for management, but rather relies on the expertise of the Company's management to sustain future development of the business.

The Company is largely dependent upon external financings to fund activities.  In order to search for new business opportunities and pay for administrative costs, the Company will spend its existing working capital and raise additional funds as needed.  The Company will continue to assess new business opportunities and seek to acquire new business assets if it feels there are sufficient business opportunities or economic potential and if it has adequate financial resources to do so.  Management reviews its capital management approach on an ongoing basis and believes that this approach, given the relative size of the Company, is reasonable.

There were no changes in the Company's approach to capital management during the year ended February 28, 2018.  The Company is not subject to externally imposed capital requirements.

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

___

### 14. RELATED PARTY TRANSACTIONS

Related parties and related party transactions impacting the accompanying financial statements are summarized below and include transactions with the following individuals or entities:

Key management personnel:

Key management personnel include those persons having authority and responsibility for planning, directing and controlling the activities of the Company as a whole. The Company has determined that key management personnel consist of executive and non-executive members of the Company's Board of Directors and corporate officers.

Remuneration attributed to key management personnel can be summarized as follows:

|  | Year ended February 28, | |
|  | 2018 | 2017 |
|---|---|---|
| Short-term benefits* | $ 141,501 | $ 86,004 |
| Directors' fees | 2,000 | 2,500 |
| Totals | $ 143,501 | $ 88,504 |

*includes base salaries pursuant to contractual employment, or consultancy arrangements. These have been recorded in management and consulting fees, and professional fees.

During the year ended February 28, 2018, the Company incurred $1,500 (2017 - $6,000) for office rental expense to a director and officer of the Company.

As at February 28, 2018, $40 (2017 - $274,403) was included in accounts payable and accrued liabilities for fees owed to related parties.

### 15. INCOME TAXES

A reconciliation of income taxes at statutory rates with the reported taxes is as follows:

|  | **2018** | **2017** |
|---|---|---|
| Income (loss) for the year | $ (542,156) | $ 225,970 |
| Expected income tax (recovery) | $ (142,000) | $ 59,000 |
| Change in statutory, exchange rates, and other | (87,000) | 7,000 |
| Permanent differences | (5,000) | - |
| Share issue costs | (285,000) | - |
| Change in unrecognized deductible temporary differences | $ 519,000 | $ (66,000) |
| Total income tax expense (recovery) | $ - | $ - |
| Current income tax | $ - | $ - |
| Deferred tax recovery | $ - | $ - |

**ALQ GOLD CORPORATION**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in Canadian Dollars)
FEBRUARY 28, 2018

---

15.    **INCOME TAXES (continued):**

In September 2017, the British Columbia (BC) Government proposed changes to the general corporate income tax rate to increase the rate from 11% to 12% effective January 1, 2018 and onwards.  This change in tax rate was substantively enacted on October 26, 2017.  The relevant deferred tax balances have been re-measured to reflect the increase in the Company's combined Federal and Provincial (BC) general corporate income tax rate from 26% to 27%.

The Company's unrecognized deductible temporary differences and unused tax losses for which no deferred tax assets are recognized consist of the following amounts:

| | 2018 | Expiry date range | 2017 |
|---|---|---|---|
| **Temporary Differences** | | | |
| Non-capital losses | $  3,936,000 | 2026-2038 | $  3,128,000 |
| Exploration and evaluation assets | 4,023,000 | No expiry | 4,515,000 |
| Property and equipment | 373,000 | No expiry | 370,000 |
| Share issue costs | 872,000 | 2039-2043 | 1,000 |
| Allowable capital losses | - | No expiry | 6,000 |
| Tax credits | - | No expiry | 6,000 |
| | $  9,024,000 | | $  8,026,000 |

Tax attributes are subject to review, and potential adjustment, by tax authorities.

16.    **SUBSEQUENT EVENT**

Subsequent to the year ended February 28, 2018:

- the Company granted an aggregate of 2,000,000 stock options to the directors of the Company and a consultant.  The options, having an exercise price of $0.50, are fully vested and expire April 30, 2023;

- the Company entered into a Letter of Agreement ("Letter Agreement") with a third party that owns certain intellectual property rights and brand names intended for use in the cannabis industry. The Letter Agreement outlines a variety of potential transactions between the parties, including licensing and direct investment opportunities.

  In connection with the Letter Agreement, the Company provided a $5,000,000 loan and the third party issued an unsecured convertible promissory note ("Convertible Note"). The Convertible Note matures 24 months following the date of issuance and bears interest at 8% per annum. The Convertible Note is convertible into up to 3,333 common shares, or 3.3%, of the third party.



**Financial Statements**

**Years Ended February 28, 2017 and February 29, 2016**

**(Expressed in Canadian Dollars)**

| Index | Page |
|---|---|
| **Independent Auditors' Report to the Shareholders** | 2-3 |
| Financial Statements | |
| Statements of Income and Comprehensive Income | 4 |
| Statements of Financial Position | 5 |
| Statements of Changes in Shareholders' Equity | 6 |
| Statements of Cash Flows | 7 |
| Notes to the Financial Statements | 8-25 |



# INDEPENDENT AUDITORS' REPORT

## TO THE SHAREHOLDERS OF ALQ GOLD CORP.

We have audited the accompanying financial statements of ALQ Gold Corp., which comprise the statements of financial position as at February 28, 2017 and February 28, 2016 and the statements of income and comprehensive income, changes in shareholders' equity and cash flows for the years then ended, and a summary of significant accounting policies and other explanatory information.

*Management's Responsibility for the Financial Statements*
Management is responsible for the preparation and fair presentation of these financial statements in accordance with International Financial Reporting Standards and for such internal control as management determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*
Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with Canadian generally accepted auditing standards. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*
In our opinion, the financial statements present fairly, in all material respects, the financial position of ALQ Gold Corp. as at February 28, 2017 and February 29, 2016, and its financial performance and its cash flows for the years then ended in accordance with International Financial Reporting Standards.

2

**Vancouver**
7th Floor 355 Burrard St
Vancouver, BC  V6C 2G8

**T:** 604 687 1231
**F:** 604 688 4675

**Langley**
305 – 9440 202 St
Langley, BC  V1M 4A6

**T:** 604 282 3600
**F:** 604 357 1376

**Nanaimo**
201 – 1825 Bowen Rd
Nanaimo, BC  V9S 1H1

**T:** 250 755 2111
**F:** 250 984 0886

Smythe LLP | **smythecpa.com**



*Emphasis of Matter*

Without qualifying our opinion, we draw attention to note 1 in the financial statements, which describes matters and conditions that indicate the existence of material uncertainties that may cast significant doubt about the Company's ability to continue as a going concern.

*Smythe LLP*

Chartered Professional Accountants

Vancouver, British Columbia
June 19, 2017

3

| Vancouver | Langley | Nanaimo |
|---|---|---|
| 7th Floor 355 Burrard St | 305 – 9440 202 St | 201 – 1825 Bowen Rd |
| Vancouver, BC  V6C 2G8 | Langley, BC  V1M 4A6 | Nanaimo, BC  V9S 1H1 |
| **T:** 604 687 1231 | **T:** 604 282 3600 | **T:** 250 755 2111 |
| **F:** 604 688 4675 | **F:** 604 357 1376 | **F:** 250 984 0886 |

Smythe LLP | **smythecpa.com**

ALQ Gold Corp.
(Exploration Stage Company)
Statements of Income and Comprehensive Income
Expressed in Canadian dollars

|  | Note | Years Ended | |
|---|---|---|---|
|  |  | February 28, 2017 | February 29, 2016 |
| **Operating Expenses** |  |  |  |
| Consulting and management fees |  | $ 52,504 | $ 52,504 |
| Depreciation | 8 | 2,326 | 2,328 |
| Insurance |  | 6,277 | 6,287 |
| Office, printing and miscellaneous |  | 36,492 | 36,331 |
| Professional fees |  | 66,496 | 35,046 |
| Regulatory fees and transfer fees |  | 37,737 | 15,407 |
| Rent | 10 | 6,000 | 6,000 |
| Share-based payments | 9(e), 10 | - | 2,882 |
| Shareholder relations |  | 199 | 179 |
| **Total Operating Expenses** |  | **208,031** | **156,964** |
| **Other Items** |  |  |  |
| Gain on sale of Lustdust Property | 5, 6 | 490,000 | - |
| Interest income |  | 378 | 919 |
| General exploration |  | (1,000) | - |
| Sundry income |  | - | 1,645 |
| Interest expenses, bank charges and foreign exchange |  | (377) | (120) |
| Unrealized loss on fair value of marketable securities | 5 | (55,000) | - |
| **Net Income (Loss) and Comprehensive Income (Loss) for the Year** |  |  |  |
|  |  | $ **225,970** | $ **(154,520)** |
| Earnings/(loss) per share - basic and diluted |  | $ 0.041 | $ (0.028) |
| Weighted average number of common shares outstanding |  |  |  |
| Basic |  | 5,518,670 | 5,518,670 |
| Effect of dilutive stock options |  | 53,159 | - |
| Diluted |  | 5,571,829 | 5,518,670 |

The accompanying notes are an integral part of these audited financial statements          4

**ALQ Gold Corp.**
**(Exploration Stage Company)**
**Statements of Financial Position**
**Expressed in Canadian dollars**

| | Note | February 28, 2017 | February 29, 2016 |
|---|---|---|---|
| **Assets** | | | |
| **Current** | | | |
| Cash and cash equivalents | 14 | $ 16,552 | $ 67,978 |
| Receivables | | 12,800 | 7,855 |
| Reclamation bond | 7 | 30,000 | - |
| Marketable securities | 5, 15 | 385,000 | - |
| Prepaid and deposits | | 2,098 | - |
| | | **446,450** | **75,833** |
| **Non-current** | | | |
| Mineral properties | 6 | - | 1 |
| Reclamation bond | 7 | - | 30,000 |
| Equipment | 8 | 3,103 | 5,429 |
| | | **3,103** | **35,430** |
| **Total Assets** | | $ **449,553** | $ **111,263** |
| **Liabilities** | | | |
| **Current** | | | |
| Accounts payable and accrued liabilities | 10 | $ 310,561 | $ 198,241 |
| | | **310,561** | **198,241** |
| **Shareholders' Equity (Deficit)** | | | |
| Share capital | 9 | 17,204,394 | 17,204,394 |
| Share-based payments reserve | | 699,341 | 699,341 |
| Deficit | | (17,764,743) | (17,990,713) |
| **Total Shareholders' Equity (Deficit)** | | **138,992** | **(86,978)** |
| **Total Liabilities and Shareholders' Equity (Deficit)** | | $ **449,553** | $ **111,263** |

**Approved on behalf of the Board**

*"Carl Pines"*                                      *"Neil F. Hummel"*
_____                          _____
Carl Pines                                              Neil F. Hummel
Director                                                   Director

The accompanying notes are an integral part of these audited financial statements                    5

**ALQ Gold Corp.**
**(Exploration Stage Company)**
**Statements of Changes in Shareholders' Equity**
**Expressed in Canadian dollars**

| | Share Capital | | Share-based | | |
| --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Payments Reserve | Deficit | Total Equity |
| **Balance as at February 28, 2015** | **5,518,670** | **$  17,204,394** | **$         696,459** | **$  (17,836,193)** | **$         64,660** |
| Share-based payments | - | - | 2,882 | - | 2,882 |
| Loss for the year | - | - | - | (154,520) | (154,520) |
| **Balance as at February 29, 2016** | **5,518,670** | **17,204,394** | **699,341** | **(17,990,713)** | **(86,978)** |
| Income for the year | - | - | - | 225,970 | 225,970 |
| **Balance as at February 28, 2017** | **5,518,670** | **$  17,204,394** | **$         699,341** | **$  (17,764,743)** | **138,992** |

The accompanying notes are an integral part of these audited financial statements                    6

**ALQ Gold Corp.**
**(Exploration Stage Company)**
**Statements of Cash Flows**
**Expressed in Canadian dollars**

| | | Years Ended | |
| --- | --- | --- | --- |
| Cash provided by (used for): | | February 28, 2017 | February 29, 2016 |
| **Operating Activities** | | | |
| Net income (loss) for the year | $ | 225,970 $ | (154,520) |
| Items not involving cash: | | | |
| Gain on sale of Lustdust property | | (490,000) | - |
| Depreciation | | 2,326 | 2,328 |
| Unrealized loss on fair value of marketable securities | | 55,000 | - |
| Share-based payments | | - | 2,882 |
| | | (206,704) | (149,310) |
| Changes in non-cash working capital | | | |
| Receivables | | (4,945) | (1,982) |
| Prepaid and deposits | | (2,098) | - |
| Accounts payable and accrued liabilities | | 112,321 | 101,719 |
| | | 105,278 | 99,737 |
| **Cash Used in Operating Activities** | | **(101,426)** | **(49,573)** |
| **Investing Activity** | | | |
| Proceeds on sale of Lustdust property | | 50,000 | - |
| **Cash Provided by Investing Activity** | | **50,000** | **-** |
| **Decrease in Cash During the Year** | | **(51,426)** | **(49,573)** |
| **Cash and Cash Equivalents, Beginning of the Year** | | 67,978 | 117,551 |
| **Cash and Cash Equivalents, End of the Year** | $ | **16,552** $ | **67,978** |

Supplemental cash flow information - Note 12

The accompanying notes are an integral part of these audited financial statements                    7

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

1.    Nature of Operations and Going Concern

ALQ Gold Corp. (the "Company") was incorporated under the laws of British Columbia, Canada, on February 25, 1985. The Company is primarily engaged in the acquisition, exploration and development of mineral properties located in Canada.

The Company's corporate office and principal place of business is 410 Donald Street, Coquitlam, British Columbia, Canada V3K 3Z8.

The business of exploring for minerals involves a high degree of risk and there can be no assurance that any of the Company's current or future exploration programs will result in profitable mining operations. The recoverability of amounts shown for mineral properties is dependent upon the discovery of economically recoverable reserves, the ability of the Company to obtain financing to complete their exploration and development, and establish future profitable operations, or realize proceeds from their sale. The carrying value of the Company's mineral properties does not reflect present or future value.

These financial statements were prepared on a going concern basis, which assumes that the Company will be able to realize its assets and discharge its liabilities in the normal course of business. As at February 28, 2017, the Company had working capital of $135,889 (2016 – working capital deficit $122,408) (note 15). Accounts payable to directors and officers as at February 28, 2017 is $274,403. The directors and officers are making efforts to make funds available for operations. As the Company chooses to proceed on exploration and development of properties it may acquire, it will need to raise additional funds for those expenditures. These circumstances comprise material uncertainties that cast significant doubt as to the ability of the Company to meet its obligations as they fall due, and accordingly, the ability of the Company to continue as a going concern.

The Company has relied mainly upon the issuance of share capital to finance its activities. Future capital requirements will depend on many factors, including the Company's ability to execute its business plan. The Company will be required to issue share capital to finance its future activities through private placements and the exercise of options and warrants, and is actively seeking additional equity financing. There can be no assurance that such financing will be available to the Company. Inability to secure future financing would have a material adverse effect on the Company's business, results of operations and financial condition.

These financial statements do not include the adjustments to assets and liabilities that would be necessary should the Company be unable to continue as a going concern. Such adjustments could be material.

8

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

**2.    Basis of Preparation**

These financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS"), as issued by the International Accounting Standards Board ("IASB"), on a historical cost basis using the accrual basis of accounting, except for cash flow information and financial instruments measured at fair value.

The financial statements were approved and authorized for issue by the Board of Directors on June 19, 2017.

The Company's functional and presentation currency is the Canadian dollar.

**3.    Summary of Significant Accounting Policies**

**(a)    Significant Accounting Estimates and Judgments**

The preparation of financial statements in conformity with IFRS requires management to make estimates and judgments that affect amounts reported in the financial statements. Estimates and judgments are continually evaluated and are based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances, and subject to measurement uncertainty. The effect on the financial statements of changes in such estimates in future reporting periods could be significant.

Estimates and areas where judgment is applied that have significant effect on the amount recognized in the financial statements include:

*The determination of, and provision for, reclamation and remediation obligations*

The Company assesses its provision for asset retirement obligations at each reporting date or when new material information becomes available. Accounting for reclamation and remediation obligations requires management to make estimates of the future costs the Company will incur to complete the reclamation and remediation work required to comply with existing laws and regulations. Actual costs incurred may differ from those amounts estimated. Also, future changes to environmental laws and regulations could increase the extent of reclamation and remediation work required to be performed by the Company. Increases in future costs could materially impact the amounts charged to operations for reclamation and remediation.

*Deferred taxes*

The Company recognizes a deferred tax asset to the extent recovery is probable. Assessing the recoverability of deferred tax assets requires management to make significant estimates of future taxable income against which deductible temporary differences and the carry-forward of unused tax credits and unused tax losses can be utilized. In addition, changes in tax laws could limit the ability of the Company to obtain tax deductions in future periods.

9

**ALQ Gold Corp.**
**(Exploration Stage Company)**
**Notes to the Financial Statements**
**Years ended February 28, 2017 and February 29, 2016**
**Expressed in Canadian dollars**

3.      **Summary of Significant Accounting Policies, continued**

(a)     **Significant Accounting Estimates and Judgments, continued**

*Going concern*

The assessment of the Company's ability to continue as a going concern and to raise sufficient funds to pay its ongoing operating expenditures, meet its liabilities for the ensuing year, and to fund planned and contractual exploration programs involves significant judgment based on historical experience and other factors, including expectation of future events that are believed to be reasonable under the circumstances.

(b)     **Cash and Cash Equivalents**

Cash and cash equivalents consists of cash on hand, term deposits, and investments with maturities of three months or less from the date of purchase that are readily convertible to known amounts of cash and subject to an insignificant risk of change in value.

(c)     **Mineral Properties**

All expenditures related to the acquisition, exploration and evaluation of mineral properties are capitalized on a property-by-property basis, net of recoveries, until these mineral properties are placed into commercial production, sold or abandoned. If commercial production is achieved from a mineral property, the related mineral properties are tested for impairment and reclassified to mineral property in production. If a mineral property is sold or abandoned, the related capitalized costs will be expensed to profit or loss in that period.

From time to time, the Company may acquire or dispose of all or part of its mineral property interests under the terms of property option agreements. Options are exercisable entirely at the discretion of the optionee, and accordingly, option payments are recognized when paid or received. If recoveries are received and exceed the capitalized expenditures, the excess is reflected in profit or loss.

All capitalized mineral property costs are reviewed at each reporting date, on a property-by-property basis, to consider whether there are any conditions that may indicate impairment. When the carrying value of a property exceeds its net recoverable amount that may be estimated by quantifiable evidence of an economic geological resource or reserve, joint venture expenditure commitments or the Company's assessment of its ability to sell the property for an amount exceeding the carrying value, provision is made for the impairment in value. The amounts capitalized for mineral properties represent costs incurred to date less write-downs, and are not intended to reflect present or future values.

The Company recognizes an estimate of the liability associated with statutory, contractual, constructive or legal obligations associated with site closure and property retirement costs in the period in which the liability is incurred if a reasonable estimate of fair value can be made. The estimated fair value or present value of future cash flows is capitalized to the related mining assets with a corresponding increase in the rehabilitation provision in the period incurred. The capitalized amount will be depreciated on a unit-of-production basis over the estimated life of the ore reserve.

10

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

**3.    Summary of Significant Accounting Policies, continued**

**(c)    Mineral Properties, continued**

The amount of the provision will be increased each reporting period due to the passage of time and the amount of accretion is charged to profit or loss. The provision can also increase or decrease due to changes in regulatory requirements, discount rates, and assumptions regarding the amount and timing of future rehabilitation expenditures. Any changes are recorded directly to the related mining assets with a corresponding change to the rehabilitation provision. Actual rehabilitation expenditures incurred are charged against the rehabilitation provision to the extent of the liability recorded.

**(d)    Reclamation Bond**

The Company's reclamation bond is recorded at amortized cost and held by Canadian government agencies, in trust or a cashable term deposit.

**(e)    Share Capital**

*Equity units*

Proceeds from the issue of units, consisting of common shares and share purchase warrants, are first allocated to common shares based on the quoted market value of the common shares at the time the units are priced, and the balance, if any, is allocated to the attached warrants. Share issue costs are netted against share proceeds.

*Flow-through shares*

Flow-through shares entitle a company that incurs certain resource expenditures in Canada to renounce them for tax purposes allowing the expenditures to be deducted for income tax purposes by the investors who purchased the shares.

Any difference between the amount recognized in common shares and proceeds received is deemed equal to an estimated premium investors pay for the flow-through feature and is initially recorded as a liability.

The amount recorded as a liability relating to the sale of tax benefits is reversed when the tax benefits are renounced. The difference between the amount originally recorded as a liability and the estimated income tax benefits on the date of renouncement is recognized in profit or loss. The tax effect of the renunciation is recorded at the time the Company makes the renunciation, which may differ from the effective date of renunciation.

**(f)    Non-monetary Consideration**

Shares issued for non-monetary consideration are recorded at fair value based on the quoted market value of the Company's shares on the date of share issuance. Shares to be issued, which are contingent upon future events or actions, are recorded by the Company when it is reasonably determinable that the shares will be issued.

11

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

3.      Summary of Significant Accounting Policies, continued

(g)      Share-based Payments

Share-based payments for employees are measured at the fair value of the instruments issued and amortized over the vesting period. Share-based payments for non-employees are measured at either the fair value of the goods or services received or the fair value of the equity instrument issued, if it is determined the fair value of the goods or services cannot be reliably measured, and are recorded on the date the goods or services are received. The fair value of the options is charged to profit or loss using the graded vesting method, with the offset credit to share-based payments reserve.

Consideration received on the exercise of stock options is recorded as share capital and the related fair value calculated is transferred from share-based payment reserve to share capital.

(h)      Income Taxes

The Company follows the asset and liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities, and their respective tax basis. Deferred tax assets and liabilities are measured using enacted or substantively enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled.

The effect on deferred tax assets and liabilities of a change in tax rates is recognized in profit or loss in the period that includes the enactment date. Deferred tax assets also result from unused losses carried forward, resource related pools and other deductions. A deferred tax asset is recognized for unused tax losses, tax credits and deductible temporary differences to the extent that it is probable that future taxable income will be available against which they can be utilized. Deferred tax assets are reviewed at each reporting date and are reduced to the extent that it is no longer probable that the related tax benefit will be realized.

(i)      Earnings/(loss) per Share

Basic earnings/(loss) per share is computed by dividing the net loss available to common shareholders by the weighted average number of shares outstanding during the reporting period. Diluted earnings/(loss) per share is computed similar to basic earnings/(loss) per share, except that the weighted average shares outstanding are increased to include additional shares for the assumed exercise of stock options, warrants and similar instruments. It assumes that the proceeds of such exercise would be used to repurchase common shares at the average market price during the period. However, the calculation of diluted earnings/(loss) per share excludes the effects of various conversions and exercise of options, warrants and similar instruments that would be anti-dilutive.

12

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

3.      Summary of Significant Accounting Policies, continued

(j)     Financial Instruments

*Fair value*

The Company uses the following hierarchy for determining and disclosing the fair value of financial instruments, which are measured at fair value by valuation technique:

Level 1: Quoted (unadjusted) prices in active markets for identical assets or liabilities
Level 2: Other techniques for which all inputs which have a significant effect on the recorded fair value are observable, either directly or indirectly
Level 3: Techniques which use inputs which have a significant effect on the recorded fair value that are not based on observable market data.

The Company classifies its financial assets in the following categories: at fair value through profit or loss ("FVTPL"), available-for-sale ("AFS") or loans and receivables. The classification depends on the purpose for which the financial assets were acquired. Management determines the classification of financial assets at recognition.

*Fair value through profit or loss*

FVTPL financial assets are initially recognized at fair value with changes in fair value recorded through profit or loss.

*Available-for-sale*

AFS financial assets are non-derivatives that are either designated as available-for-sale or not classified in any of the other financial asset categories and are recognized at fair value and subsequently carried at fair value. Changes in the fair value of AFS financial assets other than impairment losses are recognized as other comprehensive loss and classified as a component of equity.

*Loans and receivables*

Loans and receivables are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market. They are classified as current assets or non-current assets based on their maturity date. Loans and receivables are initially recognized at fair value and subsequently carried at amortized cost less any impairment losses.

*Impairment of financial assets*

At each reporting date, the Company assesses whether there is any objective evidence that a financial asset or a group of financial assets is impaired. A financial asset or group of financial assets is deemed to be impaired if, and only if, there is objective evidence of impairment as a result of one or more events that has occurred after the initial recognition of the asset and that event has an impact on the estimated future cash flows of the financial asset or the group of financial assets.

13

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

3.     Summary of Significant Accounting Policies, continued

(j)     Financial Instruments, continued

*Financial liabilities*

The Company classifies its financial liabilities in the following categories: other financial liabilities and derivative financial liabilities.

Other financial liabilities are non-derivatives and are recognized initially at fair value, net of transaction costs incurred, and are subsequently stated at amortized cost. Any difference between the amounts originally received, net of transaction costs, and the redemption value is recognized in profit or loss over the period to maturity using the effective interest method. Other financial liabilities are classified as current or non-current based on their maturity date.

The Company has no derivative financial liabilities.

(k)     Equipment

Equipment is measured at cost less accumulated depreciation and impairment losses. Cost comprises expenditures that are directly attributable to the acquisition of the asset. Gains and losses on disposal of an item of equipment are determined by comparing the proceeds from disposal with the carrying amount of the equipment, and recognized in profit or loss.

Depreciation is calculated over the estimated useful life of the assets using the declining-balance method at an annual rate of 30%.

(l)     Mining Exploration Tax Credit

The federal and provincial taxation authorities provide companies with tax incentives for undertaking mineral exploration programs in certain areas. The Company accounts for these credits as a reduction of exploration and evaluation expenditures in the period that the credits are received. These credits are subject to review by the relevant authorities and by their nature are subject to measurement uncertainty. Adjustments, if any, resulting from such a review are recorded in the period that the tax filings are amended.

(m)     Accounting Standards Issued but not yet Effective

The following accounting standards are issued but not yet effective. The Company has not early-adopted these revised standards and expects no significant effect on the Company's financial statements when adopted.

14

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

**3.     Summary of Significant Accounting Policies, continued**

**(m)     Accounting Standards Issued but not yet Effective, continued**

**IFRS 9** *Financial Instruments*

IFRS 9 will replace IAS 39 *Financial Instruments: Recognition and Measurement* and IFRIC 9 *Reassessment of Embedded Derivatives*. The final version of this new standard supersedes the requirements of earlier versions of IFRS 9. The main features introduced by this new standard compared with predecessor IFRS are as follows: classification and measurement of financial assets, classification and measurement of financial liabilities, Impairment of financial assets and hedge accounting.

The standard is effective for annual periods beginning on or after January 1, 2018.

**IFRS 16** *Leases*

IFRS 16 specifies how to recognize, measure, present and disclose leases. The standard provides a single lessee accounting model, requiring lessees to recognize assets and liabilities for all leases unless the lease term is 12 months or less or the underlying asset has a low value. Lessors continue to classify leases as operating or finance, with IFRS 16's approach to lessor accounting substantially unchanged from its predecessor, IAS 17 *Leases*.

The standard is effective for annual periods beginning on or after January 1, 2019.

**4.     Financial Instruments**

**(a)     Categories of Financial Instruments**

The Company's financial instruments include cash and cash equivalents, marketable securities, reclamation bond, and accounts payable and accrued liabilities.

The Company has classified its financial instruments into the following categories:

| Financial Instrument | Category | Carrying Value |
|---|---|---|
| Cash and cash equivalents | FVTPL | Fair Value |
| Marketable Securities | FVTPL | Fair Value |
| Reclamation bonds | Loans and Receivables | Amortized Cost |
| Accounts payable and accrued liabilities | Other Financial Liabilities | Amortized Cost |

**(b)     Fair Value**

The carrying values of accounts payable and accrued liabilities approximate their fair values due to the short period to maturity. The reclamation bond is non-interest-bearing, has no maturity date and its carrying value approximates fair value.

15

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

4.      Financial Instruments, continued

(c)      Financial Risk Management

The Company's risk exposure and the impact on its financial instruments are summarized as follows:

(i)      Liquidity Risk

Liquidity risk is the risk that the Company will be unable to meet financial obligations as they fall due. The Company's approach to managing liquidity risk is to provide reasonable assurance that it will have sufficient funds to meet liabilities when due by forecasting cash flows for operations and anticipated investing and financing activities and through management of its capital structure. The Company's financial liabilities of $310,561 as at February 28, 2017 have contractual maturities of less than 90 days (2016 - $198,241).

As at February 28, 2017, the Company's cash balance of $16,552 would not be sufficient to meet its liabilities and the cash requirements for the Company's administrative overhead, maintaining its mineral interests and continuing with its exploration program in the following twelve months.

(ii)      Currency Risk

The Company is exposed to currency risk to the extent expenditures incurred or funds received and balances maintained by the Company are denominated in currencies other than the Canadian dollar. The Company does not use any hedges or other derivatives to mitigate the risk against foreign exchange fluctuations.

As at February 28, 2017, the Company had no amounts receivable or payable in foreign currencies, and accordingly, is not exposed to currency risk.

(iii)      Interest Rate Risk

In respect of the Company's financial assets, interest rate risk mainly arises from the interest rate impact on cash and cash equivalents and reclamation bond. As at February 28, 2017, the Company's exposure is immaterial.

(iv)      Credit Risk

Credit risk is the risk that a counterparty to a financial instrument will fail to discharge its contractual obligations. The Company is exposed to credit risk mainly in respect to managing its cash position, which is held with Canadian financial institutions. The Company mitigates credit risk by risk management policies that require cash deposits or short-term investments be invested with Canadian chartered banks rated BBB or better, or commercial paper issuers rated R1/A2/P2 or higher. All investments must be less than one year in duration.

16

**ALQ Gold Corp.**
**(Exploration Stage Company)**
**Notes to the Financial Statements**
**Years ended February 28, 2017 and February 29, 2016**
**Expressed in Canadian dollars**

**4.    Financial Instruments, continued**

**(c)    Financial Risk Management, continued**

**(v)    Other Price Risk**

Other price risk is the risk that the future cash flows of a financial instrument will fluctuate due to changes in market prices, other than those arising from interest rate risk or foreign currency risk. As the Company's marketable securities are carried at market value and are directly affected by fluctuations in value of the underlying securities, the Company considers its financial performance and cash flows could be materially affected by such changes in the future value of the Company's marketable securities. Except for the risk related to exposure to the change in market value of marketable securities, the Company is not exposed to significant other price risk.

**5.    Marketable Securities**

The Company received 5,500,000 common shares of Lorraine Copper Corp. ("LLC") as partial proceeds on sale of the Lustdust Property (note 15).

|  | February 28, 2017 | |
|---|---|---|
|  | # | $ |
| Acquisition of LLC shares | 5,500,000 | 440,000 |
| Fair value adjustment | - | (55,000) |
| Balance as at February 28, 2017 | 5,500,000 | 385,000 |

**6.    Mineral Properties**

|  | 2017 | | 2016 | |
|---|---|---|---|---|
| Lustdust Claims |  |  |  |  |
| Acquisition costs | $ | 1 | $ | 1 |
| Disposal |  | (1) |  | - |
|  | $ | - | $ | 1 |

*Koster Dam Project*

On June 28, 2016, the Company entered into an option and joint venture agreement with Cariboo Rose Resources Ltd. ("CRR") to earn up to a 100% interest in the Koster Dam Property. In order to earn a 50% legal and beneficial interest in the Koster Dam Project (the "50% Interest"), ALQ must incur at least $110,495 of expenditures on the property on or before June 28, 2017 (the "Option Period").

17

**ALQ Gold Corp.**
**(Exploration Stage Company)**
**Notes to the Financial Statements**
**Years ended February 28, 2017 and February 29, 2016**
**Expressed in Canadian dollars**

**6.      Mineral Properties, continued**

*Koster Dam Project*, **continued**

If ALQ earns the 50% Interest then ALQ will also have the option to acquire a further 50% legal and beneficial interest in the Koster Dam Project (for a total legal and beneficial interest of 100%) (the "Additional Interest") by paying CRR a cash payment of $400,000 on or before the end of the Option Period.

If ALQ exercises the 50% Interest but does not exercise the Additional Interest then ALQ and CRR will enter into a joint venture with respect to the Koster Dam Project. If either ALQ or CRR dilute to an interest equal to 10% or less then such party's interest will automatically convert to a 1% net smelter return royalty.

Subsequent to February 28, 2017, the Company determined it will not be in a position to incur the required expenditures, and accordingly, has determined it will relinquish all of its interests in the property.

*Lustdust Claims*

In August 2016, the shareholders of the Company approved the sale of Lustdust Property to LLC whereby LLC will acquire a 100% interest in the Lustdust Property by:
- Issuing 5,500,000 LLC common shares to the Company;
- Paying $50,000 on closing of the agreement to the Company; and
- Incurring $100,000 in exploration expenditures on the Lustdust Property over a 12-month period from the date of closing.

In September 2016, the sale of the Lustdust Property was completed. The required cash payment of $50,000 was received from LLC at closing.

In October 2016, the Company received 5,500,000 LLC shares (note 5) as part of the above acquisition. Post-acquisition, the Company holds 16.9% of the issued and outstanding common shares of LLC.

**7.      Reclamation Bond**

As at February 28, 2017, the Company has placed a reclamation bond for $30,000 (2016 - $30,000) with the British Columbia Ministry of Energy and Mines. The cashable term deposit is for one year without interest and is automatically renewed annually. Subsequent to February 28, 2017 the reclamation bond was released to the Company.

18

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

8.    Equipment

| | Computer equipment | | Furniture and fixtures | | Machinery and equipment | | Trucks | | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Cost** | | | | | | | | | |
| Balance, February 28, 2015 | $ | 8,878 | $ | 17,282 | $ | 23,742 | $ | 54,939 | $ | 104,841 |
| Additions/Disposals | | - | | - | | - | | - | | - |
| Balance, February 29, 2016 | | 8,878 | | 17,282 | | 23,742 | | 54,939 | | 104,841 |
| Additions/Disposals | | - | | - | | - | | - | | - |
| Balance, February 28, 2017 | $ | 8,878 | $ | 17,282 | $ | 23,742 | $ | 54,939 | $ | 104,841 |
| **Depreciation** | | | | | | | | | |
| Balance, February 28, 2015 | $ | 8,430 | $ | 17,057 | $ | 20,503 | $ | 51,094 | $ | 97,084 |
| Depreciation for the year | | 135 | | 68 | | 972 | | 1,153 | | 2,328 |
| Balance, February 29, 2016 | | 8,565 | | 17,125 | | 21,475 | | 52,247 | | 99,412 |
| Depreciation for the year | | 135 | | 68 | | 972 | | 1,151 | | 2,326 |
| Balance, February 28, 2017 | $ | 8,700 | $ | 17,193 | $ | 22,447 | $ | 53,398 | $ | 101,738 |
| **Carrying Amount** | | | | | | | | | |
| As at February 29, 2016 | $ | 313 | $ | 157 | $ | 2,267 | $ | 2,692 | $ | 5,429 |
| As at February 28, 2017 | $ | 178 | $ | 89 | $ | 1,295 | $ | 1,541 | $ | 3,103 |

9.    Share Capital

(a)    Authorized

The authorized capital of the Company is an unlimited number of common shares without par value.

(b)    Share Issuances

There were no share issuances during the years ended February 28, 2017 and February 29, 2016.

(c)    Share Purchase Warrants

Warrant transactions for the respective years are summarized as follows:

There were no warrants outstanding or issued during the years ended February 28, 2017 and February 29, 2016.

19

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

**9.    Share Capital, continued**

**(d)    Stock Options**

The Company has established a fixed share purchase option plan whereby the Board of Directors may, from time to time, grant options to directors, officers, consultants or service providers to the Company. The maximum aggregate number of plan shares that may be reserved for issuance under the plan at any point in time is 944,734 shares, less any common shares reserved for issuance under share options granted under share compensation arrangements other than the plan, unless the plan is amended pursuant to the requirements of the TSX Venture Exchange policies at the award date. Options granted under the plan may have a maximum term of ten years. The exercise price of an option may not be less than the closing price on the TSX Venture Exchange on the last trading day preceding the grant.

A summary of the Company's options outstanding at February 28, 2017 and February 29, 2016, are as follows:

| Exercise Price | Expiry Date | Balance February 29, 2016 | Granted | Cancelled or Expired | Balance February 28, 2017 |
|---|---|---|---|---|---|
| $  0.06 | February 24, 2019 | 625,000 | - | - | 625,000 |
| Outstanding | | 625,000 | - | - | 625,000 |
| Weighted average exercise price | | $  0.06 | | | $  0.06 |
| Weighted average contractual life remaining in years | | 2.99 | | | 1.99 |
| Exercisable | | 625,000 | | | 625,000 |

| Exercise Price | Expiry Date | Balance February 28, 2015 | Granted | Cancelled or Expired | Balance February 29, 2016 |
|---|---|---|---|---|---|
| $  1.00 | July 23, 2015 | 75,000 | - | 75,000 | - |
| $  0.06 | February 24, 2019 | 625,000 | - | - | 625,000 |
| Outstanding | | 700,000 | - | 75,000 | 625,000 |
| Weighted average exercise price | | $  0.16 | | $  1.00 | $  0.06 |
| Weighted average contractual life remaining in years | | 3.61 | | | 2.99 |
| Exercisable | | 633,750 | | | 625,000 |

20

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

9.    Share Capital, continued

(e)    Share-based Payments

During the years ended February 28, 2017 and February 29, 2016, the Company did not grant any stock options. During the year ended February 29, 2016, the Company expensed $2,882 for stock options vested from the 2014 option grant.

(f)    Earnings/(loss) per share

At February 28, 2017, there were nil (2016 – 625,000) stock options that were not taken into account in the calculation of dilutive earnings/(loss) per share because their effect was anti-dilutive.

10.    Related Party Transactions

During the year ended February 28, 2017, the Company incurred $6,000 (2016 - $6,000) for office rental expense to a director and an officer of the Company.

As of February 28, 2017, accounts payable included $10,000 (2016 - $7,500) payable to directors for directors' fees, $157,512 (2016 - $105,007) to a director and an officer of the Company for management and administration services and $106,891 (2016 - $62,791) to a director and officer for financial and operating services. The amounts are without interest or stated terms of repayment.

The key management personnel of the Company are the directors and officers of the Company. The Company has no long-term employee benefits or post-employment benefits. Compensation awarded to key management during the years ended February 28, 2017 and February 29, 2016 are as follows:

|                              |    | 2017   |    | 2016   |
|------------------------------|----|--------|----|--------|
| Short-term employee benefits | $  | 86,004 | $  | 86,004 |
| Directors' fees              |    | 2,500  |    | 2,500  |
| Share-based payments         |    | -      |    | 2,882  |
| Total                        | $  | 88,504 | $  | 91,386 |

11.    Capital Management

The Company includes equity, comprising issued common shares, share-based payment reserve and deficit in the definition of capital.

The Company manages its capital structure and makes adjustments to it, based on the funds available to the Company, in order to support the acquisition, exploration and development of mineral properties. The Board of Directors does not establish quantitative return on capital criteria for management, but rather relies on the expertise of the Company's management to sustain future development of the business.

21

ALQ Gold Corp.
(Exploration Stage Company)
Notes to the Financial Statements
Years ended February 28, 2017 and February 29, 2016
Expressed in Canadian dollars

## 11.    Capital Management, continued

The property in which the Company currently has an interest is in the exploration stage, and as such, the Company is dependent upon external financings to fund activities. In order to carry out planned exploration and pay for administrative costs, the Company will spend its existing working capital and raise additional funds as needed.

Management reviews its capital management approach on an ongoing basis and believes that this approach, given the relative size of the Company, is reasonable. There were no changes in the Company's approach to capital management during the year ended February 28, 2017. The Company is not subject to externally imposed capital requirements.

## 12.    Segmented Information

The Company operates in one segment primarily directed towards the acquisition, exploration and ultimate development of gold and other precious metals with regard to mineral properties held in British Columbia, Canada.

## 13.    Income Taxes

A reconciliation of the income tax expense computed at statutory rates to the reported loss before taxes is as follows:

|  |  | 2017 |  | 2016 |
|---|---|---|---|---|
| Income tax benefit at statutory rate of 26.0% | $ | 58,752 | $ | (40,175) |
| Items not deductible for tax purposes |  | 7,150 |  | 749 |
| Unused (used) tax losses and tax offsets not recognized |  | (65,902) |  | 39,426 |
| Defered income tax recovery | $ | - | $ | - |

22

**ALQ Gold Corp.**
**(Exploration Stage Company)**
**Notes to the Financial Statements**
**Years ended February 28, 2017 and February 29, 2016**
**Expressed in Canadian dollars**

**13.    Income Taxes, continued**

The Company's unrecognized deductible temporary differences and unused tax losses for which no deferred tax assets are recognized consist of the following amounts:

|  | | 2017 | | 2016 |
|---|---|---|---|---|
| Non-capital loss carry-forwards | $ | 3,127,998 | $ | 2,920,673 |
| Resource properties | | 4,514,774 | | 4,514,772 |
| Equipment | | 370,340 | | 368,012 |
| Share issue cost | | 614 | | 1,230 |
| Capital losses | | 6,124 | | 6,124 |
| Non-refundable tax credits | | 6,181 | | 6,181 |
| | $ | 8,026,031 | $ | 7,816,992 |

The Company's non-capital losses expire as follows:

| | | |
|---|---|---|
| 2026 | $ | 168,427 |
| 2027 | | 216,928 |
| 2028 | | 406,203 |
| 2029 | | 273,021 |
| 2030 | | 381,157 |
| 2031 | | 448,430 |
| 2032 | | 321,079 |
| 2033 | | 209,110 |
| 2034 | | 181,640 |
| 2035 | | 164,755 |
| 2036 | | 149,923 |
| 2037 | | 207,325 |
| | $ | 3,127,998 |

23

**ALQ Gold Corp.**
**(Exploration Stage Company)**
**Notes to the Financial Statements**
**Years ended February 28, 2017 and February 29, 2016**
**Expressed in Canadian dollars**

14.    **Supplemental Cash Flow Information**

|  | | 2017 | | 2016 |
|---|---|---|---|---|
| Cash and cash equivalents is comprised of: | | | | |
| Cash | $ | 16,552 | $ | 5,702 |
| Guaranteed investment certificate | | - | | 62,276 |
| Total cash and cash equivalents | $ | 16,552 | $ | 67,978 |
| Cash Items | | | | |
| Interest received | $ | 378 | $ | 1,348 |
| Non-Cash Items | | | | |
| Interest income accrued | | - | | 21 |
| Shares received for sale of Lustdust property | $ | 440,000 | $ | - |

15.    **Subsequent Event**

Subsequent to February 28, 2017, the Company distributed 5,500,000 shares of LLC as a return of capital (note 5).

24

**Schedule B – MD&A of Ignite International Brands, Ltd.**

# IGNITE INTERNATIONAL BRANDS, LTD.
### (formerly Green Axis Capital Corp.)

## Management's Discussion and Analysis
## For the Ten-Month Period Ended December 31, 2018

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

This Management's Discussion and Analysis ("MD&A"), prepared as at February 27, 2019, reviews the financial condition and results of operations of Ignite International Brands, Ltd. (formerly Green Axis Capital Corp.) (the "Company" or "Ignite Canada") for the year ended December 31, 2018, and all other material events up to the date of this report.  The following discussion should be read in conjunction with the Company's December 31, 2018 audited consolidated financial statements and related notes.

The financial data included in the discussion provided in this report has been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and interpretations issued by the International Financial Reporting Interpretation Committee ("IFRIC").  All dollar amounts are in Canadian dollars, unless otherwise noted.

The Company's certifying officers are responsible for ensuring that the annual audited consolidated financial statements and MD&A do not contain any untrue statement of material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading considering the circumstances under which it was made.  The Company's officers certify that the annual audited financial statements and MD&A fairly present, in all material respects, the financial condition, results of operations and cash flows, of the Company as the date hereof.


**DESCRIPTION AND OVERVIEW OF BUSINESS**

Ignite Canada is a publicly traded company currently listed on the Canadian Securities Exchange ("CSE"), trading under the symbol "BILZ".  The Company's head office is located at 11 Cidermill Avenue, Vaughan, Ontario and is a reporting issuer in British Columbia, Alberta and Ontario.

The Company's common shares ("Common Shares") had previously traded on the TSX Venture Exchange ("TSX-V") under the trading symbol "ALQ" up until September 19, 2016.  On September 20, 2016, the Company voluntarily delisted from TSX-V and listed its Common Shares on the CSE, under the same trading symbol.  Prior to a change of business to an investment company, the Company had been primarily engaged in the acquisition and exploration of mineral properties located in Canada.

On August 28, 2017, trading in the Common Shares was halted as the Company made an application to the CSE of its intention to change its business from being a mineral resource exploration company to an investment company.  As an investment company, the Company would be seeking investment opportunities in the global cannabis sector.  It is not the Company's intention to be directly involved in the growing or direct distribution of cannabis related products.

On January 21, 2019, the Common Shares commenced trading under its new symbol "BILZ" on the CSE.

On October 30, 2018, the Company completed a consolidation of its Common Shares on a two-to-one basis and changed its name from ALQ Gold Corp. to Green Axis Capital Corp.  Subsequent to the period ended December 31, 2018 and in conjunction with its investment in Ignite International, Ltd., the Company changed its name to Ignite International Brands, Ltd. and further consolidated its Common Shares on a five-to-one basis.  As a result, the consolidations have affected an overall ten-to-one consolidation of the Common Shares; all Common Shares and per share amounts are shown on a post-consolidated basis retroactively throughout this MD&A.

The Company has provided notice to the Canada Revenue Agency and under applicable securities laws of its intention to change the Company's fiscal year end from February 28 to December 31 to be effective December 31, 2018.  The change in year end is being requested as a result of an internal corporate reorganization.

**PORTFOLIO OF INVESTMENTS**

On August 28, 2017, the Company announced its intention to become an investment company focusing on opportunities in the US and global cannabis sector.  The Company's portfolio of current investments are as follows:

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

## Salvation Botanicals Ltd.

Salvation Botanicals Ltd. ("Salvation") is a private company based in Nanaimo, British Columbia, which is involved in the production of high-quality standardized cannabinoid products and operates one of the first analytics laboratories in Canada, accredited by Health Canada to test cannabis and cannabis derivatives for licensed producers of medical cannabis, Access to Cannabis for Medical Purposes Regulations ("ACMPR") growers, approved cannabis patients, industrial hemp producers and any other party legally entitled to possess cannabis.

The Company has acquired an aggregate of 3,000,000 units (the "Units") of Salvation at a price of $0.50 per Unit for a total cost of $1,500,000. Each Unit is comprised of one common share of Salvation and one-half of one common share purchase warrant exercisable into one-half additional share of Salvation at a price of CDN$0.75 for a term of eighteen months.

## Ignite International, Ltd.

On September 29, 2018, the Company entered into a share exchange agreement (the "Share Exchange Agreement") with Ignite International, Ltd. ("Ignite US"), Veritas Investments, Ltd. ("Veritas") and Vulcan Enterprises SKN, Ltd. ("Vulcan SKN"), whereby the Company agreed to acquire 5,000,000 shares of Ignite US from Veritas and Vulcan SKN. On November 23, 2018, the share exchange transaction closed and the Company issued an aggregate of 10,140,178 Common Shares with a fair value of $1,724,246 as consideration for its investment in Ignite US.

# PROMISSORY NOTES

## Tahoe Hydroponics Company LLC

Tahoe Hydroponics Company, LLC ("Tahoe") is a private Nevada-based company involved in the cultivation and packaging of cannabis products. It owns a 25,000-square-foot recreationally licensed cultivation, pre-roll, production and packaging facility located in Carson City, Nevada.

On August 23, 2017, the Company announced that it entered into its first agreement for investment in the US cannabis industry. The Company executed a binding agreement with Tahoe whereby:

(i) the Company had agreed to initially loan an aggregate of up to US$3,000,000 to Tahoe prior to October 15, 2017;

(ii) the Company would have the option to convert that loan to equity in Tahoe, representing 30% of the outstanding shares of Tahoe; and

(iii) the Company would then have the further option to acquire the remaining 70% of the shares of Tahoe on a share exchange basis, based on the fair market value of the Common Shares and shares of Tahoe (based on a five times multiple of its 12 month trailing revenues), provided that in any event the former Tahoe shareholders will hold 65% of the outstanding shares of Ignite Canada on closing (the "Tahoe Agreement").

On April 24, 2018, the parties determined that due to the stage of Tahoe's development and their respective growth objectives, the Company's optimal investment in Tahoe would be more appropriately structured as a simple unsecured debt obligation at this time. Accordingly, the parties mutually agreed to terminate the Tahoe Agreement on May 15, 2018 and replaced it with a promissory note evidencing the advance of US$1.35 million from the Company to Tahoe with a 6% annual interest rate (the "Tahoe Note"). Terms of the Tahoe Note require Tahoe to make equal monthly installment payments of principal and interest of US$78,623. The Tahoe Note matures on December 31, 2019.

As at December 31, 2018, the Tahoe Note included $68,409 in interest receivable.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

The Company does not intend to extend or amend the due date of the Tahoe Note and as such, expects full repayment of any outstanding balance of the note, including accrued interest receivable, on December 31, 2019.

**Ignite US**

On April 26, 2018, the Company provided a $5,000,000 loan to Ignite US and received an unsecured convertible promissory note (the "Convertible Note"). The Convertible Note matures 24 months following the date of issuance and bears interest at 8% per annum. Either the Company or Ignite US may elect to convert the Convertible Note into 3,333 common shares of Ignite US at any time prior to maturity.

As at December 31, 2018, the Convertible Note included $272,877 in interest receivable.

## SELECTED ANNUAL INFORMATION

The following table sets forth selected financial information for the Company for the last three completed financial years ended December 31, 2018, February 28, 2018 and 2017.  This information has been derived from the Company's audited financial statements for each of those years and should be read in conjunction with those financial statements and the notes thereto.

|  | Ten Months Ended December 31, 2018 | Twelve Months Ended February 28, 2018 | Twelve Months Ended February 28, 2017 |
|---|---|---|---|
| Revenues | $       nil | $       nil | $       nil |
| Interest income | 336,350 | 43,839 | - |
| Gain on sale of mineral property | - | - | 490,000 |
| Income (loss) for the year | (3,231,502) | (542,156) | 225,970 |
| Income (loss) per share | (0.34) | (0.19) | 0.41 |
| Total assets | 16,221,216 | 19,006,987 | 449,553 |
| Total liabilities | 397,164 | 3,743,310 | 310,561 |
| Working Capital | $ 7,280,955 | $ 11,981,197 | $   135,889 |

## RESULTS OF OPERATIONS

*Loss for the period*

The Company reported net losses and comprehensive losses of $(3,231,502) and $(542,156) for the ten months ended December 31, 2018 and the twelve months ended February 28, 2018 respectively.  The significant increased loss can largely be attributed to costs incurred by the Company in connection with assessing potential investments.

The Company recorded management and consulting fees of $1,199,336 and $189,436 for the ten months ended December 31, 2018 and the twelve months ended February 28, 2018 respectively.  The significant increased loss, as noted above, can be attributed to management and consulting fees paid by the Company to assess potential investments.  The Company had secured, on a short-term period, a consulting group specializing in assessing

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

cannabis-based businesses.  The group's primary activity was to conduct the necessary due diligence, on behalf of the Company, to properly assess investment opportunities as they were presented to the Company.  In addition, during the year ended December 31, 2018, the Company commenced the process of relocating its head office to Vaughan, Ontario with new management personnel to be hired at this new location to oversee the business of the Company moving forward.

Office costs were $42,451 for the ten-month period ended December 31, 2018 compared to costs of $16,911 for the twelve-month period ended February 28, 2018.  The increased costs can be attributed to costs associated with maintaining offices in Vancouver, British Columbia, Los Angeles, California and Vaughan, Ontario.  The Los Angeles, California facilities were vacated during fiscal 2018.  The Vaughan, Ontario office will represent the Company's primary base of operations moving into fiscal 2019.

Professional fees were $868,687 for the ten-month period ended December 31, 2018 compared to fees of $248,652 for the twelve-month period ended February 28, 2018.  The increased costs can be attributed to legal and accounting costs associated with the Company's change of business application with the CSE and other reporting requirements. The Company also incurred additional professional fees during the year which can be attributed to various due diligence activities associated with various investment activities.

During the ten-month period ended December 31, 2018, the Company granted 200,000 stock options to its directors and a consultant. No stock options were granted during the twelve-month period ended February 28, 2018.  The options granted during the ten-month period ended December 31, 2018 had a fair value of $820,000 as determined using the Black-Scholes valuation model.

Rent costs were $63,149 and $1,500 for the ten-month period ended December 31, 2018 and the twelve-month period ended February 28, 2018 respectively.  The increased cost can be attributed to the lease of a temporary office space in Los Angeles, California and the lease of office space in Vaughan, Ontario.

The Company incurred travel costs of $169,439 for the ten-month period ended December 31, 2018 compared to costs of $52,871 for the twelve-month period ended February 28, 2018.  The increase costs can largely be attributed to various due diligence and promotional activities conducted during the year.

The Company recognized a foreign exchange gain of $37,515 for the ten-month period ended December 31, 2018 compared to a foreign exchange gain of $30,971 for the twelve-month period ended February 28, 2018.  As the Canadian dollar weakened, the Company recognized a foreign exchange gain on the promissory notes held at December 31, 2018.

*Total assets*

Total assets of the Company were $16,221,216 as at December 31, 2018 compared to assets of $19,006,987 as at February 28, 2018.

The change in total assets over the three-year periods ended December 31, 2018, February 28, 2018, and February 28, 2017 is largely the result of changes in the cash balances associated with increases in operating costs, investments and the issuance of promissory notes.

During the twelve-month period ended February 28, 2018, the Company recorded proceeds of $16,106,841, net of share issuance costs, on the issuance of Common Shares from various private placements.

On May 15, 2018, the Company and Tahoe mutually terminated the Tahoe Agreement.  The parties agreed to replace it with the Tahoe Note evidencing the advance of US$1.35 million from the Company to Tahoe. The Tahoe Note bears interest at 6% per annum and is payable in monthly installments of US$78,623.

On April 26, 2018, the Company provided a $5,000,000 loan to Ignite US in exchange for the Convertible Note. The Convertible Note matures 24 months following the date of issuance and bears interest at 8% per annum. Either the Company or Ignite US may elect to convert the Convertible Note into 3,333 common shares of Ignite US at any time prior to maturity.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

On September 29, 2018, the Company entered into the Share Exchange Agreement with Ignite US, Veritas and Vulcan SKN. On closing, the Company issued 10,140,178 Common Shares to Veritas and Vulcan SKN in exchange for 5,000,000 Ignite US shares held by Veritas and Vulcan SKN.  The fair value of the 5,000,000 Ignite US shares was determined to be $1,724,246.

*Total liabilities*

Total current and long-term liabilities of the Company were $397,164 compared to $3,743,310 as at February 28, 2018.

During the twelve-month period ended February 28, 2018, the Company incurred a liability totaling $921,681 for share subscriptions it had received for an additional 2,457,818 Common Shares at $0.375 per share, which Common Shares were not issued.  During the ten-month period ended December 31, 2018, the Common Shares were issued and the previously recorded liability was settled.

During the ten-month period ended December 31, 2018, the Company refunded $1,564,069 from over-subscribed private placements.


## SUMMARY OF QUARTERLY RESULTS

The following table summarizes information derived from the Company's financial statements for each of the eight most recently completed quarters:

| Quarter Ended | Revenues | Net income (loss) | Net income (loss) per share [1] |
|---|---|---|---|
| December 31, 2018[2] | $nil | $    (389,058) | $(0.04) |
| November 30, 2018 | $nil | $    (669,422) | $(0.07) |
| August 31, 2018 | $nil | $    (959,097) | $(0.10) |
| May 31, 2018 | $nil | $ (1,213,925) | $(0.13) |
| February 28, 2018 | $nil | $    (374,285) | $(0.13) |
| November 30, 2017 | $nil | $      37,842 | $ 0.01 |
| August 31, 2017 | $nil | $     (83,323) | $(0.03) |
| May 31, 2017 | $nil | $    (122,390) | $(0.04) |

[1] Fully diluted loss per share amounts are not shown as they would be anti-dilutive.

[2] One-month period ended December 31, 2018


The Company has incurred material costs in connection with its change of business to an investment company; many of these costs are non-recurring expenditures. The Company's prior year financial results are not relevant due to the Company's change of business.

During the past twelve months, the Company has been working with various groups to seek and assess various opportunities to add to its portfolio of investments.  The cost to conduct due diligence activities can be high depending on the nature of the investment.  The Company anticipates some reduction in these costs as management becomes more familiar with the global cannabis sector.

## LIQUIDITY AND CAPITAL RESOURCES

The Company did not generate any cash flow from operations.  The Company's financial success is reliant on management's ability to identify and evaluate suitable investments.  Future cash flows from operations will be dependent on maximizing the potential of these investments.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

In order to finance the acquisition of investments and to fund corporate overhead required to oversee these investments, the Company will be dependent on investor sentiment remaining positive towards the cannabis sector, and towards Ignite Canada in particular, so that funds can be raised through the sale of the Company's securities. Many factors have an influence on investor sentiment, including a positive climate from investors to support new investment companies in the cannabis sector, a company's past financial performance and the experience and caliber of a company's management. There is no certainty that equity funding will be available at the times and in the amounts required to fund the Company's activities. Note 1 of the Company's December 31, 2018 audited consolidated financial statements further discusses the going concern of the Company. The Company's financial statements do not include any adjustments that might result from these uncertainties.

The Company has, in the past, financed its activities through equity financings. It is anticipated that, as general sentiment towards investment companies in the cannabis sector turn positive, the Company can raise the necessary capital to secure and finance additional investments that are accretive to shareholder value.

Debt financing has not been used to fund operations and investments, and the Company has no current plans to use such financing. There are no other sources of financing that have been arranged by the Company.

The Company's working capital as at December 31, 2018 was $7,280,955 compared to $11,981,197 as at February 28, 2018.

The Company has no commitments for capital expenditures.

Premise lease

The Company has entered into into a three-year lease agreement for the office space in Vaughan, Ontario which expires on November 30, 2021. The annual base rent, plus operating costs for each year of the lease, is estimated to be as follows:

|  |  |
|---|---|
| 1st year | $36,500 |
| 2nd year | $37,500 |
| 3rd year | $38,000 |

The Company does not expect a significant impact on the overall liquidity of the operations as the annual lease payments are not material.

Ignite US License Agreement

On September 29, 2018, the Company entered into a trademark & copyright license agreement whereby Ignite US, as licensor, granted the following to the Company effective as of November 23, 2018:

- a non-exclusive royalty bearing license to use certain trademarks, trade names, and related intellectual property and copyrights (the "Trademarks and Copyrights") in all countries of the world, excluding the United States of America, in connection with certain products that contain cannabidiol ("CBD") and where the percentage content of tetrahydrocannabinol ("THC") is less than 10%;

- an exclusive royalty bearing license to use the Trademarks and Copyrights in all Provinces and Territories of Canada, excluding British Columbia, in connection with certain products containing THC but not CBD; and

- an exclusive royalty bearing license to use the Trademarks and Copyrights in all Provinces and Territories of Canada, excluding British Columbia, in connection with certain products containing a combination of THC and CBD, provided that the THC content is 10% or more.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

(collectively, the "License")

The Company has agreed to pay Ignite US on a monthly basis 10% of the aggregate total gross revenue received by the Company, directly or indirectly, from the sale of products under the License, commencing with the first commercial sale of any product. In the case of a branded dispensary, using the Ignite name and/or marks, the 10% royalty will extend to all gross sales of all products in the dispensary, whether Ignite branded or otherwise. The Company has also agreed to pay yearly minimum payments to Ignite US, applicable against royalties (in US dollars on a sliding scale), in the amount of US$2,00,000 at the end of year 1 and US$8,000,000 at the end of year 10.

The Company anticipates funding these payments through the sale of cannabis related products using the Trademarks and Copyrights.

*Cash and Financial Conditions*

The Company had a cash balance of $5,414,949 as at December 31, 2018 as compared to a cash balance of $15,220,447 as at February 28, 2018.

The decrease in cash can largely be attributed to loans of $5,000,000 to Ignite US and US$1,350,000 to Tahoe; both in exchange for promissory notes. The Company also refunded $1,564,069 for subscriptions previously received from over-subscribed private placements

The Company does not have any unused lines of credit or other arrangements in place to borrow funds and has no off-balance sheet arrangements.

The Company does not use hedges or other financial derivatives.

*Financing Activities*

During the ten-month period ended December 31, 2018, the Company issued Common Shares as follows:

  a) 50,000 Common Shares were issued at $5.00 per Common Share to Firetonic Entertainment Inc. for their assistance in initiating and facilitating the early discussions between the Company and Tahoe in connection with a debt financing transaction.

  b) 2,457,818 Common Shares were issued at $0.375 per Common Share by way of a non-brokered private placement, for gross proceeds of $921,681. These shares were issued to settle its obligation related to subscriptions received during the year end February 28, 2018.

  c) 10,140,178 Common Shares were issued on closing of the transactions contemplated by the Share Exchange Agreement whereby the Company acquired 5,000,000 shares of Ignite US from Veritas and Vulcan SKN.

During the twelve-month period ended February 28, 2018, the Company issued Common Shares as follows:

  a) 2,457,817 Common Shares were issued at $0.375 per Common Share by way of a non-brokered private placement, for gross proceeds of $921,681.

  b) 2,593,682 Common Shares were issued at $1.75 per Common Shares by way of a non-brokered private placement, for gross proceeds of $4,538,944.

  c) 2,401,580 units were issued at $5.00 per unit, by way of a non-brokered private placement, for gross proceeds of $12,007,900. Each unit comprised of one Common Share and one-half share purchase warrant with each whole warrant exercisable into one Common Share for $12.50 for a period of twelve months.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

The Company also incurred cash costs of $1,045,734, issued 41,300 Common Shares to finders valued at $43,989, and issued 261,582 finder's warrants valued at $198,458. The finder's warrants were calculated using a Black-Scholes option pricing model with the following weighted average assumptions: expected life of 1.51 years, dividend yield of 0%, expected volatility of 111.52% and a risk-free interest rate of 1.33%.

During the year ended February 28, 2018, the Company received $1,617,273 in cash for private placements which were oversubscribed. The Company has refunded $1,564,069 to subscribers for the amounts collected for which Common Shares will not be issued.

No warrants or options were exercised during the ten-month period ended December 31, 2018 and the twelve-month period ended February 28, 2018.

*Investing Activities*

Tahoe Hydroponics Company LLC

On August 23, 2017, the Company entered into the Tahoe Agreement.

As at the period ended February 28, 2018, the Company had advanced USD$1,350,000 to Tahoe.

On April 24, 2018, the Company and Tahoe mutually terminated the Tahoe Agreement and replaced it with the Tahoe Note.

Ignite US

On September 29, 2018, the Company entered into the Share Exchange Agreement with Ignite US, Veritas and Vulcan SKN. The share exchange transaction closed on November 23, 2018.

On April 26, 2018, the Company provided a $5,000,000 loan to Ignite US in exchange for the Convertible Note.

**SECURITIES OUTSTANDING**

*Common Shares*

As at December 31, 2018, the Company had 20,694,242 Common Shares issued and outstanding.

As at the date of this MD&A, the Company had 20,717,092 Common Shares issued and outstanding.

*Options*

On April 30, 2018, the Company granted an aggregate of 200,000 stock options to the directors of the Company and a consultant. The options, having an exercise price of $5.00, are fully vested and expire April 30, 2023.

As at December 31, 2018, the Company had 220,000 stock options outstanding.

Subsequent to the period ended December 31, 2018, 20,000 options with an exercise price of $0.60 per share and an expiry date of February 14, 2019 were exercised.

Subsequent to the period ended December 31, 2018, the Company granted 1,710,000 stock options to certain directors, officers and employees pursuant to the Company's stock option plan. The options are exercisable at a price of $3.50 per share, will vest equally over a three-year period and expire on February 2, 2024.

At the date of this MD&A, the Company had 1,910,000 stock options outstanding.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

*Warrants*

As at December 31, 2018, the Company had 1,462,372 warrants outstanding.

Subsequent to the period ended December 31, 2018, 2,850 warrants were exercised with an exercise price of $2.15 per share for total proceeds of $6,128.

Subsequent to the period ended December 31, 2018, 1,339,803 warrants with an exercise price of $12.50 per share expired.

At the date of this MD&A, the Company had 119,719 warrants outstanding.

**OUTLOOK**

The Company's ability to continue in the normal course of operations is dependent on its ability to raise equity financing or through the sale of its investments at amounts favorable to the Company. Management estimates there is sufficient working capital as at December 31, 2018 to continue current operations for the next twelve months.

The Company is largely dependent upon external financings to fund activities. Management and the board of directors of the Company continuously review and examine business proposals for the Company and conduct their due diligence in respect of the same. The Company will continue to seek new investments if it feels there are sufficient opportunities to increase shareholder value and if it has adequate financial resources to do so. Management reviews its capital management approach on an ongoing basis and believes that this approach, given the relative size of the Company, is reasonable.

**OFF-BALANCE SHEET ARRANGEMENTS**

At the date of this report, the Company had no off-balance sheet arrangements.

**TRANSACTIONS WITH RELATED PARTIES**

Related parties and related party transactions impacting the accompanying financial statements are summarized below and include transactions with the following individuals or entities:

*Key management personnel*

Key management personnel include those persons having authority and responsibility for planning, directing and controlling the activities of the Company as a whole. The Company has determined that key management personnel consist of executive and non-executive members of the Company's board of directors and executive officers.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

Remuneration attributed to key management personnel can be summarized as follows:

|  | Ten Months Ended December 31, 2018 | | Twelve Months Ended February 28, 2018 | |
|---|---|---|---|---|
| Short-term benefits | $ | 201,000 | $ | 141,501 |
| Share-based compensation | | 574,000 | | - |
| Director fees | | - | | 2,000 |
| Totals | $ | 775,000 | $ | 143,501 |

  *includes fees pursuant to contractual employment, or consultancy arrangements.

For the ten-month period ended December 31, 2018, the Company incurred $100,000 (FY2018 – $54,000) in management fees with Patriot Capital Corp., a company controlled by Morgan Good, the former interim CEO and director of the Company.

For the ten-month period ended December 31, 2018, the Company incurred $94,000 (FY2018 – $59,500) in professional fees with MJJ & Associates Ltd., a company controlled by Ming Jang, the former CFO and director of the Company.

For the ten-month period ended December 31, 2018, the Company incurred $7,000 (FY2018 – $14,000) in professional fees from Joanne Ward, a former officer of the Company.

For the ten-month period ended December 31, 2018, the Company incurred $nil (FY2018 – $12,501) in management fees from Carl Pines, a former director of the Company.

For the ten-month period ended December 31, 2018, the Company incurred $nil (FY2018 – $1,500) in rent fees from Joanne Ward, a former officer of the Company.

As at December 31, 2018, $nil (2018 - $40) was included in accounts payable and accrued liabilities for fees owed to related parties.

**FOURTH QUARTER RESULTS**

The Company has provided notice to the Canada Revenue Agency and under applicable securities laws of its intention to change the Company's fiscal year end from February 28 to December 31 to be effective December 31, 2018.  The change in year-end was requested as a result of an internal corporate reorganization.

The Company has elected to file audited consolidated financial statements for the ten-month period ended December 31, 2018. As such, the Company's fourth quarter reporting is limited to the one month ended December 31, 2018.

For the one-month period ended December 31, 2018, the Company recorded a loss of $(389,058) compared to a loss of $(374,285) for the three-month quarter ended February 28, 2018.  The increased loss can be attributed to the ongoing activity in the month associated with changes in management, the costs associated with a proposed second share exchange transaction with Ignite US which was subsequently terminated and costs associated with the opening of the office in Vaughan, Ontario.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

---

**PROPOSED TRANSACTIONS**

Subsequent to the period ended December 31, 2018, the Company entered into a Binding Letter of Intent ("Binding LOI") to acquire all of the issued and outstanding shares of Gen X Biosciences Corp. ("Gen X") in exchange for 8,500,000 Common Shares.

Gen X is a cannabis-focused bioscience firm with operations in Long beach, California and headquartered in Toronto, ON.  The company aims to create cannabis products above the industry norms in terms of purity using rigorous extraction processes and technologies.

As a result of further due diligence, the Company has decided to terminate the Binding LOI.

Subsequent to the period ended December 31, 2018, the Company announced that it had entered into a Binding Letter Agreement with an established, vertically integrated European white-label manufacturer.  It is proposed that the European manufacturer will manufacture, package and distribute Ignite-branded products to select wholesale and retail channels in strategic European territories under a non-exclusive license to be granted by the Company.

**CRITICAL ACCOUNTING ESTIMATES AND JUDGEMENTS**

The Company makes estimates and judgments about the future that affect the reported amounts of assets and liabilities. Estimates and judgments are continually evaluated based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances.  In the future, actual experience may differ from these estimates and assumptions.

The effect of a change in an accounting estimate is recognized prospectively by including it in comprehensive income in the year of the change if the change affects that year only, or in the year of the change and future years if the change affects both.

Information about critical estimates and judgments in applying accounting policies that have the most significant risk of causing material adjustment to the financial statements are discussed below.

*Critical judgments*

The preparation of these consolidated financial statements requires management to make judgments regarding the going concern of the Company as discussed in Note 1 of the Company's audited consolidated financial statements.

*Key sources of estimation uncertainty*

The following are key assumptions concerning the future and other key sources of estimation uncertainty that have a significant risk of resulting in a material adjustment to the carrying amount of assets and liabilities within the current and future years:

i)   Judgment is required in determining whether deferred tax assets are recognized in the statement of financial position. Deferred tax assets, including those arising from unutilized tax losses, require management to assess the likelihood that the Company will generate taxable earnings in future periods, in order to utilize recognized deferred tax assets. Estimates of future taxable income are based on forecast cash flows from operations and the application of existing tax laws in each jurisdiction. To the extent that future cash flows and taxable income differ significantly from estimates, the ability of the Company to realize the net deferred tax assets recorded at the date of the statement of financial position could be impacted.

Additionally, future changes in tax laws in the jurisdictions in which the Company operates could limit the ability of the Company to obtain tax deductions in future periods.

The Company has not recorded any deferred tax assets.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

---

ii)  Management uses the Black-Scholes Option Pricing model for valuation of share-based compensation and warrants, which requires the input of subjective assumptions including expected price volatility, risk-free interest rates and forfeiture rates. Changes in the input assumption can materially affect the fair value estimate and the Company's results of operations and equity reserves.

iii)  The Company recognizes its investment at fair value. Fair value is determined on the basis of market prices from independent sources, if available. If there is no market price, then the fair value is determined using level 3 inputs which involve considerable estimates as the inputs used to value these financial instruments are based on unobservable market data. There is inherent uncertainty and imprecision in estimating the factors that can affect fair value, and in estimating fair values generally, when observable market data is not available. Changes in assumptions and inputs used in valuing financial instruments could affect reported fair values.

The Company recognizes its investment at fair value. Fair value is determined on the basis of market prices from independent sources, if available. If there is no market price, then the fair value is determined using level 3 inputs which involve considerable estimates as the inputs used to value these financial instruments are based on unobservable market data. There is inherent uncertainty and imprecision in estimating the factors that can affect fair value, and in estimating fair values generally, when observable market data is not available. Changes in assumptions and inputs used in valuing financial instruments could affect reported fair values.

iv)  The Company has issued two unsecured promissory notes.  The Company maintains good communications with the management of the companies which the promissory notes were issued to and at this time, and no provision has been made on the collectability of these promissory notes based on the business activities of the companies.  There will be some uncertainty as to the collectability of the promissory notes should these companies encounter liquidity issues.

## RECENT ACCOUNTING PRONOUNCEMENTS

No new standards or interpretations were adopted during the year.

**New standards and interpretations not yet adopted**

Certain new standards, interpretations, amendments and improvements to existing standards were issued by the IASB or IFRIC that are mandatory for accounting periods beginning on or after January 1, 2019. Updates which are not applicable or are not consequential to the Company have been excluded thereof. The following have not yet been adopted by the Company.

- IFRS 16 – Leases: New standard to establish principles for recognition, measurement, presentation and disclosure of leases with an impact on lessee accounting, effective for annual periods beginning on or after January 1, 2019. The Company does not expect a significant impact on the adoption of IFRS 16 as the annual lease payments are not material.

- IFRS 15 – Revenue from Contracts with Customers: was issued by the IASB in June 2014. The objective of IFRS 15 is to provide a single, comprehensive revenue recognition model for all contracts with customers. The underlying principle is that an entity will recognize revenue to depict the transfer of goods or services to customers at an amount that the entity expects to be entitled to in exchange for those goods or services. It also contains new disclosure requirements. IFRS 15 will be effective for the Company on January 1, 2018.  Since the Company did not recognize any revenue for the year, there will be no impact on these consolidated financial statements.

- IFRIC 23 – Uncertainty over Income Tax Treatment: New standard to clarify the accounting for uncertainties in income taxes.  The interpretation provides guidance and clarifies the application of the recognition and measurement criteria in IAS 12 "Income Taxes" when there is uncertainty over income tax treatments.  The interpretation is effective for annual periods beginning on January 1, 2019. The Company is currently assessing the impact of IFRIC 23 on its consolidated statements.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

**FINANCIAL INSTRUMENTS AND RELATED RISKS**

**Categories of Financial Assets and Financial Liabilities**

**Financial Instruments**

The Company has adopted new accounting standard IFRS 9 – Financial Instruments, effective March 1, 2018. The new standard sets out requirements for classifying, recognizing and measuring financial assets and financial liabilities. This standard replaces IAS 39 – Financial Instruments: Recognition and Measurement.

IFRS 9 is effective for annual periods beginning on or after January 1, 2018.  IFRS 9 allows for an exemption from restating prior periods in respect of the standard's classification and measurement requirements.  The Company has chosen to apply this exemption upon initial adoption, although it was determined that the adoption of IFRS 9 had no impact on the comparative period's financial statements.

IFRS 9 establishes three primary measurement categories for financial assets: fair value through profit and loss ("FVTPL"), fair value through other comprehensive income ("FVOCI") and amortized cost. The basis for classification depends on the entity's business model and the contractual cash flow characteristics of the instrument. For financial liabilities, the new standard retains most of the requirements of IAS 39, except that fair value changes due to changes in an entity's own credit risk are recorded in other comprehensive Income rather than in net earnings.

Upon adoption of IFRS 9, the Company has changed its accounting policy for financial instruments as follows:

**Classification**

The Company determines the classification of its financial instruments at initial recognition. Upon initial recognition, a financial asset is classified as measured at: amortized cost, FVTPL or FVOCI. The classification of financial assets is generally based on the business model in which a financial asset is managed and its contractual cash flow characteristics. The adoption of IFRS 9 has not had a significant effect on the Company's accounting policies related to financial liabilities and derivative financial instruments. A financial liability is classified as measured at amortized cost or FVTPL.

A financial asset is measured at amortized cost if it meets both of the following conditions and is not designated as FVTPL:
  - it is held within a business model whose objective is to hold assets to collect contractual cash flows; and
  - its contractual terms give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

A debt investment is measured at FVOCI if it meets both of the following conditions and is not designated as FVTPL:
  - it is held within a business model whose objective is achieved by both collecting contractual cash flows and selling financial assets; and
  - its contractual terms give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

An equity investment that is held for trading is measured at FVTPL. For other equity investments that are not held for trading, the Company may irrevocably elect to designate them as FVOCI. This election is made on an investment-by-investment basis.

All financial assets not classified as measured at amortized cost or FVOCI as described above are measured at FVTPL. This includes all derivative financial assets. On initial recognition, the Company may irrevocably designate a financial asset that otherwise meets the requirements to be measured at amortized cost or at FVOCI as at FVTPL if doing so eliminates or significantly reduces an accounting mismatch that would otherwise arise.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

Financial liabilities are measured at amortized cost, unless they are required to be measured at FVTPL (such as instruments held for trading or derivatives) or the Company has elected to measure them at FVTPL.

The Company completed an assessment of its financial assets and liabilities as at December 31, 2018. The adoption of IFRS 9 has no quantitative impact on the Company's financial instruments as at December 31, 2018.

However, it has an impact on the classification of the Company's financial instruments compared to the old standard IAS 39 as follows:

| Asset or Liability | Original classification IAS 39 | New classification IFRS 9 |
|---|---|---|
| Cash and cash equivalents | FVTPL | FVTPL |
| Receivables | Loans and receivables | Amortized cost |
| Investments | FVTPL | FVTPL |
| Promissory notes | Loans and receivables | Amortized cost |
| Trade payables and accrued liabilities | Other liabilities | Amortized cost |

**Measurement**

Initial measurement

On initial recognition, all financial assets and financial liabilities are measured at fair value adjusted for directly attributable transaction costs except for financial assets and liabilities classified as FVTPL, in which case the transaction costs are expensed as incurred.

Subsequent measurement

The following accounting policies apply to the subsequent measurement of financial instruments:

**Financial assets at FVTPL**
These assets are subsequently measured at fair value. Net gains and losses, including any interest or dividend income, are recognized in profit or loss.

**Financial assets at amortized cost**
These assets are subsequently measured at amortized cost using the effective interest method. The amortized cost is reduced by impairment losses. Interest income, foreign exchange gains and losses and impairment are recognized in profit or loss. Any gain or loss on derecognition is recognized in profit or loss.

**Equity investments at FVOCI**
These assets are subsequently measured at fair value. Dividends are recognized as income in profit or loss unless the dividend clearly represents a recovery of part of the cost of the investment. Other net gains and losses are recognized in OCI and are never reclassified to profit or loss.

**Debt investments at FVOCI**
These assets are subsequently measured at fair value. Interest income is calculated using the effective interest rate method, foreign exchange gains and losses and impairment are recognized in profit or loss. Other net gains and losses are recognized in OCI. On derecognition, gains and losses accumulated in OCI are reclassified to profit or loss.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

Impairment of financial instruments

The Company assesses at each reporting date whether there is objective evidence that a financial asset or a group of financial assets is impaired.

For financial assets measured at amortized cost, and debt investments at FVOCI, the Company applies the expected credit loss impairment model. On adoption of the expected credit loss model there was no material adjustment.

**Risk Management**

The Company's risk exposures and the impact on the Company's financial instruments are summarized below:

*Credit risk*

Credit risk is the risk of loss associated with a counterparty's inability to fulfill its payment obligations.   The Company's receivables primarily consist of input tax credits receivable from the Government of Canada. The Company is exposed to credit risk on its promissory notes due from Tahoe and Ignite US.

*Liquidity risk*

The Company's approach to managing liquidity risk is to ensure that it will have sufficient liquidity to meet liabilities when due. As at December 31, 2018, the Company had a cash balance of $5,414,949 to settle current liabilities of $397,164.  The Company does not believe it is exposed to any significant liquidity risk as at December 31, 2018.

*Market risk*

Market risk is the risk of loss that may arise from changes in market factors such as interest rates and, commodity and equity prices.

a)    Interest rate risk
       The Company has cash balances which are not at a significant risk to fluctuating interest rates.  The Company's current policy is to invest excess cash in investment-grade short-term deposit certificates issued by its banking institutions.  The Company periodically monitors the investments it makes and is satisfied with the credit ratings of its banks.  As at December 31, 2018, the Company did not have any cash and cash equivalents invested that are subject to variable interest rates.

b)    Price risk
       The Company is exposed to price risk with respect to equity prices.  Equity price risk is defined as the potential adverse impact on the Company's earnings due to movements in individual equity prices or general movements in the level of the stock market.

c)    Foreign currency risk
       The Company is exposed to foreign currency risk on the Tahoe Note which is denominated in US dollars. A 10% fluctuation in the foreign exchange rate would have a $184,052 impact on profit and loss.

**ISSUERS WITH U.S. CANNABIS-RELATED ACTIVITIES**

On February 8, 2018, the Canadian Securities Administrators published Staff Notice 51-352 (Revised) – *Issuers with U.S. Marijuana Related Activities* ("Staff Notice 51-352"), which provides specific disclosure expectations for issuers that currently have, or are in the process of developing, cannabis-related activities in the United States as permitted within a particular state's regulatory framework. All issuers with United States cannabis-related activities are expected to clearly and prominently disclose certain prescribed information in prospectus filings and other required disclosure documents.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

As a result of the Ignite Canada's investments in the United States, Ignite Canada is subject to Staff Notice 51- 352.

At this time, Ignite Canada's involvement in the U.S. cannabis industry is limited. Ignite Canada may be considered to have "material ancillary involvement" in cannabis activities under Staff Notice 51-352 through its investment in Ignite US, which has ancillary involvement in U.S. marijuana related activities. Until the Tahoe Note is repaid, Ignite Canada can also be considered to have "material ancillary involvement" in Tahoe (together with Ignite Canada, the "Investees"), which is a cultivator and/or seller of marijuana in the United States. **Marijuana is illegal under U.S. federal law and enforcement of relevant laws is a significant risk.**

## Compliance with Applicable State Laws in the United States

The Company has not obtained legal advice regarding compliance with applicable state regulatory frameworks and exposure and implication arising from U.S. federal laws as they relate to the cannabis industry. For each of the Investees involved in the U.S. cannabis industry, to the best of the Company's knowledge, the Company is not aware of any non-compliance with applicable licensing requirements and the regulatory framework enacted by the applicable U.S. state for any of such Investees' business and the Company is not aware of: (i) any non-compliance by these Investees with respect to marijuana-related activities or (ii) any notices of violation with respect to any Investees' marijuana-related activities by its respective regulatory authorities.

Nature of Investments with U.S. Cannabis-Related Activities

*Ignite International, Ltd.*
The Company holds 5,000,000 shares of Ignite US, which represents 6% of the issued and outstanding shares of Ignite US as at December 31, 2018. The Company acquired the 5,000,000 Ignite US shares in exchange for an aggregate of 10,140,178 Common Shares with a fair value of $1,724,246. The Company's investment in Ignite US represents 53% of the Company's total investment portfolio as at December 31, 2018. Ignite US is a corporation incorporated under the laws of the State of Wyoming and has the right to license the use of the Trademarks and Copyrights with respect to the "IGNITE" brand.

As at December 31, 2018, the Company held the following investments in the cannabis sector in the U.S.:

| Investee | Jurisdiction | Industry Involvement | Investment Type | Cost ($) | Fair Value ($) | Company's Ownership % |
|---|---|---|---|---|---|---|
| Ignite US | Nevada California | Ancillary | Shares | $1,724,246 | $1,724,246 | 6.0% |

United States Federal Overview

In the United States, thirty-one (31) states and Washington D.C. have legalized medical marijuana, while nine states and Washington, D.C. have legalized recreational marijuana. cannabis currently remains a Schedule I drug under the Controlled Substances Act (the "CSA") and is, therefore, illegal under federal law. Even in those states in which the use of cannabis has been legalized pursuant to state law, its use, possession or cultivation remains a violation of federal law. A Schedule I controlled substance is defined as one that has no currently accepted medical use in the United States, a lack of safety for use under medical supervision and a high potential for abuse. The U.S. Department of Justice (the "DOJ") defines Schedule I controlled substances as the most dangerous drugs of all the drug schedules with potentially severe psychological or physical dependence. If the United States federal government decides to enforce the CSA, persons that are charged with distributing, possessing with intent to distribute or growing cannabis could be subject to large fines and/or terms of imprisonment. This is the case even if a business is operating legally under state law.

The U.S. Department of Justice under the former Obama administration previously issued a series of memoranda, including, among others, "Policy Statement Regarding Marijuana Issues in Indian Country," issued by then-Director of the Executive Office for U.S. Attorneys Monty Wilkinson and a memoranda issued by then-Deputy Attorney General James Cole, on August 29, 2013, commonly referred to as the "Cole Memorandum", which generally

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

directed the U.S. Attorneys' offices (U.S. federal prosecutors) that individuals and businesses that rigorously comply with state regulatory provisions in states that have strictly-regulated legalized medical or recreational cannabis programs should not be a prosecutorial priority for violations of federal law.

However, on January 4, 2018, Attorney General Jeff Sessions issued a new memorandum "Marijuana Enforcement" then rescinded the previous guidance memoranda, including the Cole Memorandum. Under the new guidance, Attorney General Sessions directs all U.S. Attorneys to enforce the laws enacted by Congress and to follow well-established principles when pursuing prosecutions related to marijuana activities. The DOJ asserts this return to the rule of law is also a return of trust and local control to federal prosecutors who know where and how to deploy Justice Department resources most effectively to reduce violent crime, stem the tide of the drug crisis, and dismantle criminal gangs. Therefore, the prosecution of individuals and businesses under the CSA that are engaging in cannabis-related activities in compliance with state law is now act the discretion of local U.S. Attorneys.

Despite this, the Sessions memorandum, being only a statement of DOJ enforcement policy, did not effect the Rohrabacher-Blumenauer amendment which prohibits the DOJ from using federal funds to interfere with state-legal medical marijuana programs. While that amendment is still in effect, it is subject to periodic extensions by Congress, the most recent being a December 7, 2018 extension through to December 21, 2018. The amendment does not cover activities under state recreational marijuana laws.

Under U.S. federal law it is highly likely a violation of federal money laundering statutes for financial institutions to take any proceeds from marijuana sales or any other Schedule I substance. Canadian banks are also hesitant to deal with cannabis companies, due to the uncertain legal and regulatory framework of the industry. Banks and other financial institutions could be prosecuted and possibly convicted of money laundering and other violations of organized crime statutes for providing services to a cannabis businesses. Under U.S. federal law, banks or other financial institutions that provide a cannabis business with a checking account, debit or credit card, small business loan, or any other service could be found guilty of money laundering, conspiracy and other federal crimes.

In 2014, the Financial Crimes Enforcement Network ("FinCEN"), in coordination with the DOJ, issued guidelines for financial institutions serving marijuana businesses. The FinCEN guidance is singularly focused on ways to meet Bank Secrecy Act/anti-money-laundering (BSA/AML) obligations while serving the state-legal marijuana sector. It does not authorize financial institutions to serve that sector; rather, it provides a roadmap for BSA/AML compliance for institutions that choose to do so or that otherwise encounter transactions involving marijuana. The FinCEN Guidance requires that banks engaged in banking marijuana businesses file special-purpose SARs that distinguished among: (a) marijuana businesses lawfully operating in a state (requiring the filing of a "marijuana limited" SAR); (b) marijuana businesses that arguably may not be operating in a manner compliant with state laws (requiring the filing of a "marijuana priority" SAR); and (c) marijuana businesses for which the bank has concluded that a cannabis business was operating in violation of one or more red-flags identified in the Cole Memorandum (requiring the filing of a "marijuana termination" SAR). Despite the recent memorandum by Attorney General Jeff Sessions, FinCEN has subsequently re-affirmed its guidance. In the U.S., on several occasions, bills have been introduced in Congress to grant banks and other financial institutions immunity from federal criminal prosecution for servicing marijuana-related businesses if the underlying marijuana business follows state law. These bills have not been passed and there can be no assurance that any will be passed. In both Canada and the United States, transactions involving banks and other financial institutions are both difficult and unpredictable under the current legal and regulatory landscape. Legislative changes to help reduce these challenges would eliminate these challenges for companies in the cannabis space, and would improve the efficiency of both significant and minor financial transactions.

Despite the legal, regulatory, and political obstacles the marijuana industry currently faces, the industry has continued to grow.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

The following is an analysis of market and regulatory conditions for the marijuana industry in U.S. states in which CRHC has a substantial operating presence.

| State | Type of Regulated Cannabis Program | Population (2015) | Number of Patients (as of) | Number of Total Cannabis Licenses (as of) |
|---|---|---|---|---|
| Arizona | medical | 6,758,300 | 99,895 (May 2016) | 99 (January 2016) |
| California | medical and future adult-use | 38,714,725 | no data | no data |
| Colorado | medical and adult-use | 5,442,681 | 102,914 (October 2016) | 2892 (November 2016) |
| Florida | low-THC medical and future medical | 19,789,625 | no data | 6 (November 2016) |
| Puerto Rico | medical | 3,474,182 | no data | no data |
| Oregon | medical and adult-use | 4,013,800 | 68,201 (October 2016) | 796 (November 2016) |
| Washington | medical and adult-use | 7,061,410 | no data | 1682 (November 2016) |

Enforcement of U.S. Federal Laws

For the reasons set forth above, the Company's existing investments in the Investees with operations or investments in the United States, and any future investments, may become the subject of heightened scrutiny by regulators, stock exchanges and other authorities in Canada. As a result, the Company may be subject to significant direct and indirect interaction with public officials. There can be no assurance that this heightened scrutiny will not in turn lead to the imposition of certain restrictions on the Company's ability to invest in the United States or any other jurisdiction.

Government policy changes or public opinion may also result in a significant influence over the regulation of the cannabis industry in Canada, the United States or elsewhere. A negative shift in the public's perception of medical cannabis in the United States or any other applicable jurisdiction could affect future legislation or regulation. Among other things, such a shift could cause state jurisdictions to abandon initiatives or proposals to legalize medical cannabis.

Further, violations of any federal laws and regulations could result in significant fines, penalties, administrative sanctions, convictions or settlements arising from civil proceedings conducted by either the federal government or private citizens, or criminal charges, including, but not limited to, disgorgement of profits, cessation of business activities or divestiture. This could have a material adverse effect on the Investees and therefore the Company.

Ability to Access Public and Private Capital

The Company has historically, and continues to have, access to equity and debt financing from prospectus exempt (private placement) markets in Canada and the United States. The Company's executive team and board of directors have extensive relationships with sources of private capital (such as funds and high net worth individuals), that could be invested at a higher cost of capital.

While the Company is not able to obtain bank financing in the U.S. or financing from other U.S. federally regulated entities, it currently has access to equity financing through the private markets in Canada and the public and private markets in the United States. Since the use of marijuana is illegal under U.S. federal law, and in light of concerns in the banking industry regarding money laundering and other federal financial crime related to marijuana, U.S. banks have been reluctant to accept deposit funds from businesses involved with the marijuana industry. Consequently, businesses involved in the marijuana industry often have difficulty finding a bank willing to accept their business.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

Likewise, marijuana businesses have limited, if any, access to credit card processing services. As a result, marijuana businesses in the U.S. are largely cash-based. This complicates the implementation of financial controls and increases security issues.

Commercial banks, private equity firms and venture capital firms have approached the cannabis industry cautiously to date. However, there are increasing numbers of high net worth individuals and family offices that have made meaningful investments in companies and projects similar to the Company's projects and investments. Although there has been an increase in the amount of private financing available over the last several years, there is neither a broad nor deep pool of institutional capital that is available to issuers with cannabis-related activities. There can be no assurance that additional financing, if raised privately, will be available to the Company when needed or on terms which are acceptable. The Company's inability to raise financing to fund capital expenditures or acquisitions could limit its growth and may have a material adverse effect upon future profitability.

<u>Risks Related to the Marijuana Industry</u>

*The fact that Marijuana is Illegal in Most Jurisdictions May Affect the Trading of Common Shares*

Ignite Canada's business may involve the distribution of securities of an entity that is expected to indirectly derive a portion of its revenues from the cannabis industry in certain U.S. states, which industry is illegal under U.S. federal law. Ignite US may be considered to have ancillary involvement (through licensing of its brand name "Ignite" for cannabis products and related merchandise) in the cannabis industry in the United States where local state law permits such activities. In Canada, the *Cannabis Act* (Canada) regulates the production, distribution and sale of cannabis for unqualified adult use and came into force on October 17, 2018. The *Access to Cannabis for Medical Purposes Regulations* (Canada) ("ACMPR") will continue to operate in tandem with the recreational regime, and will be re-evaluated within five years of the *Cannabis Act* (Canada) coming into force. Currently, Ignite Canada is not directly engaged in the manufacturing, importation, possession, use, sale or distribution of cannabis in the recreational cannabis marketplace in either Canada or the United States, nor is Ignite Canada directly engaged in the manufacturing, importation, possession, use, sale or distribution of cannabis in the medical cannabis marketplace in the United States or Canada.

Almost half of the U.S. states have enacted legislation to regulate the sale and use of medical cannabis without limits on THC, while other states have regulated the sale and use of medical cannabis with strict limits on the levels of THC. Notwithstanding the permissive regulatory environment of cannabis at the state level, cannabis continues to be categorized as a controlled substance under the CSA in the United States and as such, may be in violation of federal law in the United States.

As a result of the conflicting views between state legislatures and the federal government regarding cannabis, involvement in cannabis businesses in the United States is subject to inconsistent legislation and regulation. Unless and until the United States Congress amends the CSA with respect to cannabis (and as to the timing or scope of any such potential amendments there can be no assurance), there is a risk that federal authorities may enforce current federal law, which may adversely affect the current and future business of Ignite Canada in the United States. As such, there are a number of risks associated with Ignite Canada's existing and future business in the United States.

For the reasons set forth above, Ignite Canada's existing business in the United States cannabis market, and future business, may become the subject of heightened scrutiny by regulators, stock exchanges, clearing agencies and other authorities in Canada. It has been reported by certain publications in Canada that The Canadian Depository for Securities Limited is considering a policy shift that would see its subsidiary, CDS Clearing and Depository Services Inc. ("**CDS**"), refuse to settle trades for cannabis issuers that have investments in the United States. CDS is Canada's central securities depository, clearing and settlement hub settling trades in the Canadian equity, fixed income and money markets. CDS or its parent company has not issued any public statement in regard to these reports. However, if CDS were to proceed in the manner suggested by these publications, and apply such a policy to Ignite Canada, it would have a material adverse effect on the ability of holders of Common Shares to make trades. In particular, the Common Shares would become highly illiquid as investors would have no ability to effect a trade of the Common Shares through the facilities of a stock exchange.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

*Marijuana Remains Illegal Under Federal Law*

Producing, manufacturing, processing, possessing, distributing, selling, and using marijuana is a federal crime in Canada and the United States. The Government of Canada does not endorse the use of marijuana, but the courts have required reasonable access to a legal source of marijuana when authorized by a healthcare practitioner. As a result, should the courts approach toward marijuana change or should legislation be implemented to restrict its use, this would have a material adverse impact on the ability of Ignite Canada to invest in companies in the cannabis sector and enter into sub-licensing agreements with third parties for the branding of cannabis products, which in turn, would have a material adverse impact on the business, financial condition and operating results of Ignite Canada.

Because marijuana is illegal under U.S. and Canadian federal laws, investing in cannabis business could be found to violate the CSA and the *Controlled Drug and Substances Act* (Canada) ("CDSA"). As a result, individuals involved with cannabis business, including but not limited to investors and lenders, may be indicted under U.S. and Canadian federal law. Your investment in Ignite Canada, and the investment by Ignite Canada in companies in the cannabis business, may: (a) expose you personally to criminal liability under U.S. and Canadian federal law, resulting in monetary fines and jail time; and (b) expose any real and personal property used in connection with Ignite Canada's business to seizure and forfeiture to the U.S. and Canadian federal government. Active enforcement of the current federal law on cannabis may thus directly and adversely affect revenues and profits of Ignite Canada. The risk of strict enforcement of the CSA and the CDSA remains uncertain.

*Risks Relating to Other Laws and Regulations*

The industry in which Ignite Canada operates could subject Ignite Canada to comply with a myriad of other federal, state, provincial and local laws and regulations, which could include, among others, laws and regulations relating to cannabis, personally identifiable information, wage and hour restrictions, health and safety matters, consumer protection and environmental matters. Ignite Canada's business objectives are contingent upon, in part, compliance with regulatory requirements enacted by these governmental authorities and obtaining all regulatory approvals, where necessary, for the sale of its products. Ignite Canada cannot predict the time required to secure all appropriate regulatory approvals for its products. Compliance with such laws and regulations may be costly and a failure to comply with such laws and regulations could result in fines, penalties, litigation and other liability that could materially adversely affect Ignite Canada.

Ignite Canada's business and products is and will continue to be regulated as applicable laws continue to change and develop. Regulatory compliance and the process of obtaining regulatory approvals can be costly and time-consuming. Further, Ignite Canada cannot predict what kind of regulatory requirements its business will be subject to in the future. Any delays in obtaining, or failure to obtain regulatory approvals would significantly delay the development of markets and products and could have a material adverse effect on the business, results of operations and financial condition of Ignite Canada.

Furthermore, although the operations of Ignite Canada are currently carried out in accordance with all applicable rules and regulations, no assurance can be given that new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner which could limit or curtail Ignite Canada's ability to conduct its business. Amendments to current laws and regulations governing the importation, distribution, transportation and/or production of medical marijuana, or more stringent implementation thereof could have a substantial adverse impact on Ignite Canada. Local, state, provincial and federal laws and enforcement policies concerning marijuana-related conduct are changing rapidly and will continue to do so for the foreseeable future. Changes in applicable law are unpredictable and could have a material adverse effect on Ignite Canada. Changes in applicable laws or regulations could significantly diminish Ignite Canada's prospects. Ignite Canada has little or no control over potential changes to laws or regulations that may affect its business.

Additionally, governmental regulations affect taxes and levies, healthcare costs, energy usage and labor issues, all of which may have a direct or indirect effect on Ignite Canada's business and its customers or suppliers. Changes in these laws or regulations, or the introduction of new laws or regulations, could increase the costs of doing business for Ignite Canada, or its customers or suppliers, or restrict Ignite Canada's actions, causing Ignite Canada to be materially adversely affected.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

*Nevada Regulatory Risks*

In Nevada, all marijuana establishments must register with DOT and be issued a medical marijuana establishment registration certificate. In a local governmental jurisdiction that issues business licenses, the issuance by DOT of a medical marijuana establishment registration certificate is considered provisional until the local government has issued a business license for operation and the establishment is in compliance with all applicable local governmental ordinances. Final registration certificates are valid for a period of one year and are subject to annual renewals after required fees are paid and the business remains in good standing. Renewal requests are typically communicated through email from DOT and include a renewal form. The renewal periods serve as an update for DOT on the licensee's status toward active licensure. It is important to note provisional licenses do not permit the operation of any commercial or medical cannabis activity. Only after a provisional licensee has gone through necessary state and local inspections, if applicable, and has received a final registration certificate from DOT may an entity engage in cannabis business operation. There is no assurance that Tahoe will be issued final registration certificates in respect of its provisional licenses.

*Anti-Money Laundering Laws and Regulations*

Ignite Canada will be subject to a variety of laws and regulations domestically and in the United States that involve money laundering, financial recordkeeping and proceeds of crime, including the Bank Secrecy Act, as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Sections 1956 and 1957 of U.S.C. Title 18 (the Money Laundering Control Act), the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada), as amended and the rules and regulations thereunder, the *Criminal Code* (Canada) and any related or similar rules, regulations or guidelines, issued, administered or enforced by governmental authorities in the United States and Canada.

Banks often refuse to provide banking services to businesses involved in the marijuana industry due to the present state of the laws and regulations governing financial institutions in the United States. The lack of banking and

financial services presents unique and significant challenges to businesses in the marijuana industry. The potential lack of a secure place in which to deposit and store cash, the inability to pay creditors through the issuance of checks and the inability to secure traditional forms of operational financing, such as lines of credit, are some of the many challenges presented by the unavailability of traditional banking and financial services.

The FinCEN guidance provides instructions to banks seeking to provide services to cannabis-related businesses. The FinCEN guidance states that in some circumstances, it is permissible for banks to provide services to cannabis-related businesses without risking prosecution for violation of federal money laundering laws. It refers to supplementary guidance relating to the prosecution of money laundering offenses predicated on cannabis- related violations of the CSA. While the FinCEN guidance has not been rescinded by the Department of Justice at this time, it remains unclear whether the current administration will follow its guidelines. Overall, the Department of Justice continues to have the right and power to prosecute crimes committed by banks and financial institutions, such as money laundering and violations of the Bank Secrecy Act, that occur in any state, including in states that have legalized the applicable conduct and the Department of Justice's current enforcement priorities could change for any number of reasons, including a change in the opinions of the President of the United States or the United States Attorney General. A change in the Department of Justice's enforcement priorities could result in the Department of Justice prosecuting banks and financial institutions for crimes that previously were not prosecuted.

In the event that any of Ignite Canada's operations, or any proceeds thereof, any dividends or distributions therefrom, or any profits or revenues accruing from such operations in the United States were found to be in violation of money laundering legislation or otherwise, such transactions may be viewed as proceeds of crime under one or more of the statutes noted above or any other applicable legislation. This could restrict or otherwise jeopardize the ability of the Resulting Issuer to declare or pay dividends, effect other distributions or subsequently repatriate such funds back to Canada. Furthermore, in the event that a determination was made that Ignite Canada's proceeds from operations (or any future operations or investments in the United States) could reasonably be shown to constitute proceeds of crime, Ignite Canada may decide or be required to suspend declaring or paying dividends without advance notice and for an indefinite period of time).

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

*Change in Laws, Regulations and Guidelines*

Ignite Canada's operations will be subject to various laws, regulations and guidelines relating to the manufacture, management, transportation, storage and disposal of medical marijuana, as well as being subject to laws and regulations relating to health and safety, the conduct of operations and the protection of the environment.

On October 19, 2015, the Liberal Party of Canada obtained a majority government in Canada. The Liberal Party has committed to the legalization of recreational cannabis in Canada. On June 30, 2016, the Canadian Federal Government established the Task Force on Cannabis Legalization and Regulation to seek input on the design of a new system to legalize, strictly regulate and restrict access to marijuana. The Task Force has completed its review and published a report dated December 13, 2016, which outlines its recommendations. On November 27, 2017, the House of Commons passed Bill C-45, and on December 20, 2017, the Prime Minister announced that the Canadian Federal Government intends to legalize cannabis in the summer of 2018. A previous reports stated a July 1, 2018 deadline and it is unknown exactly when these regulatory changes will be implemented.

The Task Force had several recommendations for the *Cannabis Act* (Canada) including, permitting home cultivation, restrictions on advertising and branding, and potentially easing access for individuals to enter into the Canadian recreational cannabis market. The Task Force's advice will be taken into account by the Government of Canada as it builds the framework for recreational cannabis. These recommendations could materially and adversely affect the business, financial condition and results of Ignite Canada.

On August 11, 2016, Health Canada announced the new ACMPR which came into force on August 24, 2016, replacing the *Marihuana for Medical Purposes Regulations* (Canada) ("MMPR") as the regulations governing Canada's medical cannabis program. The ACMPR was implemented as a result of the Federal Court ruling in the Allard Decision. In the Allard Decision, the Federal Court found the MMPR to be unconstitutional and of no force and effect, but suspended its declaration of invalidity for six months in order to give the government time to respond.

As per Health Canada's statement and corresponding fact sheet released on August 11, 2016, the ACMPR allows Canadians who have been authorized by their health care practitioner, and who are registered with Health Canada, to produce a limited amount of medical marijuana for their own medical purposes, or to designate someone who is registered with Health Canada to produce it for them. Starting materials such as plants or seeds are to be obtained from Licensed Producers only. Individuals will also continue to have the option to purchase quality controlled medical marijuana from Licensed Producers. It is possible that such developments could significantly reduce the addressable market for Ignite Canada's products and materially and adversely affect the business, financial condition and results of operations of Ignite Canada.

The Canadian Federal Government's Task Force sought input on the design of a new system to legalize, strictly regulate and restrict access to marijuana. The Task Force has completed its review in a report dated November 30, 2016 which outlines their 25 recommendations. Their advice will be considered by the Government of Canada as a new framework for recreational marijuana is developed. It is possible that such developments could significantly adversely affect the business, financial condition and results of operations of Ignite Canada.

On October 3, 2017, the Government's Parliamentary Standing Committee on Health (HESA) proposed amendments to the *Cannabis Act* (Canada) that edibles containing cannabis and its extracts would be added to the classes of cannabis an authorized person may sell. HESA's report also suggested that a framework for sale of edibles and cannabis concentrates would be implemented within one year from the enactment of the *Cannabis Act* (Canada). HESA's proposed amendments were incorporated Bill C-45, which was passed by the House of Commons on November 27, 2017 and the Senate on June 20, 2018.

On November 10, 2017, the National Department of Finance issued regulatory proposals and legislation for the taxation of cannabis. The effect would be that the cannabis producers would be placed in the existing rules that currently apply an excise duties on tobacco, wine and spirits producers under the *Excise Tax Act* (Canada). There will be a new tax licensing category for cannabis producers where excise duties payable by licensed cannabis

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

producers on both recreational and medical cannabis products in addition to GST/HST under the *Excise Tax Act* (Canada). There would also be rules in place for stamping and marking rules and ongoing reporting requirements. The framework for the cannabis excise duty is proposed to generally be in effect by the date that legal recreational cannabis becomes available for retail sale under the proposed *Cannabis Act* (Canada).

On June 21, 2018, the Cannabis Act received Royal Assent and came into force on October 17, 2018. The ACMPR will continue to operate in tandem with the recreational regime, and will be re-evaluated within five years of the Cannabis Act coming into force. The governments of every Canadian province and territory have implemented different regulatory regimes for the distribution, sale and use of recreational cannabis within those jurisdictions. For example, Quebec, Manitoba, New Brunswick, Nova Scotia, Prince Edward Island and the Northwest Territories have chosen the government regulated model for distribution, whereas Saskatchewan and Newfoundland & Labrador have opted for a private sector approach. Alberta and British Columbia are pursuing a hybrid approach of public and private sale and distribution.

While Ontario had previously committed to a government-regulated model for distribution, it subsequently enacted the Cannabis License Act, 2018, which creates a licensing scheme for private cannabis retail stores. The Ontario Cannabis Retail Corporation will have the exclusive right to sell cannabis in Ontario online and the exclusive right to sell cannabis in Ontario to a holder of a retail store authorization for the purposes of resale. The Government of Ontario has indicated that the private retail model will launch by April 1, 2019, with the Ontario Cannabis Retail Corporation offering online sales of recreational cannabis in the interim.

*Risks Relating to the Licensing Process*

The medical marijuana rules are constantly changing throughout the global cannabis industry. As a result, consumers and producer rights are in limbo. The future business partnerships and licensee agreements that Ignite Canada may make may be subject to receiving regulatory certification or accreditation through Health Canada, US Laws, or any other applicable regulatory authority. Such licensing, certification or accreditation may include, but not be limited to: licenses issued under the CDSA, the Narcotic Control Regulations, GMP Certification and ISO certification. Licensing requirements are stringent and there can be no guarantee that the regulatory authorities will issue, extend or renew any license. Failure to maintain a license or any failure to comply with the requirements of a license would have a material adverse impact on the business, financial condition and operating results of Ignite Canada and could lead to a significant decline in the value of its securities.

**Risk Factors Related to the United States**

Unlike in Canada which has federal legislation and a framework regarding the cultivation, distribution, sale and possession of medical cannabis under the ACMPR. In the U.S. cannabis remains a Schedule I substance under the U *Controlled Substance Act* ("CSA"). Therefore, while numerous states and the District of Columbia has passed laws permitting possession and use of marijuana for medical or recreational purposes, it remains illegal on the federal level and individuals and businesses engaged in the marijuana industry have ongoing risk of prosecution for felony crimes under federal laws.

While in August 2013, as a result of the conflicting views between state and federal government regarding cannabis, then Deputy Attorney General, James Cole, authored a memorandum (the Cole Memorandum) addressed to all U.S. district attorneys. outlining certain priorities for the DOJ relating to the prosecution of cannabis offenses, on January 4, 2018, a memorandum from U.S. Attorney General Jeff Sessions was issued to U.S. District Attorneys, effectively rescinding previous guidance from the DOJ specific to cannabis enforcement in the U.S., including the Cole Memorandum. U.S. federal prosecutors no longer have guidance relating to the exercise of their discretion on prosecuting cannabis related violations of U.S. federal law. Following this decision, the Canadian Securities Administrators issued a statement on February 8, 2018, that Canadian public companies with U.S. Marijuana Related Activities are required additional disclosures. These disclosures and additional expectations that apply to all issuers with U.S. marijuana-related activities, including those with direct and indirect involvement in the cultivation and distribution of marijuana, as well as issuers that provide goods and services to third parties involved in the U.S. marijuana industry. Issuers are expected to provide these disclosures in prospectus filings and other required documents, such as their Annual Information Form and Management's Discussion and Analysis.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

With the Cole Memorandum rescinded, U.S. federal prosecutors no longer have guidance relating to the exercise of their discretion in determining whether to prosecute cannabis related violations of U.S. federal law. It is possible that further developments could significantly adversely affect the business, financial condition and results of businesses involved in U.S. marijuana- related activities and in the cannabis industry generally. Such potential proceedings could involve significant restrictions being imposed upon the Corporation or third parties, while diverting the attention of key executives. Such proceedings could have a material adverse effect on Ignite Canada's business, revenues, operating results and financial condition as well as Ignite Canada's reputation, even if such proceedings were concluded successfully in favor of Ignite Canada.

The U.S. Congress passed appropriations bills for the last 3 years which have not appropriated funds to the DOJ for prosecution of cannabis offenses for individuals who are in compliance with state level medical cannabis laws. Most recently, Congress extended the prohibition to September 2018. This prohibition is, however, subject to ongoing extension/approval by Congress and could be rescinded. Courts have interpreted these appropriations bills to the effectively to prevent the federal government from prosecuting individuals when those individuals comply with state law. This conduct continues to violate federal law, American courts have observed that should Congress at any time choose to appropriate funds to fully prosecute under the CSA, any individual or business, (despite fully complying with state laws) could be prosecuted for violations of federal law. If Congress ever restores funding, the federal government will have the authority to prosecute individuals for violations of the law before it lacked funding under the CSA's five-year statute of limitations. Further, the prohibition on the use of funds relates solely to medical marijuana state laws and does not prevent the DOJ from spending funds to prosecute individuals and businesses operating under state recreational marijuana laws.

There are currently 31 States and the District of Columbia which have laws broadly legalizing marijuana in some form or another. Nine of which, have adopted expansive laws legalizing marijuana for recreational use (Alaska, California, Colorado, Maine, Massachusetts, Nevada, Oregon, Vermont, Washington and the District of Columbia). Notwithstanding the permissive regulatory environment of medical cannabis at the state level, cannabis continues to be categorized as a controlled substance under the CSA and as such, violates federal law in the U.S.

Violations of any federal regulations and laws could result in administrative sanctions, penalties, fines, criminal charges and convictions which may result in diminished profit, cessation of business activities or divestiture losses. These violations can also have a material adverse effect on Ignite Canada, including its brand, reputation and ability to conduct business, financial position, ability to raise additional capital, operating results, profitability or liquidity. It is difficult for Ignite Canada to estimate the resources and time needed for the investigation of any such matters or its final resolution.

Ignite Canada's business in the U.S. will currently be limited to the licensing of Ignite Canada brands and the personality of Dan Bilzerian for products in the cannabis industry. In order to become a licensee or sub-licensee, the licensee entity must provide Ignite Canada with the licenses it has been granted by the State regulatory authorities which permit it to carry on the sale of cannabis products. On a go-forward basis, the licensee entity is also required to maintain the licenses in good standing or Ignite Canada shall have the right to cancel the licensing arrangement. On this basis, management is of the view that the Company's business interests in the United States adhere to the principles of the Cole Memorandum.

*Service Providers*

As a result of any adverse change to the approach in enforcement of United States cannabis laws, adverse regulatory or political change, additional scrutiny by regulatory authorities, adverse change in public perception in respect of the consumption of marijuana or otherwise, third party service providers to Ignite Canada could suspend or withdraw their services, which may have a material adverse effect on Ignite Canada's business, revenues, operating results, financial condition or prospects.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

*Unfavourable Publicity or Consumer Perception*

Management of Ignite Canada believes the medical marijuana industry is highly dependent upon consumer perception regarding the safety, efficacy and quality of the medical marijuana produced. Consumer perception of Ignite Canada's proposed products may be significantly influenced by scientific research or findings, regulatory investigations, litigation, media attention and other publicity regarding the consumption of medical marijuana products.

There can be no assurance that future scientific research, findings, regulatory proceedings, litigation, media attention or other research findings or publicity will be favourable to the medical marijuana market or any particular product, or consistent with earlier publicity. Future research reports, findings, regulatory proceedings, litigation, media attention or other publicity that are perceived as less favourable than, or that question, earlier research reports, findings or publicity could have a material adverse effect on the demand for Ignite Canada's proposed products and the business, results of operations, financial condition and cash flows of Ignite Canada. Ignite Canada's dependence upon consumer perceptions means that adverse scientific research reports, findings, regulatory proceedings, litigation, media attention or other publicity, whether or not accurate or with merit, could have a material adverse effect on Ignite Canada, the demand for Ignite Canada's proposed products, and the business, results of operations, financial condition and cash flows of Ignite Canada. Further, adverse publicity reports or other media attention regarding the safety, efficacy and quality of medical marijuana in general, or Ignite Canada's proposed products specifically, or associating the consumption of medical marijuana with illness or other negative effects or events, could have such a material adverse effect. Such adverse publicity reports or other media attention could arise even if the adverse effects associated with such products resulted from consumers' failure to consume such products appropriately or as directed.

*Liability, Enforcement Complaints etc.*

Ignite Canada's participation in the marijuana industry may lead to litigation, formal or informal complaints, enforcement actions, and inquiries by various federal, provincial, state, or local governmental authorities. Litigation, complaints, and enforcement actions could consume considerable amounts of financial and other corporate resources, which could have an adverse effect on Ignite Canada's future cash flows, earnings, results of operations and financial condition.

*Ignite Canada's contracts may be unenforceable*

As the CSA and the CDSA currently prohibit the production, processing and use of marijuana, contracts with third parties (customers, suppliers, vendors, landlords, etc.) pertaining to the production, processing, or selling of marijuana-related products, including any leases for real property, may be unenforceable. In addition, if the U.S. and Canadian federal governments begin strict enforcement of the CSA and the CDSA, any property (personal or real) used in connection with a marijuana-related business may be seized by and forfeited to the federal government. In this case, Ignite Canada's inability to enforce contracts, including its sub-licensing contracts, or any loss of business property (whether Ignite Canada's or its vendors') will have a material adverse effect on Ignite Canada.

*Ignite Canada may not be able to obtain or maintain a bank account*

Because producing, manufacturing, processing, possessing, distributing, selling, and using marijuana is a crime under the CSA and the CDSA, most banks and other financial institutions are unwilling to provide banking services to marijuana businesses due to concerns about criminal liability under the CSA and the CDSA as well as concerns related to federal money laundering rules in Canada and the United States. Though guidelines issued in past years allow financial institutions to provide bank accounts to certain cannabis businesses, few banks have taken advantage of those guidelines and many cannabis businesses still operate on an all-cash basis. Operating on an all-cash or predominantly-cash basis would make it difficult for Ignite Canada to manage its business, pay its employees and pay its taxes, and may create serious safety issues for Ignite Canada, its employees and its service providers. Although Ignite Canada currently has several bank accounts, its inability to maintain that bank accounts, or obtain and maintain other bank accounts, could have a material adverse effect.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

*The marijuana industry faces significant opposition*

It is believed by many that large well-funded businesses may have strong economic opposition to the marijuana industry. The pharmaceutical industry is well funded with a strong and experienced lobby that eclipses the funding of the medical marijuana industry. Any inroads the pharmaceutical industry could make in halting or impeding the marijuana industry could have a material adverse effect on Ignite Canada.

*The protections of bankruptcy law may be unavailable*

As discussed above, the use of marijuana is illegal under federal law. Therefore, it may be argued that the federal bankruptcy courts cannot provide relief for parties who engage in marijuana or marijuana-related businesses. Recent bankruptcy court rulings have denied bankruptcies for dispensaries upon the justification that businesses cannot violate federal law and then claim the benefits of federal bankruptcy for the same activity. In addition, some courts have reasoned that courts cannot ask a bankruptcy trustee to take possession of and distribute marijuana assets as such action would violate the CDSA. Therefore, Ignite Canada may not be able to seek the protection of the bankruptcy courts for the equal protection of creditors or debtor-in-possession financing or obtain credit from federal-charted financial institutions.

**FINANCIAL RISK FACTORS**

The fair value of the Company's receivables, advance, promissory notes, trade payables and accrued liabilities, approximate their carrying value, which is the amount recorded on the statement of financial position, due to their short terms to maturity.  The Company's cash and cash equivalents are measured at fair value, under the fair value hierarchy based on level one quoted prices in active markets for identical assets or liabilities.

**FORWARD-LOOKING STATEMENTS**

Certain information set forth in this document includes forward-looking statements.  By their nature, forward-looking statements are subject to numerous risks and uncertainties, some of which are beyond the Company's control, including but not limited to: general economic and business conditions related to the cannabis industry; cash flow

projections; currency fluctuations; risks relating to our ability to obtain adequate financing for future activities; the nature of our future activities; and other general market and industry conditions as well as those factors discussed in the Company's amended and restated listing statement dated January 18, 2019, a copy of which is available on SEDAR at www.sedar.com.

Although the Company has attempted to identify important factors that could cause actual results to differ materially from those contained in forward-looking statements, there may be other factors that cause results not to be as anticipated, estimated or intended. The Company's actual results, programs and financial position could differ materially from those expressed in or implied by these forward-looking statements and accordingly, no assurance can be given that the events anticipated by the forward-looking statements will transpire or occur, or if any of them do so, what benefits the Company will derive from them.  Readers are cautioned that the assumptions used in the preparation of such information, although considered reasonable at the time of preparation, may prove to be imprecise and as such, undue reliance should not be placed on forward-looking statements.

The Company believes that the expectations reflected in these forward-looking statements are reasonable, but no assurance can be given that these expectations will prove to be correct and as such forward looking statements contained into this report should not be relied upon.  Actual results and developments are likely to differ, and may differ materially, from those expressed or implied by the forward-looking statements contained in this report.  Such statements are based on a number of assumptions which may prove to be incorrect, including, but not limited to assumptions about general business and economic conditions, the availability of financing for the Company, and the ability to identify and secure a quality asset or a business with a view of completing a transaction subject to receipt of shareholder approval and acceptance by regulatory authorities.

**IGNITE INTERNATIONAL BRANDS, LTD.**
**(formerly Green Axis Capital Corp.)**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Period Ended December 31, 2018**

**ADDITIONAL SOURCES OF INFORMATION**

Additional information relating to Ignite Canada can be found on the SEDAR website at www.sedar.com.



**Management's Discussion and Analysis**
**For the Year Ended February 28, 2018**

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Year Ended February 28, 2018**

This Management's Discussion and Analysis ("MD&A") prepared as at July 6, 2018, reviews the financial condition and results of operations of ALQ Gold Corp. ("ALQ", or the "Company") for the year ended February 28, 2018, and all other material events up to the date of this report.  The following discussion should be read in conjunction with the Company's February 28, 2018 annual audited consolidated financial statements and related notes.

The financial data included in the discussion provided in this report has been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and interpretations issued by the International Financial Reporting Interpretation Committee ("IFRIC").  All dollar amounts are in Canadian dollars, unless otherwise noted.

The Company's certifying officers are responsible for ensuring that the annual audited consolidated financial statements and MD&A do not contain any untrue statement of material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made.  The Company's officers certify that the annual audited financial statements and MD&A fairly present, in all material respects, the financial condition, results of operations and cash flows, of the Company as the date hereof.

## DESCRIPTION AND OVERVIEW OF BUSINESS

ALQ Gold Corp. is a publicly listed company currently listed on Canadian Securities Exchange ("CSE"), trading under the symbol "ALQ".  The Company's shares had been trading on the TSX Venture Exchange ("TSX-V") under the trading symbol "ALQ" up to September 19, 2016.  On September 20, 2016, the Company voluntarily delisted from TSX-V and listed its common shares on the CSE, under the same trading symbol.

On August 28, 2017, trading in the shares of ALQ were halted as the Company made an application to the CSE of its intention to change its business focus from being a mineral resource exploration company to an investment company.  As an investment company, ALQ will be seeking investment opportunities in the global cannabis sector. It is not the Company's intention to be directly involved in the growing or distribution of cannabis related products, but rather to make strategic investments in several companies that would be actively engaged in such businesses. The change of business is subject to regulatory and shareholder approval. The Company's shares will be halted from trading until the Company has made adequate filings with the CSE in regards to its change of business.

Becoming an investment company will result in a Change of Business under the CSE Policies, and as such, requires ALQ to:

- obtain ALQ Shareholder approval. ALQ anticipates obtaining such approval by way of consent resolution of existing ALQ Shareholders holding at least 51% of the currently outstanding ALQ Shares;
- prepare and file this Listing Statement with respect to its new proposed business;
- meet the criteria for a new listing as an investment company on the CSE, make a complete initial application to qualify for listing by filing all necessary documents; and
- obtain the consent of the CSE to ALQ's proposed Change of Business and listing as an investment company.

## PORTFOLIO OF INVESTMENTS

On August 28, 2017, ALQ announced its intention to become an investment company focusing on opportunities in the US and global cannabis sector.  The Company's portfolio of investments are as follows:

**Tahoe Hydroponics Company LLC**
Tahoe Hydroponics Company, LLC ("Tahoe") is a private Nevada-based company involved in the cultivation and packaging of cannabis products. It owns 25,000-square-foot recreationally licensed cultivation, pre-roll, production and packaging facility located in Carson City, Nevada.

2

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Year Ended February 28, 2018**

On August 23, 2017, the Company announced that it entered into its first agreement for investment in the US cannabis industry. The Company executed a binding agreement with Tahoe whereby:

(i) ALQ agreed to initially loan an aggregate of up to US$3,000,000 to Tahoe prior to October 15, 2017;

(ii) ALQ would have the option to convert that loan to equity in Tahoe, representing 30% of the outstanding shares of Tahoe; and

(iii) ALQ would then have the further option to acquire the remaining 70% of the shares of Tahoe on a share exchange basis, based on the fair market value of ALQ's Shares and Tahoe (based on a five times multiple of its 12 month trailing revenues), provided that in any event the former Tahoe shareholders will hold 65% of the outstanding shares of ALQ on closing (the "Tahoe Agreement").

The parties later determined that due to the stage of Tahoe's development and their respective growth objectives, the Company's optimal investment in Tahoe would be more appropriately structured as a simple unsecured debt obligation at this time. Accordingly, the parties mutually agreed to terminate the Tahoe Agreement on May 15, 2018 and replaced it with a promissory note evidencing the advance of US$1.35 million from ALQ to Tahoe with a 6% annual interest rate (the "Tahoe Note"). Terms of the agreement will be monthly installment payments of principal and interest which can be accelerated by a liquidity event.

**Salvation Botanicals Ltd.**

Salvation Botanical Ltd. ("Salvation") is a private British Columbia company based in Nanaimo, which is involved in the production of high-quality standardized cannabinoid products for licensed producers and operates one of the first analytics laboratories in Canada, accredited by Health Canada to test cannabis and derivatives for licensed producers of medical cannabis, ACMPR growers, approved cannabis patients, Section 56 license holders, industrial hemp producers and any other party legally entitled to possess cannabis.

Salvation holds a Narcotic Dealer's License (NDL), allowing contract extract production, with authority to extract and produce oil, capsules and tinctures within Health Canada guidelines. In 2016, Health Canada granted Salvation a Hemp Processing License (HPL) permitting production and sale of seed and grain derivatives. Using the name Purely Hemp, Salvation has developed a line of value-added foods including hemp protein powder, hulled hemp seeds, protein bars, hemp butter, capsules (oil, protein powder) and cold-pressed hemp oil, while building exports of value-added bulk hemp products.

The Company has acquired an aggregate of 3,000,000 units (the "Units") of Salvation at a price of CDN$0.50 per Unit for a total cost of CDN$1,500,000. Each Unit is comprised of one common share of Salvation and one-half of one common share purchase warrant exercisable into one-half additional share of Salvation at a price of CDN$0.75 for a term of eighteen months.

3

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Year Ended February 28, 2018**

## SELECTED ANNUAL INFORMATION

The following table sets forth selected financial information for the Company for the last three completed financial years ended February 28, 2018, 2017 and February 29, 2016.  This information has been derived from the Company's audited financial statements for each of those years, and should be read in conjunction with those financial statements and the notes thereto.

| | As at and for the fiscal year ended | | |
|---|---|---|---|
| | February 28, 2018 | February 28, 2017 | February 29, 2016 |
| Revenues | $      nil | $      nil | $      nil |
| Gain on sale of mineral property | - | 490,000 | - |
| Income (loss) for the year | (542,156) | 225,970 | (154,520) |
| Income (loss) per share | (0.02) | 0.041 | (0.028) |
| Total assets | 19,006,987 | 449,553 | 111,263 |
| Total liabilities | 3,743,310 | 310,561 | 198,241 |
| Working capital (deficit) | 11,981,197 | 135,889 | (122,408) |

## RESULTS OF OPERATIONS

*Income (loss) for the year*

The Company reported net loss and comprehensive loss of $(542,156) for the fiscal year ended February 28, 2018 compared to a comprehensive income of $225,970 for the fiscal year ended February 28, 2017.

The Company incurred management and consulting fees of $189,436 and $52,504 for fiscal years ended February 28, 2018 and 2017 respectively.  As the Company changed its business focus from a mineral resource exploration company to an investment company, additional management and consulting related costs were incurred to assess business opportunities and conduct the necessary due diligence on these potential investments.

Professional fees were $248,652 and $66,496 for the fiscal years ended February 28, 2018 and 2017 respectively. The increased costs can be attributed to the various legal and accounting costs associated with the Company's change of business application with the Canadian Securities Exchange and other reporting requirements. Many of these costs are one-time expenditures.

The Company also recorded travel costs of $52,871 and $nil for the fiscal years ended February 28, 2018 and 2017 respectively.  The increase in travel related costs can be attributed to the marketing and various promotional activities initiated by Company to raise capital and to conduct various due diligence activity on potential investments.

The Company recognized a foreign exchange gain of $30,971 and $nil for the fiscal years ended February 28, 2018 and 2017 respectively.  The gain can be attributed to a US dollar denominated loans the Company made in the fiscal year ended February 28, 2018.  As the Canadian dollar weakened, the Company recognized a foreign exchange gain on the promissory note held.

4

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Year Ended February 28, 2018**

*Total assets*

The change in total assets over the three year period from 2016-2018 is largely the result of changes in the cash balances.  During the year ended February 28, 2018, the Company recorded proceeds of $16,106,841, net of share issuance costs, from the issuance of its common shares.

Total assets of the Company were $19,006,987 as at February 28, 2018 compared to assets of $449,553 as at February 28, 2017.

*Total liabilities*

As at February 28, 2018, the current liabilities of the Company were $3,743,310 compared to $310,561 as at February 28, 2017.  The general increase can be attributed to the timing of payments to various service providers and the obligation to return funds from over-subscribed private placements.

During the year end February 28, 2018, the Company also received subscriptions for an additional 24,578,170 common shares at $0.0375 for which the shares were not issued.  As at February 28, 2018, $921,681 is included in obligation to issue shares related to these subscriptions.


**SUMMARY OF QUARTERLY RESULTS**

The following table summarizes information derived from the Company's financial statements for each of the eight most recently completed quarters:

| Quarter Ended | Revenues | Net income (loss) | Net income (loss) per share [1] |
|---|---|---|---|
| February 28, 2018 | $nil | $(374,285) | $(0.01) |
| November 30, 2017 | $nil | $ 37,842 | $ 0.01 |
| August 31, 2017 | $nil | $ (83,323) | $(0.01) |
| May 31, 2017 | $nil | $(122,390) | $(0.01) |
| February 28, 2017 | $nil | $ (5,898) | $ (0.00) |
| November 30, 2016 | $nil | $ 327,375 | $ 0.08 |
| August 31, 2016 | $nil | $ (46,495) | $(0.02) |
| May 31, 2016 | $nil | $ (49,012) | $(0.02) |

[1] Fully diluted loss per share amounts are not shown as they would be anti-dilutive.

As ALQ Gold Corp is a junior investment company listed on the CSE; it is the nature of such companies that there are no sales or revenues. There can be significant variances in the Company's reported loss from quarter to quarter arising from factors that are difficult to anticipate in advance or to predict from past results.  Additionally, due to certain market conditions and the inability to raise additional working capital, many companies like ALQ Gold Corp. have written-down various assets due to the uncertainty of continued operations from its past activities.

The Company has experienced significant operating costs with the transition to an investment company.  The Company's comparables to prior years are not relevant due to the Company's change of business.  The Company has incurred relatively higher expenditures due to this transition, many of these costs are one time expenditures. Prior year operating costs reflect those of a junior exploration company with minimal activity.

The Company is continuing with its work with various regulatory authorities and the CSE to execute a change of business.  Many of these costs are one-time expenditures and are reflected in these reporting period.

5

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Year Ended February 28, 2018**

---

**LIQUIDITY AND CAPITAL RESOURCES**

ALQ did not generate any cash flow from operations.  The Company's financial success is reliant on management's ability to identify and evaluate assets or a business with a view to completing a transaction subject to receipt of shareholder approval and acceptance by regulatory authorities.   Future cash flows from operations will be dependent on maximizing the potential of these opportunities.

In order to finance the acquisition of assets or a business and to fund corporate overhead, the Company will be dependent on investor sentiment remaining positive towards the cannabis companies, and towards ALQ in particular, so that funds can be raised through the sale of the Company's securities.   Many factors have an influence on investor sentiment, including a positive climate from investors to support junior investment companies in the cannabis sector, a company's track record and the experience and the caliber of a company's management. There is no certainty that equity funding will be available at the times and in the amounts required to fund the Company's activities.  Note 1 of the Company's 2018 audited consolidated financial statements further discusses the going concern of the Company.  The Company's financial statements do not include any adjustments that might result from these uncertainties.

The Company has in the past, financed its activities through equity financings.   It is anticipated as general sentiment towards junior companies turn positive, the Company can raise the necessary capital to secure and finance the acquisition of additional assets or invest in business opportunities.

Debt financing has not been used to fund asset and business acquisitions, and the Company has no current plans to use such financing.  There are no other sources of financing that have been arranged by the Company.

The Company's working capital for the periods ended February 28, 2018 and 2017 was $11,981,197 and $135,889 respectively.

The Company has no commitments for capital expenditures.

*Cash and Financial Conditions*

The Company had a cash balance of $15,220,447 as at February 28, 2018 as compared to a cash balance of $16,552 as at February 28, 2017.  The increase in cash is a result of several completed private placements during twelve months ended February 28, 2018.

The Company does not have any unused lines of credit or other arrangements in place to borrow funds and has no off-balance sheet arrangements.

ALQ Gold Corp. does not use hedges or other financial derivatives.

*Financing Activities*

During the year end February 28, 2018, the Company issued common shares as follows:

   a)   24,578,170 common shares were issued at $0.0375 per common share, by way of a non-brokered private placement, for gross proceeds of $921,681.

   b)   25,936,818 common shares were issued at $0.175 per common share, by way of a non-brokered private placement, for gross proceeds of $4,538,944.

   c)   24,015,800 Units were issued at $0.50 per Unit, by way of a non-brokered private placement, for gross proceeds of $12,007,900. Each Unit comprises one common share and one share purchase warrant with each whole warrant exercisable into a common share for $1.25 for a period of twelve months.

The Company incurred cash costs of $1,045,734, issued 413,000 common shares to finders valued at $43,989, and issued 2,279,956 finder warrants valued at $139,912.  The finder's warrants were calculated using a Black-Scholes option pricing model with the following weighted average assumptions: expected life of 1.37 years, dividend yield of 0%, expected volatility of 105.63% and a risk free interest rate of 1.31%.

6

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Year Ended February 28, 2018**

---

As at February 28, 2018, a total of $315,950 in subscriptions was receivable for shares issued; at the date of this MD&A, the full amount has been collected.

During the year end February 28, 2018, the Company received subscriptions for an additional 24,578,170 common shares at $0.0375 for which the shares were not issued. As at February 28, 2018, $921,681 is included in obligation to issue shares related to these subscriptions.

During the year ended February 28, 2018, the Company also received $1,617,273 in cash for private placements which were oversubscribed. The Company will return the funds received to subscribers for the amounts collected for which shares will not be issued.

On April 17, 2017, the Company completed a return of capital to shareholders of record on January 25, 2017 for the 5,500,000 shares or Lorrain Copper Corp. originally received as consideration for the Lustdust Property.

No warrants or options were exercised during the twelve month periods ended February 28, 2018 and 2017 respectively.

*Investing Activities*

On August 23, 2017, the Company entered into a Letter of Agreement (the "Letter") with Tahoe Hydroponics Company LLC ("Tahoe") of Carson City, Nevada.  Terms of the Letter with Tahoe, a US based cannabis cultivation company initially required that: (i) the Company will loan an aggregate of US$3,000,000 to Tahoe prior to October 15, 2017; (ii) the Company will have the option to convert that loan to equity in Tahoe, representing 30% of the outstanding shares of Tahoe; and (iii) the Company will then have the further option to acquire the remaining 70% of the shares of Tahoe on a share exchange basis, based on the fair market value of ALQ's shares and Tahoe (based on a five times multiple of its 12 month trailing revenues), provided that in any event the former Tahoe shareholders will hold 65% of the outstanding shares of ALQ on closing.

During the year ended February 28, 2018 the Company had advanced USD$1,350,000 to Tahoe.  The Company is currently amending its agreement with Tahoe to take into account such funds advanced and the timing of future advances.

Subsequent to the year ended February 28, 2018 it was determined that due to the stage of Tahoe's development and their respective growth objectives, the Company's optimal investment in Tahoe would more be better structured as a simple unsecured debt obligation.  Accordingly, Tahoe and the Company terminated the Letter on May 15, 2018 and replaced it with a promissory note evidencing the advance of US$1.35 million from ALQ to Tahoe with a 6% annual interest rate (the "Tahoe Note").  ALQ plans to seek repayment of this loan through receiving monthly payments of principal and interest which can be accelerated by a liquidity event.

During the year ended February 28, 2018, the Company entered into agreements to acquire 3,000,000 units (the "Units") of Salvation Botanical Ltd. ("Salvation"), a private British Columbia company based in Nanaimo, BC.  The Each Unit comprised of one common share of Salvation and one-half of one common share purchase warrant exercisable into one-half additional share of Salvation at a price of CDN$0.75 for a term of eighteen months.

Salvation is involved in the production of high-quality standardized cannabinoid products for licensed producers and operates one of the first analytics laboratories in Canada, accredited by Health Canada to test cannabis and derivatives for licensed producers of medical cannabis, ACMPR growers, approved cannabis patients, Section 56 license holders, industrial hemp producers and any other party legally entitled to possess cannabis.

**SECURITIES OUTSTANDING**

As at February 28, 2018, the Company had 80,462,458 common shares issued and outstanding.

During the year end February 28, 2018, the Company received subscriptions for an additional 24,578,170 common shares at $0.0375 for which the shares were not issued. As at February 28, 2018, $921,681 is included in obligation to issue shares related to these subscriptions.

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Year Ended February 28, 2018**

Subsequent to the period ended February 28, 2018, the Company issued 500,000 common shares in connection with the Tahoe Note and pursuant to a finder's fee agreement dated June 1, 2018, The Company agreed to pay a finder's fee to Firetronic Entertainment Inc. in consideration of the introduction of Tahoe and the facilitation of negotiations in respect of the Tahoe Agreement and Tahoe Note.

As at the date of this MD&A, the Company had 80,962,458 common shares issued and outstanding.

As at February 28, 2018, the Company had 200,000 stock options outstanding with a weighted average exercise price of $0.06.

During the year ended February 28, 2018, the Company cancelled 425,000 stock options with a weighted average exercise price of $0.06.

No stock options were granted during the twelve month periods ended February 28, 2018 and 2017 respectively.

Subsequent to the year ended February 28, 2018, the Company granted an aggregate of 2,000,000 stock options to the directors of the Company and a consultant.  The options, having an exercise price of $0.50, are fully vested and expire April 30, 2023;

As at the date of this MD&A, the Company had 2,200,000 stock options outstanding.


**OUTLOOK**

The Company's ability to continue in the normal course of operations is dependent on its ability to raise equity financing or through the sale of its investments at amounts favorable to the Company.  Management estimates there is sufficient working capital as at February 28, 2018 to continue current operations for the next twelve months.

The Company is largely dependent upon external financings to fund activities.  In order to search for new business opportunities and pay for administrative costs, the Company will spend its existing working capital and raise additional funds as needed.  The Company will continue to assess new business opportunities and seek to acquire new business assets if it feels there are sufficient business opportunities or economic potential and if it has adequate financial resources to do so.  Management reviews its capital management approach on an ongoing basis and believes that this approach, given the relative size of the Company, is reasonable.

Management and the Board of Directors continuously review and examine business proposals for the Company and conduct their due diligence in respect of the same.


**OFF-BALANCE SHEET ARRANGEMENTS**

At the date of this report, the Company had no off-balance sheet arrangements.


**TRANSACTIONS WITH RELATED PARTIES**

Related parties and related party transactions impacting the accompanying financial statements are summarized below and include transactions with the following individuals or entities:

Key management personnel:

Key management personnel include those persons having authority and responsibility for planning, directing and controlling the activities of the Company as a whole. The Company has determined that key management personnel consist of executive and non-executive members of the Company's Board of Directors and corporate officers.

8

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Year Ended February 28, 2018**

Remuneration attributed to key management personnel can be summarized as follows:

|  | Year ended February 28, | |
|---|---|---|
|  | 2018 | 2017 |
| Short-term benefits* | $ 141,501 | $ 86,004 |
| Directors' fees | 2,000 | 2,500 |
| Totals | $ 143,501 | $ 88,504 |

*includes base salaries pursuant to contractual employment, or consultancy arrangements. These have been recorded in management and consulting fees, and professional fees.

During the year ended February 28, 2018, the Company incurred $1,500 (2017 - $6,000) for office rental expense to a director and officer of the Company.

As at February 28, 2018, $40 (2017 - $274,403) was included in accounts payable and accrued liabilities for fees owed to related parties.

**PROPOSED TRANSACTIONS**

Subsequent to the period ended February 28, 2018, the Company has entered into a Letter of Agreement ("Letter Agreement") with a third party that owns certain intellectual property rights and brand names intended for use in the cannabis industry. The Letter Agreement outlines a variety of potential transactions between the parties, including licensing and direct investment opportunities.

In connection with the Letter Agreement, the Company provided a $5,000,000 loan and the third party issued an unsecured convertible promissory note ("Convertible Note"). The Convertible Note matures 24 months following the date of issuance and bears interest at 8% per annum. The Convertible Note is convertible into up to 3,333 common shares, or 3.3%, of the third party.

**CRITICAL ACCOUNTING ESTIMATES AND JUDGEMENTS**

The Company makes estimates and judgments about the future that affect the reported amounts of assets and liabilities. Estimates and judgments are continually evaluated based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances.  In the future, actual experience may differ from these estimates and assumptions.

The effect of a change in an accounting estimate is recognized prospectively by including it in comprehensive income in the year of the change, if the change affects that year only, or in the year of the change and future years, if the change affects both.

Information about critical estimates and judgments in applying accounting policies that have the most significant risk of causing material adjustment to the financial statements are discussed below.

*Critical judgments*

The preparation of these consolidated financial statements requires management to make judgments regarding the going concern of the Company as discussed in Note 1 of the Company's audited consolidated financial statements.

*Key sources of estimation uncertainty*

The following are key assumptions concerning the future and other key sources of estimation uncertainty that have a significant risk of resulting in a material adjustment to the carrying amount of assets and liabilities within the current and future years:

9

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
Year Ended February 28, 2018

i) Judgment is required in determining whether deferred tax assets are recognized in the statement of financial position. Deferred tax assets, including those arising from unutilized tax losses, require management to assess the likelihood that the Company will generate taxable earnings in future periods, in order to utilize recognized deferred tax assets. Estimates of future taxable income are based on forecast cash flows from operations and the application of existing tax laws in each jurisdiction. To the extent that future cash flows and taxable income differ significantly from estimates, the ability of the Company to realize the net deferred tax assets recorded at the date of the statement of financial position could be impacted.

Additionally, future changes in tax laws in the jurisdictions in which the Company operates could limit the ability of the Company to obtain tax deductions in future periods.

The Company has not recorded any deferred tax assets.

ii) Management uses the Black-Scholes Option Pricing model for valuation of share-based compensation and brokers' warrants, which requires the input of subjective assumptions including expected price volatility, risk-free interest rates and forfeiture rates. Changes in the input assumption can materially affect the fair value estimate and the Company's results of operations and equity reserves.

iii) The Company recognizes its investment at fair value. Fair value is determined on the basis of market prices from independent sources, if available. If there is no market price, then the fair value is determined using level 3 inputs which involve considerable estimates as the inputs used to value these financial instruments are based on unobservable market data. There is inherent uncertainty and imprecision in estimating the factors that can affect fair value, and in estimating fair values generally, when observable market data is not available. Changes in assumptions and inputs used in valuing financial instruments could affect reported fair values.

## RECENT ACCOUNTING PRONOUNCEMENTS

No new standards or interpretations were adopted during the year.

**New standards and interpretations not yet adopted**

Certain new standards, interpretations, amendments and improvements to existing standards were issued by the IASB or IFRIC that are mandatory for accounting periods beginning on or after January 1, 2018. Updates which are not applicable or are not consequential to the Company have been excluded thereof. The following have not yet been adopted by the Company.

• IFRS 9 – New standard that replaced IAS 39 for classification and measurement, effective for annual periods beginning on or after January 1, 2018.

• IFRS 16 – Leases: New standard to establish principles for recognition, measurement, presentation and disclosure of leases with an impact on lessee accounting, effective for annual periods beginning on or after January 1, 2019.

The Company does not expect a significant impact from adoption of the above standards.

10

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
Year Ended February 28, 2018

---

**FINANCIAL INSTRUMENTS AND RELATED RISKS**

**Categories of Financial Assets and Financial Liabilities**

**Financial Instruments**

All financial instruments are initially recognized at fair value on the statement of financial position. The Company has classified each financial instrument into one of the following categories: (1) financial assets or liabilities at fair value through profit or loss ("FVTPL"), (2) loans and receivables, (3) financial assets available-for-sale, (4) financial assets held-to maturity, and (5) other financial liabilities. Subsequent measurement of financial instruments is based on their classification.

Financial assets and liabilities at FVTPL are subsequently measured at fair value with changes in those fair values recognized in net earnings.  Financial assets "available-for-sale" are subsequently measured at fair value with changes in fair value recognized in other comprehensive income (loss), net of tax.

Financial assets "held-to-maturity", "loans and receivables", and "other financial liabilities" are subsequently measured at amortized cost using the effective interest method. The Company's financial assets and liabilities are recorded and measured as follows:

| Asset or Liability | Category | Measurement |
|---|---|---|
| Cash | FVTPL | Fair value |
| Amounts receivable | Loans and receivables | Amortized cost |
| Marketable securities | FVTPL | Fair value |
| Investment | FVTPL | Fair value |
| Promissory note | Loans and receivables | Amortized cost |
| Trade payables and accrued liabilities | Other liabilities | Amortized cost |

The Company determines the fair value of financial instruments according to the following hierarchy based on the amount of observable inputs used to value the instrument.

Level 1 – Quoted prices are available in active markets for identical assets or liabilities as of the reporting date. Active markets are those in which transactions occur in sufficient frequency and volume to provide pricing information on an ongoing basis.

Level 2 – Pricing inputs are other than quoted prices in active markets included in Level 1. Prices in Level 2 are either directly or indirectly observable as of the reporting date. Level 2 valuations are based on inputs, including quoted forward prices for commodities, time value and volatility factors, which can be substantially observed or corroborated in the marketplace.

Level 3 – Valuations in this level are those with inputs for the asset or liability that are not based on observable market data.

Cash has been measured at fair value using Level 1 inputs.  The Company's investment is measured at fair value using Level 3 inputs.

**Risk Management**

The Company's risk exposures and the impact on the Company's financial instruments are summarized below:

*Credit risk*

Credit risk is the risk of loss associated with a counterparty's inability to fulfill its payment obligations.  The Company's receivables primarily consist of input tax credits receivable from the Government of Canada. The Company is exposed to credit risk on its promissory note due from Tahoe.

11

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Year Ended February 28, 2018**

_Liquidity risk_

The Company's approach to managing liquidity risk is to ensure that it will have sufficient liquidity to meet liabilities when due. As at February 28, 2018, the Company had a cash balance of $15,220,447 to settle current liabilities of $3,743,310.  The Company does not believe it is exposed to any significant liquidity risk as at February 28, 2018.

_Market risk_

Market risk is the risk of loss that may arise from changes in market factors such as interest rates and, commodity and equity prices.

a)      Interest rate risk
        The Company has cash balances which are not at a significant risk to fluctuating interest rates.  The Company's current policy is to invest excess cash in investment-grade short-term deposit certificates issued by its banking institutions.  The Company periodically monitors the investments it makes and is satisfied with the credit ratings of its banks.  As of February 28, 2018, the Company did not have any investments in investment-grade short-term deposit certificates.

b)      Price risk
        The Company is exposed to price risk with respect to equity prices.  Equity price risk is defined as the potential adverse impact on the Company's earnings due to movements in individual equity prices or general movements in the level of the stock market.

c)      Foreign currency risk
        The Company is exposed to foreign currency risk on its promissory note from Tahoe which is denominated in US dollars. A 10% fluctuation in the foreign exchange rate would have a $190,000 impact on profit and loss.

_Investment in cannabis based businesses_

The Company recognizes there are certain risks in its investment with a cannabis based business.  Marijuana is classified as a Schedule I controlled substance under US federal law and as such, marijuana related practices or activities, including the cultivation, possession or distribution of marijuana, are illegal under US federal law.  There remains a conflict between state and federal law related to marijuana with certain US states permitting its use and sale within a regulatory framework.

The US Department of Justice had recently rescinded the Cole memo which had given guidance that it will generally not enforce federal prohibitions on marijuana in US states that have authorized this conduct so long as the US state has implemented a strong and effective regulatory program.  Future enforcement decisions will now be up to the US Attorneys in their respective states, who are to decide which cases to prosecute by weighing all relevant considerations, including federal law enforcement priorities set by the Attorney-General, the seriousness of the crime, the deterrent effect of federal prosecution and the cumulative impact of particular crimes on the community.

The Company considers it unlikely that local federal prosecutors will take action in those states where the legalization of cannabis has been implemented as a result of a majority vote of the state's electorate or by an act of the respective state's legislature.  There may be action taken against those who are acting outside state regulations, and this type of enforcement is only beneficial to those businesses operating within local regulations.

The Company conducts extensive due diligence in its investment in the cannabis based business and ensures strict compliance of state policies governing this industry.  The Company is unaware of any non-compliance issues associated with Tahoe's licensing requirements as set out by the state of Nevada.

**ALQ GOLD CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Year Ended February 28, 2018**

---

**FINANCIAL RISK FACTORS**

The fair value of the Company's receivables, advance, trade payables and accrued liabilities, approximate their carrying value, which is the amount recorded on the statement of financial position, due to their short terms to maturity. The Company's cash is measured at fair value, under the fair value hierarchy based on level one quoted prices in active markets for identical assets or liabilities.

**FORWARD-LOOKING STATEMENTS**

Certain information set forth in this document includes forward-looking statements. By their nature, forward-looking statements are subject to numerous risks and uncertainties, some of which are beyond ALQ's control, including but not limited to: general economic and business conditions related to the cannabis industry; cash flow projections; currency fluctuations; risks relating to our ability to obtain adequate financing for future activities; the nature of our future activities; and other general market and industry conditions as well as those factors discussed in prior management discussion and analysis, available on SEDAR at www.sedar.com.

Although ALQ Gold Corp. has attempted to identify important factors that could cause actual results to differ materially from those contained in forward-looking statements, there may be other factors that cause results not to be as anticipated, estimated or intended. ALQ's actual results, programs and financial position could differ materially from those expressed in or implied by these forward-looking statements and accordingly, no assurance can be given that the events anticipated by the forward-looking statements will transpire or occur, or if any of them do so, what benefits ALQ will derive from them. Readers are cautioned that the assumptions used in the preparation of such information, although considered reasonable at the time of preparation, may prove to be imprecise and as such, undue reliance should not be placed on forward-looking statements.

The Company believes that the expectations reflected in these forward looking statements are reasonable, but no assurance can be given that these expectations will prove to be correct and as such forward looking statements contained into this report should not be relied upon. Actual results and developments are likely to differ, and may differ materially, from those expressed or implied by the forward looking statements contained in this report. Such statements are based on a number of assumptions which may prove to be incorrect, including, but not limited to assumptions about general business and economic conditions, the availability of financing for the Company, and the ability to identify and secure a quality asset or a business with a view of completing a transaction subject to receipt of shareholder approval and acceptance by regulatory authorities.

**ADDITIONAL SOURCES OF INFORMATION**

Additional information relating to ALQ Gold Corp. can be found on the SEDAR website at www.sedar.com.



**Management's Discussion and Analysis**
**For the Year Ended February 28, 2017**
**Dated: June 19, 2017**

| <u>Index</u> | | | <u>Page</u> |
|---|---|---|---|
| A | - | Introduction | 2 |
| B | - | Summary of Mineral Exploration | 2 |
| C | - | Results of Operations | 4 |
| D | - | Fourth Quarter | 5 |
| E | | Summary of Annual Information | 5 |
| F | | Summary of Quarterly Results | 5 |
| G | - | Financial Condition, Liquidity and Capital Resources | 6 |
| H | - | Outstanding Equity and Convertible Securities | 6 |
| I | - | Related Party Information | 7 |
| J | - | Financial Instruments | 7 |
| K | - | Event After the Reporting Period and Outlook | 9 |
| L | - | Off-balance Sheet Arrangements | 9 |
| M | - | Disclosure Controls and Procedures | 9 |
| N | - | Risks and Uncertainties | 10 |
| O | - | Proposed Transactions | 11 |
| P | - | Significant Accounting Estimates | 12 |
| Q | - | Changes in Accounting Policies Including Initial Adoption | 12 |
| R | - | Forward-Looking Statements | 13 |

**ALQ GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

## A. Introduction

The following Management's Discussion and Analysis (MD&A) of the operating results and financial condition of ALQ Gold Corp. ("ALQ" or the "Company") is for the year ended February 28, 2017 and is dated June 19, 2017. This MD&A was prepared to conform to National Instrument 52-102F1 and was approved by the Board of Directors prior to its release. This analysis should be read in conjunction with the Company's audited financial statements for the years ended February 28, 2017 and February 29, 2016, and the accompanying notes, which have been prepared in accordance with International Financial Reporting Standards ("IFRS").

The Company's shares traded on the TSX Venture Exchange under the trading symbol "**ALQ**" up to September 19, 2016.  On September 20, 2016, the Company voluntarily delisted from TSX Venture Exchange and listed its common shares on the Canadian Securities Exchange, under the same trading symbol. The CUSIP (00164E101) and ISIN (CA 00164E1016) numbers remain the same.

The Company's functional and reporting currency is the Canadian dollar and all dollar amounts are in Canadian dollars, unless otherwise indicated.

Additional information related to the Company, and prior news releases are available on the Company's website www.alqgold.com and on SEDAR www.sedar.com.

## B. Summary of Mineral Exploration

ALQ Gold Corp. is a mineral exploration company primarily engaged in the acquisition, exploration and development of mineral properties located in Canada.  The Company's exploration efforts were focused on the Lustdust Property, located in the Omineca Mining Division of British Columbia, for several years.

On June 28, 2016, the Company entered an option and joint venture agreement with Cariboo Rose Resources Ltd.("CRR") to earn up to a 100% interest in the Koster Dam Project.  Located in the Clinton mining division, approximately 80 kilometers south of the city of Williams Lake in south-central British Columbia, the Koster Dam Project consists of 6 mineral claims encompassing approximately 3,286 hectares.

In order to earn a 50% legal and beneficial interest in the Koster Dam Project (the "50% Interest") ALQ must incur at least $110,495 of expenditures on the property on or before June 28, 2017 (the "Option Period").

If ALQ earns the 50% Interest then ALQ will also have the option to acquire a further 50% legal and beneficial interest in the Koster Dam Project (for a total legal and beneficial interest of 100%) (the "Additional Interest") by paying CRR a cash payment of $400,000 on or before the end of the Option Period.

If ALQ exercises the 50% Interest but does not exercise the Additional Interest then ALQ and CRR will enter into a joint venture with respect to the Koster Dam Project. If either ALQ or CRR dilute to an interest equal to 10% or less then such party's interest will automatically convert to a 1% net smelter return royalty.

On June 13, 2017, the Company announced it will not be in a position to incur the required expenditures and, accordingly, has determined it will relinquish all of its interests in the property.

**ALQ GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

Pursuant to an Agreement dated June 14, 2016, the Company announced on September 26, 2016 the completion of the sale of the Lustdust property to Lorraine Copper Corp. ("LLC") whereby LLC would acquire 100% interest in the Lustdust property by:

- Issuing 5.5 million LLC shares of common stock to the Company
- Paying to the Company $50,000 on closing of the agreement, and
- Incurring $100,000 in exploration expenditures on the Lustdust property over a 12 month period from the date of closing

On October 13, 2016, the Company announced the receipt of 5.5 million common shares of LLC pursuant to the above agreement.

On April 5, 2016, the shareholders of the Company voted in favour of the distribution of common shares of Lorraine Copper Corp. ("LLC") to the Company's shareholders as a return of capital.

The report and the Company's News Releases are available on the Company's website www.alqgold.com and on SEDAR at www.sedar.com.

Currently under consideration is the possibility of acquiring additional mineral claims. It is expected that the Company will have to obtain additional funding. Management has been assessing and will continue to assess opportunities in this regard. ALQ Gold Corp. will comment on recommendations, currently under consideration by the Board, by way of news releases in the future.

**Mineral Property Expenditures**

The Company's accounting policy related to expenditures incurred for the acquisition and exploration of mineral properties is to capitalize all expenditures on a property-by-property basis, net of recoveries. During the year ended February 28, 2017, the Company did not incur acquisition and exploration costs on its mineral property.

| Lustdust property | Balance February 29, 2016 $ | Additions Q1 $ | Q2 $ | Q3 $ | Q4 $ | Balance February 28, 2017 $ |
|---|---|---|---|---|---|---|
| Acquisition costs | 1 | - | - | (1) | - | - |
| Exploration costs | - | - | - | - | - | - |
| **Total** | **1** | **-** | **-** | **(1)** | **-** | **-** |

**ALQ GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

### C.    Results of Operations

|  | Years Ended | | Variance Increase/(Decrease) | |
|---|---|---|---|---|
|  | February 28, 2017 | February 29, 2016 | $ | % |
| **Operating Expenses** | | | | |
| Consulting and management fees | 52,504 | 52,504 | - | - |
| Office, printing and miscellaneous | 36,492 | 36,331 | 161 | - |
| Professional fees | 66,496 | 35,046 | 31,450 | 90 |
| Insurance | 6,277 | 6,287 | (10) | - |
| Regulatory fees and transfer fees | 37,737 | 15,407 | 22,330 | 145 |
| Rent | 6,000 | 6,000 | - | - |
| Depreciation | 2,326 | 2,328 | (2) | - |
| Share-based payments | - | 2,882 | (2,882) | N/A |
| Gain on sale of Lustdust property | (490,000) | - | (490,000) | N/A |
| Unrealized loss on fair value of marketable securities | 55,000 | - | 55,000 | N/A |

Net income of the Company for the year ended February 28, 2017 ("2017") was $225,970 compared to a net loss and comprehensive loss of $154,520 for the comparative period ("2016"). The main reason for the net income was the sale of Lustdust property, and the Company recognizing $490,000 profit on the sale of which $50,000 was received by way of cash, and $440,000 was the fair value of the 5.5 million LLC shares received as at the date of the closing of the transaction.

Share-based payments, fair value adjustments and depreciation are non-cash items. Excluding the non-cash items the net loss for 2017 was $206,704 compared to $149,310 for 2016. Management successfully maintained a similar level of operating cost structure in 2017 compared to that of 2016 to manage the affairs of the Company, and continues to monitor expenses in order to preserve the treasury. The increase in professional fees was due to an increase in legal services related to the mineral property acquisition agreement, the sale of the Lustdust property, and the change of listing for the Company. Regulatory fees and transfer fees increased due to expenses related to listing on the Canadian Securities Exchange.

Management continues to explore opportunities to acquire properties for ALQ.

The Company's mandate is to acquire, explore and develop mineral resource properties and the Company is actively seeking the acquisition of properties outside of British Columbia. The Company is somewhat hampered in its ability to do so due to the current conditions in the financial markets and the inability of junior exploration companies like ALQ to raise funds for exploration. In addition, the current climate in British Columbia for mining exploration has been set back by the decision of the Supreme Court of Canada in a case titled Tsilhqot'in, pursuant to which the Supreme Court of Canada granted title to a First Nation of some 17,000 sq. kilometers of land in central British Columbia.

### D. Fourth Quarter Analysis

The Company continued exploring the possibility of acquiring properties, share consolidation and financing the Company. The Company recognized a $55,000 unrealized gain on fair value of marketable securities during the fourth quarter.

**ALO GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

## E. Summary of Annual Information

|  | February 28, 2017 $ | February 29, 2016 $ | February 28, 2015 $ |
|---|---|---|---|
| **Net Income/(loss)** | 225,970 | (154,520) | (10,780,881) |
| **Comprehensive Income (loss)** | 225,970 | (154,520) | (10,780,881) |
| **Basic Earnings/(loss) per share - basic and diluted** | 0.041 | (0.028) | (1.954) |
| **Current assets** | 446,450 | 75,833 | 123,424 |
| **Other non-current assets** | - | 30,000 | 30,000 |
| **Equipment** | 3,103 | 5,429 | 7,757 |
| **Mineral properties** | - | 1 | 1 |
| **Total assets** | 449,553 | 111,263 | 161,182 |
| **Total non-current financial liabilities** | 310,561 | 198,241 | 96,522 |
| **Cash dividends per common share** | - | - | - |

## F. Summary of Quarterly Results

The Company earned no revenue during the periods presented other than minimal interest income.

The Company's operating costs have been relatively constant and quarterly fluctuations mainly relate to share-based payments which vary as stock options are vested. The November 30, 2016 quarter was affected by the sale of the Lustdust property. Recognition of unrealized gain on fair value of marketable securities resulted in a decrease in losses during the quarter ended February 28, 2017.

The following unaudited financial data was derived from the Company's financial statements for the last eight quarters prepared in accordance with IFRS:

|  | Feb 28 2017 $ | Nov 30 2016 $ | Aug 31 2016 $ | May 31 2016 $ | Feb 29 2016 $ | Nov 30 2015 $ | Aug 31 2015 $ | May 31 2015 $ |
|---|---|---|---|---|---|---|---|---|
| Net and comprehensive loss/(income) | 5,898 | (327,375) | 46,495 | 49,012 | 37,546 | 41,589 | 37,322 | 38,063 |
| Basic and diluted loss per share | ($0.001) | ($0.080) | $0.008 | $0.009 | $0.007 | $0.008 | $0.007 | $0.007 |

**ALO GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

## G. Financial Condition, Liquidity and Capital Resources

Historically the Company's sole source of funding has been the issuance of equity securities for cash, primarily through private placements to sophisticated investors and institutions. The Company's access to exploration financing when the financing is not transaction specific is always uncertain. There can be no assurance of continued access to significant equity funding.

As at February 28, 2017, the Company had working capital of $135,889 compared to a working capital deficit of $122,408 as at February 29, 2016. Accounts payable to directors and officers as at February 28, 2017 was $274,403 (February 29, 2016 - $175,298). The Directors and officers are making efforts to ensure funds are available for operations. Therefore effective working capital available as of February 38, 2017 is $410,292 (February 29, 2016 - $52,890). In April 2017, the Company distributed 550,000 of common shares of Lorraine Copper Corp. ("LLC") to the Company's shareholders as a return of capital. Excluding the shares of LLC, the Company has a working capital deficiency of $249,111 at February 28, 2017 and an effective working capital excluding amounts owed to directors of $25,292.

As the Company chooses to proceed on acquisition, exploration and development of mineral properties it may acquire, it will need to raise additional funds for those expenditures.

### Commitments

The Company has no long term debt, capital lease obligations, operating leases or any other long term obligations. The Company has no "Purchase Obligations" defined as any agreement to purchase goods or services that is enforceable and legally binding on the Company that specifies all significant terms, including: fixed or minimum quantities to be purchased; fixed, minimum or variable price provisions; and the approximate timing of the transaction.

The Company had no commitments for material expenditures as of February 28, 2017.

## H. Outstanding Equity and Convertible Securities

### i)  Issued and outstanding

As at February 28, 2017, and the date of this MD&A the Company had 5,518,670 common shares issued and outstanding.

### ii)  Stock Options

As at February 28, 2017 and the date of this MD&A the Company had stock options outstanding as follows:

| Exercise Price | Expiry Date | Balance February 28, 2017 | Expired | Balance June 28, 2017 |
|---|---|---|---|---|
| $0.06 | February 24, 2019 | 625,000 | - | 625,000 |
| | | **625,000** | **-** | **625,000** |
| Weighted average exercise price | | $0.06 | | $0.06 |
| Weighted average contractual life remaining in years | | 1.99 | | 1.66 |

### iii)  Share Purchase Warrants

As of February 28, 2017 and the date of this MD&A there were no warrants outstanding.

**ALO GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

## I. Related Party Information

During the year ended February 28, 2017, the Company incurred $6,000 (2016 - $6,000) for office rental payable to a director and an officer of the Company.

The key management personnel of the Company are the directors and officers of the Company. The Company has no long-term employee benefits or post-employment benefits and compensation awarded to key management during the years ended February 28, 2017 and February 29, 2016 are as follows:

|  | | 2017 | | 2016 |
|---|---|---|---|---|
| CEO services | $ | 50,004 | $ | 50,004 |
| CFO and Corporate Secretarial services | | 36,000 | | 36,000 |
| Directors fees | | 2,500 | | 2,500 |
| Share-based payments | | - | | 2,882 |
| Total | $ | 88,504 | $ | 91,386 |

As of February 28, 2017, accounts payable included $10,000 (2016 - $7,500) payable to directors for directors' fees, $157,512 (2016 - $105,007) to a director and an officer of the Company for management and administration services and $106,891 (2016 -$62,791) to a director and officer for financial and operating services. The amounts are without interest or stated terms of repayment.

## J. Financial Instruments

*Fair value*

The Company uses the following hierarchy for determining and disclosing the fair value of financial instruments which are measured at fair value by valuation technique:

Level 1: Quoted (unadjusted) prices in active markets for identical assets or liabilities
Level 2: Other techniques for which all inputs which have a significant effect on the recorded fair value are observable, either directly or indirectly
Level 3: Techniques which use inputs which have a significant effect on the recorded fair value that are not based on observable market data.

The Company classifies its financial assets in the following categories: at fair value through profit or loss ("FVTPL"), available-for-sale ("AFS") or loans and receivables. The classification depends on the purpose for which the financial assets were acquired. Management determines the classification of financial assets at recognition.

*Fair value through profit or loss*

FVTPL financial assets are initially recognized at fair value with changes in fair value recorded through profit or loss. The 5.5million shares received from LLC have been recorded as fair value through profit and loss.

**ALO GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

*Available-for-sale*

AFS financial assets are non-derivatives that are either designated as available-for-sale or not classified in any of the other financial asset categories and are recognized at fair value and subsequently carried at fair value. Changes in the fair value of AFS financial assets other than impairment losses are recognized as other comprehensive loss and classified as a component of equity.

*Loans and receivables*

Loans and receivables are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market. They are classified as current assets or non-current assets based on their maturity date. Loans and receivables are initially recognized at fair value and subsequently carried at amortized cost less any impairment.

*Impairment of financial assets*

At each reporting date the Company assesses whether there is any objective evidence that a financial asset or a group of financial assets is impaired.

A financial asset or group of financial assets is deemed to be impaired if, and only if, there is objective evidence of impairment as a result of one or more events that has occurred after the initial recognition of the asset and that event has an impact on the estimated future cash flows of the financial asset or the group of financial assets.

*Financial liabilities*

The Company classifies its financial liabilities in the following categories: other financial liabilities and derivative financial liabilities.

Other financial liabilities are non-derivatives and are recognized initially at fair value, net of transaction costs incurred, and are subsequently stated at amortized cost. Any difference between the amounts originally received, net of transaction costs, and the redemption value is recognized in profit or loss over the period to maturity using the effective interest method. Other financial liabilities are classified as current or non-current based on their maturity date.

The Company has no derivative financial liabilities.

*Financial Risk Management*

The Company's risk exposure and the impact on its financial instruments are summarized as follows:

(i)    *Liquidity Risk*

Liquidity risk is the risk that the Company will be unable to meet financial obligations as they fall due. The Company's approach to managing liquidity risk is to provide reasonable assurance that it will have sufficient funds to meet liabilities when due by forecasting cash flows for operations and anticipated investing and financing activities and through management of its capital structure.

The Company's cash balance would not be sufficient to meet the cash requirements for the Company's administrative overhead, maintaining its mineral interests and continuing with its exploration program in the following twelve months.

**ALO GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

*(ii)      Currency Risk*

The Company is exposed to currency risk to the extent expenditures incurred or funds received and balances maintained by the Company are denominated in currencies other than the Canadian dollar. The Company does not use any hedges or other derivatives to mitigate the risk against foreign exchange fluctuations.

As at February 28, 2017, the Company had no amounts receivable or payable in foreign currencies, and accordingly, is not exposed to currency risk.

*(ii)      Interest Rate Risk*

In respect of the Company's financial assets, interest rate risk mainly arises from the interest rate impact on cash and cash equivalents and reclamation bond. As at February 28, 2017, the Company's exposure is immaterial.

*(iv)      Credit Risk*

Credit risk is the risk that a counterparty to a financial instrument will fail to discharge its contractual obligations. The Company is exposed to credit risk mainly in respect to managing its cash position, which is held with Canadian financial institutions. The Company mitigates credit risk by risk management policies that require cash deposits or short-term investments be invested with Canadian chartered banks rated BBB or better, or commercial paper issuers R1/A2/P2 or higher. All investments must be less than one year in duration.

*(v)      Other Price Risk*

Other price risk is the risk that the future cash flows of a financial instrument will fluctuate due to changes in market prices, other than those arising from interest rate risk or foreign currency risk. The Company is not exposed to other price risk as of the date of this MD&A.

## K. Event After the Reporting Period and Outlook

The Company distributed 550,000 common shares of Lorraine Copper Corp. ("LLC") to the Company's shareholders as a return of capital in April 2017.

## L. Off-balance Sheet Arrangements

The Company does not have any off-balance sheet arrangements and does not contemplate having them in the foreseeable future.

## M. Disclosure Controls and Procedures

The Board of Directors is responsible for ensuring that management fulfils its responsibilities for financial reporting and internal control.

There have been no significant changes to the Company's internal control over financial reporting that occurred during the period that have materially affected, or are reasonably likely to materially affect the Company's internal control over financial reporting.

**ALO GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

---

The Board of Directors has established procedures for complaints received regarding accounting, internal controls or auditing matters, and for a confidential, anonymous submission procedure for concerns regarding questionable accounting or auditing matters.

Being a venture issuer, the Company is exempt from certification on Disclosure Controls and Procedures and Internal Control Over Financial Reporting. The Company is required to file Form 52-109FV1 for annual reporting and Form 52-109FV2 for interim reporting.

## N. Risks and Uncertainties

The principal business of the Company is the acquisition, exploration and development of mineral properties. Given the nature of the mining business, the limited extent of the Company's assets and the present stage of development, the following risk factors, among others, should be considered.

### Exploration Stage Company

The Company does not hold a known body of commercial ore and does not generate any revenues from production. The Company's success will depend largely upon its ability to locate commercially productive mineral reserves. Mineral exploration is highly speculative in nature, involves many risks and frequently is non-productive. There is no assurance that exploration efforts will be successful.  Success in establishing reserves is a result of a number of factors, including the quality of management, the level of geological and technical expertise, and the quality of property available for exploration.

Once mineralization is discovered, it may take several years in the initial phases of drilling until production is possible, during which time the economic feasibility of production may change.  Substantial expenditures are required to establish proven and probable reserves through drilling and bulk sampling, to determine the optimal metallurgical process to extract the metals from the ore and, in the case of new properties, to construct mining and processing facilities.  Because of these uncertainties, no assurance can be given that the Company's exploration programs will result in the establishment or expansion of resources or reserves.

### Operating History and Availability of Financial Resources

The Company has no operating revenues and is unlikely to generate any significant amount in the foreseeable future. Hence, it may not have sufficient financial resources to undertake any future mineral claim acquisition and exploration activities. Operations will continue to be financed primarily through the issuance of securities. The Company will need to continue its reliance on the issuance of such securities for future financing, which may result in dilution to existing shareholders. Furthermore, the amount of additional funds required may not be available under favorable terms, if at all. Failure to obtain additional funding on a timely basis could result in delay or indefinite postponement of further exploration and development.

### Price Volatility and Lack of Active Market

In recent months, the securities markets in Canada and elsewhere have continued to experience a significant price depression, and the market prices of securities of many public companies have not necessarily been tied to trading performance. It may be anticipated that any quoted market for the Company's securities will be subject to such market trends and that the value of such securities may be affected accordingly.

The resource industry is intensively competitive in all of its phases, and the Company competes with many other companies possessing much greater financial and technical resources.

**ALO GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

Competition is particularly intense with respect to the acquisition of desirable undeveloped properties.  The principal competitive factors in the acquisition of prospective properties include the staff and data necessary to identify and investigate such properties, and the financial resources necessary to acquire and develop the projects.  Competition could adversely affect the Company's ability to acquire additional suitable prospects suitable for exploration.

*Title to Property*

Although the Company has exercised the usual due diligence with respect to title of its properties, there is no guarantee that title to the properties will not be challenged or impugned as a result of  prior unregistered agreements or transfers, aboriginal land claims, government expropriation and  undetected defects.

*Government Regulations and Environmental Risks and Hazards*

The Company's conduct is subject to various federal, provincial, state laws, rules and regulations, including environmental legislation.

Environmental legislation is becoming increasingly stringent and costs and expenses of regulatory compliance are increasing. The impact of new and future environmental legislation on the Company's operations may cause additional expenses and restrictions. If the restrictions adversely affect the scope of exploration and development on the resource property interests, the potential for production on the property may be diminished or negated. The Company has adopted environmental practices designed to ensure that it continues to comply with environmental regulations currently applicable to it.  All of the Company's activities are in compliance in all material respects with applicable environmental legislation.

Environmental hazards may exist on the Company's properties, which may have been caused by previous or existing owners or operators of the properties.

*Dependence on Key Personnel*

The Company is dependent on a relatively small number of key directors, officers and senior personnel.  Loss of any one of those persons could have an adverse effect on the Company. The Company does not currently maintain "key-man" insurance in respect of any of its management.

*Licenses and Permits*

The operations of the Company require licenses and permits from various government authorities. The Company believes that it holds all necessary licenses and permits under applicable laws and regulations for work in progress and believes it is presently complying in all material respects with the terms of such licenses and permits. However, such licenses and permits are subject to change in various circumstances. There can be no guarantee that the Company will be able to obtain or maintain all necessary licenses and permits that may be required to explore and develop its properties, commence construction or operation of mining facilities or to maintain continued operations that economically justify the cost.

## O. Proposed Transactions

No proposed transactions as of the date of this MD&A.

**ALO GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

## P. Significant Accounting Estimates

Deferred taxes

The Company recognizes a deferred tax asset to the extent recovery is probable. Assessing the recoverability of deferred tax assets requires management to make significant estimates of future taxable profit against which deductible temporary differences and the carry-forward of unused tax credits and unused tax losses can be utilized. In addition, changes in tax laws could limit the ability of the Company to obtain tax deductions in future periods.

Going concern

The assessment of the Company's ability to continue as a going concern and to raise sufficient funds to pay for its ongoing operating expenditures, meet its liabilities for the ensuing year, and to fund planned and contractual exploration programs, involves significant judgment based on historical experience and other factors, including expectation of future events that are believed to be reasonable under the circumstances.

## Q. Changes in Accounting Policies Including Initial Adoption

**Accounting standards issued but not yet effective**

The following accounting standards are issued but not yet effective. The Company has not early-adopted these revised standards and expects no significant effect on the Company's consolidated financial statements when adopted.

**IFRS 9 Financial Instruments**

IFRS 9 will replace IAS 39 Financial Instruments: Recognition and Measurement and IFRIC 9 Reassessment of Embedded Derivatives. The final version of this new standard supersedes the requirements of earlier versions of IFRS 9. The main features introduced by this new standard compared with predecessor IFRS are as follows: classification and measurement of financial assets, classification and measurement of financial liabilities, Impairment of financial assets and hedge accounting.

The standard is effective for annual periods beginning on or after January 1, 2018.

**IFRS 16 Leases**

IFRS 16 specifies how to recognize, measure, present and disclose leases. The standard provides a single lessee accounting model, requiring lessees to recognize assets and liabilities for all leases unless the lease term is 12 months or less or the underlying asset has a low value. Lessors continue to classify leases as operating or finance, with IFRS 16's approach to lessor accounting substantially unchanged from its predecessor, IAS 17 Leases.

The standard is effective for annual periods beginning on or after January 1, 2019.

**ALQ GOLD CORP.**
**(An Exploration Company)**
**Year Ended February 28, 2017**
**MANAGEMENT DISCUSSION AND ANALYSIS**
**Dated June 19, 2017**

---

**R. Forward-Looking Statements**

Some of the statements contained in this MD&A may be deemed "forward-looking statements." These include estimates and statements that describe the Company's future plans, objectives or goals, and expectations of a stated condition or occurrence. Forward-looking statements may be identified by the use of words such as "believes", "anticipates", "expects", "estimates", "may", "could", "would", "will", or "plan". Since forward-looking statements are based on assumptions and address future events and conditions, by their very nature they involve inherent risks and uncertainties.

Actual results relating to, among other things, results of exploration, reclamation, capital costs, and the Company's financial condition and prospects, could differ materially from those currently anticipated in such statements for many reasons such as but not limited to; changes in general economic conditions and conditions in the financial markets; changes in demand and prices for the minerals the Company expects to produce; litigation, legislative, environmental and other judicial, regulatory, political and competitive developments; technological and operational difficulties encountered in connection with the Company's activities; and changing foreign exchange rates and other matters discussed in this MD&A.

Readers should not place undue reliance on the Company's forward-looking statements. Further information regarding these and other factors, which may cause results to differ materially from those projected in forward-looking statements, are included in the filings by the Company with securities regulatory authorities. The Company does not assume any obligation to update or revise any forward-looking statement that may be made from time to time by the Company or on its behalf, except in accordance with applicable securities laws, whether as a result of new information, future events or otherwise.

**Schedule C – Financial Statements of Ignite International, Ltd.**

**IGNITE INTERNATIONAL, LTD.**
**(Formerly Vulcan Enterprises US, Ltd.)**

**FINANCIAL STATEMENTS**
December 31, 2018 & 2017

(Expressed in US Dollars)





REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and
Stockholders of Ignite International, Ltd.

**Opinion on the Financial Statements**

We have audited the accompanying statements of position of Ignite International, Ltd. (Formerly Vulcan Enterprises US, Ltd.) (the "Company") as of December 31, 2018 and 2017, the related statements of operations, stockholders' equity, and cash flows for the year ended December 31, 2018 and the period from inception (December 28, 2017) to December 31, 2017, and the related notes (collectively referred to as the "financial statements").  In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for the year ended December 31, 2018 and the period from inception (December 28, 2017) to December 31, 2017, in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

*Accell Audit & Compliance, PA*

We have served as the Company's auditor since 2018.

Tampa, Florida
January 31, 2019

# IGNITE INTERNATIONAL, LTD.
STATEMENTS OF FINANCIAL POSITION
(EXPRESSED IN US DOLLARS)

| | *Note* | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and Cash Equivalents | | $ | 9,732,338 | $ | - |
| Accounts Receivable | *4* | | 188,762 | | - |
| Prepaid Expenses | *5* | | 1,077,000 | | - |
| Due From Related Parties | *18* | | 3,597 | | - |
| **Total Current Assets** | | | 11,001,697 | | - |
| | | | | | |
| **Non-Current Assets** | | | | | |
| Fixed Assets, at cost, net of accumulated depreciation of $25,059 and $0 respectively | *8* | | 322,822 | | - |
| Intangibles, net | *9* | | 179,434 | | - |
| Other Assets | *7* | | 5,010,125 | | - |
| **Total Assets** | | $ | 16,514,078 | $ | - |
| | | | | | |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | | | | |
| **Current Liabilities** | | | | | |
| Accounts Payable & Accrued Liabilities | *11* | $ | 1,569,171 | $ | - |
| Due to Related Parties | *18* | | 1,482,895 | | - |
| **Total Current Liabilities** | | | 3,052,066 | | - |
| | | | | | |
| **Non-Current Liabilities** | | | | | |
| Convertible Note Payable | *12* | | 3,881,000 | | - |
| **Total Liabilities** | | | 6,933,066 | | - |
| | | | | | |
| **Stockholders' Equity** | | | | | |
| Common Stock, $.01 par value; 200,000,000 shares authorized; 87,616,000 & 86,100,000 shares issued and outstanding at December 31, 2018 & 2017, respectively | *13* | | 876,160 | | 861,000 |
| Additional Paid-In Capital | *13* | | 21,271,838 | | 36,039,000 |
| Subscription Note Receivable | *13* | | - | | (36,900,000) |
| Accumulated Deficit | | | (12,566,986) | | - |
| **Total Stockholders' Equity** | | | 9,581,012 | | - |
| **Total Liabilities and Stockholders' Equity** | | $ | 16,514,078 | $ | - |
| | | | | | |
| **Nature of Operations** | *1* | | | | |
| **Commitments & Contingencies** | *20* | | | | |
| **Subsequent Events** | *21* | | | | |

Approved on Behalf of the Board of Directors and Authorized for Issuance on January 28, 2019:



DocuSigned by:

*Dan Bilzerian*

Dan Bilzerian, Chairman

See Report of Independent Registered Auditors and the accompanying notes to these financial statements.

2

**IGNITE INTERNATIONAL, LTD.**
STATEMENTS OF OPERATIONS
(EXPRESSED IN US DOLLARS)

| | Note | Year Ended December 31, 2018 | Period from Inception (December 28 2017) to December 31, 2017 |
|---|---|---|---|
| **REVENUES** | | $ 1,890,013 | $ - |
| Costs of Goods Sold | | 1,344,697 | - |
| **Gross Profit** | | 545,316 | - |
| | | | |
| **EXPENSES** | | | |
| Marketing & Promotion | | 8,282,805 | - |
| Employee Compensation | | 1,948,406 | |
| Professional Fees | | 1,576,566 | |
| General & Administrative | | 1,354,775 | - |
| Depreciation & Amortization | *8,9* | 25,892 | - |
| Total Expenses | | 13,188,444 | - |
| | | | |
| **Operating Loss** | | (12,643,128) | - |
| | | | |
| **Non-Operating Income/(Expenses)** | | | |
| Interest Income | | 286,578 | - |
| Interest Expense | | (210,436) | - |
| Total Non-Operating Income/(Expenses) | | 76,142 | - |
| | | | |
| **Net Loss** | | $ (12,566,986) | $ - |

See Report of Independent Registered Auditors and the accompanying notes to these financial statements.

3

**IGNITE INTERNATIONAL, LTD.**
STATEMENTS OF CASH FLOWS
(EXPRESSED IN US DOLLARS)

| | Note | Year Ended December 31, 2018 | Period from Inception (December 28 2017) to December 31, 2017 |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net Loss | | $ (12,566,986) | $ - |
| Adjustments to reconcile net loss to net cash flows from operating activities | | | |
| Depreciation & Amortization | | 25,892 | - |
| | | | |
| **Changes in non-cash working capital:** | | | |
| Accounts Receivable | | (188,762) | - |
| Prepaid Expenses | | (1,077,000) | - |
| Due From Related Parties | | (198,717) | - |
| Other Assets | | (5,010,125) | - |
| Accounts Payable & Accrued Liabilities | | 1,569,171 | - |
| Due to Related Parties | | 1,482,895 | - |
| **Net cash flows from operating activities** | | (15,963,632) | - |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Purchases of Property & Equipment | | (347,881) | - |
| Purchases of Intangibles | | (180,267) | - |
| Issuance of Note Receivable | | (8,514,340) | - |
| **Net cash flows from investing activities** | | (9,042,488) | - |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Capital Contributions | | 32,147,998 | - |
| Stock Repurchases | | (1,290,540) | - |
| Issuance of Note Payable | | 3,881,000 | - |
| Net cash from financing activities | | 34,738,458 | - |
| | | | |
| **NET CHANGE IN CASH AND CASH EQUIVALENTS** | | 9,732,338 | - |
| **CASH AND CASH EQUIVALENTS,** beginning of year | | - | - |
| **CASH AND CASH EQUIVALENTS,** end of year | | $ 9,732,338 | $ - |

| | Note | | |
|---|---|---|---|
| **SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:** | | | |
| Non-Cash Disclosure of Investing & Financing Activities: | | | |
| Related Party Interest Receivable Settled by Stock Repurchases | *6,13* | $ 1,478,620 | $ - |
| Related Party Notes Receivable Settled by Stock Repurchases | *10,13* | $ 8,514,340 | $ - |
| Stock Subsciption Receivables Settled by Stock Repurchases | *13* | $ 36,100,000 | $ - |
| Cash Paid During the Period For: | | | |
| Interest | | $ - | $ - |
| Income Taxes | *14* | $ - | $ - |

See Report of Independent Registered Auditors and the accompanying notes to these financial statements.

4

**IGNITE INTERNATIONAL, LTD.** 5
STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY
(EXPRESSED IN US DOLLARS)

| | Common Stock Shares | Common Stock Value | Additional Paid-in Capital | Stock Subscription Receivables | Accumulated Deficit | Total Stockholder's Equity |
|---|---|---|---|---|---|---|
| **Inception, December 28, 2017** | - | $ - | $ - | $ - | $ - | $ - |
| Capital Contributions | 86,100,000 | 861,000 | 36,039,000 | (36,900,000) | - | - |
| Net Loss | - | - | - | - | - | - |
| **December 31, 2017** | 86,100,000 | 861,000 | 36,039,000 | (36,900,000) | - | - |
| Capital Contributions | 14,016,000 | 140,160 | 32,491,338 | 800,000 | - | 33,431,498 |
| Stock Repurchased | (12,500,000) | (125,000) | (47,258,500) | 36,100,000 | - | (11,283,500) |
| Net Loss | - | - | - | - | (12,566,986) | (12,566,986) |
| **December 31, 2018** | 87,616,000 | $ 876,160 | $21,271,838 | $ - | $(12,566,986) | $ 9,581,012 |

See Report of Independent Registered Auditors and the accompanying notes to these financial statements.

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

## 1.    NATURE OF OPERATIONS

Ignite International, Ltd. (the "Company" or "Ignite") was incorporated on December 28, 2017 in the United States in the state of Wyoming under the name Vulcan Enterprises US, Ltd.("Vulcan").  On October 30, 2018, Vulcan changed its name to Ignite International, Ltd.  The Company is a privately held limited liability company and is taxed under US law as a corporation.  Its fiscal year-end is December 31.

Ignite was created for the purposes of licensing and branding the Ignite brand, which was created by social media celebrity Dan Bilzerian, to companies whose products align with Mr. Bilzerian's lifestyle and which can be marketed to his vast number of  social media followers. Health, diet, wellness and fitness are areas of Mr. Bilzerian's lifestyle that are an important part of Ignite's business strategy.  A significant part of this business strategy is focused on cannabis based consumer products.

Ignite has licensed its brand to high quality licensed cannabis companies.  It has also partnered with ecommerce partners to fulfill and distribute Ignite branded cannabidiol ("CBD") consumer products across the United States.

## 2.    BASIS OF PRESENTATION

### Statement of compliance

These financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and interpretations of the IFRS Interpretations Committee ("IFRIC") and are in full compliance with such standards.  The financial statements were approved by the Board of Directors and authorized for issuance on January 28, 2019.

### Basis of measurement

These financial statements have been prepared on a historical cost basis except for cash and cash equivalents, which are measured at fair value. Historical cost is generally based upon the fair value of the consideration given in exchange for assets.

### Functional and presentation currency

These financial statements are presented in US dollars. The functional currency of the Company is the US dollar.

### New and Amended Standards Adopted in 2018

Certain new standards, interpretations, amendments and improvements to existing standards were issued by the International Accounting Standards ("IAS") Board or IFRIC.  The new standards adopted by the Company are:

- IFRS 9, *Financial Instruments*, which introduces new requirements for (1) the classification and measurement of financial assets and financial liabilities, (2) impairment of financial assets and liabilities, and (3) general hedge accounting. IFRS 9 became effective from January 1, 2018. IFRS 9 introduces new classification and measurement models for financial assets, using a single approach to determine whether a financial asset is measured at amortized cost or at fair value. The accounting for financial liabilities continues to be classified and measured in accordance with IAS 39, except that the portion of a change of fair value relating to the entity's own credit risk is presented in other comprehensive income unless it would create an accounting mismatch. Accounting for hedges under IFRS 9 provides a new and simpler approach that is intended to more closely align with risk management activities undertaken by entities when hedging financial and non-financial risks. The adoption of IFRS 9 did not have a material effect on the financial statements.

6

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

- IFRS 15, *Revenue from Contracts with Customers*, establishes a comprehensive model to be used in accounting for revenue arising from contracts with customers. IFRS 15 has superseded all prior guidance on the recognition of revenue. The core principle of the new standard is that an entity must recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The standard requires that (1) contracts be identified, together with the separate performance obligations within the contract, (2) the transaction price be determined, adjusted for the time value of money excluding credit risk, (3) the transaction price be allocated to the separate performance obligations on a basis of relative stand-alone selling price of each distinct good or service, or estimation approach if no distinct observable prices exist, and (4) revenue be recognized when each performance obligation is satisfied. For goods, the performance obligation would be satisfied when the customer obtains control of the goods.

## New standards and interpretations not yet adopted

The following have not yet been adopted by the Company:

- IFRS 16, Leases, has not been adopted by the Company, as it becomes mandatorily effective for annual periods beginning on or after January 1, 2019, and the Company has chosen not to adopt it early. For lessees, IFRS 16 will eliminate the classifications of operating leases and finance leases. Subject to exceptions, a so-called right-of-use asset will be capitalized in the balance sheet measured as the present value of the unavoidable future lease payments to be made over the lease term. For short-term leases of 12 months or less and leases of low-value assets (such as personal computers and small office furniture), an accounting policy choice will exist under which either a right-of-use asset is recognized or lease payments are charged to profit or loss as incurred. A liability corresponding to the capitalized lease will also be recognized. Straight-line operating lease expense recognition will be replaced by a depreciation charge for the leased asset and interest expense on the recognized lease liability. Lessor accounting under IFRS 16 has not been significantly changed from existing standards. The Company is in the process of evaluating IFRS 16.

## 3.    SIGNIFICANT ACCOUNTING POLICIES

The accounting policies set out below have been applied consistently to all periods presented.

## Critical accounting estimates and judgments

The preparation of financial statements in conformity with IFRS requires the Company's management to make judgments, estimates and assumptions about future events that affect the amounts reported in the financial statements and related notes to the financial statements. Although these estimates are based on management's best knowledge of the amount, event or actions, actual results may differ from those estimates. Estimates and judgments are continuously evaluated and are based on management's experience and other factors, including expectations of future events that are believed to be reasonable.

Revisions to accounting estimates are recognized in the period in which the estimates are revised and in any future periods affected. Significant areas of estimation uncertainty and judgment considered by management in preparing these financial statements are as follows:

*Estimated useful lives and depreciation of property and equipment*

Depreciation of property and equipment is dependent upon estimates of useful lives, which are determined through the exercise of judgment. The assessment of any impairment of these assets is dependent upon estimates of recoverable amounts that take into account factors such as economic and market conditions and the useful lives of assets.

7

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

*Impairment of long-lived assets*

Long-lived assets, including property and equipment, and intangible assets, are reviewed for impairment at each statement of financial position date or whenever events or changes in circumstances indicate that the carrying amount of an asset exceeds its recoverable amount. For the purpose of impairment testing, assets that cannot be tested individually are grouped together into the smallest group of assets that generates cash inflows from continuing use that are largely independent of the cash inflows of other assets or group of assets ("CGU"). The recoverable amount of an asset or a CGU is the higher of its fair value, less costs to sell, and its value in use. If the carrying amount of an asset exceeds its recoverable amount, an impairment charge is recognized immediately in profit or loss by the amount by which the carrying amount of the asset exceeds the recoverable amount. Where an impairment loss subsequently reverses, the carrying amount of the asset is increased to the lesser of the revised estimate of recoverable amount, or the carrying amount that would have been recorded had no impairment loss been recognized previously.

## Cash and cash equivalents

Cash and cash equivalents include cash deposits in financial institutions.  Cash equivalents consist of short-term, highly liquid investments that are readily convertible to known amounts of cash and that are subject to an insignificant risk of changes in value.

## Inventories

Fulfilment of eCommerce orders are executed on a just in time basis.  Hence, there is no finished goods inventory on hand.  Costs of products sold are recognized as an expense included in costs of goods sold.

## Foreign currencies

*Functional and presentation currency*

The functional currency is the currency of the primary economic environment in which the Company operates. The functional currency of the Company was determined by conducting an analysis of the factors identified in IAS 21, *"The Effects of Changes in Foreign Exchange Rates"* ("IAS 21"), based on the relevant economic substance of the transactions. The functional currency of the Company and its subsidiaries is set forth in Note 2.

*Translation of foreign transactions and balances into the functional currency*

Foreign currency transactions, if any, are translated into the functional currency of the Company at rates of exchange prevailing on the dates of the transactions. At each financial position reporting date, all monetary assets and liabilities that are denominated in foreign currencies are translated to the functional currency of the Company at the rates prevailing at the date of the statement of financial position. Foreign exchange gains and losses resulting from the settlement of such transactions are recognized in profit or loss.

## Financial instruments

*Financial assets*

The Company classifies its financial assets into one of the following categories, depending on the purpose for which the asset was acquired. The Company's accounting policy for each category is as follows:

*Fair value through profit or loss* - This category comprises derivatives, or assets acquired or incurred principally for the purpose of selling or repurchasing it in the near term. If any, they are carried in the statements of financial position at fair value with changes in fair value recognized in profit or loss.

*Loans and receivables* - These assets are non-derivative financial assets with fixed or determinable payments that are not

8

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

quoted in an active market. They are carried at cost less any provision for impairment.

*Held-to-maturity investments* - These assets are non-derivative financial assets with fixed or determinable payments and fixed maturities that the Company's management has the intention and ability to hold to maturity. These assets are measured at amortized cost using the effective interest method. If there is objective evidence that the investment is impaired, determined by reference to external credit ratings and other relevant indicators, the financial asset is measured at the present value of estimated future cash flows. Any changes to the carrying amount of the investment, including impairment losses, are recognized in profit or loss.

*Available-for-sale* - Non-derivative financial assets not included in the above categories are classified as available-for-sale. They are carried at fair value with changes in fair value recognized directly in members' equity. Where a decline in the fair value of an available-for-sale financial asset constitutes objective evidence of impairment, the amount of the loss is removed from members' equity (deficiency) and recognized in profit or loss.

All financial assets except for those recorded at fair value through the recognition of profit or loss are subject to review for impairment no less often than at each reporting date. Financial assets are impaired when there is any objective evidence that a financial asset or a group of financial assets is impaired. Different criteria to determine impairment are applied for each category of financial assets, which are described above.

*Financial liabilities*

The Company classifies its financial liabilities into one of two categories, depending on the purpose for which the asset was acquired. The Company's accounting policy for each category is as follows:

*Fair value through profit or loss* - This category comprises derivatives, or liabilities acquired or incurred principally for selling or repurchasing it in the near term. They are carried in the statements of financial position at fair value with changes in fair value recognized in profit or loss.

*Other financial liabilitie*s - This category consists of liabilities carried at amortized cost using the effective interest method. The Company derecognizes a financial liability when its contractual obligations are discharged, cancelled or expire.

The Company has classified its cash at face value through profit or loss and bank deposits, due from affiliates, deposits and notes receivable as loans and receivables measured at amortized cost. The Company's promissory note, accounts payable and accrued liabilities, and due to related parties are classified as other financial liabilities. Refer to Note 7 for additional disclosures.

**Financial instruments**

The Company has adopted IFRS 9, which replaced IAS 39, *Financial Instruments: Recognition and Measurement*.

The revised guidance changed the classification and measurement of financial assets and liabilities. Under IFRS 9, financial assets are classified and measured based on the business model in which they are held and the characteristics of their contractual cash flows. It contains three primary measurement categories for financial assets: measured at amortized cost, fair value through profit and loss ("FVTPL"), and fair value through other comprehensive income ("FVTOCI"). Presently, the Company's only financial instruments are in the form of cash, accounts receivable, accounts payable and accrued liabilities and notes payable.  Hence, the financial assets held by the Company are measured at amortized cost.

The Company determines classification of financial assets at initial recognition. The Company accounting policy in respect to its financial instruments is as follows:

(i)    Financial assets - are classified and measured at FVTPL unless they meet the following criteria for amortized cost:

   • The Company plans to hold the financial assets in order to collect contractual cash flows; and
   • Payments received on the financial assets are solely payments of principal and interest on the principal amount outstanding.

9

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

(ii)     Financial liabilities - non-derivative financial liabilities are measured at amortized cost unless they have been designated as FVTPL. Derivative liabilities are initially measured at FVTPL, with subsequent changes in fair market value recognized in the statement of operations.

Financial instruments recorded at fair value are classified using a fair value hierarchy that reflects the significance of inputs used in making the measurements. The hierarchy is summarized as follows:

• Level 1 quoted prices (unadjusted) in active markets for identical assets or liabilities
• Level 2 inputs that are observable for the asset or liability, either directly (prices) for similar assets or liabilities in active markets or indirectly (derived from prices) for identical assets or liabilities in markets with insufficient volume or infrequent transactions
• Level 3 inputs for assets or liabilities not based upon observable market data

## Impairment of non-financial assets

At the end of each reporting period the carrying amounts of the Company's assets are reviewed to determine whether there is any indication that those assets may be impaired. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment, if any. The recoverable amount is the higher of fair value less costs to sell and value in use. Fair value is determined as the amount that would be obtained from the sale of the asset in an arm's length transaction between knowledgeable and willing parties. In assessing value in use, the estimated future cash flows are discounted to their present value using a discount rate that reflects current market assessments of the time value of money and the risks specific to the asset. If the recoverable amount of an asset is estimated to be less than its carrying amount, the carrying amount of the asset is reduced to its recoverable amount and the impairment loss is recognized in profit or loss for the period. For an asset that does not generate largely independent cash inflows, the recoverable amount is determined for the cash generating unit to which the asset belongs. Following the recognition of an impairment loss, the depreciation charge applicable to the asset is adjusted prospectively in order to systematically allocate the revised carrying amount, net of any residual value, over the remaining useful life. Where an impairment subsequently reverses, the carrying amount of the asset (or CGU) is increased to the revised estimate and its recoverable amount, but to an amount that does not exceed the carrying amount that would have been determined had no impairment loss been recognized for the asset (or CGU) in prior periods. A reversal of an impairment loss is recognized immediately in profit or loss.

## Intangible assets

Intangible assets are recorded at cost less any accumulated amortization and impairment losses. Amortization is recorded on a straight-line basis over the estimated useful life. An intangible asset is derecognized on disposal, or when no future economic benefits are expected from use or disposal. Gains or losses arising from derecognition of an intangible asset are recognized in profit or loss when the asset is derecognized. At the end of each reporting period, the Company reviews the carrying amounts of its intangible assets to determine whether there is any indication of impairment. Intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment at least annually, and whenever there is an indication that the asset may be impaired.

Recoverable amount is the higher of fair value less costs of disposal and value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted. If the recoverable amount is less than the carrying amount, the carrying amount of the asset is reduced to its recoverable amount and an impairment loss is recognized immediately in profit or loss. When impairment subsequently reverses, the carrying amount of the asset is increased to the revised estimate of its recoverable amount, but not greater than the carrying amount that would have been determined had no impairment loss been recognized in prior years. A reversal of an impairment loss is recognized immediately in profit or loss.

10

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

## Revenue recognition

Revenue from contracts with customers is recognized when control of the goods or services are transferred to the customer at an amount representing the consideration in exchange for such goods or services. For contracts involving multiple performance obligations, the transaction (i.e., selling) price is allocated based on relative standalone selling prices of the goods or services. If a standalone selling price is not directly observable, it is estimated using an adjusted-market-assessment approach, which, for the most part, involves referring to prices from competitors for similar goods and then making an adjustment to such prices to reflect the company's costs and margins. Contract assets arise when the company transfers goods or services in advance of receiving consideration from customers. Contract liabilities arise from the obligation to transfer goods or services to the customer when consideration has already been received.

## Property and equipment

Property and equipment are stated at cost, net of accumulated depreciation and accumulated impairment losses, if any.

Depreciation is calculated using the following terms and methods:

| | | |
|---|---|---|
| Fixtures | Straight-line | 5-7 years |
| Equipment | Straight-line | 2-7 years |
| Leasehold improvements | Straight-line | Length of the lease |

The Company capitalization policy is to capitalize any long-lived assets purchased with an individual cost exceeding $10,000 and a useful life exceeding one year.  An item of property and equipment is derecognized upon disposal or when no future economic benefits are expected from its use. Any gain or loss arising from derecognition of the asset (calculated as the difference between the net disposal proceeds and the carrying value of the asset) is included in the profit or loss in the period the asset is derecognized. The assets' residual values, useful lives and methods of depreciation are reviewed at each reporting date, and adjusted prospectively, if appropriate. Construction in progress are expenditures for buildout of new facilities that will be depreciated commencing upon becoming operational.

## Income taxes

The Company is a limited liability company treated as a Corporation for federal and state income tax purposes. Income tax expense represents the sum of tax currently payable and deferred amounts.  The tax currently payable is based on taxable income for the year, which may differ from income reported in the statement of operations because of income or expenses that are taxable or deductible in other years. The liability for current tax is calculated using tax rates that have been enacted or substantively enacted as of the date of the financial statements. Deferred tax represents the undiscounted amount expected to be paid or recovered on differences between the carrying amounts of assets and liabilities in the financial statements and the corresponding tax bases used in the computation of taxable income. Deferred tax liabilities are generally recognized for all taxable temporary differences and deferred tax assets are recognized to the extent that it is more likely than not that taxable income will be available against which deductible temporary differences can be utilized. The carrying amount of deferred tax assets is reviewed at the date of the financial statements and reduced to the extent that it is no longer more likely than not that sufficient taxable income will be available to allow all or part of the asset to be recovered.

## 4.    ACCOUNTS RECEIVABLE

Accounts Receivable are comprised of the following amounts:

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| eCommerce | $    171,689 | $        - |
| Royalties | 17,073 | - |
| Total | $    188,762 | $        - |

11

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

The aging analysis of trade receivables is as follows:

| Total | | Total | Neither Past Due Nor Impaired | Past Due But Not Impaired | | |
|---|---|---|---|---|---|---|
| | | | | < 90 Days | 91-180 Days | > 180 Days |
| December 31, 2018 | $ | 188,762 | 188,762 | - | - | - |
| December 31, 2017 | $ | - | - | - | - | - |

## 5. PREPAID EXPENSES

Prepaid expenses primarily consist of prepaid rent for the Chalon Estate in California. The Chalon Estate is rented under a 36 month lease. Monthly rent is $200,000 per month and is prepaid in 6 month increments. The lease expires May 31, 2021.

## 6. INTEREST RECEIVABLE

Interest accrued on the note receivable balance described in Note 10, as well as the interest earned from outstanding stock subscriptions as documented in Note 13. All of this interested was settled through the stock repurchase discussed in Note 13.

## 7. OTHER ASSETS

Other assets consist of the following:

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Purchase Option | $ 5,000,000 | $ - |
| Security Deposit | 10,125 | - |
| Total | $ 5,010,125 | $ - |

The purchase option is a three-year option on the Chalon Estate in California. The Company expects to exercise or extend the option before it expires.

- If option is exercised by May 31, 2019, the purchase price is $60,000,000.
- If option is exercised between June 1, 2019 and May 31, 2020, the purchase price is $62,500,000.
- If option is exercised between June 1, 2010 and May 31, 2021, the purchase price is $65,000,000.

The security deposit is related to a short-term professional office lease in California.

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

## 8.   FIXED ASSETS

Fixed assets consist of the following:

|  | December 31, 2018 | | December 31, 2017 |
|---|---|---|---|
| Leasehold Improvements - Patrick Lane Estate | $ | 282,528 | $ - |
| Leasehold Improvements - Chalon Estate |  | 65,353 | - |
| **Total Property & Equipment, at cost** |  | 347,881 | - |
| Accumlated Depreciation |  | (25,059) | - |
| **Total Property & Equipment, net** | $ | 322,822 | $ - |

Ignite records accumulated depreciation based upon the useful lives of the related assets as previously noted in the Significant Accounting Policies section.  For the year ended December 31, 2018, the Company incurred $25,059 of interest expense.  No depreciation expense was incurred in 2017.

## 9.   INTANGIBLES

Following is a summary of activity in intangible assets having finite lives:

|  | Trademarks | |
|---|---|---|
| **Balance, inception (December 28, 2017)** | $ | - |
| Additions |  | - |
| Amortization |  | - |
| **Balance, December 31, 2017** |  | - |
| Additions |  | 50,000 |
| Amortization |  | (833) |
| **Balance, December 31, 2018** | $ | 49,167 |

Certain trademarks are amortized on the specific identification method over the lower of their legal or estimated useful lives, which average approximately 15 years.  For the year ended December 31, 2018, the Company incurred $833 of amortization expense.  No amortization expense was incurred in 2017.

Another trademark and a domain name, purchased in 2018, have been deemed to have infinite lives and have a combined carrying value of $130,267 at December 31, 2018.

## 10.   NOTE RECEIVABLE - RELATED PARTY

During 2018, the Company issued a secured promissory note from 30 Meadowhawk Lane, LLC, an entity controlled by the founder and chairman of the Company, for the purchase of the Patrick Lane Estate in Nevada, which the Company is leasing over a two year lease term.  The note had a principal balance of $8,514,340, bore annual interest of 5% and interest was due on demand.

The note was settled by a stock repurchased as described in Note 13.

13

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

## 11.  ACCOUNTS PAYABLE AND ACCRUED LIABILITIES

Accounts Payable and Accruals consist of the following:

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Trade Payables | $ 1,239,135 | $ - |
| Accrued Interest | 210,436 | - |
| Acrued Payroll | 116,144 | - |
| Accrued Merchant Account Fees | 3,456 | - |
| Total | $ 1,569,171 | $ - |

## 12.  CONVERTIBLE NOTE PAYABLE

In April 2018, the Company entered into a convertible note payable in the amount of $5,000,000 CAD with a maturity date of April 26, 2020 and bearing interest at 8%.  The note is convertible into 3,300,000 shares of Ignite stock. As of December 31, 2018, Ignite has accrued $132,816 in interest which is included in Accounts Payable & Accrued Liabilities.

Since the Company has issued the convertible note payable in a currency other than its functional currency, it does not meet the definition of equity under IAS 32 because a fixed amount of foreign currency is not a fixed amount of cash in functional currency terms.  For this reason, the conversion feature in a foreign currency convertible bond is classified as a derivable liability at fair value and the loan component of the convertible debt is recorded at amortized cost.

Management has chosen to not record a separate derivative liability because in its detailed valuation using the Black Scholes valuation model, the financial impact is immaterial to the financial statements.

## 13.  STOCKHOLDERS' EQUITY

Ignite's ownership is comprised of one class of equity shares. All shares have a voting right.

At December 31, 2017, Ignite had outstanding stock subscription receivables with two shareholders in the amount of $5,500,000 and $30,600,000, respectively.  The receivable balances incurred interest at 4%.  The related accrued interest of $1,283,500 was recorded as additional paid-in capital and was settled upon the stock repurchased discussed below.

On November 20, 2018, the Company entered into a Share Purchase Agreement with a shareholder.  This agreement allowed the Company to repurchase 8,500,000 shares at $3.728 per share.  The proceeds were used to retire the subscription receivable in the amount of $30,600,000 and pay in full the accrued interest earned on the subscription receivable in the amount of $1,088,000.

On November 20, 2018, the Company entered into a Share Purchase Agreement with a shareholder.  This agreement allowed the Company to repurchase 1,500,000 shares at $3.80 per share.  The proceeds were used to retire the subscription receivable in the amount of $5,500,000 and pay in full the accrued interest earned on the subscription receivable in the amount of $195,500.

On November 20, 2018, the Company entered into a Share Purchase Agreement with the Chairman.  This agreement allowed the Company to repurchase 2,500,000 shares at $4.00 per share.  The proceeds were used to retire the Note Receivable, Related Party in the amount of $8,514,340 and pay in full the accrued interest earned on the note receivable of $195,120.  The remainder of $1,290,540 was paid in cash.

14

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

## 14. INCOME TAXES

The difference between income tax expense (recovery) computed by applying the enacted income tax rate to earnings (losses) before taxes for the year and period ended December 31, 2018 and 2017, respectively, is as follows:

| | Year Ended December 31, 2018 | Period from Inception (December 28 2017) to December 31, 2017 |
|---|---|---|
| Loss from operations | $ (12,566,986) | $ - |
| Expected tax rate | 21% | 21% |
| | | |
| Expected tax benefit resulting from loss | 2,639,067 | - |
| Non-deductible expenses | (1,613) | - |
| Effect of unrecognized temporary differences | (2,637,454) | - |
| | $ - | $ - |

The unrecognized temporary differences of the Company are comprised of:

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Losses carried forward | $ 12,559,303 | $ - |

Management has chosen not to recognize the benefit of tax loss carryforwards accrued to the year ended December 31, 2018. The Company's position has considered all factors that may impact the utilization of the tax loss carryforwards in future periods, including the ability to generate sufficient taxable income during which the tax loss carryforwards remain deductible.

## 15. FINANCIAL RISK MANAGEMENT

The Company's financial instruments consist of cash, accounts receivable, accounts payable and loans payable. The carrying values of these financial instruments approximate their fair value at December 31, 2018.

The Company's risk exposures and the impact on the Company's financial instruments are summarized below.

### Fair value of financial assets and liabilities

IFRS 13 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities and the lowest priority to unobservable inputs. The three levels of the fair value hierarchy are as follows:

Level 1:      Unadjusted quoted prices in active markets for identical assets or liabilities,
Level 2:      Inputs other than quoted prices that are observable for the asset or liability either directly (i.e.: As prices) or indirectly (i.e.: derived from prices); and
Level 3:      Inputs that are not based on observable market data.

The fair value of cash is measured using Level 1 inputs. The carrying values of amounts due from affiliates, accounts payable and accrued liabilities, income taxes payable, and amounts due to related parties approximate their respective fair

15

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

values due to the short-term nature of these instruments.

The following table summarizes the Company's financial instruments at December 31, 2018:

| | Cash and Receivables | Other Financial Liabilities | Total |
|---|---|---|---|
| **Financial Assets:** | | | |
| Cash | $ 9,732,338 | $              - | $  9,732,338 |
| Accounts Receivable | $     188,762 | $              - | $     188,762 |
| Due from Related Parties | $         3,597 | $              - | $         3,597 |
| | | | |
| **Financial Liabilities:** | | | |
| Accounts Payable and Accrued Liabilities | $              - | $  1,569,171 | $  1,569,171 |
| Due to Related Parties | $              - | $  1,482,895 | $  1,482,895 |

## Financial instrument risk management

The Company's financial instrument exposures and the impact on its financial instruments are summarized below.

## Credit risk

Credit risk is the risk of loss associated with counterparty's inability to fulfill its payment obligations. The Company's credit risk is primarily attributable to cash, amounts due from related parties, and interest receivable.

Cash is held with reputable United States financial institutions and Ignite does not transact with hard currency. The Company's maximum credit risk exposure is equivalent to the carrying value of these instruments. Ignite has carefully evaluated its credit and collectability risk of all receivables. Furthermore, the Company has, and intends, to adhere strictly to the state statutes and regulations in its operations.

As at December 31, 2018, the Company's aging of receivables is calculated in Note 4.

## Liquidity risk

The Company's approach to managing liquidity risk is to ensure that it will have sufficient liquidity to meet liabilities when due. As at December 31, 2018, the Company's financial liabilities consist of accounts payable, notes payable, interest payable and accrued liabilities.   The Company manages liquidity risk by reviewing its capital requirements on an ongoing basis. The Company regards liquidity risk to be low as it has sufficient working capital to for at least the next twelve months, and it has access to additional capital.

## Interest rate risk

Interest rate risk is the risk that the fair value of future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Company holds cash in accounts with variable interest rates, and currently does not carry variable interest-bearing debt. It is management's opinion that the Company is not exposed to significant interest rate risk.

16

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

## 16.  LEASES

### Operating Leases

Minimum future rental payments under non-cancelable operating leases having remaining terms in excess of one year as of December 31, 2018 are as follows:

| | | |
|---|---|---|
| 2019 | | 2,820,000 |
| 2020-2023 | | 2,575,000 |
| Subsequent to 2023 | | - |
| **Total** | $ | 5,395,000 |

Rent expense under all operating leases during year ended December 31, 2018 was $1,670,985 and is included in marketing & promotion expenses on the statement of operations.  No rent expense was incurred in 2017.

## 17.  CAPITAL RISK MANAGEMENT

The Company defines capital as stockholders' equity. The Company manages its capital structure and makes adjustments in order to have the funds available to support its operating activities.

The Company's objective when managing capital is to safeguard the Company's ability to continue as a going concern in order to pursue the development of its business. The Company manages its capital structure and adjusts it in light of changes in economic conditions and the risk characteristics of the underlying assets. To maintain or adjust its capital structure, the Company may issue new equity instruments, new debt, or acquire and/or dispose of assets.

Management reviews its capital management approach on an ongoing basis. There were no changes in the Company's approach to capital management during the years presented. The Company is not subject to any externally imposed capital requirement.

## 18.  RELATED PARTY TRANSACTIONS

The Company has several transactions either directly with, or with entities owned by, the founder and Chairman.

The nature of these transactions include the Note Receivable, Related Party as described in Note 10.  In addition, the majority of the balances are derived from operational transactions in which the Chairman has incurred expenses on behalf of the Company and is seeking reimbursement.  The majority of these transactions initiate from use of the Chairman's high limit credit card on behalf of Company business.  Due to the early stage of the business, Ignite management is currently establishing short term credit and credit card facilities to minimize the level of related party transactions.

Ignite also leases the Patrick Lane Estate from 30 Meadowhawk Lane LLC, a related party.  This entity is owned by the Chairman.  The lease term is 24 months and expires June 4, 2020.  Monthly rent is $35,000 and is payable on demand by the landlord.

17

**IGNITE INTERNATIONAL, LTD.**
NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018
(EXPRESSED IN US DOLLARS)

A summary of the related party balances as of December 31, 2018 and December 31, 2017 are as follows:

**Due From Related Parties**

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Entities controlled by the Chairman | $ 3,597 | $ - |
| Total | $ 3,597 | $ - |

**Due To Related Parties**

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Chairman | $ 1,188,330 | $ - |
| Entities controlled by the Chairman | 294,565 | - |
| Total | $ 1,482,895 | $ - |

## 19.  CUSTOMER AND VENDOR CONCENTRATION

For the year ended December 31, 2018, the Company had one vendor that accounted for greater than 10% of total purchases.

## 20.  COMMITMENTS AND CONTINGENCIES

Management is unaware of any potential or threatened claims against the Company.

## 21.  SUBSEQUENT EVENTS

The Company has evaluated subsequent events through the date of this report and have not identified anything that would require disclosure.

18

E-1

**Schedule D – MD&A of Ignite International, Ltd.**

**IGNITE INTERNATIONAL, LTD.**
**Management's Discussion and Analysis**
**For the Twelve-month Period Ended December 31, 2018**

LEGAL_31075935.1

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

This Management's Discussion and Analysis ("MD&A"), prepared as at April 4, 2018, reviews the financial condition and results of operations of Ignite International, Ltd. ("Ignite" or the "Company") for the twelve-month period ended December 31, 2018 and all other material events up to the date of this report.

All dollar amounts referenced are denominated in United States dollars, unless otherwise noted.

The financial data included in the discussion provided in this report has been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and interpretations issued by the International Financial Reporting Interpretation Committee ("IFRIC").

The Company's certifying officers are responsible for ensuring that the audited financial statements and MD&A do not contain any untrue statement of material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made.  The Company's officers certify that the audited financial statements and MD&A fairly present, in all material respects, the financial condition, results of operations and cash flows, of the Company as the date hereof.

## DESCRIPTION AND OVERVIEW OF BUSINESS

Ignite was incorporated on December 28, 2017 in the United States in the state of Wyoming under the name "Vulcan Enterprises US, Ltd." On October 30, 2018, the Company changed its name to "Ignite International, Ltd." The Company is a privately held limited liability company and is taxed under US law as a C corporation.  Its fiscal year-end is December 31.

Ignite was created for the purposes of licensing and branding the Ignite brand, which was created by social media celebrity Dan Bilzerian ("Bilzerian"), to companies whose products align with Bilzerian's lifestyle and which can be marketed to his vast number of  social media followers. Health, diet, wellness and fitness are areas of Bilzerian's lifestyle that are an important part of Ignite's business strategy.  A significant part of this business strategy is focused on cannabis-based consumer products.

Ignite has licensed its brand to high quality licensed cannabis companies.  It has also partnered with ecommerce partners to fulfill and distribute Ignite branded cannabidiol ("CBD") consumer products across the United States.

## RECENT TRANSACTIONS

The recent transactions of the Company are as follows:

### 30 Meadowhawk Lane, LLC

30 Meadowhawk Lane, LLC ("Meadowhawk") is an entity controlled by Bilzerian, the Founder and Chairman of the Company.

During 2018, Meadowhawk issued the Company a secured promissory note (the "Meadowhawk Note") in the amount of $8,514,340 in respect of funds used by Meadowhawk for the purchase of a real estate property in Las Vegas, Nevada (the "Nevada Property").  The Meadowhawk Note is secured against the Nevada Property, bears interest at 5% per annum and is due on demand.  The Meadowhawk Note matures on June 5, 2020.  On maturity, the total principal and accrued interest is due.

Subsequent to the purchase of the Nevada Property, the Company entered into a two-year lease agreement with Meadowhawk for exclusive use of the Nevada Property.  The lease expires on June 4, 2020.  Monthly lease payments per the agreement are $35,000 (gross).

On November 20, 2018, the Company entered into a share repurchase agreement with Bilzerian.  This agreement allowed the Company to repurchase 2,500,000 shares of the Company at $4.00 per share.  The proceeds from the share repurchase agreement were used to retire the Meadowhawk Note in its entirety ($8,514,340) and accrued interest owing on the Meadowhawk Note totaling $195,120.  The remainder of the proceeds were paid to Bilzerian in cash.

-2-

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

**Purchase Option**

The Company purchased a three-year option on a leased property in Los Angeles with terms as follows:

(a)  If option is exercised by May 31, 2019, the purchase price is $60,000,000.
(b)  If option is exercised between June 1, 2019 and May 31, 2020, the purchase price is $62,500,000.
(c)  If option is exercised between June 1, 2020 and May 31, 2021, the purchase price is $65,000,000.

The Company expects to exercise or negotiate an extension of the option before it expires.

**Ignite International Brands, Ltd. (formerly Green Axis Capital Corp., formerly ALQ Gold Corp.)**

On October 12, 2018, the Company announced that it had entered into a share exchange agreement (the "Share Exchange Agreement") with ALQ Gold Corp., which subsequently changed its name to Green Axis Capital Corp. and then to Ignite International Brands, Ltd. ("Ignite Canada"), and two of the Company's shareholders whereby Ignite Canada agreed to issue 50,700,890 common shares on a post-consolidated basis to the two Ignite shareholders in exchange for 5,000,000 common shares of Ignite, representing approximately 5% of the issued and outstanding common shares of Ignite (the "First Share Exchange"). The First Share Exchange closed on November 23, 2018.

On September 29, 2018, the Company and Ignite Canada entered into their first trademark & copyright license agreement (the "License Agreement"), which became effective on closing of the First Share Exchange.

Pursuant to the License Agreement, the Company agreed to grant to Ignite Canada:

(a)      a non-exclusive royalty bearing license to use certain trademarks, trade names, related intellectual property and copyrights (the "Trademarks and Copyrights") in all countries of the world, excluding the United States, in connection with certain products that contain CBD and where the percentage content of tetrahydrocannabinol ("THC") is less than 10%;

(b)      an exclusive royalty bearing license to use the Trademarks and Copyrights in Canada, excluding British Columbia, in connection with certain products containing THC but not CBD; and

(c)      an exclusive royalty bearing license to use the Trademarks and Copyrights in Canada, excluding British Columbia, in connection with certain products containing a combination of THC and CBD, provided that the THC content is 10% or more (collectively, the "License").

The License allows Ignite Canada to enter manufacturing agreements and develop certain approved Ignite-branded products that it has agreed to market, promote, sell and distribute with the oversight of the Company's operations team.

Ignite Canada has agreed to pay the Company on a monthly basis 10% of the aggregate total gross revenue received by Ignite Canada, directly or indirectly, from the sale of products under the License, commencing with the first commercial sale of any product. In the case of a branded dispensary, using the Ignite name and/or marks, the 10% royalty will extend to all gross sales of all products in the dispensary, whether Ignite branded or otherwise.

Ignite Canada has also agreed to pay yearly minimum payments, applicable against royalties (in US Dollars on a sliding scale) in the amount of $2,000,000 at the end of year 1 and $8,000,000 at the end of year 10. Ignite Canada has also agreed to apply, on a monthly basis, at least 2% of the gross revenue received for all products in the previous month on marketing, which may be managed by Ignite Canada (with the Company's approval) or remitted to the Company to offset the Company's marketing and advertising expenditures.

The License Agreement and the License granted thereunder commenced on November 23, 2018, and will continue for an initial term of 10 years. Upon the expiration of the initial term, The Company and Ignite

-3-

LEGAL_31075935.1

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

Canada will have the opportunity to renegotiate in good faith.  Should the parties fail to reach a mutually satisfactory agreement within 40 days of the end of such 10-year period or such other period as may be mutually agreed by the parties in writing, then the License Agreement will extend for a further 5-year fixed term commencing from the end of such 10-year period. During this 5-year term, the terms and conditions of the License Agreement will continue, with the exception of the foregoing yearly minimum payments whereby Ignite Canada agreed, for each of the 5 years, to make the yearly minimum royalty payments, applicable against royalties, set for the amount payable in the final year of the initial term.

## SELECTED ANNUAL INFORMATION

The following table presents selected financial data from the indicated periods' annual financial statements of the Company. The selected financial data set out below may not be indicative of the Company's future performance.

| | Year Ended December 31, 2018 | Period from Inception (December 28, 2017) to December 31, 2017 |
|---|---|---|
| Revenue | $1,890,013 | $nil |
| Cost of Goods Sold | $1,344,697 | $nil |
| Gross Profit | $545,316 | $nil |
| Total Expenses | $13,188,444 | $nil |
| Operating Loss | $(12,643,128) | $nil |
| Total Non-Operating Income | $76,142 | $nil |
| Net Loss | $(12,566,986) | $nil |
| Operating Loss per Share (diluted and undiluted) | $(0.14) | $nil |
| Net Loss per Share (diluted and undiluted) | $(0.14) | $nil |
| Total Assets | $16,514,078 | $nil |
| Total Non-Current Liabilities | $3,881,000 | $nil |
| Dividends per Share | $nil | $nil |

## RESULTS OF OPERATIONS

*Loss for the period*

There was no operating activity for the same period ended December 31, 2017 as the Company was legally incorporated on December 28, 2017. Transactions were limited to activities related to the incorporation of the Company.

The Company reported net losses and comprehensive losses of $(12,566.986) for the twelve-month period ended December 31, 2018. The Company reported net losses and comprehensive losses of $(5,733,050) for the three-month period ended December 31, 2018.

In order to ensure that the Ignite brand continues to be enhanced and protected, the Company has incurred significant expenses in connection with Bilzerian's lifestyle which are necessary for maintaining the brand's image.

LEGAL_31075935.1

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

For the twelve-month period ended December 31, 2018, the Company incurred $1,948,406 in employee compensation costs. These costs relate to the burdened payroll costs for full-time employees operating at the Company's headquarters in Los Angeles, California. These employees' primary responsibilities include corporate and business development, marketing, public relations, and supply chain management in addition to contract maintenance associated with licensing agreements entered with strategic wholesale partners.

General and administrative costs totaled $1,354,775 for the twelve-month period ended December 31, 2018. These costs included travel expenses, contract labor, information technology maintenance, communications, and miscellaneous office supplies and equipment.

Professional fees were $1,576,566 for the twelve-month period ended December 31, 2018. These costs were associated with legal, financial and industry specific advisory costs the Company incurred over the course of the start up of its operations in fiscal 2018.

The Company incurred sales and marketing costs of $8,282,505 for the twelve-month period ended December 31, 2018. These costs included value-added initiatives intended to develop and strengthen the Ignite brand globally through various forms of media. These costs also included facility rents, maintenance and utilities for two leased properties, located in Los Angeles, California and Las Vegas, Nevada. The properties are utilized by the Company to house its US head office operations in Los Angeles in addition to hosting brand related initiatives supporting the Ignite brand. The Company will continue to invest in these types of initiatives based on management's assessment of the best way to maximizes the value of the brand into all global markets.

The Company recorded $25,892 in depreciation costs associated with leaseholds maintained at the Los Angeles and Las Vegas facilities.

The Company incurred total interest expense of $210,436 for the twelve-month period ended December 31, 2018. Interest expense was related to accrued interest owing on the convertible note payable to Ignite Canada. Interest income of $286,578 realized over the same period related to accrued interest owing on the Meadowhawk Note in addition to accrued interest owing by contractual arrangement on stock subscriptions receivable.

*Total Assets*

Total assets of the Company were $16,514,078 as at December 31, 2018.

The change in total assets since formation is largely the result of changes in the cash balances of the Company tied to various investments made by the Company during this period in addition to start-up operating expenses incurred over the course of its first fiscal year.

*Total liabilities*

As at December 31, 2018, the current liabilities of the Company were $3,052,066 represented by trade payables and balances due to related parties.

During the period ended December 31, 2018, the Company commenced sales of its cannabis related products and, as such, executed payables terms with key suppliers within the industry. Trade payables owed by way of contractual terms with these key suppliers totaled $1,569,171 as at December 31, 2018. Related party balances on hand as of December 31, 2018 in the amount of $1,482,895 are intended to be settled subsequent to the reporting period ended.

## SUMMARY OF QUARTERLY RESULTS

The following table summarizes information derived from the Company's financial statements for each of the eight most recently completed quarters:

IGNITE INTERNATIONAL, LTD.
MANAGEMENT'S DISCUSSION AND ANALYSIS
Twelve-month Period Ended December 31, 2018

| Quarter Ended | Revenues | Operating income (loss) | Operating income (loss) per Share (diluted and undiluted) | Net income (loss) | Net Income (loss) per Share (diluted and undiluted) |
|---|---|---|---|---|---|
| December 31, 2018 | $1,476,529 | $(5,837,925) | $(0.07) | $(5,733,048) | $(0.07) |
| September 30, 2018 | $413,353 | $(4,483,000) | $(0.05) | $(5,263,298) | $(0.05) |
| June 30, 2018 | $131 | $(1,528,598) | $(0.02) | $(1,138,035) | $(0.02) |
| March 31, 2018 | $nil | $(793,605) | $(0.01) | $(432,605) | $(0.01) |
| December 31, 2017[1] | $nil | $nil | $nil | $nil | $nil |

(1) The Company was incorporated on December 28, 2017

The Company incurred material operating costs relating to the start-up of its operations in fiscal 2018 including larger scale expenses related to brand awareness initiatives. The Company has started to produce revenues from sales of its Ignite branded products, and will continue to diligently invest in marketing initiatives which may negatively impact its profitability even as sales continue to grow.

## LIQUIDITY AND CAPITAL RESOURCES

The Company did not generate any cash flow from operations. The Company's financial success is reliant on management's ability to monetize the Ignite brand through sales of Ignite branded products. Future cash flows from operations will be dependent on maximizing the potential of these sales opportunities.

In order to finance the acquisition of assets or a business and to fund corporate overhead, the Company will be dependent on investor, shareholder and lender (key stakeholders) sentiment remaining positive towards cannabis companies, and towards Ignite in particular, so that funds can be raised, as required, through the most efficient means of financing.

Many factors have an influence on key stakeholder sentiment, including a positive and supportive regulatory climate for the cannabis industry, a company's track record and the experience in executing its business model within a dynamic cannabis sector, and the caliber of a company's management. There is no certainty that appropriate funding will be available at the times required and in the amounts required to fund the Company's activities. The Company's financial statements do not include any adjustments that might result from these uncertainties.

The Company has, in the past, financed its activities through equity financings. It is anticipated that the Company can raise the necessary capital to secure and finance the acquisition of additional assets, invest in business opportunities, and invest in funding recurring working capital and corporate overhead as the business continues to scale.

Debt financing has been used in a limited capacity, as outlined below, to fund start-up operating expenses. The Company has no current plans to use debt as a key part of its capital structure unless a particular opportunity is best suited to this form of financing.

On April 24, 2018, the Company entered into an agreement with Ignite Canada pursuant to which Ignite Canada provided a $3,881,000 loan to the Company in exchange for an unsecured, convertible promissory note, (the "Convertible Note"). The Convertible Note matures twenty-four (24) months following the date of issuance and bears interest at 8% per annum. The Convertible Note is convertible into up to 3.3% of common shares of the Company. Both the Company and Ignite Canada have agreed to negotiate settlement of the Convertible Note subsequent to the end of the reporting period.

LEGAL_31075935.1

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

There are no other sources of financing that have been arranged by the Company.

The Company's working capital for the period ended December 31, 2018 was negligible given that the Company had just recently commenced sales of its Ignite branded products via strategic wholesale channels in addition to strategic outlays included in the Company's current assets.

The Company has no commitments for capital expenditures.

*Cash and Financial Conditions*

The Company had a cash balance of $9,732,338 as at December 31, 2018.

The Company does not have any unused lines of credit or other arrangements in place to borrow funds and has no off-balance sheet arrangements.

Ignite does not use hedges or other financial derivatives.

*Financing Activities*

At December 31, 2017, the Company had outstanding stock subscription receivables with two shareholders in the amount of $5,500,000 and $30,600,000, respectively.  The receivable balances incurred interest at 4%. The related accrued interest of $1,283,500 was recorded as additional paid-in capital and was settled upon the stock repurchase transactions discussed below.

On November 20, 2018, the Company entered into a share purchase agreement with a shareholder.  This agreement allowed the Company to repurchase 8,500,000 shares at $3.728 per share.  The proceeds were used to retire the subscription receivable in the amount of $30,600,000 and pay in full the accrued interest owing on the subscription receivable int eh amount of $1,088,000.

On November 20, 2018, the Company entered into a share purchase agreement with a shareholder.  This agreement allowed the Company to repurchase 1,500,000 shares at $3.80 per share.  The proceeds were used to retire the subscription receivable in the amount of $5,500,000 and pay in full the accrued interest owing on the subscription receivable in the amount of $195,500.

On November 20, 2018, the Company entered into a share repurchase agreement with Bilzerian.  This agreement allowed the Company to repurchase 2,500,000 shares of the Company at $4.00 per share.  The proceeds from the share repurchase agreement were used to retire the Meadowhawk Note in its entirety ($8,514,340) and accrued interest owing on the Meadowhawk Note totaling $195,120.  The remainder of the proceeds were paid to Bilzerian in cash.

The Company did not incur any material cash costs associated with the transactions that provided the above noted capital contributions.

No warrants or options were exercised during the twelve-month period ended December 31, 2018.

*Investing Activities*

The Company invested $347,881 in leaseholds associated with the leased Las Vegas and Los Angeles properties. In addition, the Company invested $180,267 in select intangible assets including a trademark and web domain names.

**SECURITIES OUTSTANDING**

As at December 31, 2017, the Company had 100,116,000 common shares issued and outstanding.

During the period ended December 31, 2018, the Company repurchased 12,500,000 common shares bringing the total issued and outstanding common shares as of the date of this MD&A to 87,616,000.

LEGAL_31075935.1

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

**OUTLOOK**

The Company's ability to continue in the normal course of operations is dependent on its ability to execute on its projected business plan through fiscal 2021 in addition to being able to raise financing when required.

Management estimates there is sufficient working capital, including cash, as at December 31, 2018, to continue current operations for the next twelve months and it has access to additional capital.

The Company is currently largely dependent upon external financings to fund activities.  In order to search for new business opportunities and fund corporate overhead, the Company will spend its existing working capital, including cash, and raise additional funds as needed.  The Company will continue to assess new business opportunities and seek to acquire new business assets to continue to maximize shareholder returns if it has adequate financial resources to do so.  Management reviews its capital management approach on an ongoing basis and believes that this approach, given the relative size of the Company, is reasonable.  Management and the Board of Directors continuously review and examine business proposals for the Company and conduct their due diligence in respect of the same.

**OFF-BALANCE SHEET ARRANGEMENTS**

At the date of this report, the Company had no off-balance sheet arrangements.

**TRANSACTIONS WITH RELATED PARTIES**

The Company has several transactions either directly with, or with entities owned by, the Founder and Chairman of the Company, Bilzerian.

The receivable balances due from Bilzerian's entities (Due from Related Parties) related to chargebacks for administrative services rendered by the Company.

The payable balances due to Bilzerian's entities (Due to Related Parties) are derived from operational transactions in which Bilzerian incurred business expenses on behalf of the Company and is seeking reimbursement.  Examples of the types of business expenses include general consumables, fixtures, and various travel costs related to the Company's sales and marketing initiatives. The Company leveraged Bilzerian's higher limit credit card at the time the expenses were incurred given the restrictions the Company faces, from a treasury perspective, operating in the current US market space. The Company is actively seeking a treasury arrangement that permits it to use its own credit facilities as it does not intend to lever Bilzerian's credit facilities moving forward.  The Company's intention is to repay the entire balance of the liability by its subsequent fiscal year end.

Ignite also leases the Nevada Property from Meadowhawk, a related party owned by Bilzerian.  The lease term is 24 months and expires June 4, 2020.  Monthly rent is $35,000 and is payable on demand by Meadowhawk.

A summary of the related party balances as of December 31, 2018 and December 31, 2017 follows:

LEGAL_31075935.1

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

**Due From Related Parties**

|  | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| Entities controlled by the Chairman | $ | 3,597 | $ | - |
| Total | $ | 3,597 | $ | - |

**Due To Related Parties**

|  | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| Chairman | $ | 1,188,330 | $ | - |
| Entities controlled by the Chairman |  | 294,565 |  | - |
| Total | $ | 1,482,895 | $ | - |

As at December 31, 2018, $nil was included in trade accounts receivable or accounts payable for fees owed to related parties. All related party balances have been separately disclosed in the Company's financial statements.

**PROPOSED TRANSACTIONS**

On February 28, 2019, the Company entered into a letter agreement with Ignite Canada pursuant to which Ignite Canada agreed to acquire all of the outstanding shares of the Company not already owned by Ignite Canada in exchange for securities of Ignite Canada (the "Proposed Transaction"). The Proposed Transaction will constitute a change of business of Ignite Canada from an investment company to a vertically-integrated company operating in the cannabis industry and a reverse take-over under the rules of the Canadian Securities Exchange (the "CSE").

On April 9, 2019, the Company, Ignite Canada, certain subsidiaries of Ignite Canada and the shareholders of the Company entered into a definitive business combination agreement with respect to the Proposed Transaction (the "Definitive Agreement").

Pursuant to the terms of the Definitive Agreement, Ignite Canada will create a new class of Proportionate Voting Shares and rename its current class of CSE-listed common shares as Subordinate Voting Shares. The Proportionate Voting Shares and Subordinate Voting Shares will have the same rights, be equal in all respects and will be treated by Ignite Canada as if they were shares of one class only. Proportionate Voting Shares will at any time, at the option of the holder, and subject to certain conditions to ensure that Ignite Canada remains a "foreign private issuer" (as such term is defined in Rule 405 of Regulation C under the U.S. Securities Act of 1933 (the "SEC Rules")), be convertible into Subordinate Voting Shares at a ratio of 200 Subordinate Voting Shares for each Proportionate Voting Share. Prior to conversion, each Proportionate Voting Share will carry 200 votes per share (compared to one vote per Subordinate Voting Share). The Proportionate Voting Shares are being created in order for Ignite Canada to meet the definition of a "foreign private issuer" under the SEC Rules.

The Definitive Agreement provides that Ignite Canada will acquire all of the Ignite shares it does not already hold in exchange for 756,257 Proportionate Voting Shares and 67,681,000 Subordinate Voting Shares, which will result in Ignite becoming a wholly-owned subsidiary of Ignite Canada.

Pursuant to the Proposed Transaction, the License Agreement will be terminated and two newly-formed subsidiaries of Ignite Canada will enter into new license agreements with the Company.

The Company and Ignite Canada have also agreed to pursue a brokered private placement, to be led by broker(s) selected by the Company, for gross proceeds currently expected to be CAD$50 million.

The Proposed Transaction is subject to customary conditions, including shareholder and CSE approval, and is expected to be completed by way of a plan of arrangement on or before May 30, 2019.

LEGAL_31075935.1

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

## CRITICAL ACCOUNTING ESTIMATES AND JUDGEMENTS

The preparation of financial statements in conformity with IFRS requires the Company's management to make judgments, estimates and assumptions about future events that affect the amounts reported in the financial statements and related notes to the financial statements. Although these estimates are based on management's best knowledge of the amount, event or actions, actual results may differ from those estimates. Estimates and judgments are continuously evaluated and are based on management's experience and other factors, including expectations of future events that are believed to be reasonable.

Revisions to accounting estimates are recognized in the period in which the estimates are revised and in any future periods affected. Significant areas of estimation uncertainty and judgment considered by management in preparing these financial statements are as follows:

*Estimated useful lives and depreciation of property and equipment*

Depreciation of property and equipment is dependent upon estimates of useful lives, which are determined through the exercise of judgment. The assessment of any impairment of these assets is dependent upon estimates of recoverable amounts that take into account factors such as economic and market conditions and the useful lives of assets.

*Impairment of long-lived assets*

Long-lived assets, including property and equipment, and intangible assets, are reviewed for impairment at each statement of financial position date or whenever events or changes in circumstances indicate that the carrying amount of an asset exceeds its recoverable amount. For the purpose of impairment testing, assets that cannot be tested individually are grouped together into the smallest group of assets that generates cash inflows from continuing use that are largely independent of the cash inflows of other assets or group of assets ("CGU"). The recoverable amount of an asset or a CGU is the higher of its fair value, less costs to sell, and its value in use. If the carrying amount of an asset exceeds its recoverable amount, an impairment charge is recognized immediately in profit or loss by the amount by which the carrying amount of the asset exceeds the recoverable amount. Where an impairment loss subsequently reverses, the carrying amount of the asset is increased to the lesser of the revised estimate of recoverable amount, or the carrying amount that would have been recorded had no impairment loss been recognized previously.

## RECENT ACCOUNTING PRONOUNCEMENTS

**New standards and interpretations adopted**

Certain new standards, interpretations, amendments and improvements to existing standards were issued by the IASB or IFRIC.  The new standards adopted by the Company are:

- IFRS 9*, Financial Instruments*, which introduces new requirements for (1) the classification and measurement of financial assets and financial liabilities, (2) impairment of financial assets and liabilities, and (3) general hedge accounting. IFRS 9 became effective from January 1, 2018. IFRS 9 introduces new classification and measurement models for financial assets, using a single approach to determine whether a financial asset is measured at amortized cost or at fair value. The accounting for financial liabilities continues to be classified and measured in accordance with IAS 39, except that the portion of a change of fair value relating to the entity's own credit risk is presented in other comprehensive income unless it would create an accounting mismatch. Accounting for hedges under IFRS 9 provides a new and simpler approach that is intended to more closely align with risk management activities undertaken by entities when hedging financial and non-financial risks. The adoption of IFRS 9 did not have a material effect on the financial statements.

- IFRS 15, *Revenue from Contracts with Customers*, which establishes a comprehensive model to be used in accounting for revenue arising from contracts with customers. IFRS 15 has superseded all prior guidance on the recognition of revenue. The core principle of the new standard is that an entity must recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The standard requires that (1)

-10-

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

contracts be identified, together with the separate performance obligations within the contract, (2) the transaction price be determined, adjusted for the time value of money excluding credit risk, (3) the transaction price be allocated to the separate performance obligations on a basis of relative stand-alone selling price of each distinct good or service, or estimation approach if no distinct observable prices exist, and (4) revenue be recognized when each performance obligation is satisfied. For goods, the performance obligation would be satisfied when the customer obtains control of the goods.

The Company does not expect a significant impact from adoption of the above standards.

**New standards and interpretations not yet adopted**

The following have not yet been adopted by the Company:

- IFRS 16, *Leases*, has not been adopted by the Company, as it becomes mandatorily effective for annual periods beginning on or after January 1, 2019, and the Company has chosen not to adopt it early. For lessees, IFRS 16 will eliminate the classifications of operating leases and finance leases. Subject to exceptions, a so-called right-of-use asset will be capitalized in the balance sheet measured as the present value of the unavoidable future lease payments to be made over the lease term. For short-term leases of 12 months or less and leases of low-value assets (such as personal computers and small office furniture), an accounting policy choice will exist under which either a right-of-use asset is recognized, or lease payments are charged to profit or loss as incurred. A liability corresponding to the capitalized lease will also be recognized. Straight-line operating lease expense recognition will be replaced by a depreciation charge for the leased asset and interest expense on the recognized lease liability. Lessor accounting under IFRS 16 has not been significantly changed from existing standards. The Company is in the process of evaluating IFRS 16.

## FINANCIAL INSTRUMENTS AND RELATED RISKS

### Categories of Financial Assets and Financial Liabilities

### Financial Instruments

The Company has adopted IFRS 9, which replaced IAS 39, *Financial Instruments: Recognition and Measurement*.

The revised guidance changed the classification and measurement of financial assets and liabilities. Under IFRS 9, financial assets are classified and measured based on the business model in which they are held and the characteristics of their contractual cash flows. It contains three primary measurement categories for financial assets: measured at amortized cost, fair value through profit and loss ("FVTPL"), and fair value through other comprehensive income ("FVTOCI"). Presently, the Company's only financial instruments are in the form of cash, accounts receivable, accounts payable and accrued liabilities and notes payable. Hence, the financial assets held by the Company are measured at amortized cost.

The Company determines classification of financial assets at initial recognition. The Company accounting policy in respect to its financial instruments is as follows:

(i)     Financial assets - are classified and measured at FVTPL unless they meet the following criteria for amortized cost:

• The Company plans to hold the financial assets in order to collect contractual cash flows; and
• Payments received on the financial assets are solely payments of principal and interest on the principal amount outstanding.

(ii)     Financial liabilities - non-derivative financial liabilities are measured at amortized cost unless they have been designated as FVTPL. Derivative liabilities are initially measured at FVTPL, with subsequent changes in fair market value recognized in the statement of operations.

Financial instruments recorded at fair value are classified using a fair value hierarchy that reflects the significance of inputs used in making the measurements. The hierarchy is summarized as follows:

-11-

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

- Level 1 quoted prices (unadjusted) in active markets for identical assets or liabilities
- Level 2 inputs that are observable for the asset or liability, either directly (prices) for similar assets or liabilities in active markets or indirectly (derived from prices) for identical assets or liabilities in markets with insufficient volume or infrequent transactions
- Level 3 inputs for assets or liabilities not based upon observable market data

IFRS 13 establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities and the lowest priority to unobservable inputs. The three levels of the fair value hierarchy are as follows:

Level 1:    Unadjusted quoted prices in active markets for identical assets or liabilities;
Level 2:    Inputs other than quoted prices that are observable for the asset or liability either directly (i.e. as prices) or indirectly (i.e. derived from prices); and
Level 3:    Inputs that are not based on observable market data.

**Financial Risk Management**

The Company's risk exposures and the impact on the Company's financial instruments are summarized below:

*Credit risk*

Credit risk is the risk of loss associated with counterparty's inability to fulfill its payment obligations. The Company's credit risk is primarily attributable to cash, amounts due from related parties, and interest receivable.

Cash is held with reputable United States financial institutions and Ignite does not transact with hard currency. The Company's maximum credit risk exposure is equivalent to the carrying value of these instruments. Ignite has carefully evaluated its credit and collectability risk of all receivables.  Furthermore, the Company has, and intends, to adhere strictly to the state statutes and regulations in its operations.

As at December 31, 2018, the Company's aging of receivables is calculated as follows:

*Liquidity risk*

| | | Neither Past Due Nor Impaired | Past Due But Not Impaired | | |
| | Total | | < 90 Days | 91-180 Days | > 180 Days |
|---|---|---|---|---|---|
| December 31, 2018 | $ 188,762 | 188,762 | - | - | - |
| December 31, 2017 | $ - | - | - | - | - |

The Company's approach to managing liquidity risk is to ensure that it will have sufficient liquidity to meet liabilities when due.

As at December 31, 2018, the Company's financial liabilities consist of accounts payable, notes payable, interest payable and accrued liabilities. The Company manages liquidity risk by reviewing its capital requirements on an ongoing basis. The Company regards liquidity risk to be low as it has sufficient working capital, including cash, for at least the next twelve months and it has access to additional capital.

*Market risk*

Market risk is the risk of loss that may arise from changes in market factors such as interest rates and commodity and equity prices.

a)      Interest rate risk

-12-

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

Interest rate risk is the risk that the fair value of future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Company holds cash in accounts with variable interest rates, and currently does not carry variable interest-bearing debt. It is management's opinion that the Company is not exposed to significant interest rate risk.

*Operations in cannabis-based businesses*

The Company recognizes there are certain risks associated with its operations in as a cannabis-based business.

Marijuana is classified as a Schedule I controlled substance under US federal law and as such, marijuana related practices or activities, including the cultivation, possession or distribution of marijuana, are illegal under US federal law.  There remains a conflict between state and federal law related to marijuana with certain US states permitting its use and sale within a regulatory framework.

The US Department of Justice had recently rescinded the Cole memo which had given guidance that it will generally not enforce federal prohibitions on marijuana in US states that have authorized this conduct so long as the US state has implemented a strong and effective regulatory program.  Future enforcement decisions will now be up to the US Attorneys in their respective states, who are to decide which cases to prosecute by weighing all relevant considerations, including federal law enforcement priorities set by the Attorney-General, the seriousness of the crime, the deterrent effect of federal prosecution and the cumulative impact of particular crimes on the community.

The Company considers it unlikely that local federal prosecutors will take action in those states where the legalization of cannabis has been implemented as a result of a majority vote of the state's electorate or by an act of the respective state's legislature.  There may be action taken against those who are acting outside state regulations, and this type of enforcement is only beneficial to those businesses operating within local regulations.

The Company conducts extensive due diligence as it continues to scale the business in the United States and ensures strict compliance of state policies governing this industry.

The Company is unaware of any non-compliance issues associated with its current operations as set out by the state of Nevada and California, being the two states in which it currently conducts its business.

## FINANCIAL RISK FACTORS

The Company's financial instruments consist of cash, accounts receivable, amounts due from related parties, accounts payable and accrued liabilities, amounts due to affiliates and notes payable.

The fair value of cash is measured using Level 1 inputs. The carrying values of amounts due from related parties, accounts payable and accrued liabilities, and amounts due to related parties approximate their respective fair values due to the short-term nature of these instruments.

## FORWARD-LOOKING STATEMENTS

Certain information set forth in this document includes forward-looking statements.  By their nature, forward-looking statements are subject to numerous risks and uncertainties, some of which are beyond Ignite's control, including but not limited to: the ability to complete the Proposed Transaction as proposed or at all; general economic, business and regulatory conditions related to the cannabis industry; cash flow projections; currency fluctuations; risks relating to our ability to obtain adequate financing for future activities; the nature of our future activities; and other general market and industry conditions.

Although the Company has attempted to identify important factors that could cause actual results to differ materially from those contained in forward-looking statements, there may be other factors that cause results not to be as anticipated, estimated or intended. The Company's actual results, programs and financial position could differ materially from those expressed in or implied by these forward-looking statements and accordingly, no assurance can be given that the events anticipated by the forward-looking statements will transpire or occur, or if any of them do so, what benefits Ignite will derive from them.

LEGAL_31075935.1

**IGNITE INTERNATIONAL, LTD.**
**MANAGEMENT'S DISCUSSION AND ANALYSIS**
**Twelve-month Period Ended December 31, 2018**

Readers are cautioned that the assumptions used in the preparation of such information, although considered reasonable at the time of preparation, may prove to be imprecise and as such, undue reliance should not be placed on forward-looking statements.

The Company believes that the expectations reflected in these forward-looking statements are reasonable, but no assurance can be given that these expectations will prove to be correct and as such forward looking statements contained into this report should not be relied upon.  Actual results and developments are likely to differ, and may differ materially, from those expressed or implied by the forward-looking statements contained in this report.  Such statements are based on a number of assumptions which may prove to be incorrect, including, but not limited to assumptions about general business and economic conditions and the availability of financing for the Company.

**ADDITIONAL SOURCES OF INFORMATION**

There are no relevant sources of additional information.

LEGAL_31075935.1

**Schedule E – Pro-Forma Consolidated Financial Statements of Ignite International Brands, Ltd.**

**IGNITE INTERNATIONAL BRANDS, LTD**

**Pro Forma Consolidated Statement of Financial Position**

**As at December 31, 2018**

**(Unaudited)**

**IGNITE INTERNATIONAL BRANDS, LTD.**
Pro Forma Consolidated Statement of Financial Position
(Unaudited)
(Expressed in Canadian Dollars)

| | Ignite International as at December 31, 2018 | Ignite US as at December 31, 2018 | Notes | Pro Forma Adjustments | Pro Forma Consolidated |
|---|---|---|---|---|---|
| | ($) | ($) | | ($) | ($) |
| **ASSETS** | | | | | |
| **Current assets** | | | | | |
| Cash | 5,414,949 | 13,222,732 | 4(a) | 25,800,000 | 43,937,681 |
| | | | 4(b) | (500,000) | |
| Receivables | 222,708 | 256,459 | | - | 479,167 |
| Advance | 12,321 | - | | - | 12,321 |
| Prepaid expenses | 118,062 | 1,463,254 | | - | 1,581,316 |
| Due from related parties | - | 4,887 | | - | 4,887 |
| Current portion of promissory notes | 1,910,079 | - | | - | 1,910,079 |
| | **7,678,119** | **14,947,332** | | **25,300,000** | **47,925,451** |
| | | | | | |
| **Investment** | 3,224,246 | - | 4(b) | (1,724,246) | 1,500,000 |
| **Promissory notes** | 5,272,877 | - | 4(c) | (5,272,877) | - |
| **Property and Equipment** | 45,974 | 438,598 | | - | 484,572 |
| **Intangible assets** | - | 243,786 | | - | 243,786 |
| **Other assets** | - | 6,806,950 | | - | 6,806,950 |
| **Goodwill** | - | - | 4(b) | 16,975,831 | 16,975,831 |
| | **16,221,216** | **22,436,666** | | **35,278,708** | **73,936,590** |
| | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| **Current liabilities** | | | | | |
| Accounts payable and accrued liabilities | 343,960 | 2,131,937 | | - | 2,475,897 |
| Subscriptions received in advance | 53,204 | - | | - | 53,204 |
| Due to related parties | - | 2,014,719 | | - | 2,014,719 |
| | **397,164** | **4,146,656** | | **-** | **4,543,820** |
| | | | | | |
| **Convertible note payable** | - | 5,272,877 | 4(c) | (5,272,877) | - |
| | **397,164** | **9,419,533** | | **(5,272,877)** | **4,543,820** |
| **Shareholders' equity** | | | | | |
| Share capital | 35,644,654 | 30,091,128 | 4(a) | 25,800,000 | 86,966,765 |
| | | | 4(b) | 31,075,637 | |
| | | | 4(b) | (35,644,654) | |
| Reserves | 1,717,799 | - | 4(b) | (1,717,799) | - |
| Deficit | (21,538,401) | (17,073,995) | 4(b) | 21,538,401 | (17,573,995) |
| | | | 4(b) | (500,000) | |
| | **15,824,052** | **13,017,133** | | **40,551,585** | **69,392,770** |
| | **16,221,216** | **22,436,666** | | **35,278,708** | **73,936,590** |

2

**IGNITE INTERNATIONAL BRANDS, LTD.**
Pro Forma Consolidated Statement of Operations
(Unaudited)
(Expressed in Canadian Dollars)

| | Ignite International 10 months ended December 31, 2018 | Ignite US 12 months ended December 31, 2018 | Notes | Pro Forma Adjustments | Pro Forma Consolidated |
|---|---|---|---|---|---|
| | ($) | ($) | | ($) | ($) |
| **Revenue** | - | 2,567,845 | | - | 2,567,845 |
| **Cost of Sales** | - | (1,826,957) | | - | (1,826,957) |
| | - | 740,888 | | - | 740,888 |
| **Expenses** | | | | | |
| Advertising | 387,871 | 11,253,340 | | - | 11,641,211 |
| Depreciation | 2,554 | 35,178 | | - | 37,732 |
| Insurance | 8,608 | - | | | 8,608 |
| Management and consulting fees | 1,199,336 | - | | - | 1,199,336 |
| Employee compensation | - | 2,647,180 | | - | 2,647,180 |
| Office costs | 42,451 | - | | - | 42,451 |
| Professional fees | 868,687 | 2,141,984 | | - | 3,010,671 |
| Regulatory and transfer agent fees | 43,272 | - | | - | 43,272 |
| General and administrative | - | 1,840,650 | | | 1,840,650 |
| Rent | 63,149 | - | | - | 63,149 |
| Share based compensation | 820,000 | - | | - | 820,000 |
| Travel | 169,439 | - | | | 169,439 |
| | (3,605,367) | (17,918,332) | | - | (21,523,699) |
| Interest expense and bank charges | - | (285,907) | | - | (285,907) |
| Foreign exchange | 37,515 | - | | - | 37,515 |
| Interest income | 336,350 | 389,356 | | - | 725,706 |
| Transaction costs | - | - | 4(b) | (500,000) | (500,000) |
| | 373,865 | 103,449 | | (500,000) | (22,686) |
| **Loss and comprehensive loss for the period** | (3,231,502) | (17,073,995) | | (500,000) | (20,805,497) |

3

**IGNITE INTERNATIONAL BRANDS, LTD**
Notes to the Pro Forma Financial Statements
(Unaudited)
(Expressed in Canadian Dollars)

## NOTE 1 – BASIS OF PRESENTATION

Ignite International Brands (the "Company" or "Ignite International") is a publicly traded company currently listed on the Canadian Securities Exchange ("CSE"), trading under the symbol "BILZ".  The Company's head office is located at 11 Cidermill Avenue, Vaughan, Ontario, L4K 4B6. The Company is a reporting issuer in British Columbia, Alberta and Ontario.

On April 3, 2019, the Company entered into an agreement to complete a reverse takeover transaction by way of a share exchange with certain shareholders of Ignite International, Ltd. ("Ignite US"), a privately held company incorporated under the laws of the state of Wyoming (referred to below in Note 3 as the Proposed Transactions).
The unaudited pro forma consolidated financial statements of the Company have been compiled from the following information and should be read in conjunction with the following:

1.      The audited financial statements of Ignite International as at and for the 10 months ended December 31, 2018;
2.      The audited financial statements of Ignite US as at and for the year ended December 31, 2018.

For the purposes of the Pro Forma consolidated financial statements, the audited financial statements of Ignite US as at and for the year ended December 31, 2018 were translated from United-States dollars to Canadian dollars using an exchange rate of 1.36.

The unaudited pro forma consolidated statement of financial position is intended to reflect the financial position of the Company as if the Proposed Transactions had been effected on December 31, 2018.  The unaudited pro forma consolidated statement of financial position is not necessarily indicative of the financial position which would have resulted if the transaction had actually occurred on December 31, 2018.

The unaudited pro-forma consolidated statements of loss and comprehensive loss have been prepared as if the transactions described in Note 3 had occurred on January 1, 2018.

As a result of the Proposed Transactions, former shareholders of Ignite US will acquire control of the Company, and the Proposed Transactions will be accounted for as a reverse take-over that constitutes a business combination for accounting purposes and is accounted for using the acquisition method under IFRS 3.  Ignite US is deemed to be the acquiring company and its assets and liabilities, equity and historical operating results are included at their historical carrying values, and the net assets of the Company will be recorded at fair value as at the date of the Proposed Transactions.  Transaction costs that were incurred in connection with the Proposed Transactions, other than costs associated with financings, have been expensed as incurred.

It is management's opinion that the unaudited pro forma consolidated statement of financial position includes all adjustments necessary for the fair presentation, in all material respects, of the transactions described in Note 3 in accordance with IFRS applied on a basis consistent with Ignite US and the Company's accounting policies.

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The unaudited pro forma consolidated statement of financial position has been compiled using the significant accounting policies as set out in the audited financial statements of the Company and Ignite US as described in Note 3 to their audited financial statements for the 10 months ended December 31, 2018 and the year ended December 31, 2018, respectively.

4

**IGNITE INTERNATIONAL BRANDS, LTD**
Notes to the Pro Forma Financial Statements
(Unaudited)
(Expressed in Canadian Dollars)

**NOTE 3 – TRANSACTION**

On April 3, 2019, the Company entered into a business combination agreement (the "Agreement") with the shareholders of Ignite US pursuant to which the Company will acquire all the shares of Ignite US from the shareholders in exchange for shares of the Company (the "Transaction"). The Transaction will constitute a reverse take-over under the rules of the Canadian Securities Exchange (the "CSE").

Pursuant to the terms of the Agreement, the Company will create a new class of proportionate voting shares (the "**Proportionate Voting Shares**") and rename its current class of CSE-listed common shares as "**Subordinate Voting Shares**". The Proportionate Voting Shares and Subordinate Voting Shares will have the same rights, be equal in all respects and will be treated by the Company as if they were shares of one class only. Proportionate Voting Shares will at any time, at the option of the holder, and subject to certain conditions to ensure that the Company remains a "foreign private issuer" (as such term is defined in Rule 405 of Regulation C under the U.S. Securities Exchange Act of 1934 (the "**SEC Rules**")), be convertible into Subordinate Voting Shares at a ratio of 200 Subordinate Voting Shares for each Proportionate Voting Share. Prior to conversion, each Proportionate Voting Share will carry 200 votes per share (compared to one vote per Subordinate Voting Share). The Proportionate Voting Shares are being created in order for the Company to meet the definition of a "foreign private issuer" under the SEC Rules.

The Agreement provides that the Company shall, directly or indirectly, acquire all the Ignite US shares it does not already hold in exchange for 756,257 Proportionate Voting Shares and 67,681,000 Subordinate Voting Shares of the Company, which would result in Ignite US becoming a wholly-owned subsidiary of the Company. As a result, approximately 91.4% of the equity securities of the Company will be issued to Ignite US shareholders pursuant to the Transaction, and, following the Transaction, the existing Ignite US shareholders would hold approximately 95.6% of the equity securities of the Company (assuming in each case the conversion of all Proportionate Voting Shares into Subordinate Voting Shares). Dan Bilzerian, the Chairman of the Company, would hold not less than 62.4% of the issued and outstanding shares (assuming in each case the conversion of all Proportionate Voting Shares into Subordinate Voting Shares), on a non-diluted basis and excluding any shares issued pursuant to the brokered private placement (as described below).

On May 24, 2019, the Company and Ignite US completed a private placementfor gross proceeds of CAD$25.8 million.

The closing of the Transaction is subject to certain other conditions, including (i) the Company obtaining all requisite regulatory approvals from the CSE and any applicable Canadian securities regulatory authorities by May 29, 2019; and (ii) the Transaction closing by May 30, 2019.

**NOTE 4 – PRO FORMA ASSUMPTIONS AND ADJUSTMENTS**

The unaudited pro forma consolidated statement of financial position has been presented giving effect to the following assumptions and pro forma adjustments:

a)        **Transaction Financing**

The Company completed a private placement at a price of $1.50 per share for gross proceeds of of $25,800,000.

5

**IGNITE INTERNATIONAL BRANDS, LTD**
Notes to the Pro Forma Financial Statements
(Unaudited)
(Expressed in Canadian Dollars)

---

**NOTE 4 – PRO FORMA ASSUMPTIONS AND ADJUSTMENTS** (continued)

**b)**      **Proposed transaction**

The Proposed Transaction will be accounted for as a reverse take-over that constitutes a business combination and is accounted for using the acquisition method under IFRS 3, Business Combinations. As such, the unaudited pro forma consolidated statement of financial position is presented as a continuation of the financial statements of Ignite US.  The assets and liabilities of Ignite US are included in the unaudited pro forma consolidated statement of financial position at their historic cost values as at December 31, 2018.  The net assets of Ignite International are included in the unaudited pro forma consolidated statement of financial position at their fair values as at December 31, 2018.  The historical values of Ignite International's share capital, warrant reserve and deficit are eliminated.

Ignite International will issue 756,257 Proportionate Voting Shares and 67,681,000 Subordinate Voting Shares (Note 5) in exchange for all of the issued and outstanding shares of Ignite US, other than the Ignite US shares already held by the Company.

The shares deemed to be issued by Ignite US for the acquisition of Ignite International are recorded as additional amounts in shareholders' equity and are set out as follows along with a summary of the fair value of net identifiable assets acquired:

The purchase price is allocated as follows:

|  | Amount |
|---|---:|
|  | **($)** |
| Fair value of Ignite International shares[1] | 31,075,637 |
| Shares of Ignite US held by Ignite International[2] | 1,724,246 |
| Total consideration | **32,799,883** |
|  |  |
| Net identifiable assets (liabilities) of the Company |  |
|     Cash | 5,414,949 |
|     Receivables | 222,708 |
|     Advance | 12,321 |
|     Prepaid expenses | 118,062 |
|     Investments | 3,224,246 |
|     Promissory Notes | 7,182,956 |
|     Property and equipment | 45,974 |
|     Trade payables | (343,960) |
|     Subscriptions received in advance | (53,204) |
|  | **(15,824,052)** |
| Goodwill | **16,975,831** |

[1] 20,717,091 common shares at $1.50 per share
[2] As of December 31, 2018, Ignite International held a total of 5,000,000 common share of Ignite US with a value of $1,724,246

The Company expects to incur $500,000 in transactions costs related to the Proposed Transaction.

6

**IGNITE INTERNATIONAL BRANDS, LTD**
Notes to the Pro Forma Financial Statements
(Unaudited)
(Expressed in Canadian Dollars)

**NOTE 4 – PRO FORMA ASSUMPTIONS AND ADJUSTMENTS** (continued)

**c)**      **Elimination of intercompany loans**

Convertible note between the Company and Ignite in the amount of $5,272,877 including accrued interest are eliminated.

**NOTE 5 – PRO FORMA SHARE CAPITAL**

The number of shares issued and outstanding after giving effect to the assumptions and pro forma adjustments discussed in Note 4 is as follows:

|  | Note | Number ofShares | Amount |
|---|---|---|---|
|  |  |  | ($) |
| Ignite International common shares issued and outstanding at December 31, 2018 |  | 20,694,242 | 35,644,654 |
| Transaction financing –private placement | 4(a) | 17,200,000 | 25,800,000 |
| Subordinate voting shares issued to Ignite US shareholders in connection with the Transaction | 4(b) | 67,681,000 | 9,606,756 |
| Proportionate voting shares issued to Ignite US shareholders in connection with the Transaction (1) | 4(b) | 756,257 | 21,468,881 |
| Ignite US common shares issued and outstanding at December 31, 2018 |  |  | 30,091,128 |
| Adjustment for Transaction |  | - | (35,644,654) |
|  |  | 106,331,499 | 86,966,765 |

**NOTE 6 – INCOME TAXES**

The pro forma effective statutory Canadian income tax rate applicable to the consolidated operations subsequent to the completion of the Transaction is approximately 27%.

7